**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CHICKEN SOUP FOR THE SOUL ENTERTAINMENT INC., *et al.*,[1] | Case No. 24-11442 |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF WILLIAM J. ROUHANA, JR., CHAIRMAN OF
THE BOARD, IN SUPPORT OF
DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, William J. Rouhana, Jr., hereby declare under penalty of perjury:

1.      I am the Chairman of the Board (the "CSSE Board") and former Chief Executive Officer ("CEO") of debtor and debtor-in-possession Chicken Soup for the Soul Entertainment Inc. ("CSSE" and, together with each of CSSE's affiliated debtors and debtors-in-possession, the "Debtors" and, each individually, a "Debtor").  I served as Executive Chairman of CSSE's predecessor, Chicken Soup for the Soul Productions, LLC ("CSSP"), from December 2014 until the formation of CSSE in May 2016, when I transitioned to service as Chairman of CSSE.  I served as CEO of CSSP from 2008 through the formation of CSSE, when I transitioned to service as CEO of CSSE and CSSE's affiliated debtors.  I stepped down from the role of CEO on June 24, 2024, shortly prior to the commencement of the above-captioned chapter 11 cases, but remain a director

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number (where applicable), are: 757 Film Acquisition LLC (4300); Chicken Soup for the Soul Entertainment Inc. (0811); Chicken Soup for the Soul Studios, LLC (9993); Chicken Soup for the Soul Television Group, LLC; Crackle Plus, LLC (9379); CSS AVOD Inc. (4038); CSSESIG, LLC (7150); Digital Media Enterprises LLC; Halcyon Studios, LLC (3312); Halcyon Television, LLC (9873); Landmark Studio Group LLC (3671); Locomotive Global, Inc. (2094); Pivotshare, Inc. (2165); RB Second Merger Sub LLC (0754); Redbox Automated Retail, LLC (0436); Redbox Entertainment, LLC (7085); Redbox Holdings, LLC (7338); Redbox Incentives LLC (1123); Redwood Intermediate, LLC (2733); Screen Media Films, LLC; Screen Media Ventures, LLC (2466); and TOFG LLC (0508).  The Debtors' corporate headquarters and service address is 132 East Putnam Avenue, Floor 2W, Cos Cob, CT 06807.

of each of CSSE and the other Debtors.  In these roles, I have been responsible for overseeing the operations and financial activities of the Debtors.

2.      I have been involved in the media, entertainment, and communications industries for more than 35 years.  Prior to joining CSSP as CEO in 2008, I was the founder and CEO of Winstar Communications, a wireless broadband pioneer, and Winstar New Media, one of the earliest online content companies, from 1993 until 2001.  During my career, I led the acquisition of numerous media companies, including Virgin Vision, a Virgin Group worldwide film distribution venture, in the 1980s.  As an entertainment and finance lawyer from 1977 to 1985, I developed new film financing models for major producers.  I am a founder of The Humpty Dumpty Institute, which created the International Film Exchange, and the Co-Chairman of the Global Creative Forum, which connects the United Nations with major film and television executives, producers, and talent.  I received my bachelor's degree from Colby College, where I am Trustee Emeritus, and my *juris doctor* from Georgetown Law School.

3.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition (collectively, the "Petitions") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").  To minimize the potential adverse impact of the commencement of the above-captioned chapter 11 cases (these "Chapter 11 Cases"), the Debtors have requested certain "first day" relief in various applications and motions filed with the Court, each of which is listed in Section IV below (collectively, the "First Day Motions").  The First Day Motions seek relief intended to avoid irreparable harm to the Debtors and preserve the Debtors' value by, among other things, paying certain prepetition and administrative obligations to ensure the success of the Debtors' restructuring efforts, and obtaining procedural relief that facilitates the Debtors' orderly

transition into and emergence from these Chapter 11 Cases.  The relief is critical to the Debtors' restructuring efforts.

