## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>CHICKEN SOUP FOR THE SOUL<br>ENTERTAINMENT, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-11442<br><br>(Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS UNDER 11 U.S.C. §§ 105, 361, 362, 363 AND 364 (I) AUTHORIZING THE DEBTORS, ON A FINAL AND INTERIM BASIS, TO (A) OBTAIN POST-PETITION FINANCING, (B) GRANT LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS TO POST-PETITION LENDERS, AND (C) UTILIZE CASH COLLATERAL; (II) PROVIDING ADEQUATE PROTECTION TO THE PRE-PETITION SECURED PARTIES; (III) MODIFYING THE AUTOMATIC STAY; (IV) GRANTING RELATED RELIEF, PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 362, 363, 364 AND 507; AND (V) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE <u>4001 AND LOCAL RULE 4001-2; AND (VI) GRANTING RELATED RELIEF</u>**

The debtors and debtors in possession in the above-captioned cases (collectively, the "<u>Debtors</u>") hereby move (the "<u>Motion</u>") pursuant to sections 105, 361, 362, 363 and 364 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rule 4001-2(a)(i) and (ii) of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court of the District of Delaware (the "<u>Local Rules</u>") for the entry of an interim order (the "<u>Interim Order</u>") and a final order (the "<u>Final Order</u>"):

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number (where applicable), are: 757 Film Acquisition LLC (4300); Chicken Soup for the Soul Entertainment Inc. (0811); Chicken Soup for the Soul Studios, LLC (9993); Chicken Soup for the Soul Television Group, LLC; Crackle Plus, LLC (9379); CSS AVOD Inc. (4038); CSSESIG, LLC (7150); Digital Media Enterprises LLC; Halcyon Studios, LLC (3312); Halcyon Television, LLC (9873); Landmark Studio Group LLC (3671); Locomotive Global, Inc. (2094); Pivotshare, Inc. (2165); RB Second Merger Sub LLC (0754); Redbox Automated Retail, LLC (0436); Redbox Entertainment, LLC (7085); Redbox Holdings, LLC (7338); Redbox Incentives LLC (1123); Redwood Intermediate, LLC (2733); Screen Media Films, LLC; Screen Media Ventures, LLC (2466); and TOFG LLC (0508).  The Debtors' corporate headquarters and service address is 132 East Putnam Avenue, Floor 2W, Cos Cob, CT 06807.

(1)     authorization and approval for the Debtors to obtain up to $20,000,000.00 in post-petition financing and other financial accommodations in connection with the debtor-in-possession financing (the "DIP Facility"), but only up to $10,000,000 on an interim basis pursuant to and in accordance with an DIP Budget and the terms and conditions set forth on the Summary of Terms and Conditions (the "DIP Term Sheet") substantially in the form as filed with the Court and attached as **Exhibit 1** to the proposed Interim Order, by and among the Debtors, as borrowers and guarantors, Owlpoint IP Opportunities JVF I LP, on its own behalf or, on behalf of its managed accounts, funds, and affiliated (collectively, the "DIP Lender");

(2)     authorization for the Debtors to use the proceeds of the DIP Facility and the Pre-Petition Collateral, including Cash Collateral (as defined below), in accordance with the terms of the Interim Order and the DIP Loan Documents (as defined below), and as limited by the DIP Budget (as defined below), for, *inter alia*: (a) general operating, corporate, and working capital purposes of the Debtors in the ordinary course of business; (b) the costs and expenses of administering the Chapter 11 Cases; (c) payment of Adequate Protection Obligations (as defined below) and other payments as authorized by and provided in the Interim Order; and (d) reasonable and documented costs, fees, and other expenses;

(3)     approval of and authorization for Debtors to (a) enter into, execute, and perform under (i) the DIP Term Sheet and (ii) all security agreements, pledge agreements, notes, guarantees, mortgages, deeds of trust, control agreements, Uniform Commercial Code financing statements, certificates, reports, and other agreements, documents, and instruments either or both executed and/or delivered with or to the DIP Lender in connection with or related thereto (collectively, as amended, modified, supplemented, extended, restated or replaced from time to time, the "DIP Loan Documents") and (b) take and perform all other acts and steps as may be required or contemplated by or in connection with the DIP Loan Documents and the Interim Order;

(4)     granting to the DIP Lender first priority, priming, valid, perfected, and enforceable Liens (as defined in Bankruptcy Code section 101(37)) in and upon all of the DIP Collateral (as defined below), subject only to the Carve-Out (as defined below) and any Permitted Liens (as defined below), to secure principal of, and accrued interest on, amounts advanced to the Borrowers under the DIP Facility, in respect of letters of credit deemed issued under the DIP Term Sheet as provided in the Interim Order, and all other fees, indemnification obligations, reimbursement obligations, any other obligations arising under the DIP Term Sheet, and all other obligations whether due or to become due, absolute or contingent, under or in connection with the DIP Loan Documents (collectively, the "Post-Petition Obligations"), as provided by and more fully defined in, the DIP Loan Documents;

(5)     granting to the DIP Lender allowed superpriority administrative expense claim status for the Post-Petition Obligations pursuant to section 364(c)(1) of the Bankruptcy Code, subject only to the Carve-Out, in accordance with the terms of the Interim Order;

(6)     authorizing the Debtors' use in accordance with the terms of the DIP Loan Documents and as limited by the DIP Budget of all property constituting "cash collateral" ("Cash Collateral"), as such term is defined in Bankruptcy Code section 363(a), and will include, without limitation, all cash and cash equivalents of the Debtors, whenever or wherever acquired, and the proceeds of all collateral pledged to the Pre-Petition Agent (as defined below) and to the DIP Lender, all in accordance with the terms set forth herein;

(7)     granting adequate protection, including, without limitation, Adequate Protection Liens and Adequate Protection Claims to (a) HPS Investment Partners LLC, in its capacity as administrative agent (in such capacity, the "Pre-Petition Agent") under that certain *Amended and Restated Credit Agreement* dated as of August 11, 2022 (as amended, restated, amended and restated, modified, supplemented, or extended from time to time, the "Pre-Petition Credit Agreement") by and among the Debtors, the Pre-Petition Agent, and the financial institutions party thereto from time to time (collectively, the "Pre-Petition Lenders," and together with the Pre-Petition Agent and any financial institution (including, without limitation, any Pre-Petition Lender or the Pre-Petition Agent or any of their affiliates) that provided bank products to the Debtors prior to the Petition Date as contemplated and further provided for in the Pre-Petition Credit Agreement, collectively referred to as the "Pre-Petition Secured Parties"), and all security agreements, pledge agreements, notes, mortgages, guarantees, control agreements, collateral access agreements, subordination agreements, and related agreements and documents (collectively, with the Pre-Petition Credit Agreement, all "Loan Documents" as defined in the Pre-Petition Credit Agreement, and each "Bank Product Agreement" as defined in the Pre-Petition Credit Agreement (as it relates to any Pre-Petition Obligations (as defined below) constituting "Bank Product Obligations" as defined in the Pre-Petition Credit Agreement), as each may have been amended, modified, supplemented, extended, restated, or replaced from time to time, the "Pre-Petition Loan Documents"), and (b) the Pre-Petition Lenders, all such adequate protection with the priority set forth in the Interim Order and otherwise in accordance with the terms set forth in the Interim Order, with respect to the use and aggregate diminution in the value of their respective interests in the Collateral, including the Cash Collateral;

(8)     approving the application of collections and proceeds of all of the Pre-Petition Collateral (as defined below) and DIP Collateral (as defined below) and the payment of Pre-Petition Obligations (as defined below) and Post-Petition Obligations in the manner and on the terms set forth in the DIP Term Sheet and the Interim Order (and, as applicable, by the Final Order);

(9)     subject to and upon entry of a Final Order, the waiver of (a) the ability of the Debtors and their bankruptcy estates (as defined under Bankruptcy Code section 541, the "Estates") to surcharge against the DIP Collateral and the Pre-Petition Collateral pursuant to Bankruptcy Code section 506(c), (b) the applicability of the "equities of the case" exception under Bankruptcy Code section 552(b) with respect to the proceeds, products, offspring or profits of the Pre-Petition Collateral, and

(c) the equitable doctrine of "marshaling" and any similar equitable doctrine with respect to any of the DIP Collateral or the Pre-Petition Collateral;

(10)    modifying the automatic stay imposed by Bankruptcy Code section 362 to the extent hereinafter set forth and waiving the fourteen (14) day stay provisions of Bankruptcy Rule 4001(a)(3);

(11)    approving the Break-Up Fee (as defined herein) for the proposed DIP Lender;

(12)    waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order;

(13)    scheduling a second interim hearing on the Motion (the "Second Interim Hearing") to consider interim approval of the remaining $10,000,000 portion of the of the proposed DIP Facility; and

(14)    scheduling a final hearing on the Motion ("Final Hearing") to consider the relief requested in the Motion and entry of a Final Order and approving the form of notice with respect to the Final Hearing.

