IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>CHICKEN SOUP FOR THE SOUL<br>ENTERTAINMENT INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-11442 (TMH)<br><br>(Joint Administration Requested) |

## DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING THE DEBTORS TO CONTINUE ORDINARY COURSE BUSINESS RELATIONSHIP UNDER MANAGEMENT SERVICES AGREEMENT AND LICENSE AGREEMENT WITH PARENT COMPANY

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") hereby move (this "Motion") for entry of an interim Order substantially in the form attached as **Exhibit A** (the "Interim Order") and a final Order substantially in the form attached as **Exhibit B** (the "Final Order" and, together with the Interim Order, the "Proposed Orders") granting the relief requested below. In support of this Motion, the Debtors, through their undersigned counsel, respectfully represent as follows:[2]

## RELIEF REQUESTED

1.  By this Motion, pursuant to sections 105(a), 363(b), 1107(a), and 1108 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code") and Rules 6003 and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number (where applicable), are: 757 Film Acquisition LLC (4300); Chicken Soup for the Soul Entertainment Inc. (0811); Chicken Soup for the Soul Studios, LLC (9993); Chicken Soup for the Soul Television Group, LLC; Crackle Plus, LLC (9379); CSS AVOD Inc. (4038); CSSESIG, LLC (7150); Digital Media Enterprises LLC; Halcyon Studios, LLC (3312); Halcyon Television, LLC (9873); Landmark Studio Group LLC (3671); Locomotive Global, Inc. (2094); Pivotshare, Inc. (2165); RB Second Merger Sub LLC (0754); Redbox Automated Retail, LLC (0436); Redbox Entertainment, LLC (7085); Redbox Holdings, LLC (7338); Redbox Incentives LLC (1123); Redwood Intermediate, LLC (2733); Screen Media Films, LLC; Screen Media Ventures, LLC (2466); and TOFG LLC (0508). The Debtors' corporate headquarters and service address is 132 East Putnam Avenue, Floor 2W, Cos Cob, CT 06807.

[2] The facts and circumstances supporting the relief requested herein are set forth in the First Day Declaration (as defined below), filed contemporaneously herewith and incorporated herein by reference. Capitalized terms used but not defined in this Motion have the meanings given in the First Day Declaration.

6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Debtors seek entry of the Proposed Orders (as defined below) (a) authorizing the Debtors to continue honoring their existing course-of-dealing under the Management Agreement and the License Agreement (each as defined below), including to pay the *current* amount due under those Agreements based on that course of dealing; and (b) granting related relief.  For the avoidance of doubt, the Debtors by this Motion do *not* request authority to pay other accrued amounts owed under the two Agreements.

2. For the reasons set forth below, the Debtors submit that the relief requested is in the best interest of the Debtors, their estates, creditors, and other parties in interest.

## JURISDICTION AND VENUE

3. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Pursuant to Local Rule 9013-1(f), the Debtors consent to entry of a final Order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final Orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The statutory predicates for the relief requested by this Motion are sections 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code, and such relief is warranted under Bankruptcy Rules 6003 and 6004.

**BACKGROUND**

6. On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned cases (collectively, the "Chapter 11 Cases"). The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code. No official committees have been appointed in the Chapter 11 Cases, and no request has been made for the appointment of a trustee or an examiner.

7. Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the Chapter 11 Cases under Bankruptcy Rule 1015(a).

8. Additional information regarding the Debtors' business, their capital structure, and the circumstances leading to the filing of the Chapter 11 Cases is set forth in the *Declaration of William J. Rouhana, Jr., Chairman of the Board, in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration").

