Exhibit C

Case 24-11442-MFW    Doc 27-3    Filed 07/01/24    Page 2 of 7

In re R&J Pizza Corporation, Not Reported in B.R. Rptr. (2014)

2014 WL 12973408

Editor's Note: Additions are indicated by Text and deletions by Text .

Only the Westlaw citation is currently available.
United States Bankruptcy Court, E.D. New York.

IN RE: R&J PIZZA CORPORATION, Debtor.

Case No.: 14-43066-CEC
|
Signed October 14, 2014

**Attorneys and Law Firms**

Wanda Borges, Borges & Associates, LLC, Syosset, NY, Jennifer Lang Koo, Deer Park, NY, for Debtor.

Melanie A. FitzGerald, Gary F. Herbst, Salvatore LaMonica, Nicholas C. Rigano, LaMonica Herbst & Maniscalco LLP, Wantagh, NY, for Trustee Salvatore LaMonica, Esq.

Marylou Martin, Department of Justice, New York, NY, for U.S. Trustee.

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

Carla E. Craig, United States Bankruptcy Judge

 *1  UPON the motion of Merchant Cash & Capital, LLC ("MCC"), by its attorneys, Pryor & Mandelup, LLP (the "Motion") filed August 13, 2014 [Docket No. 43] seeking the entry of an order prohibiting the use of non-estate property by R&J Pizza Corporation (the "Debtor"); and good and timely notice of the Motion having been made; and the Debtor having filed an objection to the Motion (the "Objection") on September 1, 2014 [Docket No. 49]; and a hearing having been held on the Motion on September 3, 2014; and the Debtor having appeared by its counsel, The Law Office of Jennifer Koo; and MCC having appeared by its counsel, Pryor & Mandelup, LLP; and after due deliberation and for good cause shown, the Court makes the following Findings of Fact and Conclusions of Law and issue the within Order.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

1. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

2. On June 16, 2014 (the "Petition Date") the Debtor filed a voluntary petition for relief from its creditors pursuant to Chapter 11 of the Bankruptcy Code.

3. The Debtor continues to manage and operate its business as a debtor-in-possession pursuant Bankruptcy Code §§ 1107 and 1108.

4. On or about February 3, 2012, the Debtor and MCC entered into an agreement (the "February 2012 Purchase Agreement") under which the Debtor sold, and MCC purchased, an undivided 16% interest in future credit card, debit card, bank card and/or other charge card (collectively, "Credit Card") receivables (the "Accounts") due to the Debtor in the total amount of $129,000.00.

5. In order to facilitate the distribution to MCC of the cash attributable to its purchased interest in the credit card receivables, the Debtor agreed to enter into a processing agreement with a credit card processor acceptable to MCC.

6. Accordingly, contemporaneously with the execution of the February 2012 Purchase Agreement, the Debtor entered into a credit card processing agreement with Newtek Merchant Solutions ("Newtek") and an addendum thereto which authorized Newtek to direct cash attributable to the purchased accounts directly to MCC.

7. On or about February 3, 2012, MCC paid to the Debtor the purchase price for the Accounts in the amount of $100,000.00. In accordance with Article 9 of the New York Uniform Commercial Code ("UCC"), MCC filed a UCC-1 financing statement with the New York Secretary of State to provide notice of its purchase of the Accounts.

8. On or about May 7, 2012 the Debtor entered into a further agreement (the "May 2012 Purchase Agreement") whereby MCC purchased additional Accounts from the Debtor.

9. On May 29, 2013, the Debtor and MCC agreed to a modification of the May 2012 Purchase Agreement (the "Modification Agreement" and, collectively with the February 2012 Purchase Agreement and the May 2012 Purchase Agreement, the "Purchase Agreements") under which the Debtor agreed to sell further additional Accounts to MCC, aggregating $72,000.00, for the purchase price of $91,821.00.

 *2  10. Under the Modification Agreement, The Debtor sold, and MCC purchased, 13% of the Debtor's Accounts until the aggregate total of the purchase price is paid in full.

