## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| CHICKEN SOUP FOR THE SOUL ENTERTAINMENT, INC., *et al.*, [1] | Case No. 24-11442 (TMH) |
| Debtors. | (Joint Administration Requested) |
| | **Re: D.I. 3, 4, 8, 10** |

## HPS INVESTMENT PARTNERS, LLC'S OMNIBUS OBJECTION TO THE DEBTORS' DIP MOTION, CASH MANAGEMENT MOTION, MANAGEMENT SERVICES FEE MOTION, AND WAGES MOTION

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number (where applicable), are: 757 Film Acquisition LLC (4300); Chicken Soup for the Soul Entertainment Inc. (0811); Chicken Soup for the Soul Studios, LLC (9993); Chicken Soup for the Soul Television Group, LLC; Crackle Plus, LLC (9379); CSS AVOD Inc. (4038); CSSESIG, LLC (7150); Digital Media  Enterprise, LLC; Halcyon Studios, LLC (3312); Halcyon Television, LLC (9873); Landmark Studio Group LLC (3671); Locomotive Global, Inc. (2094); Pivotshare, Inc. (2165); RB Second Merger Sub LLC (0754); Redbox Automated Retail, LLC (0436); Redbox Entertainment, LLC (7085); Redbox Holdings, LLC (7338); Redbox Incentives LLC (1123); Redwood Intermediate, LLC (2733); Screen Media Films, LLC; Screen Media Ventures, LLC (2466); and TOFG LLC (0508). The Debtors' corporate headquarters and service address is 132 East Putnam Avenue, Floor 2W, Cos Cob, CT 06807.

HPS Investment Partners, LLC (the "Agent"), as administrative agent under the Amended and Restated Credit Agreement, dated as of August 11, 2022 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Credit Agreement"), among Debtor Chicken Soup for the Soul Entertainment, Inc. ("CSSE" and, together with its subsidiaries, the "Company", and, together with its Debtor affiliates, the "Debtors") and Redbox Automated Retail, LLC, as borrowers, the HPS-managed lender parties thereto, including Aiguilles Rouges Sector B Investment Fund, L.P., American United Life Insurance Company, Brickyard Direct Holdings, L.P., Cactus Direct Holdings, L.P., Cactus Direct Lending, L.P., Core Senior Lending Fund (A-A), L.P., Core Senior Lending Fund, L.P., Core Senior Master Fund (PB), L.P., CSL Fund (PB) Holdings C, L.P. CSL Fund (PB) Holdings, B, L.P., CSL Fund (PB) Holdings, L.P., and Falcon Credit Fund, L.P. (collectively, the "Secured Lenders"), by and through its undersigned counsel, respectfully submits this objection (the "Objection") objecting to the DIP Motion,[2] Cash Management Motion,[3] Wages Motion,[4] and Management Services Fee Motion[5] filed on June 28-29, 2024 (collectively, the "First Day Motions"), and seek an order delaying any interim or final

---

[2]  *Debtors' Motion for Entry of Interim and Final Orders Under 11 U.S.C. §§ 105, 361, 362, 363 and 364 (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing, (B) Grant Liens and Superpriority Administrative Expense Claims to Post-Petition Lenders, and (C) Utilize Cash Collateral; (II) Providing Adequate Protection to the Pre-Petition Secured Parties; (III) Modifying the Automatic Stay; (IV) Granting Related Relief, Pursuant to 11 U.S.C. Sections 105, 361, 362, 363, 364 and 507; and (V) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2; and (III) Granting Related Relief*, [Dkt No. 8] (the "DIP Motion").*

[3]  *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of Cash Management System, Bank Accounts, and Business Forms and Payment of Related Prepetition Obligations; (II) Waiving the Requirements of 11 U.S.C. § 345(b); (III) Authorizing Continued Performance of Intercompany Transactions; and (IV) Granting Related Relief*, [Dkt No. 4] (the "Cash Management Motion").*

[4]  *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Reimbursable Expenses, and other Obligations on Account of Compensation and Benefits Programs and (B) Continue Compensation and Benefits Programs; and (II) Granting Related Relief*, [Dkt No. 3] (the "Wages Motion").*

[5]  *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Continue Ordinary Course Business Relationship Under Management Services Agreement and License Agreement with Parent Company*, [Dkt No. 10] (the "Management Services Fee Motion").*

ruling on any of the First Day Motions pending the outcome of *HPS Investment Partners, LLC's Motion to (I) Reconstitute the Debtors' Board of Directors and Strategic Review Committees, or in the Alternative, (II) Appoint a Chapter 11 Trustee, or, in the Alternative, (III) Convert the Chapter 11 Cases to Chapter 7 Liquidation* (the "<u>Reconstitution Motion</u>"), which is forthcoming, and granting such other relief as is just and proper.  In support of this Objection, the Agent states as follows:[6]

