**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CHICKEN SOUP FOR THE SOUL ENTERTAINMENT, INC., *et al.* | Case No. 24-11442 |
| Debtors. | (Joint Administration Requested) |
| | **Proposed Obj Deadline: July 1, 2024 at 10:00 a.m. (ET)** |
| | **Proposed Hearing Date: July 1, 2024 at 10:00 a.m. (ET)** |

**HPS INVESTMENT PARTNERS, LLC'S MOTION TO**
**(I) RECONSTITUTE THE DEBTORS' BOARD OF DIRECTORS AND STRATEGIC**
**REVIEW COMMITTEES, OR, IN THE ALTERNATIVE, (II) APPOINT A CHAPTER**
**11 TRUSTEE, OR, IN THE ALTERNATIVE,**
**(III) CONVERT THE CHAPTER 11 CASES TO CHAPTER 7 LIQUIDATION**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................. 4

RELEVANT PARTIES ........................................................................................ 10

JURISDICTION .............................................................................................. 11

RELEVANT BACKGROUND ................................................................................ 11

    A.    The Debtors Are Deeply Insolvent. .................................................................. 12

    B.    The Debtors Have Been Grossly Mismanaged Through Mr. Rouhana's Egregious and Bad Faith Conduct. ............................................................................................ 13

        1.    Mr. Rouhana's Entities Have Continuously Drained the Debtors of Much Needed Cash. ................................................................................................ 14

        2.    The Debtors Have Breached the Credit Agreement Numerous Times and Misled the Public About Their Dealings with the Agent. ................................................ 15

        3.    The Debtors Have Failed to Make Payroll, Pay Their Taxes, and Pay Their Health Insurance Premiums. ....................................................................... 17

        4.    The Debtors Have Hemorrhaged Advisors. ............................................... 18

    C.    Despite the Debtors' Mismanagement and Insolvency, the Agent Had Agreed to a Path Forward for the Debtors. ........................................................................... 18

    D.    Failing to Honor His Agreement, Mr. Rouhana Egregiously Purported to Dismiss the SRC and Retakes Control of the Debtors. .......................................................... 21

RELIEF REQUESTED ....................................................................................... 22

BASIS FOR RELIEF REQUESTED .......................................................................... 22

    A.    Each of the Directors and Strategic Review Committees that Were Purportedly Terminated by Mr. Rouhana Should Be Reconstituted. ............................................................ 22

        1.    Mr. Rouhana Dismissed the Other Members of the Company's Boards of Directors and the SRC……………………………………………………………23

        2.    The Bankruptcy Court Possesses the Equitable Powers Necessary to Intervene in the Corporate Management of the Debtors. .......................................... 23

        3.    Mr. Rouhana's Actions Were Unauthorized and Violated the Company's Binding Agreements. ....................................................................................... 24

        4.    The Court Must Intervene in Corporate Management to Protect Creditors and

          Enforce the Company's Binding Obligations. ......................................................26

B.     In the Alternative, the Court Should Appoint a Chapter 11 Trustee. ..................................27

       1.     Cause Exists to Appoint a Chapter 11 Trustee as the Debtors' Management Is
              Incompetent and Has Grossly Mismanaged the Affairs of the Debtors...............28

       2.     Appointment of a Chapter 11 Trustee Is In the Stakeholders' Interest...............32

C.     In the Alternative, the Court Should Convert the Chapter 11 Cases to Cases Under Chapter
       7......................................................................................................................................33

       1.     Cause Exists for Conversion Because the Debtors Have Experienced and Are
              Experiencing a Substantial or Continuing Loss and Lack Any Reasonable
              Likelihood of Rehabilitation. ...............................................................................35

              i.      The Debtors Have Incurred Substantial and/or Continuing Losses........36

              ii.     There is No Reasonable Likelihood of Rehabilitation...........................38

       2.     Cause Also Exists to Convert These Chapter 11 Cases to Chapter 7 Due to the
              Debtor's Gross Mismanagement of the Estate.....................................................40

       3.     The "Unusual Circumstances" Exception Does Not Apply................................43

NOTICE...........................................................................................................................................44

CONCLUSION................................................................................................................................44

## TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*In re 1031 Tax Grp., LLC*,
    374 B.R. 78 (Bankr. S.D.N.Y. 2007) ..................................................................40

*In re 15375 Memorial Corp.*,
    386 B.R. 548 (Bankr. D. Del. 2008), *rev'd on other grounds*, 400 B.R. 420 (D.
    Del. 2008) ..........................................................................................................35

*In re AIG Fin. Prods. Corp.*,
    651 B.R. 463 (Bankr. D. Del. 2023) ..................................................................33

*In re Am. Capital Equip., LLC*,
    688 F.3d 145 (3d Cir. 2012)...............................................................................31

*In re Ancona*,
    2016 Bankr. LEXIS 4114 (Bankr. S.D.N.Y. Nov. 30, 2016) ..............................25

*In re BH S&B Holdings, LLC*,
    439 B.R. 342 (Bankr. S.D.N.Y. 2010)...............................................................35

*In re Broad Creek Edgewater, LP*,
    371 B.R. 752 (Bankr. D.S.C. 2007)...................................................................38

*In re Clinton Centrifuge, Inc.*,
    85 B.R. 980 (Bankr. E.D. Penn. 1988) ..............................................................24

*In re Executive Air Center, Inc.*,
    60 B.R. 652 (Bankr. W.D. La. 1986).................................................................21

*FDIC v. Colonial Realty Co.*,
    966 F.2d 57 (2d Cir. 1992).................................................................................21

*In re Gateway Access Sols., Inc.*,
    374 B.R. 556 (Bankr. M.D. Pa. 2007) .......................................................*passim*

*In re Grasso*,
    No. 12-11063-MDC, 2012 Bankr. LEXIS 6247 (Bankr. E.D. Pa. Oct. 16,
    2012) ............................................................................................................26, 29

*In re Great Am Pyramid J.V.*,
    144 B.R. 780 (Bankr. W.D. Tenn. 1992)...........................................................35

*Hawkins v. Daniel*,
    273 A.3d 792 (Del. Ch. 2022)...........................................................................22

*In re Landmark Atlantic Hess Farm, LLC*,
    448 B.R. 707 (Bankr. D. Md. 2011) ...................................................................35

*In re Lizeric Realty Corp.*,
    188 B.R. 499 (Bankr. S.D. N.Y. 1995) ...........................................................31, 32

*In re Lodge at Big Sky, LLC*,
    Nos. 10-62229-11, 10-62230-11, 2011 Bankr. LEXIS 2296 (Bankr. D. Mont.
    June 8, 2011) ........................................................................................................37

*Loop Corp. v. United States Tr.*,
    379 F.3d 511 (8th Cir. 2004) ..........................................................................31, 35

*In re MatlinPatterson Global Opportunities Partners II L.P.*,
    644 B.R. 418 (Bankr. S.D.N.Y. 2022) ................................................................40

*In re Morristown & Erie R. Co.*,
    885 F.2d 98 (3d Cir. 1989)...................................................................................21

*New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc.*,
    351 F.3d 86 (2d Cir. 2003)...................................................................................21

*In re NTI-NV, Inc.*,
    BAP No. NV-22-1248-BCL, 2023 Bankr. LEXIS 1575 (9th Cir. B.A.P. June
    15, 2023) ..............................................................................................................31

*In re Prods. Int'l Co.*,
    395 B.R. 101 (Bankr. D. Ariz. 2008)..............................................................37, 38

*In re PRS Ins. Group, Inc.*,
    274 B.R. 381 (Bankr. D. Del. 2001) ....................................................................29

*In re Ralph C. Tyler, P.E., P.S., Inc.*,
    156 B.R. 995 (Bankr. N.D. Ohio 1993) ...............................................................21

*In re Riverbend Cmty., LLC*,
    2012 WL 1030340, at *3 (Bankr. D. Del. Mar. 23, 2012)...................................31

*In re Sharon Steel Corp.*,
    86 B.R. 455 (Bankr. W.D. Pa. 1988) ..............................................................24, 25

*In re Sharon Steel Corp.*,
    871 F.2d 1217 (3d Cir. 1989)......................................................................24, 25, 29

*In re Starmark Clinics, LP*,
    388 B.R. 729 (Bankr. S.D. Tex. 2008) ................................................................31

*In re Viscon Shareholders Trust*,
   478 B.R. 292 (Bankr. S.D. Ohio 2012)...................................................................................37

HPS Investment Partners, LLC, ("HPS" or the "Agent") as administrative agent under the Amended and Restated Credit Agreement, dated as of August 11, 2022 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement," attached hereto as **Exhibit B**), among Debtor Chicken Soup for the Soul Entertainment, Inc. ("CSSE" and, together with its subsidiaries, the "Company", and, together with its Debtor affiliates, the "Debtors") and Redbox Automated Retail, LLC, as borrowers, the Agent-managed lender parties thereto, including Aiguilles Rouges Sector B Investment Fund, L.P., American United Life Insurance Company, Brickyard Direct Holdings, L.P., Cactus Direct Holdings, L.P., Cactus Direct Lending, L.P., Core Senior Lending Fund (A-A), L.P., Core Senior Lending Fund, L.P., Core Senior Master Fund (PB), L.P., CSL Fund (PB) Holdings C, L.P. CSL Fund (PB) Holdings, B, L.P., CSL Fund (PB) Holdings, L.P., and Falcon Credit Fund, L.P. (together, the "Secured Lenders"), and the Agent, by and through its undersigned counsel, respectfully submits this motion (the "Motion") for an order (i) reconstituting the Debtors' respective board of directors; in the alternative (ii) appointing a Chapter 11 trustee; or in the alternative (iii) converting the above-captioned chapter 11 cases (the "Chapter 11 Cases") to cases under chapter 7.  In support of the Motion, the Agent states as follows:

## PRELIMINARY STATEMENT

1.      These cases are necessary because of the gross mismanagement and self-dealing of William J. Rouhana Jr, the controlling shareholder, chairman of the board and former Chief Executive Officer at each of the Debtors.  On June 11, 2024, in violation of an irrevocable proxy, the corporate governance documents of CSSE's subsidiaries, and a carefully negotiated contractual agreement with the Agent and the Secured Lenders, Mr. Rouhana—the then-CEO of CSSE—fired all the directors of the Debtors (including recently appointed independent directors) except for

himself.  That same day, Mr. Rouhana also terminated and disbanded the Strategic Review Committee (the "SRC"), a subcommittee at each of the boards of directors that included two new independent directors.  Mr. Rouhana had no authority—contractual, corporate, or otherwise—to take these actions, which must be deemed void.  As a consequence of these actions, as well as Mr. Rouhana's rampant malfeasance, the Agent respectfully requests that this Court enter an order for reconstitution of the Debtors' boards of directors and the SRC.  Alternatively, the Agent submits that the Court should either appoint a chapter 11 trustee or convert these cases to a chapter 7 liquidation for cause.

2.     Roughly two weeks after Mr. Rouhana fired all directors and terminated the SRCs (but before filing these cases), the Company, under Mr. Rouhana's leadership, failed to make payroll for over 1,000 employees and missed payments, which resulted in the termination of their medical benefits.  It is the Agent's further understanding that Mr. Rouhana directly oversaw the Debtors' failure to pay over $15 million in payroll taxes, which remain outstanding.

