# EXHIBIT 1



## KIOSK OPERATING AGREEMENT
### Summary Page

| | |
|---|---|
| **Client:** | CVS Pharmacy, Inc., on its behalf and on behalf of its affiliates |
| **Primary Client Contact:** | John Dempsey; 401-770-8171; John.Dempsey@CVSHealth.com |
| **Form of Organization:** | A corporation organized under the laws of the State of Rhode Island |
| **Client Addresses:** | *Principal Office:*<br><br>One CVS Drive　　　　　　　　　Attention: Thomas S. Moffatt, Vice President,<br>Woonsocket, Rhode Island 02895　　Corporate Law |
| **Initial Term:** | 3 years beginning on January 1, 2016 (the "**Effective Date**") and expiring on December 31, 2018 (the "**Expiration Date**"). Thereafter, the contract shall renew in accordance with Section 9.1(b). |
| **Placements:** | ☐ Indoor　　　　　　　　　☒ Outdoor |
| **Commission:** | Commission payment is calculated in accordance with Section 7. |
| **Products:** | ☒ DVD Rental<br>☒ DVD Sell Through<br>☒ DVD Previously-Viewed Sell Through<br>☒ Video Game Rental<br>☒ Video Game Sell Through<br>☒ Video Game Previously-Viewed Sell Through |
| **Issuance of Commission Payments:** | Quarterly |
| **Cancellation of Prior Contracts:** | This contract, on and after its Effective Date, supersedes and cancels the prior contracts (except with respect to any outstanding payment obligations) identified as follows:<br><br>Kiosk Operating Agreement Effective July 29, 2010; Video Games Addendum dated May 1, 2010 and Tickets Addendum dated September 4, 2012. |

| CVS PHARMACY, INC. | REDBOX AUTOMATED RETAIL, LLC |
|---|---|
| By: *[signature]* | By: *[signature]* |
| Name: Michael McKean | Name: TARYN ARONSON |
| Title: VP Merchandising | Title: VP, Finance |
| Date: 1/25/16 | Date: 1-19-16 |

# KIOSK OPERATING AGREEMENT

## Contents

1. Definitions
2. Nature of Our Agreement
3. Identification of Sites and Premises
4. Kiosk Installation
5. Kiosk Operation and Maintenance
6. Kiosk Relocation, Removal and Re-Installation
7. Commission Payments
8. Marketing
9. Term and Termination
10. Confidential Information
11. Assumption of Loss; Insurance
12. Indemnification
13. Limitations of Liability
14. Miscellaneous

---

This Kiosk Operating Agreement (this "contract" or "Agreement") is entered into between **CVS Pharmacy, Inc.**, a Rhode Island corporation ("you," "your" or "Client") with its principal offices at One CVS Drive, Woonsocket, Rhode Island 02895 and **Redbox Automated Retail, LLC**, a Delaware limited liability company ("we," "our" or "Redbox"), with its principal offices at One Tower Lane, Suite 900, Oakbrook Terrace, Illinois 60181. The term "us" refers to both Client and Redbox. The contract consists of the Summary Page, the following terms and conditions, and the exhibits to the contract.

## Terms and Conditions

### 1. Definitions

"**Commissions**" refers to the sums payable to you under this contract, as detailed in the Section entitled "Commission Payments."

"**Kiosk**" means a Redbox® branded machine that vends Media (a) selected by a customer on the Kiosk's touch screen monitor (b) after the presentment of a valid payment card accepted by Redbox. The Kiosk also has a card reader, a lighted panel for displaying Media cover art that is mounted on the side of the Kiosk, and may have a flat screen video monitor mounted above the Kiosk to play promotional or advertising materials. The Kiosk specifications are substantially similar to those displayed on Exhibit "A."

"**Media**" means DVD movies (in both standard and Blu-ray formats) and video games.

"**Net Revenue**" means Net Rental Revenue and Net Sales Revenue combined.

"**Net Rental Revenue**" means all gross revenues from paid rentals of Media and from the failure of customers to return rented Media, less customer refunds, credit card charge backs, declined transactions, promotional discounts, and applicable taxes.

"**Net Sales Revenue**" means all gross revenues from paid sales of Media and from the failure of customers to return rented Media, less customer refunds, credit card charge backs, declined transactions, promotional discounts, and applicable taxes.

"**Premises**" means prominent and visible space measuring approximately three (3) feet by seven (7) feet in a mutually agreed, strategic location at each Site, together with non-exclusive access rights over, upon and across those areas designated by Client and Redbox for the installation, operation, maintenance and repair of the Kiosks.

"**Sites**" means the retail locations listed on Exhibit B, together with all additional locations acquired or controlled by you after the Effective Date which the parties mutually agree to add to Exhibit B.

### 2. Nature of Our Agreement

**2.1 Kiosk Deployment.** Redbox operates automated Kiosks offering customers a convenient way to rent or buy Media, and an efficient way for you to generate income from your Premises. You have requested, and we have agreed, that Redbox will install and operate Kiosks at Sites. You grant Redbox the exclusive right to install and operate automated media rental and sales machines, and to rent Media, at your Sites. In return, Redbox will pay you the Commissions detailed in the Section entitled "Commission

Payments." Redbox is prohibited from offering any product, other than Media at your Sites under this contract without your written approval. Notwithstanding any other provision contained in this Agreement, nothing herein shall restrict or preclude Client from operating photo finishing departments, equipment and/or kiosks allowing Client's customers to digitally download photos, video and/or other media or from allowing Client to sell music, movies, video games and/or other media to customers via digital download from equipment and/or kiosks situated inside the Client's retail locations at the Sites.

