Docusign Envelope ID: 3266206D-6E02-4094-8C40-719CFDD52D8D

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

--------------------------------X
In re                            :    Chapter 7
CHICKEN SOUP FOR THE SOUL        :    Case No. 24-11442 (MFW)
ENTERTAINMENT INC, *et al.*,[1]  :    (Jointly Administered)
    Debtors.              :
                                 :
                                 :
--------------------------------X

## DECLARATION OF DAISY DEDERICK IN SUPPORT OF ALBERTSONS COMPANIES, INC.'s MOTION UNDER SECTION 11 U.S.C. § 362(d)(1) FOR RELIEF FROM THE AUTOMATIC STAY TO PERMIT ALBERTSONS COMPANIES, INC. TO <u>REMOVE AND DISPOSE OF KIOSKS</u>

I, Daisy Dederick, hereby declare under penalty of perjury and pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge and belief.

1. I am a National Sales Manager in Merchandising for Albertsons Companies, Inc. ("**Albertsons**"), which, including its wholly owned subsidiaries, owns and operates grocery stores throughout the United States. I submit this declaration (the "**Declaration**") in support of *Albertsons Companies Inc.'s Motion Under Section 11 U.S.C. § 362(d)(1) For Relief From the Automatic Stay to Permit Albertsons Companies, Inc. to Remove and Dispose of Kiosks* (the "**Motion**"). To the best of my knowledge, understanding, and belief, the facts stated in this Declaration are true and accurate. I am authorized to submit this Declaration on behalf of Albertsons.

2. On or about August 1, 2019, Albertsons and Redbox Automated Retail, LLC ("**Redbox**") entered into an agreement titled Kiosk Operating Agreement ("**Master Agreement**"). A

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number (where applicable), are: 757 Film Acquisition LLC (4300); Chicken Soup for the Soul Entertainment Inc. (0811); Chicken Soup for the Soul Studios, LLC (9993); Chicken Soup for the Soul Television Group, LLC; Crackle Plus, LLC (9379); CSS AVOD Inc. (4038); CSSESIG, LLC (7150); Digital Media Enterprises LLC; Halcyon Studios, LLC (3312); Halcyon Television, LLC (9873); Landmark Studio Group LLC (3671); Locomotive Global, Inc. (2094); Pivotshare, Inc. (2165); RB Second Merger Sub LLC (0754); Redbox Automated Retail, LLC (0436); Redbox Entertainment, LLC (7085); Redbox Holdings, LLC (7338); Redbox Incentives LLC (1123); Redwood Intermediate, LLC (2733); Screen Media Films, LLC; Screen Media Ventures, LLC (2466); and TOFG LLC (0508). The Debtors' corporate headquarters and service address is 132 East Putnam Avenue, Floor 2W, Cos Cob, CT 06807.

true and correct copy of the Master Agreement (with certain redactions) is attached hereto as **Exhibit 1**.

3. On or about September 12, 2023, Redbox stopped paying monies owed to Albertsons under the Master Agreement. Redbox has not paid any of these past-owed monies to date.

4. As of the present date, Redbox owned/owns approximately 2,000 kiosks ("Kiosks") at Albertsons' stores located throughout the United States.

5. On January 18, 2024, in accordance with Section 9.3(b) of the Master Agreement, Albertsons provided written notice of termination of the Master Agreement, with the termination effective immediately (*i.e.* as of January 18, 2024).

6. Under Section 6.7 of the Master Agreement, Redbox was obligated to remove the Kiosks within 30 days of termination (thus, by February 17, 2024). Redbox's deadline for removal of the Kiosks had long expired by the date of its Chapter 11 bankruptcy filing.

7. Albertsons has made numerous demands on Redbox, pre-petition, for removal of the Kiosks. To date, the Kiosks have not been removed.

I declare under penalty of perjury that the foregoing is true and correct

Dated: August 13, 2024

Signed by: Daisy Dederick
AC96B127F6354D2...

# EXHIBIT 1



# KIOSK OPERATING AGREEMENT
## Summary Page

| | |
|---|---|
| **Client:** | Albertsons Companies, Inc. |
| **Primary Client Contact:** | Michael Watson; ███████████████ |
| **Form of Organization:** | A corporation organized under the laws of the State of Delaware |
| **Client Addresses:** | *Principal Office:*  Albertsons Companies, Inc.  250 East Park Center Blvd.  Boise, ID 83706    *For Notices:* Same |
| **Effective Date:** | The date upon which Redbox and Client have both executed this contract. |
| **Initial Term:** | 3 years beginning on August 1, 2019 and expiring on July 31, 2022. Thereafter, this contract may renew in accordance with Section 9.1(b). |
| **Commission:** | See Section 7. |
| **Products:** | ☒ Movie Rental  ☒ Movie Sell Through  ☒ Movie Previously-Viewed Sell Through  ☒ Video Game Rental  ☒ Video Game Sell Through  ☒ Video Game Previously-Viewed Sell Through |
| **Issuance of Commission Payments:** | Monthly, Net 30 |
| **Cancellation of Prior Contracts:** | This contract, on and after its Effective Date, supersedes and cancels the prior contracts (except with respect to any outstanding payment, confidentiality, indemnification or other obligations or rights identified as surviving termination) identified as follows:    <u>Redbox and Albertson's LLC</u>  Kiosk Operating Agreement effective November 18, 2015; First Amendment to Kiosk Operating Agreement effective January 21, 2016; Second Amendment to Kiosk Operating Agreement effective August 1, 2018; and Amendment to Kiosk Operating Agreement effective April 15, 2019.    <u>Redbox and New Albertson's, L.P.</u>  Kiosk Operating Agreement effective August 15, 2015, First Amendment to Kiosk Operating Agreement effective January 21, 2016; Amendment to Kiosk Operating Agreement effective August 1, 2018; and Amendment to Kiosk Operating Agreement effective April 15, 2019.    <u>Redbox and Safeway, Inc.</u>  Kiosk Operating Agreement effective August 1, 2013, First Amendment to Kiosk Operating Agreement effective September 1, 2015, Second Amendment to Kiosk Operating Agreement effective August 15, 2015, Amendment, erroneously referred to as a First Amendment to |

