## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>CHICKEN SOUP FOR THE SOUL<br>ENTERTAINMENT INC., *et al.*,[1]<br><br>Debtors. | Chapter 7<br><br>Case No. 24-11442 (MFW)<br><br>(Jointly Administered)<br><br>**Objection Deadline:**<br>August 28, 2024 at 4:00 p.m. (ET)[2]<br><br>**Hearing Date:**<br>September 4, 2024 at 2:00 p.m. (ET) |

### OMNIBUS OBJECTION TO (i) APPLICATION OF THE STRATEGIC REVIEW COMMITTEE AND THE DEBTORS FOR AUTHORIZATION TO EMPLOY AND RETAIN PACHULSKI STANG ZIEHL & JONES LLP AS CHAPTER 11 COUNSEL EFFECTIVE AS OF JUNE 28, 2024 THROUGH AND INCLUDING JULY 10, 2024 AND (ii) APPLICATION OF THE CHAPTER 7 TRUSTEE FOR AN ORDER AUTHORIZING THE RETENTION OF PACHULSKI STANG ZIEHL & JONES LLP AS SPECIAL LITIGATION AND TRANSACTIONAL COUNSEL TO THE CHAPTER 7 TRUSTEE EFFECTIVE AS OF JULY 11, 2024

Pursuant to 11 U.S.C. § 327, Rule 2014(a) of the Federal Rules of Bankruptcy Procedure, and Local Rule 2014-1, Chicken Soup for the Soul, LLC ("CSS"), a non-debtor indirect parent company and creditor of Chicken Soup for the Soul Entertainment, Inc. ("CSSE"), and William Rouhana, former CEO and director of CSSE, and CEO of CSS (collectively, "Objectors"), hereby object (this "Omnibus Objection") to: (i) the *Application Of The Strategic Review Committee And*

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number (where applicable), are: 757 Film Acquisition LLC (4300); Chicken Soup for the Soul Entertainment, Inc. (0811); Chicken Soup for the Soul Studios, LLC (9993); Chicken Soup for the Soul Television Group, LLC; Crackle Plus, LLC (9379); CSS AVOD Inc. (4038); CSSESIG, LLC (7150); Digital Media Enterprises LLC; Halcyon Studios, LLC (3312); Halcyon Television, LLC (9873); Landmark Studio Group LLC (3671); Locomotive Global, Inc. (2094); Pivotshare, Inc. (2165); RB Second Merger Sub LLC (0754); Redbox Automated Retail, LLC (0436); Redbox Entertainment, LLC (7085); Redbox Holdings, LLC (7338); Redbox Incentives LLC (1123); Redwood Intermediate, LLC (2733); Screen Media Films, LLC; Screen Media Ventures, LLC (2466); and TOFG LLC (0508).

[2] The objection deadline to the 327(a) Application was noticed as August 26, 2024, but was extended by agreement for CSS to August 28.

*The Debtors For Authorization To Employ And Retain Pachlski Stang Ziehl & Jones LLP As Chapter 11 Counsel* (D.I. 226) (the "327(a) Application"); and (ii) the *Application Of The Chapter 7 Trustee For An Order Authorizing The Retention Of Pachulski Stang Ziehl & Jones LLP As Special Litigsation And Transactional Counsel* (D.I. 225) (the "327(e) Application"; together with the 327(a) Application, the "Applications").  In support of this Omnibus Objection, CSS states as follows:

## PRELIMINARY STATEMENT

1.      The Applications should be denied.  The 327(a) Application should be denied for three reasons: (1) the applicant, Robert Warshauer ("Warshauer"), a former director of CSSE and member of CSSE's Strategic Review Committee (the "SRC"), lacks, upon information and belief, the requisite authority to seek retention of Pachlski Stang Ziehl & Jones LLP ("PSZJ") *ex post facto* as he is neither a current director of Debtors, nor a current member of the SRC; (2) PSZJ is not disinterested; and (3) PSZJ holds or represents interests adverse to Debtors' Estates.  The 327(e) Application should be denied because the proposed retention fails to satisfy the retention requirements of section 327(e): (1) PSZJ has not previously represented Debtors; (2) the representation is not in the best interest of Debtors' Estates; and (3) PSZJ holds interests adverse to Debtors or their Estates in connection with the matters on which it is to be employed.

2.      As discussed more fully below, CSS respectfully submits Debtors' demise was the direct and inevitable consequence of HPS Investment LLC's ("HPS") abusive lending tactics, which drained the life out of an iconic American entertainment company by reneging on a plan for Debtors to obtain $40 million in additional financing from an asset-backed lender ("ABL").  While Debtors' CEO William Rouhana ("Rouhana") negotiated and presented multiple ABL solutions, HPS engaged in a pattern and practice of either ignoring the proposals or defeating them.  HPS in

bad faith starved Debtors of needed working capital, then under duress, pressured Debtors into agreeing to an onerous Forbearance Agreement that purported to wipe out all of HPS's misconduct with sweeping releases, while also allowing HPS to usurp Debtors' decision making by appointing supposedly "independent" board members to the SRC. The SRC hired PSZJ, which had represented HPS numerous times before. The SRC's mission was to carry out HPS's goal of taking complete control of Debtors' valuable assets and liquidating them, regardless of the detriment to creditors, shareholders, and employees. It did so by inexplicably replacing Debtors' experienced and capable chapter 11 counsel, Reed Smith, LLP ("Reed Smith"), with PSZJ.

3.      The SRC, with PSZJ, quickly squashed and destroyed Debtors' asset maximization goals by supplanting Reed Smith, which was attempting to administer the DIP financing HPS promised to pay. But HPS failed to fund the entire DIP Order and shielded itself from that contempt through PSZJ conducting a rushed, sham investigation of Debtors' books and records over a holiday weekend when PSZJ complained it lacked access to information. Miraculously, though, after PSZJ claimed to represent Debtors for only three business days, PSZJ's Richard Pachulski came to this Court with an oral motion, supported by no evidence or analysis, contending without being under oath that Debtors were a "trainwreck" and the matter must be converted to chapter 7. This manufactured an excuse for HPS to stop funding the DIP Order, leaving the other creditors and employees out to dry. As soon as this mission was accomplished, HPS's hand-picked SRC members resigned. Yet the 327(a) Application is signed by one of these former SRC members, so he appears to have no authority to seek relief on behalf of Debtors. And, as will be shown below, PSZJ is embroiled in contentious unadjudicated disputes between HPS, Debtors, CSS, Rouhana, Debtors' employees, and other creditors due to its representation of the SRC, its

loyalty to HPS, and its actions to date show PSZJ cannot be impartial or disinterested with respect to any representation of Debtors.

4.      PSZJ's multiple representations should give the Court tremendous pause.  As will be shown below, prior to the Petition Date and at the First Day Hearing, PSZJ represented the SRC.  A mere three days later PSZJ entered an appearance on behalf of Debtors.  The 327(a) Application lacks any disclosure as to the nature, extent, and specific terms of PSZJ's multiple engagements and representations of the SRC and Debtors.[3]

5.      The Court should also scrutinize the chapter 7 Trustee's request to engage PSZJ to handle completely undefined "Litigation Claims" as well as to advise and assist the Trustee in connection with the disposition of certain of Debtors' Estates' property, including certain sale transactions, unlimited in scope by the 327(e) Application.  The failure to identify the scope of the special retention or any specifics concerning the potential litigation claims, beyond vague reference to "tort claims," is extremely problematic.  If, for example, PSZJ is investigating claims against directors, PSZJ represented the three members of the SRC who served as directors and would be conflicted.  To the extent PSZJ will be asked to investigate claims arising from or relating to HPS's prepetition and postpetition conduct (e.g., HPS's failure to fund the full $8.5 million of the Court approved Interim DIP Financing, choosing instead to only fund $3.5 million of the Court-approved facility), PSZJ is conflicted by its prior representation of HPS and its appointees to the SRC.  PSZJ cannot investigate such claims without conflict either.  And, to the extent PSZJ will

---

[3] For example, when was PSZJ retained by the SRC prior to the Petition Date?  What were the terms of PSZJ's engagement?  What amounts, if any, were paid to, or are owed to, PSZJ relating to its prepetition engagement by the SRC?  What are the SRC members' relationships to HPS?  What was the scope of PSZJ's representation of the SRC in the chapter 11 case, a representation that was undertaken while Debtors were separately represented by Reed Smith?  What conflicts existed between the SRC and Debtors during PSZJ's representation of the SRC?  What claims, if any, exist against the SRC for the prepetition or postpetition actions they undertook in connection with the chapter 11 cases?  On what basis, and on what specific terms, was PSZJ able to replace or supplant Reed Smith as Debtors' counsel?  In short, material facts concerning the nature and extent of PSZJ's multiple representations of the SRC and Debtors have not been disclosed to the Court.

be investigating claims against CSS and Rouhana, their defenses to any such claims will implicate

misconduct of HPS and the SRC, which finds PSZJ in another inevitable conflict.

