# EXHIBIT 1

SM Content, LLC
244 Madison Avenue #1214
New York, NY 10016

Attn: Andrew Kotliar

Re:    **NAKED SINGULARITY**

Dear Andrew:

This Amended and Restated Sublicense Agreement (this "Agreement") is entered into as of December 23, 2021 (the "Effective Date"), sets forth the essential deal terms  pursuant to which SM Content, LLC ("Licensor") has agreed to license to Screen Media Ventures, LLC ("Screen Media") and Chicken Soup For The Soul Entertainment, Inc. ("CSSE") (together, "Licensee") the motion picture known as Naked Singularity ("Picture) and amends and restates in its entirety that certain Sublicense Agreement dated as of June 9, 2021 by and between Licensor and Licensee (the "Original Agreement").

All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Producer Agreement, as identified below.

1.  <u>Picture or Series</u> is defined as the feature-length motion picture starring John Boyega, Olivia Cooke, Bill Skarsgard and Ed Skrein, and directed by Chase Palmer ("Picture").

2.  <u>Rights</u>.
    Licensor hereby assigns to Licensee and Licensee hereby assumes all rights and obligations granted to Licensor pursuant to the agreement between Licensor and 150 Degrees Pictures, LLC., ("Producer") dated as of April 26, 2021 ("Long Form Producer Agreement") as well as the Deal Memo ("Short Form Deal Memo") and the amendment to the Short Form Deal Memo ("Amendment"). The Short Form Deal Memo and the Amendment are attached hereto as Schedule A.

3.  <u>Buy Out</u>
    Provided Licensee is not in breach of this Agreement, Licensee shall have the right to buy out Licensor's rights to the Picture for One Hundred Dollars ($100) ("Buy Out Fee") upon the conclusion of six (6) years from Licensee's first exploitation of the Picture. Licensee shall provide Licensor with written notice of its first exploitation of the Picture. Upon payment of the Buy Out Fee, Licensor shall fully assign to Licensee the Short Form Producer Agreement and Licensee shall have no further obligations with respect to the Picture to Licensor.

4.  <u>License Fee</u>
    As full consideration of the Licensed Rights granted herein, whether pursuant to Sec. 2 or

Sec. 3 above, Licensee shall pay to Licensor the sum of Three Million Seven Hundred and Five Thousand United States Dollars (USD $3,705,000) ("Minimum Guarantee" or "MG").

The parties agree that the MG shall be paid to Licensor in nine equal quarterly instalments over the course of a thirty (30) month period with the first payment due on December 15, 2021 as per Schedule B.

Licensee acknowledges and agrees that the MG shall be paid to Licensor regardless of the Picture's performance.

For the avoidance of doubt, any monies due pursuant to the Producer Agreement additional to the Advance, including without limitation, performance based advances, Additional Advances, Box Office Advances and Academy Award Advances (defined therein as the "Additional Advances") shall be the sole obligation of and shall be paid by Licensee.

5.    Distribution Fee
      For its distribution of the Picture, Licensee shall retain Twenty Five Percent (25%) of all "Gross Receipts" (as defined in Paragraph 8) ("Distribution Fee").

6.    Distribution Costs
      All reasonable distribution costs (collectively "Distribution Costs") incurred by Licensee shall be advanced by Licensee and shall be recouped from Gross Receipts subject to the Distribution Cost Cap (defined below). Distribution Costs shall include but not be limited to any Delivery Material costs incurred by Licensee, Theatrical Release costs, all home video costs (including but not limited to replication, manufacturing, shipping, returns, reserves for returns, marketing incentive programs (i.e., SPIFF and MDFs), and internal rebate programs), advertising, marketing, MPAA rating fees, music performance rights fees, guild residuals, digital encoding costs, streaming, broadband, shipping, satellite feeds, reserves, bad debts, discounts, rebates, allowances, adjustments, tape duplication, tape shipping, satellite feeds, advertising agency, third party sales agent fees, financing costs, closed captioning, subtitling, taxes, Nielsen ratings, editing, re-mastering, commercial integration, contract enforcement, interest, collection costs and other out of pocket expenditures.

      Distribution Costs shall be subject to an agreed upon cap of One Million Dollars ($1,000,000)  (the "Distribution Cost Cap"). Distribution Costs exceeding the Distribution Cost Cap shall not be recoupable by Licensee, as set forth in Sec. 8 below unless otherwise approved by Licensor in writing prior to the incursion of such costs; such approval shall not be unreasonably withheld.

7.    Third Party Obligations
      Licensee shall be solely  responsible for any and all payments to third parties in respect of the Picture, including without limitation, obligations to persons who appeared in or otherwise rendered services in connection with the Picture or who are entitled to payment

in respect of the exploitation of the Picture, including, without limitation, all production costs, revenue participations, royalties, talent or license fees, production related costs, guild and union residuals, guild and union fringe benefits, fees and costs, including without limitation, any penalties or interest and costs incurred with respect to any grievance or claims of any guild and/or union having or claiming jurisdiction over the Picture, (collectively, the "Union Obligations"), and any such like items whether by way of Licensee's exploitation of the Picture hereunder, the revenues generated therefrom or otherwise, and will enter into any distributor assumption agreements as required by SAG-AFTRA and WGC. Licensee shall be entitled to recoup all residual payments and all reasonable, actual, verifiable, out-of-pocket, third-party administrative costs associated therewith as Distribution Costs (collectively, the "Residual Obligations").

8.  <u>Allocation of Gross Receipts.</u>
"Gross Receipts" shall be defined and comprised of all monies received and retained by Licensee derived from the exercise of any and all rights assigned by Licensor to Licensee hereunder and shall include but not be limited to all revenues from theatrical, non-theatrical, public video, mobile, television, video on demand, and demand view, internet, digital and from home video sales, less any actual returns. Licensor acknowledges that Licensee makes no representation or warranty as to the amount of Gross Receipts that may be achieved. Gross Receipts shall be allocated as follows and in the following order:

    a)  To Licensee for payment of the Distribution Fee;

    b)  To Licensee for recoupment of Distribution Costs subject to the Distribution Cost Cap;

    c)  Recoupment of the MG

    d)  The remaining Gross Receipts shall be deemed "Net Profits" and shall be allocated and paid as follows:

        i.  Twenty-Seven Percent (27%) to Licensor ("Licensor's Share of Revenue"), and

        ii.  Seventy-Three (73%) to Licensee ("Licensee's Share of Revenue"),

9.  <u>Statements and Payments.</u>
Licensee shall provide Licensor with quarterly statements and payments, which statements and payments shall be furnished to Licensor no later than sixty (60) days after the end of each calendar quarter, commencing with the quarter in which this Agreement is executed, or the Picture is initially released to the public, whichever is later. Any statement or report submitted to Licensor by Licensee hereunder shall be deemed conclusively true, accurate and incontestable as to all of the items and information contained therein if not disputed in writing by Licensor within twenty-four (24) months after such statement or report is delivered to Licensor. Licensor shall be entitled, at its own expense, to appoint a duly qualified, industry recognized accountant to inspect,

audit, and examine Licensee's books at the premises of Licensee's business no more than once every twelve (12) months upon no less than sixty (60) days written notice and during normal business hours. Licensee shall maintain all records with respect to the foregoing for at least five (5) years from the date of the scheduled report as stated above. Licensee shall make payment to Licensor of any underpayment. In the event any audit uncovers an inaccurate discrepancy of more than seven- and one-half percent (7.5%) unfavorably to Licensor, Licensee shall pay the reasonable, actual, verifiable, third party costs of any such audit. Licensor and/or its duly authorized representative acting on its behalf hereunder shall not disclose to any third party, other than its professional advisors and/or Licensor and except as may be required by law, any information acquired as a result of any inspection of the books and records of Licensee except to the extent necessary for Licensor to enforce its rights hereunder.

10.   Remedies
Licensor shall have the right to terminate this Agreement in the event of a material breach by Licensee. For the avoidance of doubt, the parties hereby acknowledge that failure by Licensee to account for or timely make any payments due in accordance with the terms of this Agreement shall constitute a material breach. Termination or expiration of this Agreement for any reason shall not release Licensee from any liability or obligation under this Agreement, nor effect the survival of any provision hereto to the extent it is expressly stated to survive such termination.  Upon termination of this Agreement by Licensor under this Section 10, in addition to any and all other rights and remedies which Licensor expressly retains at Licensor's option, (i) all rights, title, and interests of Licensee to the Picture shall immediately terminate and revert to Licensor; (ii) any and all sub-license agreements entered into by Licensee hereunder that are in effect shall automatically be fully assigned to Licensor, (iii) Licensee shall execute any and all documents and issue any declarations necessary to effect the termination of such rights and licenses; and (iv) Licensee shall cease all exploitation of the Picture. Notwithstanding any such termination, Licensee shall remain obligated to pay any unpaid amounts due to Licensor under this Agreement. Further, no right, power or remedy conferred upon or reserved to or by Licensor in this Agreement is intended to be exclusive of any other right, power or remedy conferred upon or reserved to or by Licensor under this Agreement, at law, or in equity, but each and every remedy shall be cumulative and concurrent, and shall be in addition to each and every other right, power and remedy given under this Agreement or now or subsequently existing at law or in equity, and Licensor shall be free to seek damages, costs and any other remedies that may be available under applicable law (including an action for money damages and costs) or in equity (including to seek an injunction) for any breach of this Agreement by Licensee.

11.   Notice and Cure
No failure by either Party to perform any of its obligations under this Agreement shall be deemed a material breach, until the Party claiming breach has given the Party alleged to be in breach written notice of its failure to perform and such failure has not been corrected within thirty (30) days from and after the giving of such notice, provided that such notice has specifically delineated the alleged breach in sufficient detail to enable a cure. In the event the alleged breach is incapable of cure within thirty (30) days, the cure

period may be extended at the discretion of the non-breaching party for a reasonable time to enable the cure to be affected. Notwithstanding the foregoing, any failure by Licensee to make any payment owing to Licensor hereunder or to any third parties as set forth in the Agreement shall be subject to a cure period of ten (10) business days from Licensee's receipt of notice of the breach.

12.   Representations and Warranties
Both parties hereto warrant and represent that they each have the right and power to enter into this Agreement, to grant all rights granted herein, and to perform all of their respective obligations;

Licensee warrants and represents that:

a) It is a company validly existing and in good standing under the laws of its domicile;

b) It will use commercially reasonable efforts in accordance with industry custom to monetize the Picture, including by obtaining all rights and necessary approvals for the distribution and exploitation of the Picture in the applicable territory;

c) It will not, with respect to the Picture, infringe upon or violate the rights of copyright or trademark of any person or entity, or violate any other personal property rights of any person or entity;

d) It will negotiate and execute arms-length distribution agreements with distributors, broadcasters and/or agents for the distribution, exhibition, and exploitation of the Picture. Arms-length Agreements shall mean an agreement that is on commercially reasonable terms and representative of similar agreements in the industry made by two similarly situated independent parties.

e) Any distribution or other licensing arrangement with Crackle shall be entered into on an arms-length basis and shall be on commercially reasonable terms;

f) it will not encumber the Picture with any type of lien or security interest.

g) It is validly existing under the laws of the jurisdiction of their incorporation or formation;

h) All necessary governmental approvals, authorizations, licenses and waivers having been obtained or granted free from onerous conditions and are in full force and effect in order for it to fully perform its obligations under this Agreement;

i) The execution, delivery and performance of the Agreement does not and will not cause any borrowing limit or restriction of the Company to be exceeded or violated in any respect;

j) The accuracy of information in all material respects and financial statements for Licensee are complete and correct and fairly present the financial condition of Licensee in accordance with applicable generally accepted accounting principles;

k) No default or event of default (present or prospective) exists.

l) There is currently an absence of any pending or threatened litigation, investigation, or proceeding that may have a material adverse effect on the business, condition (financial or otherwise), operations, performance, properties, or prospects of Licensee;

m) The legality, validity, binding effect and enforceability of this Agreement and the absence of any violation of law and/or material agreements;

n) It has no agreement with or obligations to any third party that might conflict or interfere with this Agreement in a way that has a material adverse effect on this Agreement;

o) There are, to the best of Licensee's knowledge after reasonable due diligence, no claims or actions threatened against or affecting Licensee's ability to fulfill its obligations hereunder;

p) None of the materials created by Licensee or any designee of Licensee does or will, during the term, violate or infringe upon any rights, including but not limited to copyright, publicity, or name and likeness rights, of any third party;

q) Licensee will abide by all cutting restrictions, guild requirements, and contractual credit obligations and publicity approval rights/restrictions reasonably notified to Licensee by Licensor or Producer prior to or promptly following the Complete Delivery of the Picture to Licensee;

r) Licensee shall not cause the Picture to be licensed to distributors under agreements that are cross-collateralized with any other pictures or any other motion picture owned, represented or otherwise controlled by Licensee (unless otherwise approved by Licensor in writing).

13.  Distribution Services
Licensee shall provide all services customarily rendered by distributors of feature-length motion pictures or series in the applicable territory, including, without limitation, the following distribution services:

a) Negotiation and execution of arms-length Distribution Agreements with Distributors, broadcasters and/or agents for the distribution, exhibition, and exploitation of the applicable rights. "Arms-Length Distribution Agreements" shall mean a distribution agreement that is on customary commercially reasonable terms and representative of similar distribution agreements in the industry made by two similarly situated

independent parties;

b) Supervising and coordinating of the marketing, distribution, and release of the Picture in the territory during the term, in consultation with Licensor;

c) Facilitating and managing collection of monies from related parties (including sub-distributors) including, without limitation, tracking overages, analyzing accounting statements, and overseeing audits, and exerting best efforts to receive prompt and accurate accounting statements and payments from such related parties;

d) Delivering the Picture (including quality checking incoming deliverables, technical servicing, and complete delivery) (at Licensee's cost) to all distributors;

e) Obtaining timely and accurate information from the Producer necessary to abide by and comply with its obligations to any applicable guild or union, including without limitation the payment of residuals.