4.      As a result of my work as Chairman and CEO of the Debtors, my review of relevant documents, and my discussions with other members of the Debtors' management and advisory teams, I am familiar with the Debtors' businesses, financial conditions, policies and procedures, day-to-day operations, and books and records.  I also am familiar with the Debtors' recent restructuring efforts, transaction efforts, and related strategies.  Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' management or retained advisors that report to me in the ordinary course of my responsibilities.  References to the Bankruptcy Code, the chapter 11 process, and related legal issues are based on my understanding of such matters, as explained to me by counsel.

5.      I am over the age of 18 and authorized to submit this declaration (the "First Day Declaration") on behalf of the Debtors.  I submit this First Day Declaration to assist the Court and other parties in interest understand the circumstances leading to the commencement of these Chapter 11 Cases and in support of the First Day Motions.  If called upon to testify, I would testify competently to the facts set forth in the First Day Declaration.

## I.
## INTRODUCTION

6.      The Debtors provide premium entertainment content to value-conscious consumers. The Debtors comprise one of the largest advertising-supported video-on-demand companies in the United States, with three flagship streaming services: *Redbox*, *Crackle*, and *Chicken Soup for the Soul*.  In addition, through Debtor Redbox Automated Retail LLC ("RBAR"), the Debtors operate (i) Redbox Free Live TV, a free ad-supported streaming television service with approximately 180 channels, (ii) a transaction video-on-demand service, and (iii) a network of approximately 24,000

kiosks across the United States for DVD rentals (collectively, "Redbox").  To provide original and exclusive content to their viewers, the Debtors create, acquire, and distribute films and television series through Debtors Screen Media Ventures, LLC ("Screen Media"), Chicken Soup for the Soul Television Group, LLC ("CSSTV"), Landmark Studio Group, LLC, and each of their subsidiaries.

7.      As explained more fully below, prior to the commencement of these Chapter 11 Cases, the Debtors have experienced liquidity challenges which the Debtors have asserted were proximately caused by repeated commercially unreasonable failures and refusals by their Pre-Petition Lenders (as defined below) to live up to their obligations, resulting in asserted defaults and/or contractual terminations across critical content and service providers, thereby impacting the Debtors' ability to procure and monetize content efficiently across their valuable distribution platforms.

8.      The Debtors, in consultation with their advisors, ultimately determined that the best path forward was the commencement of these Chapter 11 Cases to implement a sequenced recapitalization plan for certain of the Debtors' businesses; orderly sales of certain of the Debtors' businesses; settlement of the Debtors' debts; and potential prosecution of adversary proceedings seeking redress for damages caused to the Debtors prior to the Petition Date.  The Debtors believe that this process will provide maximum value to all stakeholders.

## II.
## BACKGROUND

**A.     The Debtors**

9.      CSSE is a Delaware corporation formed on May 4, 2016.  CSSE is an indirect subsidiary of Chicken Soup for the Soul, LLC ("CSS"), which publishes the famous *Chicken Soup for the Soul* book series and produces super-premium pet food under the *Chicken Soup for the Soul* brand name.  CSSE became a publicly traded company in 2017 (ticker:  CSSE).

10.     CSSE currently owns or controls, directly or indirectly, each of the other Debtors.  Effective the morning of June 28, 2024, 2024, the board of directors was reconstituted with the reappointment of former director Chris Mitchell and the appointment of new directors Bart M. Schwartz, Joshua Mandel, and Steven Goldsmith.  In addition, William J. Rouhana, Jr. has at all times served as a director and Chairman of the Board of CSSE.  A summary chart depicting the Debtors' corporate structure is attached as Exhibit A.  All non-debtor direct and indirect subsidiaries of CSSE depicted on the corporate organizational chart are shell entities that do not have any assets, revenues, or business operations.

11.     Non-debtor CSSP is the parent and controlling stockholder of CSSE.  Non-debtor CSS owns 100% of the membership interests in CSSP.  CSSE is a public reporting company with the United States Securities and Exchange Commission (the "SEC").  As a result, the beneficial ownership of CSSE is widely dispersed and constantly changing; however, Mr. Rouhana directly or indirectly owns or controls (including through his interest in CSSP) approximately 79.7% of the voting power represented by CSSE's outstanding Series A common stock and Series B common stock.