In support of the Motion, the Debtors rely on the *Declaration of William J. Rouhana, Jr., Chairman of the Board, in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First-Day Declaration") filed contemporaneously herewith, and respectfully represent as follows:

## JURISDICTION AND VENUE

1.    The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Pursuant to Local Rule 9013-1(f), the Debtors consent to entry of a final Order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final Orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.    Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested by this Motion are sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, and such relief is warranted under Bankruptcy Rules 2002 and 4001 and Local Rule 4001-2(a)(i).

## BACKGROUND

### A.      General Background

4.      On June 28, 2024, and June 29, 2024 (as applicable, the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned cases (collectively, the "Chapter 11 Cases"). The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code. No official committees have been appointed in the Chapter 11 Cases, and no request has been made for the appointment of a trustee or an examiner.

5.      Contemporaneously herewith, the Debtors have filed, or will file, a motion requesting joint administration of the Chapter 11 Cases under Bankruptcy Rule 1015(a).

6.      Additional information regarding the Debtors' business, their capital structure, and the circumstances leading to the filing of the Chapter 11 Cases is set forth in the First Day Declaration.

### B.      The Debtors' Pre-Petition Indebtedness

#### i.      The Secured Credit Agreements

7.      Redbox Automated Retail, LLC, a Delaware limited liability company (the "Original Borrower"), Redwood Intermediate, LLC, the lenders party thereto (the "Existing Lenders") and HPS Investment Partners, LLC, as administrative agent and collateral agent entered in that certain Credit Agreement, dated as of October 20, 2017. The Original Credit Agreement (as defined below) was amended by that certain Incremental Assumption and Amendment

Agreement dated as of September 7, 2018, that certain Amendment No. 2 dated as of September 30, 2020, that certain Amendment No. 3 dated as of December 28, 2020, that certain Incremental Assumption and Amendment Agreement No. 4 dated as of January 29, 2021, that certain Amendment No. 5 dated as of May 16, 2021, that certain Consent Agreement to Amendment No. 5 to the Credit Agreement dated October 11, 2021, and that certain Incremental Assumption and Amendment Agreement No. 6 dated as of April 15, 2022 and as may be further amended or modified prior to the effectiveness of this Agreement (the "Original Credit Agreement").

8.      The Debtor and the Original Borrower (individually, a "Borrower" and, collectively, the "Borrowers") and certain Lenders party thereto from time to time, and HPS Investment Partners, LLC ("HPS"), as administrative agent (in such capacity, the "Pre-Petition Administrative Agent") for the Pre-Petition Lenders and Pre-Petition Collateral Agent entered into that certain Amended and Restated Credit Agreement, dated as of August 11, 2022 (the "Pre-Petition Credit Agreement").

9.      Pursuant to the terms of the Pre-Petition Credit Agreement,

10.     CSSE and its non-Redbox affiliates assumed the pre-existing obligations of Redbox under the Original Credit Agreement, including the assumption of (i) a term loan facility representing all "Senior Obligations" under the pre-Redbox Acquisition credit facility between Redbox and HPS in the approximate amount of $357.5 million; (ii) $31.7 million funded under an $80 million revolving credit facility; (iii) outstanding letters of credit, and (iv) other financial accommodations (collectively, the "Pre-Petition Senior Facilities").

11.     Interest is payable on the Pre-Petition Senior Facilities entirely in cash or, for a period of up to 18 months, could be paid by increasing the principal amount of the Senior Facilities (PIK Interest), or through a combination of cash and PIK Interest.  The applicable margin for

borrowings under the Amended Credit Agreement is 7.25% plus the greater of SOFR or 1.0% per annum.  In addition, the Pre-Petition Credit Agreement contains an unused line fee of 3.625% per annum.  Interest and fees on the loan are payable in arrears on the payment dates and on the maturity of the loan.  The maturity of the revolving credit facility is 30 months or February 11, 2025 and the term loan is 5 years or August 11, 2027.  Beginning in August of 2024 the Debtor may be subject to quarterly payments based upon any excess cash flow.

12.     During the year ended December 31, 2022, the Debtor exercised the option to PIK interest accrued on the outstanding debt.  The total outstanding debt had net book value of $417.7 million ($335.3 million under a term loan, $80 million under a revolving credit facility and $2.4 million under a revolving PIK loan).  The total PIK interests of $11.9 million was deferred and compounded and added to the principal balance.

13.     To further secure the Debtor's obligations under the Senior Facilities, all obligations thereunder are unconditionally guaranteed by each of the Debtor's existing and future direct and indirect material, wholly-owned domestic subsidiaries, subject to certain exceptions.  The obligations of the Debtor and its subsidiary guarantors under the Amended Credit Agreement are secured by a first-priority lien in substantially all of the assets of the Company and its subsidiaries, subject to certain exceptions.

14.     Under the Pre-Petition Credit Agreement, the Debtor has a letter of credit arrangement to provide for the issuance of standby letters of credit.  The arrangement supports the collateral requirements for insurance claims and is good for one year to be renewed annually if necessary.  The letter of credit is cash-collateralized at 105% in the amount of $3.1 million as of December 31, 2022.  Additionally, there is a letter of credit arrangement of $0.3 million that serves as a security deposit for leased warehouse space and is pledged by an equal amount of cash

pledged as collateral. The Debtors' letter of credit arrangements collateral is classified as restricted cash and reflects balances of $3.4 million as of December 31, 2022.

### ii.    The Unsecured 9.50% Notes

15.    CSSE and U.S. Bank National Association, as Trustee (the "Trustee") entered into that certain Indenture (the "Indenture"), dated as of July 17, 2020. On the same date, the Debtor and Trustee entered into that certain First Supplemental Indenture (the "First Supplemental Indenture"), dated as of July 17, 2020. Pursuant to the Indenture and First Supplemental Indenture, the Debtor completed a public offering of 9.50% Notes due 2025 (the "Notes") in the aggregate principal amount of $44,855,900.  The Notes bear interest at 9.50% per annum, payable every March 31, June 30, September 30, and December 31, and at maturity. The Notes mature on July 31, 2025. The 9.50% Notes are unsecured and are effectively subordinated to all of the Debtors' existing and future secured indebtedness.

### iii.    Film Acquisition Advances

16.    CSSE and Great Point Media Limited ("GPM") entered into that certain Film Acquisition Advance Agreement (the "Film Advance Agreement"), dated as of August 27, 2020. GPM advanced to the Debtor $10.2 million of acquisition advances on August 28, 2020 (the "Acquisition Advance") and may, directly, or through affiliated entities, fund additional acquisition advances in the future.

17.    CSSE and Media Entertainment Partners ("MEP") entered into those certain Film Acquisition Advance Agreements beginning in January 2022.  Under the agreements, MEP financed the Company $26.9 million of acquisition advances and may, directly, or through affiliated entities, fund additional acquisition advances in the future.

**C.** **The Debtors' Efforts to Obtain Postpetition Financing**

18.     Given the Debtors' pre-petition capital structure and the challenges facing the Debtors' businesses, the DIP Facility represents the best available postpetition financing. The Pre-Petition Collateral securing the Debtors' Pre-Petition Obligations comprises substantially all of the Debtors' assets, and the Debtors understand that the Pre-Petition Secured Parties will not consent to priming of their security interests in the Pre-Petition Collateral. Accordingly, it was a substantial task for the Debtors' investment banker to secure a third-party offer for postpetition financing knowing that any attempt to institute secured financing would require successfully priming the Pre-Petition Secured Parties on a contested basis.

19.     Notwithstanding these existing challenges, and as detailed in the DIP Declaration, the DIP Lender recognized the opportunity to support the Debtors and work with them on a successful chapter 11 case.