**THE MANAGEMENT AGREEMENT**

9. Debtor Chicken Soup for the Soul Entertainment Inc. ("CSSE") and nondebtor affiliates Chicken Soup for the Soul, LLC ("Parent"), Chicken Soup for the Soul Digital, LLC, and Chicken Soup for the Soul Productions, LLC (collectively, with Parent, the "Service Providers") are parties to the *Management Agreement* dated May 12, 2016 (as amended, the "Management Agreement"), Under the Management Agreement, the Service Providers provide the Debtors with the broad operational expertise of Parent and its subsidiaries and personnel, including the services of its chairman and chief executive officer, William Rouhana, its senior brand advisor and director, Amy Newmark, and the CSS chief financial officer, Christopher Mitchell. The CSS Management Agreement also provides for additional services such as accounting, legal, marketing,

management, data access and back-office systems, and provides the Debtors with office space and equipment usage. Attached as <u>Exhibit C</u> hereto is a true and correct copy of the Management Agreement.

10. For these services, the Debtors pay the Service Parties a quarterly fee (the "<u>Management Fee</u>") equal to 5% of their gross revenues as reported by CSSE under GAAP for each fiscal quarter. The Management Fee pays for, among other things, the direct cost to the Services Providers of the salary and benefits of the personnel that are made available to the Debtors, insurance premiums, and other direct operating expenses.

11. Under section 2.2 of the Management Agreement, Service Providers were also entitled to charge a 20% sales commission fee. However, on August 1, 2019, CSSE and Service Providers entered into an amendment of the Management Agreement, pursuant to which the parties agreed to delete section 2.2 in its entirety retroactively to May 12, 2016. No amounts had ever been due or paid pursuant to section 2.2 of the Management Agreement.

## THE LICENSE AGREEMENT

12. In addition, Parent and CSSE are party to that certain License Agreement (the "<u>License Agreement</u>") dated as of May 12, 2026, under which Parent granted to CSSE a perpetual, exclusive, worldwide right and license to create, design, develop, publish, manufacture, advertise, promote, market, sell, use, and otherwise exploit the Licensed Rights. Under the License Agreement, the Licensed Rights include the right to exploit the "Chicken Soup for the Soul" brand and related content, and any related trademark, copyright, and design and derivative thereof, including stories published in the *Chicken Soup for the Soul* books as well as the production and distribution of video content. Attached as <u>Exhibit D</u> hereto is a true and correct copy of the License Agreement.

13. For this license, CSSE pays Parent an incremental recurring license fee equal to 4% of its gross revenues as reported by CSSE under GAAP for each fiscal quarter plus a quarterly marketing fee equal to 1% of gross revenues as reported under GAAP for each fiscal quarter by CSSE (collectively, the "Licensing Fees").

## THE PARTIES' ORDINARY COURSE DEALINGS

14. Beginning in early 2023, the Debtors were no longer able to remain current on their obligations under the Management and License Agreements, including their obligations to pay the quarterly Management Fees and Licensing Fees. Accordingly, in March 2023, the CSS Management Agreement and License Agreement were modified to provide for (i) approximately $3.45 million in aggregate fees earned under the two agreements in the first quarter of 2023 and (ii) 25% of the next $51 million of such fees that will be earned by CSS thereafter to be paid in Class A shares of common stock in CSSE at a fixed price of $3.05 per share. As of March 31, 2024, CSSE has issued an aggregate of 2,096,688 shares of Class A common stock to CSS under this modified arrangement, and another $9.8 million of future management and license fees will be offset by the issuance of Class A common stock to CSS in the periods after March 31, 2024. As of this filing, the cash portion of the outstanding management and license fees owed to Parent and the other Service Parties totaled well over $5 million.

15. Notwithstanding this accommodation, the effect of the Debtors' inability to pay its Management and Licensing Fee obligations both current and in cash put increased pressure on Parent, which was effectively compelled to advance on a weekly or monthly basis for the direct costs associated with the services provided, including payroll expense, insurance premiums, and other such direct operating expenses. To alleviate this pressure and "normalize" the cash flow relating to these otherwise ordinary operating expenses, the parties developed a course of dealing

in which CSSE remits funds to Parent on a weekly or monthly basis for the actual pass-through cost of necessary operating expenses, including (i) approximately $750,000 per month for the salary and benefits of the employees whose services are provided to the Debtors, office rent and related supplies, and legal and consulting fees; (ii) $100,000 to $250,000 per month for insurance premiums (depending on which policy premiums are due in that month); and approximately $163,000 per week on average for IT support and hosting. The projected amounts to be paid by the Debtors in the coming weeks are consistent with these historical averages and set forth in detail in the budget (the "DIP Budget") accompanying the Debtors' motion for approval of postpetition "DIP" financing.