11. Subsequent to the Petition Date, and in breach of the Purchase Agreements, the Debtor ceased utilizing Newtek and, retained a new credit card processor without MCC's knowledge or consent, and failed to instruct the new credit card processor to forward to MCC its portion of the Accounts thereby diverting the purchased Accounts and converting MCC's property.

12. The Debtor has failed to turnover the purchased Accounts as required under the Purchase Agreements. The unpaid portion of the purchased Accounts presently due to MCC is $17,627.68.

13. [Section 541 of the Bankruptcy Code](#) governs property of the Debtor's estate. However, the provisions of the Bankruptcy Code that govern "property of the estate" are borrowing statutes, i.e., the Bankruptcy Code does not create any property rights; rather, it protects legal or equitable interest already in existence. [In re Air Illinois, Inc., 53 B.R. 1, 2 (Bankr. Ill., 1984)](#). State law determines whether the debtor has a property right or interest in specific property. [Butner v. United States, 440 U.S. 48, 54 (1979)](#); [Mutual Benefit Life Ins. Co. v. Pinetree, Ltd. (In re Pinetree Ltd.), 876 F.2d 34, 36 (5th Cir. 1989)](#); [Maiona v. Vassilowitch (In re Vassilowitch), 72 B.R. 803, 805 (Bankr. D. Mass. 1987)](#).

14. Although Article 9 of New York's Uniform Commercial Code generally governs secured transactions, in the context of "accounts," the Article applies to both security interests in accounts and sales of accounts because the term "security interest" includes "any interest ***of a (CEC)*** ... ~~of a~~ buyer of accounts." [NY UCC § 1-201(37)](#).

15. The credit card receivables purchased by MCC qualify as "accounts" within the meaning of [NY UCC § 9-102(a)(2)](#).

16. The express language of [NY UCC § 9-318(a)](#) states: "A debtor ~~who~~ ***that*** has sold an account, a chattel paper, ~~a~~ payment intangible, or promissory note does not retain a legal or equitable interest in the collateral sold."

17. The official comment to this section elaborates:

> Subsection (a) makes explicit what was implicit, but perfectly obvious, under former Article 9: the fact that a sale of an account or chattel papers gives rise to a "security interest" does not imply that the seller retains an interest in the property that has been sold. To the contrary, a seller of an account or chattel paper retains no interest whatsoever in the property to the extent that it has been sold.

[NY UCC § 9-318](#), Official Comment 2.

18. The Debtor has no interest in purchased Accounts, having previously sold the Accounts to MCC, and thus the bankruptcy estate similarly has no interest in the purchased Accounts.

19. The Uniform Commercial Code does not provide rules for distinguishing between sales transactions and security transactions. See [NY UCC § 9-318](#), Official Comment 2. The determination of whether the Purchase Agreements constitutes a sale or a secured transaction is accordingly left to the Courts. See New [Jersey Tractor Trailer Training, Inc., 2007 WL 2892956,*5](#) (Bankr. D.N.J. 2007).

20. However, courts have developed a series of factors to be employed in determining whether assets transfers are "true sales" or transfers of collateral in connection with secured financing. [Id., at *7](#) (citing Aicher & Fellerhoff, [Characterization of a Transfer of Receivables as a Sale or a Secured Loan Upon Bankruptcy of the Transferor](#), 65 Ann. Bankr.L.J. 181 (1991)). The factors identified by various courts to find that a sale of receivables is in reality a loan are:

In re R&J Pizza Corporation, Not Reported in B.R. Rptr. (2014)

Case 24-11442-MFW    Doc 27-3    Filed 07/01/24    Page 4 of 7

**\*3** (1) Language of the documents and conduct of the parties;

(2) Recourse to the seller;

(3) Seller's retention of servicing and commingling of proceeds;

(4) Purchaser's failure to investigate the credit of the account debtor;

(5) Seller's right to excess collections;

(6) Purchaser's right to alter pricing terms;

(7) Seller's retention of right to alter or compromise unilaterally the terms of the transferred assets; and

(8) Seller's retention of right to repurchase assets.