## <u>PRELIMINARY STATEMENT</u>

1.      As described in the Reconstitution Motion, these cases have been improperly filed. Just weeks before filing, Mr. William J. Rouhana, Jr., the then-CEO of the Debtors and the current controlling shareholder of all the Debtors and the chairman of each of their boards, purported to fire all of the Debtors' directors (other than himself), including independent directors approved by the Agent, and to terminate a key subcommittee (populated by multiple independent directors) tasked with monetizing the Company's assets.  Then, on the *literal eve* of the Debtors' bankruptcy filing, Mr. Rouhana reconstituted the boards and subcommittees, removing the previous, independent directors, and installing a CEO who lacks experience to lead the Debtors through the immense challenges they face.  And while these machinations would have entrenched Mr. Rouhana in power (despite his disastrous and lawless stewardship of the Debtors), they violated corporate governance documents and carefully negotiated credit and other agreements with the Company's lenders, and are therefore void.

2.      Setting aside those infirmities, the Secured Lenders believe that a bankruptcy proceeding before this Court, supervised by a *legitimate* board or chapter 11 trustee, is the best

---

[6]     Capitalized terms used but not otherwise defined herein have the same meanings ascribed to them in the Reconstitution Motion.

course for these cases.  And while the Agent submits that the Court should, for this reason, rule on the Reconstitution Motion as the first point of order, it remains compelled to file this objection to several of the First Day Motions—which are not only half-baked, but shocking in their lies, inaccuracies, and lack of merit.

3.      Most egregious is the DIP Motion.  The Debtors seek to (i) prime the collateral securing the Secured Lenders' roughly $500 million in outstanding first lien debt with a facility in an amount up to $20 million (with the ability to upsize to $100 million at the discretion of the DIP lender) and (ii) use the Secured Lenders' cash collateral on a non-consensual basis.  But the *only* adequate protection the Debtors are providing to the Secured Lenders to justify priming their first priority interests and using their cash collateral is in the form of replacement liens—which, as case law confirms, provide no protection at all.  Alternatively, the Debtors point to a mythical equity cushion of at least 20%.

4.      The Agent struggles to understand how this could be pleaded with a straight face— the assertion is flatly contradicted by the Debtors' own quantifiable metrics *and* the parties' conduct.  For example, the Debtors have reported suffering net losses of $636.6 million in 2023 and $52.9 million in Q1 2024.  As of the Petition Date, it appears that the Debtors have a book value deficit of over *$550 million*.  Based on those figures, it is unfathomable that the Debtors' current assets could exceed the outstanding debt of the Secured Lenders, even before accounting for the priming DIP.  Furthermore, the Court need look no further than the Forbearance Agreement among the Agent, the Secured Lenders, and the Debtors in which the Secured Lenders agreed to exit their investment for a *60% haircut* on their loans if the Debtors could raise new financing to pay them down within the time periods required by, and as provided in, the Forbearance Agreement.  The Debtors could not.  Mr. Rouhana instead purported to fire all of the directors

other than himself.

5.      The "evidence" the Debtors *do* purport to use to establish an equity cushion cannot be credited.  The entire basis for the Debtors' assertion that there is an equity cushion is a 2023 report from Virtu Global Advisors, LLC, which erroneously suggests that CSSE has an enterprise value in excess of $800 million.  The Debtors present no witness declaration to substantiate the report, which is fatally flawed.  Among many other things, the report is dated November 2023 (eight months before the Petition Date) and uses actual numbers only for FY 2022 and projections for everything else—projections that have *proven* to be wildly inaccurate.  As one example, the report *projects* a total operating loss of $77 million in FY 2023, where we *know* the Company suffered *actual* operating losses of *$556 million* in that period.  Furthermore, CSSE has *never* traded even close to an enterprise value of $800 million, which would have likely been impossible given the continued losses experienced by the Company.

6.      The Debtors also fail to provide competent evidence of a DIP marketing process. Claiming in their papers to have run a robust process, the Debtors point to solicitation work allegedly done by a former advisor, Solomon Partners.  But the Debtors submit no declaration from anyone at Solomon Partners as support for their assertion.  More concerning, the Agent understands that Solomon Partners did not even participate in any such marketing process.  The Debtors have failed on every measure to satisfy their steep burden to warrant the priming DIP and nonconsensual use of cash collateral they seek.

7.      To overcome these manifest infirmities, the Debtors argue (also incredibly) that the Secured Lenders somehow consented to a priming facility under the Credit Agreement.  This argument is, once again, demonstrably false and frivolous.  In support, the Debtors cite to a provision in the Credit Agreement that *no longer exists*—it was removed by an amendment, dated

April 29, 2024, that was signed by Mr. Rouhana, himself, on behalf of the Debtors and filed publicly in the Debtors' Form 8-K. But even if this provision were not completely made up, it is wholly irrelevant, as it does not contemplate bankruptcy, DIP financing, priming of liens, or consent of any kind.