3.     In anticipation of this bankruptcy filing, Mr. Rouhana has purported to reestablish new boards of directors and a new SRC.  But, as with the antecedent purging of the Debtors' directors and committees, neither of these actions are valid: among other things, Mr. Rouhana's unilateral reconstitution of the boards violated a host of corporate governance documents and contracts, including the Credit Agreement and a Forbearance Agreement (defined *infra*).  Mr. Rouhana also installed a new CEO who, like the newly appointed directors, lacks knowledge about the Company and its business and has no apparent experience running distressed companies. Conveniently, these new parties will be reliant on Mr. Rouhana to continue steering the ship in the background so long as this status quo remains.  Additionally, through his declaration, Mr. Rouhana

hinted at future legal action directed by CSSE against the Agent, though such claims, which would be frivolous, were already fully and permanently released pursuant to the Forbearance Agreement.

4.      These violations of contractual and fiduciary obligations come on the heels of years of gross mismanagement by Mr. Rouhana—including millions of dollars in payments by the Company to insiders and equity holders while the Company was bleeding cash (including as recently as September 2023)—that resulted in the Company incurring net losses of $636.6 million in 2023 and $52.9 million for the first quarter of 2024; receiving notices of delisting from the Nasdaq Composite, beginning on September 22, 2023; and having its liabilities exceed the book value of its assets by over $555 million as of the end of the first quarter of 2024.  Mr. Rouhana's misconduct is disqualifying, particularly given the urgency of the Debtors' situation.  Entrusting the future of the Company to the very individual who thrust it into despair is akin to hiring an arsonist to put out the raging fire she began.  These cases simply cannot proceed with Mr. Rouhana involved in *any* capacity and certainly not without the involvement of the independent directors Mr. Rouhana saw fit to summarily dismiss.

5.      To remedy the situation, by this motion, the Agent seeks, in the first instance, an order reconstituting the Debtors' boards of directors and the SRC to include the independent directors who were purportedly terminated by Mr. Rouhana.[1]  While the Agent does not believe that the Debtors had authority to file these Chapter 11 Cases and the first day motions in the first instance without the approval of these directors, there is no question that the Debtors belong in bankruptcy.  The Agent expects that, should these independent directors be reconstituted as having never been properly terminated, they would ratify the petitions for bankruptcy, provided that these

---

[1]    For the avoidance of doubt, such "reconstitution" includes any affirmation that these independent directors had never been properly terminated in the first place or direction that they be reinstated regardless of whether the directors' termination was valid.

cases proceed with appropriate first day and other relief.  In the alternative, by this motion, the Agent seeks an order either appointing a chapter 11 trustee or converting these Chapter 11 Cases to chapter 7 cases.

6.      Ample grounds exist for all three forms of alternative relief sought in this Motion.

7.      With respect to the reconstitution of the boards of directors and the SRC to include the independent directors approved by the Agent, the Court has broad authority to use its equitable powers to reconstitute a debtor's board of directors and board committees or to otherwise intervene in management decisions where such intervention is in the interest of the estate's creditors.  The statutory scheme and accompanying case law provides the Court with the discretion to do so where necessary, such as unwinding *ultra vires* decisions made by management, or more generally, to prevent a continuation of gross mismanagement to the detriment of creditors.

8.      Here, reconstitution of the Company's boards of directors and the SRC is warranted because Mr. Rouhana's firing of all the other directors and termination of the SRC lacked legal basis and therefore was invalid.  Mr. Rouhana (via entities he owns and controls) had already pledged the voting power accompanying his common shares via a proxy agreement.  In that voting proxy, Mr. Rouhana agreed *not* to remove the independent directors on the SRC and to vote for new directors in accordance with the Forbearance Agreement in the case of a vacancy in the seat filled by such director (the Forbearance Agreement required, among other things, the Company to select directors reasonably acceptable to the Agent for these seats).  Not only did Mr. Rouhana therefore violate the proxy agreement by removing the Company's directors, but, on information and belief, Mr. Rouhana also failed to comply with the corporate formalities at the subsidiary level when he purported to remove all the directors (or equivalent) at these entities but for himself.

9.     With respect to the appointment of a chapter 11 trustee, such appointment is required if the court (i) finds cause for appointment such as "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management" or (ii) finds that appointment is in the interest of the debtor's stakeholders and estate.  11 U.S.C. § 1104(a).

10.    These alternative standards are satisfied.  Debtors' management—led by Mr. Rouhana—has incompetently and grossly mismanaged the Debtors' affairs.  The misconduct described above—including making transfers to insiders while the Company was bleeding cash, firing the Company's directors in breach of both contract and corporate governance documents, failing to pay thousands of employees and allowing their medical benefits to be cancelled, and failing to pay millions of dollars in payroll taxes—is the tip of the iceberg.  Rather than work with its creditors, the Company, under Mr. Rouhana's leadership, preferred dishonesty and gamesmanship.  As just one example, earlier this year, the Company purported to make an interest payment on the loans issued by the Agent by having a Company representative drop a company check in an abandoned building that had not been occupied by the Agent for many years and was not the address that the Agent listed in the Credit Agreement.

11.    Initially, the Agent did not take remedial action, notwithstanding its right to do so. Over time, however, the breaches became increasingly significant.  In response, the Agent first sought to work with the Debtors to improve the business.  It agreed to a forbearance for multiple months while the Company sought new financing in exchange for, among other things, the Company appointing new independent directors and creating the SRC.  But after the Company received the benefit of that bargain and could not find a new financing in the allotted time, Mr. Rouhana reneged on the agreement by purporting to fire the directors and terminate the SRC.  Even in the very commencing of these chapter 11 cases Mr. Rouhana has engaged in gross

mismanagement, with Mr. Rouhana approving the filing of pleadings that assert blatantly false statements and request approval to use new financing to continue making insider payments to Mr. Rouhana's companies.  In short, Mr. Rouhana has repeatedly demonstrated that he cannot be trusted to have any role in the management of the Debtors.  Thus, appointing an independent chapter 11 trustee to take Mr. Rouhana's place would further the interest of all stakeholders and facilitate a more efficient and effective reorganization.

12.     Finally, if the Court finds that appointment of a chapter 11 trustee is not in the best interest of the Debtors' creditors and the estates, the Court should convert these Chapter 11 Cases to liquidation cases under chapter 7.  A Court must convert a chapter 11 case to a case under chapter 7 if it finds that cause exists for such conversion.  *See* 11 U.S.C. § 1112(b).  Cause for conversion includes "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" and "gross mismanagement of the estate."  *Id.*  Here, it is beyond dispute that the Debtors' estate has suffered substantial or continuing loss: the Company incurred enormous net losses in 2023 and in the first quarter of 2024, and virtually every relevant financial metric indicates that its financial condition has gone from bad to worse.  In particular, on April 29, 2024, the Secured Lenders and the Debtors entered into a forbearance agreement (the "Forbearance Agreement"), where the Secured Lenders agreed to accept a roughly *60%* haircut on their claims if the Debtors made the reduced repayments on the required terms and within required time period.  Not only did the Debtors fail to make the first payment by the deadline, but they also were unable to raise the necessary financing.  Moreover, there is no reasonable likelihood that the Debtors under the leadership or influence of Mr. Rouhana will be able to rehabilitate the Debtors' business.  Indeed, the gross mismanagement of the Debtors' affairs by Mr. Rouhana is the very reason for the Debtors' troubles today.

## **RELEVANT PARTIES**

13.     The Agent, as the administrative agent and collateral agent for the Lenders, administers an $80 million revolving credit facility and a $325 million term loan facility under the Credit Agreement.  As such, funds managed by the Agent represent the primary holders of the senior secured debt of Debtor CSSE and its subsidiaries.

14.     CSSE is a publicly traded Delaware corporation that filed for bankruptcy relief before this Court on June 28, 2024.[2]  CSSE is a direct subsidiary of CSS, which is owned and controlled by Mr. Rouhana and his wife, Amy Newmark.[3]  CSSE is one of the largest advertising-supported video-on-demand companies in the U.S.[4]  The Company additionally provides free ad-supported streaming television services, as well as a network of approximately 27,000 kiosks across the U.S. for DVD rentals.[5]  CSSE acquires and distributes film and TV series through its subsidiaries.[6]  CSSE has 38 subsidiary companies, all which were purportedly solely controlled by Mr. Rouhana after he recently purported to terminate all the other directors of these companies except himself, before he attempted to install new directors on the eve of these Chapter 11 Cases.[7]  Despite being a public company, CSSE remains under the reckless influence of Mr. Rouhana, who is the majority equity holder of CSSE's voting stock and the Chairman of the board of directors and, until earlier this week, was the CEO.

---

[2]     CSSE Chapter 11 Voluntary Pet. [Dkt. No. 1].

[3]     CSSE, Quarterly Report (Form 10-Q) at 24 (May 20, 2024) ("CSS is controlled by Mr. William J. Rouhana, Jr.")

[4]     *Id.* at 8; *see also Declaration of William J. Rouhana, Jr., Chairman of the Board, In Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "Rouhana Decl.") ¶ 6 [Dkt. No. 7].

[5]     CSSE, Quarterly Report (Form 10-Q) at 24 (May 20, 2024).

[6]     *Id.*

[7]     CSSE, Current Report (Form 8-K) (June 17, 2024) (noting that CSSE had removed all member of CSSE's board of directors and the board of directors or board of managers of each subsidiary other than Mr. Rouhana).

## JURISDICTION

15.    This Court has jurisdiction to hear this matter and enter a final order granting the relief requested herein pursuant to 28 U.S.C. §§ 1334 and 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2) upon which this Court has the authority to enter a final order.  The basis for the requested relief is 11 U.S.C. §§ 105(a), 1104(a), 1107(a), and 1112(b).

## RELEVANT BACKGROUND

16.    The Debtors provide entertainment content to value-conscious consumers,[8] and operate three advertising supported streaming services: Redbox, Crackle, and Chicken Soup for the Soul.[9]  To provide original and exclusive content to their viewers, the Debtors create, acquire, and distribute films and television series through Debtors Screen Media Ventures, LLC, Chicken Soup for the Soul Television Group, LLC, Landmark Studio Group, LLC, and each of their subsidiaries.[10]  In addition, through Debtor Redbox Automated Retail LLC ("RBAR"), the Debtors operate (i) Redbox Free Live TV, a free ad-supported streaming television service with approximately 180 channels, (ii) a transaction video-on-demand service, and (iii) a network of approximately 24,000 kiosks across the United States for DVD rentals.[11]

17.    In August 2022, the Debtors acquired RBAR.  At that time, the Debtors sought debt financing to fund that acquisition and subsequently entered into the Credit Agreement, which gave the Debtors access to an $80 million revolving credit facility and a $325 million term loan facility.  Movant, the Agent, serves as the administrative agent and collateral agent under the Credit

---

[8]    *See* Rouhana Decl. at ¶ 6.
[9]    *Id.*
[10]   *Id.*
[11]   *Id.* The remainder of the Rouhana Declaration should not be relied upon as it contains numerous mischaracterizations, distortions, and outright lies.

Agreement.  As such, the Agent represents the Secured Lenders: the lenders under the Credit Agreement and the Debtors' largest secured creditors.  By the Credit Agreement, the Debtors granted the Lenders security interests over substantially all their property.