**2.2  Access to Sites.** You grant Redbox (for its use and the use of its employees and agents) a limited license over your Sites when the Sites are open to the public for business. This license allows Redbox to enter and exit the Sites, and to perform any necessary installation, service, maintenance, repair, relocation and removal of the Kiosks in accordance with the terms of this Agreement. You will not cause or permit any unreasonable interference to or from the Kiosks.

**2.3  Ownership of Kiosks and Media.** As between the two of us, you acknowledge that we own all right, title and interest in the Kiosks and the Media. You will not interfere with our ownership.

## 3. Identification of Sites and Premises

**3.1  Site Identification.** The parties agree to operate Kiosks at Sites. The parties agree to review whether to operate Kiosks at locations not listed on Exhibit B on a routine basis. Installation and operation of Kiosks at locations added to Exhibit B is by mutual agreement. Exhibit B may be updated as Kiosks are added or removed in accordance with the terms of this Agreement, without a formal amendment through the use of email acknowledged by both parties.

**3.2  Selection of Premises.** The parties will mutually agree to Premises at Sites.

**3.3  Permits.** At our expense, the parties will work together to obtain any necessary permits, licenses or other governmental authorizations. However, we shall have sole discretion whether to proceed to obtain such necessary permits, licenses or other governmental authorizations in order to install Kiosks if we object to the costs associated therewith.

**3.4  Installation and Access Authority.** Subject to applicable law, regulation, or the terms of any agreement for any new Site (which is in effect prior to the time you own or operate the new Site), you represent and warrant that you have the authority (a) to grant Redbox the right to install and operate Kiosks at the Sites, and (b) to grant access to Redbox, and its invitees, from and to the Kiosks so we can perform our obligations under this contract.

## 4. Kiosk Installation

**4.1  Our Installation Responsibilities.** Should the parties mutually agree to add locations to Exhibit B, we will install Kiosks at the Sites according to a mutually agreed deployment schedule. Kiosk specifications are substantially similar to those described in Exhibit A. We will try to minimize disturbances to your Site operations during our installation of the Kiosks. For security reasons, we may bolt an outdoor Kiosk to the pavement. We will notify you in writing at least two (2) weeks prior to the installation of a Kiosk at a Site; you acknowledge that our obligation to notify you pursuant to this section may be satisfied by email.

**4.2  Your Preparation of the Premises.** Should the parties mutually agree to add locations to Exhibit B before the scheduled date of Kiosk delivery, you will prepare the Premises for installation by removing any structures, machinery, or displays located on the Premises. Due to the potential variation of deployment options, any additional preparation of a Site for the deployment of an outdoor Kiosk will be determined following a Site visit by Redbox personnel.

**4.3  Utilities.** With the exception of electrical power, our Kiosks normally have "plug and play" capability. Should the parties mutually agree to add locations to Exhibit B, before the scheduled date of Kiosk delivery, you will provide two (2) electrical outlets from a dedicated circuit providing 120 volt, 20 Amp A.C. electrical power service to operate the Kiosk. We are responsible for communication or data connectivity. Should two (2) electrical outlets from a dedicated circuit providing 120 volt, 20 Amp A.C. electrical power service to operate the Kiosk, not exist, we will install the outlets using contractors approved by you and pay up to one thousand three hundred dollars ($1300) per Site for installation. Should the costs to install such outlets exceed one thousand three hundred dollars ($1300) per Site, we will pay the entire cost and then invoice you (supplying appropriate documentation) for the amount in excess of one thousand three hundred dollars ($1300). You agree to pay our invoice within thirty (30) days of receipt. Further, should it be necessary to install curb stops adjacent to the Kiosks, we will install such curb stops with contractors approved by you at our cost. We will be responsible for communication or data connectivity.

## 5. Kiosk Operation and Maintenance

**5.1  Our Responsibilities.** We have exclusive rights over the operation, use and control of the Kiosks, including but not limited to their hardware and software. Your personnel have only the same limited right of access to the Kiosks as are granted to the general public. We will provide all hardware and software support, maintenance and repairs for the Kiosks. We will operate and maintain the Kiosks in an attractive and good state of repair, and in proper working order in compliance with all applicable laws, ordinances, regulations, lease provisions and other applicable agreements. If there is a Kiosk malfunction, we will promptly initiate diagnostic and repair services after receiving notice of the malfunction. The Redbox personnel assigned to perform Redbox's obligations under this contract will be qualified for the services they are assigned to perform. They will perform Redbox's obligations with promptness and diligence, and in a good and workmanlike manner. We will

not be required to make any improvements to the Site or incur any additional cost to install a Kiosk at a Site other than the installation of dedicated electrical outlets as detailed in Section 4.3. With respect to DVD content, no DVD's having a rating of "X", "Adults Only" or similar rating by the Ratings Board of the Motion Picture Association of America (or its equivalent for video games) or similar authority may be sold or rented from the Kiosks. This restriction shall include films which have not been rated by a ratings authority but contain content that would reasonably qualify them for such ratings.

**5.2  Your Responsibilities.** You will maintain the area immediately surrounding the Premises in a neat, clean and good condition, so as to provide an attractive and suitable environment for the use of the Kiosks by customers. You will provide all electrical service. As to those Sites where you are not the party responsible for exterior maintenance, you will use good faith efforts to insure that the party responsible for exterior maintenance maintains the area as described herein.