Kiosk Operating Agreement, effective November 1, 2017; Amendment to Kiosk Operating Agreement effective August 1, 2018; and Amendment to Kiosk Operating Agreement effective April 15, 2019.

| ALBERTSONS COMPANIES, INC. | REDBOX AUTOMATED RETAIL, LLC |
|---|---|
| By: _[signature]_ | By: _Galen Smith_ (DocuSigned) |
| Name: Kv.c Hymus | Name: Galen Smith |
| Title: SVP GM/HBC | Title: CEO |
| Date: 8/8/19 | Date: August 3, 2019 |

# KIOSK OPERATING AGREEMENT

## Contents

1. Definitions
2. Nature of Our Agreement
3. Identification of Sites and Premises
4. Kiosk Installation
5. Kiosk Operation and Maintenance
6. Kiosk Relocation, Removal and Re-Installation
7. Commission Payments
8. Marketing
9. Term and Termination
10. Confidential Information
11. Assumption of Loss; Insurance
12. Indemnification
13. Limitations of Liability
14. Miscellaneous

This Kiosk Operating Agreement (this "**contract**") is entered into between **Albertsons Companies, Inc.**, a Delaware corporation ("**you**," "**your**" or "**Client**") with its principal offices at 250 East Park Center Boulevard, Boise, Idaho 83706 and **Redbox Automated Retail, LLC,** a Delaware limited liability company ("**we**," "**our**" or "**Redbox**"), with its principal offices at One Tower Lane, Suite 900, Oakbrook Terrace, Illinois 60181. The term "**us**" refers to both Client and Redbox. The contract consists of the Summary Page, the following terms and conditions, and the exhibits to the contract.

## Terms and Conditions

### 1. Definitions

"**Commissions**" refers to the sums payable to you under this contract, as detailed in the Section entitled "Commission Payments."

"**Grand Opening Grocery Site**" means a newly constructed retail grocery location from the ground up and a new or newly acquired grocery Site(s) branded as your banner or any other banner across all business units.

"**Kiosk**" means a Redbox® branded machine that vends Media (a) selected by a customer on the Kiosk's touch screen monitor (b) after the presentment of a valid payment card accepted by Redbox. The Kiosk also has a card reader, and may have a lighted panel for displaying Media cover art that is mounted on the side of the Kiosk, and may have a flat screen video monitor mounted above the Kiosk to play promotional or advertising materials. The Kiosk specifications are substantially similar to those displayed on Exhibit "A."

"**Media**" means DVDs (in in all formats) and video games.

"**Net Rental Revenue**" means all gross revenues from paid rentals of Media and from the failure of customers to return rented Media, less customer refunds, credit card charge backs, declined transactions, promotional discounts, and applicable taxes.

"**Net Revenue**" means Net Rental Revenue and Net Sales Revenue combined.

"**Net Sales Revenue**" means all gross revenues from paid sales of Media and from the failure of customers to return rented Media, less customer refunds, credit card charge backs, declined transactions, promotional discounts, and applicable taxes.

"**Premises**" means prominent and visible space measuring approximately three (3) feet by seven (7) feet in a mutually agreed, strategic location at each Site, together with non-exclusive access rights over, upon and across those areas designated by Client and Redbox for the installation, operation, maintenance and repair of the Kiosks.

"**Sites**" means the retail locations, including but not limited to grocery, fuel and/or convenience store locations, which you own or operate within the United

States, together with all additional locations acquired or controlled by you after the Effective Date.

## 2. Nature of Our Agreement

**2.1 Kiosk Deployment.** Redbox operates automated Kiosks offering customers a convenient way to rent or buy Media, and an efficient way for you to generate income from your Premises. You grant Redbox the exclusive right to install and operate automated media rental and sales machines and to rent Media at all of your Sites. During the Term, neither you nor any third party shall install or operate an automated media sales or rental machine at any Site, regardless of whether a Kiosk is installed, is not installed or is removed from any of your Sites. In return, Redbox will pay you the Commissions detailed in the Section entitled "Commission Payments."

**2.2 Access to Sites.** You grant Redbox (for its use and the use of its employees and agents) a limited license to access your Sites when the Sites are open to the public for business. This license allows Redbox to enter and exit the Sites, and to perform any necessary installation, service, maintenance, repair, relocation and removal of the Kiosks. You will not cause and will make good faith efforts not to permit any unreasonable interference to or from the Kiosks.

**2.3 Ownership of Kiosks and Media.** As between the two of us, you acknowledge that we own all right, title and interest in the Kiosks and the Media. You will not interfere with our ownership.

**2.4 Media Content.** With respect to Media content, no Media having a rating of "NC-17", "X", "Adults Only" or similar rating by the Ratings Board of the Motion Picture Association of America (or its equivalent for video games) or similar authority may be rented or sold from the Kiosk. This restriction shall include films which have not been rated by a ratings authority but contain content that would reasonably qualify them for such ratings.