6.      For these and other reasons below, the Court should deny both Applications.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and

1334 and the *Amended Standing Order of Reference* from the United States District Court for the

District of Delaware, dated February 29, 2012.   This matter is a core proceeding within the

meaning of 28 U.S.C. § 157(b)(2), and CSS confirms its consent to the extent it is later determined

that the Court, absent consent of the parties, cannot enter final orders or judgments in connection

herewith consistent with Article III of the United States Constitution.   Venue is proper before this

Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### I.    CSSE's Core Business Platform And Value Was Grounded In Entertainment Streaming Services And Related Advertising Support.

8.      CSSE, a publicly traded company, is an indirect subsidiary of CSS, which publishes

the famous "Chicken Soup for the Soul" book series.  (Ex. 1, D.I. 7, Decl. of William J. Rouhana,

Jr., June 29, 2024, at ¶ 9.)  CSSE provided premium content to consumers and was one of the

largest advertising-supported video-on-demand ("AVOD") companies in the United States.  (*Id.*

at ¶ 12.)  CSSE's AVOD services boasted approximately 40 million monthly active users and were

distributed through major distribution platforms, including Roku, Amazon Fire TV, Samsung,

Vizio, Xbox, PlayStation, and many more.  (*Id.* at ¶ 14.)  CSSE's subsidiary, Crackle, was among

the most watched independent AVOD streaming services.  (*Id.*)

9.      To provide original and exclusive content to its viewers, CSSE created, acquired,

and distributed films and TV series, through its subsidiaries.  (*Id.* at ¶ 13.)  CSSE's consumers

viewed content produced through various television production affiliates or licensed from Sony Pictures Television, Lionsgate, Paramount, Fox, Warner Bros. Discovery, Disney, and other production and distribution companies, as well as through CSSE media partners. (*Id.* at ¶ 14.)

10.    CSSE and its subsidiaries collectively own a large, high-quality content library consisting of more than 50,000 film and television titles. (*Id.* at ¶ 16.) The library currently ranges from classics, including *The Little Rascals*, *Laurel & Hardy*, and *Blondie*, to acclaimed epic event miniseries such as *Lonesome Dove* and *Dinotopia*. (*Id.*) Additionally, CSSE (through subsidiaries) had significant film and television production, financing, and distribution activities for platforms across a broad spectrum in the United States and internationally, including premium series such as *Hunters* (Amazon Prime) and *Mysterious Benedict Society* (Disney+). (*Id.* at ¶ 7.)

11.    CSSE also had a best-in-class ad sales organization known as Crackle Connex, a sales platform of unique scale and differentiated reach. (*Id.* at ¶ 13.)

## II.    CSSE Saved HPS From Its Dead Redbox Loan.

12.    Redbox is a group of companies perhaps best known for its physical, self-service kiosks allowing customers to rent and return videos using the kiosks. Redbox established a dominant market niche, benefitting from tens of thousands of kiosks nationwide and stable distribution relationships with major film studios. The physical rental market began facing increasing competitive pressure from consumers' widespread adoption of digital video streaming, driving Redbox to seek credit to shore up its long-term financial health.

13.    On October 20, 2017, Redbox Automated Retail, LLC and its parent Redwood Intermediate, LLC, on the one hand, and a group of lenders including HPS, on the other hand, entered into a credit agreement (the "Existing Credit Agreement"). (*See id.* at ¶¶ 20-23.) HPS acted as the administrative agent and collateral agent for the Existing Credit Agreement. (*Id.*) By

mid-2022, Redbox owed HPS more than $350 million, secured by liens on substantially all of the Redbox entities' assets.  (*See id.* at ¶ 20.)

14.     CSSE's media entertainment businesses were a successful going concern, and CSSE saw an opportunity to salvage and create value in Redbox by leveraging the CSSE platform synergies, Redbox customer base, and CSSE's existing streaming capabilities.  (*See id.* at ¶ 23.) As a result, on August 11, 2022, CSSE acquired all Redbox entities, assuming its debt to HPS and entering into a Credit Agreement with HPS that required CSSE and its subsidiaries to become co-obligors on more than $350 million of indebtedness to HPS, and pledge its ownership interests in substantially all the assets of its non-Redbox subsidiaries as security in favor of HPS, which gained liens on the assets.  (*Id.* at ¶¶ 20-23; *see also* Ex. 2, Amended and Restated Credit Agreement as Amended by the First Amendment ("Credit Agreement").)   CSSE's ability to service this debt was predicated on projections for a partial return to one-third of pre-COVID levels in the number and cadence of theatrical releases that were available for the kiosk network, as well as cost synergies the CSSE platform would provide.  (Ex. 1 at ¶ 23.)

15.     CSSE's operating plan and budget shared with HPS in the transaction process called for CSSE to obtain working capital of up to $40 million pursuant to an ABL structure that would require HPS to waive a portion of its liens in favor of the ABL financer.  (*Id.* at ¶ 24.)  A working capital loan meeting these criteria was specifically contemplated by the Credit Agreement and was intended to allow CSSE to invest in the expected rebound in theatrical releases in late spring 2023 to improve kiosk offerings.  (*Id.*; *see also* Ex. 2 at 103-104 § 6.01(j), 109 § 6.02(q); *see also id.* at 30, 38, § 1.01 (discussing a "GRA Term Sheet" and "Owlpoint Term Sheet").)

16.     In sum, CSSE rescued HPS from a dying loan with Redbox, with the expectation that a new partnership between CSSE and HPS would breathe life back into Redbox and mutually benefit both parties.  What ensued thereafter, though, was the exact opposite.

### III.    The HPS Disputes.

17.     Substantial disputes quickly arose between HPS and CSSE (the "HPS Disputes"). As contemplated under the Credit Agreement, CSSE (under the leadership of Rouhana) diligently presented multiple financing solutions for the $40 million working capital Debtors needed.  (Ex. 1 at ¶¶ 24-32.)  But the Credit Agreement proved to be a Trojan Horse built to facilitate HPS's mission to seize Debtors' media library and other non-Redbox assets, which were far more valuable than the Redbox assets on which HPS previously had liens.

18.     The evolution and nature of some of the HPS Disputes are summarized in a November 2023 letter from CSSE's counsel to HPS's counsel, which: (1) explains the basis for CSSE's position that HPS was obligated to approve a new reasonable and customary ABL facility up to $40 million; (2) summarizes CSSE's presentation of such financing opportunities to HPS, which HPS blocked; (3) summarizes bad-faith conduct by HPS, which prevented CSSE from carrying out the working capital business plan; (4) discusses ways in which HPS was harming CSSE by tortiously interfering with business relationships and commercially slandering it; (5) explains that HPS appeared to be unfairly angling to acquire all or substantially all of CSSE's more than $1 billion of value in exchange for HPS's $405 million of then-outstanding principal; (6) discusses a new term sheet CSSE was negotiating for a credit facility affording up to $50 million and another potential line of credit up to $145 million; and (7) demanding HPS cooperate with certain waivers of Credit Agreement provisions necessary to close on working capital financing solutions.  (Ex. 3, Letter from Reed Smith to Milbank LLP ("Milbank"), Nov. 8, 2023.)

HPS's hostile response to CSSE's lawyer's letter exemplifies the contentiousness of the HPS Disputes.  (Ex. 4, D.I. 29-6, Letter from Reed Smith to Milbank, Nov. 13, 2023.)