14.  Indemnification
Licensee shall indemnify and hold harmless Licensor, its affiliates, related funds, directors, managers, agents, successors, officers, attorneys, employees, and limited partners against any and all third-party claims, demands, costs, expenses (including reasonable outside attorneys' fees), liabilities, damages, and judgments arising out of, resulting from, based upon or directly or indirectly relating to, Licensee's distribution and exploitation of the Picture, including, for the avoidance of doubt, any claim, demand, cost, expenses (including reasonable attorneys' fees), liabilities, damages, and judgements arising out of, resulting from, based upon or directly or indirectly relating to the Additional Advance, union obligations, third party participations and associated payments.

15.  Assignment
Unless and until Licensee exercises its right to Buy Out the Picture and Licensor receives its Buy Out Fee; Licensee may not assign this Agreement without the prior written approval of Licensor.  Such approval will not be unreasonably withheld.

16.  Joint and Several Liability.
Each of Screen Media and CSSE shall be deemed to have jointly and severally made and entered into all of the representations, warranties and agreements contained in this Agreement and shall be jointly and severally obligated and bound thereby. All of Licensor's rights pursuant to this Agreement relate to and are exercisable against each of Screen Media and CSSE jointly and severally.

17.  Governing Law.
This Agreement, and any claim, controversy or dispute arising under or related thereto, shall be governed by, and construed in accordance with, the laws of the state of New York (including section 5-1401 and section 5-1402 of the General Obligations Law of the State of New York), without reference to any other conflicts or choice of law principles

thereof. The parties hereto hereby waive any right to trial by jury with respect to any claim or action arising out of this term sheet or Agreement. The parties hereto hereby agree that any suit or proceeding arising in respect of this Agreement or any of the matters contemplated hereby or thereby will be tried exclusively in the U.S. District Court for the Southern District of New York or, if such court does not have subject matter jurisdiction, in any state court located in the Borough of Manhattan, and the parties hereto hereby agree to submit to the exclusive jurisdiction of, and venue in, such court. The parties hereto hereby agree that service of any process, summons, notice or document by certified mail addressed to you or each of the parties hereto will be effective service of process against such party for any action or proceeding relating to any such dispute. The parties hereto irrevocably and unconditionally waive any objection to venue of any such action or proceeding brought in any such court and any claim that any such action or proceeding has been brought in an inconvenient forum. A final judgment in any such action or proceeding may be enforced in any other courts with jurisdiction over the Licensee

If the terms set forth above meet with your approval, please so indicate by signing in the space provided below.

Accepted and agreed to by:

SCREEN MEDIA VENTURES, LLC

By *David Fannon*_____

Name_David Fannon_____

Date_Jan 6, 2022_____

CHICKEN SOUP FOR THE SOUL ENTERTAINMENT, INC

By *David Fannon*_____

Name_David Fannon_____

Date_Jan 6, 2022_____

SM Content, LLC

By_____

Name Andrew Kotliar

Date_1/5/22_____

SCHEDULE B

| | |
|---|---|
| December 15, 2021 | $411,666 |
| March 15, 2022 | $411,666 |
| June 15, 2022 | $411,666 |
| September 15, 2022 | $411,666 |
| December 15, 2022 | $411,666 |
| March 15, 2023 | $411,666 |
| June 15, 2023 | $411,666 |
| September 15, 2023 | $411,666 |
| December 15, 2023 | $411,666 |
| **Total** | **$3,705,000** |

As of April 26, 2021

150 Degrees Pictures, LLC
24, rue Astrid, L-1143 Luxembourg
Grand Duchy of Luxembourg

Attn: Ross Jacobson and Sebastien Raybaud

Re:    <b>NAKED SINGULARITY</b>

Dear Ross and Sebastien:

Set forth below are the essential deal terms ("Agreement") between 150 Degrees Pictures, LLC ("Licensor") and SM Content, LLC ("SM") in connection with the motion picture, as screened for SM on January 25, 2021, entitled "*Naked Singularity*" ("Picture").

1. <u>Picture</u>.
   *"Naked Singularity"* a feature length motion picture starring John Boyega, Olivia Cooke, Bill Skarsgard, and Ed Skrein and directed by Chase Palmer, with a running time of not less than ninety (90) minutes and capable of receiving an MPA rating no more restrictive than R.

2. <u>Conditions Precedent.</u>
   SM's obligations under this Agreement shall be subject to the following conditions precedent being fulfilled or met (the "Conditions"):

   a) SM's approval of the "Chain of Title" (as defined in Schedule A) of the Picture (the parties hereby acknowledge the Condition Precedent satisfied);
   b) SM's receipt of a fully executed version of this Agreement

3. <u>Approvals.</u>
   SM shall have approval over the following aspects of the Picture (not to be unreasonably withheld) ("Approvals"):

   a) The final cut of the Picture (the version screened for SM on January 25, 2021, is hereby approved);
   b) Any non-commercial release (including but not limited to festivals, premieres, and markets) in the Territory excluding any such releases prior to the date hereof;
   c)
   d) Marketing and distribution strategies in the Territory, although SM shall first meaningfully consult with Licensor; and
   e) Mutual approval with Licensor over any press releases and over any festival strategies.

April 26, 2021
NAKED SINGULARITY
Page 2

4. <u>Territory.</u>
The "Territory" shall mean the United States, the Caribbean (as defined below), Canada and their respective territories, commonwealths, and possessions, and any cruise ships, or oil rigs, flying the flag of any country in the Territory. Additionally, the Territory shall include worldwide airlines.

"Caribbean" shall mean: Aruba; British Virgin Islands; Cuba (*subject to embargo*); Dominican Republic; French Antilles; Haiti; Netherlands Antilles, Former Territories of; West Indies.

"British Virgin Islands" shall mean: Anegada; Jost Van Dyke; Tortola; Virgin Gorda.

"French Antilles" shall mean: Guadeloupe (*including Basse-Terre, Grand-Terre, Petite Terre, Marie-Galante, La Desirade, Les Saintes, St. Bart (St Barthelemy), and St. Martin*); Martinique.

"Netherlands Antilles, Former Territories of" shall mean: Aruba; Bonaire; Curacao; Saba; St. Eustatius; Sint Maarten.

"West Indies" shall mean: Bahamas; Barbados; Bermuda; Cayman Islands; Jamaica; Leeward Islands (*Anguilla, Antigua, Barbuda, Montserrat, St. Kitts [St. Christopher] and Nevis*); Trinidad & Tobago; Turks & Caicos; Windward Islands (*Dominica, Grenada, Grenadines, St. Lucia, St. Vincent*).

Notwithstanding the foregoing, the Caribbean (as specifically defined above) shall be limited to non-exclusive English language only.

5. <u>Term.</u>
Commencing on the date hereof and continuing for twenty (20) years from the earlier of (i) delivery to SM and approval by SM (not to be unreasonably withheld) of the "Essential Delivery Items" (as defined in Schedule A) and (ii) the initial release of the Picture hereunder. SM shall have an exclusive right of first negotiation to extend its rights herein, on terms and conditions to be negotiated within thirty (30) days prior to the expiration of the Term.

6. <u>Rights.</u>
During the Term, throughout the Territory, and in all languages (subject to the above), subject to payment of the full Advance (see below) to Licensor, Licensor hereby exclusively grants to SM the sole and exclusive right, under copyright, to (and to license others to) exhibit, distribute, market, display, project, transmit, reproduce, broadcast, perform, advertise, publicize, exploit, sell copies of, dispose of and otherwise communicate publicly or privately, the Picture in any and all languages (subject to the language exclusions set forth in Paragraph 4 above) and approved versions, on any and all kinds, sizes, gauges and/or widths of film, tape, computer, electronic, digital, on-line transmission by any and every means, method, process or device or other delivery systems now known or hereafter exploited, and not yet known or devised, in the exercise

of all forms of theatrical, non-theatrical, public video, home video, television, video on demand, and demand view, internet, digital, airlines, hotels, cruise ships, trains, vehicles, and mobile (individually and collectively, the "Licensed Rights") on the terms and conditions set forth in this Agreement.

The "Licensed Rights" shall also include, without limitation, a) the right to use the names, photographs, likenesses, acts, poses, sound effects and voices of all artists appearing in the Picture, the director thereof, others appearing in or connected with the Picture and b) the right to use and perform all musical compositions (including lyrics) and master recordings created for or first exploited in the Picture and any pre-existing musical compositions and master recordings licensed for use in the Picture; the foregoing subject only to the "Acceptable Restrictions", which are defined as: (i) contractual restrictions of such use, (ii) which Licensor has informed SM of prior to or concurrently with delivery of the Picture, in writing, and (iii) which are customary in the motion picture industry. All other rights (e.g., subsequent/derivative productions, print publishing, music publishing, soundtrack, merchandising, commercial tie-in rights, etc.) are reserved to the Licensor (the "Reserved Rights").

SM shall have the exclusive right of first negotiation for thirty (30) days to negotiate to acquire the distribution rights for any subsequent productions (including, but not limited to, TV series, prequels, sequels, or derivative audiovisual works) based on the Picture on a "rolling basis" as such subsequent productions are announced.

7. <u>Prior Exposure in the Territory.</u>
None.

8. <u>Holdbacks and Availability.</u>
Licensor shall not release, and shall not authorize any third parties to release, the Picture in any form in any media whatsoever in any territory in the world before the earlier of SM's initial release of the Picture in the Territory (i.e., currently expected to be August 6, 2021) or the "Outside Release Date" (as defined below). Licensor shall use good faith efforts to communicate to and coordinate with SM regarding the publishing date of marketing materials in English-speaking territories.

Licensor shall not release, and shall not authorize any third parties to release, any marketing or promotional materials in connection with the Picture (including any trailer for the Picture) prior to SM's release of the corresponding marketing or promotional material in the Territory. Licensor shall not be deemed in breach if the marketing or promotional materials of a distributor outside of the Territory has overspill into the Territory.

9. <u>Theatrical Release.</u>
Subject to the commercial availability of theaters, SM shall release the Picture theatrically on fifty-one (51) simultaneous screens for a minimum of seven (7) days each (each such seven-days release on a given screen shall be defined as a "Screening"). At least one Screening shall occur in each of the top twenty-five (25) US markets, including

New York and Los Angeles. The remaining screenings and markets shall be at SM's discretion.

Licensor acknowledges that the release of the Picture via any form of video-on-demand shall be at SM's discretion ("VOD Release").

SM shall use best efforts to ensure that the initial release of the Picture in the Territory shall be no later than August 31, 2021. Notwithstanding the foregoing, the outside initial release date for the Picture in the Territory shall be December 31, 2021 ("Outside Release Date").

In the event of a "Force Majeure Event" (as defined in Paragraph 25) that materially interferes with SM's ability to satisfy the Theatrical Release commitment set forth above, SM's commitment to a Theatrical Release shall be waived.

10. <u>Advance.</u>
As full consideration of the Rights granted herein, SM shall advance to Licensor the sum of Two Million Eight Hundred Fifty Thousand Dollars ($2,850,000) ("Advance"), net of any withholdings or other taxes. The parties agree that the Advance shall be paid out as follows:

    a) Ten Percent (10%) upon execution of the Short Form Agreement and delivery to and acceptance by SM of the "Chain of Title Documents" (as defined in Schedule A) (the parties hereby acknowledge such condition satisfied);

    b) Eighty Percent (80%) upon delivery to and acceptance by SM of all Essential Delivery Items (the parties hereby acknowledge such condition satisfied); and

    c) Ten Percent (10%) prior to first release of the Picture by SM.

Notwithstanding the foregoing, One Hundred Percent (100%) of the Advance shall be paid to Licensor by SM prior to first release of the Picture by SM but no later than July 31, 2021, provided Licensor has delivered all Delivery Materials necessary to release the Picture theatrically in the Territory.