**B.      The Business**

12.     CSSE provides premium content to value-conscious consumers, and is one of the largest advertising-supported video-on-demand (AVOD) companies in the US, with three flagship AVOD streaming services: Redbox, Crackle and Chicken Soup for the Soul. In addition, the Company operates Redbox Free Live TV, a free ad-supported streaming television (FAST) service with nearly 170 channels as well as a transactional video-on-demand (TVOD) service, and a network of approximately 24,000 kiosks across the U.S. for DVD rentals.

13.     To provide original and exclusive content to its viewers, the Company creates, acquires, and distributes films and TV series through its Screen Media and Chicken Soup for the

Soul TV Group subsidiaries. The Company's best-in-class ad sales organization is known to advertisers as Crackle Connex, a sales platform of unique scale and differentiated reach. Across Redbox, Crackle, Chicken Soup for the Soul and Screen Media, the Company has access to approximately 50,000 content assets, with approximately 60,000 programming hours.

14.     Our AVOD services boast approximately 40 million monthly active users and are distributed through every major distribution platform including Roku, Amazon Fire TV, Samsung, Vizio, Xbox, PlayStation and many more. Our consumers view content produced through our various television production affiliates, acquired by Screen Media, or licensed from Sony Pictures Television (SPT), Lionsgate, Paramount, Fox, Warner Bros. Discovery, Disney and other production and distribution companies, as well as through our media partners. Crackle is among the most watched ad-supported independent VOD streaming services and has multiple branded FAST networks, all of which offer consumers free TV series and movies. Crackle is known for premium original and acquired content that delivers audiences of scale across a demographic spectrum.

15.     The Debtors' current business operations comprise the following four business segments: (i) streaming services, including advertising-supported video-on-demand ("AVOD") services, transaction video-on-demand ("TVOD") services, and free ad-supported streaming television ("FAST"); (ii) physical media rentals via Redbox kiosks and related kiosk services; (iii) content acquisition and distribution; and (iv) content production.

16.     The Debtors collectively own a large, high-quality content library consisting of approximately 28,000 film titles and approximately 40,000 episodes of television.  The Debtors low-risk content acquisition model and growing intellectual property library ownership drive

higher margins.  Several of the Debtors maintain television and film libraries that are managed and distributed to exhibitors and third-party networks via Screen Media.

(a)    Screen Media manages one of the industry's largest independently owned television and film libraries consisting of approximately 20,000 films and television program**s**.  Screen Media also acquires approximately 10 to 20 new feature films and a few hundred genre titles each year.

(b)    Screen Media's subsidiary, 1091 Pictures, has a library of approximately 4,000 films and television programs.

(c)    Debtor Halcyon Television, LLC ("Halcyon Television") manages the extensive film and television library acquired from Sonar in 2021.  This library is distributed by Screen Media and contains approximately 1,000 titles and thousands of hours of programming, ranging from classics, including *The Little Rascals*, *Laurel & Hardy*, and *Blondie*, to acclaimed epic event mini-series such as *Lonesome Dove* and *Dinotopia*.  Halcyon Television library titles have received 446 Emmy Award nominations, 105 Emmy Awards, and 15 Golden Globe Awards.

(d)    Other films and televisions shows are owned by CSSE, 757 Film Acquisitions LLC, Landmark Studio Group LLC, and Chicken Soup for the Soul Studios, LLC.

17.    Screen Media and 1091 Pictures distribute the films and television series owned by themselves and other Debtor affiliates through the Debtors' TVOD, AVOD, FAST, and DVD rental services.  Screen Media and 1091 Pictures also distribute their libraries to other exhibitors and third-party networks to generate additional revenue and operating cash flow.  To that end, Screen Media and 1091 Pictures are party to certain license agreements and distribution agreements with television and film producers that provide Screen Media and 1091 Pictures with rights to exhibit content through the Debtors' platforms and/or to third-party networks.  The terms of the agreements vary.  Some agreements require Screen Media and 1091 Pictures to pay an advance before the content is produced; some agreements require a fee when the content is delivered; and others require Screen Media and 1091 Pictures to pay a portion of the revenue generated from the content.