20.     The Debtors' financial advisors canvassed the market to assess whether any third parties were willing to provide DIP Financing to the Debtors. Solomon Partners, drawing on its experience in debt financing transactions in the home-related products industry, identified multiple well-known and active DIP Lender, that in their professional judgment were the most likely to seriously pursue third-party postpetition financing. The DIP Lender was the only party that expressed any willingness to pursue postpetition financing of the Debtors under the circumstances presented.

21.     The Debtors therefore focused on negotiating with the DIP Lender to obtain the best postpetition financing terms available. Those negotiations were extended, arm's-length, good-faith negotiations resulting in the currently proposed DIP Facility, which, as set forth in the DIP Declaration, includes meaningful improvements in terms over the facility as first proposed. The DIP Facility is the best postpetition financing available to the Debtors. The Debtors are not

able to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, and new credit is unavailable to the Debtors without providing the DIP Lender the (i) DIP Superpriority Claims (as defined herein) and (ii) DIP Liens in the DIP Collateral, as provided herein and in the DIP Loan Documents.

**D.      Need for Debtor in Possession Financing and Use of Pre-Petition Collateral**

22.      If this Motion is not approved and the Debtors do not obtain authorization to borrow under the DIP Facility and to use the Cash Collateral, the Debtors will suffer immediate and irreparable harm.  As of the Petition Date, the Debtors had minimal cash on hand.  Without the funds available under the DIP Facility and the use of the Cash Collateral, the Debtors will not have sufficient available sources of working capital and financing to carry on the operation of their businesses.  The Debtors' ability to maintain business relationships with their vendors, suppliers, operators and managers, to satisfy other working capital and operational needs, and to otherwise finance their operations is essential to the Debtors' continued viability.

## SUMMARY OF RELIEF REQUESTED

23.      The Debtors seek authority to establish the DIP Facility that provides for postpetition secured loans in the amount of $20,000,000 (subject to an Accordion feature as described below) upon entry of a Final Order, of which $10,000,000 is requested for approval on an interim basis.[2]

## SUMMARY OF TERMS OF THE DIP FACILITY

24.      The below chart contains a summary of the material terms of the proposed DIP Loans, together with references to the applicable sections of the relevant source documents, as

---

[2] The DIP Facility does provide an accordion feature that provides additional capital to the Debtors, and the increased facility is solely at the absolute discretion of the DIP Lender.

required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2(a)(i) and

(ii):[3]

| Summary of Material Terms[4] | |
|---|---|
| **Borrowers**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Chicken Soup for the Soul Entertainment Inc., its subsidiaries and affiliates that are chapter 11 debtors |
| **Guarantors**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Not applicable. |
| **DIP Lender**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Those Lenders party to the DIP Term Sheet and any other Person that becomes a Lender thereunder. |
| **DIP Lender**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Owlpoint IP Opportunities JVF I LP |
| **Maturity Date**<br><br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br><br>Del. Bankr. L.R. 4001-2(a)(i) | The maturity date of the DIP Facility will be (and all DIP Loans and obligations, including but not limited to Minimum Return as defined below, under the DIP Facility shall be repaid in full in cash on) the earliest of: (i) January 1, 2026 (ii) the effective date of any Chapter 11 plan ("***Plan***") of any Debtors or the date of funding of a sale upon entry of a sale order under Section 363 of the Bankruptcy Code, (iii) the date that is 30 days after the Interim Order Entry Date if the Final Order Entry Date shall not have occurred by such date and (iv) the acceleration of the DIP Loans or termination of the commitments under the DIP Facility, including, without limitation, as a result of the occurrence of an Event of Default (any such occurrence, the "***Maturity Date***").<br><br>Notwithstanding the foregoing, any DIP Facility Overdraw shall be repaid in full within three business days or constitute an Event of Default. |

[3] This summary is qualified in its entirety by the provisions of the DIP Loan Documents. To the extent there are any conflicts between this summary and any DIP Loan Document, the terms of such DIP Loan Document will govern. Capitalized terms used but not defined herein will have the meanings set forth in the DIP Term Sheet or the Interim Order, as applicable.

[4] Except where stated otherwise, the sources of the material terms selected for inclusion herein are Federal Rule of Bankruptcy Procedure 4001(c)(1)(B) and Local Rule 4001-2(a)(ii).

|  | Notwithstanding anything to the contrary, the Maturity Date may be extended by up to 3 years upon successful confirmation and closing of the Plan, at Lender's Sole and Absolute Discretion. |
|---|---|
| **Commitment**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii), 4001(c)(1)(B)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(A) | $20,000,000, availability will be subject to Borrowing Base and other conditions in loan documents to be negotiated.  The commitment amount could be increased should the need arise at Lender's Sole and Absolute Discretion as per an Accordion Feature in a form to be determined by Lender and approved by the court. |
| **Provisions that Provide for the Funding of Non-Debtor Affiliates**<br>Del. Bankr. L.R. 4001-2(a)(i)(D) | The Debtors are permitted to use Cash Collateral to make payments to non-Debtor affiliates as set forth in the DIP Budget (after giving effect to Permitted Variances (as defined below)) or with the written consent of the DIP Lender.<br><br>*See* Term Sheet. |
| **Conditions of Borrowing**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(I) | The effectiveness of the DIP Term Sheet and the occurrence of the Closing Date, as well as the availability of each Advance, are subject to the satisfaction of the DIP Lender in its Sole and Absolute Discretion, or waiver by the DIP Lender in its Sole and Absolute Discretion, of conditions precedent customary for financings of this type and as set forth in the DIP Term Sheet. |
| **Interest Rates**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Del. Bankr. L.R. 4001-2(a)(ii) | 3-month SOFR with a floor of 4% plus 11% margin, which shall be provided for in the DIP Budget to be paid monthly.  All accrued and unpaid interest shall be paid in full on the Maturity Date.<br><br>Following an Event of Default, the Interest Rate increases by 4%. |
| **Use of DIP Financing Facility and Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(l)(B)(ii)<br><br>Del. Bankr. L.R. 4001-2(a)(ii) | The Debtors shall use the proceeds of the DIP Facility and Cash Collateral in accordance with the DIP Loan Documents, and the DIP Budget (subject to Permitted Variances), for the following:<br><br>• finance its working capital needs and for other general corporate purposes;<br><br>• pay related transaction costs, fees, liabilities and expenses (including professional fees and expenses), adequate protection payments, and other administration costs incurred in connection with and for the benefit of the Cases, in each case |

| | |
|---|---|
| | in accordance with the DIP Budget (subject to variances permitted under the DIP Loan Documents); and |
| | • pay fees, liabilities and expenses (including professional fees and expenses incurred by the DIP Lender) under the DIP Facility, including those incurred in connection with the preparation, negotiation, documentation, and court approval of the DIP Facility. |
| | *See* Interim Order ¶ J. |
| **Adequate Protection and Professional Fees and Expenses**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ii)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(B), 4001-2(a)(i)(G), 4001-2(a)(i)(K) | The proposed adequate protection provided to the Pre-Petition Secured Parties comprises the following:<br><br>(i)    Adequate protection claims and liens will be provided to the Prepetition Secured Creditors to the extent of any diminution in the value of interests in their respective prepetition collateral (the "***Adequate Protection Liens***").  Pursuant to 11 U.S.C. §§ 361 and 363(e), adequate protection will be provided in the form of replacement liens in the DIP Collateral (junior to the Carve-Out and the Priming Lien) and § 503(b) and § 507(b) claims (which claims will be junior to the Carve-Out and the Priming Lien) to the same extent, validity and priority that the liens of the Prepetition Secured Creditors existed immediately prior to the Petition Date. Nothing in this section will provide for any Adequate Protection Lien that would be senior to the Priming Lien. For clarity, it is understood that no additional liens except those existing prior to the Petition Date shall be granted to the Prepetition Creditors except as provided herein and there shall be no limits placed on the ability of the Debtors or any other party to challenge the liens and claims of the Prepetition Secured Creditors.<br><br>*See* Interim Order Sec. 4. |
| **Repayment Features / Provisions Limiting Repayment**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(I) | <u>Voluntary Prepayments</u>.  At any time after the Initial Advance (defined below) is made, Borrowers may repay the DIP Loans at any time after paying a minimum return (inclusive of the Upfront Fee, Lender Admin Fee, and Breakup Fee (if applicable)) equal to the greater of a Multiple Of Invested Capital (MOIC) of 1.30 times cash-on-cash and 20% Internal Rate of Return ("IRR") (the "***Minimum Return***").   Any portion of the Minimum Return not already paid as provided herein shall be paid in full upon the Maturity Date.<br><br><u>Mandatory Repayments</u>.   The following events, which are not exhaustive, will require mandatory prepayments, subject to the Minimum Return:<br><br>1.   <u>Asset Sales (with or without court order)</u>: prepayment in an amount equal to 100% of the net cash proceeds of the sale, |