16. These amounts are meticulously tracked and accounted for by the parties and reconciled periodically to the Debtors' quarterly obligations, although the net effect is still a substantial *underpayment* of the Debtors' contractual amounts owed under the Management and License Agreements.

17. Again, for the avoidance of doubt, the Debtors do not seek authority by this Motion to pay that larger past-due amount, but only to continue making payments to the Parent consistent with their present course of dealing, including that that amount—consistent with the DIP Budget—that might be construed to have accrued prepetition and would ordinarily have been paid under the parties' present course of dealing.

**BASIS FOR RELIEF**

**A. The Debtors Should Be Authorized to Make Pre-Petition Payments Under the Management and License Agreements Pursuant to Sections 363(b) and 105(a).**

18. Sections 363(b) and 105(a) of the Bankruptcy Code allow the Court to approve the Debtors' payments to Parent pursuant to the Management Agreement and the License Agreement (collectively, the "Agreements"). Under section 363(b)(1) of the Bankruptcy Code, a debtor may,

in the exercise of its sound business judgment and after notice and a hearing, "use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1); *see also Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a court may approve an application under Section 363(b) upon a showing of a good business reason for the disposition). For a court to approve the use, sale, or lease of estate property under section 363(b) of the Bankruptcy Code, the debtor must "articulate some business justification, other than mere appeasement of major creditors . . . ." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (holding that the debtor's payment of prepetition claims was necessary to protect its business and to ensure successful reorganization). When a debtor can articulate a reasonable basis for its business decisions, "courts will generally not entertain objections to the debtor's conduct." *In re Filene's Basement, LLC*, 2014 Bankr. LEXIS 2000, at *39–40 (Bankr. D. Del. Apr. 29, 2014) (quoting *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986)); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

19. Section 105(a) of the Bankruptcy Code grants the Court authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). A bankruptcy court's use of its equitable powers to "authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *Ionosphere Clubs*, 98 B.R. at 175. Section 105 allows a court to authorize the "pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor." *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (*citing Ionosphere Clubs*, 98 B.R. at 177).

20. The Debtors submit that pre-petition payments under the Agreements are necessary and may be authorized under sections 363(b) and 105(a) of the Bankruptcy Code pursuant to the "doctrine of necessity," which "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor." *Ionosphere Clubs*, 98 B.R. at 176.[3] In a chapter 11 case, the doctrine of necessity enables the bankruptcy court to exercise its equitable power and allow payment of prepetition claims. *See In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims when payment is essential to continued operation of the debtor, such as where there is a "possibility that the creditor will employ an immediate economic sanction, failing such payment"); *In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that the doctrine of necessity "permit[s] immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims shall have been paid"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (noting that debtors may pay prepetition claims that are essential to continued operation of business). "[F]acilitating the continued operation and rehabilitation of the debtor" is a paramount goal of both the doctrine of necessity and chapter 11. *In re Ionosphere Clubs, Inc.*, 98 B.R. at 176.

---

[3] *Accord In re Pers. Commc'ns Devices, LLC*, 588 B.R. 661, 666 (Bankr. E.D.N.Y. 2018); *see also In re Friedman's Inc.*, No. 09-10161 (CSS), 2011 WL 5975283, at *3 (Bankr. D. Del. Nov. 30, 2011) ("Normally, a debtor only pays prepetition, unsecured claims through a confirmed plan of reorganization . . . [h]owever, most courts will allow such payments under the 'doctrine of necessity,' if the debtor establishes that in its business judgment making such payments is critical to the survival of the debtor's business."); *In re Just for Feet, Inc.*, 242 B.R. 821, 825 (D. Del. 1999) ("The Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of prepetition claims when such payment is necessary for the debtor's survival during chapter 11."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) ("[T]o justify payment of a prepetition unsecured creditor, a debtor must show that the payment is necessary to avert a serious threat to the chapter 11 process.").