Id. (citing Aicher & Fellerhoff, *supra*, 65 Am. Bankr.L.J. at 186-194; Lupica, Revised Article 9, Securitization Transactions and the Bankruptcy Dynamic, 9 Am. Bankr.Inst. L.Rev. 287, n 49 (2001); Fireman's Fund Ins. Cos. v. Grover (In re Woodson Co.), 813 F.2d 266, 272 (9th Cir. 1987); Bear v. Coben (In re Golden Plan of California, Inc.), 829 F.2d 705.707, 710 (9th Cir. 1986); Major's Furniture Mart, Inc. v. Castle Credit Corp. 602 F.2d 538, 542-44 (3d Cir. 1979); In re Coronet Capital Co., 142 B.R. 78 (Bankr. S.D.N.Y. 1992); In re Evergreen Valley Resort, Inc., 23 B.R. 659 (Bankr. D. Me. 1982); First Nat'l Bank of Louisville v. Hurricane Elkhorn Coal Corp. II (In re Hurricane Elkhorn Coal Corp. II), 19 B.R. 609 (Bankr. W.D. Ky. 1982); Federated Dept. Stores, Inc. v. Comm'r, 51 T.C. 500, 511 (1968), aff'd, 426 F.2d 417 (6th Cir. 1970).

21. Thus, the case law focuses on the economics of the transaction and which party bears the risk of non-collection from the account debtor in determining whether a sale of accounts is a true sale or a secured transaction. In re Carolina Utilities Supply Co., 118 B.R. 412 415 (Bankr.D.S.C.199). While the terminology and characterization of the transaction in the agreement itself is a factor to be considered, it is not conclusive. Id. An examination of the Purchase Agreements reflect that consideration of the factors identified in the case law establishes that the transaction between the parties is a true sale and that the Debtor retained no rights in the purchased Accounts.

**A. Language of the Purchase Agreements**

22. The Purchase Agreements consistently refer to the transaction as a "purchase" and "sale" and MC and the Debtor as "Buyer" and "Seller" respectively. Specifically:

Merchant Cash and Capital, LLC (together with its successors and/or assigns, the "Buyer") hereby purchases from the merchant set forth above (the "Seller"), a percentage, as specified below (the "Purchased Percentage") of each future credit card, debit card, bank card and/or other charge card (collectively, "credit card") receivable due to the Seller from its credit card processor until the Buyer has received the amount specified below (the "Purchased Amount") for the purchase price ("Purchase Price") set forth below.

\* \* \*

Section 3.9 *Seller Not Indebted to Buyer.* The Seller is not a debtor of the Buyer as of the date of this Agreement.

\* \* \*

Section 4.1 *Sale of Credit Card Receivables.* The Seller and the Buyer acknowledge and agree that the Purchase Price paid by the Buyer in exchange for the Purchased Amount of future credit card receivables is a sale of the Purchased Amount and is not intended to be, nor shall it be construed as, a loan from the Buyer to the Seller.

**\*4**

\* \* \*

Section 5.5 *Filing of UCC Financing Statements; Further Assurances.*

Seller acknowledges that the sale of the Purchased Amount of Seller's future credit card receivables is governed by the Article 9 of the Uniform Commercial Code, which provides, among other things, that a purchaser is authorized to file a financing statement against a seller of receivables in order give notice to third parties. Accordingly, Seller hereby authorizes Buyer to file one or more financing statements evidencing the sale of the Purchased Amount of future credit card receivables hereunder, and any continuation statements or amendments thereto, and ratifies the filing of any financing statement filed by Buyer prior to the effectiveness hereof.

Case 24-11442-MFW    Doc 27-3    Filed 07/01/24    Page 5 of 7

In re R&J Pizza Corporation, Not Reported in B.R. Rptr. (2014)

...