8.    The lead-up to this filing and the proposed DIP Financing makes the Debtors' and Mr. Rouhana's bad faith conduct even clearer. The Agent attempted to engage with the Debtors for months regarding their failing liquidity position and was rebuffed at every turn. In fact, *on the day of the bankruptcy filing*, the Agent and Mr. Rouhana were in contact, and Mr. Rouhana neither mentioned that he was planning on filing a bankruptcy case, nor shared any details regarding a potential priming DIP facility for these Chapter 11 Cases. This is astonishing.

9.    Finally, under the present circumstances, there is no basis to permit Mr. Rouhana and his affiliated entities to receive any funds from the Debtors—the risk of dissipation of assets is real and substantial. For this reason, the Agent also submits its initial objections to the Cash Management Motion and Management Services Fee Motion. Indeed, in the Cash Management Motion, the Debtors seek "to continue, in the ordinary course, certain intercompany transfers between and among the Debtors and their non-debtor affiliates," which would undoubtedly capture entities directly associated with Mr. Rouhana that have been receiving insider payments from the Company—at the expense of its creditors—for years. And the Management Services Fee Motion seeks to directly pay fees to CSSE's parent entity, which is controlled by Mr. Rouhana. To be clear, Mr. Rouhana should not be allowed to collect insider payments to the detriment of the Debtors and their creditors any longer, especially during these Chapter 11 Cases. In addition, the Agent objects to the Wages Motion on the ground that it does not provide enough evidentiary support to determine if the relief requested is appropriate. The Agent also believes there is a

6

credible basis to hold Mr. Rouhana personally liable for misuse of IRS funds and missed employee wages.

10.　　For the reasons detailed in this Objection, and the forthcoming Reconstitution Motion, the Agent respectfully requests that this Court (i) defer ruling on the First Day Motions until it has ruled on the Reconstitution Motion, or (ii) if the Court is inclined to consider the First Day Motions at this time, deny them as set forth herein.[7]

## **OBJECTION**

### I.　**Ruling on the First Day Motions Should Be Delayed Until the Court has Ruled on the Reconstitution Motion.**

11.　　Notwithstanding the purported resolutions attached to each of the Debtors' voluntary petitions, the "boards" that authorized those resolutions do not have the corporate authority to do so.　As discussed at length in the Reconstitution Motion, Mr. Rouhana improperly terminated all of Debtors' directors, except for himself, *ultra vires*.　Thus, any actions taken by Mr. Rouhana and these new "boards" are invalid, including seeking the relief requested in the First Day Motions.[8]　For this reason, alone, the Court should delay ruling on the relief sought in the First Day Motions—including the interim relief sought in the First Day Motions—until after ruling on the Reconstitution Motion.

12.　　Similar relief was sought before this Court in *In re Genapsys, Inc.*, Case No. 20-1061 (BLS) (Aug. 4, 2022).　There, the Court declined to rule on the final DIP financing motion and bidding procedures motion until after the Court had the opportunity to rule on a motion seeking to, among other things, dismiss the debtors' cases for being filed without proper corporate

---

[7]　Additional factual background is detailed in the Reconstitution Motion.

[8]　Although the "board" that authorized the first day petitions does not have corporate authority to do so, the Agent agrees that a bankruptcy proceeding before this Court is the best course of action for these Debtors at this time. Thus, the Agent is <u>not</u> seeking to dismiss these cases, but instead, seeks to reconstitute the boards as detailed in the Reconstitution Motion.

authorization or, in the alternative, appoint a chapter 11 trustee, given a contention, like here, that a different board of directors actually was in place than the board that authorized the filing.  *In re Genapsys, Inc.*, Aug. 4, 2022 Hr'g Tr. 25: 5-27:21 ("And I don't believe it would be appropriate for me to enter a final DIP order or otherwise . . . where in 11 days' time I'm going to be conducting what I assume is a substantive hearing on the motion to dismiss.").[9]  The same relief is necessary in these Chapter 11 Cases, as the Reconstitution Motion must be addressed in the first instance to ensure that the appropriate board of directors is making decisions on behalf of the Debtors and to further ensure that the Court does not consider priming the existing Secured Lenders, among other things, until it learns whether the true, authorized boards support such a request.