18.     The Debtors are currently insolvent.  They have been in continuing default under the Credit Agreement, which has been accelerated prepetition.  The Debtors owe the Lenders at least $500 million today.[12]  Despite numerous accommodations from the Agent, the Debtors have been unable to resolve its myriad woes.  Now faced with an inability to pay its most basic obligations, the Debtors have filed for Chapter 11.

**A.     The Debtors Are Deeply Insolvent.**

19.     The Debtors' liabilities exceed their book value assets by hundreds of millions of dollars, and they are currently insolvent.

20.     Virtually every relevant financial metric indicates that the Debtors' business is failing.  The Debtors did not generate a profit in 2023; instead, they incurred net losses of $636.6 million in 2023.[13]  These significant losses have continued into 2024, with the Debtors incurring a net loss of approximately $52.9 million of the three months ended March 31, 2024.[14]  They have also experienced ***negative*** cash flow for the last few years.[15]  *Id.* (stating that cash flow was negative $502,728 for the quarter ended March 31, 2024; CSSE, Annual Report, (Form 10-K) 49 (April 19, 2024) (showing negative cash flows of $62.9 million for 2023).

21.     Additionally, since the beginning of 2023, the Debtors' financial condition worsened, with their liabilities now exceeding the book value of their assets by over $555 million.

---

[12]   CSSE, Quarterly Report (Form 10-Q) at 20 (May 20, 2024) (noting that, as of March 31, 2024, the total outstanding debt owed to the Agent has a "net book value of $493.1 million" as well as an additional $87.3 million in PIK interest).

[13]   CSSE, Annual Report, (Form 10-K) at 5 (Apr. 19, 2024).

[14]   CSSE, Quarterly Report, (Form 10-Q) at 39 (May 20, 2024).

[15]   *Id.* (stating that cash flow was negative $500,000 for the period ended March 31, 2024); CSSE, Annual Report, (Form 10-K) at 49 (Apr. 19, 2024) (showing negative cash flows of $23.3 million for 2022).

22.     CSSE's stock price has likewise declined in value during this period to reflect impending insolvency, especially on the date on which CSSE received a determination from NASDAQ to delist its stock.[16]   And, beginning with the third quarter of 2023, the Company's financial statements have contained a going concern qualification.[17]

23.     The Debtors' failed prepetition financing efforts further confirm that the Debtors are insolvent.   While the financial situation of the Debtors continued to grow more dire, the Secured Lenders entered into numerous agreements and agreed to accept $200 million (or 40 cents on the dollar) for their claims, expressly conditioned on the Debtors raising the secured financing necessary to make such payment within the periods and on the terms prescribed by the Forbearance Agreement (which they did not).   The Debtors, however, were unable to raise the requisite financing even on a company that, by agreement, would have had 60% less of its secured debt load.   Financing efforts confirm that the Debtors are insolvent today.

**B.      The Debtors Have Been Grossly Mismanaged Through Mr. Rouhana's Egregious and Bad Faith Conduct.**

24.     Mr. Rouhana is the founder and ultimate majority owner of the Debtors.[18]   Since 2008, Mr. Rouhana has been the CEO of the Debtors' parent company CSSE or its predecessor entity.[19]   He has similarly been the Executive Chairman of those entities since 2014.[20]   Through these roles, Mr. Rouhana has had complete control of the Debtors and has been responsible for overseeing the operational and financial activities of the Debtors.[21]

---

[16]    CSSE, Current Report (Form 8-K) (Mar. 29, 2024).
[17]    *See, e.g.*, CSSE, Quarterly Report, (Form 10-Q) at 8 (Dec. 22, 2023); CSSE, Quarterly Report, (Form 10-Q) at 8 (May 20, 2024).
[18]    CSSE, Annual Report (Form 10-K) at 26 (Apr. 19, 2024) ("William J. Rouhana, Jr., has control over the vast majority of all the outstanding voting power as represented by our outstanding Class B and Class A Common Stock and effectively controls CaSS Holdings and CSS, which controls CSS Productions, and, in turn, our company.").
[19]    *William J. Rouhana, Jr., Chairman & Chief Executive Officer*, Chicken Soup for the Soul Entertainment, https://ir.cssentertainment.com/management/william-j-rouhana-jr (last visited Jun. 30, 2024).
[20]    *Id*.
[21]    *Id*.

25.     From the Agent's perspective, Mr. Rouhana ran the Company with a focus first and foremost on maintaining his control.   He often limited or excluded any other members of management or Company advisors from various plans he had for the Company's future.   When it became clear that the business was deteriorating—and that the Company was not recovering from Covid as Mr. Rouhana had hoped—he continued to adopt unrealistic positions on the business projections and the Company's access to capital, which has led the Company to its current dire position: missed payroll, missed taxes, cancelation of employee healthcare, zero liquidity, and deteriorating assets.   This behavior is nothing new; Mr. Rouhana previously settled multimillion-dollar lawsuits that alleged similar bad faith conduct related to his management of his defunct former company, Winstar.[22]

### 1.      Mr. Rouhana's Entities Have Continuously Drained the Debtors of Much Needed Cash.

26.     For some time, the Debtors have been losing money quickly and have needed liquidity.[23]   Despite this need, Mr. Rouhana has caused the Debtors to continue to transfer cash to his controlled entities.   These transfers have enriched Mr. Rouhana personally to the detriment of the Debtors and their creditors.

27.     For example, in 2022 and 2023, approximately $18.4 million of management and license fees was paid each year to Mr. Rouhana or entities he controlled.[24]   And in the three months ended March 31, 2024, the Debtors paid a total of $9 million in management and license fees.[25]   Those management and license agreements, which were negotiated between entities controlled by

---

[22]   *See generally Chicken Soup for the Soul Entertainment is a Toxic Mess*, HINDENBURG RESEARCH, https://hindenburgresearch.com/chicken-soup-for-the-soul-entertainment-is-a-toxic-mess/ (last visited June 30, 2024).

[23]   *See supra* Section A.

[24]   CSSE, Annual Report (10-K) at 44 (Apr. 19, 2024).

[25]   CSSE, Quarterly Report (10-Q), at 24 (May 20, 2024).

Mr. Rouhana (*i.e.*, Mr. Rouhana was on both sides of the transactions), required the Debtors to pay approximately ***10% of their gross revenues*** to Mr. Rouhana's companies.[26]

28.     Further, Mr. Rouhana caused the Debtors to declare multiple dividends.  Since July 2018, CSSE has declared monthly cash dividends of $0.2031 per share on its Series A Preferred Stock to holders of record as of each month end.[27]  The dividends declared in 2022 totaled $9.7 million.[28]  On May 18, 2023, the Debtors announced a dividend of $0.2031 per share payable on June 15, 2023.[29]  And, most egregiously, on September 18, 2023, the Debtors announce another dividend $0.2031 per share, only four days before CSSE received a delisting notice from Nasdaq.[30] These dividend payments drained the Debtors of valuable resources at a time when they needed it most.

29.     Incredibly, in the first day motions, the Debtors seek to continue making payments to Mr. Rouhana or entities he controls in the ordinary course in these Chapter 11 Cases.[31]

### 2.     The Debtors Have Breached the Credit Agreement Numerous Times and Misled the Public About Their Dealings with the Agent.

30.     Mr. Rouhana's gross negligence has caused the Debtors to breach the Credit Agreement on numerous occasions.  Such breaches have caused the Debtors (and the Secured Lenders) severe harm.  While certain breaches were a result of poor financial performance, the Debtors' other breaches were avoidable.  Indeed, certain breaches appear intentional.

---

[26]  *See Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Continue Ordinary Course Business Relationship under Management Services Agreement and License Agreement with Parent Company* [D.I. 10] (June 29, 2024) (the "Insider Payment Motion").  Mr. Rouhana continues to attempt to siphon these generous management fees from the Debtors.  On June 29, 2024, the Debtors moved for authorization to continue making these payments to Mr. Rouhana or his controlled entities, including those amounts authorized by the aforementioned management agreements.  While the Debtors do no assert exactly how much would be paid in the postpetition period, the Debtors ask for authority to continue to pay Mr. Rouhana's entities over $1.6 million per month.

[27]  CSSE, Annual Report (10-K) at 37 (Mar. 31, 2023).

[28]  *Id.*

[29]  CSSE, Current Report (8-K) (May 18, 2023).

[30]  CSSE, Current Report (8-K) (Sept. 18, 2023).

[31]  *See supra* note 26.

31.     For example, in February of 2024, the Debtors breached the Credit Agreement because they failed to deliver quarterly financial statements for the fourth quarter of 2023.[32] Financial reporting is a basic function of a public company of the Debtors' size and scope.  Yet, the Debtors could not timely create and deliver such reports.

32.     At other times, the Debtors—at the direction of Mr. Rouhana—breached the agreement in bad faith.  On or about February 21, 2024, the Debtors delivered a non-certified check to an abandoned office space in Greenwich, Connecticut to purportedly make an interest payment to the Agent on behalf of the Lenders.[33]  The Agent sent a letter to Mr. Rouhana, noting that checks were not an acceptable method of payment under the Credit Agreement.[34]  The Agent further expressed confusion, because the address of the abandoned office space was not the payment address contained in the Credit Agreement.[35]

33.     The Debtors have also actively misled the public about their dealings with the Agent and the Lenders.  For example, in their quarterly report for the quarter ending September 30, 2023, the Debtors stated that they were in "active discussions to modify the terms of its existing loan agreement," among other things, for a "conversion of the entire existing debt and accrued interest into a minority and non-controlling interest in the Class A common stock of CSSE."[36]  In truth, the Company had unilaterally demanded that the Agent agree to a conversion (in a letter from its counsel on November 8, 2023) and the Agent had responded (in a letter from its counsel on November 13, 2023) that this was a non-starter.[37]  Thereafter, on December 3, 2023, the Debtors

---

[32]  *See* Letter from Alexey Pazukha, HPS, to William J. Rouhana, Jr, *et al*., CSSE, re: "Notice of Additional Event of Default and Reservation of Rights," at 1 (Mar. 15, 2024), attached hereto as **Exhibit C**.
[33]  *See* Letter from Daniel Wallitt, HPS, to William J. Rouhana, Jr, *et al*., CSSE, re: "Return of Check," at 1 (Feb. 26, 2024), attached hereto as **Exhibit D**.
[34]  *Id.*
[35]  *Id*.
[36]  CSSE, Quarterly Report (Form 10-Q) at 10, 42 (Dec. 22, 2023).
[37]  *See* Letter from Al Pisa, *et al.*, Milbank, to Jordan W. Siev, Reed Smith, re: "Chicken Soup for the Soul Entertainment, Inc.," dated Nov. 13, 2023, attached hereto as **Exhibit E**.

indicated that bankruptcy was imminent and the Agent sent a term sheet for debtor-in-possession financing to the Company, 19 days before that report was made.

### 3. The Debtors Have Failed to Make Payroll, Pay Their Taxes, and Pay Their Health Insurance Premiums.

34.    Paying employees and taxes are the two most basic financial functions of a business. Yet, the Company has failed to make such payments before filing these Chapter 11 Cases.