**5.3  Security and Access to Stores.** Each of us will take reasonable precautions to ensure safe working procedures and conditions during and in connection with such our operations at a Site. While on-Site, Redbox's personnel will comply with your security and access policies as may be in effect (and as are identified or provided in writing to Redbox) at the Sites. At your request, our personnel will check in with Site management when they arrive to perform maintenance or operations at a Site.

**5.4  Customer Queuing.** You will keep the area immediately adjacent to the Premises open so individuals waiting to use the Kiosks may queue. Of course, you may direct such queuing so as to minimize interference with your other business traffic.

**5.5  Customer Service.** We will maintain a toll free customer service phone number which will be prominently displayed on the Kiosk. We will handle all customer calls and other issues relating to the operation of the Kiosks, providing live phone coverage across seven (7) days/week from 6 am to Midnight Central Standard Time.

## 6. Kiosk Relocation, Removal and Re-Installation

We understand that, under certain circumstances, a Kiosk may need to be moved or relocated such as, without limitation, store closings, relocations, remodels and renovations. This Section details the procedures governing movement and relocation of a Kiosk.

**6.1  Movement of a Kiosk.** It is critical that only Redbox – and not you – physically moves a Kiosk. Redbox needs to handle any move for several reasons, including: (a) the Kiosk is our property; (b) the Kiosk contains sensitive electronic equipment and precision machinery; (c) the Kiosk needs to remain powered and have consistent Internet connectivity to conduct transactions, monitor inventory and status, and to receive programming updates; (d) due to its size, weight, and various components, the Kiosk requires specialized equipment for handling by trained personnel to prevent damage to and shifting of contents, personal injury, unnecessary service calls and lost revenue; and (e) because a sub-optimal location may result in less revenue, the new location must be mutually agreed upon between us. You agree to communicate these points to your personnel.

**6.2  Process for Movement, Relocation and Reinstallation of a Kiosk.** The agreed-upon process for relocation, removal or reinstallation ("3R") of Kiosks is as follows:

(a)  You must request in writing the relocation, removal or reinstallation of any Kiosk by submitting your request to your client relations manager no less than ten (10) business days prior to the requested relocation, removal or reinstallation date.

(b)  Because Kiosk location is by mutual agreement, we will promptly respond with our agreement or disagreement as to the proposed Premises. Any relocated placement must be similar to the original location. In the unlikely event that the parties cannot agree on new Premises at a Site, then either party may terminate this contract with respect to that Site.

(c)  Once the parties reach agreement on relocation, removal or reinstallation, we will coordinate with your representative at the Site and will mutually determine the schedule (date and time) for it to take place. We – and not you – are responsible for the relocation, removal or reinstallation of the Kiosk.

(d)  The costs associated with any relocation, removal or reinstallation of the Kiosk made at your request will be at your sole cost and expense limited to either the relocation of the electrical lines to the Kiosk or the installation of utilities. Redbox is responsible for the cost of removing, reinstalling and physically moving the Kiosk.

**6.3  Disclaimer of Liability.** We are not liable, and disclaim all assumption of loss, for any damages, personal or otherwise, should you or any of your agents take it upon themselves to relocate, remove, or re-install a Kiosk. If you move a Kiosk without following the procedures set forth in Section 6.2, you will defend and indemnify Redbox for any Claims that result from the unauthorized movement according to the provisions of Section 12 ("Indemnification") below. We also may offset your Commission for any damages we incur. If you move a Kiosk a second time at a Site without following the procedures set forth in this Section 6.3, we may immediately terminate this contract with respect to that Site.

**6.4  Remodels and Rebuilds.** Should your operations continue during any period of remodeling or rebuilding of a Site, reasonable accommodations will be made to attempt to keep the Kiosk operating at the Site during that period. However, we may remove a Kiosk from a Site or suspend service at a Kiosk during that period if, in our reasonable opinion, the remodeling or rebuilding would have a material adverse effect upon (a) the number of customer transactions conducted at the Kiosk or (b) the Kiosk's condition.

**6.5  Vandalism or Burglary.** Either party may request approval of the other party for the exclusion of any Site from

these obligations if the Kiosk has repeatedly been vandalized or burglarized. The other party's approval of this request will not be unreasonably withheld, conditioned or delayed.

**6.6 Removal for Failure to Generate Income.**

(a) After the Term starts, if a Kiosk fails to generate average Net Rental Revenue in excess of five hundred dollars ($500.00) per week for any four (4) consecutive weeks occurring eight (8) weeks or more after the initial installation of a Kiosk at the Site, we may remove the Kiosk. Upon removal of the Kiosk, this contract automatically terminates with respect to that Site. Should we remove Kiosks from Sites, we agree to do so on a mutually scheduled quarterly basis. It is within our sole discretion to remove a second Kiosk from a Site for any reason.

(b) Notwithstanding section 6.6(a) above, the number of Kiosks that Redbox may remove from Sites for failure to generate income in a contract year will be calculated as of the start of the Term and on each contract anniversary date thereafter by taking the average number all Kiosks removed for failure to generate income over the prior three (3) year period (regardless of whether such Kiosks were installed pursuant to a prior contract between the parties) multiplied by two (2). By way of example and not by limitation, assume that as of the start of the Term (which is January 1, 2016), the average number of Kiosks removed for failure to generate income during calendar years 2013-2015 was sixty-five (65). During 2016 (which is also the first contract year of this contract) Redbox may remove up to one hundred thirty (130) Kiosks for failure to generate income.