## 3. Identification of Sites and Premises

**3.1 Site Identification.** Subject to the applicable terms of this contract (including but not limited to Section 3.7 below), the parties have mutually agreed to install and operate Kiosks, or to continue to operate Kiosks at Site(s) on Exhibit B. The parties may mutually agree to add or remove Sites from Exhibit B without amending this contract, through the use of email.

**3.2 Site Eligibility.** To be eligible for the future installation of a Kiosk, a Site must support Redbox's model for economic viability and be accessible to individuals pursuant to the requirements of the Americans with Disabilities Act of 1990 ("ADA"). As an additional eligibility requirement for fuel and/or convenience store Sites only, there shall be no more than five (5) Kiosks installed at any Redbox client within a three (3) mile radius of the proposed fuel and/or convenience store Site. If a Site does not meet these criteria, then we may, but will not be obligated to, install a Kiosk at the Site.

**3.3 Selection of Premises.** After identifying the Sites, the parties will work together to select Premises at the Sites to install the Kiosks. The order of installing Kiosks and the selection of Premises are largely determined by satisfying the goals of maximizing foot traffic, visibility, revenue and Commissions. Any installations will be subject to all applicable ordinances, codes, local laws, leases, covenants, and use restrictions.

**3.4 Permits.** At our expense, the parties will work together to obtain any necessary permits, licenses or other governmental authorizations.

**3.5 New and Newly Acquired Sites.** You will use good faith efforts to provide Redbox throughout the term with a notification of your newly acquired Sites and a rolling forecast of your projected openings to determine eligibility according to section 3.2 above. However, unless otherwise set forth in this contract, we are not obligated to install or operate a Kiosk at a new or newly acquired Site, unless newly acquired Site(s) has/have a Kiosk, then that/those Sites shall be added to Exhibit B and covered by this contract. In the event that you acquire Site(s) which have a competitor kiosk installed, you will decline to renew or extend the contract which gives the competitor the right to operate a kiosk at that Site(s) and, if such competitor contract allows you to cancel or terminate that contract without breach, you shall promptly exercise that right; thereafter Redbox will install a Kiosk at such Site(s) and such Site(s) shall be added to Exhibit B.

**3.6 Installation and Access Authority.** Subject to applicable law, regulation, or the terms of any agreement for any new Site (which is in effect prior to the time you own or operate the new Site), you represent and warrant that you have the authority (a) to grant Redbox the right to install and operate Kiosks at the Sites, and (b) to grant access at reasonable times to Redbox, and its invitees, from and to the Kiosks so we can perform our obligations under this contract.

**3.7 Redbox Installation Commitments.** Redbox will:

(a) subject to the pre-installation conditions set forth in this contract, including but not limited to Sections 3.5, 4.2 and 4.3, install and operate Kiosks at all of your Grand Opening Grocery Sites;

(b) subject to the pre-installation conditions set forth in this contract, including but not limited to Sections 3.2, 4.2 and 4.3, install and operate Kiosks at all Sites on Exhibit C, new locations at which a competitor previously or presently operates a kiosk under an expired or expiring agreement but which you represent and warrant may be awarded to Redbox on of the Effective Date without breach of an agreement with that competitor. With respect to your pre-installation condition set forth in Section 4.2(i), you agree to use your best efforts to ensure kiosk removals within (30) days of the Effective Date;

(c) subject to the pre-installation conditions set forth in this contract, including but not limited to Sections 3.2, 4.2 and 4.3, during the Initial Term, install Kiosks at up to twelve (12) fuel Sites selected by Client in its sole discretion; and

(d) review (which may include a Site survey by Redbox personnel) all Sites found on Exhibit D (Sites where a Kiosk is currently not installed), in order for the parties to mutually agree whether a Kiosk should be installed. The parties may mutually agree to add or remove Sites from Exhibit D without amending this contract, through the use of email.

Further:

(e) Upon installation or removal of a Kiosk at a Site, such Site shall be removed from or added to the list of Sites on Exhibit B through the use of email rather than amending Exhibit B; and

(f) Unless otherwise stated in Section 3.7(c), Redbox shall have no obligation to install and operate, or to continue to operate, a Kiosk at any Site which is a fuel and/or convenience store location (including those on Exhibit B). The installation and operation of a Kiosk at any such location shall be by mutual agreement and subject to the terms and conditions of this contract.

## 4. Kiosk Installation

**4.1 Our Installation Responsibilities.** We will install Kiosks at the Sites according to a mutually agreed deployment schedule. Kiosk specifications are substantially similar to those described in Exhibit A. We will try to minimize disturbances to your Site operations during our installation of the Kiosks. For security reasons, we will bolt an outdoor Kiosk to the pavement.

**4.2 Your Preparation of the Premises.** Before the scheduled date of Kiosk delivery, you will (i) ensure that any kiosk installed and previously operated by a competitor of Redbox under an expired or terminated contract is removed from the Site; and (ii) prepare the Premises for installation by removing any structures, machinery, or displays located on the Premises. Due to the potential variation of deployment options, any additional preparation of a Site for the deployment of a Kiosk will be determined following a Site survey by Redbox personnel.