19.     As one example of HPS's bad faith, in response to a proposed $40 million credit term loan CSSE presented in May 2023, HPS responded with a counterproposal requiring $37.5 million of the funding go to HPS, leaving CSSE only $2.5 million in working capital, a hollow gesture given HPS knew the business plan required CSSE to obtain a full $40 million in financing. (Ex. 5, D.I. 29-9, Wallitt Letter to Rouhana, June 12, 2024.)[4]

20.     Nevertheless, CSSE raised $5.9 million through private placements of its Series A Preferred Stock in the fourth quarter of 2023.  However, without the needed ABL financing, CSSE's capital resources continued to deteriorate.  (Ex. 1 at ¶ 30.)

21.     On March 15, 2024, HPS, through new counsel Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel"), sent CSSE a litigation hold notice advising it was investigating claims against CSSE, together with another litigation threat letter.  (Ex. 7, Quinn Emanuel Letters, Mar. 15, 2024.)  CSSE, through its counsel Reed Smith, responded on March 22, 2024, denying false accusations made by the Quinn Emanuel letter.  (Ex. 8, Reed Smith Letter, Mar. 22, 2024.) HPS did not, however, follow through with the Quinn Emanuel litigation threats.

22.     Instead, under the crushing financial pressure caused by HPS's bad-faith conduct, CSSE entered into an April 29, 2024 Forbearance Agreement, pursuant to which HPS gave CSSE additional time to make interest payments under the Credit Agreement and consummate certain

---

[4] HPS even went so far as to claim CSSE missed a payment deadline merely because it delivered a $640,091.61 check to an HPS office location listed in the Credit Agreement (which turned out to be an address HPS was no longer using). Rather than deposit the check, HPS mailed it back to CSSE, claiming delivery of a check was a "payment default" as only wire payments were acceptable to HPS.  (*See* D.I. 29 at ¶ 10; *see also* Ex. 6, D.I. 29-5, Wallitt Letter, Feb. 26, 2024.)  This was not the conduct of a commercially reasonable lender.

"Proposed Financings."  (*See* Ex. 9, Forbearance Agreement at 1-2; *also* Ex. 2 at 45 § 1.01, 64 § 2.11(f), 96 § 5.08(b), 126 § 6.13 (discussing the Proposed Financings).)

23.    The Forbearance Agreement, and an attendant amendment to the Credit Agreement, also increased HPS's leverage over Debtors by creating a three-person SRC dominated by two candidates selected by HPS—Warshauer and John Young ("Young").  (Ex. 9 at § 3.02(a)(3); Ex. 2 at 50 § 1.01, 101 § 5.19.)[5]  CSSE presented HPS with three financing proposals during the forbearance period, but none closed before the forbearance period expired.

24.    Due to threats by the SRC and HPS to take control of CSSE's assets to the detriment of shareholders, creditors, and employees, Rouhana removed all board members (other than himself), including Warshauer and Young, on June 11, 2024, pursuant to a written stockholder consent to remove the CSSE Board, Section 3.8 of CSSE's bylaws, and the General Corporation Law of the State of Delaware.  (Ex. 10, Written Stockholder Consent; Ex. 11, CSSE Letter to HPS, June 13, 2024 (summarizing authority for removals).)[6]

## IV.    PSZJ Represented The SRC In Prepetition Disputes And Purported To Replace Debtors' Counsel Reed Smith At The Removed SRC's Direction.

25.    In response to Rouhana removing Warshauer and Young from the board, on June 12, 2024, HPS noticed CSSE in default under the Forbearance Agreement, asserted the SRC remained in place, claimed the SRC would liquidate CSSE's assets, and contested the validity of Rouhana's termination of the SRC members.  HPS's letter said, "The Lenders intend to meet with the Strategic Review Committee ***and its counsel*** to determine a path forward for the Company. . .

---

[5] The version of the Credit Agreement attached as Exhibit 2 incorporates and reflects the amendment referenced in this paragraph.

[6] To be clear, CSS does not suggest the HPS Disputes ought to be resolved in the context of the Applications—they should not.  The HPS Disputes involve dozens of witnesses, thousands of records spanning almost two years of communications between CSSE and HPS, plus complex financing proposals of multiple third parties as well as communications with them and other professional consultants.  Rather, CSS's purpose in raising the HPS Disputes is to expose to the Court facts that neither the SRC, the Trustee, nor PSZJ revealed in their Applications that serve as the predicate for certain aspects of CSS's Objection.

." (Ex. 5 (emphasis added).)  The referenced SRC's counsel was PSZJ.  Indeed, beginning two days earlier, Mr. Pachulski of PSZJ, on behalf of the SRC, emailed CSSE's lawyers at Reed Smith, stating on June 11, 2024, "the SRC decided that at this time they preferred all discussions go through counsel, which is why John [Young] will not be returning Bill[ Rouhana]'s call." (Ex. 12, Email from Pachulski to Reed Smith, June 11, 2024 (also referencing a "standing . . . call" between HPS and the SRC).)

26.    On the night of June 12, PSZJ sent a letter to CSSE's attorneys stating it was "counsel *to the Company* at the direction of the Company's Strategic Review Committee." (Ex. 13, Letter from Pachulski to CSSE Counsel, June 12, 2024 (emphasis added).)  At the same time, HPS's lawyers at Milbank sent an email to CSSE's attorneys at Reed Smith and Graubard Miller ("Graubard") stating that they should, "direct all further discussions or enquiries relating thereto, including with respect to . . . potential financings, to the Strategic Review Committee *and their counsel Rich Pachulski*." (Ex. 14, Email from Milbank, June 12, 2024 (emphasis added).)  Thus, they blurred the lines regarding whom PSZJ was actually representing.

27.    CSSE responded on June 13 with a letter denying the SRC had any authority to hire PSZJ to represent CSSE, asserting that the SRC and PSZJ were acting *ultra vires*, and stating that their assertion of representation of CSSE was invalid.  (Ex. 11.)  CSSE's letter, like the November 2023 letter of its counsel, also further summarized the nature of the evolving disputes with HPS, including HPS's hand-picking of the SRC members, retention of bankruptcy counsel, and PSZJ sending a letter to CSSE parroting HPS's position and claiming to be CSSE's counsel.  (*Id*.)  Thus, not only was an authority dispute evolving, PSZJ was in the middle of it by claiming to be retained by former board members whom CSSE contended were lawfully terminated.  (*Id*.)  This was a confusing and unethical posture.

28.     Skirmishes concerning who rightly represented CSSE continued as Reed Smith prepared and filed Debtors' chapter 11 petitions in this Court on June 28, 2024.

29.     This dispute continues still.  For example, the 327(a) Application is purportedly signed by Warshauer on behalf of the SRC (D.I. 226 at 8), yet Warshauer and Young told CSSE's employees nearly seven weeks ago that they "have resigned as Board Members," signing the email as "Former Board Members."  (Ex. 15, Warshauer and Young Email, July 10, 2024.)

## V.     HPS And The SRC Manipulated The DIP Order Process To Oust Reed Smith And Purport To Retain PSZJ As Debtors' Counsel To Advance HPS's Interests.

30.     At the July 1, 2024 First Day Hearing, Greg Taylor of Ashby & Geddes introduced himself as local counsel for Debtors, along with co-counsel from Reed Smith, Michael Cooley. (Ex. 16, FDH Tr. Part 1, July 1, 2024, at 6:9-16.)  The Court immediately identified Debtors' need to fund payroll as a critical issue and expressed concern about proceeding.  (*Id.* at 7:2-8.)  But Mr. Cooley responded that delay would harm employees due to the impending Fourth of July holiday and requested additional time to negotiate with HPS, which was refusing to agree to the $20 million priming DIP financing arranged for by Debtors designed to keep Debtors operating for an extended period.  (*Id.* at 7:15-8:14, 11:23-12:6.)  No one appeared at this hearing on behalf of the SRC, nor did anyone challenge Reed Smith's representation of Debtors.