11. <u>Additional Advances.</u>
Subject to the following criteria being achieved, SM shall pay to Licensor the following cumulative sums ("Additional Advance(s)") to be recouped by SM from Licensor's share of Gross Receipts as set forth in Paragraph 14 below. Any Additional Advances shall be payable when earned.

a) Box Office Bonuses (valid only until the later of the start of first pay window [TV/SVOD/AVOD] or thirty (30) days from theatrical release in the US):

    i. One Hundred Thousand Dollars ($100,000) Additional Advance when US Box Office reaches Five Million Dollars ($5,000,000).

    ii. One Hundred Fifty Thousand Dollars ($150,000) Additional Advance when US Box Office reaches Seven Million Five Hundred Thousand Dollars ($7,500,000).

    iii.    One Hundred Fifty Thousand Dollars ($150,000) Additional Advance for every additional Two Million Five Hundred Thousand Dollars ($2,500,000) of US Box Office.

b)   VOD Bonuses (valid only until the start of standard pricing window):

    i.    Fifty Thousand Dollars ($50,000) at four hundred twenty-five thousand (425,000) transactions in the Territory during the Term.

    ii.    Seventy-Five Thousand Dollars ($75,000) for every additional one hundred thousand (100,000) transactions in the Territory during the Term.

c)   Talent Bonuses (to be paid to talent as contingent compensation):

    i.    John Boyega:

- Twenty-Five Thousand Dollars ($25,000) Additional Advance at Twenty Million Dollars ($20,000,000) Domestic Box Office
- Thirty Thousand Dollars ($30,000) Additional Advance at Twenty-Five Million Dollars ($25,000,000) Domestic Box Office
- Thirty-Five Thousand Dollars ($35,000) Additional Advance at Thirty Million Dollars ($30,000,000) Domestic Box Office
- Forty Thousand Dollars ($40,000) Additional Advance at Thirty-Five Million Dollars ($35,000,000) Domestic Box Office
- Forty-Five Thousand Dollars ($45,000) Additional Advance at Forty Million Dollars ($40,000,000) Domestic Box Office
- Fifty Thousand Dollars ($50,000) Additional Advance at Forty-Five Million Dollars ($45,000,000) Domestic Box Office
- Fifty Thousand Dollars ($50,000) Additional Advance at Fifty Million Dollars ($50,000,000) Domestic Box Office
- Seventy-Five Thousand Dollars ($75,000) Additional Advance at Fifty-Five Million Dollars ($55,000,000) Domestic Box Office
- One Hundred Thousand Dollars ($100,000) Additional Advance at Sixty Million Dollars ($60,000,000) Domestic Box Office

    ii.    Olivia Cooke:

- Twenty-Five Thousand Dollars ($25,000) Additional Advance at Twenty Million Dollars ($20,000,000) Domestic Box Office
- Twenty-Five Thousand Dollars ($25,000) Additional Advance (capped at One Hundred Seventy-Five Thousand Dollars ($175,000)) for every additional Five Million Dollars ($5,000,000) Domestic Box Office

    iii.    Bill Skarsgard:

- Twenty-Five Thousand Dollars ($25,000) Additional Advance at Twenty Million Dollars ($20,000,000) Domestic Box Office
- Twenty-Five Thousand Dollars ($25,000) Additional Advance (capped at One Hundred Seventy-Five Thousand Dollars ($175,000)) for every additional Five Million Dollars ($5,000,000) Domestic Box Office

    iv.    Chase Palmer:

- Twenty-Five Thousand Dollars ($25,000) Additional Advance at Twenty Million Dollars ($20,000,000) Domestic Box Office

- ▪ Twenty-Five Thousand Dollars ($25,000) Additional Advance (capped at One Hundred Seventy-Five Thousand Dollars ($175,000)) for every additional Five Million Dollars ($5,000,000) Domestic Box Office

d) Award Bonuses (to be paid to talent as contingent compensation):

   i. John Boyega (for acting):
- ▪ Twenty-Five Thousand Dollars ($25,000) for a Golden Globe nomination
- ▪ Fifty Thousand Dollars ($50,000) for a Golden Globe win
- ▪ Fifty Thousand Dollars ($50,000) for an Academy Award nomination
- ▪ One Hundred Thousand Dollars ($100,000) for an Academy Award win

   ii. Chase Palmer (for directing):
- ▪ Twenty-Five Thousand Dollars ($25,000) for Golden Globe nomination
- ▪ Fifty Thousand Dollars ($50,000) for Golden Globe win
- ▪ Fifty Thousand Dollars ($50,000) for Academy Award nomination
- ▪ One Hundred Thousand Dollars ($100,000) for Academy Award win

   iii. Chase Palmer (for screenplay):
- ▪ Twenty-Five Thousand Dollars ($25,000) for Golden Globe nomination
- ▪ Fifty Thousand Dollars ($50,000) for Golden Globe win
- ▪ Fifty Thousand Dollars ($50,000) for Academy Award nomination
- ▪ One Hundred Thousand Dollars ($100,000) for Academy Award win

12. <u>Distribution Fee.</u>
For its distribution of the Picture, SM shall be paid Twenty-Five Percent (25%) of all "Gross Receipts" (as defined in Paragraph 14) ("Distribution Fee").

Such Distribution Fee shall be inclusive of any subdistribution fees, with the following two exceptions:

a) For "big box" DVD sales, an additional sub-distribution fee shall be capped at Fifteen (15%).
b) For exploitation in Canada, an additional sub-distribution fee shall be capped at Twenty-Two and One-Half Percent (22.5%).

13. <u>Distribution Costs.</u>
All actual, verifiable, direct, out-of-pocket, third party, reasonable distribution costs incurred by SM in the Territory and during the Term (collectively "Distribution Costs") shall be advanced by SM and shall be recouped from Gross Receipts. Distribution Costs shall include but not be limited to any Delivery Material costs incurred by SM, Theatrical Release costs, all home video costs (including but not limited to replication,

manufacturing, shipping, returns, reserves for returns, marketing incentive programs (i.e., SPIFF and MDFs), and internal rebate programs), advertising, marketing, MPAA rating fees, music performance rights fees, guild residuals, digital encoding costs, streaming, broadband, shipping, satellite feeds, reserves, bad debts, discounts, rebates, allowances, adjustments, tape duplication, tape shipping, satellite feeds, advertising agency third party fees, financing costs, closed captioning, subtitling, taxes, Nielsen ratings, editing, re-mastering, commercial integration, contract enforcement, interest, collection costs and other similar expenditures. Such Distribution Costs shall not include any overhead. There shall be no so-called "double deductions".

Notwithstanding the foregoing:

a) SM acknowledges that its total marketing and advertising costs ("Soft Distribution Costs") shall be capped at One Million Dollars ($1,000,000) ("Soft Distribution Cost Cap"). SM shall not exceed the Soft Distribution Cost Cap without Licensor's prior written approval.

b) The parties agree that the Soft Distribution Cost Cap does not apply to costs that must be incurred in order to conclude or enforce a sale ("Hard Distribution Costs"). Hard Distribution Costs shall include but not be limited to, creation of materials, manufacturing, replication, rebate programs, sub-distribution costs, discounts, returns, reserves shipping, storage, sales conferences, commercial integration, digital encoding, dubbing and subtitling, contract enforcement, and collection costs actually paid by SM to unaffiliated third parties.

14. Allocation of Gross Receipts.
"Gross Receipts" shall be defined and comprised of all monies received by or credited to SM, its affiliates or subsidiaries, from all forms of distribution and other exploitation of the Picture and the Licensed Rights in the Territory during the Term. Licensor acknowledges that SM makes no representation or warranty as to the amount of Gross Receipts that may be achieved. Gross Receipts shall be allocated on a continuous and cumulative basis as follows and in the following order:

a) To SM for payment of the Distribution Fee;
b) To SM for recoupment of Distribution Costs;
c) Thereafter, all remaining amounts shall be allocated Eighty Percent (80%) of One Hundred Percent (100%) to Licensor ("Licensor's Share") and Twenty Percent (20%) of One Hundred Percent (100%) to SM. Provided, however, SM shall recoup the Advance and Additional Advances (if any), plus interest (to be calculated at US prime interest rate plus One Percent [1%]), from Licensor's Share of Gross Receipts.

15. Delivery Date.
All Essential Delivery Items shall be delivered to "Licensee's Representative" (as defined in Schedule A) on or before April 15, 2021 ("Delivery Date") (SM hereby confirms that delivery of Essential Delivery Items has been completed). SM shall bear all shipping and handling costs. Licensee's Representative shall have thirty (30) days to notify Licensor of any missing or defective Delivery Materials (as defined in Schedule A) and Licensor

shall have fifteen (15) days to deliver any missing Delivery Materials or remedy any
defective Delivery Materials. Delivery shall not be deemed to have been accepted by
Licensee's Representative until Licensee's Representative has approved all Delivery
Materials. Licensor acknowledges that the Delivery Date is of the essence of this
Agreement.

16. <u>Third Party Obligations.</u>
Excluding payment of the Advance, Additional Advances and Licensor's Share of Gross
Receipts, SM shall not have any obligation or responsibility for payments that are or may
become due to Licensor or third parties by way of profit or revenue participations,
royalties, talent or license fees, production related costs, guild residuals, guild fees and
costs and any such like items whether by way of SM's exploitation of its rights
hereunder, the revenues generated therefrom or otherwise. Notwithstanding anything in
this Agreement to the contrary, in the event the Picture is a guild production, SM shall act
as paymaster for guild residuals, but SM shall not assume any guild obligations and shall
not sign any distributor assumption agreements. SM shall engage a payroll company for
purposes of making guild residuals payments for the Picture and shall promptly notify
Licensor thereof. Any and all such guild residual payments shall be paid by SM and
treated as a Distribution Cost.

17. <u>Editing.</u>
Subject to any subtitling/dubbing restrictions of the talent, SM shall have customary
rights to subtitle and/or dub the Picture and to edit the Picture only for rating, TV
broadcasts and standards, and to avoid legal liability and/or censorship. Chase Palmer
shall have a first opportunity right to make any such edits and shall have the right to
supervise the panning and scanning of the Picture for purposes of creating home video
and DVD versions, provided that Chase Palmer acknowledges his willingness and
availability to do so within 48 business hours from notification by SM. Should Chase
Palmer fail to provide his acknowledgement within the time period above, SM shall have
no obligation to him with regard to the edits or the panning and scanning of the Picture.

SM shall not change the title of the Picture without Licensor's written approval.

18. <u>Statements and Payments.</u>
Commencing with the first calendar quarter in which Gross Receipts are received and
earned by SM and on a quarterly basis for two (2) years thereafter, on a semi-annual basis
for the next year thereafter, and once annually thereafter during any period, SM shall
provide Licensor with a statement showing the calculation of Gross Receipts, all
deductions, and the amount due to Licensor with respect to such period. All payments
owed to Licensor, including Advance and/or any Additional Advance payments, shall be
made within thirty (30) days of the applicable benchmark being reached and SM's receipt
of an invoice detailing monies owed. SM shall not be obligated to make any payment to
Licensor that is less than Five Hundred Dollars ($500) ("Threshold Amount"). Any
money that is owed that is less than the Threshold Amount shall be carried over until the
payment exceeds the Threshold Amount. Any statement or report submitted to Licensor
by SM hereunder shall be deemed conclusively true, accurate and incontestable as to all

of the items and information contained therein if not disputed in writing by Licensor within twelve (12) months after such statement or report is delivered to Licensor; provided, however, that if Licensor delivers to SM a written notice objecting to such statement within said twelve (12) month period, and if such notice specifies in reasonable detail the particular transactions to which Licensor objects, then only insofar as such particular objections to such transactions are concerned, such statement shall not be deemed correct or conclusive and binding upon Licensor. Any objection to any statement shall be deemed to have been waived unless a legal proceeding based thereon is instituted by Licensor against SM within twelve (12) months following the expiration of such twelve (12) month period. If any statement should include any transactions or accountings which were reflected in any prior statement, then with respect to such accountings and transactions, such statement shall be deemed correct and conclusive and binding upon Licensor in all respects within twelve (12) months after the date of the statement on which any such accountings or transactions were first reflected, even though it may be included in a later statement or statements. A general objection shall not be deemed adequate and sufficient for this purpose, unless an accurate accounting has not been provided. Licensor shall be entitled, at its own expense, to appoint a duly qualified accountant to inspect, audit, and examine SM's books at the premises of SM's business no more than once every twelve (12) months upon no less than thirty (30) days written notice and during normal business hours.  If such an audit reveals a genuine discrepancy in Licensor's favor of more than five percent (5%) (but in any event, no less than Ten Thousand U.S. Dollars (US$10,000)), then SM will pay the costs of such audit upon receipt by SM of an invoice from Licensor, in addition to SM paying such undiscovered payment. SM shall maintain all records with respect to the foregoing for at least two (2) years from the date of the scheduled report as stated above. Licensor and/or its duly authorized representative acting on its behalf hereunder shall not disclose to any third party, other than its professional advisors and/or Licensor and except as may be required by law, any information acquired as a result of any inspection of the books and records of SM except to the extent necessary for Licensor to enforce its rights hereunder.

19. Music.
Licensor shall deliver the Picture with all composed music fully cleared for in-context and out-of-context use.  Licensed music shall be cleared for in-context use only. Licensor shall deliver to SM copies of music licenses for the Picture pursuant to the foregoing.

20. Art Materials.
Licensor shall deliver to SM sufficient art and promotional materials to construct a first-class marketing campaign. Included in such art and promotional materials shall be substantial on-set photography that includes photos of leading cast members of which SM has prior approval.  SM shall have the right to promote the Picture solely with one (1) or more cast member's name and likeness, and shall have the right to use any cast member's name and likeness prominently in all key art, subject to the terms of Paragraph 3 above and the paid ad statement delivered to SM.

SM and Licensor shall have mutual free access to any and all materials (including, but not limited to trailers, key art, TV spots, DVD materials or other marketing materials)

created for the Picture by Licensor, SM, or a sales agent. The receiving party shall bear all associated shipping and handling costs.

21. <u>Credits.</u>
SM shall be entitled to the following credits in the Territory during the Term, all to be added to the Picture at SM's cost:

a) Screen Media Ventures, LLC ("SMV") company logo in first position on screen (i.e., prior to any other logo or credit before the start of the Picture).
b) SMV company logo credit in all artwork and paid advertising with respect to the Picture.
c) In the Territory, SMV company presentation credit on a single card on screen in the main titles of the Picture and in the billing block of all artwork and paid advertisements.
d) For purposes of clarification, Chicken Soup for the Soul Entertainment, Inc. ("CSSE") shall be included only in press releases. CSSE will not appear on marketing materials or the Picture itself. SM shall abide by all contractual credit and logo requirements for the Picture, provided that such requirements are provided to SM in writing.