18.    Finally, the Debtors produce films and television series through Debtors Chicken Soup for the Soul Studios, LLC, Halcyon Studios, LLC, Landmark Studio Group LLC, and Locomotive Global Inc.  These entities house the Debtors' film and television production activities and produce or co-produce original content for the Debtors' streaming platforms as well as content for other third-party networks.  As an example, Halcyon Studios, LLC develops, produces, finances, and/or distributes high-caliber scripted content for all platforms across a broad spectrum in the United States and internationally, including premium series such as *Hunters* (Amazon Prime) and *Mysterious Benedict Society* (Disney+).

**C.    The Senior Secured Indebtedness**

19.    CSSE and Redbox, as borrowers (together, the "Pre-Petition Borrowers"), the certain lenders party thereto from time to time (the "Pre-Petition Lenders"), and HPS Investment Partners, LLC ("HPS"), as administrative and collateral agent (in such capacities, the "Pre-Petition Agent" and, collectively with the Lenders, the "Pre-Petition Secured Parties"), are each party to that certain *Amended and Restated Credit Agreement* dated as of August 11, 2022 (as the same may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Pre-Petition Credit Agreement" and, together with all related loan documents, the "Pre-Petition Loan Documents").

20.    Pursuant to the Pre-Petition Loan Documents, the Pre-Petition Lenders provided to, and for the account of, the Pre-Petition Borrowers:  (i) a term loan facility consisting of the assumption by CSSE of all "Senior Obligations" under the pre-Redbox Acquisition credit facility between Redbox and HPS in the approximate amount of $357.5 million (the "Pre-Petition Term Loan Facility"); (ii) $31.7 million funded under an $80 million revolving credit facility (the "Pre-Petition Revolving Loan Facility"); (iii) outstanding letters of credit (the "Pre-Petition Letters of Credit" and, collectively with the Pre-Petition Term Loan Facility and the Pre-Petition Revolving

Loan Facility, the "Pre-Petition Obligations"), and (iv) other financial accommodations (collectively with the Pre-Petition Obligations, the "Pre-Petition Secured Facility"). The Pre-Petition Revolving Loan Facility matures on February 11, 2025, and the Pre-Petition Term Loan Facility matures on August 11, 2027. The Debtors drew down another $25.9 million on the Pre-Petition Revolving Loan Facility contemporaneously with that closing, and on September 19, 2022, made an additional draw under the Pre-Petition Revolving Loan Facility of $22.3 million.

21.     The Pre-Petition Secured Facility is guaranteed by each of CSSE's existing and future direct and indirect material, wholly-owned domestic subsidiaries, subject to certain exceptions (collectively, the "Pre-Petition Guarantors"). The Pre-Petition Obligations are secured by first priority security interests in and liens upon substantially all of the assets of the Pre-Petition Borrowers and the Pre-Petition Guarantors in existence as of the Petition Date (collectively, the "Pre-Petition Collateral") subject only to certain permitted liens and encumbrances as more fully set forth in the Pre-Petition Loan Documents.

22.     As of April 29, 2024, HPS asserted that $500,876,623.42 in outstanding principal was due and owing under the Pre-Petition Secured Facility, plus fees, expenses, interest (including default interest) and other amounts that are chargeable or otherwise reimbursable under the Pre-Petition Loan Documents.

### III.
### EVENTS LEADING TO THE CHAPTER 11 FILING

23.     In connection with CSSE's acquisition of the Redbox business in August 2022, CSSE and its subsidiaries assumed and become co-obligors on approximately $359.9 million of indebtedness under the Pre-Petition Secured Facility. The ability to service this debt was predicated on a partial return to pre-COVID levels in the number and cadence of theatrical releases

that were available to the company for its kiosk network, as well as cost synergies. The corresponding rebound in demand for physical kiosk rentals was expected to return to approximately one-third of 2019 levels. Along with expected synergies from the Redbox Acquisition, the post-COVID rebound in demand for physical kiosk rentals was expected to generate sufficient cash flows to cover the cash needs of the combined businesses.