|  | factoring or other disposition of any property or assets of the Borrowers; provided that the foregoing shall not apply to any ordinary course transactions involving the distribution, exploitation, or exhibition of film and TV copyrights or other ordinary course transactions involving the acquisition of new content; |
|  | 2. <u>Insurance Proceeds</u>: prepayment in an amount equal to 100% of the net cash proceeds of insurance (including return of unearned premiums) paid on account of any loss of any property or assets of the Borrowers; |
|  | 3. <u>Incurrence of Indebtedness (with or without court order)</u>: prepayments in an amount equal to 100% of the net debt proceeds; provided that the foregoing shall not apply to ordinary course transactions involving the distribution, exploitation, or exhibition of film and TV copyrights or other ordinary course transactions involving the acquisition of new content; |
|  | 4. <u>DIP Facility Overdraw</u>: On any date that outstanding DIP Loans in aggregate exceed Borrowing Base then, before the expiration of three business days, the Borrowers must prepay the DIP Loans so that outstanding DIP Loans in aggregate no longer exceed Borrowing Base; and |
|  | 5. <u>Event of Default</u>: prepayment in full under any uncured Event of Default. |
|  | For the avoidance of doubt, the sale-leaseback transaction involving Veterans Capital and the Redbox assets shall not trigger a Mandatory Prepayment. |
| **Budget**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(E) and 4001-2(a)(iii) | The use of proceeds of the DIP Facility and Cash Collateral is subject to the 13-week cash flow forecast setting forth all projected cash receipts and cash disbursements on a weekly basis (the "***Initial DIP Budget***") attached to the Interim Order as **Exhibit 2**.<br><br>*See* Interim Order, **Exhibit 2** |
| **Variance Covenant**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(E) and 4001-2(a)(iii) | The Borrower shall provide to the DIP Lender a budget variance report (the "***Budget Variance Report***") on the Friday of every week during the DIP Budget Period, and the DIP Budget Variance Report shall set forth in reasonable detail in a form acceptable to DIP Lender in its Sole and Absolute Discretion comparing all variances from the then-current and original DIP Budget, together with a statement certifying compliance with the DIP Budget Covenant set forth below. The Debtors shall not permit or suffer to exist, (i) cumulative Cash Disbursements (defined below) of 10% or more above the Cash |

<table>
<tr><td></td><td>Disbursements amounts set forth in the DIP Budget or (ii) cumulative Cash Receipts (defined below)  of 10% or more below the Cash Receipts set forth in the then-current DIP Budget  (each, a "***Permitted Variance***"), tested on a cumulative rolling two (2) week basis (the "***DIP Budget Covenant***").  For the purposes of this calculation: (a) "Cash Disbursements" means all disbursements of cash, including without limitation Operating Disbursements, Non-Operating Disbursements, and Financing & Related Disbursements as shown on the DIP Budget; and (b) "Cash Receipts" includes without limitation all Operating Receipts as shown on the DIP Budget and any cash received from any of the DIP Collateral and "Cash Receipts" does not include cash constituting DIP Loans advances.  The Borrower shall subsequently provide DIP Lender an updated budget every week prior to the end of the DIP Budget Period for the remaining weeks left under the Initial DIP Budget, if the total projected cash receipts or the total projected cash disbursements in the updated budget are more than 10% above or below the sum of those amounts in the latest DIP Budget (as defined below).  Each updated budget shall be subject to the approval of the DIP Lender in its Sole and Absolute Discretion  (each such approved budget, a "***Supplemental Approved DIP Budget***" and together with the Initial DIP Budget, the "***DIP Budget***"); provided that until such time as the DIP Lender approves any updated budget, Borrower shall be subject to and be governed by the terms of the Initial DIP Budget or such Supplemental Approved DIP Budget, as applicable, then in effect in accordance with the DIP Order.<br><br>The DIP Lender may decline in its Sole and Absolute Discretion to permit the use of proceeds of DIP Facility or cash collateral, and the Borrower shall have no authority to use proceeds of DIP Facility or cash collateral, other than in accordance with the DIP Budget, subject to the DIP Budget Covenant and as set forth in the DIP Order.<br><br>Notwithstanding anything to the contrary herein, the DIP Budget will provide for timely payment of all obligations under the DIP Facility.</td></tr>
<tr><td>**Termination Events / Events of Default**<br><br>Bankruptcy Rules 4001(b)(1)(B)(iii) and 4001(c)(1)(B)<br><br>Del. Bankr. L.R.</td><td>The occurrence of any one or more of the following shall constitute an "Event of Default" subject to customary cure periods:<br><br>(i)      Failure by the Debtors to pay principal, interest or any other amounts provided by this Transaction when due;</td></tr>
</table>

| 4001-2(a)(i) and 4001-2(a)(i)(M), (S) | (ii) | Breach by any Debtor of any of the covenants set forth in final documentation and this DIP Term Sheet; |
|---|---|---|
| | (iii) | The Borrower's noncompliance with the DIP Budget that is not curable or, if curable, not cured within two (2) business days; |
| | (iv) | Any representation or warranty made by any Debtor shall prove to have been incorrect in any material respect when made; |
| | (v) | Without the consent of the DIP Lender (which may or may not be granted or withheld in its Sole and Absolute Discretion), any of the Cases shall be dismissed or converted to a Chapter 7 case or termination or expiration of any Debtor's exclusivity period under Section 1121 of the Bankruptcy Code; |
| | (vi) | Unless consented to by DIP Lender(which may or may not be granted or withheld in its Sole and Absolute Discretion), a Chapter 11 trustee, a responsible officer or an examiner with enlarged powers relating to the operation of the business of the Debtors (i.e., powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Cases; |
| | (vii) | The filing of a motion by any of the Debtors, without written consent of the DIP Lender (which may or may not be granted or withheld in its Sole and Absolute Discretion), to incur debt whether or not secured by a lien with priority equal to, or superior to, the DIP Liens, or which is given superpriority administrative expense status under section 364(c) of the Bankruptcy Code, unless such motion provides for the proceeds of such debt to be used for the indefeasible payment in full in cash of the DIP Loans (including the Voluntary Payment amount), and any and all other amounts due to the DIP Lender; |
| | (viii) | The filing of a motion by any of the Debtors, without written consent of the DIP Lender, (which may or may not be granted or withheld in its Sole and Absolute Discretion) to create or grant any other superpriority claim or lien which is *pari passu* with or senior to the claims or liens of the DIP Lender under the DIP Facility or the granting of such claim or lien upon a request of another party in any of the Chapter 11 Cases, other than the Carve-out; |
| | (ix) | The filing of a motion by and of the Debtors to use cash collateral of the DIP Lender or the Prepetition Secured Parties under section 363(c) of the Bankruptcy Code or any |

equivalent provision of relevant applicable law without prior written consent of the DIP Lender (which may or may not be granted or withheld in its Sole and Absolute Discretion) and the Prepetition Secured Parties;

(x)     Any Debtor shall (a) challenge or contest the validity or enforceability of the DIP Orders or deny that it has further liability thereunder, (b) challenge or contest the nature, extent, amount, enforceability, validity, priority or perfection of the obligations under the DIP Facility, the DIP Liens, the DIP superpriority claims, (c) assert any claim, defense or cause of action that seeks to avoid, recharacterize, subordinate (whether equitable subordination or otherwise), disgorge, disallow, impair or offset all or any portion of the obligations under the DIP Facility, the DIP Liens, the DIP superpriority claims, investigate, join or file any motion, application or other pleading in support of, or publicly support any other entity that has asserted any of the claims, challenges or other requested relief contemplated in clauses (a) through (c) above;

(xi)     Entry of an order staying, reversing, vacating, or otherwise modifying the DIP Facility or the DIP Orders in any manner not consented to in writing by the DIP Lender (which may or may not be granted or withheld in its Sole and Absolute Discretion);

(xii)    The allowance of any claim or claims under section 506(c) of the Bankruptcy Code or otherwise against or in relation to any DIP Lender or the DIP Collateral;