21. The relief requested in this Motion is an appropriate exercise of the Debtors' business judgment under sections 363(b) and 105(a) of the Bankruptcy Code. If the Service Providers do not continue providing the Services pursuant to the Management Agreement, the Debtors are at risk of immediate and irreparable harm. In the exercise of their business judgment, the Debtors have determined that payment under the Management Agreement is essential to its ongoing operations. Likewise, the Debtors, in the exercise of their business judgment, have determined that payment of prepetition amounts owing under the License Agreement is essential to avoid immediate and irreparable harm to its ongoing operations.

B. **The Debtors Should Be Authorized to Make Pre-Petition Payments Under the Agreements Pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.**

22. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are operating their businesses as debtors-in-possession. Accordingly, they are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) [their] equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). A chapter 11 debtor in possession has the implicit duty "to protect and preserve the estate, including an operating business's going-concern value." *Id.*

23. Under certain circumstances, a debtor in possession can fulfil its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The *CoServ* court noted that preplan satisfaction of prepetition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id.* The court outlined a three-prong test for determining whether a preplan payment on account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant. Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to

>   the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's prepetition claim. Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id.* at 498.

24. Payment of the Management Fee pursuant to the Service Agreement meets all three *CoServ* elements. First, it is critical that the Debtors deal with Parent because Parent provides various management, administrative, and technical services that are imperative to the Debtors' ongoing operations. Second, the Debtors believe that Parent would be unable to provide the Services postpetition if their prepetition balances are not paid. In fact, if the relationship between CSSE and Parent is severed, both companies risk becoming financially distressed. Consequently, failing to pay Parent the Management Fee harms the Debtors financially because losing access postpetition to the Services may force the Debtors to stop ongoing operations and cause irreparable harm. Third, there is no practical or legal alternative to payment of the claim. Thus, the Debtors submit that paying the Management Fee is a sound exercise of their fiduciary duties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

25. Likewise, payment of current prepetition Licensing Fees owing under the License Agreement meets each *CoServ* element. First, it is critical that the Debtors deal with Parent because Parent licensed the exclusive right to exploit the name "Chicken Soup for the Soul" to CSSE. Without such license, the Debtors cannot exploit the name "Chicken Soup for the Soul" and its related trademark, copyright, and design to produce Video Content. Second, loss of the license would result in disastrous harm to the Debtors because the mark "Chicken Soup for the Soul" is the most recognizable brand of the Debtors' businesses. Third, t there is no practical or legal alternative to payment of the claim.

**C. The Court Should Authorize the Debtors to Continue Paying Parent Postpetition in the Ordinary Course of Business Under the Agreements.**

26. The Debtors respectfully request that they be allowed to continue paying Parent pursuant to the Agreements consistent with their established course of dealing. Such payments are necessary to enable Parent to continue providing critical employees, insurance coverage, and other services upon which the Debtors rely to continue their own business and fulfill their obligations as debtors in possession in these Chapter 11 Cases.

27. Among other services, the Management Agreement provides for the payment for services that the Debtors are already obligated to pay. For example, under the Management Agreement, Parent provides health insurance for CSSE employees—a payment that CSSE would have to pay on its own if it was not provided for under the Management Agreement.

28. Additionally, both Parent and the Debtors rely on the Agreements to remain financially afloat. If the business relationship between Parent and CSSE were destroyed, both companies risk becoming financially distressed.

29. Although the Debtors do not assume the Agreements pursuant to this Motion, the Debtors believe the Services and license provided under the Agreements are actual and necessary costs of preserving its estate. Accordingly, the Debtors should be permitted to continue to pay for the Services and license pursuant to the Agreements.