The UCC financing statement shall state that the sale of the credit card receivables of the Seller is intended to be a outright sale of future credit card receivables and is not intended to be, nor is it to be construed as, a financing or an assignment for securing the obligations of the seller....

(See May 2012 Purchase Agreement, Exhibit "D" to the Motion)

23. The UCC-1 financing statement filed by MCC similarly describes the transaction as a purchase and sale:

> Certain future credit card, debit card, bank card and other charge card (credit card) receivables sold by [Debtor] as seller, and purchased by [MCC] as buyer ... The sale of future receivables pursuant to the Agreement is intended by the parties thereto to be an outright sale of such future receivables and not intended to be, nor is it to be construed as, a financing or an assignment for securing the obligations of the seller ...

(See UCC-1, Exhibit "C" to Motion)

24. Moreover, the business terms of the transaction are consistent with a true sale and not a secured transaction. Notably, there is no right to collect interest on the "Purchase Price", regardless of how long it may take for MCC to collect the "Purchased Amount" of the Accounts.

**B. No Recourse to the Seller.**

25. The Purchase Agreement does not provide for recourse against the Debtor for non-collection. Thus, if the Debtor ceases operations, MCC has no right to collect any amounts from the Debtor, regardless of the amount of credit card receivables that have been collected and remitted to MCC at the time. Indeed, the only circumstance under which MCC would have rights against the Debtor occurs upon an affirmative act by the Debtor which impairs MCC's rights in the acquired assets, such as the subsequent sale or granting of a lien on the purchased Accounts, or the termination of the credit card processor.

26. Moreover, the personal guarantee of the Debtor's principal provided in the Purchase Agreement is effective only upon a certain limited circumstances including, misrepresentation of fact, a termination of the credit card processor before MCC receives the Purchased Amount, or a sale by the Debtor of substantially all of its assets without notice to MCC.

**C. No Right to Repurchase**

27. The Purchase Agreement expressly provides that the Debtor has no right to repurchase any of the purchased Accounts.

**D. Seller Retained No Rights to Process and Commingle Proceeds**

 *5  28. Under the Purchase Agreement, the Debtor did not retain any servicing rights or any rights to collect the proceeds of the purchased Accounts. To the contrary, the Purchase Agreement expressly requires the Debtor to utilize a credit card processor designated by MCC as its sole processor:

> In exchange for the foregoing, the Seller hereby agrees to enter into a credit card processing agreement reasonably acceptable to Buyer with a credit card processor (who shall serve as Seller's sole credit card processor), in order to obtain credit card processing services and the Seller hereby authorizes such credit card processor to pay the cash attributable to the Purchased Percentage of each credit card receivable due to the Seller to the Buyer rather than to the Seller until the Buyer has received an amount equal to the Purchased Amount.

\* \* \*

Section 1.1 *Processing Agreement.* The Seller has entered, or simultaneously with the execution hereof shall enter, into a processing agreement with a credit card processor reasonably acceptable to the Buyer. The Seller hereby authorizes and directs the credit card processor to pay to Buyer, rather than to the Seller, the Purchased Percentage of each credit card receivable due to the Seller, until the Buyer has received an amount equal to the Purchased Amount. Alternatively, if Buyer agrees to purchase credit card receipts of Seller pursuant to Buyer's "ACH Program", Seller authorizes Buyer and its agents to initiate electronic check or ACH payments equal to the Purchased Percentage of all credit card receipts of Seller until the Buyer has received an amount equal to the Purchased Amount and authorizes and directs its credit card processor and all

Case 24-11442-MFW    Doc 27-3    Filed 07/01/24    Page 6 of 7

In re R&J Pizza Corporation, Not Reported in B.R. Rptr. (2014)

applicable third parties to provide to Buyer and its agents all information necessary to permit them to determine the amount to be paid to Seller and initiate such electronic check or ACH payments. The authorizations in this Section 1.1 may only be revoked with the prior written consent of the Buyer, and the agreement with the credit card processor cannot be amended or terminated without the prior written consent of the Buyer. Buyer or its lender may change the account to which payments are made at any time without the consent of or notice to Seller, notwithstanding anything set forth in any payment instruction letter among the Seller, Buyer and credit card processor to the contrary. In the event that the Buyer determines, in its sole discretion, that the authorized credit card processor utilized by the Seller is no longer acceptable, the Seller shall have five (5) business days, upon receipt of Notice from the Buyer, to terminate its relationship with its credit card processor and to enter into a similar processing agreement with a new credit card processor acceptable to the Buyer. The Seller agrees to execute any documents and/or agreements in order to implement the foregoing.