## II.   If the Court Does Not Delay Ruling, the Relief Sought in the First Day Motions Should Be Denied.[10]

### A.   The DIP Motion Should be Denied.

#### 1.   The Prepetition Agent Has Not Consented to a Priming Facility.

13.   The Debtors' argument that the Agent consented to a priming facility is nothing short of a brazen falsehood.  *First*, the provision that the Debtors point to as proof of consent is nowhere to be found in the ***operative*** Credit Agreement.  *See* DIP Motion ¶ 30 (citing to "section 6.01(j) of the Amended Credit Agreement").  The Debtors pulled this provision from a ***superseded*** version of the loan agreement, which has since been amended.  As can be seen in the Debtors' public filing attaching the operative Credit Agreement, Mr. Rouhana signed the "First Amendment to the Amended and Restated Credit Agreement" on behalf of the Debtors on April 29, 2024, which

---

[9]   In *In re Genapsys*, unlike here, the movants did not file an objection to the DIP motion until after interim relief was already granted.  A copy of the hearing transcript is attached hereto as **Exhibit A**.

[10]   While this Objection primarily focuses on specific objections to the DIP Motion, the Agent reserves all rights to assert additional objections related to the other First Day Motions at the appropriate juncture in these Chapter 11 Cases.  As discussed herein, and as a threshold issue, the Agent contends that the Debtors did not have the corporate authority to file the First Day Motions, and thus, all of the motions should be denied on this basis alone.

does not include the provision referenced in the DIP Motion. *See* May 3, 2024 CSSE 8-K, Exhibit 10.2. In other words, this provision does not exist. The fact that the Debtors would cite to a non-existent provision as their leading argument speaks volumes to their credibility.

14.     *Second*, even if the provision cited by the Debtors existed (it does not), it fails to provide any basis for this Court to conclude that the Secured Lenders have consented to a priming DIP facility. The former Section 6.01(j) provision does not reference bankruptcy, DIP financing, priming of liens, or consent of any kind. It is puzzling how the Debtors concluded that this provision amounts to the Secured Lenders' advance consent of a priming DIP facility. Indeed, the suggestion that a superseded debt basket (that simply permitted an ABL facility that was reasonably satisfactory to the Secured Lenders, with no corresponding lien basket) provides for consent to a DIP facility priming all the liens available under the loan agreement is incredulous and utterly unprecedented.[11]

15.     Pursuant to the Credit Agreement (and even the superseded versions thereof), the Lenders have **not** consented to any DIP financing that would prime their security position.

> **2.     The Debtors Failed to Satisfy Their Burden Under Section 364(d) of the Bankruptcy Code.**

16.     The Debtors have not met their burden to obtain a *priming* DIP financing under either prong of section 364(d) of the Bankruptcy Code. This section provides that a court may authorize a priming DIP "***only if***—(A) the [debtors are] unable to obtain such credit otherwise;

---

[11]    For reference, the superseded provision reads as follows: "Indebtedness of any Borrower or any Subsidiary Loan Party under (x) the Existing MidCap Facility in an aggregate principal amount not to exceed $40,000,000 and provided such Indebtedness is subject to the ABL Intercreditor Agreement and (y) any Permitted Refinancing Indebtedness in respect thereof, provided that (i) any Permitted Refinancing Indebtedness which is incurred to refinance in full both the Existing MidCap Facility and the Revolving Facility hereunder, may be in an aggregate principal amount not to exceed the $40,000,000 plus the aggregate principal amount outstanding under the Revolving Facility, (ii) all such Permitted Refinancing Indebtedness is subject to the ABL Intercreditor Agreement and (iii) all such Permitted Refinancing Indebtedness shall have customary advance rates on accounts receivable and inventory and shall be on other terms and conditions reasonably satisfactory to the Administrative Agent."

and (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1) (emphasis added). The Debtors have failed to demonstrate either prong.

> **a.    The Debtors Fail to Demonstrate They Made a Reasonable Effort to Obtain Financing on More Favorable Terms.**

17.    Under section 364(d)(1)(A) of the Bankruptcy Code, the "debtor ***must*** demonstrate that no suitable alternative financing is available from other sources." *In re Shubh Hotels Pittsburgh, LLC*, No. 312, 2011 WL 7145601, at *2 (Bankr. W.D. Pa. Feb. 1, 2011) (citing *Suntrust Bank v. Den-Mark Constr., Inc.*, 406 B.R. 683, 689 (E.D.N.C. 2009)) (emphasis added); *see also In re Harborwalk, LP*, No. 10-80043-G3-11, 2010 WL 346298, at *2 (Bankr. S.D. Tex. Jan. 29, 2010) ("[A] debtor must show that it made a reasonable effort to obtain post-petition financing from other potential lenders on less onerous terms and that such financing was unavailable."); *Suntrust Bank v. Den-Mark Constr., Inc.*, 406 B.R. at 691 (same); *In re Ames Dep't Stores, Inc.*, 115 B.R 34, 38 (Bankr. S.D.N.Y. 1990) (courts only begin to consider the terms of financing "once unavailability of less intrusive credit has been shown . . . ."). More specifically, "[s]ection 364(d)(1)(A) requires that [the] Debtor prove that financing is not available without the granting of a senior or equal lien." *In re Harborwalk, LP*, 2010 WL 346298, at *2 (denying a motion to approve post-petition financing from a third-party that included priming liens because the debtors' pre-petition lender had offered a competing proposal secured by existing liens).