35.    Press reports details these misses. For example, numerous employees anonymously disclosed to *Deadline* that employees were not paid their wages owed to them on June 21, 2024.[38] *Deadline* reports that Mr. Rouhana admitted that the Debtors did not pay their employees on time, but that he hoped they would be made whole soon.[39] Further, *Deadline* reports that employees' medical benefits have been suspended since at least mid-May. The Debtors purportedly admit to allowing their employees' medical benefits to lapse as of May 14, 2024, and that Anthem, the Debtors' health insurer, would be denying all claims as of that same date.[40] Instead of paying those insurance premiums, the Debtors informed their employees that they "recommend all elective, non-urgent and routine medical appointments be rescheduled until [the Debtors] can provide your medical providers the details of how to process claims" and instructed the employees to "use your best judgement on whether or not you can reschedule any of your appointments."[41] Indeed, the Debtors concede these non-payments in the *Debtors' Motion For Entry Of Interim And Final Orders (I) Authorizing Debtors To (A) Pay Prepetition Wages, Salaries, Reimbursable Expenses, And Other Obligations On Account Of Compensation And Benefits Programs And (B) Continue*

---

[38]    *See, e.g.*, Dade Hayes, "Troubled Redbox Parent Chicken Soup for the Soul Entertainment Is Nearly a Week Late Paying Employees; Medical benefits Also Cut, Deadline (June 26, 2024), *available at* https://deadline.com/2024/06/redbox-owner-chicken-soup-for-the-soul-payroll-health-care-delays-1235984010/
[39]    *Id.*
[40]    *Id.*
[41]    *Id.*

*Compensation And Benefits Programs; And (II) Granting Related Relief* [Dkt. No. 3] (the "Wages Motion") at 6 ("[T]he Debtors were unable to make payroll for the two-week period ending June 14, 2024.").

36.     Moreover, the Debtors are purportedly months behind on paying their payroll taxes. The Debtors assert in the Wages Motion that they owe approximately $15.5 million in accrued but unpaid withholding taxes *from October 1, 2023 – June 7, 2024*.[42]  In other words, the Debtors have failed to pay payroll taxes for ***nine months***.

### 4.     The Debtors Have Hemorrhaged Advisors.

37.     Because of the Debtors' mismanagement and Mr. Rouhana's control of the Debtors, the Debtors have had a revolving door of advisors supporting their operations.  Between August 2022 and today, the Debtors have employed three separate legal advisors to represent them in dealings with the Agent: Graubard Miller; Wachtell, Lipton, Rosen & Katz; and, most recently, Reed Smith.  Further, it appears that the Debtors engaged numerous different financial advisors over time, including Riveron, Richter Consulting, FTI Consulting, Phoenix Financial Services, and Solomon Partners.[43]  None of these advisors provided the Agent with any useful information on the Debtors' liquidity, segment-level financials, or outreach regarding asset sales, presumably because the Debtors did not provide them with access to that information even when required to do so by the credit documents.  This turnover among advisors is remarkable.

### C.     Despite the Debtors' Mismanagement and Insolvency, the Agent Had Agreed to a Path Forward for the Debtors.

38.     After the Agent began sending notices of Events of Default, the Agent sought to find a path forward and agreed to forbear from exercising certain rights, remedies, powers,

---

[42]     *See* Wages Motion ¶ 26 [Dkt. No. 3].
[43]     *See* CSSE, Current Report (8-K) at 47 (Apr. 29, 2024).

privileges and defenses under the Credit Agreement and the other loan documents.[44]  On April 29, 2024, the Agent and the Lenders amended the then-existing Credit Agreement and entered into a Forbearance Agreement.[45]  Both agreements were signed by Mr. Rouhana on behalf of CSSE and its subsidiaries, and, in the case of the Forbearance Agreement, on behalf of Mr. Rouhana's affiliated entities and personally.[46]  The Forbearance Agreement included a full release that "fully, finally, and forever remise[d], release[d] and discharge[d]" the Agent and Secured Lenders from claims and liabilities arising under the Credit Agreement.  As part of the Forbearance Agreement, Mr. Rouhana executed an irrevocable proxy, which granted the Agent the right to vote the shares of Chicken Soup for the Soul, LLC and Chicken Soup for the Soul Productions, LLC in connection with any corporate action related to certain restructuring transactions; any proposal, transaction, or agreement that would reasonably be expected to interfere with the terms of the Forbearance Agreement; or the removal of any of the independent directors (the "Irrevocable Proxy").[47]

39.    The then-existing Credit Agreement was amended in several ways.  First, the Debtors and each of their Subsidiaries were required to maintain two new independent directors on their respective boards.[48]  Second, each board must establish and maintain an independent subcommittee, known as the Strategic Review Committee (each Strategic Review Committee together, the "SRC"), which must be composed of the two new independent directors, as well as a third independent director.[49]  Third, neither CSSE nor any of its subsidiaries may enter into any voluntary bankruptcy or similar bankruptcy proceeding without the "affirmative resolution of the

---

[44]    *See* CSSE, Current Report (Form 8-K) Exhibit 10.1, Forbearance Agreement at 12-22 (May 3, 2024), attached hereto as **Exhibit B.**

[45]    *Id*. at Item 1.01.

[46]    *Id.* at Exhibit 3.2 – First Amendment to Amended and Restated Credit Agreement; Exhibit 10.1 – Forbearance Agreement § 8 (Apr. 29, 2024).

[47]    *See* Irrevocable Proxy, attached hereto as **Exhibit F.**

[48]    *See* **Exhibit B**, *supra* note 44, at Exhibit 3.2, First Amendment to Amended and Restated Credit Agreement; *Id.* at Credit Agreement, Exhibit 10.2, § 5.18.

[49]    *Id.* at Credit Agreement § 5.19.

majority of" the entity's respective SRC.[50]   Fourth, the governance documents of CSSE and its subsidiaries must be revised to effect the foregoing matters.[51]   The corporate governance documents of CSSE's subsidiaries were subsequently amended and became effective.

40.    Under the Forbearance Agreement, the Agent and the Lenders agreed to forbear from exercising their rights and remedies pursuant to eight enumerated events of default and expected events of default under the Credit Agreement, as long as CSSE consummated certain proposed financings and made an initial prepayment to the Agent by 5:00 p.m. EST on June 6, 2024.[52]   In addition, the Forbearance Agreement required delivery of the Irrevocable Proxy and the establishment of the SRCs at the various entities.[53]

41.    Under the Irrevocable Proxy, certain of CSSE's stockholders—namely, Mr. Rouhana and CSS, an entity controlled by Mr. Rouhana—agreed to vote against removal of any of the Debtors' independent directors.[54]   These entities also agreed to comply with the obligations in the Credit Agreement with respect to the appointment and removal of the independent directors and the SRC.[55]    Further, these entities agreed to vote in favor of restructuring transactions approved by CSSE's SRC and against actions that are inconsistent with the 2024 Credit Agreement and Forbearance Agreement.[56]   Specific performance of the Irrevocable Proxy is expressly available as a remedy under the Irrevocable Proxy.[57]

42.    In connection with the Forbearance Agreement and the amendments to the Credit Agreement, CSSE entered into an agreement with the Agent to raise $175 million of additional

---

[50]    *Id.* at Credit Agreement § 5.21(a)(x)(5)(i).
[51]    *Id.* at Credit Agreement § 6.09(a)(i).
[52]    *See* **Exhibit B,** *supra* note 44, Forbearance Agreement at 12-22.
[53]    *Id.* at § 3.02.
[54]    *See* **Exhibit F,** *supra* note 47.
[55]    *Id.* at § 5.
[56]    *Id.* at § 2.a.
[57]    *Id.* at § 12.

working capital prior to June 6, 2024.[58]  The agreement required CSSE to consummate certain strategic transactions for which it has signed term sheets that have been reviewed with the Agent, including the sublicensing of material video content assets and one or more sales leaseback transactions with targeted aggregate gross proceeds of at least $175 million.  If CSSE was able to successfully consummate these transactions in their entirety, it was obligated to utilize $75 million of the net proceeds thereof prior to June 6, 2024 to pay down amounts owed under the Credit Agreement.  Furthermore, if CSSE timely made the $75 million repayment, CSSE would then have until September 30, 2024, to make an additional repayment of $125 million to the Agent.  If CSSE also made that second payment successfully, the remainder of the principal and interest under the Credit Agreement would be fully terminated.

43.     In short, the Agent agreed to forgo the roughly $500 million owed to it by CSSE in exchange for a total payment of $200 million.[59]  CSSE, however, did not consummate the proposed financing and failed to achieve even the first repayment of $75 million to the Agent by June 6, 2024.[60]

### D.     Failing to Honor His Agreement, Mr. Rouhana Egregiously Purported to Dismiss the SRC and Retakes Control of the Debtors.

44.     In a final act of bad faith, Mr. Rouhana purported to terminate the independent directors on the Debtors various boards of directors on the eve of expiration of the Forbearance Agreement—in blatant violation of the Forbearance Agreement, the Credit Agreement, and the Irrevocable Proxy. Because Mr. Rouhana did not follow the proper channels for terminating the

---

[58]   *See* **Exhibit B,** *supra* note 44, at Item 1.01.
[59]   *See* Letter from HPS to CSSE, "Re: Release Letter," dated Apr. 29, 2024, at 2 (requiring payment totaling $200 million in exchange for satisfaction of all remaining obligations under the Credit Agreement, pursuant to the Forbearance Agreement), attached hereto as **Exhibit G.**
[60]   *See* Letter from Daniel Wallitt, HPS, to William J. Rouhana, *et al.*, CSSE, "Re: Chicken Soup for the Soul Entertainment, Inc.," dated June 12, 2024, attached hereto as **Exhibit H.**

SRC at CSSE's subsidiaries, such actions are also in direct violation of the governance documents of each of the subsidiaries.

45.     In short, Mr. Rouhana did not have the authority to terminate the independent directors at CSSE or any of its subsidiaries and such actions are plainly invalid.  As a result of Mr. Rouhana's actions, the Agent sent a notice to accelerate the debt pursuant to its rights under the 2024 Credit Agreement on June 13, 2024.

46.     Mr. Rouhana has since improperly purported to install the current Debtors' management and board of directors that purport to control the Debtors and these Chapter 11 cases, but he has no right or authority to do so.[61]

## RELIEF REQUESTED

47.     By this Motion, the Agent requests entry of an Order for (i) reconstitution of the Debtors' board of directors and strategic review committees, or, in the alternative, (ii) appointment of a chapter 11 trustee, or, in the alternative, (iii) conversion of these Chapter 11 Cases to chapter 7 liquidation, for cause.

## BASIS FOR RELIEF REQUESTED

**A.     Each of the Directors and Strategic Review Committees that Were Purportedly Terminated by Mr. Rouhana Should Be Reconstituted.**

48.     Pursuant to sections 105(a) and 1107(a) of Title 11 of the United States Code (the "Bankruptcy Code"), the Agent seeks entry of an Order reconstituting the Debtors' boards of directors and the SRC to be comprised of each of the directors (including the independent directors approved by the Agent) and the SRC members that were purportedly terminated by Mr. Rouhana without the requisite authority to do so.

---

[61]     *See* Rouhana Decl. ¶ 10.