**6.7 Surrender of Premises; Transitional Operation.** Upon the expiration or the termination of this contract, in whole or with respect to any individual Site, we will (a) remove the Kiosks, (b) surrender possession of the Premises, and (c) return the Premises in good clean condition, subject to normal and reasonable wear and tear related to the installation, use, operation and removal of the Kiosks. At the time we remove the Kiosk, we will either cut anchor bolts flush with the ground or fill holes with concrete and restore the surface at the time we remove such bolts. We will consult with you to mutually agree upon a reasonable schedule to accomplish these tasks, which should not exceed thirty (30) days from expiration or termination. Unless we terminate this contract for your breach, we will continue to operate the Kiosks and pay you commissions upon the same terms and conditions until removal of the Kiosks is complete. In the event you elect to close the retail store at a location at which a Kiosk is located, we agree to remove such Kiosk in accordance with the terms of this contract. You agree to give us thirty (30) days prior written notice of such closing so that we can remove the Kiosk. We agree to indemnify you pursuant to Section 12 if we fail to timely remove such Kiosk.

## 7. Commission Structure and Payments

**7.1 Rental Commissions.**

(a) Redbox offers Media in Kiosks for rental by end-customers. Redbox will pay Client a quarterly Commission for DVD rental based on a percentage of Annual Net Rental Revenues (defined as calendar year Net Rental Revenue for Media) received by Redbox collected from Kiosks at Client Sites. Subject to adjustments detailed below, during the term, Redbox agrees to pay Client Commission as follows:

| Annual Net Rental Revenue | DVD rental Commission percentage Per Client Kiosk. |
|---|---|
| $0 - $26,000 | 5.5% |
| $26,000.01 – $39,000 | 7.5% |
| $39,000.01 – $52,000 | 11% |
| $52,000.01 – $65,000 | 14% |
| $65,000.01 – above | 16% |

The commission percentage for rental of video games throughout the Term of this contract will be five percent (5%).

(i) In order to determine the DVD rental Commission percentage payable Redbox will:

(a) include Net Rental Revenue generated by the rental of both DVD's and video games;

(b) using average daily Net Rental Revenue back to January 1st, annualize Net Rental Revenue at the conclusion of each calendar quarter; and

(c) in the event that annualized Net Rental Revenue at the conclusion of the calendar quarter changes to such an extent that there is a resulting change in the DVD rental Commission percentage applied, make a "True Up" payment or offset Commission. (Redbox may also make a True Up payment or offset Commission upon early termination of this contract as to any Site(s)).

(ii) All Commission payments revert back to dollar one on January 1st each year (thereby potentially changing the commission percentage). Commission is applied against Annual Net Rental Revenue at each Client Site on a per Kiosk basis and therefore it is possible that two Kiosks at the same Client Site may have different Commission rates.

(iii) Media Sell Through and Previously Viewed Sell Through revenue will not be included toward Total Annual Net Rental Revenue.

(b) For all Kiosks installed and operating at the Sites, Redbox will pay Client Commissions (inclusive of a True Up payment) within thirty (30) days of the end of each calendar quarter. Net Rental Revenues, to which Commission shall

be applied, will:

(i) be calculated in accordance with generally accepted US accounting principles;

(ii) be applied against DVD Net Rental Revenue; and

(iii) be accompanied by a report which itemizes revenue by Kiosk and Site.

Refer to Exhibit C for Rental Commission calculation example.

**7.2 Sell Through Commissions.** We may offer new Media for direct sale from the Kiosks as noted on the Summary Page. We will pay you a Commission based on a percentage of the Net Sales Revenue received by Redbox for the sale of new Media. Redbox will determine the sale price of the Media. The Commission for new Media throughout the Term of this contract will be three percent (3%).

**7.3 Previously-Viewed Sell Through Commissions.** We may offer previously-viewed Media for direct sale from the Kiosks as noted on the Summary Page. We will pay you a commission based on a percentage of the Net Sales Revenue received by Redbox for the sale of previously-viewed Media. We reserve the right to determine the selection and pricing for previously-viewed Media. The commission rate for previously-viewed Media throughout the Term of this contract will be three percent (3%).

**7.4 Net Sales Revenue Calculation and Payment.** For all Kiosks installed and operating at the Sites, we will pay you your Commission within thirty (30) days of the end of each calendar quarter. Net Sales Revenues, to which Commission shall be applied, will:

a) be calculated in accordance with generally accepted US accounting principles;

(b) be applied against Net Sales Revenue; and

(c) be accompanied by a report which itemizes revenue by Kiosk and Site.

**7.5 Inspection of Records.** It is your right, within one hundred eighty (180) days of payment of a commission, to inspect our accounts and reports relating to the calculation of that commission. Inspections can occur at reasonable intervals upon reasonable advance written notice, and during our regular business hours.

**7.6 Taxes.** Any Commission paid by Redbox under this Agreement shall not include any taxes, assessments and other amounts assessable by any government authority on the Kiosks or services offered under this Agreement, including any sales, use, transaction privilege, gross receipts, rental/lease or value-added tax (collectively, "Taxes"). Redbox shall be liable for any Taxes on any Kiosks or other goods or services furnished under this Agreement and agrees to remit such Taxes directly to any government authority. In addition, Redbox shall provide Client a Direct Pay Permit to release Client and its affiliates of any liability for any Taxes and/or obligation to collect and remit any such Taxes. Client shall be responsible for all taxes relating to its stores, operations and income.