**4.3 Utilities.** With the exception of electrical power, our Kiosks have "plug and play" capability. Before the scheduled date of Kiosk delivery, you will provide two (2) electrical outlets from a dedicated circuit providing 120 volt, 20 Amp A.C. electrical power service to operate the Kiosk. We are responsible for communication or data connectivity. Should two (2) electrical outlets from a dedicated circuit providing 120 volt, 20 Amp A.C. electrical power service to operate the Kiosk, not exist, Redbox agrees to have them installed at Redbox cost, provided such costs do not exceed One Thousand Five Hundred Dollars ($1500.00) at the Site. In the event that the costs exceed One Thousand Five Hundred Dollars ($1500.00) at the Site, the parties shall meet in good faith to either agree on a cost sharing arrangement or forego installation at the Site.

## 5. Kiosk Operation and Maintenance

**5.1 Our Responsibilities.** We have exclusive rights over the operation, use and control of the Kiosks, including but not limited to their hardware and software. Your personnel have only the same limited right of access to the Kiosks as are granted to the general public. We will provide all hardware and software support, maintenance and repairs for the Kiosks. We will maintain the Kiosks in an attractive and good state of repair, and in proper working order. If there is a Kiosk malfunction, we will promptly initiate diagnostic and repair services after receiving notice of the malfunction. The Redbox personnel assigned to perform Redbox's obligations under this contract will be qualified for the services they are assigned to perform. They will perform Redbox's obligations with promptness and diligence, and in a good and workmanlike manner.

**5.2 Your Responsibilities.** You will maintain the area immediately surrounding the Premises in a neat, clean and good condition, so as to provide an attractive and suitable environment for the use of the Kiosks by customers. You will provide all electrical service. For indoor Kiosk locations, you are responsible for heating and air conditioning services.

**5.3 Security and Access to Stores.** Each of us will

take reasonable precautions to ensure safe working procedures and conditions during and in connection with such our operations at a Site. While on-Site, Redbox's personnel will comply with your security and access policies as may be in effect (and as are identified or provided in writing to Redbox) at the Sites. At your request, our personnel will check in with Site management when they arrive to perform maintenance or operations at a Site.

**5.4   Customer Queuing**. You will keep the area immediately adjacent to the Premises open so individuals waiting to use the Kiosks may queue. Of course, you may direct such queuing so as to minimize interference with your other business traffic.

**5.5   Customer Service**. We will maintain a toll free customer service phone number which will be prominently displayed on the Kiosk. We will handle all customer calls and other issues relating to the operation of the Kiosks.

## 6.   Kiosk Relocation, Removal and Re-Installation

We understand that, under certain circumstances, a Kiosk may need to be moved or relocated. This Section details the procedures governing movement and relocation of a Kiosk.

**6.1   Movement of a Kiosk**. It is critical that only Redbox – and not you – physically moves a Kiosk. Redbox needs to handle any move for several reasons, including: (a) the Kiosk is our property; (b) the Kiosk contains sensitive electronic equipment and precision machinery; (c) the Kiosk needs to remain powered and have consistent internet connectivity to conduct transactions, monitor inventory and status, and to receive programming updates; (d) due to its size, weight, and various components, the Kiosk requires specialized equipment for handling by trained personnel to prevent damage to and shifting of contents, personal injury, unnecessary service calls and lost revenue; and (e) because a sub-optimal location may result in less revenue, the new location must be mutually agreed upon between us. You agree to communicate these points to your personnel.

**6.2   Process for Movement, Relocation and Reinstallation of a Kiosk.** The agreed-upon process for relocation, removal or reinstallation ("3R") of Kiosks is as follows:

(a)   You must request in writing (email is accepted) the relocation, removal or reinstallation of any Kiosk by submitting a "3R" request to your Client relations manager no less than fifteen (15) business days prior to the requested relocation, removal or reinstallation

date. Notwithstanding the foregoing, Redbox acknowledges that in rare cases, Client will not be able to provide fifteen (15) business days' notice prior to the requested relocation, removal or reinstallation. In such cases, Client agrees to use its best efforts to notify Redbox a soon as possible.

(b)   Because Kiosk location is by mutual agreement, we will promptly respond with our agreement or disagreement as to the proposed Premises. Any relocated placement must be similar to the original location. In the unlikely event that the parties cannot agree on new Premises at a Site, the Kiosk will not be removed or relocated from its original Premises.

(c)   Once the parties reach agreement on relocation, removal or reinstallation, we will coordinate with your representative at the Site and will mutually determine the schedule (date and time) for it to take place. We – and not you – are responsible for the relocation, removal or reinstallation of the Kiosk.

(d)   Except for Kiosks removed pursuant to Section 6.4 below, Redbox may elect to charge reasonable costs associated with relocation, removal or reinstallation of a Kiosk made at your request. In the event of an internal only move or an external only move, Client's costs shall be limited to no more than Five Hundred Dollars ($500.00). Client's costs for an internal to external move shall be limited to no more than Two Thousand Dollars ($2,000.00).

**6.3   Disclaimer of Liability**. We are not liable, and disclaim all assumption of loss, for any damages, personal or otherwise, should you or any of your agents take it upon themselves to relocate, remove, or re-install a Kiosk. If you move a Kiosk without following the procedures set forth in Section 6.2, you will defend and indemnify Redbox for any Claims that result from the unauthorized movement according to the provisions of Section 12 ("Indemnification") below. We also may offset your Commission for any damages we incur. If you move a Kiosk a second time at a Site without following the procedures set forth in Section 6.2, we may immediately terminate this contract with respect to that Site.

**6.4   Remodels and Rebuilds**. Should your operations continue during any period of remodeling or rebuilding of a Site, reasonable accommodations will be made to attempt to keep the Kiosk operating at the Site during that period. However, we may remove a Kiosk from a Site or suspend service at a Kiosk during that period if, in our reasonable opinion, the remodeling or rebuilding would have a material adverse effect upon (a) the number of customer transactions conducted at the Kiosk or (b) the Kiosk's condition.