31.     The First Day Hearing reconvened on July 2, 2024.  HPS's counsel told the Court that PSZJ had been serving as counsel to the SRC.  (Ex. 17, FDH Tr. Part 2, July 2, 2024, at 13:25 - 14:6, 15:12.)  Mr. Pachulski of PSZJ confirmed he was appearing "on behalf of the [SRC]."  (*Id.* at 19:14-18.)  He also said his firm was retained by the SRC "to assist in the event that default [under the Forbearance Agreement] took place."  (*Id.* at 19:14-18.)  He then said, "we have independent directors, and we put them in" without explaining who "we" is (*id.* at 20:8-9), but given that HPS is the one that appointed Warshauer and Young, Mr. Pachulski appeared to be

indicating "we" referred to himself and his former client HPS.  He then lauded HPS's Motion to Reconstitute, which if granted would have ordered that his clients on the SRC were properly on Debtors' board.  (*Id.* at 21:1-15.)  He then told the Court that he received a call from an unnamed colleague inquiring about this matter, and that he conveyed to that colleague HPS's position that "their only alternative" was a chapter 7, clearly indicating he was in the know and advocating HPS's legal position not only in the Court but in the external legal market.  (*Id.* at 21:8-15.)  He then proceeded to advocate further on HPS's behalf with respect to the HPS Disputes, based on nothing but unimpeached attorney rhetoric supported by no documents or evidence.  (*Id.* at 22:16-23:8; *see also id.* at 45:17-21 (HPS adopting Mr. Pachulski's comments).)  In contravention of the Court's and Mr. Cooley's concern for the employees, Mr. Pachulski also professed his belief that "going forward with a losing DIP is really not in anyone's interest."  (*Id.* at 27:3-7.)  In contrast, Mr. Cooley presented testimony from Debtors' then-CEO Bart Schwartz stating that his priority was obtaining $8 million in DIP financing to pay employees, then working through the disputes with HPS.  (*Id.* at 44:17-22.)

32.     The Court sought confirmation that the people directing the actions of Debtors through Reed Smith were not involved in the control disputes.  (*Id.* at 47:7-11.)  The Court then recessed for the parties to work on negotiating a DIP order to be financed by HPS.  When the parties reconvened, Mr. Cooley reported on behalf of Debtors that they had negotiated a DIP financing term sheet for $8 million to be funded by HPS, which should be sufficient to "get back on track with payroll . . . and [ ] stabilize things."  (*Id.* at 49:20-51:9.)  On July 3, 2024, the parties filed a Proposed Interim DIP Order (D.I. 77), and the Court entered the Interim DIP Order on July 4, 2024.  (D.I. 85.)

33.     Once the Court entered the Interim DIP Order, everything changed.  On the Fourth of July, PSZJ unleashed a heavy-handed plan to manufacture grounds for a chapter 7 conversion motion and abandon the chapter 11 strategy Mr. Cooley presented to the Court.  They hired FTI Consulting ("FTI") to inspect Debtors' books and records, and PSZJ insisted that CSS let FTI into CSS's leased premises first thing on July 5, even though no Debtor files are stored there.  And PSZJ started sending harassing emails to a CSS employee giving her instructions to send an email to all Debtors' employees on behalf of the SRC *on the Fourth of July*, even though CSS was represented by counsel.  (Ex. 18, Hinger-Pachulski Emails, July 4-5, 2024.)  PSZJ sent FTI to CSS's office anyway, with FTI pestering a CSS employee and sending her emails demanding access to CSS's premises, disrupting CSS and its counsel, who were working with Mr. Cooley (as counsel for Debtors) throughout the day to facilitate information needed to make payroll (which for reasons not disclosed to CSS did not get funded until the following Monday).  (Ex. 19, Hinger-Pachulski Email, July 5, 2024; Ex. 20, Cooley Email to CSS, July 5, 2024.)

34.     Mr. Cooley then reported that HPS was proposing to fund only a portion of the $8 million it committed to fund under the DIP Order.  (*Id.*)  That afternoon, PSZJ sent CSS an onerous demand for turnover of 24 categories of Debtors' books and records pursuant to section 542 of the Bankruptcy Code without identifying itself as having been retained to represent Debtors, and PSZJ asserted CSS was to start turning over documents "immediately and through the weekend."  (Ex. 21, Golden Email, July 5, 2024.)  Several hours later, Mr. Pachulski sent another email chiding CSS for helping Mr. Cooley with his work on payroll issues and threatening to go to the Court on Monday morning if CSS employees did not work through the weekend to turn over documents to him.  (Ex. 22, Pachulski Email, July 5, 2024.)  CSS's counsel responded, explaining that the requested material was in the possession of Debtors' employees, proposing a call, and offering to

provide a list of Debtor employee custodians CSS expects would have the materials the SRC was seeking.  (Ex. 23, Hinger Email to PSZJ, July 5, 2024.)  Throughout these July 5 exchanges, PSZJ did not advise CSS that it had supposedly been retained by Debtors.  But that evening, PSZJ attorneys began entering their appearances for Debtors.  (D.I. 89.)

35.     PSZJ continued its harassment of CSS over the weekend, requesting a call at almost 5 p.m. on Saturday and claiming that Debtors' CFO did not have access to the information PSZJ was seeking (which CSS asserts was erroneous).  CSS was helpful and provided information available to it as of the weekend.  (Ex. 24, Hinger-Pachulski Emails, July 6, 2024.)  Mr. Pachulski then announced FTI would be attempting to search the CSS offices for Debtor documents again first thing Monday morning and sought confirmation they would be let in.  (Ex. 25, Hinger-Pachulski Emails, July 6-7, 2024.)  CSS responded Sunday morning reiterating that neither FTI nor anyone else should come to the CSS offices on Monday morning and explaining that CSS had plans to work on identifying Debtors' employee custodians of the document categories in PSZJ's document request email.  (*Id.*)

36.     On Monday July 8, 2024, Reed Smith withdrew its appearance without explanation. (D.I. 96.)

37.     Also on July 8, 2024, CSS provided PSZJ a list of custodians of the records it sought and an org chart for Debtors.  (Ex. 26, Email from Rauscher to PSZJ, July 8, 2024.)  Later that day, PSZJ sent another email indicating it did not yet have, but wanted, many key documents related to Debtors' assets, finances, and operations.  (Ex. 27, Golden Email, July 8, 2024.)  The following afternoon, CSS's counsel and PSZJ had a meet-and-confer video call to review information about document custodians and other issues. It was apparent from these

communications that PSZJ was in the early stages of gathering and assessing Debtors' books and records.

38.     Yet, despite PSZJ complaining it did not have access to most of Debtors' records it needed to transition into its new purported representation of Debtors, PSZJ orchestrated a "status conference" the next morning at which it made an oral motion to convert the case to chapter 7, with no notice, no evidence, and not even a written motion.

39.     Thereafter, HPS violated the Interim DIP Order by failing to fully fund the DIP financing authorized by the Court, depriving Debtors' employees of health benefits and replacing the stabilization plan put in place by Debtors through Reed Smith with a new strategy that benefitted one party—HPS, PSZJ's former client.

40.     More recently, PSZJ—claiming to be the Trustee's counsel—sent a similarly heavy-handed letter to CSSE's former counsel, who also served and serves as counsel for CSS and Rouhana, on August 19, 2024 demanding the production of "all documents . . . concerning or related to the Debtors" by August 23, 2024, before this Objection was due, much less before the Court had an opportunity to rule on the Applications.  (Ex. 28, PSJZ Letter to Graubard, Aug. 19, 2024.)  In addition to being an unreasonable request in scope and timeframe, production of the requested documents is almost certain to include privileged material relating to the conduct of PSJZ's former and present clients (HPS, Warshauer, and Young).  And PSZJ's attempt to seek these privileged documents is improper under the circumstances, as is PSJZ's attempt to obtain them before interested parties had an opportunity to object to PSZJ's retention.

## VI.    PSZJ's And The SRC Members' Prior Relationships With HPS, And PSZJ's Representations Of Another Creditor.

41.     PSZJ has represented HPS in at least half a dozen other matters before this Court, with those matters spanning years: *In re Emerge Energy Services LP*, No. 1:19-bk-11563 (Bankr.