SM agrees that all credits on the version of the Picture screened to SM on January 25, 2021, are hereby approved.  SM also agrees to abide by all the terms of the paid ad statement delivered to SM pursuant to Schedule A.

22. <u>Universal PR.</u>
Screen Media agrees to use good faith efforts to provide to Universal Visual Programming Limited ("Universal") and up to ten (10) media outlets (such media outlets shall be subject to approval by talent) from the territory licensed by Universal from Licensor for the Picture with free access to attend any press junkets or press days organized by or on behalf of Screen Media for the Picture.

23. <u>Remedies.</u>
All remedies accorded herein or otherwise available to either party shall be cumulative and no one such remedy shall be exclusive of any other.  No action or omission by either party shall constitute a breach of this Agreement until the non-defaulting party first notifies the defaulting party of such default pursuant to Paragraph 26 below.  Except for failure to pay the full Advance in accordance with Paragraph 10 above, if SM breaches its obligations hereunder, Licensor hereby acknowledges and agrees that the damage, if any, caused to Licensor shall not be irreparable or sufficient to entitle Licensor to injunctive or other equitable relief.  Consequently, except for failure to pay the full Advance in accordance with Paragraph 10 above, Licensor's rights and remedies shall be limited to the right to recover damages, if any, and Licensor waives any right or remedy in equity, including without limitation any right to terminate or rescind this Agreement or any of the rights granted to SM hereunder or to enjoin or restrain or otherwise impair in any manner the development, production, distribution, exhibition or other exploitation of the Picture.

24. <u>Assignment.</u>
SM shall have the right to assign any of its rights herein, delegate any of its obligations and/or freely assign this Agreement in whole to Screen Media, LLC or CSSE or any subsidiary of either (individually, an "Approved Entity," collectively, the "Approved Entities"). Upon an assignment to and assumption of this Agreement by an Approved Entity, SM shall have no further obligation to Producer whatsoever and any and all obligations owed to Licensor hereunder shall be the sole responsibility of the Approved Entity. Licensor shall have the right to assign its right to receive payment hereunder.

25. <u>Force Majeure Event.</u>
In the event the performance by either party of its duties or obligations hereunder is interrupted or interfered with by reason of any cause beyond its reasonable control including, but not limited to, fire, storm, flood, earthquake, explosion, epidemic, pandemic (inclusive of the COVID pandemic), other outbreak of disease, war, strike or labor disruption, rebellion, insurrection, quarantine, act of God, boycott, embargo, shortage or unavailability of supplies, riot, or governmental law, regulation or edict or civil protests that materially disrupt normal commerce, governmental lockdown orders and/or curfew restrictions that negatively impact such party's normal business operations, stay-at-home orders or guidelines that limit individuals to return to normal work conditions and major economic disruptions (unemployment above 15% as reported for any month by the Bureau of Labor Statistics, a depression or a sustained recession with an economic contraction over three consecutive months of an aggregate GDP contraction of 10% or more) (collectively, "Force Majeure Event"), such party shall not be deemed to be in default of this Agreement by reason of its non-performance due to such Force Majeure Event, but shall give notice to the other party of the Force Majeure Event. In such event, such party shall resume the performance of its duties and obligations hereunder as soon as reasonably practicable after the end of the Force Majeure Event.

26. <u>Notice and Cure.</u>
No failure by either party to perform any of its obligations under this Agreement shall be deemed a material breach, until the party claiming breach has given the party alleged to be in breach written notice of its failure to perform and such failure has not been corrected within thirty (30) days (or within ten (10) days for failure to pay) from and after the giving of such notice, provided that such notice has specifically delineated the alleged breach in reasonably sufficient detail to enable a cure. In the event the alleged breach is incapable of cure within thirty (30) days, the cure period shall be extended for a reasonable time to enable the cure to be affected (if curable).

27. <u>Representations, Warranties, & Indemnities.</u>
   a. Both parties hereto warrant and represent that they each have the right and power to enter into this Agreement, to grant all rights granted herein, and to perform all of their respective obligations.

   b. Licensor warrants and represents that (i) Licensor owns or controls all rights in and to the Picture and in and to all literary, dramatic and musical material included therein

required for SM to exercise the granted Rights, without any lien, claim or other encumbrance thereon (other than customary liens of the financiers, lender, bond company and guilds); (ii) all musical compositions for the Picture have been cleared for in-context use and out-of-context use (including use in advertising and publicity of the Picture and the DVD menu) in all media, now known, within the Territory, for the duration of Term, and licensed music is cleared for in-context use only; (iii) all licenses of any material licensed for use in connection with the Picture contain language to the substantive effect that the licensor of such material has not and shall not commit any act likely to prevent or hinder the full enjoyment of the rights that are licensed hereunder; (iv) no part of the Picture nor any use of the Picture by SM or its licensees in exercising the granted Rights will violate or infringe upon any rights, including but not limited to copyright, publicity, or name and likeness rights, of any third party; (v) other than SAG-AFTRA and WGA, there are no guilds or unions that may claim jurisdiction over the services to be rendered hereunder and no collective bargaining agreements covering the Picture; (vi) subject to any third party contractual obligations notified to SM on or prior to delivery, that all persons furnishing services in connection with the Picture have authorized or will authorize the use of their name, likeness and biographical data in connection with the advertising and promotion of the Picture in such manner as SM shall reasonably determine; and (vii) there is no action, suit, claim or proceeding pending, affecting or, to the best of Licensor's knowledge, threatened against the Picture.

c.  SM warrants and represents that it is a company validly existing and in good standing under the laws of its domicile.

d.  Licensor will defend, indemnify and hold harmless SM (including its officers, directors, owners, shareholders, employees and agents) against any and all third party claims and expenses (including, without limitation, reasonable outside attorneys' fees) and liabilities due to i) Licensor's breach of any of its obligations, representations or warranties set forth in this Agreement, ii) Licensor supplying SM with any incorrect, inaccurate or incomplete information pursuant to this Agreement, including the Delivery Schedule, iii) SM being required to make any payments to any union, guild or labor organization (other than payments pursuant to Paragraph 16 above), or if any member thereof claims that SM's payment based upon the information supplied by Licensor to SM is incorrect, inadequate or insufficient. Licensor will remain responsible for honoring Licensor's indemnities despite any assignment, expiration or termination of this Agreement.  SM will defend, indemnify and hold harmless Licensor (including its officers, directors, partners, owners, shareholders, employees and agents) against any and all third party claims and expenses (including, without limitation, reasonable attorneys' fees) and liabilities, due to SM's breach of any of SM's obligations, representations or warranties set forth in this Agreement and from SM's creation of any promotional and marketing materials (excluding any elements provided by Licensor). Licensor will remain responsible for honoring Licensor's indemnities despite any assignment, expiration or termination of this Agreement.

28. <u>SM Security Interest</u>.

In order to secure SM's ownership and control of the Licensed Rights, Licensor hereby grants to SM a continuing, first priority lien and security interest after any guild security interests (WGA and SAG-AFTRA) in and to the Licensed Rights and any results, proceeds or products therefrom in the Territory, including without limitation, the physical materials specified in the Delivery Materials and all other rights and materials as more specifically set forth in Exhibit A of Schedule C and Exhibit A of Schedule D (collectively, the "Collateral"). SM shall have all the rights of a secured party under the Uniform Commercial Code of New York and/or any other state designated by SM and the right to pursue and exercise any and all remedies available to a secured party at law, in equity or otherwise. This security interest shall commence on the date hereof and shall continue throughout the Territory until expiration of the Term and shall be senior to all other security interests, liens, pledges, charges and encumbrances (other than to the WGA and SAG-AFTRA). In order to evidence further SM's security interest, Licensor shall execute and deliver to SM any and all documents that SM may reasonably deem necessary or desirable, including without limitation any and all customary security documents as required under the Uniform Commercial Code of New York, and/or any other state reasonably designated by SM. Licensor agrees to execute such other and further documents, including but not limited to, laboratory access letters, a Short Form Assignment of Rights in the form attached here to as Schedule "B", a Copyright Mortgage and Assignment in the form attached hereto Schedule "C", and other security documentation consistent herewith reasonably required by SM, to be negotiated in good faith, and any such other document as SM may reasonably require to perfect, protect or evidence the foregoing security interest. SM shall have the right to file a UCC-1 in the form attached here as Schedule "D". In the event that Licensor fails to execute and deliver any security documents or other documents and instruments required by SM that are consistent with the terms of this Agreement within five (5) business days following Licensor's receipt of SM's request therefor, Licensor hereby appoints SM as its true and lawful attorney-in-fact (it being acknowledged that such appointment is irrevocable and coupled with an interest) with full power of substitution and delegation to make, execute, deliver and file any and all such documents and instruments and to enforce and protect SM's rights hereunder and to prevent the infringement thereof, and to litigate and collect and receive all damages, penalties and other recoveries arising from any such infringement and, in SM's sole discretion, to join Licensor as a party plaintiff or defendant in any such action or proceeding. SM shall provide Licensor with copies of any such documents executed on behalf of Licensor pursuant to this Paragraph 28; provided that an inadvertent failure to do so shall not be a breach of this agreement by SM. Licensor shall cooperate with SM in connection with any suit or action threatened or instituted by or against SM relating to any rights granted or to be granted to SM, to the full extent of Licensor's ability. Upon an uncured material breach by Licensor hereunder, SM shall have the right to proceed against the Collateral, and to exercise any and all rights and remedies of a secured creditor, as SM shall determine.

29. <u>Errors & Omissions.</u>

Licensor hereby acknowledges that it will deliver original certificates of insurance and endorsements thereto evidencing Licensor's Errors and Omissions coverage reflecting no

material exclusions and in a form and substance satisfactory to SM meeting all of the following requirements (all as more detailed in Schedule A): SM shall be named as an additional insured for any and all media and any of its licensees may be named as additional insured at SM's request; the limits of coverage shall be for not less than Three Million Dollars ($3,000,000) for each claim and Five Million Dollars ($5,000,000) aggregate for all claims; the policy deductible shall be no greater than Twenty Five Thousand Dollars ($25,000); the policy term shall expire no earlier than three (3) years following delivery of the Picture to SM with a Term Rights Endorsement.

30. <u>Miscellaneous.</u>
This Agreement is not a partnership between or joint venture of the parties hereto and neither party is the agent of the other. This Agreement is not for the benefit of any third party, whether or not referred to herein. This Agreement is governed by and must be construed in accordance with the laws of the state of New York, without regard to conflicts of law provisions.  Each of the parties hereto agrees that any dispute under this Agreement shall be resolved by binding arbitration conducted under the auspices of the Independent Film and Television Alliance ("IFTA") in effect as of the date the request for arbitration is filed (the "Rules") before a single, neutral arbitrator, selected in accordance with the Rules.  Each of the parties may initiate such arbitration pursuant to the Rules.  The arbitration shall be held in the New York, New York (such site being herein referred to as the "Forum").  Each of the parties agrees that it will abide by any decision rendered in such arbitration, and that any court having jurisdiction may enforce such a decision.  Each of the parties hereto submits to the non-exclusive personal jurisdiction of the courts of the Forum as an appropriate place for compelling arbitration or giving legal confirmation of any arbitration award.  Each of the parties agrees that service of process for all arbitration proceedings may be made in accordance with the Rules and shall be deemed effective as provided therein. This Agreement, together with any schedules and exhibits hereto, contains the entire understanding of the parties hereto relating to the subject matter hereof and no terms, obligations, representations, promises, conditions (whether written or oral, express or implied) relating to the subject matter hereof have been made or relied upon, other than those contained herein.  This Agreement may not be modified, nor may any provision be waived, except in a writing signed by both parties hereto.  Payment under this Agreement will not operate as a waiver under any provision hereof.  No waiver of any breach or default under this Agreement will operate as a waiver of any preceding or subsequent breach or default. Nothing contained herein constitutes a partnership between or joint venture by the parties hereto or constitutes either party the agent of the other.  Neither party shall hold itself out contrary to the terms of this Paragraph and neither party will become liable by any representation, act or omission of the other contrary to the provisions hereof.  The headings and subheadings of the sections of this Agreement are inserted for convenience of reference only and do not control or affect the meaning or construction of any of the agreements, terms, covenants and conditions of this Agreement in any manner. This Agreement has been fully reviewed and negotiated by the parties and their respective legal counsel.  Accordingly, in interpreting this Agreement, no weight will be placed upon which party or its counsel drafted the provision being interpreted. Only the final, executed Agreement is admissible as the written agreement between the parties.  If this

April 26, 2021
NAKED SINGULARITY
Page 15

Agreement has been revised during the course of negotiation, such revisions and prior drafts incorporating such revisions or original language may not be used, and will not be admissible, as evidence for any purpose in any litigation that may arise between the parties. If any term or provision of this Agreement is found to be void or contrary to law, such term or provision will, but only to the extent necessary to bring this Agreement within the requirements of law, be deemed to be severable from the other terms and provisions of this Agreement, and the remainder of this Agreement will be given effect as if the parties had not included the severed term herein. This Agreement may be executed in two or more counterparts, each of which is deemed an original but all of which together constitute one and the same instrument. This Agreement and any amendments to it may be executed in any number of counterparts each of which taken together shall be deemed to constitute one and the same agreement and each of which individually shall be deemed to be an original, with the same effect as if the signature on each counterpart were on the same original.  Delivery of an executed counterpart of this Agreement by facsimile or transmitted electronically in either a Tagged Image Format File ("TIFF") or Portable Document Format ("PDF") shall be equally effective as delivery of a manually executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by facsimile, TIFF or PDF shall also deliver a manually executed counterpart of this Agreement, but failure to do so shall not affect the validity, enforceability, of binding effect of this Agreement. Except as otherwise required by applicable federal and/or state law, neither party shall disclose to any unrelated third party any information with respect to the terms and provisions of this Agreement during the Term of this Agreement and thereafter, except: (a) to the extent necessary to comply with law, administrative order or rule or the valid order or decree of a court of competent jurisdiction, in which event the party required to make disclosure shall so notify the other and shall seek confidential treatment of such information, or (b) as part of its normal reporting or review procedure to its partners, divisions, affiliates, financiers, financial advisers, auditors, attorneys, and profit participants (to the extent deemed necessary by the disclosing party) (collectively, "Representatives"); provided, however, that any and all such Representatives agree to be bound by the confidentiality provisions of this Paragraph 30 prior to disclosure.