24.     The Debtors' operating plan and budget called for the Debtors to obtain a working capital loan of up to $40 million secured by a first lien on the Debtors' accounts receivable. A working capital loan meeting these criteria is specifically contemplated under the terms of the Pre-Petition Credit Agreement and was believed at the time to be sufficient to enable the Debtors to take advantage of the expected rebound in theatrical releases in the late spring of 2023.

25.     Although CSSE was offered a loan facility by a reputable private lending fund on terms compliant with the Pre-Petition Credit Agreement, the new loan facility was not approved by the Pre-Petition Agent. Thus, as the flow of theatrical releases began to increase following COVID, the Debtors' inability to secure the accounts receivable loan hampered their ability to pay for and secure new content, which began to strain relationships with the Debtors' creditors, including content providers. As a result, the Debtors were unable to pay for all the movies that were offered by their providers, and operating results failed to meet management's expectations, particularly in Redbox's kiosk rentals, resulting in insufficient cash flows and working capital to operate the business efficiently.[2]

---

[2] In the interest of brevity and circumscribing the contents of this Declaration to solely those of most relevance to approval of the First Day Motions, the majority of facts, circumstances, and consequences of the Pre-Petition Lenders' wrongdoing are omitted from this Declaration. Consequently, the recitations herein shall not be taken as a full exposition of the facts and circumstances surrounding the Debtors' interactions with the Pre-Petition Lenders, and the Debtors expressly reserve their rights to supplement such recitations in future submissions.

26.     As of June 30, 2023, the Debtors' cash position and available capital resources as compared to current obligations required the Debtors to raise significant additional capital through one or more financing transactions.  The Debtors considered accounts receivable financing, asset sales, sales of equity or debt, or a combination of the foregoing.  Around the same time, the Debtors launched cost reduction initiatives to reduce forward operating expenses and to improve operational cash flow, including, but not limited to, (i) optimizing their kiosk network, (ii) evaluating and implementing workforce reductions across their supply chain and corporate teams, and (iii) maximizing cost synergies among entities.  Further, the Debtors' indirect parent company, CSS, agreed that it would defer payment of 25% of the cash portion of the fees payable by CSSE under the Management Agreement and the License Agreement for up to 12 months.

27.     To partially replace the working capital shortfall resulting from the lack of a working capital loan, the Debtors factored short-dated receivables, but were unable to factor their long-term receivables (which were expected to create additional liquidity generally sufficient to cover the shortfall).

28.     In August 2023, given an increased level of strategic opportunities, the Debtors began to evaluate transactions that management believed were available to the Debtors and to consider various ways to unlock maximum value.

29.     The Debtors evaluated a number of strategic initiatives that management believed could provide sufficient financing to fund operations.  In the fall of 2023, the Debtors: (i) retained an investment banker, Solomon Partners, and other advisors to help sell assets and to assess strategic alternatives to maximize value; (ii) procured three additional non-binding term sheets from third-party lenders, two for $50 million each and one for $145 million to provide additional financing that the Debtors believed would be sufficient to fund future operations if and when

closed; and (iii) engaged in discussions to modify the terms of the Pre-Petition Credit Agreement, including (a) allowing the Debtors to close up to an additional $195 million of financing, (b) extending terms under the Pre-Petition Credit Agreement, and (c) converting the Pre-Petition Obligations into a minority and noncontrolling interest in the Class A common stock of CSSE.

30.     Although CSSE raised $5.9 million through private placements of its Series A Preferred Stock in the fourth quarter of 2023, the Debtors' capital resources continued to deteriorate, including through their inability to proceed productively with any of the aforementioned financing opportunities due to the unwillingness of their Pre-Petition Lenders to cooperate reasonably in such refinancings.

31.     As a result of the Debtors' diminished capital position, the Debtors received an increasing number of termination and/or non-renewal notices from content suppliers and other service providers, including receiving default notices under certain of its leases (office, distribution facility, and its car fleet).  The Debtors' inability to timely pay content providers has materially diminished the content available across the Debtors' distribution platforms and had significant adverse effects on the Debtors' overall business and financial condition.

32.     The combination of these factors has resulted in asserted defaults and/or contractual terminations across critical content and service providers, impacting the Debtors' ability to procure and monetize content efficiently across their distribution platforms.  Due to the on-going impact of these factors on the Debtors' current and future results of operations, cash flows, and financial condition, the Debtors opted to commence these Chapter 11 Cases.