(xiii)   Any Debtor shall make any payment on account of any prepetition claim or payables of a Debtor except as otherwise permitted under the DIP Budget;

(xiv)   Subject to exceptions to be agreed upon in Lender's Sole and Absolute Discretion, the Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any Debtor which have an aggregate value in excess of $100,000 (other than with respect to those Debtors for which the Lender consents to such relief);

(xv)    Failure to timely provide Reporting to DIP Lender and/or file reports and/or schedules required of the Debtors by the Bankruptcy Code or rules;

| | |
|---|---|
| | (xvi) Cessation of liens or superpriority claims granted in the DIP Orders to be valid, perfected and enforceable in all respects with the priority described herein; and<br><br>(xvii) Application or use of proceeds of the DIP Loan, any Collateral, and/or the Carve-Out in violation of the DIP Orders, the Term Sheet, or any agreement governing the DIP Loans.<br><br>*See* Interim Order Sec. 11. |
| **Entities with Interests in Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(i) | The following secured parties have an interest in Cash Collateral:<br><br>• DIP Lender; and<br><br>• Prepetition Agent, on behalf of the Pre-Petition Lenders.<br><br>*See* Interim Order ¶ 6; Sec. III. |
| **Carve Out**<br><br>Bankruptcy Rules 4001(b)(1)(B)(iii), 4001(c)(1)(B)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(F) | As used in the Interim Order, the term "<u>Carve-Out</u>" includes:<br><br>(i) the costs and administrative expenses permitted to be incurred by any Chapter 7 trustee under Section 726(b) of the Bankruptcy Code pursuant to an order of the Bankruptcy Court following any conversion of the Cases pursuant to section 1112 of the Bankruptcy Code in an amount not to exceed $75,000;<br><br>(ii) to the extent allowed by the Bankruptcy Court on an interim or final basis at any time, (a) all fees, costs, and expenses of the Debtors or any statutory committee earned, accrued, or incurred by persons or firms retained by the Debtors under §§ 327 or 363 and by any statutory committee under §§ 1103, (b) up to $75,000 in the aggregate to pay any allowed fees and expenses incurred by the Debtors' professionals following occurrence of an Event of Default, and (c) up to $25,000 in the aggregate to pay any allowed fees and expenses incurred by any statutory committee's professionals following the occurrence of an Event of Default; and<br><br>(iii) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under 28 U.S.C. § 1930 plus interest at the statutory rate. Except to the extent expressly provided by further order of this Court, the Debtors may use funds held in the Carve-Out Reserve Account only to pay Professional Fees as they are incurred or earned (i) at any time before delivery of a |

| | |
|---|---|
| | Carve-Out Trigger Notice, whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice, subject and limited in all respects to the amounts set forth in the DIP Budget for payment of such Professionals; and (ii) at the DIP Lender's option, beginning on first day after the delivery of the Carve-Out Trigger Notice to the Debtors, the Debtors' counsel, and counsel for any Committee, the fees and expenses incurred by the Professionals retained by the Debtors in an aggregate amount not to exceed the Post-EOD Carve-Out Cap.<br><br>So long as a Carve-Out Trigger Notice has not been delivered as provided above: (i) the Debtors will be permitted to pay Professional Fees allowed and payable under sections 328, 330 or 331 of the Bankruptcy Code or other order of this Court, as the same may become due and payable, including on an interim basis; and (ii) such payments will not reduce, or be deemed to reduce, the Carve-Out. Without prejudice to the rights of any Professional to contest any such objection, nothing in the Interim Order will be construed to impair the ability of any creditor or party in interest to object to any Professional Fees.<br><br>*See* Interim Order ¶ VI. |
| **Fees and other Compensation**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(B) | • **Closing Fee**. Debtors will pay to DIP Lender a closing and commitment fee in the amount of 3% of the Commitment Amount, which shall be provided for in the DIP Budget and payable upon entry of the Interim DIP Order, either in cash or netted from the first advance from the DIP Facility.<br><br>• **DIP Lender's Professionals' Fees**. All reasonable and necessary documented out of pocket fees, costs, and expenses of the DIP Lender (including fees and disbursements of legal counsel), i) to be paid in cash or netted out of the first advance of the DIP Facility; or ii) if the DIP Facility is not approved, in an amount to be approved by the court as a Superpriority Claim in the same manner and in addition to the Breakup Fee.<br><br>• **Interest, Legal, and Administrative Reserve**. $400,000. To the extent the Interest, Legal and Admin Reserve is drawn upon, it shall be replenished by the Borrowers on an evergreen basis within three business days after the first day of the next calendar month. After the funding of the first advance of the DIP Facility, DIP Lender at its Sole and Absolute Discretion, can draw Interest, Legal and Admin Reserve for all reasonable and necessary expenses, if not paid by the Debtors within ten days after receipt of invoices therefor.<br><br>• **Warrants**. Penny warrants equal to 5% of the fully diluted |

| | equity interests of the reorganized Company established under the confirmed plan. If the plan provides for more than one class of stock or other equity interests, the warrants shall be for the stock/interests with the highest preference, shall have voting rights, and shall not be subject to dilution. |
|---|---|
| **Liens on Avoidance Actions**<br><br>Bankruptcy Rule 4001(c)(1)(B)(xi)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(U) | Upon entry of the Final Order, the DIP Lender will be granted DIP Liens in and upon the proceeds of all avoidance actions under chapter 5 of the Bankruptcy Code.<br><br>*See* Interim Order Sec. II. |
| **Liens and Priorities**<br><br>Bankruptcy Rule 4001(c)(1)(B)(i), (ii)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(G), 4001-2(a)(i)(P) | Subject to the certain customary carve outs (as defined below), all amounts owing by the Borrower under the DIP Facility shall at all times be secured by:<br><br>(i)     pursuant to section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully perfected first-priority liens on and security interests in all DIP Collateral (as defined below) that is not subject to any liens or encumbrances immediately prior to the Petition Date, subject only to the Carve-Out (as defined below); and<br><br>(ii)     pursuant to sections 363(c)(3) and 364(d)(1) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully perfected first priority, priming liens on and security interests in all other DIP Collateral, which liens and security interests shall be subject only to (x) any valid, enforceable, perfected, and non-avoidable lien or security interest in favor of any person other than HPS that was in existence immediately prior to the Petition Date or that is perfected as permitted by Section 546(b) of the Bankruptcy Code (a "***Permitted Encumbrance***") and (y) the Carve-Out, and senior to all other liens and encumbrances in respect of the DIP Collateral (the "***Priming Lien***" and, together with the foregoing item (i), the "***DIP Liens***"). For the avoidance of doubt, the DIP Liens shall prime the liens securing the HPS Loan and all other liens that are not Permitted Encumbrances.<br><br>Subject to the certain customary carve outs (as defined below), all amounts owing by the Borrower under the DIP Facility at all times will constitute allowed superpriority administrative expense claims (the "***Superpriority Claims***") in the Cases, having priority over all claims and administrative expense claims against the Borrower, now existing or hereafter arising, of any kind or nature whatsoever, |

including, without limitation, of the kinds specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113, 1114 and any other provision of the Bankruptcy Code, and shall at all times be senior to the rights of the Borrower and any successor trustee or creditor in the Cases or any successor case thereto.

The DIP Liens, the Superpriority Claims, and the relative priority of all amounts owed under the DIP Facility will be subject only to a carve-out (collectively, the "***Carve-out***") in an amount equal to the sum of

    (i)    the costs and administrative expenses permitted to be incurred by any Chapter 7 trustee under Section 726(b) of the Bankruptcy Code pursuant to an order of the Bankruptcy Court following any conversion of the Cases pursuant to section 1112 of the Bankruptcy Code in an amount not to exceed $75,000;

    (ii)    to the extent allowed by the Bankruptcy Court on an interim or final basis at any time, (a) all fees, costs, and expenses of the Debtors or any statutory committee earned, accrued, or incurred by persons or firms retained by the Debtors under §§ 327 or 363 and by any statutory committee under §§ 1103, (b) up to $75,000 in the aggregate to pay any allowed fees and expenses incurred by the Debtors' professionals following occurrence of an Event of Default, and (c) up to $25,000 in the aggregate to pay any allowed fees and expenses incurred by any statutory committee's professionals following the occurrence of an Event of Default; and

    (iii)    all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under 28 U.S.C. § 1930 plus interest at the statutory rate.