**THE DEBTORS HAVE SATISFIED BANKRUPTCY RULE 6003(b)**

30. Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before 21 days after filing the petition. Fed. R. Bankr. P. 6003(b). As described above and in the First Day Declaration, the

relief requested in this Motion is essential to the Debtors' ongoing operations. Accordingly, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 6003(b) because the relief requested herein is necessary to avoid immediate and irreparable harm.

## BANKRUPTCY RULES 6004(a) AND (h) SHOULD BE WAIVED

31. To the extent that any aspect of the relief sought by this Motion constitutes a use of property under section 363(b) of the Bankruptcy Code, the Debtors respectfully request that the Court find that notice of this Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances and waive the fourteen (14) day stay under Bankruptcy Rule 6004(h). As described above and in the First Day Declaration, the relief requested by this Motion is necessary for the Debtors to be able to continue to operate their businesses and preserve the value of their estates. Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

32. Nothing contained in the Proposed Orders or this Motion (i) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors and their estates; (ii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority, basis, or amount of any claim against the Debtors and their estates; (iii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to any and all claims or causes of action; or (iv) shall be construed as a promise to pay a claim.

**NOTICE**

33. Notice of this Motion has or will be provided to (i) the Office of the United States Trustee for the District of Delaware; (ii) the holders of the thirty (30) largest unsecured claims against the Debtors' estates on a consolidated basis; (iii) counsel to Owlpoint IP Opportunities JVF I LP; (iv) counsel to HPS Investment Partners, LLC; (v) counsel to U.S. Bank National Association, as trustee for the 9.500% Notes due 2025; (vi) the Office of the United States Attorney for the District of Delaware; (vii) the Internal Revenue Service; (viii) the United States Securities and Exchange Commission; (ix) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (x) any other party in interest entitled to notice of this Motion pursuant to Local Rule 9013-1(m). As this Motion is seeking "first day" relief, within two (2) business days of the hearing on this Motion, the Debtors will serve copies of this Motion and any Order entered in respect of the Motion as required by Local Rule 9013-1(m). Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no other or further notice is necessary.

**NO PRIOR REQUEST**

34. No prior request for the relief sought by this Motion has been made to this Court or any other court.

**CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court: (i) enter the proposed Interim Order, substantially in the form attached as **Exhibit A**, granting the relief requested in this Motion on an interim basis and scheduling a final hearing on the Motion, and thereafter; (ii) enter the proposed Final Order, substantially in the form attached as **Exhibit B**; and (iii) grant such other relief to the Debtors as is appropriate.

| | |
|---|---|
| Dated:  June 29, 2024<br>          Wilmington, Delaware | Respectfully submitted, |
| **ASHBY & GEDDES, P.A.** | **REED SMITH LLP** |
| */s/ Ricardo Palacio*<br>Ricardo Palacio (DE Bar No. 3765)<br>Gregory A. Taylor (DE Bar No. 4008)<br>500 Delaware Avenue, 8th Floor<br>Wilmington, DE 19899-1150<br>Telephone: (302) 654-1888<br>Facsimile: (302) 654-2067<br>RPalacio@ashbygeddes.com<br>GTaylor@ashbygeddes.com | Mark W. Eckard (No. 4542)<br>1201 North Market Street, Suite 1500<br>Wilmington, DE 19801<br>Telephone:  302.778.7500<br>Facsimile:  302.778.7575<br>MEckard@ReedSmith.com<br><br>- and - |
| Michael P. Cooley (*pro hac vice* pending)<br>2850 N. Harwood St., Suite 1500<br>Dallas, TX 75201<br>Telephone:  469.680.4200<br>MPCooley@ReedSmith.com | Luke A. Sizemore (*pro hac vice* pending)<br>Reed Smith Centre<br>225 Fifth Avenue, Suite 1200<br>Pittsburgh, PA 15222<br>Telephone:  412.288.3334<br>LSizemore@ReedSmith.com<br><br>*Proposed Counsel for the Debtors and Debtors-in-Possession* |