Section 3.10 *Exclusive Use of Processor*. Seller understands that the services of the credit card processor accepted by the Buyer is the exclusive means by which the Seller can process its credit card transactions.

(See May 2012 Purchase Agreement, Exhibit "D").

29. MCC, in turn, is required to provided the Debtor with periodic reporting of the amounts collected;

> Section 2.2 *Monthly Statements*. The Buyer shall provide Seller with online access to view a history of credit card receipts received by the Buyer from the credit card processor.

 **\*6**  (See May 2012 Purchase Agreement, Exhibit "D" to Motion).

30. Under the foregoing provisions of the Purchase Agreements, the Debtor has no right to control the processing of its credit card receivables and no right to commingle the credit card receivables with those credit card receivables that were purchased by MCC.

**E. Purchasers Has No Right to Alter Pricing Terms.**

31. Under the Purchase Agreements, MCC has no right to alter the price of terms of the purchase.

32. The Purchase Agreements represent a true sale and not a disguised financing arrangement. Therefore, under the provisions of the Uniform Commercial Code cited above, the Debtor retained no rights in the purchased Accounts (*i.e.,* the Purchased Percentage), and thus the money the Debtor is currently collecting (as a result of its utilization of a new credit card processor in breach of the Purchase Agreements) does not constitute "cash collateral" which the Debtor may utilize under § 363 of the Bankruptcy Code, but rather constitutes the property of MCC which the Debtor has improperly converted.

33. The Debtor is obligated to turnover the purchased Accounts to MCC. See, In re Florian, 233 B.R. 25 (Bankr. D. CT. 1999) (directing trustee to turnover insurance proceeds which did not constitute property of debtor's estate);

Matter of Georgian Villa, Inc., 10 B.R. 79, 83-84 (Bankr. Ga. 1981) (holding that where it appears that the debtor has no beneficial interest in the property held in trust, it should be turned over to its true owner) citing In re Clemens 472 F.2d 939 (6th Cir. 1972); Todd v. Pettit, 108 F.2d 139 (5th Cir. 1939).

### ORDER

**BASED UPON THE FOREGOING, IT IS HEREBY**

**ORDERED**, the Accounts of the Debtor purchased by MCC pursuant to the pre-petition Purchase Agreements do not constitute property of the Debtor or the Debtor's bankruptcy estate; and it is further

**ORDERED**, that the Debtor is prohibited from utilizing the purchased Accounts (which constitute thirteen (13%) percent of the Debtor's future Credit Card receivables as defined in the Purchase Agreements) until the unpaid portion of the purchased Accounts totaling $17,627.68 is paid in full; and it is further

**ORDERED,** that within ten (10) days the entry of this order, the Debtor shall begin utilizing a credit card processor ("the Credit Card Processor") acceptable to MCC; and it is further

In re R&J Pizza Corporation, Not Reported in B.R. Rptr. (2014)

Case 24-11442-MFW    Doc 27-3    Filed 07/01/24    Page 7 of 7

**ORDERED**, the Credit Card Processor is hereby authorized and directed to turn over the purchased Accounts to MCC in accordance with the terms of the Purchase Agreements until such time as the unpaid portion of the purchased Accounts totaling $17,627.68 is delivered in full.

**All Citations**

Not Reported in B.R. Rptr., 2014 WL 12973408

---

End of Document                © 2024 Thomson Reuters. No claim to original U.S. Government Works.