18.    Despite their indisputable burden to do so, the Debtors put forth ***zero*** admissible evidence of their alleged efforts to "canvass[] the market" for an alternative DIP financing. DIP Motion ¶ 20. The Debtors make references to a "DIP Declaration" that supposedly lays out the marketing process, but the Debtors have not filed any such declaration. *See e.g.*, *id.* ¶¶ 19, 21, 34.

They also failed to list any witness for the first day hearing.  This is unsurprising, however, because there was no marketing process.

19.     Further, the Debtors disingenuously contend that "Solomon Partners, drawing on its experience in debt financing transactions in the home-related products industry,[12] identified multiple well-known and active DIP Lender, that in their professional judgment were the most likely to seriously pursue third-party postpetition financing.  The DIP Lender was the only party that expressed any willingness to pursue postpetition financing of the Debtors under the circumstances presented."  *Id.* ¶ 20.  Not only is this hearsay statement insufficient to satisfy the Debtors' burden under section 364(d), but it is false.  Upon information and belief, Solomon Partners was not involved in the alleged marketing process.  In fact, during a regularly scheduled call, Solomon Partners personnel communicated to the Agent that they were denied information necessary to conduct a proper sale process.  Presumably, this is why the Debtors have not filed Solomon Partners' declaration as support of the so-called marketing process nor listed any Solomon Partners personnel as a witness for the first day hearing.

20.     Shockingly, the Debtors failed to engage with their incumbent first-lien lenders on a DIP facility, as one would expect in any restructuring scenario, and especially in a marketing process led by a reputable firm like Solomon Partners.  It is hard to imagine any robust marketing process where the Debtors' own existing secured lenders were not included.

21.     The Debtors have not shown they made a good faith effort to obtain a DIP financing on better terms, and on this point alone, the relief requested in the DIP Motion should be denied.

---

[12]    It is unclear why Solomon Partners' experience in the "home-related products industry" is relevant in these cases.

       **b.**      **The Debtors Fail to Demonstrate that the Secured Lenders Are Adequately Protected.**

22.    Under section 364(d)(1), a court may not approve a non-consensual priming DIP unless the debtor proves "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1)(B). Importantly, the debtor "has the burden of proof on the issue of adequate protection." *Id.* § 364(d)(2).

23.    Courts recognize that "[p]riming is extraordinary relief requiring a strong showing that the loan to be subordinated is adequately protected. Bankruptcy judges are required to grant Section 364(d) financing only upon a tangible demonstration of adequate protection." *In re LTAP US, LLLP,* Case No. 10-14125(KG), 2011 Bankr. LEXIS 667, at *9 (Bankr. D. Del. Feb. 18, 2011) (*citing In re Swedeland Development Group, Inc*., 16 F.3d 552 (3d Cir. 1994)). Because of its extraordinary nature, a priming DIP must be a "last resort," and courts must be "particularly cautious when evaluating whether the subordinated creditor is adequately protected." *In re Stoney Creek Techs., LLC,* 364 B.R. 882, 890 (Bankr. E.D. Pa. 2007) (citation and internal quotation marks omitted); *see also In re YL W. 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("[G]ranting post-petition financing on a priming basis is extraordinary and is allowed only as a last resort.").

24.    The Debtors cannot meet their burden under section 364(d)(1)(B), because (i) there is no equity cushion, and (ii) the proposed adequate protection package is insufficient to protect the Secured Lenders' interests.

       *i.*  *The Secured Lenders Are Not Adequately Protected by an Equity Cushion.*

25.    "[I]n determining whether a secured creditor's interest is adequately protected, most courts engage in an analysis of the property's 'equity cushion'—the value of the property

after deducting the claim of the creditor seeking relief from the automatic stay and all senior claims." *Matter of Mendoza*, 111 F.3d 1264, 1272 (5th Cir. 1997) (quoting *Indian Palms Assoc., Ltd.*, 61 F.3d 197, 207 (3rd Cir.1995)). While an equity cushion may provide adequate protection, courts typically require that collateral value exceed the amount of debt outstanding by at least 20%. *See, e.g.*, *In re McKillips*, 81 B.R. 454, 458 (Bankr. N.D. Ill. 1987) ("Case law has almost uniformly held that an equity cushion of 20% or more constitutes adequate protection.") (collecting cases); *cf. Nantucket Inv'rs II v. Cal. Fed. Bank (In re Indian Palms Assocs.)*, 61 F.3d 197, 206 (3d Cir. 1995); *see also In re JER/Jameson Mezz Borrower II, LLC,* 461 B.R. 293, 305 (Bankr. D. Del. 2011) (finding 9% equity cushion to be inadequate). Moreover, "[v]aluation in a given case depends on that calculation which properly reflects a secured creditor's true state of protection. The concept of adequate protection does not envision a court stripping a secured creditor of the benefit of its bargain." *In re Phoenix Steel Corp.*, 39 B.R. 218, 224-25 (D. Del. 1984) (citing H. Rep. No. 95–595, 95th Cong., 1st Sess. 339 (1977), reprinted in 1978 U.S. Code Cong. & Admin. News 5963, 6295)).