1.    **Mr. Rouhana Dismissed the Other Members of the Company's Boards of Directors and the SRC.**

49.    The boards of CSSE and its subsidiaries were rightfully comprised of: Chris Mitchell, Amy L. Newmark, Cosmo DeNicola, Christina Weiss Lurie, Fred Cohen, Diana Wilkin, Martin Pompadur, Vikram Somaya, John T. Young, Robert H. Warshauer, and Mr. Rouhana himself.[62]  And the SRCs rightfully included John T. Young and Robert H. Warhauser.[63]

50.    John T. Young and Robert H. Warshauer are independent directors, and, as required under the Forbearance Agreement and Credit Agreement, the Agent approved their appointment as directors and members of the SRC.[64]  Both are eminently qualified for this incredibly challenging situation.  The Forbearance Agreement and Credit Agreement also required CSSE to amend its corporate charter to require CSSE to maintain, at all times, an SRC consisting of three independent directors.[65]  Although the Credit Agreement required that the Agent consent to any termination of Mr. Young or Mr. Warshauer as independent directors or members of the SRC,[66] neither Mr. Rouhana nor the entities he controls ever solicited or received such consent prior to terminating them.

2.    **The Bankruptcy Court Possesses the Equitable Powers Necessary to Intervene in the Corporate Management of the Debtors.**

51.    Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue ***any*** order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a) (emphasis added).   Section 1107(a) of the Bankruptcy Code further provides that "***[s]ubject to . . . such limitations or conditions as the court prescribes***, a debtor in possession

---

[62]    CSSE, Amendment to Annual Report (Form 10-K/A) (Apr. 24, 2024) (noting that John T. Young, Jr., and Robert H. Warshauer had been appointed to the Company's board of directors effective as of May 3, 2024).
[63]    *Id.* at 5-7.
[64]    *Id.* at 1-2.
[65]    *Id.* at Exhibit 3.1.
[66]    *See* **Exhibit B**, *supra* note 44, Credit Agreement at § 5.18.

003bf274f281a262

Case 24-11442-TMH   Doc 29   Filed 07/01/24   Page 27 of 48

shall have all the rights . . . and powers, and shall perform all the functions and duties . . . of a trustee serving in a case under this chapter." 11 U.S.C. § 1107(a) (emphasis added).

52.     Most courts acknowledge that the reach of section 105(a) is "limit[ed by the] bankruptcy court's equitable powers, which must and can only be exercised within the confines of the Bankruptcy Code." *FDIC v. Colonial Realty Co.*, 966 F.2d 57, 59 (2d Cir. 1992) (cleaned up); *see also New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (noting that the construction of section 105(a) "suggests that an exercise of section 105(a) power be tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective").  So long as a nexus exists between relief granted by a court in equity and the Bankruptcy Code, the court has "general equitable powers" to fashion such orders as required. *See In re Morristown & Erie R. Co.*, 885 F.2d 98, 100 (3d Cir. 1989).

53.     Section 1107(a) grants bankruptcy courts clear authorization to act in this manner. That section provides bankruptcy courts with "considerable authority to interfere with the management of the DIP to protect creditors' interests." *In re Ralph C. Tyler, P.E., P.S., Inc.*, 156 B.R. 995, 997 (Bankr. N.D. Ohio 1993); *see also In re Executive Air Center, Inc.*, 60 B.R. 652, 654 (Bankr. W.D. La. 1986) (noting that although the debtor-in-possession holds title and powers of trustee, such title and powers are subject, at all times, to the control of the bankruptcy court). Together, sections 105(a) and 1107(a) grant the Court the authority to order the debtor-in-possession to take management actions to protect creditors' interests.

### 3.     Mr. Rouhana's Actions Were Unauthorized and Violated the Company's Binding Agreements.

54.     Reconstituting the legitimate boards and SRCs of each of the Debtors is necessary to ensure any possibility of success in these Chapter 11 cases, and the Agent implores the court to exercise its powers of equity to do so.  Not only is Mr. Rouhana ill-suited to make decisions on

behalf of the Debtors he drove into bankruptcy, but Mr. Rouhana's dismissal of the above-referenced boards and SRCs also violated contractual and governance obligations. The Forbearance Agreement contemplates that the Agent shall receive the Irrevocable Proxy from Mr. Rouhana. *See* § 3.02(a)(2). Pursuant to the Irrevocable Proxy, Mr. Rouhana agreed to vote against any attempted removal of an independent director, and the proxy expressly contemplates specific performance as a remedy to enforce any breach thereof. *See* § 12. Additionally, the Credit Agreement requires on its face that CSSE and its subsidiaries maintain two independent directors at all times, along with the SRC. *See* §§ 5.18 & 5.19. The Credit Agreement further requires the Agent's approval prior to any removal of the independent directors. *See* § 6.12. Thus, Mr. Rouhana's actions purporting to remove all the Debtors' directors (save himself) and terminate the Debtors' SRCs are clear breaches of contract.

55. The termination of the board of directors and SRCs was also *ultra vires* and is void. Specifically, Mr. Rouhana executed the Irrevocable Proxy, whereby he delegated his voting authority to the Agent and agreed to refrain from voting to remove the independent directors that were approved by the Agent and appointed to the boards of directors of CSSE and its subsidiaries. Under Delaware law, when Mr. Rouhana signed the Irrevocable Proxy, he "separate[d] the voting rights associated with the shares from the underlying economic interest." *Hawkins v. Daniel*, 273 A.3d 792, 795 (Del. Ch. 2022). A proxy arrangement "does more than just create an agency relationship," rather, "[f]rom a corporate governance standpoint, it **decouples** the power to vote the shares from the economic interest in the shares." *Id*. at 808 (emphasis added). Mr. Rouhana exercised voting power that he had already delegated to another party and did so in a manner inconsistent with his promise to exercise his voting rights against such removal. Consequently,

Mr. Rouhana lacked the legal authority to remove the boards of directors of CSSE and its subsidiaries.

56.     The other actions Mr. Rouhana has taken in approving the Chapter 11 Petition and subsequent bankruptcy filings are also *ultra vires* and therefore void.  Neither Mr. Rouhana nor the replacement boards of directors that he just recently purported to put in place (which did not include independent directors Young and Warshauer) possess the necessary voting authority under CSSE's corporate governance structure to properly authorize the Debtors' bankruptcy filings. Nevertheless, the Agent agrees that the Debtors belong in bankruptcy at this time and does not seek dismissal of the Chapter 11 Cases.  It is the Agent's expectation that should the Debtors' boards of Directors and SRCs be reconstituted, independent directors Young and Warshauer would ratify the petitions for bankruptcy.

> **4.     The Court Must Intervene in Corporate Management to Protect Creditors and Enforce the Company's Binding Obligations.**

57.     Bankruptcy courts are empowered with general equitable powers in their pursuit of ensuring the equitable treatment of creditors.  Given extreme mismanagement of the bankruptcy estate both prepetition and postpetition—which are further described *supra* Section F(1)—creditors will continue to suffer, absent relief from the Court.  Therefore, the Court should reconstitute the boards of directors and SRCs and thereby mitigate the disastrous management of the Debtor and limit the creditors' exposure.

58.     In sum, Mr. Rouhana's recent actions (i) undermine the Debtors' ability to navigate reorganization, (ii) violate contractual and governance requirements, and (iii) harm the interests of the Agent and other creditors through gross mismanagement of the estate.  Accordingly, the Court should issue an order reconstituting the boards of directors and SRC and refrain from further

breaching the obligations provided in the Credit Agreement, the Forbearance Agreement, and the Irrevocable Proxy.

**B.      In the Alternative, the Court Should Appoint a Chapter 11 Trustee.**

59.      In the alternative to reconstituting the Debtors' boards of directors and SRCs, the Agent seeks an Order appointing a chapter 11 trustee, as Mr. Rouhana is clearly unfit to lead the Debtors in any capacity or have any responsibility for maximizing value of the Debtors' estates.

60.      Under Bankruptcy Code section 1104(a), "at any time after the commencement of the case but before the confirmation of a plan," any "party in interest" may request that the court appoint a trustee.  And the court "***shall***" order the appointment of a trustee-

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause . . . or
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a) (emphasis added).

61.      Though section 1104(a)(1) mandates appointment of a trustee when the bankruptcy court finds cause, the determination of cause is within the discretion of the court.  *See In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989).  "[C]ause" is not defined the Bankruptcy Code, but section 1104(a) provides a non-exhaustive list of types of cause: fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management.  In general, the most common basis for appointing a trustee under section 1104(a)(1) is for both gross mismanagement and incompetence.  *In re Sharon Steel Corp.*, 86 B.R. 455, 458 (Bankr. W.D. Pa. 1988).  The movant bears the burden of showing cause by clear and convincing evidence.  *Id.*; *In re Clinton Centrifuge, Inc.*, 85 B.R. 980, 986 (Bankr. E.D. Penn. 1988).

62.     Section 1104(a)(1) also explicitly authorizes courts analyzing "cause" to consider the debtors' prepetition activity.  *In re Ancona*, 2016 Bankr. LEXIS 4114, at \*32 (Bankr. S.D.N.Y. Nov. 30, 2016) ("A court may consider both pre-and post-petition misconduct of the current management when making the determination of whether 'cause' exists under section 1104(a)(1).").

63.     As an alternative to section 1104(a)(1), section 1104(a)(2) provides a more flexible standard for the appointment of the trustee.  *In re Sharon Steel Corp.*, 86 B.R. at 457.  Under that standard, the Court uses "its broad equity powers to engage in a cost-benefit analysis in order to determine whether the appointment of a Trustee would be in the interests of creditors, equity security holders, and other interests of the estate."  *Id.*

64.     In this case, appointment of a trustee is proper under either prong of section 1104(a).  The Debtors' current management—controlled or influenced by Mr. Rouhana—has grossly mismanaged the Debtors' affairs.  Furthermore, the appointment of an independent Trustee is in the interests of all relevant stakeholders as the Debtors' current management suffers from material conflicts of interest that would prevent them from fulfilling their fiduciary duty to creditors.

> **1.     Cause Exists to Appoint a Chapter 11 Trustee as the Debtors' Management Is Incompetent and Has Grossly Mismanaged the Affairs of the Debtors.**

65.     The specific factors used to determine whether current management is guilty of incompetence and/or gross mismanagement will vary depending on the facts of the individual case. *In re Sharon Steel Corp.*, 86 B.R. at 458.  But courts have repeatedly affirmed that diverting the debtor's funds and/or paying insiders qualifies as incompetence and gross mismanagement.  For example, in *Sharon Steel*, the bankruptcy court mandated the appointment of a trustee in light of the debtor's transfers of significant assets to insiders, which the court found could constitute either voidable preferences or fraudulent conveyances.  *Id.* at 459, *subsequently aff'd*, 871 F.2d 1217 (3d

Cir. 1989).  Similarly, in *Midland Loan Services. v. Shubh Hotels Pittsburgh, LLC*, the bankruptcy

court appointed a trustee when, among other things, the debtor's owner had transferred the debtor's

revenues to "[the debtor's owner] and his associates for their own benefit despite the fact that trade

vendors of the [debtor] remained unpaid."  Nos. 10-26337JAD, 312, 2011 Bankr. LEXIS 5324, at

\*2-3 (Bankr. W.D. Pa. Feb. 1, 2011); *see In re Grasso*, No. 12-11063-MDC, 2012 Bankr. LEXIS

6247, at \*7 (Bankr. E.D. Pa. Oct. 16, 2012) (finding that debtor's postpetition transfer of estate

assets to fund the operation of entities in which the debtor held an ownership interest qualified as

gross mismanagement).