## 8. Marketing

Recognizing that marketing is critically important to increasing customer awareness, which in turn substantially impacts revenue, the parties agree to engage in marketing efforts which includes but is not limited to the following:

**8.1 Location Guide and Press Release.** You authorize Redbox to use your name and address of the Sites for the purpose of providing a location guide for customers. This guide may be in interactive media form or Internet-based, such as but not limited to a locator guide on our website. In addition, you agree to work with Redbox in order to issue a press release to the public subject to such guidelines and restrictions as may be reasonably requested by you.

**8.2 Point of Purchase Merchandising.** We reserve the right to use a digital merchandising screen for point of purchase merchandising within the Sites. The screen would be directly attached and secured to the Kiosks, and would have a visual component as well as an audio component. The screen may display (but not be limited to displaying):

- ☒ Cover art from the currently offered Media;
- ☒ Movie trailers from new movie releases and upcoming releases; and
- ☒ External advertising

**8.3 Other.** The parties may engage in the following additional marketing efforts which are subject to approval by Client and any restrictive covenants, leases, codes, laws or ordinances applicable to the Site : Ceiling Danglers, Window Clings, Cooler Clings, Door Decals, Cashier Stickers, Cashier Buttons, Cashier Handouts, Breakroom Posters, Lighted Window Signs, Floor Talkers, Cart Cards, Lane Dividers, A-Frame Signs, Free Standing Inserts, Email Promotions, Text Promotions, Radio Promotions, Online Internet Promotions, Demo Programs, and Out Of Home (OOH) Advertising. Also included are any programs involving promo code distribution via cross promotions (Catalina or POS System), circular advertising, and text programs. Further, you may agree to maintain on your corporate website a description of the Redbox products and services offered at your Sites, along with a photo of a Kiosk. The text and photo appearing on this webpage are subject to the mutual approval of the parties.

## 9. Term and Termination

**9.1 Term.**

(a) This contract goes into effect on the **Effective Date**, which is identified on the Summary Page. The term of this contract expires at 11:59 p.m. (Central time) on the **Expiration Date** identified on the Summary Page unless it

renews according to the following provision. Term is defined as the Initial Term together with all Renewal Term(s).

(b) This contract automatically renews for two (2) additional one (1) year periods, each a ("**Renewal Term**") unless either party gives notice of its intent not to renew this contract at least ninety (90) days before expiration of the term.

**9.2 Termination for Cause.** Either of us may terminate this contract as a result of a material breach by the other party of any of its obligations. The termination will be effective upon the breaching party's receipt of notice of the breach, subject to a thirty (30) business day cure period. If the breaching party fails to cure or to initiate and diligently begin prosecuting a plan to cure the breach within thirty (30) business days after its receipt of the notice and thereafter to diligently pursue such cure, the non-breaching party may terminate the contract.

**9.3 Immediate Termination.** Notwithstanding the foregoing paragraph, either of us may terminate this contract immediately upon written notice if any of the following events occur: (a) the other party ceases or is likely to cease to carry on all or any principal part of its business; (b) the other party is unable to pay its debts as and when they become due; (c) due to an encumbrance, a third party takes possession of all or any part of the business, property or asset of the other party, or any liquidator or receiver is appointed in respect thereof; (d) the other party makes a general assignment for the benefit of its creditors; or (e) any order has been made or any resolution has been passed for the winding up of the other party.

## 10. Confidential Information

**10.1 Definition of "Confidential Information."** "Confidential Information" means information, whether received before or after the Effective Date, marked or otherwise identified in writing by one of us as proprietary or confidential, or information that, under the circumstances surrounding the disclosure, the receiving party reasonably should recognize as being confidential. It includes non-public information regarding either party's products, software, marketing and promotions, business methods, cost information, forecasts, sales, revenues, profits, customer information (including personally identifiable information, rental transactions, and rental history), supplier information, development plans, store openings, store closings, store relocations and the terms of this contract.

**10.2 Information Not Considered Confidential.** Confidential Information does not include information which: (a) the recipient developed independently; (b) the recipient knew before receiving it from the other party; or (c) is or subsequently becomes publicly available or is received from another source, in both cases other than by a breach of an obligation of confidentiality. The burden of proof to establish that one of the above exceptions applies will be upon the recipient.

**10.3 Use of Confidential Information.** For a period of three (3) years after initial disclosure, neither party will:

(a) use the other's Confidential Information without the other's written consent, except in furtherance of this business relationship or as expressly permitted by this contract; or

(b) disclose the other's Confidential Information, except to obtain advice from its professional advisors, legal or financial consultants, or if compelled by law (including disclosure necessary or appropriate in filings with the U.S. Securities Exchange Commission) or generally accepted accounting principles, in which case the party compelled to make the disclosure will use its best efforts to give the other party notice of the requirement so that the disclosure can be contested.

**10.4 Protection of Confidential Information.** Each party will take reasonable precautions to safeguard the other party's Confidential Information. Those precautions will be at least as great as the precautions that the other party takes to protect its own Confidential Information. Each party will disclose the other's Confidential Information to its employees, consultants or subcontractors only on a need-to-know basis and subject to the confidentiality obligations imposed here. When Confidential Information is no longer necessary to perform any obligation under this agreement, each party will return it to the other party or destroy it at the other's request.