**6.5 Vandalism, Burglary or Site Closure.** Upon fifteen (15) business days' notice, either party may request approval of the other party for the exclusion of any Site from these obligations if the Kiosk has repeatedly been vandalized or burglarized. You may also request we remove a Kiosk should you permanently close a Site. The other party's approval of this request will not be unreasonably withheld, conditioned or delayed.

**6.6 Removal for Failure to Generate Income.** If a Kiosk fails to generate average Net Rental Revenue in excess of Two Hundred Fifty Dollars ($250.00) per week for any four (4) consecutive weeks occurring eight (8) weeks or more after the initial installation of a Kiosk at the Site, the Kiosk qualifies for removal for underperformance. Thereafter, the Kiosk will remain installed for an additional four (4) week cure period and should the applicable Kiosk fail to generate average Net Rental Revenue in excess of Two Hundred Fifty Dollars ($250.00) per week over the additional four (4) week cure period, Redbox may remove the Kiosk. Redbox agrees to make itself available for a discussion regarding any underperforming kiosk before its removal. In the event that there are two or three Kiosks installed next to one another at a Site, Redbox may remove the second or third Kiosk from the Site based upon the underperformance criteria set forth above.

**6.7 Surrender of Premises; Transitional Operation.** Upon the expiration or the termination of this contract, in whole or should Redbox remove a Kiosk from a Site pursuant to this contract, Redbox will (a) remove the Kiosks, (b) surrender possession of the Premises, and (c) return the Premises in good clean condition, subject to normal and reasonable wear and tear related to the installation, use, operation and removal of the Kiosks. We will consult with you during the (30) day period from expiration or termination of this contract to mutually agree upon a reasonable schedule to accomplish these tasks. Unless we terminate this contract for your breach, we will continue to operate the Kiosks and pay you commissions upon the same terms and conditions until removal of the Kiosks is complete.

## 7. Commission Payments

**7.1 Rental Commissions.** We offer Media in the Kiosks for rental by end-customers. We will pay you a commission based on a percentage of Net Rental Revenue received by Redbox as detailed in Section 7.4 below.

**7.2 Sell Through Commissions.** We may offer new Media for direct sale from the Kiosks. We will pay you a commission based on a percentage of New Sales Revenue received by Redbox as detailed in Section 7.4 below. Redbox will determine the sale price of the Media.

**7.3 Previously-Viewed Sell Through Commissions.** We may offer previously-viewed Media for direct sale from the Kiosks. We will pay you a commission based on a percentage of the Net Sales Revenue received by Redbox for the sale of previously viewed Media as detailed in Section 7.4 below. We reserve the right to determine the selection and pricing for previously-viewed Media.

**7.4 Commission Percentages/ Commission Calculation and Payment.**

(a) Grocery Sites: █████████

(b) Fuel and/or convenience store Sites: ████████

(c) For all Kiosks installed and operating at the Sites, we will pay you your commissions within thirty (30) days of the end of each calendar month. Commission payments will:

(i) be calculated in accordance with generally accepted accounting principles;

(ii) be based against the prior months' Net Rental Revenue or Net Sales Revenue (as the case may be) on a per Kiosk basis; and

(iii) be accompanied by a report which itemizes revenue by Kiosk and Site

**7.5 Inspection of Records.** It is your right, within one hundred eighty (180) days of payment of a commission, to inspect our accounts and reports relating to the calculation of that commission. Inspections can occur at reasonable intervals upon reasonable advance written notice, and during our regular business hours.

**7.6 Taxes**

(a) Redbox shall ensure compliance with all federal, state and local tax laws applicable to the Kiosks, Media and services including but not limited to registering to pay, collecting and remitting taxes imposed upon Redbox in performance of its obligations under this contract. Each party shall be solely responsible for any taxes owed on its income, gross receipts, property or net worth, including income

generated under this contract. Redbox will have no liability to separately reimburse Client for any income, gross receipts, business and occupation, or similar tax imposed on Client's business, income, or receipts for any amount paid to Client by Redbox as a result of this contract or any Kiosk transactions.

(b) In the event that the tax authorities subsequently seek to assess taxes against Client that Client reasonably believes are Redbox's obligation, then Client, rather than remit such taxes and seek reimbursement from Redbox, shall immediately provide written notice to Redbox, and Redbox and Client shall reasonably cooperate with each other to investigate and accurately determine the appropriate tax liability, if any, and work together to minimize such tax liability, to the extent legally permissible. Notwithstanding the indemnification provision set forth below, if the Parties, exercising good faith, determine that the assessed taxes, or some portion thereof, is properly due and payable by Redbox, Redbox shall pay such taxes, and in such a case, Redbox shall bear all interest, levies and penalties, assessed by such tax authorities as required by applicable Law, unless the failure to collect and remit taxes is attributable to a Client misrepresentation or failure to disclose a material fact that affects the imposition of taxes due.

(c) The Parties shall provide prompt notice to one another of any audit by tax authorities with respect to Taxes, and shall reasonably cooperate to identify and defend positions that may arise under such an audit.

**7.7 Bonus.** In consideration of, among other things, Client granting Redbox the exclusive right to install and operate automated media rental and sales machines at all Client Sites (chain wide across all banners) throughout the Term, regardless of whether a Kiosk is installed or removed from any Site (but subject to the following sentence), Redbox will pay Client a bonus of Two Million Six Hundred Thousand Dollars ($2,600,000.00). Redbox will pay this bonus within five (5) business days of installation of Kiosks at all Sites listed on Exhibit C.