D. Del. filed July 15, 2019); *Pownall Services LLC v. Superior Silica Sands LLC*, No. 1:19-ap-50295

11563 (Bankr. D. Del. filed Aug. 6, 2019); *Market & Johnson, Inc. v. Superior Silica Sands LLC*,

No. 1:19-ap-50728 (Bankr. D. Del. filed Oct. 25, 2019); *A-1 Excavating, Inc. v. Superior Silica*

*Sands LLC*, No. 1:19-ap-50730 (Bankr. D. Del. filed Oct. 25, 2019); *Stout Excavating Group LLC*

*v. Superior Silica Sands LLC*, No. 1:19-ap-50729 (Bankr. D. Del. filed Oct. 25, 2019); and *Midwest*

*Frac and Sands LLC v. Superior Silica Sands LLC*, No. 1:19-ap-50732 (Bankr. D. Del. filed Oct.

25, 2019).

42.     Warshaur and Young also have prior relationships with HPS.  For example, in a

July 15, 2022 communication from Redbox to its stockholders regarding the proposed CSSE

merger, Redbox explained that Warshauer: (1) was previously "appointed to the Redbox Board as

of April 18, 2022," apparently pursuant to an amendment to Redbox's "HPS Credit Agreement";

and (2) would "receive a cash retainer of $30,000 per month for [his] services" for at least nine

months.  (Ex. 29, Excerpts from Galen Smith Letter to Redbox Stockholders, July 15, 2022, at 56,

100-101.)[7]  Similarly, in the 2019 timeframe, HPS "exercised its rights under a Pledge Agreement"

with another debtor, Echo Energy Partners I, LLC, to amend its "LLC Agreement to name John Young

as the sole Manager on the Board of Managers" for that debtor.  (Ex. 31, Decl. of Gregg Laswell in

*In re Echo Energy Partners I, LLC* (Bankr. S.D. Tx.), Apr. 26, 2020, at ¶ 8.)

43.     The PSZJ Declarations supporting the Applications do not identify Young or

Warshauer as former directors or officers of Debtors (D.I. 225-3 at 6; 226-4 at 8), which is an

astonishing omission since PSZJ represented them as members of the SRC.  Nor does either

Application disclose Warshauer's or Young's history with HPS.

---

[7] Warshauer was also named in a June 2022 lawsuit, in his capacity as a director of Redbox Entertainment, Inc., alleging the omission of material information relating to financial projections in a registration statement filed with the U.S. Securities and Exchange Commission.  (Ex. 30, Compl. in *Whitfield v. Redbox Entertainment, Inc., et al.*, No. 1:22-cv-05613-AKH (S.D.N.Y. filed June 30, 2022).)

44.     PSZJ also represents and has represented another creditor, Zayo Group LLC, repeatedly in recent years: *In re Frontier Communications Corp.*, No. 7:20-bk-22476 (Bankr. S.D.N.Y. filed Apr. 14, 2020) (ongoing); *In re Paradigm Telecom II, LLC*, No. 4:18-bk-34112 (Bankr. S.D. Tex. Filed July 27, 2018) (ongoing); *In re BCD Group, Inc.*, No. 1:23-bk-00484 (Bankr. N.D. Iowa filed June 13, 2023) (ongoing); *In re CMTSU Liquidation, Inc.*, No. 1:17-bk-10772 (Bankr. D. Del. filed Apr. 9, 2017 (ongoing); *In re Starry Group Holdings, Inc.*, No. 1:23-bk-10219 (Bankr. D. Del filed Feb. 20, 2023); and *In re Windstream Holdings*, No. 7:19-bk-22312 (Bankr. S.D.N.Y filed Feb. 25, 2019).

## BASIS FOR REQUESTED RELIEF

45.     In light of the above, the Court should: (1) deny the 327(a) Application because PSZJ has interests adverse to Debtors and the Estates and is not disinterested; (2) deny the 327(e) Application because PSZJ is not qualified due to not validly representing Debtors currently or in the past (in part because the 327(a) Application should be denied), and PSZJ holds interests adverse to Debtors and the Estates with respect to the matters on which PSZJ would be employed; and (3) deny both Applications due to PSZJ's actual and potential conflicts and its failure to fully and timely disclose them to the Court.

## I.     The 327(a) Application Should Be Denied Because PSZJ Holds Or Represents Interests Adverse To The Estates And Is Not Disinterested.

### A.  Legal Standards For Section 327(a) Application.

46.     The 327(a) Application is made pursuant to section 327(a) of the Bankruptcy Code, which "restricts retention of lawyers and other professionals to those who do not hold or represent an interest adverse to the estate and are disinterested." *Century Indem. Co. v. Congoleum Corp. (In re Congoleum Corp.)*, 426 F.3d 675, 688-89 (3d Cir. 2005). These requirements "apply at the

time of retention and throughout the case." *In re Granite Partners, L.P.*, 219 B.R. 22, 32 (Bankr. S.D.N.Y. 1998).

47.    An "interest adverse to the estate" may arise "when counsel has 'a competing economic interest tending to diminish estate values or to create a potential or actual dispute in which the estate is a rival claimant.'" *U.S. Trustee v. First Jersey Sec., Inc. (In re First Jersey Sec., Inc.)*, 180 F.3d 504, 509 (3d Cir. 1999) (quoting *In re Caldor, Inc.*, 193 B.R. 165, 171 (Bankr. S.D.N.Y. 1996)).   This adverse-interest standard "includes any interest or relationship, ***however slight***, that would ***even faintly*** color the independence and impartial attitude required by the Code and Bankruptcy Rules." *In re Granite Partners, L.P.*, 219 B.R. at 33 (citation and quotation marks omitted) (emphasis added).   Thus, "if it is plausible that the representation of another interest may cause the debtor's attorneys to act any differently than they would without that other representation[,]" then they have a disabling conflict and an interest adverse to the estate. *Id.*

48.    Additionally, section 327(c) of the Bankruptcy Code provides:

> In a case under chapter 7, 12, or 11 of this title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, ***unless there is objection by another creditor*** or the United States trustee, ***in which case the court shall disapprove such employment if there is an actual conflict of interest***.

11 U.S.C. § 327(c) (emphasis added).

49.    Conflicts of interest are not defined in the Bankruptcy Code, but rather are evaluated on a case-by-case basis. *See Staiano v. Pillowtex, Inc. (In re Pillowtex, Inc.)*, 304 F.3d 246, 251 (3d Cir. 2002) (citing *In re BH & P, Inc.*, 949 F.2d 1300, 1315 (3d Cir. 1991)).   "[A] conflict is actual, and hence per se disqualifying, if it is likely that a professional will be placed in a position permitting it to favor one interest over an impermissibly conflicting interest." *Id.* (citing *In re BH & P, Inc.*, 949 F.2d at 1315); *see also Granite Partners, L.P.*, 219 B.R. at 33 ("An actual

conflict involves the representation of two presently competing and adverse interests, while a potential conflict occurs where the competition may become active if certain contingencies arise.") (citation and quotation marks omitted).

50.     The Court should generally not authorize retentions with a potential conflict of interest.  *See In re BH & P, Inc.*, 949 F.2d at 1316; *see also*, *e.g.*, *In re Woodworkers Warehouse, Inc.*, 303 B.R. 740, 742 (Bankr. D. Del. 2003) ("In most instances a potential conflict should be the basis for disqualification[.]") (citing *In re Marvel Entm't Grp., Inc*, 140 F.3d 463, 476 (3d Cir. 1998)).   The Court should only permit retention despite a potential conflict in certain circumstances, such as if "every competent professional in a particular field is already employed by a creditor or a party in interest" or if "the possibility that the potential conflict will become actual is remote, and the reasons for employing the professional in question are particularly compelling."  *In re BH & P, Inc.*, 949 F.2d at 1316.

51.     Section 327(a) also requires that an estate professional be disinterested.  *See* 11 U.S.C. § 327(a).  A "disinterested person" is defined as a person that:

> (A) is not a creditor, an equity security holder, or an insider;
>
> (B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and
>
> (C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

11 U.S.C. § 101(14).  Subsection (C) is a catch-all category related to whether the proposed professional has a "materially adverse" interest to the estate or a class of creditors or equity holders and, thus, overlaps with the adverse-interest prong of section 327(a).