If the terms set forth above meet with your approval, please so indicate by signing in the space provided below.

Yours truly,

**SM CONTENT, LLC**

By:_____

1/5/22

AGREED TO AND ACCEPTED

**LICENSOR**

By:_____    John Zois

April 26, 2021
NAKED SINGULARITY
Page 16

Date:_____10/22/21_____

SCHEDULE A

## DELIVERY MATERIALS AND REQUIREMENTS

The following materials shall be delivered to the attention of Screen Media Ventures, LLC as SM's duly authorized agent and representative ("Licensee's Representative"):

Screen Media Ventures, LLC
Alex Girard
Director of Laboratory Services 800 Third Avenue
New York, NY 10022

All Delivery Materials set forth in Sections 1, 2, and 3 below shall be of the highest technical quality, shall be free from defects, shall conform to the final edited version of the Picture and shall, except as may be specifically provided below, be in the same ratio of camera picture images in which the Picture was photographed (original aspect ratio).

All Delivery Materials set forth in Sections 1, 2, and 3 below will be delivered by Licensor by way of (a) making physical delivery of the following materials at Licensor's sole expense, and (b) granting access to such materials by a fully executed Irrevocable Laboratory Access Letter. Unless indicated otherwise in the Agreement, SM shall have thirty (30) days following Licensor's complete delivery of each and every of the Delivery Materials hereunder in which to inspect and evaluate all the Delivery Materials to determine whether delivery has been effected in accordance with the terms of the Agreement and Licensor shall have fifteen (15) days to deliver any missing Delivery Materials or remedy any defective Delivery Materials.

## SECTION 1 – ARCHIVAL MATERIALS

A.  Digital Source Master
Deliver one (1) archive of the 4K DSM (digital source master) of the final color graded full frame digital intermediate ("DI") files, using LTFS file system without compression or encryption of any kind. Delivery on LTO7 (or latest industry standard equivalent).

B.  Textless Backgrounds
Deliver one (1) of the 4K DSM data files of final color graded textless background materials (i.e., without any superimposed lettering of the main and end titles and all descriptive titles, including backgrounds for inserts). Delivery on LTO7 (or latest industry standard equivalent).

C.  Video Assembly Master
Deliver one (1) ungraded DSM of the final conformed Picture with same as source bit depth (highest possible). Deliver on LTO7 (or latest industry standard equivalent). Included textless material.

## SECTION 2 – THEATRICAL MATERIALS

April 26, 2021
NAKED SINGULARITY
Page 18

Producer shall deliver the following elements to a lab of SM's choosing:

A.  Feature DCDM
Deliver one (1) 4K DCDM (xyz 16-bit tiff) containing texted feature along with all textless backgrounds and subtitle elements. Delivery on LTO6 (or latest industry standard equivalent)

This master is to conform to the standards of digital cinema masters at the time of delivery. The master must be fully color corrected for presentation in a current digital cinema theater (current DCI compliant color space is 'DCI P3') and must contain a comparable Dolby 5.1 soundtrack (i.e., Printmaster), which is in perfect synchronization with the picture.

    i.    Image format scope 2048 x 858
   ii.    Image format flat 1998 x 1080

B.  Feature DCP - Two (2) Versions
DCPs will be fully DCI-compliant conforming to SMPTE 428-1-2006 D-Cinema Distribution Mastering specifications, in JPEG 2000 format (ISO/IEC 15444-1) with a set of DKDMs. SM's required logo to be included at the head of the feature. DKDM should be open for 10 years designated to SM's lab of choice.

Please have the DCP delivered on CRU drive with an additional digital file delivery via Aspera, Signiant or other secure digital delivery method as agreed by SM to a link to be provided by SM.

Texted version - fully titled with main and end credits. If any non-English dialogue contained in the film, DCP to be wrapped/packaged with separate English language subtitle stream (XML format). Final DCP to include closed caption files as side car.

    i.    *Festival DCP- Deliver one (1) encrypted DCP in 24 fps of texted feature with subtitle streams as applicable in EXT3 format. Delivery on CRU drive in rugged shipping case labeled with CPL name.

   ii.    Final DCP - Deliver one (1) encrypted DCP in 24 fps of texted feature with subtitle streams as applicable in EXT3 format. Delivery on CRU drive in rugged shipping case labeled with CPL name.

## SECTION 3 – VIDEO ELEMENTS

Each of the following must be new, fully color-corrected and of the highest technical quality and condition. Materials will be QC'd by Deluxe after delivery. If requested, licensor will provide fix patches for materials deemed of insufficient technical quality in the QC report. SM reserves the right to make repairs and deduct the associated costs from the Advance payment.

Where SM has been granted theatrical rights, an unencrypted DCP of the feature will be delivered to SM digitally or via lab access.

April 26, 2021
NAKED SINGULARITY
Page 19

In the event Picture was shot in 4K additional language below applicable:

A.  <u>UHD Master Feature Quicktimes Plus Textless</u>
If Picture was shot in 4K or higher resolution, delivered via electronic or physical delivery of final color timed master (CTM) UHD master. Must be delivered with an approved QC report from a lab pre-approved by SM.

    i.    UHD SDR File (100 nit) QuickTime (.mov) ProRes 422 HQ; Rec. 709; 23.976 fps; 3840x2160 (letterboxed OAR)

    ii.    UHD HDR File -(1000 nit) QuickTime (.mov) ProRes 422 HQ; Rec. 2020 (DCI P3); White Point D65; EOTF: SMPTE 2084 (PQ); 23.98fps; 3840x2160 (letterboxed OAR)

An HDR metadata file with Max CLL, Max FALL and Master Reference Display values is to be provided in a separate text file.

**File Specifications:**

    i)  <u>Head Build</u>
        1.  00:59:51:23 – 00:59:52:00 – Slate
        2.  00:59:51:23 – 00:59:52:00 – Framing Chart
        3.  00:59:52:00 – 1:00:00:00 – Picture Start / 8 Second. Countdown
        4.  00:59:58:00 – 2-Pop
        5.  1:00:00:00 – First Frame of Action (FFOA)

    ii)  <u>Audio</u>
        1.  10 Channels – 5.1 (Nearfield) + LtRt (Nearfield) + SLtRt M&E (Nearfield) + LtRt DME
        2.  Encoding: Linear PCM
        3.  Channel Configuration
            a.  Ch. 1: Left
            b.  Ch. 2: Right
            c.  Ch. 3: Center
            d.  Ch. 4: LFE
            e.  Ch. 5: Left Surround
            f.  Ch. 6: Right Surround
            g.  Ch. 7: Left Total
            h.  Ch. 8: Right Total
            i.  Ch. 9: Stereo M&E Left
            j.  Ch. 10: Stereo M&E Right
            k.  Ch.11: Split Track Stereo 2.0 Dialog Left
            l.  Ch.12: Split Track Stereo 2.0 Dialog Right
            m.  Ch.13: Split Track Stereo 2.0 Music Left
            n.  Ch14: Split Track Stereo 2.0 Music Right
            o.  Ch15: Split Track Stereo 2.0 Effects Left

   p. Ch16: Split Track Stereo 2.0 Effects Right
   q. Ch17: Split Track Stereo 2.0 Narration Left (if applicable)
   r. Ch18: Split Track Stereo 2.0 Narration Right (if applicable)

  iii) Textless elements are to be provided at tail starting 1 minute (60 seconds) after the last frame of action (LFOA) [see Note A below]

  iv) File name must be in the following format:
     Picture-Name_FTR_Version_Codec_Resolution_Aspect-Ratio_Audio-Layout_YYYYMMDD.ext

*Note A: For Picture with more than 25% Subtitles:*
*Licensor shall deliver the following fully textless masters of all versions above. In the event the film is entirely in a non-English language, a fully texted, but non-subtitled version is to be provided as well. Texted versions should have English subtitles for foreign language dialog should be burned into picture.*

B. *High-Definition Video Masters
 Delivery via USB 3.0 Hard Drive or digital delivery (Aspera) of the full feature with the following spec requirements:

  i. Apple ProRes4444 or 4444XQ .mov file per the highest quality available for source materials.
  ii. 4096x2160 or 3840x2160 resolution
  iii. 10 or 12-bit color
  iv. If HDR available, please include requisite HDR10 or HDR Dolby Vision Metadata File
  v. 23.98 FPS, Progressive Scan
  vi. 8-Channel Full-Mix Audio (Ch. 1-6: 5.1 Surround arranged LRCLfeLsRs, Ch. 7-8: Stereo Full Mix arranged LtRt)
  vii. Textless Material for the feature, if available/applicable, either tied to the tail of the feature file or delivered as a separate .mov file in the same resolution/codec/frame rate as the main feature.
  viii. If available, a content-edited version suitable for television broadcast in the United States per OBIN Guidelines
  ix. Trailer, if available, delivered with the same spec requirements as the feature.

C. Audio Masters
 In addition to the audio embedded in the feature file as outlined in Section a, the following separate audio files for the feature (and trailer, if available) shall be supplied on the delivery hard drive or digitally as 24-Bit .WAV or .AIFF

  i. Full, contiguous dialogue/music/effects stems for all 8 channels of audio (5.1 and Stereo) with separate combined M&E versions.
  ii. Undipped Score as separate files.

D.  **\*Closed Captioning Files**
When available, delivery of English caption files in Deliver separate .xml or .scc file used to encode the video masters as electronic file and formatted, conformed to the final version of the feature.

E.  Titles/Graphics
Delivery of all high-res digital elements used to generate graphics, inserts, dates, captions, translation, main titles, edit titles, local titles etc. Additionally, titles shall appear within 1.78 TV aspect ratio "safe title area.". Please provide a document with time coded log for placement of all titles, graphics, inserts, dates, captions etc. as relates to the Picture.

F.  \*Screening Copy
One BluRay DVD and Standard DVD screening copy of the Picture.

G.  TV/Airlines Version
If required, the TV/Airline version must meet rating, censorship, and television exhibition requirements in the United States. The Picture must have a running time of no less than 90 minutes.

    i.  ProRes 422 HQ Master (following above HQ ProRes 422 specs)

H.  **\*Metadata Sheet (template to be provided by SM)**

    i.  Legally approved and cleared "Title" name
    ii.  Long Synopsis (1000 maximum characters including spaces)
    iii.  Short Synopsis (190 maximum characters including spaces)
    iv.  Run time for the feature
    v.  Rating / Rating explanation issued by the MPA
    vi.  Genre
    vii.  Cast/Director
    viii.  Copyright name and year of the film
    ix.  Release Year

I.  Bonus Features (if available)
To be supplied as Apple ProRes422HQ or 4444/ 24-bit .WAV or AIFF as appropriate: all customary potential DVD/BD//VOD Bonus enhancement materials as available, including a 'making of' documentary, full length interviews with all above the line talent and other key cast and crew about their contribution to the Pictures, all Picture out-takes of a humorous or interesting nature - including stunts/visual effects and 'bloopers', audio commentary tracks, deleted scenes, or any enhancement materials budgeted or specifically agreed with SM any other unique materials reasonably available that could assist in the marketing of the Picture's DVD/BD or VOD Package.

J.  DVD "Bonus" Materials (if applicable)

One (1) HD master containing all material. Channels 1 & 2 shall contain stereo audio. Channels 3 & 4 shall contain 100% fully filled stereo M&E. Textless background shall be attached to the tail of the video master. All material (including any music embodied therein, behind-the-scenes footage, etc.) shall be fully cleared for exploitation within the Territory.

K.  Marketing/Advertising Restrictions Memorandum
A list of materials/clips/persons, etc. that have restrictions associated with their use in advertising and promotional materials.

## SECTION 4 – EXPLOITATION RECORDS AND MATERIALS

All items to be delivered below shall be in the English language and physically delivered. If any Delivery Materials do not apply to the Picture and/or don't exist, Licensor shall provide a signed letter which represents and warrants that such Delivery Material does not apply to the Picture and/or does not exist and that SM does not and shall not have any obligations whatsoever in connection with such Delivery Material.

A.  *Combined Dialogue and Action Continuity
One (1) Word document or PDF in the English language, including translations of all dialogue not in English, of the complete final dialogue and action continuity script conformed to the theatrical version of the Picture containing all dialogue, narration and song vocals, as well as a cut-by-cut description of the picture action (identified by footage) in a form suitable for use in connection with dubbing and subtitling the Picture and conforming exactly to the photographic action and soundtrack of the Picture.

B.  Technical Specifications Sheet
One completed Technical Specification Sheet, as in Exhibit 1 of this Delivery Schedule.