### IV.
### DEBTORS' CHAPTER 11 STRATEGY AND FIRST DAY MOTIONS

33.     The Debtors commenced these Chapter 11 Cases to avail themselves of the protections and "breathing room" that chapter 11 is intended to provide.  Through these Chapter

11 Cases, the Debtors aim is to preserve the intrinsic value of the Debtors' business for the benefit of their stakeholders through a sequenced recapitalization plan for certain of the Debtors' businesses; orderly sales of certain of the Debtors' businesses; settlement of the Debtors' debts; and potential prosecution of adversary proceedings seeking redress for damages caused to the Debtors prior to the Petition Date

34.     To enable the Debtors to fund these Chapter 11 Cases and to support the Debtors' sale efforts, Owlpoint IP Opportunities JVF I LP ("Owlpoint") has agreed to provide the Debtors up to $20 million in postpetition, superpriority secured funding (the "DIP Facility").  The DIP Motion (as defined below) explains the terms of the proposed DIP Facility, pursuant to which Owlpoint will provide the Debtors with a superpriority senior secured credit facility, the full $20 million of which will be made available upon interim approval by the Court in two $10 million one-week tranches.

35.     In connection with the filing of their Petitions, the Debtors filed the below-listed First Day Motions, which request relief that the Debtors believe is necessary to enable them to administer their estates with minimal disruption and loss of value during these Chapter 11 Cases. The Debtors believe that the relief requested in the various First Day Motions appropriately balances the need for the Debtors to swiftly proceed with their operations and sale efforts with the due process and notice required under the Bankruptcy Code, Bankruptcy Rules, and Local Rules. The facts set forth in each of the First Day Motions are incorporated herein in their entirety.

A.     **Administrative Motions:**

- Joint Administration Motion. *Debtor's Motion for Entry of an Order Authorizing Joint Administration of the Debtors' Chapter 11 Cases*;

- Consolidated Creditors' List Motion. *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (B) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, and (C) Redact or Withhold*

*Publication of Certain Personally Identifiable Information, (II) Approving the Master Service List, (III) Waiving the Requirement to File the List of Equity Security Holders, and (IV) Granting Related Relief*;

- Kroll Application.  *Debtors' Application for Entry of an Order (I) Approving the Retention and Appointment of Kroll Restructuring Administration LLC as the Claims and Noticing Agent Effective as of the Petition Date, and (II) Granting Related Relief*;

- Schedules and SOFAs Extension Motion.  *Debtors' Motion for Entry of an Order Under 11 U.S.C. §§ 105(a) and 521 Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs*;

**B.    Operational Motions Requiring Immediate Relief:**

- DIP Financing Motion.  *Debtors' Motion for Entry of Interim and Final Orders Under 11 U.S.C. §§ 105, 361, 362, 363 and 364 (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Liens and Superpriority Administrative Expense Claims to Post-Petition Lenders, and (C) Utilize Cash Collateral; (II) Providing Adequate Protection to the Pre-Petition Secured Parties; (III) Modifying the Automatic Stay; (IV) Granting Related Relief, Pursuant to 11 U.S.C. Sections 105, 361, 362, 363, 364 and 507; and (V) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2; and (III) Granting Related Relief*;

- Cash Management Motion.  *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of Cash Management System, Bank Accounts, and Business Forms and Payment of Related Prepetition Obligations; (II) Waiving the Requirements of 11 U.S.C. § 345(b); (III) Authorizing Continued Performance of Intercompany Transactions; and (IV) Granting Related Relief*;

- Wages and Benefits Motion.  *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Reimbursable Expenses, and Other Obligations on Account of Compensation and Benefits Programs and (B) Continue Compensation and Benefits Programs; and (II) Granting Related Relief*;

- Management Services Fee Motion.  *Debtor's Motion For Entry Of Interim And Final Orders Authorizing The Debtors To Continue Ordinary Course Business Relationship Under Management Services Agreement And License Agreement With Parent Company*.