Nothing herein shall be construed as impairing the ability of any party to object to any fees and expenses of a professional in the Cases.

All of the liens and secured creditor rights described herein shall be effective and perfected as of the Petition Date and without the necessity of the execution, notice, filing, or recording of any mortgages, security agreements, pledge agreements, financing statements, control agreements, or other agreements or instruments, and no further filing, notice, or act will be required to effect such perfection. However, DIP Lender shall be permitted (and will be authorized by the Debtor and the Bankruptcy Court), but not required, to make any filings, deliver any notices, make recordations, perform

|  | any searches or take any other acts as may be desirable under federal or state law in order to reflect the security, perfection or priority of the DIP Lender rights. |
|---|---|
|  | For the avoidance of doubt, and notwithstanding any other provision herein, the Debtors jointly and severally acknowledge the existence of unpaid, due and owing payroll withholding taxes and sales and use taxes as of the date hereof (together with any and all other trust fund claims of any variety whatsoever, the "**_Debtor Indemnified Tax Liabilities_**").  The Debtors jointly and severally irrevocably agree to indemnify and hold harmless the DIP Lender from and against any and all liabilities, diminution, or impairment of any amount otherwise payable to the DIP Lender hereunder, or any other cost or expense that could attach to the DIP Lender at any time, in any manner relating to or arising from the Debtor Indemnified Tax Liabilities. |
|  | *See* Interim Order ¶ II. |
|  | "**_DIP Collateral_**" shall include all present and future assets (tangible, intangible, intellectual property, real, personal and mixed) of the Debtors and bankruptcy estates, including, without limitation, all accounts, proceeds of leases, inventory, equipment, equity interests or capital stock in subsidiaries, investment property, instruments, chattel paper, contracts, patents, copyrights, trademarks and other general intangibles, commercial litigation claims, the proceeds of all claims or causes of action, and all rents, products, offspring, profits and proceeds thereof (including, without limitation, and, subject to the entry of the Final DIP Order, all claims or causes of action of the Debtors arising under sections 502(d), 542, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law avoidance actions under chapter 5 of the Bankruptcy Code), and all inter-company amounts between parent, subsidiaries, and affiliates, subject only to the Carve-Out and any Permitted Encumbrances. |
| **Joint Liability**<br><br>Del. Bankr. L.R. 4001-2(a)(i)(J) | The Debtors are jointly and severally liable for the DIP Obligations and all other obligations hereunder.<br><br>*See* Interim Order Sec. I. |
| **Limitation on Use of DIP Facility Proceeds**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii)<br><br>Del. Bankr. L.R. 4001-2(a)(ii) | No proceeds of the DIP Loan, any Collateral, or the Carve-Out, shall be used, among other things, whether directly or indirectly:<br><br>(i)      to finance or reimburse for expenses incurred or to be incurred, in both instances, in any way: (a) any investigation, adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of the DIP Lender or its rights and remedies under the DIP Loan Documents; or (b) any |

| | | |
|---|---|---|
| | | other action, which with the giving of notice or passing of time, would result in an Event of Default under the DIP Facility; |
| | (ii) | for any purpose that is prohibited under the Bankruptcy Code or Bankruptcy Court Orders or that is not in accordance with the DIP Budget; |
| | (iii) | to make any payment, advance, intercompany advance, or any other remittance or transfer whatsoever (including any intercompany loans and investments) that is not in accordance with the express terms of the DIP Budget; |
| | (iv) | to make any payment to any board member or shareholder of the Debtor, in such capacity as such, or any of its affiliates or subsidiaries; or |
| | (v) | to make any payment in settlement of any claim, action or proceeding without Bankruptcy Court approval and the prior written consent of the DIP Lender, which consent will not be unreasonably withheld or delayed. |
| | *See* Term Sheet. | |
| **Approval of the DIP Facility**<br><br>Del. Bankr. L.R. 4001-2(a)(i)(R) | The Interim Order provides for approval of the DIP Facility.<br><br>*See* Interim Order ¶ 1, Sec. I. | |
| **Section 506(c) Waiver, Section 552(b) Waiver, and Marshalling Provision**<br><br>Bankruptcy Rule 4001(c)(1)(B)(x)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(V)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(W)<br><br>Del. Bankr. L.R. 4001-2(a)(i)(X) | As a condition precedent to subsequent draws by the Debtors under the DIP Facility, the Bankruptcy Court shall have entered the Final DIP Order, in form and substance satisfactory to the Lender in its Sole and Absolute Discretion authorizing and approving the DIP Facility and granting continued use of cash collateral and the transactions contemplated thereby, including, without limitation, authorizing customary stipulations and releases by the Debtor, granting waivers with respect to sections 506(c) and 552(b) of the bankruptcy code and marshaling as provided herein, and the granting of valid, enforceable, non-avoidable and fully perfected superpriority security interests and liens on all DIP Collateral and granting superpriority claims, in each case in favor of Lender on a final basis and such Final DIP Order shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed, or subject to a stay pending appeal or otherwise challenged or subject to any challenge.<br><br>*See* Interim Order ¶ H; Sec. X. | |

| Cross- Collateralization<br><br>Del. Bankr. L.R.<br>4001-2(a)(i)(A) | No provision of the DIP Term Sheet, the Interim Order, or the Final Order grants cross-collateralization protection of the type contemplated by Local Rule 4001-2(a)(i)(A). |

## BASIS FOR RELIEF

**A.      Standards of Approval Under Sections 364(c) and 364(d)(1) of the Bankruptcy Code**

25.      Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that a debtor seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).

26.      In addition, under section 364(d)(1) of the Bankruptcy Code, courts may, after notice and a hearing, authorize a debtor to obtain postpetition credit secured by a "priming" lien from affected secured parties if (i) the debtor obtains the consent of such parties or (ii) the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected. 11 U.S.C. § 364(d)(1).  Specifically, section 364(d)(1) provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-
>
> (A)      the [debtor] is unable to obtain credit otherwise; and
>
> (B)      there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

27.      In evaluating proposed postpetition financing under sections 364(c) and 364(d)(1) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider various factors including whether:

i.      unencumbered credit or alternative financing without superpriority status is available to the debtor;

ii.     the credit transactions are necessary to preserve assets of the estate;

iii.    the terms of the credit agreement are fair, reasonable, and adequate;

iv.     the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and their creditors; and

v.      the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g.*, *In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

28.     Section 364 of the Bankruptcy Code also allows for postpetition financing secured by a priming lien.  Section 364(d)(1) provides that the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt if:

(A)     the trustee is unable to obtain such credit otherwise; and

(B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

29.     For the reasons discussed below, the Debtors satisfy the standards required to access postpetition financing on a superpriority claim and priming lien basis under sections 364(c) and 364(d) of the Bankruptcy Code.

**iv.** **The Prepetition Agent has Already Consented to a Priming Facility.**

30.    As explained further below, the Debtors believe that HPS is adequately protected by a sizeable equity cushion reflecting the difference between the amount of their probable claim in these cases and the Debtors' enterprise value.  Regardless, however, the Debtors also believe that HPS already *consented* to be primed up to $40 million under the terms of the Amended Credit Agreement.  Section 6.01(j) of that document provides:

> Indebtedness of any Borrower or any Subsidiary Loan Party under (x) the Existing MidCap Facility in an aggregate principal amount not to exceed $40,000,000 and provided such Indebtedness is subject to the ABL Intercreditor Agreement and (y) any Permitted Refinancing Indebtedness in respect thereof, <u>provided</u> that (i) any Permitted Refinancing Indebtedness which is incurred to refinance in full both the Existing MidCap Facility and the Revolving Facility hereunder, may be in an aggregate principal amount not to exceed the $40,000,000 plus the aggregate principal amount outstanding under the Revolving Facility, (ii) all such Permitted Refinancing Indebtedness is subject to the ABL Intercreditor Agreement and (iii) all such Permitted Refinancing Indebtedness shall have customary advance rates on accounts receivable and inventory and shall be on other terms and conditions reasonably satisfactory to the Administrative Agent.

31.    Given the language in section 6.01(j) of the Amended Credit Agreement, HPS cannot make a valid objection to the Debtors' entry into the DIP Term Sheet and Debtors' request to enter into the DIP Facility satisfies the requirement of the Bankruptcy Code.