26. The Debtors do not come remotely close to satisfying their burden. The Debtors allege that the Secured Lenders are adequately protected by an equity cushion based on the Debtors' "belie[f] that the evidence *will show* the existence of an approximately 30% equity cushion *after giving effect to the requested $50,000,000 DIP Financing.*" DIP Motion ¶ 51 (emphasis added); *see also id.*, n.5 ("The Debtors recognize that this 'priming' issue *may* necessitate a further evidentiary hearing."). The Debtors' mere belief as to what the evidence will show at a later date is not enough to satisfy their heightened burden under the Bankruptcy Code, which requires that they prove adequate protection as a prerequisite to obtaining a priming DIP. *In re Shaw Industries, Inc.*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003) (noting that the debtor holds

the burden to establish that a lienholder would be adequately protected if the debtor provides a senior lien); *In re Swedeland Dev.*, 16 F.3d at 564 ("A debtor has the burden to establish that the holder of the lien to be subordinated has adequate protection.").

27.     Regardless, any purported equity cushion clearly does not exist.  Publicly filed financial statements demonstrate the Debtors' distressed financial condition:  CSSE incurred ***net losses*** of approximately $636.6 million in 2023.  *See* CSSE Form 10-K (April 19, 2024) at 5 (emphasis added).  These loses have continued into 2024, with CSSE incurring a ***net loss*** of approximately $52.9 million for the three months ended March 31, 2024.  CSSE Form 10-Q (May 20, 2024) at 8 (emphasis added).  Moreover, the Debtors have been sent delisting notices on their stock that is continuing to decline, and, as of the Petition Date, the Debtors have a book value deficit of approximately $550 million.  *See* CSSE Form 10-K (April 19, 2024).

28.     Critically, pursuant to the Forbearance Agreement, the Secured Lenders agreed to take a 60% haircut on their secured loans if the Debtors could raise the new financing to pay down the balance within the time periods required by, and as provided in, the Forbearance Agreement. *See* CSSE Form 8-K (May 3, 2024).  Specifically, the Secured Lenders were willing to walk away from their $500 million in outstanding loans for a total payment of $200 million, if the Debtors could raise new financing to pay them down within the time periods required by, and as provided in, the Forbearance Agreement.  Yet, the Debtors were unable to secure new financing to effectuate this transaction.  If the Debtors could not raise enough capital to pay down the loans for 40 cents on the dollar, it is nonsensical that they will somehow be able to satisfy the Secured Parties' claims in full *after* taking into account the proposed priming DIP.  Accordingly, the Secured Parties are not protected by *any* equity cushion—let alone a 30% cushion.

29.     The Debtors ignore all of this evidence and, instead, point only to an inadmissible

"*Pro Forma Enterprise Valuation*" prepared by Virtu (which is not attached to the DIP Motion or any other pleadings) in which "Virtu identified a range of pro forma enterprise valuation indications from $834,900,000 to $883,600,000."  DIP Motion ¶ 49.  The Debtors conveniently fail to mention that the Virtu report was prepared nearly eight months ago, in November of 2023.  But, in any event, this report has always been an unreliable representation of the Debtors' financial position.  For example, the Virtu report includes an enterprise valuation of approximately $860 million, despite the fact that (i) CSSE's library was valued at only approximately $150-$200 million, and (ii) its historical market capitalization from 2018 had never even reached $700 million—let alone $860 million.  And the report relies on several questionable assumptions, including that CSSE had access to a $100 million Revolving Credit Facility.  As such, the Virtu report certainly is insufficient to prove adequate protection.

30.    Accordingly, the Debtors have failed to meet their burden under section 364 of the Bankruptcy Code and their request for a priming DIP Financing should be denied.