66.    In this case, Mr. Rouhana has repeatedly caused the Debtors to pay equity-holders

and insiders, including Mr. Rouhana himself, despite the Debtors' dire financial state.  Instances

of such egregious conduct include, among others, the following:

- Through a management services agreement dated May 12, 2016, Mr. Rouhana, through his controlled entity, has been extracting generous amounts from the Debtors; under that agreement, Mr. Rouhana extracts 5% of the Debtors' gross revenue—irrespective of whether the company is profitable while generating such revenue.  Similarly, through a license agreement dated as of the same day as the management services agreement, Mr. Rouhana extracts another 5% of the Debtors' gross revenue.  In other words, Mr. Rouhana takes 10% of the Debtors' revenue off the top, even where the Debtors are losing money.

- Even in these Chapter 11 Cases, Mr. Rouhana seeks to continue extracting payments.  In CSSE's DIP motion, the Company contemplates approximately $2.6875 million in management and licensing fees payable to Mr. Rouhana and his companies during the first thirteen weeks of the chapter 11 proceeding.[67]

---

[67]  *See Debtors' Motion for Entry of Interim and Final Orders Under 11 U.S.C. §§ 105, 361, 362, 363 and 364 (I) Authorizing the Debtors, on a Final and Interim Basis, to (A) Obtain Post-Petition Financing, (B) Grant Liens and Superpriority Administrative Expense Claims to Post-Petition Lenders, and (C) Utilize Cash Collateral; (II) Providing Adequate Protection to the Pre-Petition Secured Parties; (III) Modifying the Automatic Stay; (IV) Granting Related Relief, Pursuant to 11 U.S.C. Sections 105, 361, 362, 363, 364, and 507; and (V) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2; and (VI) Granting Related Relief* (June 29, 2024) [Dkt. No. 8].

- On May 18, 2023, CSSE announced a new round of dividend payments, which it then paid on June 15, 2023.[68]  In the three months ended June 30, 2023, the Debtor recorded a net loss of roughly $44 million.[69]

- On June 15, 2023, CSSE announced yet another round of dividend payments, which it paid in the third quarter of 2023;[70] in that same quarter, CSSE recorded a net loss of over $433 million,[71] a figure roughly ***ten times*** greater than CSSE's operating loss for the third quarter of 2022.

67.    But the gross mismanagement of the Debtors is not limited to this type of self-interested transaction.  Over the past several months, the Debtors' management also began engaging in outlandish and value destructive behavior, even as the liquidity situation grew dire and the Debtors began defaulting on the Credit Agreement.  Examples of such defaults and contemporaneous misconduct include (but are not limited to) the following:

- As previously described,[72] in February 2024, the Company attempted to avoid making interest payments by leaving a check in a building that the Agent had abandoned.[73]  This blatant failure to timely pay in accordance with the terms of the Credit Agreement precipitated the Agent sending its first notice of default to CSSE.[74]

- Subsequently in February 2024, the Company failed to deliver to the Agent quarterly financial statements for the fourth fiscal quarter ended December 31, 2023, as required by the Credit Agreement.[75]  This failure precipitated the Agent sending another notice of default to the Debtors.[76]

- In March of 2024, the Company again failed to make required interest payments to the Agent in accordance with the terms of the Credit Agreement—this time without first purporting to make the payment by dropping a check in an abandoned building.[77]

- The Debtors failed to consummate a finance transaction by the June 6, 2024

---

[68]    Nasdaq, *Chicken Soup for the Soul Entertainment, Inc. 9.75% Series A Cumulative Redeemable Perpetual Preferred Stock (CSSEP) Dividend History*, https://www.nasdaq.com/market-activity/stocks/cssep/dividend-history (last visited Jun. 29, 2024) ("Dividend History").

[69]    CSSE, Quarterly Report (Form 10-Q) at 4 (Aug. 14, 2023).

[70]    *See* Dividend History.

[71]    CSSE, Quarterly Report (Form 10-Q) at 4 (Dec. 22, 2023).

[72]    *Supra* section B.2. ¶ 32.

[73]    *See* **Exhibit D**, *supra* note 33, at 1.

[74]    *Id*. at 2.

[75]    *See* **Exhibit C**, *supra* note 32, at 1.

[76]    *Id*.

[77]    *Id*.

deadline as required by the Forbearance Agreement between the Agent and the Debtors.[78]  And, after the Agent agreed to the Debtors' request to extend the deadline to June 11, 2024, the Debtors subsequently failed to meet that deadline as well.[79]

- After the Debtors repeatedly failed to obtain timely financing, Mr. Rouhana further violated corporate governance documents and contractual agreement with the Agent by purporting to terminate the SRC and terminate all the directors of CSSE (a publicly traded company) and each of its subsidiaries save for himself.[80]

- Roughly two weeks after Mr. Rouhana had terminated all the directors of CSSE and its subsidiaries, he apparently allowed CSSE and its subsidiaries to miss payments to employees and cancelled their medical benefits—conduct practically unheard of in a public company chapter 11 case.[81]

68.     Mr. Rouhana and the Debtors' other leadership pursued this egregious course of conduct fully informed about the disastrous consequences that would result.   Beginning in February 2023, the Agent sent the Debtors multiple correspondences expressing concern with management's decisions, particularly the decision to use borrowed money to make payments to insiders and equity holders.[82]  The Agent warned management that such transactions would only worsen the Debtors' situation.[83]  The Agent also repeatedly invited the Debtors to engage in an open, constructive dialogue and urged them to begin the process of addressing the ongoing

---

[78]   *See* **Exhibit H**, *supra* note 60, at 1.

[79]   *Id*.

[80]   CSSE, Current Report (Form 8-K) (June 17, 2024).

[81]   *See, e.g.*, Dade Hayes, "Troubled Redbox Parent Chicken Soup for the Soul Entertainment Is Nearly a Week Late Paying Employees; Medical benefits Also Cut, Deadline (June 26, 2024), *available at* https://deadline.com/2024/06/redbox-owner-chicken-soup-for-the-soul-payroll-health-care-delays-1235984010/.

[82]   *See, e.g.*, Letter from Al Pisa, Milbank, to Joshua Feltman, Wachtell, Lipton, Rosen & Katz, re: "Chicken Soup for the Soul Entertainment, Inc.," dated May 25, 2023, at 2-3, attached hereto as **Exhibit I**.

[83]   *See id.* at 3 ("Given these facts and the Company's persistent underperformance, it should be clear that the liquidity infusion from the proposed facility will not provide a long-term solution to the Company's financial distress, but rather serves as one final effort by its controlling equity holders to garner additional payments.").

challenges to the business.[84]   But in each case, the Debtors either ignored the Agent or offered empty assurances that the business was turning a corner.[85]

69.     The scale of this mismanagement and irresponsible behavior inflicted serious harm not just on the Debtors' creditors but also its more than one thousand direct employees.  As a direct result of the Mr. Rouhana's decisions, the Debtors are now on the brink of total financial collapse. Such conduct constitutes incompetence and gross mismanagement, which constitute cause for appointing a chapter 11 trustee.

### 2.     Appointment of a Chapter 11 Trustee Is In the Stakeholders' Interest.

70.     A chapter 11 debtor and its directors and officers owe fiduciary duties to the estate and creditors.  *See, e.g.*, *In re Grasso*, 2012 Bankr. LEXIS 6247, at *9.  Thus, when the debtor's directors and officers suffer from "material conflicts of interest and cannot be counted on to conduct independent investigations of questionable transactions in which they were involved," an independent trustee should be appointed under section 1104(a)(2).  *Id.* (collecting cases); *see In re Sharon Steel Corp.*, 871 F.2d at 1228 (affirming bankruptcy court's order appointing a trustee under section 1104(a)(2) when management's conduct, including the syphoning of debtor's assets to other companies under common control, called into question management's ability to fulfil its fiduciary duty to debtors); *In re PRS Ins. Group, Inc.*, 274 B.R. 381, 389 (Bankr. D. Del. 2001) (finding an independent basis for the appointment of a trustee under section 1104(a)(2) in light of significant assets transfers from the debtor and to the debtor's owner and his family).

---

[84]   *See id.*; Letter from Al Pisa, Milbank, to Joshua Feltman, Wachtell, Lipton, Rosen & Katz, re: "Chicken Soup for the Soul Entertainment, Inc.," dated Apr. 12, 2023, at 1, attached hereto as **Exhibit J**; Letter from Al Pisa, Milbank, to Joshua Feltman, Wachtell, re: "Chicken Soup for the Soul Entertainment, Inc.," dated May 5, 2023 at 1, attached hereto as **Exhibit K**.

[85]   See **Exhibit J**, *supra* note 84 ("For nearly a year now, HPS has been imploring the Company's management and Board to take action to address it declining business, and it has been repeatedly rebuffed.").

71.     This case presents a quintessential example of conflicted management that should not be permitted to oversee the Debtors' bankruptcy.  The facts establish beyond dispute that the Debtors' current board of directors—which remains under the influence of Mr. Rouhana—suffer from material conflicts of interest.  As discussed previously, the Debtors' management, following Mr. Rouhana's directions, caused the Debtors to make various payments to equity-holders and insiders, including Mr. Rouhana or his affiliated entities.[86]   Thus, if the board is not reconstituted and a trustee is not appointed, the same management that approved these questionable transactions will bear the responsibility of investigating and potentially challenging them.  Management under Mr. Rouhana's influence cannot be trusted with this task.  As management is incapable of fulfilling its fiduciary duty to the Debtors' creditors, appointing an independent chapter 11 trustee to take on that responsibility is in the interests of the Debtors' stakeholders.

**C.      In the Alternative, the Court Should Convert the Chapter 11 Cases to Cases Under Chapter 7.**

72.     If the Court is disinclined to reconstitute the boards of directors and SRC of the Debtors or appoint a chapter 11 trustee, then the Agent respectfully requests that the Chapter 11 Cases be converted to chapter 7 liquidations.

73.     Bankruptcy Code section 1112(b)(1) provides that upon "request of a party in interest, and after notice and a hearing, the court ***shall*** convert a case under this Chapter to a case under Chapter 7 or dismiss a case under this Chapter, whichever is in the best interest of creditors and the estate, for cause ***unless*** the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of the creditors and the estate." 11 U.S.C. § 1112(b) (emphases added).  In other words, if the Court finds that the appointment of a trustee is not in the

---

[86]     *See supra* section B.1. ¶ 66.

best interests of the creditors and the estate and that cause exists for conversion, the Court must convert a chapter 11 case to chapter 7.[87]

74.    Though "cause" is not defined in the Bankruptcy Code, section 1112(b)(4) provides a non-exhaustive list of "causes" for conversion or dismissal.  11 U.S.C. § 1112(b).  The listed examples of cause include (i) "substantial or continuing loss or diminution of the estate and the absence of a reasonable likelihood of rehabilitation"[88] and (ii) "gross mismanagement of the estate."  11 U.S.C. §§ 1112(b)(4)(A) and (B).