**10.5 Cooperation in the Event of Disclosure.** Each party will immediately notify the other party upon discovery of any unauthorized use or disclosure of Confidential Information, and will help the other party regain possession of the Confidential Information and prevent further unauthorized use or disclosure.

**10.6 Right to Use Feedback.** If one party provides suggestions for changes or improvements, or other feedback, to the other party about the other party's products or services, the party receiving the feedback may use it for any purpose without obligation of any kind, except that the receiving party will not disclose the source of feedback without the consent of the party providing it.

## 11. Assumption of Loss; Insurance

**11.1 Assumption of Loss.** Except as otherwise stated in this contract and except for the intentional or grossly negligent acts of you, your employees or agents, we will assume responsibility for all physical loss or damage to our Kiosks, their contents, signs and other personal property.

**11.2 Insurance Coverages.**

During the Term of this Agreement, Redbox shall, at its expense, carry and maintain:

a) Workers Compensation Insurance meeting statutory requirements and Employers Liability Insurance with a limit of no less than $1,000,000 each accident for bodily injury and $1,000,000 each employee for bodily injury by disease.

b) Commercial General Liability (CGL) insurance written on ISO Occurrence form CG 00 01 12 07 or equivalent, with a limit of not less than $2,000,000 each occurrence, $4,000,000 General Aggregate and $4,000,000 Products Completed Operations Aggregate.

c) Business Automobile Liability with combined single limits of not less than $1,000,000 each accident.

d) Umbrella Excess Liability insurance in such amount as is necessary to bring the combined limits of underlying Employers Liability, Commercial General Liability and Business Automobile Liability to the limits noted in A, B and C above.

The policies shall be underwritten by an insurance company that carries an A- or better rating from A.M. Best. Each policy (except for Worker's Compensation) shall provide that:

1. CVS Health Corporation and its Subsidiaries and Affiliates shall be named as an additional insureds,
2. not less than thirty (30) days' prior, written notice shall be given to CVS Health Corporation in the event of cancellation or non-renewal thereof,
3. such insurance (except for Worker's Compensation) will be primary insurance with respect to CVS Health Corporation and its Subsidiaries and Affiliates, and
4. Redbox and its insurers will provide a Waiver of Subrogation against CVS Health Corporation and its agents, officers, directors and employees for recovery of damages against these policies.

Redbox shall furnish CVS Health Corporation with a certificate of insurance evidencing coverage, and a certificate of insurance as evidence of renewal. The amount of such required insurance coverage under this section shall not limit Redbox's obligations under this contract.

**11.3 Claims Cooperation.** You agree to (a) promptly notify Redbox in writing of any claim or loss after any potentially insurable loss is discovered, and (b) cooperate in the investigation and adjustment of any such loss.

## 12. Indemnification

**12.1 Third-Party Claims.** Each party (the "indemnifying party") will indemnify and defend the other party, its officers, affiliates, employees and agents, against and hold them harmless from, without limitation, any and all liabilities, injury, death, penalties, losses, costs, damages, claims, expenses, attorneys' fees, expenses of litigation, suits, judgments, liens and encumbrances brought, suffered or incurred by the other party or third parties (collectively, "Claims") attributable to the respective acts or omissions of the indemnifying party, its officers, affiliates, employees, agents or subcontractors, while engaged in their business or in the performance of their duties under this contract including but not limited to the Kiosk and its location, installation, maintenance, servicing and removal. A party will have no obligations under this paragraph to the extent a Claim relates to or arises from the intentional acts or omissions of the other party, its officers, employees, affiliates, subcontractors, or agents. Client will have no obligation under this paragraph for Claims attributable to the misappropriation, misuse and/or theft of credit and/or debit card information and/or identity information provided by customers of the Kiosk to Redbox; Redbox will indemnify and defend Client with respect to all Claims on account thereof.

**12.2 Landlord Claims.** You will further indemnify and defend Redbox against and hold it harmless from the Claims of any landlord or property manager who claims that we do not have the right to install or operate a Kiosk at a Site. Notwithstanding the foregoing, in the event your landlord or property manager reasonably claims that we do not have a right to install or operate a Kiosk at any of your Sites or it is otherwise determined by you that a Kiosk may not be installed or operated at any of your Sites, we will work with you to select an alternative Site location to relocate the Kiosk. In such a case, you agree reimburse us for any reasonable costs we have expended to initially install the Kiosk, including our electrical installation costs, and pay our costs related to relocating and reinstalling the Kiosk.

**12.3 Failure to Remove Kiosks and Media.** In the event Redbox fails to remove Kiosk(s) and Media within ninety (90) days of expiration or termination of this contract in whole or in part, Client shall have the right but not the obligation to remove and store such property at Redbox's sole cost and expense.

## 13. Limitations of Liability

**13.1 Limitation of Liability.** IN NO EVENT WILL A PARTY OR ANY OF ITS DIRECTORS, OFFICERS, MEMBERS, EMPLOYEES, AGENTS OR SUBCONTRACTORS BE LIABLE UNDER ANY THEORY OF TORT, CONTRACT, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY FOR LOST PROFITS, EXEMPLARY, PUNITIVE, SPECIAL, INCIDENTAL, INDIRECT, CONSEQUENTIAL DAMAGES, LOSS OF USE OF DATA OR THE LIKE, EACH OF WHICH IS HEREBY EXCLUDED BY AGREEMENT OF THE PARTIES REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE OR WHETHER EITHER PARTY OR ANY ENTITY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**13.2 Exclusions to the Limitation of Liability.** The limitations of liability in the preceding paragraph will not apply to liabilities arising under the Sections governing "Confidential Information," "Indemnification," or to acts or omissions involving a party's intentional misconduct or fraud.