**8. Marketing**

Recognizing that marketing is critically important to increasing customer awareness, which in turn substantially impacts revenue, the parties agree to engage in the following marketing efforts:

**8.1 Location Guide.** You authorize Redbox to use your name and address of the Sites for the purpose of providing a location guide for customers. This guide may be in interactive media form or Internet-based, such as but not limited to a locator guide on our website.

**8.2 Banners and Signage.** Subject to mutual agreement by the parties and prior permission by Client with respect to content and placement, Client will provide Redbox access and permission to place the following at each Client Site:

- ☒ Banners
- ☒ Monument Signs
- ☒ Pole Signs
- ☒ Ceiling Danglers
- ☒ Window Clings
- ☒ Door Decals
- ☒ Lane Dividers
- ☒ Cashier Stickers and Handouts
- ☒ Breakroom Poster

**8.3 Intercom Messages.** If a Site hosting a Kiosk has an automated intercom system which is used for promotions, each Site will play a pre-recorded thirty (30) second message once every hour during the eight (8) weeks following the grand opening of each Kiosk. Thereafter, the Site will play a message four (4) times per day, as long as the Kiosk is operating at the location. We will provide scripts that meet your specifications.

**8.4 Point of Purchase Merchandising.** We reserve the right to use a digital merchandising screen for point of purchase merchandising from the Kiosks. The screen would be directly attached and secured to the Kiosks, and would have a visual component as well as an audio component. The screen may display (but not be limited to displaying):

- ☒ Cover art from the currently offered Media;
- ☒ Movie trailers from new movie releases and upcoming releases; and
- ☒ External advertising.

**8.5 Your Website.** You will maintain on your corporate website a description of the Redbox products and services offered at your Sites. The text appearing on this webpage is subject to the mutual approval of the parties. There should be a link to the webpage from some other conspicuous point on your website (e.g., your home page).

**8.6 Press Release.** Upon execution of this contract, the parties will issue a press release announcing their relationship and the installation of Kiosks. The wording of the press release must be approved by both of us. In any printed or published material, each party will be identified by its name and/or logo in accordance with its usual and customary requirements. In so doing, each

party will take reasonable measures to protect the other party's name, including without limitation, affixing any appropriate notice of claim to trademark rights.

**8.7 Redbox Marketing Commitments.**

Throughout the Term, Redbox will provide the following marketing resources to Client:

(a) **Monopoly program.** For as long as Client sponsors its Monopoly program, Redbox will annually provide Fourteen Million (14,000,000) promo codes with a promo discount of One Dollar ($1.00) off a Media rental, with the understanding that promo codes will not be provided for any program commencing after the expiration or termination of this contract.

(b) **Employee Discount Program.** By the fifth (5th) day of each month, provide Two Hundred Eighty Thousand (280,000) unique promo codes for one free movie rental night to be used at Client Sites only. Promo codes will be distributed through Client's employee portal and will expire on the last day of the month following the month they are issued

(c) **Web/App/Kiosk Impressions.** Each month, provide Client One Million (1,000,000) to Two Million (2,000,000) impressions across the Redbox advertising platform (Web/App/Client Kiosk network) using mutually agreed Redbox digital media assets.

**8.8 Other.** The parties may agree to participate in quarterly promotions which may include the following: Circular advertising, Out Of Home (OOH) advertising, radio sponsorships, cross promotions, demo programs, text messaging programs, email marketing programs, and vend screen advertisements. Also included are any programs involving promo code distribution via cross promotions (Catalina or POS System), circular advertising, text programs and incremental in-store signage via 3rd party vendor.

## 9. Term and Termination

**9.1 Term.**

(a) This contract goes into effect on the "**Effective Date**," which is identified on the Summary Page. The term of this contract expires at 11:59 p.m. (Central time) on the date identified on the Summary Page.

(b) This contract automatically renews for up to two (2) one (1) year periods (each a "**Renewal Term**"), unless one of us gives the other written notice that the contract will expire at the end of the Initial Term or a Renewal Term. This notice must be given and received at least ninety (90) days and not more than one hundred eighty (180) days prior to the end of the Initial Term or a Renewal Term.

**9.2 Termination for Cause.** Either of us may terminate this contract as a result of a material breach by the other party of any of its obligations. The termination will be effective upon the breaching party's receipt of notice of the breach, subject to a thirty (30) business day cure period. If the breaching party fails to cure or to initiate a plan to cure the breach within thirty (30) business days after its receipt of the notice, the non-breaching party may terminate the contract.

**9.3 Immediate Termination.** Notwithstanding the foregoing Section 9.2, either of us may terminate this contract immediately upon written notice if any of the following events occur: (a) the other party ceases or is likely to cease to carry on all or any principal part of its business; (b) the other party is unable to pay its debts as and when they become due; (c) due to an encumbrance, a third party takes possession of all or any part of the business, property or asset of the other party, or any liquidator or receiver is appointed in respect thereof; (d) the other party makes a general assignment for the benefit of its creditors; or (e) any order has been made or any resolution has been passed for the winding up of the other party.

## 10. Confidential Information

**10.1 Definition of "Confidential Information."** "Confidential Information" means information, whether received before or after the Effective Date, marked or otherwise identified in writing by one of us as proprietary or confidential, or information that, under the circumstances surrounding the disclosure, the receiving party reasonably should recognize as being confidential. It includes non-public information regarding either party's products, software, marketing or promotions, business methods, cost information, forecasts, sales, revenues, profits, customer information (including personally identifiable information, rental transactions, and rental history), supplier information, and the terms of this contract.