52.     "The requirements of section 327 cannot be taken lightly, for they 'serve the important policy of ensuring that all professionals appointed pursuant to [the section] tender

undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities." *In re Leslie Fay Cos., Inc.*, 175 B.R. 525, 532 (Bankr. S.D.N.Y 1994) (quoting *Rome v. Braunstein*, 19 F.3d 54, 58 (1st Cir. 1994)). "Having to divide one's allegiance between two clients is what Section 327 attempts to prevent." *In re Mercury*, 280 B.R. 35, 54 (Bankr. S.D.N.Y. 2002) (quoting *In re Roger J. Au & Son, Inc.*, 101 B.R. 502, 505 (Bankr. N.D. Ohio 1989)).

### B.  PSZJ Had Conflicts Of Interest And Interests Adverse To The Estates That Disqualified It From Representing Debtors July 3, 2024 To July 10, 2024.[8]

53.      PSZJ was not qualified to represent Debtors from July 3, 2024 through July 10, 2024 because it had interests adverse to Debtors' bankruptcy Estates and was not disinterested.

54.      First, as a threshold matter, the 327(a) Application is signed by Warshauer, even though he resigned from Debtors' board as of July 10, 2024, so the applicant does not even appear to have present governing authority to make this Application to the Court.

55.      Second, at the time of the proposed retention, Debtors were embroiled in the HPS Disputes.  As a result, Debtors owned very contentious claims against PSZJ's client the SRC (and, by extension, Warshauer and Young) relating to their roles in executing and facilitating HPS's plan to prevent CSSE from obtaining the $40 million working capital it needed.  *See In re RNI Wind Down Corp.*, 348 B.R. 286, 293 (Bankr. D. Del. 2006) ("Upon the filing of a bankruptcy petition, . . . any claims for injury to the debtor from actionable wrongs committed by the debtor's officers and director become property of the estate under 11 U.S.C. § 541 and the right to bring a derivative action asserting such claims vests exclusively to the trustee.").  PSZJ's representation of the SRC alone should defeat the 327(a) Application, for at the time, Debtors' claims against

---

[8] It is unclear why the 327(a) Application seeks approval for Debtors' retention of PSZJ as of July 3, 2024.  PSZJ filed a Notice of Appearance as proposed counsel to Debtors on July 5, 2024.  (D.I. 89.)  Prior to that, PSZJ said its client was the SRC.  (*See* ¶¶ 25, 31, *supra.*)

HPS were one of the Estates' most valuable assets that any counsel for Debtors ought to have vigorously preserved and, at the appropriate time, pursued.  But PSZJ could not adequately, let alone zealously, represent Debtors' interests in preserving those claims when its existing clients, Warshauer and Young, were key witnesses to, and targets of, such claims.  PSZJ's representation of the SRC, coterminous with its purported representation of Debtors, was an interest adverse to the bankruptcy Estates that made it impossible for PSZJ to be disinterested.

56.    Third, PSZJ's prior representation of HPS—Debtors' largest secured creditor and the entity that caused the financial distress leading to Debtors' bankruptcy—is another impermissible conflict that disqualified PSZJ from representing Debtors.[9]  This is especially so because the circumstances and timing of PSZJ's retention by the SRC strongly suggest PSZJ and HPS were working together to execute HPS's prepetition plan to force Debtors' liquidation for HPS's gain to the detriment of Debtors' shareholder, creditors, business partners, and employees.

57.    A trustee or chapter 11 debtor in possession has a "fiduciary duty to maximize the value of the bankruptcy estate['s assets]."  *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (citations and quotation marks omitted).  Here, that includes potential claims against HPS, the SRC, Warshauer, and Young, as well as defeating HPS's plan to foreclose on Debtors' most valuable assets.  But these PSZJ clients have the opposite goals: minimizing their personal liability while helping HPS, to the detriment of Debtors and other creditors.

58.    Consequently, PSZJ represents competing economic interests tending to diminish the value of Debtors' bankruptcy Estates and tending to create a potential or actual dispute in which the bankruptcy Estates are rival claimants.  *See In re First Jersey Sec., Inc.*, 180 F.3d at 509.  PSZJ thus has a disqualifying, actual conflict of interest.

---

[9] PSZJ also currently represents another Creditor, Zayo Group LLC, in multiple unrelated actions.  (*See* ¶ 44, *supra.*)

59.     This Court recently addressed a similar issue in *In re Nu Ride Inc. f/k/a In re Lordstown Motors Corp., et al.*, No. 23-10831 (MFW) (Bankr. D. Del. filed June 27, 2023) ("*Lordstown*").  There, the Court addressed the trustee's objection to the debtors' application to employ a law firm, with that objection based largely on the law firm also representing several of the debtors' former and present directors in separate lawsuits alleging breach of fiduciary duties. *See Lordstown* D.I. 267 at 2-5, 8-10 (noting that the director defendants asserted indemnification rights against the debtors in one action).  The Court denied the application, finding:

> . . . The estate holds [the derivative action] claim and has an interest in maximizing that claim.  At the same time, [the law firm] is representing defendants that have an interest in minimizing the value of those claims.  The fact that the debtors' prosecution of the derivative actions may not be litigated during the course of this case because of the automatic stay does not eliminate that.  The estate still has an interest in pursuing those cases.

*Lordstown* Hearing Tr., Oct. 5, 2023 (D.I. 527) at 54:3-10; *see also id.* at 56:10-13 (concluding that the Court "ha[d] no discretion . . . but to deny the retention application" in light of "an existing actual conflict").  So too here.

60.     Similarly, in *In re M-H Grp., Inc.*, 139 B.R. 836 (Bankr. N.D. Ohio 1991), the court disqualified a law firm from representing debtors under section 327(a) where, among other things, the firm also represented some of the debtors' shareholders and officers at the time the bankruptcy petition was filed.  *Id.* at 839-40 ("This Court cannot allow [the law firm] to continue in its capacity as counsel for the Debtors due to the possibility of harm and the appearances of impropriety.  The integrity of the Bankruptcy system dictates such a result.").

61.     *In re Black & White Stripes, LLC*, 623 B.R. 34 (Bankr. S.D.N.Y. 2020), is also instructive.  There, a law firm represented two principals of an entertainment-company debtor for just six weeks in a state court action.  *Id.* at 37, 43-45.  The court nonetheless held that the firm's "prior representation of [the principals] precludes it from representing [the debtors] in their

bankruptcy cases." *Id.* at 51 (discussing valuable potential claims against the principals). In so holding, the court emphasized that section 327(a)'s "adverse interest test is objective and precludes any interest or relationship, however slight, that would even faintly color the independence and impartial attitude required by the Code and Bankruptcy Rules." *Id.* at 50 (quotation marks omitted).

62.     As another example, in *Paul J. Winterhalter, P.C. v. Office of the U.S. Trustee (In re The Harris Agency, LLC)*, the court affirmed disqualification of a law firm based on an actual conflict of interest where the firm represented both debtor and debtor's co-obligor on a loan and was seeking a finding that the co-obligor was not liable, despite the law firm having billed only one hour for time spent representing the co-obligor. 462 B.R. 514, 519-20, 524 (E.D. Pa. 2011). In reaching this conclusion, the court observed that "a professional may not have *any* conflict with the estate . . . ." *Id.* at 522-23 (emphasis in original).

63.     As in *In re Black and White Stripes*, this "case is in its early stages[,]" and "[i]t needs reliable bankruptcy counsel to help shepherd the Debtors through the [bankruptcy] process and to faithfully proceed on their behalf in marshalling estate assets and pursuing any claims that the Debtors may have." 623 B.R. at 52. PSZJ did not fit that bill; on July 3 (the date on which PSZJ now seeks to be retained by Debtors), Reed Smith—Debtors' then-current law firm with substantial knowledge of the claims Debtors have against its largest creditor and PSZJ's former and current clients—did. Indeed, PSZJ did not even bother to show up at the 341 meeting on August 21, 2024.

64.     The 327(a) Application should therefore be denied.

**C. CSS Objects To The 327(a) Application's Proposals To Pay PSZJ For Prior Legal Services.**

65.     Even if the Court approves the 327(a) Application (which it should not), CSS reserves the right to object to any fee application PSZJ may file in connection with the services rendered during the chapter 11 cases.