C.  *Clearances
All clearances from stock footage, music, for feature and trailer.

D.  Stock Footage/Picture Clips Agreements
Valid and subsisting license agreements from all parties having any rights in any stock footage or film clips used in the Picture, granting to SM the perpetual and worldwide right to incorporate said stock footage in the Picture (and/or in trailers and television spots for the Picture) and to distribute, exhibit, advertise and otherwise exploit the Picture or any portion thereof embodying said stock footage or clips in any and all media perpetually throughout the world. Provide a detailed time coded log of each clip used in the feature, as well as proof of payment.

E.  IATSE Seal

If any part of the Picture is produced in the United States, the seal of the International Association of Theatrical and Stage Employees (IATSE) (and/or other guilds or unions having jurisdiction, if required).

F.  <u>Guilds and Unions</u>
A letter, signed by the producer or director of the Picture setting forth all United States and foreign guilds and unions whose members rendered services on the Picture.

G.  <u>SAG</u>
If the Picture was produced under the jurisdiction of SAG, completed copies of the SAG ``Final Cast Report'' covering all actors engaged in connection with the Picture, including without limitation stunt players, actors rendering singing, looping and "voice-over" services in post production and actors not appearing in the final cut of the Picture. Actors not appearing in the final cut of the Picture shall be listed on the Final Cast Report as "not photographed" or "cut."

H.  <u>DGA</u>
If the Picture was produced under the jurisdiction of the DGA: The name, social security number, loan out information (where appropriate) and job description of all DGA members engaged on the Picture; and the DGA approval of the final main and end title credits, signed by an authorized representative of the DGA. Please note: credits should only be issued to the DGA if the film is signatory to the DGA.

I.  <u>WGA</u>
If the Picture is subject to WGA jurisdiction: The name, address, social security number and loan-out information (where appropriate) for all writers receiving credit on the Picture; a copy of the notice of tentative writing credits delivered to the WGA; a copy of the final WGA notice of final determination of credit on the Picture, signed by an authorized representative of the WGA; and the WGA approval of the final main and end title credits, signed by an authorized representative of the WGA. Please note: credits should only be issued to the WGA if the film is signatory to the WGA.

J.  <u>AFM</u>
If the Picture was produced under the jurisdiction of the AF of M: Copies of all contracts for all AF of M members engaged on the Picture.

K.  <u>Location and Site Rental Agreements</u>
Duplicate originals (or clearly legible photostatic copies, if duplicate originals are unavailable) of all licenses, contracts, assignments and/or other written permissions from the

proper parties in interest, permitting the use and photographic exploitation of any and all properties photographed in the making of the Picture. All agreements must be fully executed.

L.   *<u>Key Art and Color Stills</u>

    i.    One (1) file(s) containing a color, layered, high resolution scan of the key art (PSD format preferred) with separate files for title treatment, artwork credits, formatted billing block and logos, along with 10 printed copies of the final one sheet.

    ii.    All, and no less than one hundred (100), digital files at a DPI of no less than 300 of photographs of the Picture's production. All photographs shall be suitable for use in the preparation of advertising, exhibition and publicity material for the Picture. Licensor shall deliver any and all releases from persons appearing in the photographs needed for SM's intended use thereof.

M.   <u>Publicity Materials</u>
One (1) Word document or PDF copy of biographies of each member of the principal cast and production staff, synopses and production notes and copies of all available press clippings, press kits, flyers and other publicity material created.

N.   *<u>Electronic Press Kit</u>
One (1) electronic press kit that includes (i) synopsis, production credits, and production history of the Picture; (ii) biographies of and interviews with principal cast, the director, producers, the writer(s), and any and all key members of the crew; and (iii) substantial on-set photography that includes photos of leading cast members, both individually and collectively, in costume, in character, and on set, which they have approved for use in all art.

O.   *<u>Final Main and End Credits</u>
One (1) Microsoft Word copy of the final main and end titles of the Picture as they appear on the Original Negative.

P.   *<u>Paid Ad Credits and Billing Block</u>
One (1) Microsoft Word copy of a statement of credit billings listing all cast and production credits for the theatrical, television and video complete versions of the Picture to be given in paid advertising (including posters, print and outdoor ads) with the applicable contractual language relating to such advertising, together with a layout of the advertising copy in the form of a billing block. The Paid Ad statement shall be signed by Production Counsel and the Producers.

Q.  Dubbing and Subtitling Restrictions

One (1) Microsoft Word copy of all dubbing and subtitling restrictions relating to the replacement of any artist's voice, or any other restrictions relating to dubbing or subtitling, including the dubbing of dialogue in a language other than that in which the Picture was originally recorded.

R.  *Residual Materials

One (1) copy of the final cast list as prepared by Licensor's payroll company from which all residuals are to be calculated. Licensor shall also provide a written statement setting forth any and all guilds which may be applicable to the Picture (i.e., SAG, WGA, DGA, IATSE, AFofM, AFTRA, DGC [Director's Guild of Canada], etc.).

S.  *Music Cue Sheet (for feature and trailer)

One (1) Microsoft Excel or Microsoft Word copy of the music cue sheet detailing the particulars of all music contained in the final version of the Picture, including the title of each composition; the names and addresses of the composers, publishers, and copyright owners; the usages and the number of such uses; the place of each composition showing the film footage and running time of each cue; the performing rights society involved for each composer and publisher; the percentage of ownership for each composer and publisher; and, any other information customarily set forth in music cue sheets.

T.  Music License Materials

One (1) copy of each music synchronization, master use and performance license covering each musical composition embodied in each version of the Picture. Where any music performance license is claimed to be available by blanket license from a performing rights society, Licensor may, in lieu of an individual license, provide copies certified by Licensor to be complete and accurate in all material respects, of the composer, lyricist, and publisher affiliation agreements with the applicable performing rights society and the inclusion of the subject musical composition in the performing rights society's catalogue.

U.  Cast and Technical Personnel List

One (1) Microsoft Word or PDF copy of a list indicating: (i) the names of the character portrayed by each cast member; and (ii) the names of all technical personnel (including their title or assignment) involved in the production of the Picture.

V.  *Talent and Production Agreements

One (1) copy of all agreements or other documents related to the engagement of all personnel and facilities in connection with the Picture, including those for individual producer(s), the director, editor, casting director, director of photography, unit production manager, 1st and

April 26, 2021
NAKED SINGULARITY
Page 26

2nd assistant directors, AFofM members, all artists other than crowd artists, music composer and conductor, technicians and administrative staff.

W. \*<u>Chain of Title Documents</u>

Licensor shall deliver the following documents to SM prior to the execution of this Agreement:

    i.    **Contracts:** One (1) fully executed original copy of any and all documents, instruments and contracts pertaining to the acquisition of all underlying materials, including all literary and/or screenplay material, upon which the Picture is based, including but not limited to, assignments, licenses, consents and releases pertaining to all works of authorship and rights under copyright, trademark and other property or third party rights purchased and/or licensed by Licensor which evidences Licensor's chain of ownership in and to the rights granted to SM in connection with the Picture. With respect to any non-English documents, a certified copy of the English translation thereof will be concurrently delivered to SM.

    ii.    **Short Form Assignment.** One (1) fully executed original copy of a Short Form Assignment executed by a duly authorized principal or officer of Licensor in the presence of a Notary Public. Such document is attached to this Agreement as Schedule B.

    iii.    **Copyright Certificates.** One (1) copy of a Form PA copyright registration certificate(s) and any renewal certificate(s) for the Picture and the Underlying Material plus evidence of filing with the U.S. Copyright Office for recordation (i.e., a copy of the cover letter and payment of the filing fee or a copy of the recorded Form PA as registered with the U.S. Copyright Office).

    iv.    **Copyright and Title Reports:** One (1) copy of a copyright report and one (1) copy of a title report issued within the last six (6) by Thomson & Thomson or a similar institution known within the entertainment industry to provide such services.

    v.    **Literary Materials.**

X. <u>Other Documentation</u>

One (1) fully executed original copy of each of the following documents:

    i.    Certificate of Origin executed by a duly authorized principal or officer of Licensor.

    ii.    Copyright Mortgage and Assignment executed by a duly authorized principal or officer of Licensor in the presence of a Notary Public.

April 26, 2021
NAKED SINGULARITY
Page 27

    iii.    Form UCC-1 executed by a duly authorized principal or officer of Licensor.

    iv.    One Metadata sheet as outlined above.

    v.    Release of Liens.

    vi.    Final Audited Budget.

    vii.    Lab Acknowledgement.

    viii.    Log-in information for any official social media accounts for the Picture.

Y.  Production Schedules

    i.    Electronic copy of all production calendars and updates generated.

    ii.    Electronic copy of all post production calendars and schedule along with their updates.

    iii.    Cast and Crew contact sheets.

Z.  Social Media Information

One (1) typewritten copy of a list indicating (i) any and all social media accounts created to promote the Picture, and (ii) their corresponding login information.

**SECTION 5 – INSURANCE CERTIFICATES AND ENDORSEMENTS**

Physical delivery of separate original Certificates of Insurance and Endorsements thereto evidencing Licensor's Errors and Omissions coverage reflecting no material exclusions and in a form and substance satisfactory to SM meeting all of the following requirements:

A.  Certificates

Each of the following will be named as additional insureds on separate original Certificates of Insurance:

    i.    SM and any direct or indirect parent, subsidiary and affiliate, and the successors, licensees, assigns and customers of each of them, and the officers, directors, agents, attorneys and employees of each of them, at 800 Third Avenue, New York, NY 10022 USA.

    ii.    Licensor's limits of coverage, not less than US$3,000,000 for each claim and US$5,000,000 aggregate for all claims.

    iii.    A policy deductible no greater than US$25,000.

    iv.    A policy term expiring not earlier than three (3) years following delivery of the Picture to SM with a Term Rights Endorsement.

April 26, 2021
NAKED SINGULARITY
Page 28

     v.    Inclusion of all media including DVD extras, title and music coverage.

B.  <u>Endorsements</u>

Each of the above-referenced separate original Certificates of Insurance must be accompanied by separate original endorsements thereto evidencing the named additional insureds interest in the Picture and reflecting the following language:

     i.    During the term of Licensor's coverage, Licensor's coverage will be primary, and any insurance coverage provided by the named additional insured will apply solely to the benefit of the named additional insured as excess insurance over and above Licensor's coverage.

    ii.    Licensor's insurance may not be modified, revised or canceled without separate thirty (30) days prior notice to each named additional insured at their addresses indicated above.

   iii.    With respect only to SM's Endorsement, the following additional language must be reflected thereon: The insurance carrier will at no additional cost name any other person(s) as additional insureds and issue to such person(s) a separate original Certificate of Insurance and separate original Endorsement thereto evidencing Licensor's Errors and Omissions coverage upon the request and designation of SM Ventures, LLC at any time during the policy term. Each separate original Certificate of Insurance and separate original Endorsement thereto will be delivered to SM on the date Licensor obtains the policy, but, with respect to any Picture which has not commenced production as of the date of the Agreement, in no event later than commencement of principal photography or the date any such policy or binder of coverage or endorsement is provided to the production lender. SM will be responsible to deliver such original documents to each named additional insured. Licensor shall also deliver to SM evidence of Licensor's payment in full of the premium for the Errors and Omissions insurance policy for the entire policy term required above.

C.  <u>Appointment of Agent Under Agreement</u>

If Licensor's Errors and Omissions insurance carrier is foreign domiciled and such insurance carrier is pre-approved by SM, Licensor must also deliver to SM, at Licensor's expense, an executed "Appointment of Agent Under Agreement" letter, in a form and substance satisfactory to SM, appointing a U.S. domiciled "agent for service of process" on behalf of the insurance carrier, as its agent for service of process in connection with any process in connection with any proceeding in the courts of the State of New York and of the court of the United States of America for the District of New York relating to any suit, action or other proceeding arising out of the Agreement or otherwise related to the Picture.

April 26, 2021
NAKED SINGULARITY
Page 29

D.  <u>Personal Services Contracts</u>

Duplicate originals (or clearly legible photostatic copies, if duplicate originals are unavailable) of all fully executed agreements or other documents related to the engagement of all above-the-line and/or below-the-line personnel in connection with the Picture, including those for individual producer(s), the director, all writers, all actors, other than extras, all interview subjects, technicians and administrative staff.

E.  <u>Negative Cost Statement</u>

A statement of the final negative cost of the Picture, certified as being true, correct and complete by an officer of Company; and a "top sheet" from the final budget for the Picture (signed by the producer and director) showing the components of negative cost and any adjustments thereto.

F.  <u>Subordination Agreements</u>

Fully executed Subordination Agreements in form and substance satisfactory to SM, from any entity to whom Company sold, transferred, assigned, mortgaged, pledged, charged, hypothecated or otherwise disposed of its rights in and to the Picture prior to the conveyance to SM.