36.    The First Day Motions request authority to, among other things, enter into the DIP Credit Facility and continue to use the Debtors' cash collateral, honor workforce-related compensation and benefits obligations, pay claims of certain critical vendors, suppliers, and taxing

authorities, continue to honor customer programs, and continue the Debtors' cash management system and other operations in the ordinary course of business to ensure minimal disruption of the Debtors' business operations during these Chapter 11 Cases.  For the avoidance of doubt, the Debtors request authority, but not direction, to pay amounts or satisfy obligations with respect to the relief requested in the First Day Motions.

37.     The Debtors have narrowly tailored their requests for immediate relief to those circumstances when the failure to receive such relief would cause immediate and irreparable harm to the Debtors and their estates.  I believe an ordinary transition into chapter 11 is critical to the viability of the Debtors' operations and that any delay in granting the relief described below could hinder the Debtors' operations and cause irreparable harm.  Other requests for relief will be deferred for consideration at a later hearing.

38.     I have reviewed each of the First Day Motions and am familiar with the content and substance contained therein.  The facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on other corporate officers and advisors and I can attest to such facts.  I believe that the relief sought in each First Day Motion: (i) will enable the Debtors to continue operations with minimal disruptions, (ii) is critical to ensure the maximization of value of the Debtors' estates through preserving customer, supplier, and other partner relationships, among other things, (iii) is essential to achieving a successful restructuring, and (iv) best serves the interests of the Debtors' estates and creditors.

## V.
## CONCLUSION

39.     The Debtors' ultimate goal in these Chapter 11 Cases is to preserve the intrinsic value of the Debtors' business for the benefit of their stakeholders through a sequenced recapitalization plan for certain of the Debtors' businesses; orderly sales of certain of the Debtors'

businesses; settlement of the Debtors' debts; and potential prosecution of adversary proceedings seeking redress for damages caused to the Debtors prior to the Petition Date.  To minimize any loss of value, the Debtors' immediate objective is to maintain a business-as-usual atmosphere during the course of these Chapter 11 Cases, with as little interruption or disruption to the Debtors' operations as possible.

40.    I believe that, if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving these objectives and completing a successful restructuring will be substantially enhanced.

[*signature page to follow*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: June 28, 2024

_____
William J. Rouhana, Jr.
Chairman of the Board of Directors of Chicken
Soup for the Soul Entertainment Inc.
and its debtor affiliates

[*Signature Page to Declaration*]

**EXHIBIT A**

Corporate Structure Chart

(Attached)



Chicken Soup for the Soul Holdings, LLC

Chicken Soup for the Soul, LLC

Chicken Soup for the Soul Productions, LLC

Other Common and Preferred Shareholders

Chicken Soup for the Soul Entertainment Inc.

BD Productions, LLC
PH2017, LLC
VRPTC, LLC
VRP2018, LLC
RSHOOD 2017, LLC
The Fixer 2018, LLC
GFBS2, LLC
A Sharp Inc.

CSSESIG, LLC
95% CSS AVOD Inc.
Crackle Plus, LLC
Halcyon Television, LLC
33.5% Parkside Entertainment Inc.
Pivotshare, Inc.
Powerslam, LLC

Screen Media Ventures, LLC
757 Film Acquisition LLC
Digital Media Enterprises LLC
Screen Media Films, LLC
TOFG LLC
SMV Content, LLC

Landmark Studio Group LLC
ITBB, LLC
Safehaven 2020 Inc
LSG2020, Inc.

RB Second Merger Sub LLC
Redwood Intermediate, LLC
Redbox Automated Retail, LLC
Redbox Incentives LLC
Redbox Holdings, LLC
Redbox Entertainment, LLC

Chicken Soup for the Soul Television Group, LLC
Halcyon Studios, LLC
51% Locomotive Global, Inc.
99.99% Locomotive Global Media LLP
Chicken Soup for the Soul Studios, LLC
Pet Caves, LLC
LGBT Talk, LLC
Wedding Productions LLC
At Home With, LLC
Dirty Pool, LLC
Mutual Aid LLC

## Legend

Debtor    Non-Debtor

HPS Borrower    HPS Guarantor    Non-HPS Obligor