**v.** **The Debtors Cannot Obtain Financing on More Favorable Terms**

32.    In demonstrating that credit was not available without the protections afforded by section 364(c) or 364(d) of the Bankruptcy Code, a debtor need only make a good faith effort.  *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *In re Phoenix*

*Steel Corp.*, 39 B.R. 218, 222 (D. Del. 1984) (holding the debtor satisfied its burden to show an inability to obtain credit on other terms through its time and effort spent trying to obtain credit on alternative terms and conditions).

33.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

34.     As set forth above and in the DIP Declaration, given their current financial condition, financing arrangements and capital structure, the Debtors did not receive significant interest from potential lenders to obtain sufficient interim and long-term financing.  The DIP Lender was the only third-party to offer the Debtors a term sheet to provide DIP Financing, and the DIP Lender and Debtors negotiated the terms in good faith.  The Debtors are not able to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code.  New credit is unavailable to the Debtors without providing the DIP Lender the (i) DIP Superpriority Claims and (ii) DIP Liens in the DIP Collateral, as provided herein and in the DIP Loan Documents.

**vi.     The DIP Facility is Necessary to Preserve the Value of the Debtors' Estates**

35.     As debtors in possession, the Debtors have a fiduciary duty to protect and maximize their estates' assets.  *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004).  The DIP Facility, if approved, will provide working capital critical to funding the Debtors' day-to-day operations.  Without access to the DIP Facility, the Debtors will be forced to cease operations,

which would result in immediate and irreparable harm to their business and deplete the going

concern value of such business.  The Debtors' ability to maintain business relationships with their

vendors, suppliers, operators and managers, to satisfy other working capital and operational needs,

and to otherwise finance their operations is essential to the Debtors' continued viability.  Because

the Debtors' available and projected Cash Collateral is insufficient to fund their operations, the

credit to be provided under the DIP Facility is necessary to preserve the value of the Debtors'

estates for the benefit of all stakeholders.

       **vii.**     **Terms of the DIP Facility are Fair, Reasonable and Adequate Under the Circumstances**

36.      In considering whether the terms of postpetition financing are fair and reasonable,

courts consider the terms in light of the relative circumstances of both the debtor and the proposed

lender.  *In re L.A. Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (stating that approval

of the DIP Facility transaction requires terms that are "fair, reasonable and adequate, given the

circumstances of the debtor-borrower and the proposed lender"); *In re Farmland Indus., Inc.*,

294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil

Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365

(W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).  The

appropriateness of a proposed financing facility should also be considered in light of current

market conditions.  *See Transcript of Record* at 740:4-6, *In re Lyondell Chem. Co.*, No. 09-10023

(REG) (Bankr. S.D.N.Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as

disappointing as the [DIP] pricing terms are, I find the provisions [of a DIP that included a roll-up

of prepetition secured debt] reasonable here and now.").

37.      Given the urgent need of the Debtors to obtain financial stability for the benefit of

all parties in interest, the terms of the DIP Facility are fair, appropriate, reasonable and in the best

interests of the Debtors, their estates and their creditors.  The DIP Loan Documents were negotiated extensively by the Debtors and the DIP Lender, in good faith and at arm's length as required by section 364(e) of the Bankruptcy Code, with all parties represented by experienced counsel.

   **viii.    Entry into the DIP Loan Documents Reflects the Debtors' Reasonable Business Judgment**

   38.    A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del 1994) (noting that the interim loan, receivable facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment [were] reasonable under the circumstances and in the best interests of TWA and its creditors"); *Ames Dep't Stores, Inc.*, 115 B.R. at 40 ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *Group of Institutional Holdings v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).

   39.    Bankruptcy courts typically defer to debtors' business judgment on the decision to borrow money unless such decision is arbitrary and capricious.  *See In re Trans World Airlines, Inc.*, 163 B.R. at 974.  In fact, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private

control of administration of the estate and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

40.     For the reasons set forth above, the Debtors submit that the entry into the DIP Facility is the exercise of the Debtors' reasonable business judgment.

### ix.     Proposed Adequate Protection is Appropriate

41.     To the extent a secured creditor's interests in the collateral constitute valid and perfected security interests and liens as of the Petition Date, section 364(d)(1)(B) of the Bankruptcy Code requires that adequate protection be provided where the liens of such secured creditor are being primed to secure the obligations under a debtor in possession financing facility. Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief.  What constitutes adequate protection must be decided on a case-by-case basis.  *See In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985).  The focus of the requirement is to protect a secured creditor from the diminution in the value of its interest in the particular collateral during the period of use.  *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

42.     The proposed adequate protection provided to the Pre-Petition Secured Parties comprises the following:  (i) Adequate Protection Liens upon all of the DIP Collateral, subordinate in priority only to the DIP Liens and any liens to which the DIP Liens are Junior and to payment in full in cash of the Carve-Out, (ii) allowed superpriority administrative expense claims as provided for in Section 507(b) of the Bankruptcy Code with recourse to the DIP Collateral and subordinate to the payment in full in cash of the Carve-Out and the DIP Superpriority Claims; (iii)

subject to the Carve-Out, payment of (x) all accrued and unpaid interest and fees at default rate under the Pre-Petition Credit Agreement and (y) all reasonable and documented fees, out-of-pocket expenses and disbursements of the Pre-Petition Secured Parties, upon entry of the Interim Order; (iv) ongoing payment postpetition of the fees, expenses, and disbursements payable to the Pre-Petition Secured Parties; and (v) delivery of all required written financial reporting and other periodic reporting that is required to be provided to the DIP Lender under the DIP Term Sheet.

43.     The Debtors believe that the adequate protection proposed herein to protect any diminution in value of the Pre-Petition Secured Parties' interest in the Pre-Petition Collateral is fair and reasonable. Accordingly, based upon the foregoing, the Debtors respectfully request that the Court authorize the Debtors to provide the adequate protection described above to such parties.

**B.      Approval of Use of Cash Collateral is Appropriate**

44.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."

45.     The Debtors have an urgent need for the immediate use of the Pre-Petition Collateral, including the Cash Collateral, and seek to use all Cash Collateral existing on or after the Petition Date pursuant to the terms of the DIP Loan Documents. The Debtors need the Cash Collateral to pay operating expenses, including essential vendors, that are essential to the Debtors' business. Indeed, absent such relief, the Debtors' businesses will be brought to an immediate halt, with damaging consequences for the Debtors and their estates and creditors.

46.     The Debtors believe that the terms and conditions of their use of the Cash Collateral (including the provision of adequate protection described above) are appropriate and reasonable and that such adequate protection is sufficient to secure any adequate protection obligations under

the circumstances.  Furthermore, the Pre-Petition Secured Parties have consented to the Debtors'
use of the Cash Collateral subject to the terms and conditions of the DIP Loan Documents and the
Interim Order.  Therefore, the Debtors submit that they should be authorized to use the Cash
Collateral on the terms set forth in the DIP Loan Documents.

**C.    The Proposed Break-Up Fee is Appropriate**

47.    Through this Motion, the Debtors also seek approval to pay the DIP Lender a break-
up fee of 3% of the Commitment Amount (the "Proposed Break-Up Fee").  The Proposed Break-
Up Fee is a market provision and was offered by the Debtors to entice a potential debtor in
possession lender to fund the Debtors' chapter 11 case, particularly in light of the Debtors'
relationship with its Prepetition Lender.  Restated, the Debtors' Prepetition Lender is best
positioned to provide debtor in possession financing and to help extract the most favorable lending
terms, the DIP Lender's agreement to serve as the Debtors' debtor in possession lender spurred
positive discussions between the Debtors and Prepetition Lenders, which ultimately resulted in the
Prepetition Lenders offering the best lending terms to the Debtors.

48.    The Delaware bankruptcy court has approved break-up fees to prospective debtor
in possession lenders.  *See In re Sea Launch Co., L.L.C.*, No 09- 12153 (BLS) (Bankr. D. Del. May
12. 2010) [ECF No. 697] (approving 2% break-up fee for anticipated DIP Lender); *In re Point
Blank Solutions, Inc.*, No. 10-11255 (P JW) (Bankr. D. Del. Dec. 28. 2010) [ECF No. 968]
(approving 3.75% break-up fee and expense reimbursement for anticipated DIP lender).
Additionally, courts in the United States Bankruptcy Court for the Southern District of New York
have approved similar provisions.  *See In re Pac. Expl. & Prod. Corp*., No. 16-11189 (JLG)
(Bankr. S.D.N.Y. June 10, 2016) [ECF No. 25] (giving full force and effect in chapter 15 case to
Canadian court's approval of 5% break-up fee and expense reimbursement for anticipated DIP

lender); Order, *In re Arcapita Bank B.S.C.(c)*, No. 12-11076 (SHL) (Bankr. S.D.N.Y. May 17, 2013) [ECF No. 1113] (approving 2% break-up fee for anticipated DIP lender).