*ii.    The Debtors' Proposed Adequate Protection Package Does Not Adequately Protect the Secured Lenders' Interests.*

31.    As "adequate protection" for priming the Secured Lenders' liens, the Debtors seek to provide the Secured Lenders with mere replacement liens on the DIP Collateral (junior to the DIP Liens and Carve-Out).[13]

32.    This proposed adequate protection is wholly insufficient.  As an initial matter, "a replacement lien on assets against which [a creditor] already has a lien is illusory."  *In re LTAP US, LLLP*, No. 10-14125 (KG), 2011 WL 671761, at *3 (Bankr. D. Del. Feb. 18, 2011); *see also In re Las Torres Dev., L.L.C.*, 413 B.R. at 696 (noting it was "disingenuous" for debtors to argue

---

[13]    Although the DIP Motion—*see* ¶ 42—claims to provide additional forms of adequate protection, the proposed Interim Order only provides for the Adequate Protection Liens.  It is not clear whether this misstatement in the DIP Motion was intentional.

that they could grant replacement liens as adequate protection under section 361(2) of the Bankruptcy Code where the creditor already had a lien on the property); *Kimbrough Inv. Co. v. Royal d'Iberville Corp. (In re Royal d'Iberville Corp.)*, 10 B.R. 37, 39 (Bankr. S.D. Miss. 1981) (finding that a debtor could not satisfy its adequate protection burden with property already subject to creditor's security interest); *see also* 3 COLLIER ON BANKRUPTCY ¶ 364.05 (16th ed. 2022) ("Providing a lender with a replacement lien on assets on which it already has a lien is illusory and will not support an adequate protection finding.").

> **3.     The Debtors Should Not Be Authorized to Use the Secured Lenders' Cash Collateral Because the Debtors Have Not Demonstrated that the Secured Lenders' Interests Are Adequately Protected.**

33.     A debtor seeking to use a secured creditor's collateral is required to provide the secured creditor with adequate protection of its interest in such collateral. *See* 11 U.S.C. § 363(e) (emphasis added) ("on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or leases as is necessary to provide adequate protection of such interest."). "If adequate protection cannot be offered, such use, sale or lease of the collateral must be prohibited." *Metromedia Fiber Network Servs. v. Lexent, Inc. (In re Metromedia Fiber Network, Inc.)*, 290 B.R. 487, 491 (Bankr. S.D.N.Y. 2003) (internal quotations and citation omitted). Consent or adequate protection is particularly important in the context of cash collateral, given its unique nature and higher risks of dissipation than other forms of collateral. *See* 3 Collier on Bankruptcy ¶ 363.03[4][c] (16th ed. 2022).

34.     As with adequate protection under section 364(d)(1)(B), the proponent "should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights." *GVM, Inc. v. PeoplesBank (In re GVM, Inc.)*, 605 B.R. 315, 325 (Bankr. M.D. Pa. 2019) (citation omitted). And "[t]he burden of proof is on the debtor to demonstrate that

the secured creditor is adequately protected for the purpose of using its cash collateral." *Id.*; *see also* 11 U.S.C. § 363(p)(1).  The Debtors' burden of proof to make this demonstration is a high one.  *See, e.g.*, *First Bank of Miller v. Wieseler*, 45 B.R. 871, 876 (D.S.D. 1985) ("The debtor's standard in cash collateral cases is a high one."); *Matter of Raymer*, No. BK20-41195, 2021 WL 510198, at *4 (Bankr. D. Neb. Feb. 10, 2021) ("In cases where cash collateral is consumed the standard for determining adequate protection is strict.").

35.     The Debtors have utterly failed to meet their burden of proof because, as discussed in more detail above, (i) the Debtors' proposed adequate protection is insufficient to protect the Lenders' interests and (ii) the Debtors' purported "equity cushion" is belied by reality—including their current book value deficit of over $550 million (well in excess of the Secured Lenders' outstanding loans) and the fact that the Secured Lenders just recently offered to extinguish their debt for 40 cents on the dollar (a transaction the Debtors could not complete because they could not raise the necessary financing)—and supported by nothing more than hearsay in the form of a reference to an outdated report that, among other things, relies on unvetted "management projections" for 2023 and 2024 that have already proven to be grossly overoptimistic.

### 4.     The Debtors Have Not Demonstrated that the Other Terms of the DIP Financing Are Fair, Reasonable, and Adequate.

36.     In addition to the non-permissible priming, the proposed DIP financing contains several other egregious terms, including, among other things:

- an interest rate of "SOFR with a floor of 4% plus 11% margin," increasing by 4% upon an event of default (DIP Motion ¶ 12);

- the greater of the payment of a MOIC of "1.30 times cash-on-cash and 20% Internal Rate of Return" (*id.* ¶ 13); and

- payment of various fees and other compensation, including (i) a 3% "closing commitment fee" payable upon entry of the Interim DIP Order, (ii) professional fees, (iii) a $400,000 "Interest, Legal, and Administrative Reserve," and (iv) "[p]enny

warrants equal to 5% of the fully diluted equity interests of the reorganized Company" (*id.* at 19-20).