75.    But the list set forth in Section 1112(b)(4) is not exhaustive; the bankruptcy court retains broad discretion in determining what constitutes cause adequate for conversion under § 1112(b) and is free to consider other factors.  *In re NTI-NV, Inc.*, BAP No. NV-22-1248-BCL, 2023 Bankr. LEXIS 1575, *11 (9th Cir. B.A.P. June 15, 2023); *In re Am. Capital Equip., LLC*, 688 F.3d 145, 162 n.10 (3d Cir. 2012) (noting that the listed examples of cause in section 1112(b) are not exhaustive) (internal citation omitted).  Furthermore, since courts may apply section 1112(b)(1) *sua sponte*, the Court may convert these cases for any proper "cause," even if such cause is not specified in section 1112(b)(4) and/or set forth in this Motion.  *See In re Starmark Clinics, LP*, 388 B.R. 729, 735 (Bankr. S.D. Tex. 2008).

---

[87]    *See generally In re Riverbend Cmty., LLC*, 2012 WL 1030340, at *3 (Bankr. D. Del. Mar. 23, 2012) ("Congressional intent that 'shall' really does mean 'must in the convert or dismiss provision is readily apparent. In 2005, Congress removed the word 'may' from Section 1112(b) and substituted 'shall' if a moving party establishes 'cause.'  Congress clearly intended to make conversion or dismissal mandatory upon proof of 'cause.'") (cleaned up).

[88]    Section 1112(b)(4)(A)'s predecessor provision, section 1112(b)(1), is cited in cases decided prior to the 2005 passage of the Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA).  *See, e.g.*, *Loop Corp. v. United States Tr.*, 379 F.3d 511, 516-17 (8th Cir. 2004) (finding cause under previous section 1112(b)(1), which required a "continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation"); *In re Lizeric Realty Corp.*, 188 B.R. 499, 503 (Bankr. S.D. N.Y. 1995) (same).  The two provisions are nearly identical, and therefore courts look to pre-2005 precedent as applicable in post-2005 cases when deciding if cause exists under 1112(b)(4)(A).  *In re Gateway Access Sols., Inc.*, 374 B.R. 556, 561 (Bankr. M.D. Pa. 2007) (recognizing that the language in the new section 1112(b)(4)(A) is nearly identical to the pre-BAPCPA section 1112(b)(1) and finding that "former case law expounding on former § 1112(b)(1) is equally applicable to new § 1112(b)(4)(A).").

76.     Once cause is established, a debtor's case must be converted or dismissed, unless (i) the debtor shows unusual circumstances such that conversion or dismissal would not be in the best interest of the creditors and the estate, and (ii) there is a reasonable likelihood that a plan will be confirmed within the timeframe established in section 1121(l).  *See* 11 U.S.C. § 1112(b)(2)(A). But, as discussed *infra* Section C(3), the "unusual circumstances" exception does not apply to cause found under 1112(b)(4)(A), so this exception cannot prevent the conversion of these Chapter 11 Cases.

> **1.     Cause Exists for Conversion Because the Debtors Have Experienced and Are Experiencing a Substantial or Continuing Loss and Lack Any Reasonable Likelihood of Rehabilitation.**

77.     Bankruptcy Code section 1112(b)(4)(A) requires conversion where there is a "substantial or continuing loss or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."  11 U.S.C. § 1112(b)(4)(A).  The purpose of section 1112(b)(4)(A) is to "preserve estate assets by preventing the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation."  *In re Lizeric Realty Corp.*, 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995).  In applying section 1112(b)(4)(A), "the inquiry here is twofold.  First, the Court must look at the track record of the debtor to determine if it is suffering losses or making gains.  Second, the Court must determine whether rehabilitation is likely given the evidence[.]"  *Nester v. Gateway Access Sols., Inc. (In re Gateway Access Sols., Inc.)*, 374 B.R. 556, 558 (Bankr. M.D. Pa. 2007).

78.     Here, the Debtors have incurred and are incurring substantial, continuing losses and have no hope of rehabilitation.  Consequently, the Chapter 11 Cases must be converted.

### i. The Debtors Have Incurred Substantial and/or Continuing Losses.

79.     The "continuing or substantial loss" element of section 1112(b)(4)(A) identifies two alternative kinds of losses that may support a conversion claim. *See* 7 COLLIER ON BANKRUPTCY ¶ 1112.04[6][a][i] (2024) ("By the use of the word 'substantial' . . . Congress has indicated that a loss need not be continuing in order to satisfy the first prong[.]").  A continuing loss can be established by showing that the debtor "has continued to experience a negative cash flow." *In re AIG Fin. Prods. Corp.*, 651 B.R. 463, 475 (Bankr. D. Del. 2023).  Negative cash flow means that the estate's current liabilities are increasing more rapidly than cash is available to pay as due.  7 COLLIER ON BANKRUPTCY ¶ 1112.04[6][a][i] (2024).  Alternatively, the court may also find this prong satisfied where a debtor's loss, continuing or otherwise, is "sufficiently large under the financial circumstances of the debtor as to materially negatively impact the bankruptcy estate and interests of creditors."  7 COLLIER ON BANKRUPTCY ¶ 1112.04 (16th 2023).

80.     It cannot be disputed that the Debtors are suffering continuing and substantial financial losses.  First, as explained *supra*, virtually every relevant financial metric indicates that the Debtors' business continues on a sharp, downward trajectory.  The Debtors failed to generate a profit in 2023; instead, they incurred net losses of approximately $636.6 million.[89]  These significant losses have continued into 2024, with the Debtors incurring a net loss of approximately $52.9 million of the three months ended March 31, 2024, ***75% worse*** compared to the same period in 2023.[90]  They have also had ***negative*** cash flow for the last few years.[91]  *Id.* (stating that cash

---

[89]  CSSE, Annual Report, (Form 10-K) at 5 (Apr. 19, 2024) ("We had net losses of approximately $(636.6) million in 2023[.]").
[90]  CSSE, Quarterly Report, (Form 10-Q) at 39 (May 20, 2024).
[91]  *Id.* (stating that cash flow was negative $500,000 for the period ended March 31, 2024; *see also* CSSE, Annual Report, (Form 10-K) at 49 (Apr. 19, 2024) (showing negative cash flows of $23.3 million and $62.9 million for the years 2023 and 2022, respectively).

flow was negative $502,728 for the period ended March 31, 2024; CSSE, Annual Report, (Form 10-K) 49 (April 19, 2024) (showing negative cash flows $62.9 million for 2023).

81.    Not only are the Debtors' financial losses continuing, but they also are "sufficiently large" to materially harm the interests of creditors.  The Debtors' have become increasingly insolvent, with their liabilities now exceeding its assets by over $550 million as of March 31, 2024, and likely even more as of the Petition Date.

82.    CSSE's stock has likewise declined in value during this period to reflect insolvency, decreasing to just 48 cents per share on March 25, 2024[92] before the stock was delisted by NASDAQ on March 25, 2024.[93]  And beginning with the third quarter of 2023, the Company's financial statements have contained a going concern qualification.[94]  On top of this, as discussed in more detail previously, pursuant to the Forbearance Agreement, the Agent offered to have its $500 million in outstanding loans under the Credit Agreement extinguished for a total payment of $200 million, but the Debtors were unable to secure new financing for such payment.[95]

83.    Unsurprisingly, these dire financial circumstances have harmed the Debtors' creditors and other stakeholders, including the Debtors' own employees.  In its annual report for 2024, the Company admitted in its public filings that it currently is "not in compliance with the majority of [their] credit and lease facilities and have received default notices, which would allow for the acceleration of debt, eviction from premises or repossession of vehicles."[96]  Even more concerning, just recently, on June 26, 2024, the Company began missing payments to employees

---

[92]    *CSSE Stock Price*, MARKET WATCH, https://www.marketwatch.com/investing/stock/csse (last visited June 30, 2024).

[93]    CSSE, Current Report (Form 8-K) (Mar. 29, 2024).

[94]    *See, e.g.*, CSSE, Quarterly Report, (Form 10-Q) at 8 (Dec. 22, 2023); CSSE, Quarterly Report, (Form 10-Q) at 8 (May 20, 2024).

[95]    *See* CSSE, Current Report (Form 8-K) at 1 (Apr. 29, 2024); see **Exhibit G**, *supra* note 59 (requiring payment totaling $200 million in exchange for satisfaction of all remaining obligations under the Credit Agreement, pursuant to the Forbearance Agreement).

[96]    CSSE, Annual Filing (10-K) at F-12 (Apr. 19, 2024).

and cancelled their medical benefits.[97]  Finally, the Company has also failed to pay payroll taxes

of over $15 million, which currently remains outstanding.

84.    In sum, the Debtors have incurred both continuing and substantial losses to the

significant detriment of their stakeholders.

### ii.    There is No Reasonable Likelihood of Rehabilitation.

85.    With respect to the second element, "rehabilitation," as the term is used in section

1112(b)(4)(A), means "to put back in good condition and reestablish on a sound basis."  *In re BH*

*S&B Holdings, LLC*, 439 B.R. 342, 347 (Bankr. S.D.N.Y. 2010); 5 COLLIER ON BANKRUPTCY §

1112.03(2) (15th ed. 1980) (quoted in *re L.S. Good & Co.*, 8 B.R. 315, 317 (Bankr. N.D. W.Va.

1980)).    "Rehabilitation does not include liquidation," but rather it "means to reestablish a

business."  *In re 15375 Memorial Corp.*, 386 B.R. 548, 552 (Bankr. D. Del. 2008), *rev'd on other*

*grounds*, 400 B.R. 420 (D. Del. 2008) (reversing the bankruptcy court's denial of a motion to

dismiss); *see also Loop Corp.*, 379 F.3d at 516 ("Courts have consistently understood

'rehabilitation' to refer to the debtor's ability to restore the viability of its business."); *see also In*

*re Landmark Atlantic Hess Farm, LLC*, 448 B.R. 707, 714-15 (Bankr. D. Md. 2011) (stating that

the key inquiry is whether the debtor has "sufficient business prospects").  The debtor's prospects

must be more than "visionary schemes" or unsubstantiated hopes."  *Gateway Access Solutions*,

374 B.R. at 562 (citing *In re Brown*, 951 F.2d 564, 572 (3d Cir. 1991)); *see also In re Great Am*

*Pyramid J.V.*, 144 B.R. 780, 792 (Bankr. W.D. Tenn. 1992) ("A reorganization plan under chapter

11 must be more than a nebulous speculative venture and must have a realistic chance of success

---

[97]    *See, e.g.*, Dade Hayes, "Troubled Redbox Parent Chicken Soup for the Soul Entertainment Is Nearly a Week Late Paying Employees; Medical benefits Also Cut, Deadline (June 26, 2024), *available at* https://deadline.com/2024/06/redbox-owner-chicken-soup-for-the-soul-payroll-health-care-delays-1235984010/.

which would lead to rehabilitation, and if outside financing is needed it must be *clearly* in sight."
(emphasis in original)).

86.     In this case, there is no realistic chance of a successful rehabilitation.  As explained
previously, the Debtors' finances indicate that the business is on a precipitous decline: the business
has worsened on every major financial metric—including revenue, profit / net loss, cash flow, and
debt—and the Debtors' total liabilities currently exceed total assets by more than $550 million as
of the last reporting date.  This decline has occurred notwithstanding the Debtors' management
providing assurances that their business would soon turn around and providing lofty projections to
support those assurances.  For example, in November 2023, the Debtors provided the Agent with
a document containing "Management Case" projections that noted a "historical" total operating
loss of approximately $54 million for 2022 (the actual operating loss for 2022 was approximately
$117 million) and projected that this would increase to an operating income of approximately $6
million in 2023, $8 million in 2024 and $35 million in 2025.[98]  Needless to say, these projections
have already fallen woefully short of reality, as the Debtors posted an operating loss of
approximately $636.6 million in 2023[99] and an operating loss of approximately $27 million for the
three months ending March 31, 2024.[100]  Any assurance by the Debtors that they are on the cusp
of turning around their business is belied by these past assurances that utterly failed to come to
fruition.  By all indications, the Debtors' business is beyond repair, and any suggestion to the
contrary is nothing more than "unsubstantiated hopes."