**13.3 Disclaimer of Warranties.** EXCEPT AS EXPRESSLY STATED IN THIS CONTRACT, NEITHER PARTY MAKES ANY WARRANTY OF ANY KIND TO THE OTHER PARTY, AND DISCLAIMS ALL WARRANTIES, INCLUDING WITHOUT LIMITATION ALL IMPLIED WARRANTIES OF

MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

## 14. Miscellaneous

**14.1 Notices.** Notices, authorizations, and requests in connection with this contract must be in writing and sent by personal delivery, certified mail (return receipt requested), or express courier to the addresses listed in this contract. Notices will be treated as delivered on the date shown on the return receipt or on the courier confirmation of delivery. Notices sent to Redbox must be separately copied and sent to the "Legal Department."

**14.2 Governing Law.** The laws of the State of Delaware, excluding the rules of conflicts of law, will govern this contract.

**14.3 Dispute resolution.** When bringing an action to enforce this contract, the parties agree to the following jurisdictions: (a) if we bring the action, the jurisdiction will be in Rhode Island; and (b) If you bring an action, the jurisdiction will be Cook County (Chicago), Illinois. Notwithstanding the foregoing, either party may bring an action against the other party in Delaware.

**14.4 Jury Waiver.** Each party knowingly, voluntarily and intentionally waives the right it may have to a trial by jury in respect of any litigation based upon this contract, or arising out of, under or in connection with this contract, or any course of dealing, statements, whether verbal or written, or action of or by a party or any of their respective affiliates to the fullest extent permitted by law. This provision is a material inducement for the parties to enter into this contract.

**14.5 Independent Contractors.** Redbox acts as an independent contractor, and will be responsible for any and all social security, unemployment, workers' compensation and other withholding taxes for all of its employees. Nothing in this contract will be deemed to establish a partnership, joint venture, employment, agency or other legal relationship other than that of independent contractors.

**14.6 Subcontracting.** We may subcontract certain of our obligations under this contract, including but not limited to, installation, maintenance, supplying, servicing, relocation or removal of our Kiosks. However, we will remain primarily liable to you for any and all such subcontracted services.

**14.7 Assignment.** This contract cannot be assigned without the express written consent of the other, which consent will not be unreasonably withheld, conditioned or delayed. However, a party may withhold consent if an assignee is in or plans to be in competition with that party. Additionally, a party does not need to obtain the consent of the other party to assign this contract to a parent, subsidiary, or affiliated entity or to a corporation or limited liability entity, which acquires all or, substantially all of the membership interests, assets or stock of such, party, parent, subsidiary or affiliate.

**14.8 Entire Agreement.** This contract and all exhibits contain the entire agreement between the parties with respect to the subject matter of this contract, and supersede any previous understandings or agreements, whether written or oral, in respect of such subject matter. However, if this contract does not include a section governing the confidential nature of information exchanged by the parties, then the terms of any separate confidentiality or nondisclosure agreement signed by the parties will not be superseded by this contract.

**14.9 Interpretation.** If a court holds any provision of this agreement to be illegal, invalid or unenforceable, the rest of the document will remain in effect and this agreement will be amended to give effect to the eliminated provision to the maximum extent possible. The term "may" indicates that something is permissive and optional in a party's discretion, not mandatory or automatic. The language used in this contract has been mutually chosen by the parties to express their intent, and no rule of strict construction will be used against either party.

**14.10 Modification; Waiver.** No amendment, change, waiver or discharge of this contract is valid unless it is set forth in writing and signed by an authorized representative of the party (which in the case of Redbox is a Vice President) against whom the amendment, change, waiver or discharge is sought to be enforced.

**14.11 Third Party Beneficiaries.** There are no third-party beneficiaries, other than Client affiliate companies, who are intended to benefit in any way from this contract.

**14.12 Force Majeure.** Neither of us will be liable to each other for any loss, damage, delay or failure of performance that is attributable to acts of God, armed conflicts, war, insurrection, acts of terrorism or acts committed in furtherance of terrorism, riots, earthquakes, hurricanes, floods, unusually severe weather, conditions or events of nature that cannot be predicted, civil disturbances, power or communications failures, strikes, fire, the acts of any governmental authority, or other causes beyond a party's reasonable control. A party's performance will be excused during the pendency of any such event, but that party will take all steps reasonable, practical and necessary to effect prompt resumption of its obligations under this contract in full or in part.

**14.13 Survival.** Provisions regarding payment of commissions, limitations of liability, confidentiality, indemnification, obligations on termination or expiration and the other provisions in this Section entitled "Miscellaneous" survive termination or expiration of this contract.