**10.2 Information Not Considered Confidential.** Confidential Information does not include information which: (a) the recipient developed independently; (b) the recipient knew before receiving it from the other party; or (c) is or subsequently becomes publicly available or is received from another source, in both cases other than by a breach of an obligation of confidentiality. The burden of proof to establish that one of the above exceptions applies will be upon the recipient.

**10.3 Use of Confidential Information.** For a period of three (3) years after initial disclosure, neither party will:

(a) use the other's Confidential Information without the other's written consent, except in furtherance of

this business relationship or as expressly permitted by this contract; or

(b)  disclose the other's Confidential Information, except to obtain advice from its professional advisors, legal or financial consultants, or if compelled by law (including disclosure necessary or appropriate in filings with the U.S. Securities Exchange Commission) or generally accepted accounting principles, in which case the party compelled to make the disclosure will use its best efforts to give the other party notice of the requirement so that the disclosure can be contested.

**10.4 Protection of Confidential Information.** Each party will take reasonable precautions to safeguard the other party's Confidential Information. Those precautions will be at least as great as the precautions that the other party takes to protect its own Confidential Information. Each party will disclose the other's Confidential Information to its employees, consultants or subcontractors only on a need-to-know basis and subject to the confidentiality obligations imposed here. When Confidential Information is no longer necessary to perform any obligation under this agreement, each party will return it to the other party or destroy it at the other's request.

**10.5 Cooperation in the Event of Disclosure.** Each party will immediately notify the other party upon discovery of any unauthorized use or disclosure of Confidential Information, and will help the other party regain possession of the Confidential Information and prevent further unauthorized use or disclosure.

**10.6 Right to Use Feedback.** If one party provides suggestions for changes or improvements, or other feedback, to the other party about the other party's products or services, the party receiving the feedback may use it for any purpose without obligation of any kind, except that the receiving party will not disclose the source of feedback without the consent of the party providing it.

## 11.  Assumption of Loss; Insurance

**11.1 Assumption of Loss.** Except as otherwise stated in this contract and except for the intentional or grossly negligent acts of you, your employees or agents, we will assume responsibility for all physical loss or damage to our Kiosks, their contents, signs and other personal property.

**11.2 Insurance Coverages.** We will maintain basic commercial general liability insurance coverage in the minimum amount of $1 million per occurrence and $5 million in the aggregate, workers compensation insurance coverage in an amount equal to at least statutory limits, and employers liability coverage in the minimum amount of $2 million per accident and per employee. At your request, we will supply certificates evidencing the insurance coverages specified in this paragraph.

**11.3 Claims Cooperation.** You agree to (a) promptly notify Redbox in writing of any claim or loss after any potentially insurable loss is discovered, and (b) cooperate in the investigation and adjustment of any such loss.

## 12.  Indemnification

**12.1 Third-Party Claims.** Each party (the "**indemnifying party**") will indemnify and defend the other party, its officers, affiliates, employees and agents, against and hold them harmless from, without limitation, any and all liabilities, injury, death, penalties, losses, costs, damages, claims, expenses, attorneys' fees, expenses of litigation, suits, judgments, liens and encumbrances brought, suffered or incurred by the other party or third parties (collectively, "**Claims**") attributable to the respective acts or omissions of the indemnifying party, its officers, affiliates, employees, agents or subcontractors, while engaged in their business or in the performance of their duties under this contract. A party will have no obligations under this paragraph to the extent a Claim relates to or arises from the intentional acts or omissions of the other party, its officers, employees, affiliates, subcontractors, or agents.

**12.2 Landlord Claims.** You will further indemnify and defend Redbox against and hold it harmless from the Claims of any landlord or property manager who claims that we do not have the right to install or operate a Kiosk at a Site.

## 13.  Limitations of Liability

**13.1 Limitation of Liability.**  IN NO EVENT WILL A PARTY OR ANY OF ITS DIRECTORS, OFFICERS, MEMBERS, EMPLOYEES, AGENTS OR SUBCONTRACTORS BE LIABLE TO THE OTHER UNDER ANY THEORY OF TORT, CONTRACT, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY FOR LOST PROFITS, EXEMPLARY, PUNITIVE, SPECIAL, INCIDENTAL, INDIRECT, CONSEQUENTIAL DAMAGES, LOSS OF USE OF DATA OR THE LIKE, EACH OF WHICH IS HEREBY EXCLUDED BY AGREEMENT OF THE PARTIES REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE OR WHETHER EITHER PARTY OR ANY ENTITY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**13.2 Exclusions to the Limitation of Liability.** The limitations of liability in the preceding Section 13.1 will not apply to liabilities arising under the Sections governing "Confidential Information," "Indemnification," or to acts or omissions involving a party's intentional misconduct or fraud.

**13.3 Disclaimer of Warranties.** EXCEPT AS EXPRESSLY STATED IN THIS CONTRACT, NEITHER PARTY MAKES ANY WARRANTY OF ANY KIND TO THE OTHER PARTY, AND DISCLAIMS ALL WARRANTIES, INCLUDING WITHOUT LIMITATION ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

## 14. Miscellaneous

**14.1 Notices.** Notices, authorizations, and requests in connection with this contract must be sent by personal delivery, certified mail (return receipt requested), or express courier to the addresses listed in this contract. Notices will be treated as delivered on the date shown on the return receipt or on the courier confirmation of delivery. Notices sent to Redbox must be separately copied and sent to the "Legal Department."