66.     As shown, Debtors retained Reed Smith as bankruptcy counsel, not PSZJ.  How and why PSZJ displaced Reed Smith remains a mystery.  Reed Smith was, at the time it filed the Petition, well versed in the history of events leading to the filing and well versed in the litany of events supporting Debtors' claims against HPS.  Reed Smith also filed a thoughtful Petition supported by a DIP financing proposal that would have "stabilized" the Debtors, including funding employee wages, employee health benefits and other administrative costs, and expenses of the cases.

67.     Instead of an orderly start to the cases, an inefficient, disruptive, and value-destroying process ensued, resulting in the conversion of the chapter 11 cases to cases under chapter 7.  The process included a false narrative placing blame for Debtors' financial condition on CSS and Rouhana, while Debtors' potential claims against HPS were swept to the side.  Indeed, while Reed Smith attempted to facilitate payment of the obligations authorized to be paid pursuant to the Court's July 4, 2024 Interim DIP Order, PSZJ attorneys inexplicably came storming in over the Fourth of July holiday weekend demanding documents from CSS, demanding immediate access to CSS's offices, and attempting to force CSS employees to work weekends—all before PSZJ bothered to seek permission from the Court to be retained as Debtors' counsel.

68.     During the six days (July 5 through July 10) of its questionable representation of Debtors (which included two weekend days), PSZJ became the conduit for the SRC's destruction

of the value-preserving strategy Reed Smith had set into motion for the cases, including derailment of Debtors' potential claims and causes of action against HPS.

69.     Instead, the SRC, through PSZJ, did the unthinkable—it abused the privilege of the podium in this Court to make a surprise oral motion to convert the cases, with no notice to interested parties, substantiated by no evidence, and laced with inflammatory attorney accusations premised on nothing but platitudes.  The SRC, through PSZJ, dumped a once highly regarded publicly traded company into chapter 7 for the sole benefit of HPS.  Upon information and belief, HPS then capitalized on the chapter 7 conversion as an excuse not to fund certain of the obligations authorized to be paid under the Interim DIP Financing Order, depriving hundreds of employees benefits they were due and leaving Debtors' Estates in limbo.[10]  Put simply, the SRC, through PSZJ, never gave CSSE a chance.

70.     For these and other reasons, CSS reserves the right to object to any fee applications submitted by PSZJ in connection with its purported representation of Debtors during the chapter 11 cases.

## II.     PSZJ's Conflicts Also Disqualify It From Serving As Special Counsel To The Trustee Under Section 327(e).

71.     As an initial matter, because PSZJ is disqualified from serving as Debtors' counsel and did not represent Debtors prepetition (*see* Argument Section I, *supra*), PSZJ cannot be retained as special counsel to the Trustee in this case.  *See* 11 U.S.C. § 327(e) (providing that "[t]he trustee, with the court's approval, may employ, for a specified special purpose, . . . ***an attorney that has represented the debtor*** . . . .") (emphasis added); *see also In re Ginco, Inc.*, 105 B.R. 620, 621 (D.

---

[10] The chapter 7 Trustee will want to investigate the claims and causes of action Debtors' Estates may have or hold against the SRC and HPS relating to value-destructive actions taken by the SRC, including but not limited to the conversion of the cases, HPS's failure to fund the full amounts of the Interim DIP Financing Order, and HPS's prepetition and postpetition conduct.

Colo. 1988) (Section 327 is "relevant only where the proposed representation involves counsel that has *previously* represented the debtor.") (emphasis in original).

72.     Additionally, under section 327(e), retention of a professional must be "in the best interest of the estate," *id.*, and "an attorney employed under the section may not hold or represent an interest adverse to the debtor or the estate with respect to the matter on which the attorney is employed." *In re NNN 400 Cap. Ctr. 16, LLC*, 619 B.R. 802, 814 (Bankr. D. Del. 2020), *aff'd sub nom. In re NNN 400 Capitol Ctr. 16 LLC*, 632 B.R. 243 (D. Del. 2021), *aff'd sub nom. In re NNN 400 Capitol Ctr. 16 LLC.*, No. 21-3013, 2022 WL 17831445 (3d Cir. Dec. 21, 2022).

73.     PSZJ fails this test.  Though the 327(e) Application lacks specifics regarding the proposed scope of PSZJ's engagement as special counsel, presumably, consistent with Mr. Pachulski's unsupported, uninformed, and inaccurate mismanagement accusations made during the July 10 hearing, PSZJ will be setting its sights on investigating and pursuing claims against CSS or perhaps even its leadership.  There is no claim against CSSE or any of its board members that PSZJ could possibly investigate or prosecute that will not implicate and be inextricably intertwined with the conduct of HPS, the SRC, Warshauer, and Young that is the subject of the HPS Disputes.  No matter what claim PSZJ may concoct against Debtors or their board members, defenses thereto will point the finger at PSZJ's former client HPS and PSZJ's seemingly current client the SRC (Warshauer and Young), making it impossible for PSZJ to assist meaningfully in litigation matters without creating an impermissible conflict.[11]

---

[11] The Bankruptcy Code "clearly contemplates that the special tasks for which employment of special counsel is sought be clearly demarked in the employment application so the Court can determine whether the proposed attorney is conflicted and whether the services are indeed special tasks." *In re Interstate Distribution Ctr. Assocs. (A), Ltd.*, 137 B.R. 826, 833 (Bankr. D. Colo. 1992). ***The Trustee's application lacks this clear demarcation***, but as discussed in this Objection, PSZJ's retention would be improper for any meaningful transactional or litigation matter given HPS's role and Debtors' overlapping potential claims of wrongdoing against HPS, the SRC, Warshauer, and Young.

74.     PSZJ's recent post-Applications letter perhaps best illustrates the irreparable conflicts created by its proposed special counsel role.  PSZJ sent a brash letter to CSS and Rouhana's lawyers, who also represented Debtors, demanding turnover of essentially every document relating to Debtors, without any limitation on scope as to whatever claims PSZJ purports to be investigating.  This demand, if complied with, is likely to result in PSZJ coming into possession of privileged materials that could relate to Debtors' claims and positions adverse to HPS and the SRC.  This would be completely inappropriate given PSZJ's attorney-client relationships with HPS and the SRC.

75.     Additionally, PSZJ's prior representations of HPS and the SRC raise questions as to PSZJ's ability to meaningfully assist in any transactional matter that may arise.   Some of the unspecified transactional matters PSZJ may encounter will require cooperation and coordination with CSS and Rouhana because, among the valuable assets the Trustee must liquidate, are entertainment streaming products that benefit from a license agreement with CSS to use the Chicken Soup for the Soul name, without which these CSSE assets are useless.  While CSS is willing to negotiate an appropriate agreement with the Trustee that would allow it to derive value from the entertainment products dependent on the Chicken Soup for the Soul licensed brand name, and has even offered the Trustee a proposal to do so, papering such a deal beneficial to the Estates and fair to CSS would necessarily involve working collaboratively with CSS and Rouhana, which PSZJ cannot meaningfully do.

76.     As discussed above, HPS is Debtors' largest secured creditor; the nature, extent, validity, priority, and enforceability of HPS's alleged liens and claims remains subject to potential challenge; HPS played a significant role in Debtors' demise; the SRC's actions, and inactions, relating to the chapter 11 cases and the decision to convert the cases to chapter 7 are in dispute and

likely to be the subject of any claims or cross-claims asserted in any director and officer litigation or creditor/employee litigation; and PSZJ client, Zayo Group, LLC, is a creditor in this case. Under these circumstances, it is difficult to envision services PSZJ could perform in this case that would be "in the best interest of the estate" and not create an "interest adverse" to Debtors or the Estates.

77.     This is doubly true for any litigation matters. The actions and misconduct of PSZJ's current and former clients are intertwined with all aspects of these bankruptcy cases. Indeed, these PSZJ clients caused the financial distress and the circumstances that ultimately led to Debtors seeking bankruptcy protection. And future claims benefitting the Estates would be prosecuted against PSZJ's former and current clients, with them (and PSZJ attorneys) as key witnesses.