***Denotes Essential Delivery Item. In the event Licensor fails to deliver any of the above items and SM elects to manufacture such items, it shall have the right to do so, and the costs thereof shall be deducted from the Advance.***

April 26, 2021
NAKED SINGULARITY
Page 30

**EXHIBIT 1**
**For**
**SCHEDULE A**

**Technical Specification | Contact Sheet**

GENERAL FACT SHEET FOR "TITLE"

Questionnaire Completed by: _____

Production Company (or Licensor): _____

Telephone No.: _____ Fax No: _____

Original Program Title: _____

Alternate Title (if any): _____

Foreign Language Title: _____

Language of Original Version: _____

Original Capture Format:  Film? _____ (mm) HD video? _____(fps) SD video? _____ (fps)

Existing Picture Formats:  Film? _____ (mm) HD video? _____(fps) SD video? _____ (fps)

Existing Sound Formats:   Dolby SR? ____ Dolby E? __ Dolby SRD? ____ SDDS? ____ DTS? _____

Is Program Subtitled? _____  In What Language(s)? _____

Is Program Dubbed? _____  In What Language(s)? _____

Color or B&W? _____Main & End Titles Over Black? _____

Number of Reels: _____ Length of Film in Feet: _____

Running Time in Minutes: _____Film Stock Used (if applicable Kodak, etc.): _____

Aspect Ratio: _____Super 35? _____  If Yes, Common Center or Top? _____

Additional video / audio Materials: (Please list any additional materials that already exist, or are being produced that may be of use for the creation of the DVD, or for promotion of the film – *ex. Interviews, Commentaries, Deleted Scenes, Featurettes / Behind the Scenes Footage, Existing Trailers, or EPK's . . .*

Element: _____     Existing Format: _____
Element:_____     Existing Format: _____
Element: _____     Existing Format: _____

April 26, 2021
NAKED SINGULARITY
Page 31

Element: _____    Existing Format: _____

Genre (Drama, Comedy, Musical, etc.): _____

Principal Photographic Locations: _____

Period of Principal Photography: _____

Copyright Notice in U.S.? _____    Year of Production: _____

Name of Copyright Owner/Claimant & Address: _____

_____

Copyright in Other Countries (specify): _____

Name of Author for Copyright Purposes of the Following:

      A) Underlying Property: _____ Citizenship: _____

      B) Screenplay: _____ Citizenship: _____

      C) Film: _____ Citizenship: _____

Date of First Lawful Availability to Public (if previously distributed): _____

Date & Location of First Public Screening:_____

Initial U.S. Theatrical Release Date (if previously distributed): _____

Foreign Release Dates (if previously distributed):

| Country | Date |
|---------|------|
|         |      |
|         |      |
|         |      |

Name of Person(s) and/or Company(s) Involved in Financing of Film: _____

_____

   Address: _____

Principle Executive Involved in Making of Film: _____
   Address: _____

Film Production Company:_____

April 26, 2021
NAKED SINGULARITY
Page 32

Address: _____

Telephone no.:_____

Producer(s): _____

Director: _____ DGA Accredited? _____

Writer: _____ WGA Accredited? _____

Cinematographer: _____ Unit Photographer: _____

Principal Cast Members:_____

_____

Do the Credits Comply with the Regulations Set Forth by the DGA? _____ WGA? _____

Affiliated Guilds (Please list all guilds, including, but not limited to: DGA, WGA, SAG, IATSE, AF of M, ACTRA, Equity etc.)  _____

_____

Approximate Total Cost of Production (in US $):  Production Only: _____

April 26, 2021
NAKED SINGULARITY
Page 1

## SCHEDULE B

## **SHORT FORM ASSIGNMENT OF RIGHTS**

For good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, 150 Degrees Pictures, LLC   ("Licensor") hereby transfers and assigns to SM Content, LLC ("SM") and SM's successors and assigns, the certain distribution rights and all other rights described in the distribution agreement dated as of April 26, 2021, by and between Licensor and SM (herein "Agreement") for the Territory and solely during the Term described in the Agreement, in and to the motion picture presently entitled "Naked Singularity" (herein "Picture").

Licensor hereby appoints SM, its successors and assigns, as its irrevocable Attorney-In-Fact with the right (but not the obligation) to (i) obtain and secure copyright protection (and renewal and extensions thereof) for the Picture specified above; (ii) to enforce and protect all rights, licenses and privileges granted herein or pursuant to the Agreement and granted under any and all copyrights (and renewals thereof), and (iii) to prevent any infringement of said copyright and to litigate, collect and receive all damages arising from such infringement of such rights, licenses and privileges, using the name of the Licensor (in the discretion of the SM) and joining Licensor as party plaintiff or defendant in any suit or proceeding (in the discretion of SM).  Licensor agrees to cooperate with SM in any suit or action instituted by SM hereunder.

Licensor agrees to execute and deliver and cause to be executed and delivered to SM any and all documents and instruments necessary to effect and complete the transfer to SM of all rights granted pursuant to the Agreement.  In the event Licensor fails to execute and deliver such other documents and instruments promptly upon demand therefore by SM, SM is hereby authorized and appointed Attorney-In-Fact of and for the Licensor to make, execute and deliver any and all such documents and instruments. SM shall provide Licensor with copies of any such documents or instruments executed on behalf of Licensor pursuant to such appointment.

It is understood that SM's aforementioned powers as Attorney-In-Fact of and for the Licensor are powers coupled with an interest and irrevocable.  This Assignment and the provisions hereof shall be binding upon Licensor, its successors and assigns.

This Assignment shall be subject to the terms and conditions of the Agreement.

IN WITNESS WHEREOF, the Licensor has duly executed this Assignment as of April 26, 2021.

SM Content, LLC                                        150 Degrees Pictures, LLC

By:   Andrew Kotliar                                   By:   Ross Jacobson
Its:   Manager                                         Its:   CEO

April 26, 2021
NAKED SINGULARITY
Page 1

SCHEDULE C

## COPYRIGHT MORTGAGE AND ASSIGNMENT
### (*"Naked Singularity"*)

**150 Degrees Pictures, LLC,** a New York limited liability company ("**Mortgagor**") and SM Content, LLC, a limited liability company ("**Mortgagee**"), are party to that certain Distribution Agreement dated as of April 26, 2021, as amended, supplemented or otherwise modified from time to time (as amended, supplemented or otherwise modified from time to time, the "**Distribution Agreement**"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Distribution Agreement.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, pursuant to the Distribution Agreement, Mortgagor hereby mortgages, assigns, transfers, sets over, conveys, grants and delivers to Mortgagee and grants to Mortgagee a security interest, copyright mortgage and lien in and to all of Mortgagor's right, title and interest in and to the collateral described on **Exhibit A** attached hereto and incorporated herein by this reference, wherever located, whether now in existence or hereafter created, and whether now owned or hereafter acquired during the Term (such collateral is collectively referred to herein as the "**Collateral**").

Mortgagor agrees that if any Person shall do or perform any acts which Mortgagee reasonably believes to constitute a copyright infringement of the Collateral or constitute a plagiarism, or violate or infringe any rights of any Mortgagor or Mortgagee therein, or if any Person shall do or perform any acts which Mortgagee reasonably believes to constitute an unauthorized or unlawful distribution, exhibition, or use of the Collateral or any rights therein, then and in any such event, Mortgagee may and shall have the right to take such steps and institute such suits or proceedings as Mortgagee may deem advisable or necessary to prevent such acts and conduct and to secure damages and other relief by reason thereof, and to generally take such steps as may be reasonably advisable or necessary or proper for the full protection of the rights of the parties. Mortgagee may take such steps or institute such suits or proceedings in its own name or in the name of Mortgagor or in the names of Mortgagee and Mortgagor jointly.

Mortgagor further agrees that the rights and remedies of Mortgagee with respect to the security interest and copyright mortgage granted hereby are as more fully set forth in the Distribution Agreement.

In order to effectuate the rights described in the foregoing paragraph, Mortgagor hereby irrevocably constitutes and appoints Mortgagee its lawful attorney-in-fact to do all acts and things permitted or contemplated by the terms hereof and Mortgagee shall provide Mortgagor with copies of any documents or instruments executed on behalf of Licensor pursuant to such appointment (provided that an inadvertent failure to do so shall not be a breach by Mortgagee). Without limiting the generality of the foregoing, the aforesaid conveyance and assignment includes with respect to the rights granted all prior choses-in-action, at law, in equity and

April 26, 2021
NAKED SINGULARITY
Page 2

otherwise, the right to recover all damages and other sums, and the right to other relief allowed or awarded at law, in equity, by statute or otherwise.

This Copyright Mortgage and Assignment is made expressly subject to the terms and conditions contained in the Distribution Agreement.

This Copyright Mortgage and Assignment shall be governed by, and construed in accordance with, the laws of the State of New York, excluding (to the fullest extent a New York court would permit) any rule of law that would cause application of the laws of any jurisdiction other than the State of New York.

This Copyright Mortgage and Assignment is made and entered into this 26th day of April 2021.

IN WITNESS WHEREOF, Mortgagor has caused this Copyright Mortgage and Assignment to be duly executed and delivered by its managing member or officer thereunto duly authorized as of the date first above written.

**MORTGAGOR**:

**150 Degrees Pictures, LLC**

By: _____
Name: Ross Jacobson
Its: _____

## EXHIBIT A TO COPYRIGHT MORTGAGE AND ASSIGNMENT

## COLLATERAL

All of Mortgagor's right, title and interest of every kind and nature, whether now owned or hereafter acquired in and to the following, wherever the same may be located and whether or not same is in the possession of Mortgagor, including all products and proceeds thereof, including insurance proceeds, but solely to the extent necessary to exercise the Licensed Rights granted to Mortgagor pursuant to the Distribution Agreement and excluding the Reserved Rights (collectively, the "**Collateral**"):

(A)     The distribution rights in the Territory to that certain theatrical motion picture currently entitled "Naked Singularity" (and any other names by which the motion picture is or has been known and/or has been released, the "**Picture**") based upon a screenplay written by Chase Palmer (as such may be rewritten or polished, the "**Screenplay**"), solely to the extent required by Mortgagee to exploit the Licensed Rights granted to Mortgagor pursuant to the Distribution Agreement.  The Picture, the Screenplay, and all underlying, related, allied and ancillary rights therein and thereto and all elements thereof (in whatever state of completion), and all prints, advertising, promotional, marketing and other materials, and all third party agreements in connection with the distribution and exploitation of the Picture in the Territory during the Term ("**Third Party Agreements**", including, without limitation, the Collateral Agreements) are collectively referred to herein as the "**Property**";

(B)     With respect to section (A) above, and solely to the extent actually granted to Mortgagee pursuant to the Distribution Agreement, any and all exploitation, distribution, collateral, allied and ancillary rights therein, and all properties and things of value pertaining thereto and all products and proceeds thereof whether now in existence or hereafter made, acquired or produced, including without limitation:

(i)     All rights of every kind and nature (including, without limitation, copyrights but excluding Reserved Rights) in and to any literary, musical, dramatic or other literary material of any kind or nature upon which, in whole or in part, the Picture is or may be based, or from which it is or may be adapted or inspired or which may be or has been used or included in the Picture including, without limitation, all scripts, stories, treatments, novels, outlines, books, titles, concepts, manuscripts or other properties or materials of any kind or nature in whatever state of completion and all drafts, versions and variations thereof (collectively the "**Literary Material**"), and all materials and items prepared in connection with the pre-production, production, and post-production of the Picture or any part thereof, including, all tangible and intangible materials prepared in connection with the Picture (together with the Literary Material, the "**Underlying Material**") ;

(ii)     All physical properties of every kind or nature of or relating to the Property and all versions thereof, including, without limitation, all physical properties relating to the development, production, completion, delivery, exhibition, distribution or other exploitation of the Picture, and all versions thereof or any part thereof, including, without limitation, the Underlying Material, exposed film, developed film, positives, negatives, digital masters, prints, answer prints, special effects, preprint materials (including, without limitation, interpositives,

negatives, duplicate negatives, internegatives, color reversals, intermediates, lavenders, fine grain master prints and matrices and all other forms of preprint elements which may be necessary or useful to produce prints or other copies or additional preprint elements, whether now known or hereafter devised) , recordings, audio and video tapes and discs of all types and gauges, cutouts, trims and any and all other physical properties of every kind and nature relating to the Picture in whatever state of completion, and all duplicates, drafts, versions, variations and copies of each thereof (the "**Physical Materials**");

(iii)    All rights to perform, copy, record, re-record, produce, reproduce and synchronize any or all music and musical compositions created for, used in or to be used in connection with the Picture, and (to the extent acquired by Mortgagor) all other rights of every kind and nature in and to any and all music and musical compositions created for, used in or to be used in connection with the Picture including, without limitation, all copyrights therein and all rights to perform, copy, record, re-record, produce, publish, reproduce or synchronize any or all of said music and musical compositions as well as all other rights to exploit such music but excluding any Reserved Rights;

(iv)    All allied and ancillary rights of every kind and nature, without limitation, derived from, appurtenant to or related to the Property or the Underlying Material or derived from the Third Party Agreements, including, without limitation, all production, exploitation, and reissue rights by use of film, tape, disc or any other recording devices now known or hereafter devised, whether based upon, derived from or inspired by the Property, the Underlying Material or any part thereof, all rights to use, exploit and license others to use or exploit the title or titles of the Picture, the characters appearing in the Picture or said Underlying Material and/or the names or characteristics of said characters and including further, without limitation, any and all commercial exploitation in connection with or related to the Picture and/or said Underlying Material, but excluding any Reserved Rights;

(v)    All insurance and insurance policies heretofore or hereafter obtained in connection with the Property or the insurable properties thereof and/or of any natural person, corporation, partnership, limited liability company, joint venture, association, trust or unincorporated organization or any other entity, or a nation, state, government entity or any agency or political subdivision thereof ("**Person**") engaged in the development, production, completion, delivery, or exploitation of the Picture and the proceeds thereof;

(vi)    All copyrights, rights in copyrights, interests in copyrights and renewals and extensions of copyrights, common law or statutory, domestic and foreign, heretofore or hereafter obtained in connection with the Property, the Underlying Material or any part thereof, and the right (but not the obligation) to make publication thereof for copyright purposes, to register claim under copyright and the right (but not the obligation) to renew and extend such copyrights and the right (but not the obligation) to sue in the name of the Mortgagor or in the name of Mortgagee for past, present and future infringements of copyright;