**D.     The Prepetition Secured Lender is Adequately Protected**

49.     The Debtors believe the Pre-petition Lenders are adequately protected against diminution of their collateral value via the DIP Loan by the existence of a 20% equity cushion as demonstrated in a *Pro Forma Enterprise Valuation* prepared by Virtu Global Advisors, LLC ("***Virtu***").[5]  In that analysis, Virtu identified a range of pro forma enterprise valuation indications from $834,900,000 to $883,600,000—well in excess of the approximately $500,000,000 amount of the Pre-Petition Secured Parties' claim arising under the Pre-Petition Senior Facilities.

50.     An "equity cushion" is the amount by which the collateral value exceeds the amount of the primed secured claim. *In re Jer/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 306 (Bankr. D. Del. 2011) (where court determined equity cushion of $26,000,000 was 9% of the value of the collateral); s*ee also In re C.B.G., Ltd.*, 150 B.R. 570, 572, (Bankr. M.D. Pa. 1992) (calculating equity cushion of $4.6 million as 16% of the total value of the collateral); *In re 1606 New Hampshire Ave. Assocs.*, 85 B.R. 298, 310 (Bankr. E.D. Pa. 1998) (finding equity cushion of $450,000 was 20% of the value of the collateral); *In re McKillips*, 81 B.R. 454, 457 (Bankr. N.D. Ill. 1987) (finding equity cushion of $35,000 was 14.5% of value of property).  Courts frequently evaluate the size of the equity cushion in determining whether it provides adequate protection for a proposed priming financing.  *See In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("The existing of an equity cushion seems to be the preferred test in determining whether priming of a senior lien is appropriate under section 364.") (internal quotations omitted); *Wilmington Trust Co. v. AMR Corp. (In re AMR Corp.)*, 490 B.R. 470, 478 (S.D.N.Y. 2013) ("It

---

[5] The Debtors recognize that this "priming" issue may necessitate a further evidentiary hearing, and reserve the right to submit additional briefing and evidence on this issue in connection with that hearing.

is well-settled that the existence of an equity cushion can be sufficient, in and of itself, to constitute adequate protection.").

51.     An equity cushion of 20% is typically found to provide adequate protection under Section 362(d). *In re McKillips*, 81 B.R. 454, 457 (Bankr. N.D. Ill. 1987) ("Case law has almost uniformly held that an equity cushion of 20% or more constitutes adequate protection."); *see also In re 1606 New Hampshire Ave. Assocs.*, 85 B.R. 298, 310 (Bankr. E.D. Pa. 1998) (finding that 20% equity cushion was sufficient to establish adequate protection); contrast with *In re Jer/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 306 (Bankr. D. Del. 2011) (where 9% equity cushion insufficient); *In re C.B.G., Ltd.*, 150 B.R. 570, 572, (Bankr. M.D. Pa. 1992) (concluding that 14% equity cushion was not sufficient adequate protection to permit debtor to grant super-priority lien in collateral under § 364(d)(1)(B)).

52.     Here, the Debtors believe that the evidence will show the existence of an approximately 30% equity cushion after giving effect to the requested $50,000,000 DIP Facility. Accordingly, the Debtors submit that the Prepetition Secured Parties' collateral position is adequately protected in accordance with the requirements of section 364(d)(1)(B).

E.      **Modification of the Automatic Stay**

53.     The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Lender to exercise, upon the occurrence and during the continuation of any Event of Default under the DIP Term Sheet, all rights and remedies provided in the DIP Term Sheet without further Order of or application to the Court.  However, the Debtors will have the right to use Cash Collateral in accordance with the DIP Term Sheet to pay their weekly ordinary course payroll included in the DIP Budget through the date on which such Event of Default occurs.

54. Stay modification provisions of this sort are common features of postpetition financing facilities and, in the Debtors' business judgment, are reasonable under these circumstances. Accordingly, the Debtors request that the Court modify the automatic stay to the extent contemplated by the DIP Term Sheet and the proposed Interim Order and Final Order.

## F.     Approval of Interim Relief

55. Bankruptcy Rules 4001(b)(2) and 4001(c)(2) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the court may conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit on an interim basis "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." FED. R. BANKR. P. 4001(b)(2); (c)(2).

56. As described above in detail, the Debtors have an urgent and immediate need for cash in order to maintain business relationships with their vendors, suppliers, operators and managers, to make capital expenditures and to satisfy other working capital and operational needs, and otherwise finance their operations. Given the immediate and irreparable harm to be suffered by the Debtors, their estates, and their creditors absent interim relief, the Debtors request that, pending the Final Hearing, the Court schedule an interim hearing within two (2) business days of the Petition Date or as soon thereafter as practicable to consider the interim relief requested in the Motion.

## G.     Request for Second Interim Hearing

57. The DIP Term Sheet only permits the Debtors to make an initial draw of $10,000,000, with the second such draw to be made available one week later. Accordingly, as a second such interim hearing would come prior to the 14-day minimum notice period established

under Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Second Interim Hearing as close as practicable to one week after the Petition Date.

**H.      Request for a Final Hearing**

58.      The DIP Term Sheet requires that a Final Order approving the Motion be entered within 30 days after the Petition Date.  As such, pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, but in no event later than 21 days following the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to the Motion.

**RESERVATION OF RIGHTS**

59.      Nothing contained in the Proposed Orders or this Motion (i) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors and their estates; (ii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority, basis, or amount of any claim against the Debtors and their estates; (iii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to any and all claims or causes of action; or (iv) shall be construed as a promise to pay a claim.

**NOTICE**

60.      Notice of this Motion has or will be provided to (i) the Office of the United States Trustee for the District of Delaware; (ii) the holders of the thirty (30) largest unsecured claims against the Debtors' estates on a consolidated basis; (iii) Owlpoint IP Opportunities JVF I LP; (iv) counsel to HPS Investment Partners, LLC; (v) U.S. Bank National Association, as trustee for the 9.500% Notes due 2025; (vi) the Office of the United States Attorney for the District of Delaware; (vii) the Internal Revenue Service; (viii) the United States Securities and Exchange

Commission; (ix) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (x) any other party in interest entitled to notice of this Motion pursuant to Local Rule 9013-1(m). As this Motion is seeking "first day" relief, within two (2) business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any Order entered in respect of the Motion as required by Local Rule 9013-1(m). Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no other or further notice is necessary.

**<u>NO PRIOR REQUEST</u>**

61.     No previous request for the relief sought herein has been made to this Court or any other court.

**<u>CONCLUSION</u>**

WHEREFORE, the Debtors respectfully request that the Court:  (i) enter the proposed Interim Order, substantially in the form attached as **<u>Exhibit A</u>**, granting the relief requested in this Motion on an interim basis and scheduling a final hearing on the Motion, and thereafter; and (ii) grant such other relief to the Debtors as is appropriate.

Dated:  June 29, 2024
       Wilmington, Delaware

**ASHBY & GEDDES, P.A.**

 /s/ *Ricardo Palacio*
Ricardo Palacio (DE Bar No. 3765)
Gregory A. Taylor (DE Bar No. 4008)
500 Delaware Avenue, 8th Floor
Wilmington, DE 19899-1150
Telephone: 302.654.1888
Facsimile: 302.654.654-2067
RPalacio@ashbygeddes.com
GTaylor@ashbygeddes.com

Respectfully submitted,

Mark W. Eckard (DE BAR No. 4542)
REED SMITH LLP
1201 North Market Street, Suite 1500
Wilmington, DE 19801
Telephone:  302.778.7500
Facsimile:  302.778.7575
MEckard@ReedSmith.com

- and –

Michael P. Cooley (*pro hac vice* pending)
REED SMITH LLP
2850 N. Harwood St., Suite 1500
Dallas, TX 75201
Telephone:  469.680.4200
MPCooley@ReedSmith.com

Luke A. Sizemore (*pro hac vice* pending)
REED SMITH LLP
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222
Telephone:  412.288.3334
LSizemore@ReedSmith.com

*Proposed Counsel for the Debtors and
Debtors-in-Possession*