37.     Yet again, the Debtors have not met their burden of showing how any of these terms are "fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender." *See e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011). That is because they cannot—these terms are not market provisions.  For example, as support for the 3% fee,[14] the Debtors cite to two Delaware cases from *14 years ago* and two SDNY cases from nearly 10 years ago, which highlights the novelty of the request.  With respect to the DIP facility, generally, the Debtors claim—without providing any evidence— that "[g]iven the urgent need of the Debtors to obtain financial stability for the benefit of all parties in interest, the terms of the DIP Facility are fair, appropriate, reasonable and in the best interests of the Debtors, their estates, and their creditors."  DIP Motion ¶ 37.  This is not enough to meet their burden, especially without first running a proper market process.

38.     For all of the foregoing reasons, the DIP Motion should be denied.

### III.    The Cash Management Motion, Management Services Fee Motion, and Wages Motion Should Also be Denied.

39.     To the extent the Court is inclined to consider the relief sought in the Cash Management Motion or Management Services Fee Motion—notwithstanding that neither has been properly authorized—these Motions should also be denied.  The Debtors' cash should not be used to continue to pay insider-payments to Mr. Rouhana or non-Debtor entities associated with Mr. Rouhana.  In the Cash Management Motion, the Debtors seek "to continue, in the ordinary course,

---

[14]   This fee is referred to the Debtors as both a "closing and commitment fee" and "breakup fee."  *See e.g.*, DIP Motion ¶ 47 ("[T]he Debtors also seek approval to pay the DIP Lender a breakup fee of 3% of the Commitment Amount"); *id.* at 19 ("**Closing Fee**. Debtors will pay to DIP Lender a closing and commitment fee in the amount of 3% of the Commitment Amount, which shall be provided for in the DIP Budget and payable upon entry of the Interim DIP Order, either in cash or netted from the first advance from the DIP Facility.").

certain intercompany transfers between and among the Debtors and their non-debtor affiliates," and the Management Services Fee Motion seeks to directly pay fees to CSSE's parent entity, which is owned and controlled by Mr. Rouhana. As detailed in the Reconstitution Motion, Mr. Rouhana has engaged in a pattern of siphoning money away from the Debtors under the guise of management and other payments, which is one of the principal reasons the Debtors have found themselves in this financial predicament. Mr. Rouhana should not be allowed to continue this conduct at the expense of the estates, and the Agent implores the Court to stop him in his tracks and deny both the Cash Management Motion and Management Services Fee Motion.

40.    In the Wages Motion, the Debtors seek to pay all prepetition wages, salaries, commissions, other compensation, reimbursable expenses, and other obligations on account of compensation and benefit programs. As detailed in the Reconstitution Motion, the Debtors failed to fund payroll of its employees at the hands of Mr. Rouhana's management. The Agent objects to the Wages Motion as it does not provide enough evidentiary support to determine if wages are apportioned appropriately, and that no additional cash will be paid to Mr. Rouhana. The Agent also contends that there is a credible basis to hold Mr. Rouhana personally liable for misuse of IRS funds and missed employee wages. For these reasons, the Wages Motion should also be denied.

## RESERVATION OF RIGHTS

41.    Given that this case was filed late on Friday night with no advanced notice to the Agent or Secured Lenders, the Agent fully reserves its rights to raise additional arguments in respect of the First Day Motions, and this Objection is without prejudice to the Agent's right to seek appropriate and additional relief, including additional adequate protection.

## CONCLUSION

For the foregoing reasons, the Agent respectfully requests this Court to (i) defer ruling on

the First Day Motions until it has ruled on the Reconstitution Motion or, if the Court is inclined to consider the First Day Motions at this time, (ii) deny them as set forth herein.

[*remainder of page intentionally left blank*]

Dated: July 1, 2024
Wilmington, Delaware

/s/   Russell C. Silberglied

Mark D. Collins (No. 2981)
Russell C. Silberglied (No. 3462)
Emily R. Mathews (No. 6866)
Alexander R. Steiger (No. 7139)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 651-7700
Fax:             (302) 651-7701
Email:          collins@rlf.com
                    silberglied@rlf.com
                    mathews@rlf.com
                    steiger@rlf.com

- and -

Dennis F. Dunne (*pro hac vice* forthcoming)
Matthew Brod (*pro hac vice* forthcoming)
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone:     (212) 530-5000
Fax:             (212) 530-5219
Email:          ddunne@Milbank.com
                    mbrod@Milbank.com

Andrew M. Leblanc (*pro hac vice* forthcoming)
Brett Lowe (*pro hac vice* forthcoming)
S. Robert Marsters, Jr. (*pro hac vice* forthcoming)
Danielle Lee Sauer (*pro hac vice* forthcoming)
**MILBANK LLP**
1850 K Street, N.W.
Suite 1100
Washington, DC 20006
Telephone:     (202) 835-7500
Fax:             (202) 263-7586
Email:          aleblanc@Milbank.com
                    blowe@Milbank.com
                    rmarsters@Milbank.com
                    dlee@Milbank.com

*Co-Counsel to HPS Investment Partners*