87.     Moreover, even if the Debtors have a remote prospect of restoring their business
(they do not), their leadership—*i.e.*, Mr. Rouhana—has demonstrated that it is wholly incapable

---

[98]    Virtu Global Advisors, LLC, CSSE Pro Forma Enterprise Valuation Indications as of December 31, 2023, 17 (Nov. 15, 2023).
[99]    CSSE, Annual Filing (10-K) at F-7 (Apr. 19, 2024).
[100]   CSSE, Quarterly Filing (10-Q) at 4 (May 20, 2024).

of successfully restoring the business.  As previously explained, the Debtors' management has consistently refused to take the steps necessary to facilitate the recovery of the business.  Instead, management has relied on overly optimistic and unrealistic projections to justify burdening the Debtors' already over-levered balance sheet with additional debt and then used the resulting proceeds to enrich insiders and equity holders.  Simultaneously, management has ignored the advice and warnings from its concerned stakeholders, including the Agent.

88.     In short, the Debtors have failed to improve their business performance, lack competent management, and have alienated their stakeholders.  Thus, no reasonable likelihood for the successful reorganization of the Debtors exists.  If the board is not reconstituted and a chapter 11 trustee is not appointed, effectuating an orderly and efficient liquidation under chapter 7 is the only sensible path forward.

### 2. Cause Also Exists to Convert These Chapter 11 Cases to Chapter 7 Due to the Debtor's Gross Mismanagement of the Estate.

89.     Section 1112(b)(4)(B) provides that cause for conversion or dismissal exists where "gross mismanagement" of the estate has occurred.  U.S.C. § 1112(b)(4)(B).  If gross mismanagement is established, the Court must either convert to chapter 7 or dismiss the case unless the Court determines that the appointment of a trustee or an examiner is more appropriate.  *See* U.S.C. § 1112(b)(1).  Courts examine both prepetition and postpetition conduct when determining whether gross mismanagement occurred.  *See In re Viscon Shareholders Trust*, 478 B.R. 292, 309-11 (Bankr. S.D. Ohio 2012) (coupling prepetition unauthorized payments with postpetition lack of candor amounted to gross management); *In re Lodge at Big Sky, LLC*, Nos. 10-62229-11, 10-62230-11, 2011 Bankr. LEXIS 2296, at *21-22 (Bankr. D. Mont. June 8, 2011) (finding that the debtor had grossly mismanaged through prepetition conduct, failing to pay real estate taxes and

siphoning funds for personal use, and through postpetition conduct, omitting disclosure of this fact in the bankruptcy petition).

90.     In the context of section 1112(b)(4)(B), courts have consistently held that the lack of an effective corporate management team that is capable of directing the debtor's rehabilitation constitutes gross negligence.  *See In re Prods. Int'l Co.*, 395 B.R. 101, 110 (Bankr. D. Ariz. 2008) ("Failure to maintain an effective corporate management team has been held to constitute gross mismanagement."); *see Nester v. Gateway Access Sols., Inc. (In re Gateway Access Sols., Inc.)*, 374 B.R. 556, 565 (Bankr. M.D. Pa. 2007) (noting that the debtor's lack of a focused reorganization management team was a "major impediment" to the debtor's rehabilitation as the debtor's sole director worked a full time job as an anesthesiologist and lacked the time and experience necessary to oversee a successfully restructuring); *In re Broad Creek Edgewater, LP*, 371 B.R. 752, 759-60 (Bankr. D.S.C. 2007) (finding that lack of effective corporate management is beyond "the general financial incompetence that precedes most bankruptcy cases" and proves gross mismanagement).  A lack of an effective corporate management team supports a finding that the potential restructuring is objectively futile.  *In re Broad Creek Edgewater, LP*, 371 B.R. at 760.

91.     *Products Int'l* is particularly relevant: there, the court found that the debtor's estate had been "gross[ly] mismanage[d]" under section 1112(b)(4)(B) due to the debtor's pre and postpetition actions.  *In re Prods. Int'l Co.*, 395 B.R. at 111.  Prepetition, the debtor's management had engaged in self-dealing transactions by improperly transferring the debtor's funds to insiders, including to the debtor's owners.  *Id.*  The debtor had also failed to pay employee and corporate taxes, resulting in a large, avoidable IRS claim.  *Id.*  Postpetition, the debtor had failed to establish "a focused reorganization team" due to acrimony amongst the debtor's various owners.  *Id.*  The court concluded that evidence showed "that current management has been more interested in

engaging in self-dealing transactions, to the detriment of the Debtor" and had failed to act in accordance with their fiduciary duty to creditors. *Id.; see also Gateway Access Solutions*, 374 B.R. at 564-65 (affirming the need for an effective and focused management team).

92.     The analysis in *Products Int'l* applies directly here.  Like in *Product Int'l*, the evidence in this case supports that the Debtors lack the "focused reorganization team" required to effectuate a successful restructuring.  As previously described, even as financial walls began closing in, Mr. Rouhana directed the Debtors to make fee payments to insiders and dividend payments to equity holders, siphoning funds that should have been used to assist the company and satisfy its debts to creditors, including the Debtors' employees.  He purported to then change the Debtors' board of the directors to ensure that no one could impede his efforts.  And in these Chapter 11 Cases he seeks to continue to have the Debtors make fee payments to insiders.

93.     Since the Debtors filed their petitions, Mr. Rouhana has maintained *de facto* sole control over the Debtors and lacks the necessary personnel to effectively self-administer the Debtor's affairs during the pendency of the bankruptcy.  Indeed, the Debtors' newly formed boards of directors lack any members outside Mr. Rouhana's control.  The numerous errors, misrepresentations, and outright lies in the Debtors' bankruptcy petition and accompanying documents further evidence the Debtors' lack of a competent reorganization team.[101]  This absence of adequate management constitutes gross mismanagement.

94.     Mr. Rouhana's disastrous decisions threaten creditors' prospects for recovering any of the value remaining in the Debtors.  The Debtors continue to hemorrhage liquidity with no reasonable prospect of fiscal recovery.  As such, if the Court decides against the reconstitution of the Debtors' boards of directors and SRCs or the appointment of a chapter 11 trustee, the Court

---

[101]    *See generally* HPS Investment Partners, LLC's Omnibus Objection to Debtors' DIP Motion and Other First Day Motions [Dkt. No. 28] (June 30, 2024).

should order a swift liquidation so that creditors may recover whatever value remains amid a declining business model and a slew of abysmal management decisions.

### 3.    The "Unusual Circumstances" Exception Does Not Apply.

95.    Section 1112(b)(2) provides a limited exception to mandatory conversion under section 1112(b)(1): a court may elect not to convert a case to Chapter 7 where it "specifically identifies" that "unusual circumstances" exist such that conversion is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that—

> (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of [title 11], or if such sections do not apply, within a reasonable period of time; and
>
> (B) the grounds for converting or dismissing the case include an act or omission of the debtor *other than under paragraph (4)(A)—*
>
>> (i) for which there exists a reasonable justification for the act or omission; and
>>
>> (ii) that will be cured within a reasonable period of time fixed by the court.

11 U.S.C. § 1112(b)(2) (emphasis added).

96.    The burden rests with the party opposing conversion to prove the "unusual circumstances" exception to section 1112(b)(1)'s mandatory conversion requirement. *Gateway Access*, 374 B.R. at 561 (Bankr. M.D. Pa. 2007).

97.    Numerous courts have recognized that by the plain text of the statute, the "unusual circumstances" exception is not available where a movant has shown cause exists to convert under section 1112(b)(4)(A). *See, e.g.*, *In re MatlinPatterson Global Opportunities Partners II L.P.*, 644 B.R. 418, 438 (Bankr. S.D.N.Y. 2022) ("As a matter of textual analysis, then, the bar on courts converting or dismissing cases under § 1112(b) based on 'unusual circumstances' appears limited to cases where the 'grounds for converting' are 'other than under paragraph (4)(A).'"); *In re 1031*

*Tax Grp., LLC*, 374 B.R. 78, 93 n.17 (Bankr. S.D.N.Y. 2007) ("The exception to conversion under § 1112(b)(2) is inapplicable here because the creditors seek conversion [pursuant to § 1112(b)(4)(A)].").  As cause for conversion exists under section 1112(b)(4)(A), the Court cannot find that the unusual circumstances exception applies to this case.

* * *

98.    Cause clearly exists to convert the Chapter 11 Cases to chapter 7.  The Debtors have sustained continued and substantial financial losses, and their current management is incapable of successfully running the Debtors' business.  Under the direction of Mr. Rouhana, the Debtors' leadership engaged in gross mismanagement, repeatedly executing self-dealing transactions and forcing the Debtors' creditors and employees to the bear the burden.  Under these circumstances, if the Court declines to reconstitute the Debtors' boards of directors and the SRC or appoint a chapter 11 trustee, the Court will save valuable time, money, and resources by converting these cases to chapter 7.

## NOTICE

99.    Notice of this Motion has been or will be provided to: (i) the U.S. Trustee; (ii) the Debtors; (iii); and any party that has requested notice pursuant to Bankruptcy Rule 2002.  Considering the nature of the relief requested in this Motion, the Agent respectfully submits that no other or further notice is necessary.

## CONCLUSION

100.    For the foregoing reasons, the Agent respectfully requests this Court enter an order for (i) reconstitution of the Debtors' boards of directors and strategic review committees, or (ii) in the alternative, appointment of a chapter 11 trustee, or (iii) in the alternative, conversion of these Chapter 11 Cases to Chapter 7.

Dated: July 1, 2024
Wilmington, Delaware

Respectfully submitted,

*/s/ Russell C. Silberglied*
Mark D. Collins (No. 2981)
Russell C. Silberglied (No. 3462)
Emily R. Mathews (No. 6866)
Alexander R. Steiger (No. 7139)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 651-7700
Fax:          (302) 651-7701
Email:        collins@rlf.com
              silberglied@rlf.com
              mathews@rlf.com
              steiger@rlf.com

- and -

Dennis F. Dunne (*pro hac vice* forthcoming)
Matthew Brod (*pro hac vice* forthcoming)
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone:    (212) 530-5000
Fax:          (212) 530-5219
Email:        ddunne@Milbank.com
              mbrod@Milbank.com

Andrew M. Leblanc (*pro hac vice* forthcoming)
Brett P. Lowe (*pro hac vice* forthcoming)
S. Robert Marsters, Jr. (*pro hac vice* forthcoming)
Danielle Lee Sauer (*pro hac vice* forthcoming)
**MILBANK LLP**
1850 K Street, N.W.
Suite 1100
Washington, DC 20006
Telephone:    (202) 835-7500
Fax:          (202) 263-7586
Email:        aleblanc@Milbank.com
              blowe@Milbank.com
              rmarsters@Milbank.com
              dlee@Milbank.com

*Co-Counsel to HPS Investment Partners, LLC*