**14.14 Execution.** This contract is effective when it is signed in "pen and ink" by authorized representatives of each party. The contract may be executed in one or more counterparts, each of which will constitute an original agreement, but is not enforceable until delivery and exchange of the executed counterparts. Copies of this contract (including facsimiles) have the same force and effect as a signed original document.

| CVS PHARMACY, INC. | REDBOX AUTOMATED RETAIL, LLC |
|---|---|
| By: *[signature]* | By: *[signature]* |
| Name: Michael McEnany | Name: Taryn Aronson |
| Title: VP Merchandising | Title: VP, Finance |
| Date: 2/1/16 | Date: 1-19-16 |

redbox Approved by Legal
FS

## EXHIBIT A

### Redbox Physical/Technology Overview

Physical Specifications





1. Electricity Connection
    a. Interior Kiosk
        1. Power – 120v. 20 amp **dedicated electric line**
        2. The light box and the header that sits on top of the machine have a total electric load of 1.2 amps. The machine has a total electric load of 4.9 amps for a total connected load of 6.1 amps.
    b. Exterior Kiosk
        1. Power: 20 Amp **dedicated** circuit
        2. The light box and the header that sits on top of the machine have a total electric load of 2.1 amps. The machine has a total electric load of 8.5 amps for a total connected load of 10.6 amps.

# FIRST AMENDMENT TO
# KIOSK OPERATING AGREEMENT

This First Amendment to Kiosk Operating Agreement ("**First Amendment**") is effective January 1, 2021 (the "**First Amendment Effective Date**") between CVS Pharmacy, Inc., a Rhode Island corporation ("**Client**") and Redbox Automated Retail, LLC, a Delaware limited liability company ("**Redbox**") (**collectively, the "Parties"**).

Client and Redbox entered into a Kiosk Operating Agreement, effective January 1, 2016 (the "**Operating Agreement**"), granting Redbox the exclusive right to install and operate Kiosks at certain Sites. The Parties now desire to amend the Operating Agreement on the terms set forth below. Capitalized terms used in this First Amendment, but not defined, will have the meanings given to them in the Operating Agreement.

THEREFORE, effective as of the First Amendment Effective Date, the Parties agree to amend the Operating Agreement as follows:

1. All references to "DVD" in the Operating Agreement shall be interpreted to mean movie. Redbox shall no longer offer Video Games for rental or sale.

2. The definition of "Media" is deleted in its entirety and restated as follows:

    "**Media**" means movies.

3. Section 7.6 is deleted in its entirety and restated as follows:

**7.6    Taxes**

(a) Redbox shall ensure compliance with all federal, state and local tax laws applicable to the Kiosks, Media and services including but not limited to registering to pay, collecting and remitting taxes imposed upon Redbox in performance of its obligations under this contract. Each party shall be solely responsible for any taxes owed on its income, gross receipts, property or net worth, including income generated under this contract. Redbox will have no liability to separately reimburse Client for any income, gross receipts, business and occupation, or similar tax imposed on Client's business, income, or receipts for any amount paid to Client by Redbox as a result of this contract or any Kiosk transactions.

(b) In the event that the tax authorities subsequently seek to assess taxes against Client that Client reasonably believes are Redbox's obligation, then Client, rather than remit such taxes and seek reimbursement from Redbox, shall immediately provide written notice to Redbox, and Redbox and Client shall reasonably cooperate with each other to investigate and accurately determine the appropriate tax liability, if any, and work together to minimize such tax liability, to the extent legally permissible. Notwithstanding the indemnification provision set forth below, if the Parties, exercising good faith, determine that the assessed taxes, or some portion thereof, is properly due and payable by Redbox, Redbox shall pay such taxes, and in such a case, Redbox shall bear all interest, levies and penalties, assessed by such tax authorities as required by applicable Law, unless the failure to collect and remit taxes is attributable to a Client misrepresentation or failure to disclose a material fact that affects the imposition of taxes due.

(c) The Parties shall provide prompt notice to one another of any audit by tax authorities with respect to Taxes and shall reasonably cooperate to identify and defend positions that may arise under such an audit.

4. Section 9.1 is deleted in its entirety and restated as follows:

**9.1 Term**.

(a) This contract goes into effect on January 1, 2021 and expires at 11:59 p.m. (Central time) on December 31, 2023 unless it renews according Section 9.1(b).

(b) This contract automatically renews for two (2) additional one (1) year periods, each a ("**Renewal Term**") unless either party gives notice of its intent not to renew this contract at least ninety (90) days before expiration of the current term.

Except for the provisions set forth above, all other terms and conditions contained within the Operating Agreement remain unchanged.

THE OPERATING AGREEMENT, INCLUDING THE FIRST AMENDMENT, IS A COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN THE PARTIES REGARDING THE SUBJECT MATTER AND SUPERSEDES ALL PRIOR OR CONCURRENT PROPOSALS AND UNDERSTANDINGS, WHETHER ORAL OR WRITTEN, AND ALL OTHER COMMUNICATIONS BETWEEN THE PARTIES, RELATING TO THE SUBJECT MATTER.

Notwithstanding anything to the contrary in the Operating Agreement, in the event of a conflict between the terms and conditions of this First Amendment and those contained within the Operating Agreement, the terms and conditions of this First Amendment shall prevail.

IN WITNESS WHEREOF, Client and Redbox, by their execution below, indicate their consent to the terms of this First Amendment.

| CVS PHARMACY, INC. | REDBOX AUTOMATED RETAIL, LLC |
|---|---|
| By: *[signature]* | By: *Galen Smith* (DocuSigned, F6FE8E0196554B5...) |
| Name: Enzo Arena | Name: Galen Smith |
| Title: VPMM Consumables and GM | Title: CEO |
| Date: 12/21/20 | Date: December 23, 2020 |

redbox. Approved by Legal
SB

2