**14.2 Governing Law.** The laws of the State of Delaware, excluding the rules of conflicts of law, will govern this contract.

**14.3 Attorneys' Fees, Dispute resolution; Equitable Relief.** In the event suit is brought to enforce or interpret any part of this Agreement, the prevailing party shall be entitled to recover as an element of its costs of suit, not as damages, reasonable attorney's fees and costs to be fixed by the court. Prior to bringing suit, the parties will attempt in good faith to resolve any controversy or claim arising out of or relating to this contract through discussions between the respective Client and Redbox executives responsible for this contract.

**14.4 Independent Contractors.** Redbox acts as an independent contractor and will be responsible for any and all social security, unemployment, workers' compensation and other withholding taxes for all of its employees. Nothing in this contract will be deemed to establish a partnership, joint venture, employment, agency or other legal relationship other than that of independent contractors between the parties.

**14.5 Subcontracting.** We may subcontract certain of our obligations under this contract, including but not limited to, installation, maintenance, supplying, servicing, relocation or removal of our Kiosks. However, we will remain primarily liable to you for any and all such subcontracted services. All subcontractors will adhere to the security, safety, and confidentiality provisions set forth herein.

**14.6 Assignment.** This contract cannot be assigned without the express written consent of the other, which consent will not be unreasonably withheld, conditioned or delayed. However, a party may withhold consent if an assignee is in or plans to be in competition with that party. Additionally, a party does not need to obtain the consent of the other party to assign this contract to a parent, subsidiary, or affiliated corporation or to a corporation or entity, which acquires all or, substantially all of the assets or stock of such party, parent, subsidiary or affiliate.

**14.7 Entire Agreement.** This contract and all exhibits contain the entire agreement between the parties with respect to the subject matter of this contract, and supersede any previous understandings or agreements, whether written or oral, in respect of such subject matter. However, if this contract does not include a section governing the confidential nature of information exchanged by the parties, then the terms of any separate confidentiality or nondisclosure agreement signed by the parties will not be superseded by this contract.

**14.8 Interpretation.** If a court holds any provision of this agreement to be illegal, invalid or unenforceable, the rest of the document will remain in effect and this agreement will be amended to give effect to the eliminated provision to the maximum extent possible. The term "may" indicates that something is permissive and optional in a party's discretion, not mandatory or automatic. The language used in this contract has been mutually chosen by the parties to express their intent, and no rule of strict construction will be used against either party.

**14.9 Modification; Waiver.** No amendment, change, waiver or discharge of this contract is valid unless it is set forth in writing and signed by an authorized representative of the party (which in the case of Redbox is a Vice President) against whom the amendment, change, waiver or discharge is sought to be enforced.

**14.10 Third Party Beneficiaries.** There are no third-party beneficiaries who are intended to benefit in any way from this contract.

**14.11 Force Majeure.** Neither of us will be liable to each other for any loss, damage, delay or failure of performance that is attributable to acts of God, armed conflicts, war, insurrection, acts of terrorism or acts committed in furtherance of terrorism, riots, earthquakes, hurricanes, floods, unusually severe weather, conditions or events of nature that cannot be

predicted, civil disturbances, power or communications failures, strikes, fire, the acts of any governmental authority, or other causes beyond a party's reasonable control. A party's performance will be excused during the pendency of any such event, but that party will take all steps reasonable, practical and necessary to effect prompt resumption of its obligations under this contract in full or in part.

**14.12 Survival.** Provisions regarding payment of commissions, limitations of liability, confidentiality, indemnification, obligations on termination or expiration and the other provisions in this Section entitled "Miscellaneous" survive termination or expiration of this contract.

**14.13 Execution.** This contract is effective when it is signed by authorized representatives of each party. The contract may be executed in one or more counterparts, each of which will constitute an original agreement, but is not enforceable until delivery and exchange of the executed counterparts. Copies of this contract (including facsimiles and emailed PDF copies) have the same force and effect as a signed original document.

**ALBERTSONS COMPANIES, INC.**

By: *[signature]*

Name: Eric Hynes

Title: GVP GM/HBC

Date: 8/8/19

**REDBOX AUTOMATED RETAIL, LLC**

By: *[DocuSigned: Galen Smith]*

Name: Galen Smith

Title: CEO

Date: August 3, 2019

# EXHIBIT A

## Redbox Physical/Technology Overview

Physical Specifications

**66 TITLE INDOOR KIOSK** (redbox)

*TOP VIEW*

Front view dimensions: 32" and 34" width; heights labeled 14.5/5", 10.75", 80.17", 66", 83.63", 76.19", 7.44".

*FRONT VIEW*

Side view dimensions: 26", 8", 4.75".

*SIDE VIEW*



1. Electricity Connection
    a. Interior Kiosk
        1. Power – 120v. 20 amp **dedicated electric line**
        2. The light box and the header that sits on top of the machine have a total electric load of 1.2 amps. The machine has a total electric load of 4.9 amps for a total connected load of 6.1 amps.
    b. Exterior Kiosk
        1. Power: 20 Amp **dedicated** circuit
        2. The light box and the header that sits on top of the machine have a total electric load of 2.1 amps. The machine has a total electric load of 8.5 amps for a total connected load of 10.6 amps.

# EXHIBIT B

## INSTALLED SITE LIST    REDACTED

| Store Nbr | Banner | Address | City | State | Zip Code |
|---|---|---|---|---|---|
| | | | | | |