78.     The court in *Buckley v. TransAmerica Inv. Corp. (In re Southern Kitchens, Inc.)*, 216 B.R. 819 (Bankr. D. Minn. 1998), disqualified a law firm retained under section 327(e) under similar circumstances in the context of an adversary proceeding. There, in addition to representing the debtor's chapter 7 trustee, the law firm also represented a board member and a shareholder of the debtor. *Id.* at 821, 834. Like here, there was a dispute in *Southern Kitchens* about the conduct of the board members and, in particular, assertions that the board members—one of which was previously represented by the trustee's section 327(e) counsel—were part of an "attempted coup," ultimately taking the debtor's "operations over the cliff right when its fortunes could have been saved." *Id.* at 827-28. The court noted the fact-intensive nature of resolving the dispute over the board members' role in the debtor's failure—"in which a persisting struggle for control of a trouble company was a central incident"—and decided the law firm should be disqualified: "Litigation like this cannot go ahead under the pall that its architects may not have analyzed, structured, and pled it with full detachment, and may be influenced by continuing loyalty to an unsued agent of the Debtor's downfall." *Id.* at 828-29. This mirrors what happened here, and "[t]he Bankruptcy

Code—its ethos as well as its letter—entitles the estate to more rooted integrity in its ongoing administration, than that." *See id.* at 829.

79.    Similarly, in *In re F & C Int'l, Inc.*, 159 B.R. 220 (Bankr. S.D. Ohio 1993), the court rejected a section 327(e) application where the debtor sought to employ a law firm as special securities counsel to pursue the debtor's litigation against certain accounting professionals for purported fraud, but that law firm was also (1) prosecuting a lawsuit against the debtor's former chairman, president, and CEO for breach of fiduciary duty and fraud and (2) defending certain outside directors in a separate action. *Id.* at 221.  In denying the application, the court held that "representation of the outside directors in matters arising from the alleged fraud constitutes an interest adverse to the estate." *Id.* at 223.  The court also rejected the idea that the directors and company could consent to dual representation: "The representation must be for the benefit of and in the best interests of the creditors and other interest holders of the debtor's estate.  Thus, in the bankruptcy context, counsel, even special securities counsel, owes a duty far broader than that normally owed by corporate counsel to its client." *Id.* at 223-24; *see also In re Ginco, Inc.*, 105 B.R. at 621 (dual representation by law firm of estate and principal shareholder, officer, and debt guarantor presented sufficient conflict to raise "adverse interest" precluding employment of law firm as special counsel for debtor, as well as an adverse interest under section 327(a)); *In re Kendavis Industries Int'l, Inc.*, 91 B.R. 742, 752-54 (Bankr. N.D. Tex. 1988) ("Whenever counsel for a debtor corporation has any agreement, express or implied, with management or a director of the debtor, or with a shareholder, or with any control party, to protect the interest of that party, counsel holds a conflict.  That conflict is not potential, it is actual, and it arises the date that representation commences.").

80.    The Court should therefore deny the 327(e) Application.

III.     **The Court Should Also Deny The Applications Because PSZJ's Failed To Disclose Actual And Potential Conflicts.**

81.      The Court cannot grant the Applications unless PSZJ satisfies the requirements of Rule 2014 of the Federal Rules of Bankruptcy Procedure, and PSZJ failed to do so.  Rule 2014(a) requires, in relevant part, that a professional retention application:

> . . . *shall state* the specific facts showing the necessity for the employment, name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, *all of the person's connections with the debtor, creditors, any other party in interest*, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

Fed. R. Bankr. P. 2014(a) (emphasis added).

82.      "The disclosure mandated under Rule 2014 goes to the heart of the integrity of the bankruptcy system." *In re NNN 400 Cap. Ctr. 16, LLC*, 619 B.R. at 809 (quotation marks omitted). And "[t]he anti-conflict of interest sections of the Bankruptcy Code are based on a policy designed to avoid the potential for conflicts of interest, by requiring that parties and their attorneys not only avoid conflicts, but be *above suspicion*." *In re Interstate Distribution*, 137 B.R. at 831 (emphasis in original) (quotation marks omitted).

83.      Thus, "[t]he professional must disclose *all* connections and potential connections." *In re NNN 400 Cap. Ctr. 16, LLC*, 619 B.R. at 809 (emphasis in original); *see also In re Universal Bldg. Prods.*, 486 B.R. 650, 663 (Bankr. D. Del. 2010) (stating that professionals do not have the option to "pick and choose which [connections] to disclose and which to ignore or leave the court to search the record for such relationships").  As explained by the Third Circuit:

> It is not . . . the obligation of the bankruptcy court to search the record for possible conflicts of interest. That obligation belongs to the party who seeks employment by the estate, and although it may not be so onerous as to require the party to raise with the court every imaginable conflict which may occur in a bankruptcy, it certainly

> compels disclosure where, as here, the party had contemplated and
> discussed a specific situation involving a potentiality for conflict.
> Accordingly, this Court can find no error in the bankruptcy court's
> determination that [the trustee and proposed trustee counsel]
> breached the duty of disclosure. This breach may have been the
> product of negligence, but negligence does not excuse the failure to
> disclose a possible conflict of interests.

*In re BH & P, Inc.*, 949 F.2d at 1317-18; *see also In re Granite Partners, L.P.*, 219 B.R. 22, 35

(Bankr. S.D.N.Y. 1998) (noting that the "professional's duty to disclose is self-policing . . . [and

the court] should not have to rummage through files or conduct independent factfinding

investigations to determine if the professional is disqualified") (quotation marks omitted).

84.     Here, PSZJ purported to enter an appearance on behalf of Debtors on July 5, 2024.

No disclosure or explanation has been offered as to the terms[12] or scope of PSZJ's: (i) prepetition

engagement by the SRC; (ii) postpetition engagement of the SRC up through July 5; (iii) new

representation of Debtors as of the July 5 hearing (a representation that may have been concurrent

with PSZJ's ongoing representation of the SRC); (iv) why Warshauer and Young are not listed in

Mr. Pachulski's disclosure of CSSE's former directors or officers; or (v) what happened to

Debtors' counsel of record Reed Smith.  PSZJ's prepetition and postpetition representation of the

SRC, with unexplained shift to representing Debtors, needs to be fully disclosed and understood

by the Court and all parties-in-interest.  That alone warrants denial of both Applications because

Rule 2014's standards "are strict standards that demand full compliance and the failure to comply

warrants sanctions."  *In re NNN 400 Cap. Ctr. 16, LLC*, 619 B.R. at 809 (revoking law firm's

retention as special counsel, disqualifying firm as debtors' counsel, and disgorging fees where the

law firm, *inter alia*, failed to disclose its representation of the debtors' property manager, one of

debtors' largest unsecured creditors, "in connection with a possible pre-petition transaction"); *In*

---

[12] Including, by way example, the amount of compensation paid or owed to PSZJ under such engagements.

*re Universal Bldg. Prods.*, 486 B.R. at 663 (Bankr. D. Del. 2010) ("Failure to disclose connections itself is enough to warrant disqualification of counsel from employment.").

85.    Consequently, the Court should deny both Applications by virtue of PSZJ's inadequate disclosures.

## CONCLUSION AND REQUESTED RELIEF

86.    For the forgoing reasons, the Court should sustain Objectors' Omnibus Objections to both Applications.

87.    Alternatively, in the event the Court is not inclined to deny the Applications on the face of these and other objections that may be filed, Objectors respectfully request the Court adjourn the September 4, 2024 hearing to October, 9, 2024, the next Omnibus Hearing date scheduled in these cases, so Objectors and other parties-in-interest may pursue discovery concerning the proposed retention Applications.

Dated: August 28, 2024
      Wilmington, Delaware

**WOMBLE BOND DICKINSON (US) LLP**

*/s/ Donald J. Detweiler*
Donald J. Detweiler (DE Bar No. 3087)
Morgan L. Patterson (DE Bar No. 5388)
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Facsimile:  (302) 252-4330
Email:  don.detweiler@wbd-us.com
       morgan.patterson@wbd-us.com

-and-

Cathy A. Hinger (pro hac vice)
2001 K. Street, NW
Suite 400 South
Washington, D.C. 20006
Telephone: (202) 467-6900
Facsimile:  (202) 467-6910
Email:  cathy.hinger@wbd-us.com

Claire J. Rauscher (pro hac vice)
301 S. College St., Ste. 3500
Charlotte, NC 28202
Telephone: (704) 331-4961
Email:  claire.rauscher@wbd-us.com

*Counsel for Chicken Soup for the Soul, LLC and William Rouhana*