(vii)    All rights of Mortgagor of any kind or nature, direct or indirect, to acquire, produce, develop, reacquire, finance, release, sell, distribute, subdistribute, lease, sublease, market, license, sublicense, exhibit, broadcast, transmit, reproduce, publicize, or otherwise exploit the Picture, the Underlying Material or any part thereof (but excluding any

Reserved Rights), including, without limitation, pursuant to agreements between Mortgagor and any company controlling, controlled by, or under common control with Mortgagor which relate to the ownership, production or financing of the Picture, for the Term, in any manner and in any media whatsoever throughout the Territory, including, without limitation, by projection, radio, all forms of television (including, without limitation, free, pay, toll, cable, sustaining, subscription, sponsored and direct satellite broadcast), in theatres, non-theatrically, on cassettes, cartridges, DVDs, discs and other similar and dissimilar video devices, and by any and all other scientific, mechanical or electronic means, methods, processes or devices now known or hereafter conceived, devised or created;

(viii)    All contract rights, including, without limitation, under the Agreement, and general intangibles which grant to any Person any right to acquire, produce, develop, reacquire, finance, release, sell, distribute, subdistribute, lease, sublease, market, license, sublicense, exhibit, broadcast, transmit, reproduce, publicize, or otherwise exploit the Property, the Underlying Material or any rights therein (but excluding any Reserved Rights), and the proceeds of such agreements and any and all rights to payment thereunder and all of the rights to receive film rentals, license fees, distribution fees, producer's shares, royalties and other amounts of every description;

(ix)    All rent, revenues, income, compensation, products, increases, proceeds and profits or other property obtained or to be obtained from the production, release, sale, distribution, subdistribution, lease, sublease, marketing, licensing, sublicensing, exhibition, broadcast, transmission, reproduction, publication, ownership, exploitation or other uses or disposition of the Picture and the Underlying Material (or any rights therein or part thereof), in any and all media (but excluding any Reserved Rights), including, without limitation, the properties thereof and of any collateral, allied, ancillary and subsidiary rights therein and thereto, and amounts recovered as damages by reason of unfair competition, the infringement of copyright, breach of any contract or infringement of any rights, or derived therefrom in any manner whatsoever, including, without limitation, all sums paid or payable to Mortgagor now due or which hereinafter may become due to Mortgagor pursuant to the Agreement or any other distribution agreements relating to the Picture or by any federal, provincial or other governmental body or authority directly or indirectly as a tax credit or production credit arising from any sale and lease back arrangements relating to the Program in form and substance satisfactory to Mortgagee, and any and all allied, ancillary and subsidiary rights therein;

(x)    Solely with respect to the proceeds of Mortgagee's distribution of the Picture in the Territory during the Term, any and all accounts, deposit accounts (including, without limitation, any production bank accounts), accounts receivable, letter of credit rights, general intangibles, contract rights, chattel paper, documents, instruments and goods, including inventory (as those terms are defined in the Uniform Commercial Code), not elsewhere included in this definition, which may arise in connection with the creation, production, completion, delivery, financing, ownership, possession or exploitation of the Picture;

(xi)    Any and all documents, receipts or books and records, including, without limitation, documents or receipts of any kind or nature issued by any pledgeholder, warehouseman or bailee with respect to the Picture and any element thereof and the equipment containing such books and records; and

(xii)   All proceeds, products, additions and accessions (including insurance proceeds) of the Picture, as defined and referred to in subparagraphs (B)(i) through (B)(x) above.

SCHEDULE D

## UCC- 1

**[Use form provided by Secretary of State of the Jurisdiction in which the UCC 1 is filed and attach Exhibit A for the Collateral Description]**

### EXHIBIT A TO UCC-1

### COLLATERAL

All of Debtor's right, title and interest of every kind and nature, whether now owned or hereafter acquired in and to the following, throughout the Territory and during the Term, wherever the same may be located and whether or not in the possession of Debtor, including all products and proceeds thereof, including insurance proceeds, but solely to the extent necessary to exercise the Licensed Rights granted to Debtor pursuant to the Distribution Agreement and excluding the Reserved Rights (collectively, the "**Collateral**"):

(A)   The distribution rights in the Territory to that certain theatrical motion picture currently entitled "Naked Singularity" (and any other names by which the motion picture is or has been known and/or has been released, the "**Picture**") based upon a screenplay written by Chase Palmer (as such may be rewritten or polished, the "**Screenplay**"), solely to the extent required by Mortgagee to exploit the Licensed Rights granted to Mortgagor pursuant to the Distribution Agreement.  The Picture, the Screenplay, and all underlying, related, allied and ancillary rights therein and thereto and all elements thereof (in whatever state of completion), and all prints, advertising, promotional, marketing and other materials, and all third party agreements in connection with the distribution and exploitation of the Picture in the Territory during the Term ("**Third Party Agreements**", including, without limitation, the Collateral Agreements are collectively referred to herein as the "**Property**");

(B)   With respect to section (A) above, and solely to the extent actually granted to Secured Party pursuant to the Distribution Agreement, any and all exploitation, distribution, collateral, allied, and ancillary rights therein, and all properties and things of value pertaining thereto and all products and proceeds thereof whether now in existence or hereafter made, acquired or produced, including without limitation:

(i)   All rights of every kind and nature (including, without limitation, copyrights but excluding Reserved Rights) in and to any literary, musical, dramatic or other literary material of any kind or nature upon which, in whole or in part, the Picture is or may be based, or from which it is or may be adapted or inspired or which may be or has been used or included in the Picture including, without limitation, all scripts, stories, treatments, novels, outlines, books, titles, concepts, manuscripts or other properties or materials of any kind or nature in whatever state of completion and all drafts, versions and variations thereof (collectively the "**Literary Material**"), and all materials and items prepared in connection with the pre-

production, production, and post-production of the Picture or any part thereof, including, all tangible and intangible materials prepared in connection with the Picture (together with the Literary Material, the "**Underlying Material**");

   (ii) All physical properties of every kind or nature of or relating to the Property and all versions thereof, including, without limitation, all physical properties relating to the development, production, completion, delivery, exhibition, distribution or other exploitation of the Picture, and all versions thereof or any part thereof, including, without limitation, the Underlying Material, exposed film, developed film, positives, negatives, digital masters, prints, answer prints, special effects, preprint materials (including, without limitation, interpositives, negatives, duplicate negatives, internegatives, color reversals, intermediates, lavenders, fine grain master prints and matrices and all other forms of preprint elements which may be necessary or useful to produce prints or other copies or additional preprint elements, whether now known or hereafter devised), recordings, audio and video tapes and discs of all types and gauges, cutouts, trims and any and all other physical properties of every kind and nature relating to the Picture in whatever state of completion, and all duplicates, drafts, versions, variations and copies of each thereof (the "**Physical Materials**");

   (iii) All rights to perform, copy, record, re-record, produce, reproduce and synchronize any or all music and musical compositions created for, used in or to be used in connection with the Picture, and (to the extent acquired by Debtor) all other rights of every kind and nature in and to any and all music and musical compositions created for, used in or to be used in connection with the Picture including, without limitation, all copyrights therein and all rights to perform, copy, record, re-record, produce, publish, reproduce or synchronize any or all of said music and musical compositions as well as all other rights to exploit such music but excluding any Reserved Rights;

   (iv) All allied and ancillary rights of every kind and nature, without limitation, derived from, appurtenant to or related to the Property or the Underlying Material or derived from the Third Party Agreements, including, without limitation, all production, exploitation, and reissue rights by use of film, tape, disc or any other recording devices now known or hereafter devised, whether based upon, derived from or inspired by the Property, the Underlying Material or any part thereof, all rights to use, exploit and license others to use or exploit the title or titles of the Picture, the characters appearing in the Picture or said Underlying Material and/or the names or characteristics of said characters, and including, further, without limitation, any and all commercial exploitation in connection with or related to the Picture and/or said Underlying Materials, but excluding any Reserved Rights;

   (v) All insurance and insurance policies heretofore or hereafter obtained in connection with the Property or the insurable properties thereof and/or of any natural person, corporation, partnership, limited liability company, joint venture, association, trust or unincorporated organization or any other entity, or a nation, state, government entity or any agency or political subdivision thereof ("**Person**") engaged in the development, production, completion, delivery, or exploitation of the Picture and the proceeds thereof;

   (vi) All copyrights, rights in copyrights, interests in copyrights and renewals and extensions of copyrights, common law or statutory, domestic and foreign,

heretofore or hereafter obtained in connection with the Property, the Underlying Material or any part thereof, and the right (but not the obligation) to make publication thereof for copyright purposes, to register claim under copyright and the right (but not the obligation) to renew and extend such copyrights and the right (but not the obligation) to sue in the name of the Debtor or in the name of Secured Party for past, present and future infringements of copyright;

(vii)    All rights of Debtor of any kind or nature, direct or indirect, to acquire, produce, develop, reacquire, finance, release, sell, distribute, subdistribute, lease, sublease, market, license, sublicense, exhibit, broadcast, transmit, reproduce, publicize, or otherwise exploit the Picture, the Underlying Material or any part thereof (but excluding any Reserved Rights), including, without limitation, pursuant to agreements between Debtor and any company controlling, controlled by, or under common control with Debtor which relate to the ownership, production or financing of the Picture, during the Term, in any manner and in any media whatsoever throughout the Territory, including, without limitation, by projection, radio, all forms of television (including, without limitation, free, pay, toll, cable, sustaining, subscription, sponsored and direct satellite broadcast), in theatres, non-theatrically, on cassettes, cartridges, DVDs, discs and other similar and dissimilar video devices, and by any and all other scientific, mechanical or electronic means, methods, processes or devices now known or hereafter conceived, devised or created;

(viii)    All contract rights, including, without limitation, under the Agreement, and general intangibles which grant to any Person any right to acquire, produce, develop, reacquire, finance, release, sell, distribute, subdistribute, lease, sublease, market, license, sublicense, exhibit, broadcast, transmit, reproduce, publicize, or otherwise exploit the Property, the Underlying Material or any rights therein (but excluding any Reserved Rights), and the proceeds of such agreements and any and all rights to payment thereunder and all of the rights to receive film rentals, license fees, distribution fees, producer's shares, royalties and other amounts of every description;

(ix)    All rent, revenues, income, compensation, products, increases, proceeds and profits or other property obtained or to be obtained from the production, release, sale, distribution, subdistribution, lease, sublease, marketing, licensing, sublicensing, exhibition, broadcast, transmission, reproduction, publication, ownership, exploitation or other uses or disposition of the Picture and the Underlying Material (or any rights therein or part thereof), in any and all media, including (but excluding any Reserved Rights), without limitation, the properties thereof and of any collateral, allied, ancillary and subsidiary rights therein and thereto, and amounts recovered as damages by reason of unfair competition, the infringement of copyright, breach of any contract or infringement of any rights, or derived therefrom in any manner whatsoever, including, without limitation, all sums paid or payable to Debtor now due or which hereinafter may become due to Debtor pursuant to the Agreement or any other distribution agreements relating to the Picture or by any federal, provincial or other governmental body or authority directly or indirectly as a tax credit or production credit arising from any sale and lease back arrangements relating to the Program in form and substance satisfactory to Secured Party, and any and all allied, ancillary and subsidiary rights therein;

(x)    Solely with respect to the proceeds of Mortgagee's distribution of the Picture in the Territory during the Term, any and all accounts, deposit accounts (including,

without limitation, any production bank accounts), accounts receivable, letter of credit rights, general intangibles, contract rights, chattel paper, documents, instruments and goods, including inventory (as those terms are defined in the Uniform Commercial Code), not elsewhere included in this definition, which may arise in connection with the creation, production, completion, delivery, financing, ownership, possession or exploitation of the Picture;

(xi)    Any and all documents, receipts or books and records, including, without limitation, documents or receipts of any kind or nature issued by any pledgeholder, warehouseman or bailee with respect to the Picture and any element thereof and the equipment containing such books and records; and

(xii)    All proceeds, products, additions and accessions (including insurance proceeds) of the Picture, as defined and referred to in subparagraphs (B)(i) through (B)(x) above.

## AMENDMENT

### To Short Form Deal Memo

### "Naked Singularity"

Reference is made to that Short Form Deal Memo ("Agreement") entered into as of the 26th day of April 2021 by and between SM Content, LLC ("SM") and 150 Degrees Pictures, LLC ("Licensor") regarding the material terms for the acquisition of rights in and to the motion picture set forth below.

For good and valuable consideration, the sufficiency of which is hereby acknowledged by the parties, the terms and conditions of this Agreement are amended as follows:

An additional Paragraph 18 shall be appended to the Agreement as follows:

18. <u>Errors & Omissions.</u>
    Licensor hereby acknowledges that it will deliver original Certificates of Insurance and Endorsements thereto evidencing Licensor's Errors and Omissions coverage reflecting no material exclusions and in a form and substance satisfactory to SM meeting all of the following requirements: SM shall be named as an additional insured for any and all media and any of its licensees may be named at SM's request; the limits of coverage shall be for not less than US$3,000,000 for each claim and US$5,000,000 aggregate for all claims; the policy deductible shall be no greater than US$25,000; the policy term shall expire no earlier than three (3) years following Delivery of the Picture to SM with a Term Rights Endorsement.

Other than the above addition, all other terms and conditions of the Agreement shall remain in full force and effect without alteration.

AGREED AND UNDERSTOOD:

**SM Content, LLC ("SM")**                    **150 Degrees Pictures, LLC ("Licensor")**


By: Andrew Kotliar                            By: _John Zois_
Its: Manager                                  Its:


_Ross Jacobson_
Ross Jacobson (Jun 8, 2021 10:49 PDT)