# EXHIBIT B

## Taylor Declaration

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| CHICKEN SOUP FOR THE SOUL ENTERTAINMENT INC, *et al.*, | Case No. 24-11442 (MFW) |
| Debtors.[1] | (Jointly Administered) |

**DECLARATION OF LUKE TAYLOR IN SUPPORT OF THE MOTION OF BONDIT LLC FOR RELIEF FROM THE AUTOMATIC STAY TO PERMIT BONDIT TO EXERCISE RIGHTS AND REMEDIES**

I, Luke Taylor, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.      I submit this declaration in support of the *Motion of BondIt LLC for Relief from the Automatic Stay to Permit BondIt to Exercise Rights and Remedies* (the "Motion").

2.      I am the Chief Operating Officer and co-founder of BondIt, LLC ("BondIt"). Through this capacity, I am familiar with BondIt's business and financial affairs, including the facts set forth herein.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

3.      BondIt, as lender, and Bad Hombres Production, LLC ("BHP"), as borrower, are parties to that certain Loan and Security Agreement, dated January 26, 2022 (as amended, the

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number (where applicable), are: 757 Film Acquisition LLC (4300); Chicken Soup for the Soul Entertainment, Inc. (0811); Chicken Soup for the Soul Studios, LLC (9993); Chicken Soup for the Soul Television Group, LLC; Crackle Plus, LLC (9379); CSS AVOD Inc. (4038); CSSESIG, LLC (7150); Digital Media Enterprises LLC; Halcyon Studios, LLC (3312); Halcyon Television, LLC (9873); Landmark Studio Group LLC (3671); Locomotive Global, Inc. (2094); Pivotshare, Inc. (2165); RB Second Merger Sub LLC (0754); Redbox Automated Retail, LLC (0436); Redbox Entertainment, LLC (7085); Redbox Holdings, LLC (7338); Redbox Incentives LLC (1123); Redwood Intermediate, LLC (2733); Screen Media Films, LLC; Screen Media Ventures, LLC (2466); and TOFG LLC (0508) (collectively, the "Debtors").  The Debtors' corporate headquarters and service address is 132 East Putnam Avenue, Floor 2W, Cos Cob, CT 06807.

"Loan Agreement"), pursuant to which BondIt agreed to lend $1,482,000 to BHP for use in the payment of pre-production, production, post-production, and delivery costs in the theatrical motion picture titled "Bad Hombres" (the "Picture").  The parties amended the Loan Agreement on March 13, 2023, to, among other things, increase the loan amount to $1,740,000.  Pursuant to the Loan Agreement, BHP granted BondIt a first priority security interest in and to all of BHP's assets, including any interests in distribution agreements, which is defined to include the Distribution Agreement (as defined below) between BHP and Redbox Entertainment, LLC ("Redbox").  *See* Loan Agreement, Sections 1.16 & 4.1.  The Loan and Security Agreement and the First Amendment to the Loan and Security Agreement are attached hereto as **Exhibit 1**.

4.      On February 22, 2022, BondIt filed a UCC-1 financing statement with the New Mexico Secretary of State against BHP.  BondIt also entered into a Copyright Mortgage and Assignment with BHP, which BondIt recorded with the United States Copyright Office on January 9, 2024, perfecting BondIt's security interest in the Collateral.

5.      BHP is in default under the Loan Agreement for, among other things, BHP's failure to make, or cause to be made, payments owed to BondIt under the Loan Agreement by the applicable repayment dates.  *See* Loan Agreement, Section 9.1.1.

6.      I understand that BHP, as grantor, and Redbox, as distributor, are parties to that certain Distribution Agreement (the "Distribution Agreement").  Under the Distribution Agreement BHP granted certain distribution rights to Redbox in and to the theatrical motion picture titled "Bad Hombres" (the "Picture").  *See* Distribution Agreement ¶ 4.  Pursuant to the Distribution Agreement, Redbox was required to pay BHP a license fee in the amount of $1,175,000 payable in full upon Redbox's receipt and approval of all Delivery Materials (as defined in the Distribution Agreement). *See id.* ¶ 5.  BHP provided all the Delivery Materials in

2

accordance with the Distribution Agreement.

7.      BHP assigned its right to receive the license fee pursuant to the Distribution Agreement to BondIt in accordance with that certain Notice of Irrevocable Assignment, dated April 22, 2022.  A copy of the Notice of Irrevocable Assignment is attached hereto as **<u>Exhibit 2</u>**. Redbox acknowledged receipt of assignment and agreed to pay the license fee directly to BondIt. To date, Redbox has not paid the license fee in full.

8.      BondIt, as financier, BHP, as licensor, and Redbox, as distributor, are parties to that certain Non-Disturbance Letter, dated April 22, 2022 (the "Non-Disturbance Letter").  The Non-Disturbance Letter provides, among other things, that subject to Redbox's payment of the license fee, BondIt will not take any action under the Loan Agreement which will interfere with or otherwise impair Redbox's rights under the Distribution Agreement.  *See* Non-Disturbance Letter ¶ 4.  As noted above, Redbox has not paid the License Fee in full. A copy of the Non-Disturbance Letter is attached hereto as **<u>Exhibit 3</u>**.

9.      I understand that the Chapter 7 Trustee has not filed a motion with the Court seeking to operate the Debtors' business.  In addition, I am not aware of any plan for the Chapter 7 Trustee to sell Redbox's interests in the Distribution Agreement.

10.     Absent relief from the stay to exercise its rights and terminate the Distribution Agreement, BondIt is unable to protect the value of its security interest in the Picture as the distribution of the Picture, and any proceeds related thereto, have stalled.  As such, I believe that the Court should grant the relief requested in the Motion and lift the automatic stay so as to permit BondIt to exercise its rights and remedies as a secured creditor pursuant to applicable law.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated September 25, 2024                    */s/ Luke Taylor*
                                           Luke Taylor
                                           Chief Operating Officer, BondIt LLC

# Exhibit 1 – Loan Agreement and First Amendment to Loan Agreement

# LOAN AND SECURITY AGREEMENT

THIS LOAN AND SECURITY AGREEMENT ("Agreement") is made and entered into as of January 26, 2022 (the "Effective Date"), by and between Bad Hombres Productions, LLC, a New Mexico limited liability company ("Borrower"), on the one hand, and BondIt LLC, a limited liability company organized and existing under the laws of California ("Lender"), on the other hand.

Reference is hereby made to the following:

A.      Borrower is producing a theatrical motion picture (under whatever title such motion picture is now or may hereafter be known, the "Picture") currently entitled "Bad Hombres", based on the original screenplay by the same name written by Rex New, N.W. Turner and John Stalberg. Said screenplay and all prior and future drafts and versions thereof are herein referred to as the "Screenplay."

B.      The Commitment Amount shall be One Million Seven Hundred and Fifteen Thousand United States Dollars ($1,715,000 USD).

C.      Borrower has requested that Lender lend and advance funds to Borrower for use in the payment of pre-production, production, post-production, and delivery costs of the Picture in the aggregate principal amount not to exceed One Million Four Hundred and Eighty-Two Thousand United States Dollars ($1,482,000.00 USD) (the "Loan", i.e., the "Commitment Amount", less the "Interest Fee" and the "Extension Reserve", each as further defined below).

D.      Lender is willing to make the Loan upon the terms and conditions herein contained and in consideration of the agreements, representations and warranties of Borrower hereinafter set forth.

NOW, THEREFORE, the parties hereto hereby agree as follows:

1.      DEFINITIONS.

The following terms used in this Agreement or in any promissory note, certificate, report or other document or instrument made or delivered pursuant to this Agreement have the following meanings:

1.1      "Actor Agreements" means the executed agreement for the acting services of Tyrese Gibson  in the role of "Donnie," and Thomas Jane in the role of  "Rob," and Luke Hemsworth, in form and substance approved by Lender.

1.2      "Affiliated Person" means any Person which directly or indirectly controls, is controlled by or is under common control with the Borrower. For the purposes of this definition, "control" (including with corresponding meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities, by contract or otherwise.

1.3      "Agreement" means this Loan and Security Agreement as originally executed and as the same may hereafter from time to time be amended, supplemented, modified, extended, renewed or replaced.

1.4      "Assignment of Proceeds" means the Assignment of Proceeds, dated concurrently herewith, between Borrower and Lender, in form and substance reasonably acceptable to Lender and its counsel, as amended, restated, supplemented or otherwise modified from time to time, substantially in a form as set forth on Exhibit "A".

1.5      "AUP Audit" has the meaning specified in paragraph 7.1.1 hereof.

1.6      "Borrower" means Bad Hombres Productions, LLC, an New Mexico limited liability company.

1.7　　"Borrowing Certificate" has the meaning specified in paragraph 2.3 hereof.

1.8　　"Budget" means the production budget for the Picture dated as of January 24, 2022, as approved by Lender and attached as "Exhibit B" hereto

1.9　　"Business Day" means any day other than a Saturday, Sunday or holiday scheduled by law for commercial banking institutions in the city of Los Angeles, California.

1.10　　"Certificate of Incumbency" has the meaning specified in paragraph 6.2.8 hereof.

1.11　　"Collateral" has the meaning specified in paragraph 4.1 hereof.

1.12　　"Commitment Amount" has the meaning specified in Recital B hereof.

1.13　　"Copyright Mortgage" means the Copyright Mortgage dated concurrently herewith, between Borrower and Lender, in form and substance acceptable to Lender and its counsel, as amended, restated, supplemented or otherwise modified from time to time, substantially in a form as set forth on Exhibit "C".

1.14　　"Default Interest" has the meaning specified in paragraph 2.8.1.

1.15　　"Director Agreement" means the agreement for the directing services of John Stalberg Jr. ("Director") in form and substance approved by Lender.

1.16　　"Distribution Agreements" means, collectively and individually, each distribution agreement, between Borrower (or a Sales Agent or other Licensing Intermediary for the Picture) and a Distributor, now or hereafter entered into, pursuant to which the Distributor has been granted, sold, conveyed, licensed, sub-licensed, leased, sub-leased, or otherwise transferred rights with respect to the distribution, sub-distribution, sale, rental, lease, sub-lease, licensing, sub-licensing, exhibition, telecast, broadcast, transmission (including, without limitation, by way of satellite or cable) or other use, exploitation or disposition of the Picture or any elements thereof and/or the copyright in any of the foregoing or any part thereof in any media existing now or in the future and in any territory specified therein (including, without limitation, motion picture, television, "home video" and all other audio-visual device rights, merchandising and commercial tie-ups, soundtrack album, music publishing, novelization and publishing rights, trailer rights, and all other allied, incidental, ancillary, and subsidiary rights), including the Distribution Agreement dated on or around January 20, 2022, and any amendments approved by the Lender thereto, between Borrower and Redbox Entertainment, and any permitted amendments, modifications and supplements thereto.

1.17　　"Distributor" shall mean any Person, as sublicensee of Borrower, or a Licensing Intermediary, that has entered into, or in the future enters into, a Distribution Agreement.

1.18　　"Dollars" or "$" means the legal currency of the United States.

1.19　　"Equipment" shall have the meaning specified in paragraph 4.1.3.

1.20　　"Estimated Tax Credits" has the meaning specified in paragraph 2.3.2 hereof.

1.21　　"Event of Default" has the meaning specified in paragraph 9.1 hereof.

1.22　　"Expiration Date" shall have the meaning specified in paragraph 2.5 hereof.

1.23　　"Extension Interest" has the meaning specified in paragraph 2.8.1 hereof.

1.24　　"Extension Reserve" has the meaning specified in paragraph 2.8.3 hereof.

DocuSign Envelope ID: 8F16611C-438D-4F4E-B91E-296A79R7D543

1.25   "Final Maturity Date" has the meaning specified in paragraph 2.8.1 hereof.

1.26   "Film Office" means the State of New Mexico Governor's Office for Motion Picture and Television Development or any other authority or government entity that administers the Film Production Tax Credit program.

1.27   "Film Production Facility" has the meaning ascribed under the State Tax Credit Law.

1.28   "Gross Receipts" has the meaning specified in paragraph 4.1.1 hereof.

1.29   "Guild Intercreditor Agreements" means collectively the SAG-AFTRA Intercreditor Agreement, if any.

1.30   "Guilds" means collectively SAG-AFTRA, WGA, and IATSE.

1.31   "Indebtedness" means all monetary obligations, contingent and otherwise, of Borrower to Lender hereunder, and under the Promissory Note, and under the other Loan Documents, including, without limitation, the Commitment Amount, the Default Interest thereon (if any), and all fees, costs and expenses Borrower is obligated to pay Lender hereunder or thereunder.

1.32   "Independent Accountant" means John Thomas.

1.33   "Independent Accountant Report" means the report prepared by the Independent Accountant for the Picture confirming the amount of Estimated Tax Credits, in a form approved by Lender as set forth in paragraph 2.3.2.

1.34   "Initial Repayment Schedule" has the meaning specified in paragraph 2.7.

1.35   "Interest Fee" has the meaning specified in paragraph 2.8.1.

1.36   "Legal Fee" has the meaning in paragraph 2.3 hereof.

1.37   "Lender" means BondIt LLC, a limited liability company organized and existing under the laws of the State of California.

1.38   "Lender Account" means account number 6259475066 and any other bank account of Lender as may be provided by Lender to Borrower from time to time in writing.

1.39   "Licensing Intermediary" means each Person approved by Lender (in its sole discretion) that has been granted distribution rights in the Picture by Borrower in order to mitigate foreign withholding taxes (Freeway and its affiliates are hereby deemed pre-approved).

1.40   "Literary Property" shall have the meaning specified in paragraph 4.1.1.1.

1.41   "Loan" has the meaning specified in Recital B hereof.

1.42   "Loan Documents" means this Agreement, the Promissory Note, the Power of Attorney, the Assignment of Proceeds, the Copyright Mortgage, the Borrowing Certificate, and all other documents, instruments and agreements executed or required to be delivered hereunder or pursuant to any transaction contemplated herein.

1.43   "Person" means any natural person, entity, corporation, company, association, partnership, limited liability company, joint venture, association, joint stock company, unincorporated organization, trust, individual (including personal representatives, executors and heirs of a deceased individual), nation, state, government (including governmental agencies, departments, bureaus, boards, divisions and instrumentalities thereof), trustee, receiver or liquidator.

1.44    "Physical Property" shall have the meaning specified in paragraph 4.1.1.2.

1.45    "Picture" has the meaning specified in Recital A hereof.

1.46    "Power of Attorney" means a Power of Attorney, dated concurrently herewith, from Borrower in favor of Lender in form and substance acceptable to Lender, substantially in a form as set forth on Exhibit "D", and provided there is no uncured Event of Default, Lender agrees to use reasonable efforts to notify Borrower of when Lender intends to exercise its rights under the Power of Attorney solely in connection with the terms and conditions thereof.

1.47    "Proceeds" means the tax credit, minimum guarantee, proceeds from Distribution Agreements, or any other proceeds, that are payable to Borrower for licensing the foreign and domestic distribution rights of the Picture, pursuant to the respective Distribution Agreement(s) between Distributor and Borrower.

1.48    "Production Account" collectively mean account number 665870855 and any other account maintained by Borrower into which production funds for the Picture are to be advanced of which Borrower gives Lender prior written notice.  The proceeds of the Loan made hereunder, except as otherwise provided in this Agreement, shall first be credited, in accordance with the applicable Borrowing Certificate, into the Production Account set forth on such Borrowing Certificate. Borrower shall maintain the Production Account through to the end of production of the Picture.

1.49    "Producer Agreements" means the agreement for the producing services of David Frigerio and John Stalberg Jr. and any other physical producer of the Picture.

1.50    "Producer Holdback" means a holdback from David Frigerio and John Stalberg Jr. and any other physical producer of the Picture of One Hundred Percent (100%) of their respective producer fees in connection with the Picture until (1) principal photography wraps with no outstanding production liabilities from production and (2) the collection account management agreement ("CAMA") is executed by all parties (as applicable), upon which Seventy-Five Percent (75%) of their respective producer fees shall be payable; and thereafter the remaining Twenty-Five Percent (25%) of their respective producer fees shall be released and payable upon accepted delivery by Redbox Entertainment, in accordance with those certain Producer Holdback Agreements between David Frigerio and John Stalberg Jr., any other physical producer (as applicable), Borrower, and Lender dated on or about the date hereof.

1.51    "Production Schedule" means the final production and post-production schedule(s) for the Picture.

1.52    "Promissory Note" means the promissory note to be made and delivered by Borrower to Lender pursuant to paragraph 2.6 hereof, substantially in a form as set forth on Exhibit "E".

1.53    "Qualified Film Production Company" means a "Qualified Film Production Company" under the State Tax Credit Law.

1.54    "Qualified Production Costs" means "qualified production costs" under the State Tax Credit Law.

1.55    "Qualified Production Facility" means a Level 1 "qualified production facility" (as approved by the Film Office).

1.56    "Repayment Date(s)" has the meaning specified in paragraph 2.7 hereof.

1.57    "SAG" means the Screen Actors Guild-American Federation of Television and Radio Artists.

1.58    "SAG Intercreditor Agreement" means that certain Intercreditor Agreement, of approximately even date herewith, among Borrower, Lender and SAG, in form and substance reasonably satisfactory to Lender and its counsel.

1.59    "Sales Agent" shall mean any sales agent approved by Lender and Borrower.

1.60    "Screenplay" has the meaning specified in Recital A hereof.

1.61    "Security Interest" means a valid first priority security interest in the Collateral, second in priority only to the security interests of the Guilds (if applicable).

1.62    "Set Up Fee" has the meaning in paragraph 2.2 hereof.

1.63    State Authority" means any of New Mexico State, the New Mexico State Department of Taxation and Finance and the New Mexico Film Office.

1.64    "State Tax Credit Law" means all legislation and regulations enacted and in force in connection with the Film Production Tax Credit program, including New Mexico.

1.65    "Tax Credit Certificate" has the meaning set forth in paragraph 7.1.1.

1.66    "Tax Credit Proceeds" means all refunds, subsidies, rebates or other amounts payable by New Mexico State, its agencies or instrumentalities in connection with any Tax Credits.

1.67    "Tax Credit" means all tax credits in connection with the Picture pursuant to the State Tax Credit Law.

1.68    "UCC" means the Uniform Commercial Code as in effect from time to time in the State of New Mexico or any other state the laws of which are required to be applied in connection with the issue and perfection of the Security Interest. Terms defined in the UCC which are not otherwise defined in this Agreement are used herein as defined in the UCC.

1.69    "Uniform Commercial Code Financing Statement" has the meaning specified in paragraph 4.2 hereof.

1.70    "WGA" means the Writers Guild of America.

1.71    "WGA Intercreditor Agreement" means that certain Intercreditor Agreement, of approximately even date herewith, among Borrower, Lender and WGA, in form and substance reasonably satisfactory to Lender and its counsel.

2.    AGREEMENT TO LEND; LENDER SERVICES.

2.1    Commitment. Subject to the terms and conditions of this Agreement, following execution and delivery of the Loan Documents to Lender, and the satisfaction of the "Conditions Precedent" (as defined below), and further subject to an uncured "Event of Default" (as defined below), Lender hereby agrees to disburse the Loan to Borrower in the following installments: (i) Nine Hundred Sixty Thousand United States Dollars ($960,000.00 USD) by January 31, 2022; (ii) Two Hundred Thirty Seven Thousand United States Dollars ($237,000.00 USD) by February 14, 2022; (iii) One Hundred Fifty Thousand United States Dollars ($150,000.00 USD) by February 28, 2022; (iv) One Hundred Thirty-Five Thousand United States Dollars ($135,000.00 USD) by April 1, 2022.

2.2    Set Up Fee. In consideration of the Loan, Lender shall be entitled to a set up fee equal to Forty-Two Thousand United States Dollars ($42,000.00 USD) (the "Set Up Fee"), which Set Up Fee shall be paid by Borrower to Lender immediately upon receipt of the first installment of the Loan made hereunder (i.e., Lender shall advance the Commitment Amount, less the Interest Fee and Extension Reserve, and Borrower shall immediately pay the Set Up Fee to Lender upon closing, pursuant to paragraph 2.1 above). Such Set Up Fee is in addition to any other payments to Lender expressly provided for hereunder and shall not be credited against or applied to any other sums payable to Lender hereunder or under any other Loan Document.

2.3    Legal Fee. Borrower shall pay to Lender legal fees in the amount of Seven Thousand Five Hundred United States Dollars ($7,500.00 USD), receipt of which is hereby acknowledged, to cover Lender's due

diligence and internal audit fees and expenses, and Lender's legal fees and expenses in connection with the preparation and negotiation of the Loan Documents (collectively, the "<u>Legal Fee</u>"). The Legal Fee is in addition to any other payments to Lender provided for hereunder and shall not be credited against or applied to any other sums payable to Lender hereunder or under any other Loan Document including, without limitation, the Loan, the Set Up Fee, the Interest Fee, the Extension Reserve, and the Default Interest, if any.

2.4    <u>Certificate</u>.

2.4.1    <u>Borrowing Certificate</u>. Subject to the last sentence of this paragraph 2.3.1, if and when Borrower wishes Lender to disburse an installment of the Loan hereunder, Borrower shall give Lender not less than three (3) Business Days prior written notice of such request for disbursement, specifying in such notice the desired amount and proposed date of such disbursement of the Loan (as set forth in paragraph 2.1 above, or as otherwise agreed to by the parties in writing). Such notice shall be sent to Lender by first class U.S. mail, messenger, and e-mail or by facsimile. The request for the installment of the Loan shall be accompanied by a certificate ("<u>Borrowing Certificate</u>") in the form of <u>Exhibit "F"</u> executed by an authorized officer of Borrower, whose signature appears on the Certificate of Incumbency.  Subject to the other provisions hereof, and provided that no Event of Default has occurred hereunder (unless such Event of Default has been cured within the applicable time period [if any] expressly permitted hereunder) and Lender is reasonably satisfied that, upon disbursement, the aggregate of the disbursements of the Loan shall not exceed the Loan (i.e., Commitment Amount less the Interest Fee and the Legal Fee), the disbursement of the installment of the Loan shall be made by Lender on the date and in the amount set forth in the Borrowing Certificate by deposit of the same, in immediately available funds, into the Production Account.

2.4.2    <u>Audit of Eligible Expenses</u>.  Prior to the submission of the Borrowing Certificate pursuant to paragraph 2.3.1, Borrower shall submit to Lender the Budget and/or a detailed cost report and other information reasonably requested by Lender to enable the Independent Accountant to conduct a review of expenses funded prior to such date by Borrower to enable Independent Accountant, at Borrower's sole expense, to determine in good faith an estimated amount of Tax Credits ("<u>Estimated Tax Credits</u>") that have been generated in connection with the pre-production, production and post production of the Picture and prepare a written report ("<u>Independent Accountant's Report</u>") to Lender of the same, the costs of such review and Independent Accountant's Report to be paid by Borrower.

2.5    <u>Event of Default</u>.  Lender shall have no obligation to disburse the Loan to Borrower after February 08, 2022 (the "<u>Expiration Date</u>") or at any time after an Event of Default has occurred hereunder, unless such Event of Default has been cured within the applicable time period (if any) expressly permitted hereunder.

2.6    <u>Promissory Note</u>. Prior to Lender making a disbursement of the Loan to Borrower hereunder and as a condition thereof, Borrower shall execute in favor of Lender and deliver to Lender a promissory note (the "<u>Promissory Note</u>"), in the form of <u>Exhibit "E"</u> in the principal sum equal to the Commitment Amount (i.e., the Loan, plus the Extension Reserve and the Interest Fee). The Lender shall maintain an account or accounts evidencing the Indebtedness of Borrower to Lender hereunder, including any amounts of principal and interest payable and paid to Lender from time-to-time hereunder.  The entries made in such account or accounts shall be <u>prima facie</u> evidence of the existence and amounts of the obligations recorded therein absent manifest error; provided that the failure of Lender to maintain any such account or any error therein shall not in any manner affect the obligation of Borrower to pay the Indebtedness in accordance with the terms of this Agreement.

2.7    <u>Repayment Dates</u>. The Commitment Amount and any Default Interest on the Promissory Note shall be immediately due and payable on the following dates (the "<u>Repayment Date(s)</u>"), together the "<u>Initial Repayment Schedule</u>"): (i) One Million One Hundred and Seventy-Five Thousand United States Dollars ($1,175,000.00 USD) on or before November 1st, 2022; (ii) Five Hundred Forty Thousand United States Dollars ($540,000.00 USD) on or before May 1st, 2023.

2.8    <u>Interest on the Loan</u>.

2.8.1        Return Interest Fee; Extension Interest; Default Interest Rate. The unpaid Indebtedness shall bear no interest until the applicable Repayment Date passes other than a flat return interest fee equal to One Hundred and Sixty-Nine Thousand United States Dollars ($169,000.00 USD) (the "Interest Fee"), which Interest Fee may be deemed interest; provided that from and after any of the Repayment Dates in the Initial Repayment Schedule, the unpaid Indebtedness will bear interest ("Extension Interest") at a rate equal to three percent (3%) per month, non-compounding, until May 1, 2023 (the "Final Maturity Date"), at which point an Event of Default will have occurred. For avoidance of doubt, the Borrower has not triggered an Event of Default for payment latency until the Final Maturity Date has surpassed. Extension Interest accrual will apply for any payment made beyond the Repayment Date as scheduled in the Initial Repayment Schedule. Upon the occurrence of an Event of Default (and without constituting a waiver of such Event of Default), the unpaid Indebtedness will bear interest ("Default Interest") at a rate equal to three percent (3.0%) per month, compounding monthly and payable on demand, until the Event of Default has been cured.

2.8.2        Maximum Rate. If the provisions of this Agreement or the Promissory Note would at any time otherwise require payment to Lender of an amount of interest in excess of the maximum amount then permitted by the law applicable to the Loan, such interest payments shall be reduced to the extent necessary so as to ensure that Lender shall not receive interest in excess of such maximum amount.

2.8.3        Extension Reserve. The Lender shall withhold Fifty-Eight Thousand United States Dollars ($58,000.00 USD) which shall represent one-and-one-half (1.5) months of additional interest and shall be payable to Borrower if all amounts due under the Initial Repayment Schedule are paid to Lender within two business days of the respective Repayment Date(s), as set forth above, provided further that no other event of default has occurred or is continuing. The Extension Reserve is fully forfeitable if the above conditions are not met. The Extension Reserve shall be deducted accordingly against the accrued Extension Interest, the balance of which, if any, shall be paid to Borrower within one business day of Lender receiving the Commitment Amount in full.

2.9        Manner of Payment.

2.9.1        Time and Place of Payment; Notice of Payment. Any and all Indebtedness payable by Borrower pursuant to this Agreement, the Promissory Note and any other Loan Document (including, without limitation, the Commitment Amount and Default Interest [if any]), shall be made to the Lender in same day funds, without defense, setoff or counterclaim, to the Lender Account. Each payment by Borrower shall be made not later than 2:00 P.M. (Pacific time) on the date such payment is due and shall be deemed to have been paid by Borrower to Lender two (2) Business Days after receipt thereof into such account.  Any payment received by Lender after such time on the date payment is received shall be deemed to have been paid by Borrower to Lender three (3) Business Days after receipt thereof into such account.

2.9.2        Payments on Non-Business Days.  Whenever any payment to be made pursuant to this Agreement, the Promissory Note or any other Loan Document shall be due on a day which is not a Business Day, the payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of Default Interest pursuant to this Agreement, the Promissory Note or any other such Loan Document, as applicable; provided, however, that in the event the day upon which payment is due is not a Business Day, but is a day of the month after which no further Business Day occurs in that month, then the due date thereof shall be the next preceding Business Day.

2.9.3        Payment in Dollars. Any and all Indebtedness payable by Borrower pursuant to this Agreement, the Promissory Note or any other Loan Document (including, without limitation, the Commitment Amount and Default interest [if any]): (i) shall be dischargeable only by payment in Dollars regardless of any law, rule, regulation or statute, whether now or hereafter in existence or in effect in any jurisdiction which affects or purports to affect such obligation, and (ii) shall not be discharged or satisfied by any tender, or any recovery pursuant to any judgment, which is expressed in or converted by Lender to any currency other than the full amount of Dollars expressed to be payable in respect of the principal, interest, fees, costs, expenses (including

legal fees) and all other amounts payable by Borrower pursuant to this Agreement. The obligation of Borrower to make payments in Dollars as aforesaid shall be enforceable as an alternative or additional cause of action (which shall survive the termination of this Agreement) for the purpose of recovery in Dollars in the amount (if any) by which such actual receipt shall fall short of the full amount of Dollars expressed to be payable in respect of the principal, interest, fees, costs, expenses (including legal fees) and all other amounts payable by Borrower pursuant to this Agreement, and shall not be affected by judgment being obtained for any other sums due under this Agreement, the Promissory Note or any other Loan Document.

3.    <u>PAYMENT OF INDEBTEDNESS.</u>

      3.1    <u>Payment of the Tax Credit Proceeds and Proceeds; Payment Under Distribution Agreements</u>. Until such time as the Indebtedness is indefeasibly repaid in full, Borrower shall pay:

            3.1.1    all Tax Credit Proceeds and Proceeds received by it in good and collected funds in Dollars, directly to the Lender Account for the benefit of Lender; and

            3.1.2    Borrower shall require all Distributors to pay all sums payable to Borrower under Distribution Agreements in good and collected funds in Dollars, directly to the Lender Account for the benefit of Lender. If a Distributor shall pay any such sums to Borrower or any other Person, Borrower or such other Person shall receive such sums as trustee for Lender and promptly upon receipt thereof shall remit such sums (or cause such sums to be remitted) to Lender.

      3.2    <u>Application of Payments</u>.  Until Borrower has indefeasibly repaid in full the Indebtedness in accordance with the terms and conditions hereof, all amounts paid into the Lender Account for the benefit of Lender shall be applied by Lender to reduce the Indebtedness in the following priority: (i) first, to the payment of the amounts payable to Lender in reimbursement of its costs and expenses pursuant to paragraphs 7.5 and 7.7 hereof to the extent the same are not duly and timely paid to Lender as required by paragraphs 7.5 and 7.7 hereof; (ii) second, to the payment of the Commitment Amount and Default Interest (if any); and (iii) last, to the repayment of any other indebtedness payable to Lender by the Borrower.  Upon full repayment of the Indebtedness by Borrower to Lender, Lender shall promptly remit to Borrower all amounts received by Lender in excess of the Indebtedness.

      3.3    <u>Enforcement by Borrower</u>. Borrower, at its own expense, shall promptly make collection, and take all reasonable legal action necessary to enforce collection, of all such receipts and revenues which may be owing from Distributors pursuant to Distribution Agreements and shall remit all sums so collected to the Lender Account.

      3.4    <u>Contingency Lien</u>.  Borrower shall have a minimum budgeted contingency of Seventy-Nine Thousand United States Dollars ($79,000.00 USD) and shall notify Lender of any contingency spend in excess of Thirty Thousand United States Dollars (US $30,000.00) throughout production, post-production and delivery.

      3.5    <u>Collection Account</u>. In the event a collection account management agreement ("CAMA") is established in connection with the Picture, Lender shall be made a party, which collection account shall be pre-approved by Lender in writing (Freeway and Fintage shall be pre-approved), provided there shall be no obligation to name Lender as a party to the CAMA (or grant such pre-approval rights) if the CAMA is established following indefeasible repayment of the Indebtedness.

4.    <u>SECURITY FOR LOAN.</u>

      4.1    <u>Security Interest</u>.  As security for the full, timely and indefeasible repayment of the Indebtedness, and for the full and timely payment, performance and discharge by Borrower of all of the terms and conditions of this Agreement and the other Loan Documents, Borrower hereby irrevocably, unconditionally and absolutely grants to Lender a first priority Security Interest, and subject to the Guild Intercreditor Agreements (if any), in and to all of Borrower's assets, including, without limitation, all of Borrower's right, title and interest in and to (the following collectively referred to herein as the "Collateral") (to the extent any materials and/or rights in and to the Picture or any

other Collateral are not yet in existence or not yet acquired, such materials and rights are [to the extent applicable] hereby assigned and conveyed to Lender by way of present assignment of future copyright);

      4.1.1    <u>Film Collateral and Copyright</u>. The Picture and all of Borrower's rights therein and thereto, and all properties and things of value pertaining thereto, and all products and proceeds thereof, whether now in existence or hereafter made, acquired or produced (as used in this paragraph, the term the "Picture" shall mean and include the Picture, all of the aforesaid rights and the rights of Borrower set forth in subparagraphs 4.2.1.1 through 4.2.1.16 below), including, without limitation:

      4.1.1.1  To the extent owned or controlled by Borrower, all rights of every kind and nature (including, without limitation copyrights) in and to the literary material upon which, in whole or in part, the Picture is or may be based, or which may be or has been used or included in the Picture, including, without limitation, the Screenplay and all other scripts, scenarios, screenplays, bibles, stories, treatments, novels, outlines, books, titles, concepts, manuscripts or other properties or materials of any kind or nature, in whatever state of completion and all drafts, versions and variations thereof (all of the foregoing herein collectively referred to as the "<u>Literary Property</u>");

      4.1.1.2  All physical properties of every kind or nature of or relating to the Picture and all versions thereof, including, without limitation, all physical properties relating to the development, production, completion, delivery, exhibition, distribution or other exploitation of the Picture, and all versions thereof or any part thereof, including, without limitation, the Literary Property, exposed film, developed film, positives, negatives, prints, answer prints, special effects, pre-print materials (including interpositives, negatives, duplicate negatives, internegatives, color reversals, intermediates, lavenders, fine grain master prints and matrices, and all other forms of pre-print elements which may be necessary or useful to produce prints or other copies or additional pre-print elements, whether now known or hereafter devised), soundtracks, recordings, audio and video tapes and discs of all types and gauges, cutouts, trims and any and all other physical properties of every kind and nature relating to the Picture in whatever state of completion, and all duplicates, drafts, versions, variations and copies of each thereof (all of the foregoing herein collectively referred to as the "<u>Physical Property</u>");

      4.1.1.3  To the extent owned or controlled by Borrower, all rights of every kind or nature in and to any and all music and musical compositions created for, used in or to be used in connection with the Picture, including, without limitation, all copyrights therein and all rights to perform, copy, record, re-record, produce, reproduce and/or synchronize any or all music and musical compositions, as well as all other rights to exploit such music including record, soundtrack recording and music publishing rights;

      4.1.1.4  To the extent owned or controlled by Borrower, all collateral, allied, ancillary, subsidiary, publishing and merchandising rights of every kind and nature, without limitation, derived from, appurtenant to or related to the Picture or the Literary Property, including, without limitation, all production, exploitation or reissue rights by use of film, tape or any other recording devices now known or hereafter devised, whether based upon, derived from or inspired by the Picture, the Literary Property or any part thereof all rights to use, exploit and license others to use or exploit any and all novelization, publishing, commercial tie-ups and merchandising rights of every kind and nature, including, without limitation, all novelization, publishing, merchandising rights and commercial tie-ups arising out of or connected with or inspired by the Picture or the Literary Property, the title or titles of the Picture, the characters appearing in the Picture or said Literary Property and/or the names or characteristics of said characters, and including further, without limitation, any and all commercial exploitation in connection with or related to the Picture and/or the Literary Property;

      4.1.1.5  All rights of every kind or nature, present and future, in and to all agreements relating to the development, production, completion, delivery and exploitation of the Picture, including, without limitation, all agreements for personal services, including the services of writers, directors, cast,

producers, special effects personnel, animators, cameramen and other creative artistic and technical staff and agreements for the use of studio space, equipment, facilities animation services, special effects services and laboratory contracts;

4.1.1.6 All insurance and insurance policies heretofore or hereafter obtained in connection with the Picture or the insurable properties thereof and/or any person or persons engaged in the development, production, completion, delivery or exploitation of the Picture and proceeds thereof;

4.1.1.7 All copyrights and renewals and extensions of copyrights, domestic and foreign, heretofore or hereafter obtained in the Picture or the Literary Property or any part thereof, and the right (but not the obligation) to make publication thereof for copyright purposes, to register claim under copyright, and the right (but not the obligation) to renew and extend such copyrights, and the right (but not the obligation) to sue in the name(s) of Borrower and/or Lender for past, present and future infringements of copyright;

4.1.1.8 To the extent owned or controlled by Borrower, all rights to produce, release, sell, distribute, subdistribute, lease, sublease, market, license, sublicense, exhibit, broadcast, reproduce, publicize or otherwise exploit the Picture, the Literary Property and any and all rights therein in perpetuity, without limitation, in any manner and in any media whatsoever throughout the universe, including without limitation, by projection, radio, all forms of television (including, without limitation, free, pay, toll, cable, sustaining, subscription, sponsored and direct satellite broadcast), in theatres, non-theatrically, on cassettes, cartridges, discs and other similar and dissimilar video devices, and by any and all other scientific, mechanical or electronic means, methods, processes or devices now known or hereafter conceived, devised or created;

4.1.1.9 All right, title and interest in and to the Distribution Agreements, and all other agreements of any kind or nature licensing, granting or selling rights to distribute, broadcast, exhibit or otherwise exploit the Picture or rights therein, including, without limitation, any and all rights to the extent owned or controlled by Borrower, relating to merchandising, publishing, music and phonorecords derived from or connected with the Picture, and the proceeds of all of said agreements;

4.1.1.10 All rights of Borrower of any kind or nature, direct or indirect, to acquire, produce, develop, reacquire, finance, release, sell, distribute, subdistribute, lease, sublease, market, license, sublicense, exhibit, broadcast, transmit, reproduce, publicize, or otherwise exploit the Picture, or any rights in the Picture, including, without limitation, pursuant to any agreements between Borrower and any company controlling, controlled by, or under common control with Borrower (each, a "Subsidiary") which relate to the ownership, production or financing of the Picture;

4.1.1.11 All contract rights and general intangibles and all rights in, to and under all security agreements leases and other contracts securing or otherwise relating to any such contract rights and general intangibles, which grant to any Person any right to acquire, produce, develop, reacquire, finance, release, sell, distribute, subdistribute, lease, sublease, market, license, sublicense, exhibit, broadcast, transmit, reproduce, publicize, or otherwise exploit the Picture or any rights in the Picture including, without limitation, all such rights pursuant to agreements between Borrower and any Subsidiary which relate to the ownership, production or financing of the Picture;

4.1.1.12 To the extent owned or controlled by Borrower, all rent, revenues, income, compensation, products, increases, proceeds and profits or other property obtained or to be obtained from the production, sale, distribution, marketing, licensing, exhibition, reproduction, publication, ownership, exploitation or other uses or disposition of the Picture and the Literary Property (or any rights therein or part thereof), in any and all media, without limitation, the properties thereof and of any collateral, allied, ancillary and subsidiary rights and any and all merchandising and publishing rights therein and thereto, and amounts recovered as damages by reason of unfair competition, the

infringement of copyright, breach of any contract or infringement of any rights or derived therefrom in any manner whatsoever including, without limitation, all monies standing to the credit of the Production Account (all of the foregoing herein collectively referred to as the "<u>Gross Receipts</u>");

4.1.1.13 Any and all accounts, including the Production Account, accounts receivable, general intangibles, contract rights, chattel paper, documents, instruments and goods, including inventory (as those terms are defined in the UCC), not elsewhere included in this definition, which may arise in connection with the production, sale, distribution or exploitation of the Picture or any element thereof, including, without limitation, all general intangibles constituting rights to receive the payment of money or other valuable consideration, all receivables and all other rights to receive the payment of money including, without limitation, under present or future contracts or agreements (whether or not earned by performance), from the sale, distribution, exhibition, disposition, leasing, subleasing, licensing, sublicensing and other exploitation of the Picture or the Literary Property or any part thereof or any rights therein or related thereto in any medium, whether now known or hereafter developed, by any means, method, process or device in any market including, without limitation, all of Borrower's right, title and interest in, to and under the Distribution Agreements, and any other existing or future agreements for the distribution or other exploitation of the Picture, as the same may presently exist or hereafter from time to time come into existence, be amended, renewed, modified, supplemented, extended or replaced, including Borrower's rights to receive payments thereunder, and all other rights to receive film rentals, license fees, distribution fees, producer's shares, royalties and other amounts of every description including, without limitation, from (i) theatrical exhibitors, nontheatrical exhibitors, television networks and stations and airlines, cable television systems, pay television operators, whether on a subscription, per program charge basis or otherwise, and other exhibitors, (ii) distributors, subdistributors, lessees, sublessees, licensees and sublicensees (including any affiliated Person) and (iii) any other Person or entity that distributes, exhibits or exploits the Picture or the Literary Property or elements or components of the Picture or the Literary Property or rights relating thereto;

4.1.1.14 Any and all documents, receipts or books and records, including, without limitation, documents or receipts of any kind or nature issued by any pledgeholder, warehouseman or bailee with respect to the Picture or any element thereof;

4.1.1.15 All proceeds, products, additions and accessions (including insurance proceeds) of the Picture, as defined and referred to in subparagraphs 4.1.1.1 through 4.1.1.14 above;

4.1.1.16 All funds in or to be credited to the Production Account into which the proceeds of the Loan made shall be or shall have been credited; and

4.1.2 <u>Personal Property</u>. The following personal property, whether now owned or hereafter acquired, and the proceeds thereof: (i) all of Borrower's rights in and to the title of the Picture and the exclusive use thereof including (without limitation) any and all rights protected pursuant to trademark, service mark, unfair competition and/or other laws, rules or principles of law or equity and (ii) all inventions, processes, formulae, licenses, patents, patent rights, trademarks, trademark rights, service marks, service mark rights, trade names, trade name rights, logos, indicia, corporate and company names, business source or business identifiers and renewals and extensions thereof, domestic and foreign, relating to the Picture, whether now owned or hereafter acquired, and the accompanying good will and other like business property rights, and the right (but not the obligation) to register claim under trademark or patent and to renew and extend such trademarks or patents and the right (but not the obligation) to sue in the name(s) of Borrower and/or Lender for past, present or future infringement of trademark or patent; and

4.1.3 <u>Equipment</u>. All machinery, electrical and electronic components, equipment, fixtures, furniture, office machinery, vehicles, trailers, implements and other tangible personal property of every kind and description to the extent owned or controlled by Borrower now owned or hereafter acquired by and used in connection with the Picture (including without limitation, all wardrobe, props, mikes, scenery, sound stages,

movable, permanent or vehicular dressing rooms, sets, lighting equipment, cameras and other photographic, sound recording and editing equipment, projectors, film developing equipment and machinery) and all goods of like kind or type hereafter acquired by Borrower in substitution or replacement thereof, and all additions and accessions thereto (collectively hereinafter referred to as the "<u>Equipment</u>") and all rents, proceeds and products of the Equipment, including without limitation, the rights to insurance covering the Equipment; and

        4.1.4   <u>Cash Equivalents</u>. All cash and cash equivalents of Borrower derived from or relating to the Picture and all drafts, checks, certificates of deposit, notes, bills of exchange and other writings which evidence a right to the payment of money and are not themselves security agreements or leases and are of a type which is in the ordinary course of business transferred by delivery with any necessary endorsement or assignment whether now owned or hereafter acquired (all such drafts, checks, certificates of deposit, notes, bills of exchange and other writings, whenever acquired, collectively are called "<u>Instruments</u>"); and

        4.1.5   <u>Tax Credit Proceeds and Proceeds</u>. The Tax Credits, Tax Credit Proceeds, and Proceeds, whether now owned or hereafter acquired (including all property and/or assets converted or substituted for such Tax Credits, Tax Credit Proceeds, and Proceeds); and

        4.1.6   To the extent not included in the items described in paragraphs 4.1.1 through 4.1.5 above, all accounts, contract rights, general intangibles, documents, instruments, chattel paper, goods, inventory and equipment (as such terms are defined in the UCC) now owned or hereafter acquired by Borrower, and the proceeds and products thereof.

      4.2   <u>Perfection of Security Interest</u>.  Concurrently with the execution of this Agreement, Borrower hereby authorizes Lender to file the appropriate financing statement(s) in the applicable jurisdictions under the UCC ("<u>Uniform Commercial Code Financing Statement(s)</u>") and Borrower shall execute and deliver or cause to be executed and delivered to Lender any and all other instruments which Lender may request from time to time to perfect Lender's Security Interest hereunder and to effectuate the purposes and intent hereof, including, without limitation, to the Copyright Mortgage.

      4.3   <u>Guild Intercreditor Agreement</u>.  For the avoidance of doubt, the respective rights of the parties with respect to the Collateral are subject to the Guild Intercreditor Agreements.

      4.4   <u>Release of Security Interests</u>.  Upon full and indefeasible repayment of the Indebtedness, and as long as Borrower is not entitled to any further disbursements of the Loan hereunder, Lender shall, upon Borrower's request and at Borrower's expense, timely (but no later than five (5) Business Days after receipt of such request), execute and deliver to Borrower a release of the Copyright Mortgage which Borrower may file with the United States Copyright Office, and deliver to Borrower a form UCC-3 termination statement in respect of the Uniform Commercial Code Financing Statement filed by Lender. Lender shall also provide Borrower with a letter terminating any Letters of Direction that have been served upon third party payors by Lender.

5.     <u>REPRESENTATIONS AND WARRANTIES</u>.  In order to induce Lender to enter into this Agreement, Borrower agrees, represents and warrants to Lender as follows, which agreements, representations and warranties shall survive the execution and delivery of this Agreement:

      5.1   <u>Organization, Etc</u>.  Borrower is a limited liability company in good standing duly organized under the laws of the State of New Mexico and has the requisite power and authority to own its properties and to transact the business in which it is engaged in all places at which it engages in business.  All actions heretofore taken and agreements heretofore entered into by Borrower in connection with the Collateral were duly authorized and constitute actions and obligations of Borrower.  The chief office and principal place of business of Borrower and place where Borrower's books and records are maintained is located at 110 E. Broadway Street, Hobbs, New Mexico 88240.  Borrower shall notify Lender immediately upon any change in its chief office or principal place of business or of the place where its books and records are maintained.

5.2    <u>Financial Statements</u>.  The production budget and cost reports furnished by Borrower to Lender in connection with Borrower's application for credit hereunder, if any, are, in all material respects, accurate and correct, prepared in accordance with generally accepted, accounting principles and accurately represent the financial status of the Picture; no materially adverse changes have occurred since the dates of said documents; and no material liabilities, contingent or otherwise, not shown or contemplated on said documents exist.  Borrower has furnished to Lender copies of all material agreements, indentures, and other instruments pursuant to which it has incurred indebtedness or may be obligated, whether directly or indirectly, for borrowed money.

5.3    <u>Power and Authority</u>.  Borrower has the power and authority to execute deliver and carry out the terms and provisions of this Agreement and to execute and deliver the Promissory Note, and all other Loan Documents, and has taken all necessary corporate action to authorize the execution and delivery of this Agreement, the borrowing hereunder, and the execution and delivery of the Promissory Note, and said other Loan Documents.

5.4    <u>No Conflicts</u>.  Neither the execution and delivery of this Agreement, the Promissory Note or any other Loan Document, instrument or agreement to be executed pursuant hereto, nor the consummation of the transactions herein contemplated, nor compliance with the terms and provisions hereof or with the terms and provisions of the Promissory Note or any other Loan Document (i) will violate any provision of law or of any applicable regulation, order or decree of any court or governmental instrumentality or administrative body or agency, (ii) will conflict or will be inconsistent with, or will result in any breach of, any of the terms, covenants, conditions or provisions of any mortgage, indenture, deed of trust, agreement or other instrument to which Borrower is a party or by which it may be bound or to which it may be subject, or (iii) will violate any provision of the articles of incorporation pursuant to which Borrower was formed or any other organizational document thereof.

5.5    <u>No Pending Legal Actions</u>.  There are and will be no claims, actions, suits or proceedings, pending or threatened, against, affecting or relating to, Borrower or the Collateral before any court or governmental or administrative body or agency which might result in any material adverse change in the business, operations, properties or assets or in the condition, financial or otherwise, of Borrower or which would otherwise adversely affect the rights and Security Interest granted to Lender hereunder.  Borrower is not in default under any applicable statute, rule, order or regulation of any governmental authority, bureau or agency having jurisdiction over it.

5.6    <u>Binding Obligation</u>.  This Agreement, the Promissory Note, and each other Loan Document, when executed and delivered pursuant hereto, will constitute legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with the respective terms hereof and thereof (except as may be limited by bankruptcy, insolvency, reorganization, or moratorium or other similar laws now or hereafter in effect relating to or affecting creditors' rights generally).

5.7    <u>First Priority Security Interest</u>.  Subject to the Guild Intercreditor Agreements and any other inter-creditor executed by Lender, this Agreement and the other instruments, agreements and documents to be executed and delivered to Lender hereunder will effect (upon due execution and delivery and after the proper recordation of those documents required to be recorded) a valid first priority security interest in favor of Lender in the Collateral (including, without limitation, the Proceeds, Tax Credits, and Tax Credit Proceeds).

5.8    <u>No Other Consent</u>.  In connection with the execution, delivery, performance, validity and enforceability of this Agreement, and the Promissory Note or any other instrument, agreement or document to be executed and delivered hereunder, no consent of any Person, and no consent, license, approval, authorization, registration or declaration with any governmental authority, bureau or agency is required.

5.9    <u>Tax Credits</u>. Borrower will comply with all applicable rules and requirements of the State of New Mexico for the Borrower to qualify for the Tax Credits in connection with the Picture, and Borrower shall take all actions necessary in order for the Picture to qualify for the payment of Tax Credit Proceeds in an amount not less than the Indebtedness.

5.10    Principal Photography. Principal photography of the Picture ("Principal Photography") shall commence on or about January 31, 2022.

5.11    Financial and Tax Years; Income.  Borrower's current financial and tax year will end on December 31, 2022. Borrower will have no income to report on its New Mexico State income tax return for the tax year ending December 31, 2022.

5.12    Ownership. Borrower owns all motion picture and allied rights in and to the Screenplay and the copyright thereof as are necessary for the production, distribution, exhibition and exploitation of the Picture by all manner and means in all media throughout the universe in perpetuity, including, without limitation, all rights granted to Distributors under the Distribution Agreements.

5.13    Borrower's Acts; No Encumbrance of Tax Credits or Distribution Agreements. Borrower has not performed, nor will Borrower perform, any acts (including, without limitation, any acts that would result in the revocation of any of the Tax Credits) or execute any other instruments which prevent or could reasonably likely prevent Lender from deriving the full benefits of any of the terms or conditions of this Agreement. Borrower has not and will not have pledged, assigned, transferred or otherwise disposed of or encumbered the Proceeds, Distribution Agreements, Tax Credits or the Tax Credit Proceeds, or any of its right, title, or interest in and to the Proceeds, Distribution Agreements, Tax Credits or the Tax Credit Proceeds, other than to the Lender.  No third party has any right, title or interest in or to the Proceeds, Distribution Agreements, Tax Credits or Tax Credit Proceeds.

5.14    Third Party Rights. Except as expressly acknowledged herein and in the Guild Intercreditor Agreements: (i) Borrower (and/or others on its behalf) has not transferred, assigned, or encumbered any rights heretofore (or hereafter to be) acquired by Borrower with respect to the Collateral; and (ii) no Person (other than Borrower) has any rights of any kind in or to the Collateral.  No rights, property or interests exist or will be granted to any third party which are in any way inconsistent with or adversely affect Lender's rights and/or Lender's Security Interest under this Agreement.

5.15    No Litigation. No litigation, suits, proceedings or claims exist or are threatened relating to the Picture or rights therein or thereto or otherwise, which would have a material adverse effect on the rights and Security Interest granted to Lender hereunder or the ability of Borrower to perform its obligations hereunder or under any other agreement to which it is a party which relates to the Collateral.

5.16    Distribution Agreements. The Distribution Agreements that have been delivered to Lender are in full force and effect as of the date hereof, and neither Borrower nor, to the best of Borrower's knowledge (using reasonable prudence in such matters), Distributor is in default thereunder.

5.17    No Pending Insolvency Proceeding.  No insolvency proceedings of any nature are now pending or threatened by or against Borrower.

5.18    Proceeds of Loan.  None of the proceeds of the Loan shall be used, directly or indirectly, for any purpose other than for the payment of the costs of production of the Picture in accordance with the Budget as expressly provided herein and to pay Lender's costs and expenses specified in paragraphs 7.5 and 7.7 hereof.

5.19    Representations with Respect to the Picture.  The Picture as produced: (i) will be original and will not violate or infringe any copyright to the best of Borrower's knowledge or any other rights whatsoever of any Person; (ii) will be produced and duly and timely delivered to Distributors in accordance with the requirements of the Distribution Agreements (if any), and Borrower shall acquire all such rights (including, without limitation, all rights in and to the music of the Picture) as may be required by the Distribution Agreements and as may be necessary for Distributors to fully exercise all rights granted to them under the Distribution Agreements; (iii) shall conform to the Screenplay except for minor deviations normally made by the director which do not materially change the storyline or result in an overall increase in the cost of the Picture; and (iv) shall receive an MPAA rating no more restrictive than "R".

5.20    Qualified Film Production Company.  Borrower is a Qualified Film Production Company and shall maintain such existence until repayment of the Indebtedness.

5.21    Accurate Information. No information, exhibit, or written report or the content of any schedule furnished by or on behalf of Borrower to Lender in connection with the Loan, or the Collateral, and no representation or statement made by Borrower in any Loan Document, contains any material misstatement of fact or omits the statement of a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances in which it was made. There is no fact presently known to Borrower which has not been disclosed to Lender which materially adversely affects nor could reasonably be expected to materially adversely affect, the property or the business, operations or condition (financial or otherwise) of Borrower or the value, marketability or sufficiency of the Collateral.

5.22    Timely Performance. Borrower will duly and timely perform all of its respective material obligations and agreements hereunder and under any other agreement to which it is a party and which relates to the Picture.

6.    CONDITIONS PRECEDENT. Notwithstanding anything to the contrary herein contained, Lender shall not be obligated to advance funds under the Loan unless all of the following conditions have been satisfied at the time of each disbursement of an installment of the Loan:

6.1    Chain-of-Title.  Lender has been provided with documentation satisfactory to Lender and its counsel that Borrower has the right to produce the Picture and such other chain of title documentation in form and substance satisfactory to Lender and its counsel as Lender may reasonably require.

6.2    Required Documents.  There shall have been delivered to Lender the following documents, instruments and agreements (such documents, instruments and agreements to be executed to the extent they can be executed) in form and substance reasonably satisfactory to Lender and to Lender's counsel:

6.2.1    Financing Statements.  Uniform Commercial Code Financing Statements with respect to the Security Interests granted to Lender hereunder for all jurisdictions in which Lender, in its discretion, deems it necessary to file such Uniform Commercial Code Financing Statements to perfect the Security Interest;

6.2.2    Loan Documents. Copies of all Loan Documents, duly executed by all parties thereto, together with all exhibits, schedules, attachments and supplementary documents thereto;

6.2.3    Insurance Certificates; Notice to Insurer. Insurance certificates with respect to the insurance coverages required to be obtained and maintained pursuant to paragraph 7.10 hereof, including, without limitation, any essential elements insurance;

6.2.4    UCC Security Interest Search Reports.  Reports confirming that there are no filings of record which indicate that another Person has rights or a security interest in the Collateral hereunder, other than as expressly set forth herein, which would be inconsistent with the Security Interest granted to Lender hereunder;

6.2.5    Articles of Organization and Operating Agreement; Good Standing Certificates.  A true copy of the articles of organization of Borrower, together with a certificate of the date of filing thereof, and letter of good standing from the Secretary of State of Borrower's state of organization, dated as of a recent date; and the Operating Agreement of Borrower, duly certified as of a recent date by the secretary of Borrower;

6.2.6    Distribution Agreements. Copies of any Distribution Agreements that have been entered into by Borrower prior to the date of each disbursement of the Loan, duly executed by Distributor and Borrower.

6.2.7    Guild Intercreditor Agreements.  If Borrower has previously granted to SAG, DGA, WGA or any other talent union or guild a security interest in the Collateral, the SAG Intercreditor Agreement, or a subordination agreement from such other talent union or guild, duly executed on behalf of SAG, DGA, WGA or such other talent union or guild, provided that if Borrower has not granted a security interest to SAG, DGA,

WGA or such other talent union or guild prior to closing it will provide a Guild Intercreditor Agreement, or subordination agreement(s) promptly after Borrower is asked to execute any such security agreement(s);

6.2.8    Borrowing Resolutions; Certificate of Incumbency.  Certified copies of the resolutions of the members of the Borrower, authorizing, as applicable, the execution, delivery and performance of this Agreement and the other Loan Documents, as well as all of the transactions contemplated thereby, and such other documents relating thereto as Lender may reasonably request, together with an member's certificate ("Certificate of Incumbency"), dated as of a recent date, certifying as to the incumbency and signatures of the person(s) authorized to execute and deliver the applicable Loan Documents on behalf of the Borrower;

6.2.9    Budget, Cash Flow Schedule, Screenplay, Production Schedule(s) and Tax Credit Certificate. A copy of the Budget (which shall, in the opinion of the Lender, be sufficient to complete the Picture and for the Borrower to qualify for the aggregate Tax Credit amount of no less than Five Hundred and Forty Thousand United States Dollars (US $540,000.00) in accordance with the laws, regulations and program administrator policies relevant to the Tax Credits), cash flow schedule, Screenplay, the schedule(s) of production and post-production for the Picture and copies of the Borrower's application to the Film Office for the Tax Credits for the Picture and confirmation by the Film Office that the application process is in good standing and there are no outstanding information requests that will prevent the submission of the Borrower's "final application" for Tax Credits and the AUP Audit, and a copy of the Film Office's Certificate of Conditional Eligibility in response thereto confirming that the Picture is conditionally approved in the "Pool allocation";

6.2.10    Legal Opinion.  The favorable written opinion of counsel for Borrower, addressed to Lender, relating to such matters as Lender may request in form and substance satisfactory to Lender and its counsel;

6.2.11    Borrowing Certificate.  A Borrowing Certificate, in form and substance satisfactory to Lender and Borrower, duly signed by Borrower;

6.2.12    Independent Accountant's Report.   An Independent Accountant's Report, in form and substance satisfactory to Lender;

6.2.13    Certificate of the Members.  Duly signed certificate of the members of the Borrower in form and substance satisfactory to Lender;

6.2.14    Form 8832.  If necessary and prudent, a copy of an IRS Form 8832 whereby the Borrower elects to be taxed as a corporation, and proof of filing of the same with the Internal Revenue Service; and

6.2.15    Miscellaneous.  Such other documents as Lender may reasonably request in order to effect fully the purposes of this Agreement and/or the other Loan Documents.

6.2.16    Production Agreements. Fully executed copies of the Director Agreement, the Producer Agreements, and the Producer Holdback Agreement(s), each in form and content approved by Lender.

6.2.17    Notice of Assignment. Executed Notice of Assignments ("NOAs") for all executed sales.

6.2.18    Distributor Assumption Agreement. Copy of the signed Distributors Assumption Agreement ("DAA") provided by any union or guild at their request, specifying that Redbox Entertainment shall assume all residual obligations.

6.2.19    Actor Agreements. Fully executed Actor Agreements.

6.3    Event of Default.  At the time of disbursement of an installment of the Loan (both before and after giving effect thereto), there shall exist no uncured Event of Default and no condition, event or act which with notice or lapse of time, or both, would constitute an Event of Default hereunder.

6.4     <u>Representations and Warranties</u>. All representations and warranties contained herein or otherwise made in writing in connection herewith shall be true and correct in all material respects with the same effect as though the representations and warranties had been made on the date of disbursement of each installment of the Loan.

6.5     <u>Material Changes</u>. There has been no material adverse change in the Picture's Budget, Qualified Production Costs, Picture elements, financing structure, timing of production (including post-production) or Borrower's key production team.

6.6     <u>Change In Law</u>. No laws, rules, administrative procedures or similar authority of either the State Authority or any other relevant governmental agencies of the State of New Mexico have been changed, altered or construed in any manner to prevent the issuance of the Tax Credits, or to defer beyond the dates set forth herein, eliminate or suspend the ability to use or issue the Tax Credits, or the issuance of the tax rebate to Borrower.

6.7     <u>Production and Post-Production Accountants</u>. Lender's due diligence and approval of the production accountant (Jessica Osborne is hereby pre-approved by Lender) and post-production accountant, approval not to be unreasonably withheld, and Lender is reasonably satisfied that the production accountant has not failed to follow reasonable reporting standards and guidelines as defined by the Lender to such production accountant.

6.8     <u>Financial Condition of Borrower</u>. No material adverse change in the financial condition of Borrower has occurred at the time of the requested Loan. It is understood that this review shall be conducted by Lender in good faith in accordance with its customary practice.

6.9     <u>Background Checks</u>. Background checks performed on the officers of the Borrower that are executing Loan Documents are reasonably satisfactory to Lender.

6.10     <u>All Other Budgeted Funds Committed and Funds Paid</u>. Lender is provided with evidence reasonably satisfactory to Lender and its counsel that: (i) there shall be sufficient funds in the Picture's budget to complete the Picture for Borrower to qualify for the Estimated Tax Credits in accordance with all laws, regulations and Film Office policies; and (ii) all funds for the Budget (other than the Commitment Amount and documented deferments) have been funded to the Production Account.

7.     <u>AFFIRMATIVE COVENANTS</u>. Borrower hereby covenants and agrees as follows:

7.1     <u>State Tax Credit</u>.

7.1.1     Borrower shall take all actions necessary in order for the Picture to qualify for the Tax Credits in an amount not less than the Estimated Tax Credits including, without limitation, ensuring:

7.1.1.1     not less than seventy five percent (75%) of the aggregate of all expenses related to work on the Picture (excluding post-production work on the Picture) performed at Film Production Facilities, wherever located, shall be related to work on the Picture performed at an Qualified Production Facility;

7.1.1.2     not less than seventy five percent (75%) of the aggregate of all post production costs related to work on the Picture shall be "qualified post production costs" under the State Tax Credit Law;

7.1.1.3     not less than seventy five percent (75%) of all Principal Photography days filmed outside a Qualified Production Facility shall be filmed in New Mexico State;

7.1.1.4     all taxable tangible property and services, the costs of which qualify as Qualified Production Costs, are purchased only from entities registered to collect and remit New Mexico State and local sales taxes; and

7.1.1.5  the end credits for the Picture shall include (i) the following credit, "Filmed With the Support of the New Mexico State Governor's Office for Motion Picture and Television Development", and (ii) the New Mexico Film logo provided to Borrower by the Film Office.  Borrower shall provide the Film Office with proof of compliance with these credit and logo requirements prior to filing for the final "Certificate of Tax Credit" with the Film Office.

7.1.2    Borrower shall apply to the Film Office voluntary audit "agreed-upon procedures" program to obtain a verification letter stating that the Tax Credits were verified, such voluntary audit "agreed-upon procedures" process ("AUP Audit") to be performed by the Independent Accountant at Borrower's sole expense. Borrower shall ensure that the AUP Audit shall be submitted to the Film Office to request the "Certificate of Tax Credits" (the "Tax Credit Certificate") no later than May 15th, 2022.

7.1.3    The Borrower will provide Lender a signed and completed New Mexico State tax return in connection with which it will file the "Certificate of Tax Credit" issued by the Film Office in a timely manner, but in any event no later than two (2) weeks following receipt of the Tax Credit Certificate from the Film Office, and such tax return shall have the postal address of the Lender as the address to send any rebate checks.  Borrower shall only use a person or firm approved by Lender to prepare its New Mexico State tax return in connection with which it will file the "Certificate of Tax Credit".

7.1.4    Until such time as Lender has received an amount equal to the Indebtedness, in any tax return which Borrower files with the State of New Mexico, Borrower shall specify that all monies payable to Borrower in connection with any such tax return (including, without limitation, the Tax Credits) shall be paid to the Lender Account.

7.1.5    If any Proceeds or Tax Credit Proceeds are paid directly to Borrower, Borrower shall hold such amounts in trust for Lender and shall immediately pay any such amounts to Lender.

7.2    Books and Records.  Borrower shall maintain, at all times and in accordance with good and generally accepted accounting principles in the motion picture industry, true, full and complete books and records showing the financial transactions of Borrower and (to the extent Borrower has access to or possession of the books and records of) any other Person with respect to the Picture, and Borrower shall permit Lender (or its designee) to examine the same upon fifteen (15) Business Days' prior written notice at such time(s) during reasonable business hours as Lender (or its designee) may request upon reasonable notice and to take excerpts therefrom and to make copies thereof only until the Indebtedness is repaid in full.  Until such time as the Indebtedness is indefeasibly repaid in full and Borrower is not entitled to any further disbursements of the Loan hereunder, all such books and records (or duplicates thereof) shall be maintained at Abrams Garfinkel Margolis Bergson, LLP, 3900 West Alameda Avenue, Suite 2100, Burbank, California 91505, and shall not be maintained in any other place without Lender's prior written consent. Borrower shall inform Lender of the identity of the proposed post-production accountant for the Picture and Lender shall be entitled to conduct reasonable customary due diligence on such accountant and shall have approval of the post-production accountant for the Picture, approval not to be unreasonably withheld, delayed or conditioned.

7.3    Statements, Etc.  Until such time as the Indebtedness is indefeasibly repaid in full and Borrower is not entitled to any further disbursements of the Loan hereunder, Borrower shall furnish or cause to be furnished to Lender in form reasonably satisfactory to Lender all such information in connection with the Picture as Lender may reasonably request, including, but not limited to, the following:

7.3.1    Copies of all bank statements and other financial information with respect to the Picture received by Borrower or any Affiliated Person during the preceding financial quarter;

7.3.2    Copies of all weekly production reports, if any, indicating by Budget category all expenditures theretofore made by Borrower in connection with the Picture, the amount of cost overrun, if any, for the week immediately preceding submission of such report and the estimated cost to complete the Picture during the preceding financial quarter.  Borrower's failure to promptly provide such reports shall not constitute an Event

of Default hereunder unless Borrower fails to provide same within five (5) Business Days after any reasonable request therefor by Lender;

       7.3.3    Copies of any correspondence, applications, certificates, tax forms and other documents or instruments submitted to, or received from, the State Authority with respect to the Picture and the Tax Credits within five (5) Business Days of receipt or submission thereof, as the case may be.

       7.4    <u>Notice of Legal Proceedings</u>.  Borrower shall promptly give written notice to Lender of all litigation, proceedings, controversies (which in any material way may adversely affect Lender's rights and/or Lender's Security Interest hereunder or under any documents referred to herein, including Lender's rights to the Proceeds and Tax Credit Proceeds) or material interruptions (i.e., events of force majeure) in the production, post-production or distribution of, or claims materially affecting the Collateral or any of the rights of Borrower with respect thereto, including the Tax Credits, in each case only if and to the extent Borrower is actually aware or has received written notice thereof, and, where applicable, Borrower shall appear in and defend any and all such actions and proceedings and shall obtain and furnish to Lender from time to time, promptly following a written demand by Lender, all instruments, agreements, financial statements, documents, releases and subordinations of claims or liens as Lender may reasonably require, consistent with this Agreement, to maintain the priority of Lender's Security Interest under this Agreement.  In this regard, Borrower shall defend the Collateral against the claims and demands of all other parties claiming by, through or under Borrower, and will keep the Collateral free and clear from all security interests or other encumbrances created by, through or under Borrower, except the Security Interest created hereunder and those security interests expressly permitted hereunder.

       7.5    <u>Costs and Expenses; Taxes</u>. After the occurrence of an Event of Default (which has not been cured by Borrower as provided herein), Borrower shall pay immediately upon demand by Lender all actual, out-of-pocket costs and expenses incurred in connection with the enforcement of the rights of the Lender hereunder or under the Promissory Note or any other Loan Document or otherwise in connection with the realization upon any Collateral.  Such unpaid costs and expenses (including court costs and reasonable outside attorneys' fees) shall constitute an additional disbursement of the Loan hereunder and shall be secured and recoupable and shall bear interest in the same manner as provided for in paragraph 2 hereof.  At Lender's election, Lender shall have the right (and is hereby authorized by Borrower) to deduct all amounts payable to Lender pursuant to this paragraph 7.5 or pursuant to paragraph 7.7 hereof from a disbursement of the Loan made by Lender to Borrower, or to make additional disbursements under the Loan for the repayment to Lender of all such amounts.

       7.6    <u>Performance; Copyright Registration</u>. Borrower shall diligently and duly perform and observe all the terms, covenants and conditions on its part to be performed and observed under and pursuant to the Production Services Agreement and Distribution Agreements, as applicable. Borrower shall make all necessary recordations and copyright filings with the US Copyright Office as Lender may reasonably require. Promptly upon completion of the Picture, Borrower shall notify Lender in writing and shall also register the Picture with the United States Copyright Office. Borrower shall also give Lender prompt written notice each time the Screenplay and/or the Picture may acquire or become known by a new or different name or title.

       7.7    <u>Indemnity</u>.  Borrower shall, at all times, defend and indemnify and hold Lender (which for the purposes of this paragraph shall include the shareholders, officers, directors, employees, representatives and agents of Lender) harmless from and against any and all liabilities, claims, demands, causes of action, losses, damages, expenses (including, without limitation, reasonable outside attorneys' fees), costs, settlements, judgments or recoveries, unless a court of competent jurisdiction determines in a final and non-appealable judgment that any such claim results from Lender's gross negligence, fraud or willful misconduct, arising out of or resulting from (i) any breach of the representations, warranties, agreements or covenants made by Borrower herein or any other Loan Document, (ii) any suit or proceeding of any kind or nature whatsoever against Lender arising from or connected with the transactions contemplated by this Agreement or any of the documents, instruments or agreements to be executed pursuant hereto or any of the rights and properties assigned to Lender hereunder, (iii) the amount of the Tax Credits pursuant to the Tax Credit Certificate duly issued to Borrower in connection with the Picture being reduced below the amount of Estimated Tax Credits, cancelled, revoked, terminated or recaptured, and/or (iv)  any suit or proceeding that Lender may deem necessary or advisable to institute, in the name of Lender or Borrower or both, against any other Person for any reason whatsoever to protect the title and/or

the rights of Lender hereunder, or any rights granted to Lender, including reasonable outside attorneys' fees and court costs and all other out-of-pocket costs and expenses incurred by Lender, all of which shall be charged to and paid by Borrower and shall be secured by Lender's Security Interest in the Collateral. The foregoing indemnity shall survive repayment of the Loan and the termination of this Agreement.

7.8    <u>Further Assurances</u>.  Borrower shall, upon request from Lender, execute and deliver, or cause to be executed and delivered, to Lender the documents referred to in paragraph 6.2 hereof and such further instruments, documents and agreements consistent herewith as Lender may reasonably require and shall do, or cause to be done, such further acts as Lender may reasonably desire to carry out or effectuate the purposes of this Agreement consistent with the terms and conditions set forth herein and to enable Lender to exercise its rights and remedies hereunder. If Borrower shall fail to execute or deliver to Lender any further instruments, documents or agreements under the provisions of this paragraph 7.8 within five (5) Business Days after Borrower's receipt of Lender's written request for same from Lender, (following Borrower's reasonable opportunity to review and comment on the same), then Borrower hereby appoints Lender as Borrower's irrevocable attorney-in-fact, with full power of substitution and with the right, but not the obligation, to do any and all acts and things necessary to execute, acknowledge and deliver any and all such further instruments, documents or agreements, in Borrower's name and on Borrower's behalf, which appointment shall be deemed to be a power coupled with an interest and shall be irrevocable. Lender shall promptly provide Borrower copies of all documents so executed, provided that failure to so provide such copies of documents shall not be a default hereunder.

7.9    <u>Notice of Events of Default</u>.  Borrower shall give Lender prompt written notice of all Events of Default under any of the terms or provisions of this Agreement and of any changes in management, litigation, or of any other matter which has resulted in or may result in a material adverse change in the financial condition or operation of Borrower.

7.10    <u>Insurance</u>.

7.10.1    <u>"Producer's Package" Coverage</u>.  Borrower shall at all times hereunder at its own cost and expense obtain and keep in full force and effect in amount, kind and form reasonably satisfactory to Lender and with insurers approved by Lender, the following types of insurance providing such coverage as is customarily provided by such types of insurance: Cast Insurance in an amount equal to at least the Commitment Amount covering the director, the director of photography and the principal cast members, among others; Negative Insurance in an amount equal to the amount of the Budget and projected interest hereunder; Faulty Stock, Camera and Processing Insurance; Props, Sets and Wardrobe Insurance; Miscellaneous Equipment Insurance; Property Damage Liability Insurance; Worker's Compensation Insurance and any insurance coverage required by applicable collective bargaining agreements.

7.10.2    <u>Lender Named as Loss Payee</u>.  The Property Damage Liability Insurance shall include Lender as a loss payee and include (i) a provision for the issuance to Lender of written notice of any cancellation of or material change in such insurance coverage which written notice shall be given to Lender not less than ten (10) Business Days in advance of such cancellation of or material change in such insurance coverage and (ii) customary waiver of subrogation language in form and substance acceptable to Lender.

7.10.3    <u>Liability Insurance</u>.  Borrower shall at all times hereunder at its own cost and expense obtain and keep in full force and effect and in an amount, kind and form reasonably satisfactory to Lender and with insurers approved by Lender the following types of liability insurance which shall provide such coverage as is customarily provided by such types of insurance:

7.10.3.1 Errors and Omissions Insurance covering, among other things, the legal liability and defense of the producer of the Picture against lawsuits alleging the unauthorized use of title, format, ideas, characters, plots, plagiarism, copyright infringement and unfair competition. Such insurance shall also protect against alleged libel, slander, defamation of character and invasion of privacy. The Errors and Omissions Insurance shall be in the minimum amount of One Million Dollars ($1,000,000) per occurrence and Three Million Dollars ($3,000,000) in the aggregate, with a deductible

of Twenty-Five Thousand Dollars ($25,000) per occurrence and a period of coverage of not less than three (3) years from the date of commencement of Principal Photography of the Picture.

7.10.3.2  Comprehensive Liability Insurance covering Borrower of the Picture against, among other things, all claims for bodily injury, personal injury or property damage which arise in connection with the Picture, including, without limitation, coverage for all owned, non-owned and hired vehicles (both on and off camera) with minimum liability limits of One Million Dollars ($1,000,000).

7.10.4  <u>Naming Lender as "Additional Insured"</u>.  The insurance enumerated in subparagraph 7.10.3 shall name Lender (and its agents, officers, directors and employees) as an additional insured thereunder and shall (i) provide for the issuance to Lender of written notice of any cancellation of or material change in any such insurance coverage which written notice shall be given to Lender not less than ten (10) days in advance of such cancellation of or material change in such insurance coverage and (ii) include customary waiver of subrogation language in form and substance acceptable to Lender.

7.10.5  <u>Payment of Premiums</u>.  The policies of insurance (or the Certificates of Insurance reflecting that such coverage is in effect) referred to in this paragraph 7.10 shall (a) contain an endorsement which negates the "other insurance" clause in said policies and a statement that the insurance being provided is primary and any insurance carried by a Lender is neither primary nor contributory and (b) be delivered to Lender. Lender shall not have any liability to pay for any premiums or calls with respect to any of the insurance policies referred to in this paragraph 7.10.

7.11  <u>Reconciliation of Statements</u>. Upon the reasonable request of Lender, Borrower shall promptly furnish to Lender a reconciliation of information concerning any discrepancy with respect to any item in any summary or statement of revenues paid and payable by Distributors or any other Person, and Borrower further agrees that, if Lender in its good faith business judgment believes that an Event of Default may have occurred, Lender shall have the right to appoint an accountant to prepare such information as Lender may require, the reasonable fees and expenses of such accountant to be borne and paid by Borrower

7.12  <u>Fair Labor Standards Act</u>.  Borrower shall comply in all respects with the Fair Labor Standards Act.

7.13  <u>Intentionally Omitted.</u>

7.14  <u>Payments from Distributors</u>. At all times (including, without limitation, after the occurrence of an Event of Default hereunder) prior to the full, timely and indefeasible repayment of the Indebtedness hereunder, Borrower shall supervise and monitor the performance of and payments from Distributors under the Distribution Agreements, and Borrower shall keep true, full and complete books and records of such payments and of all production costs of the Picture, which books and records shall be in accordance with good and generally accepted accounting practices in the motion picture industry. Until such time as the Indebtedness is indefeasibly repaid in full under this Agreement, Borrower shall pay all amounts payable to Borrower under any Distribution Agreement or from any other exploitation of the Picture in good and collected funds in Dollars, directly to the Lender Account.  If any Distributor shall pay any such amounts to Borrower, Borrower shall receive such amounts as trustee for Lender and promptly upon receipt thereof shall remit such amounts (or cause such amounts to be remitted) to the Lender Account.

8.  <u>NEGATIVE COVENANTS.</u>

8.1  <u>Written Consent</u>.  Borrower hereby covenants and agrees that, so long as this Agreement is in effect and until Borrower's obligations to Lender hereunder are fully paid, performed and discharged, Borrower will not, and will not allow any Person to, without first having procured the written consent of Lender:

8.1.1  Terminate, amend, alter or modify, or consent to or permit the termination, amendment, alteration or modification of any agreement referred to herein or forming part of Lender's Security Interest in any manner, or enter into any other agreement, that would adversely affect or lessen any of the rights granted to

DocuSign Envelope ID: 8F16614C-438D-4E4F-B915-285A79B7D543

Lender under this Agreement, or under any instruments, documents or agreements executed by Borrower in connection herewith;

8.1.2    Wind up, liquidate or dissolve its affairs, or sell, lease, license, transfer, or otherwise dispose of or grant an interest in all or a substantial part of its properties and assets, or change its company or trade name or modify its company existence;

8.1.3    Create, assume or suffer to exist any security interest, mortgage, pledge, encumbrance, assignment, lien or charge of any kind upon the Collateral (other than the security interests of Lender or the Guilds, referred to in paragraph 5.14 hereof or otherwise disclosed to Lender in writing prior to execution of this Agreement);

8.1.4    Take any action, or fail to take any action, that would adversely affect the payment of the Proceeds or Tax Credit Proceeds to Lender including, without limitation, filming parts of the Picture outside of New Mexico State unless otherwise approved in advance in writing by Lender (such approval shall not be unreasonably withheld or delayed by Lender) or filing a New Mexico State tax return to apply for Tax Credits in excess of Six Hundred Thousand United States Dollars (US $600,000.00.) without the prior written approval of the Lender;

8.1.5    Except as provided in paragraph 4 and 5.16 of this Agreement, otherwise sell, assign, encumber, grant a security interest in, transfer or allocate any or all of the Collateral (including, without limitation, the Proceeds, Distribution Agreements, Tax Credits, and the Tax Credit Proceeds) to any Person other than Lender;

8.1.6    Permit any Tax Credit or Tax Credit Proceeds to be applied to any tax liability for which Borrower is liable; or

8.1.7    Elect to become an "S corporation" or form of disregarded entity pursuant to rules and regulations of the United States Internal Revenue Service.

8.2    <u>Use of Funds</u>.  Borrower shall not use any funds disbursed by Lender under the Loan for any purpose or thing except to pay the costs of production of the Picture in accordance with the approved Budget and Lender's costs and expenses specified in paragraphs 7.5 and 7.7 hereof.

9.    <u>EVENTS OF DEFAULT</u>.

9.1    <u>Specified Events of Default</u>.  Each of the following specified events hereby constitutes and is herein referred to individually as an "Event of Default", it being understood that an Event of Default shall not be deemed to have occurred until the cure period set forth in the applicable subparagraph below, if any, shall have expired, other than with respect to the calculation of Default Interest if such Event of Default is not cured within the applicable cure period:

9.1.1    Borrower's failure to make (or cause to be made) any payments to Lender hereunder when the same are due, including without limitation, payment of the Commitment Amount (and Default Interest, if any), by the applicable Repayment Date(s);

9.1.2    Borrower's failure to pay any Proceeds or Tax Credit Proceeds to Lender in accordance with paragraph 7.1.5 hereof; or

9.1.3    Borrower's failure to submit the AUP Audit to the Film Office by the date specified in paragraph 7.1.2; or

9.1.4    Borrower's failure to maintain (or cause to be maintained) in full force and effect the policies of insurance as provided in paragraph 7.10 hereof for the full periods required by Lender; provided, however, if

a policy is terminated for some reason other than by a default of Borrower, Borrower shall have five (5) Business Days to reinstate or replace such policy; or

9.1.5    Default in the due and timely observance or performance of the terms, provisions, covenants, conditions, agreements or obligations of Borrower contained in this Agreement, the Promissory Note or in any other agreement relating to the Loan or the Collateral which would materially adversely affect the validity, perfection or priority of the Lender's Security Interest in the Collateral, or the value of the Collateral or the Promissory Note; or

9.1.6    Borrower's failure to perform or observe, in a due and timely manner, any of the other (i.e., other than those subject to the immediately preceding subparagraphs 9.1.1 through 9.1.5) material terms, provisions, covenants, conditions, agreements or obligations contained herein, in the Loan Documents or in any other agreement, contract, indenture, document or instrument executed, or to be executed, by Borrower in connection with this Agreement or pursuant hereto and which would have a material adverse effect on the ability or obligation of Borrower to perform its obligations under this Agreement and under the other Loan Documents to be executed by Borrower pursuant hereto; or

9.1.7    If any Uniform Commercial Code Financing Statement, Financial Statement, the application form or other information submitted to the Film Office or the State Authority for the Tax Credits or representation or warranty made by Borrower herein or otherwise in writing in connection with this Agreement or in connection with the instruments, documents and assignments to be executed by Borrower hereunder or pursuant hereto shall be false or untrue on the date made and which would have a material adverse effect on the ability or obligation of Borrower to perform its obligations under this Agreement and under the other Loan Documents to be executed by Borrower pursuant hereto; or

9.1.8    Default of any third party hereto in the observance or performance by such party of any material term, covenant, condition, warranty or representation made or agreed to in any agreement referred to herein or secured by Lender's Security Interest hereunder which materially adversely affects Lender's Security Interest hereunder, including, without limitation, the Picture's production accountant and post-production accountant's failure to follow certain reporting standards and guidelines as defined by the Lender; or

9.1.9    Suspension by any of Borrower of its respective business operations; or

9.1.10    If any warrant of attachment, execution or other writ in an aggregate amount of greater than Fifty Thousand United States Dollars (US$50,000.00) shall be issued or levied upon the proceeds payable pursuant to any agreement referred to herein or secured by Lender's Security Interest hereunder, and such attachment, execution or other writ shall remain undischarged and unstayed for a period in excess of thirty (30) days or Borrower shall fail to post (or cause to be posted) an indemnity bond for the maximum liability pursuant to any such attachment, execution or other writ; or

9.1.11    If Borrower should become insolvent; or should be unable to pay its respective debts as they mature (including Borrower's failure to pay the Indebtedness); or should make an assignment for the benefit of creditors or to an agent authorized to liquidate any substantial amount of its respective properties or assets, or should file a voluntary petition in bankruptcy or seeking reorganization or to effect a plan or other arrangement with creditors; or should file an answer admitting the jurisdiction of any court and the material allegations of an involuntary petition filed pursuant to any Act of Congress relating to bankruptcy or reorganization; or should join in any such petition for an adjudication or for a reorganization or other arrangement; or should become or be adjudicated a bankrupt; or should apply for or consent to the appointment of or consent that an order be made appointing any receiver or trustee for itself or for any of its respective properties, assets or business; or if an order should be entered pursuant to any Act of Congress relating to bankruptcy or reorganization; or if a receiver or a trustee should be appointed otherwise than upon its own application or consent for all or a substantial part of its properties, assets or business and any such receiver or trustee so appointed is not discharged within sixty

(60) days after the date of such appointment; or if an involuntary petition is filed and not dismissed within sixty (60) days after the date of such petition; or

     9.1.12   If there shall exist or occur, and Lender shall notify Borrower of, any event or condition which in Lender's good faith business judgment (exercised in Lender's sole discretion) is an Event of Default or which would have a material adverse effect on the ability or obligation of Borrower to perform its material obligations under this Agreement and under the other Loan Documents to be executed by Borrower pursuant hereto; or

     9.1.13   If final judgment or judgments for the payment of money aggregating in excess of Fifty Thousand Dollars ($50,000.00) shall be entered or affirmed by a court against Borrower, and Borrower shall not discharge the same or provide for its or their discharge in accordance with its or their terms or procure a stay of execution thereof within sixty (60) days from the date of entry thereof; or

     9.1.14   If any Loan Document shall cease to be in full force and effect; or

     9.1.15   If Borrower shall default under any Loan Document and such default is not cured with the proscribed cure period thereunder; or

     9.1.16   If there shall exist any material change in lowering the Budget, financing structure, timing of production, including post-production, or the key production team of the Picture (i.e., David Frigerio and John Stalberg Jr. are no longer producers) unless approved by Lender; or

     9.1.17   Borrower's failure to adhere to Lender's approval rights as set forth in this Agreement; or

     9.1.18   The failure of Borrower to effect delivery of the Picture to Sales Agents and/or Distributors in accordance with the terms and conditions of the relevant Distribution Agreement.

    9.2   <u>Remedies</u>.  Upon the occurrence of any of the Events of Default set forth in paragraph 9.1 hereof, subject to paragraph 9.3, all Indebtedness shall immediately become due and payable.  At Lender's option (subject to paragraph 9.3 below), upon the occurrence of any other Event of Default, and at any time thereafter if such Event of Default shall then be continuing:

     9.2.1   Unless such Event of Default is cured within the time period (if any) provided for hereunder, Lender may terminate its obligations to advance funds to Borrower and/or the Indebtedness may, without presentment, demand, protest, or notice of any kind, all of which are hereby expressly waived by Borrower, be forthwith called due and payable, if not otherwise then due and payable (anything herein or in the Promissory Note or other agreement, contract, indenture, document or instrument contained to the contrary notwithstanding) and the Repayment Date(s) shall be accelerated accordingly;

     9.2.2   Lender may pursue the remedies afforded to Lender hereunder (including, without limitation, pursuant to paragraph 9.4 hereof) or under any of the documents executed in connection herewith, or any other remedy afforded to Lender by law or equity, and Lender may, at its option, do and perform all other acts and things necessary for the proper preservation and protection of Lender's rights hereunder, solely with respect to the Collateral (and the receipts therefrom) or pursuant to any agreement secured by Lender's Security Interest hereunder, all at the cost and expense of Borrower, which amount so expended shall constitute costs recoupable by Lender and secured as provided hereunder; and

     9.2.3   Lender may, at its option, engage others to exercise or discharge any of its rights or obligations hereunder.  The amounts payable to such others by Lender shall be recoupable by Lender and secured as provided in paragraph 7.5 hereof.

    9.3   <u>Cure Period</u>.  With respect to the Events of Default set forth in subparagraphs 9.1 hereof, provided such event is curable, Borrower shall have a period of seven (7) Business Days from receipt of written notice thereof from

Lender within which to cure any such Event of Default. At Lender's sole and exclusive option, upon the occurrence of any other Event of Default, and at any time thereafter, Lender may permit Borrower to cure such Event of Default, but Lender shall have no obligation to do so.

9.4    Attorney-in-Fact. Should an Event of Default occur hereunder, Borrower hereby irrevocably designates, constitutes and appoints Lender its true and lawful attorney-in-fact with full power of substitution and with full and irrevocable power (which power shall be deemed coupled with an interest), in the place and stead of Borrower and in the name of the Borrower, Lender, or both of them, at any time or from time to time in the sole discretion of Lender: (i) to take over and complete production of the Picture and to lease, license, sell or otherwise dispose of the Picture and/or such distribution rights in and to the Picture and such rights therein as have not been disposed of on the date of such default by Borrower as permitted hereunder (or to engage others to do so with the costs and expenses thereof to be recoupable by Lender as provided in paragraph 7.5 and 7.7 hereof); (ii) to negotiate such lease, license, sale or other agreements and to enter into such agreements on behalf of Borrower on such terms and conditions (not in conflict with the terms and conditions of such agreements consistent with this Agreement with respect to the Collateral only as have theretofore been entered into by Borrower and which Lender has been made aware of) as Lender deems appropriate; (iii) to renegotiate a Distribution Agreement or such other agreements as Lender has a Security Interest in pursuant to paragraph 4 hereof as Lender in its sole and exclusive discretion deems proper; (iv) to require, demand, collect, receive, settle, adjust, compromise and to give acquittances and receipts for the payment of any and all monies payable pursuant to the a Distribution Agreement or such other agreements as Lender has a Security Interest in pursuant to paragraph 4 hereof and such licenses and agreements as Lender may enter into as aforesaid; (v) to file any claims and/or proofs of claim, to commence, maintain or discontinue any actions, suits or other proceedings deemed by Lender advisable for the purpose of collecting or enforcing payment of any such monies against the Collateral only; (vi) to endorse any checks, drafts or other orders or instruments for the payment of monies payable to Borrower in connection with the Collateral only which shall be issued in respect of such monies; (vii) to execute any and all such instruments, agreements or documents consistent herewith as may be necessary or desirable in the premises, and Lender shall promptly provide copies to Borrower of such instruments, agreements or documents so executed upon written request of Borrower, provided that failure to so provide such copies of documents shall not be a default hereunder; (viii) to apply any receipts so derived as herein provided; (ix) to exercise all rights available to it under the UCC; and (x) to have a receiver appointed and to sell the Collateral at a public or private sale. Lender, however, shall not be obligated to make any demand or present or file any claim or take any action authorized hereby. Borrower shall gather up and deliver to Lender all materials, books, records, documents and things of any nature required by Lender in the exercise of its rights hereunder upon Lender's reasonable request. Notwithstanding the foregoing, the Lender agrees that it shall not exercise its rights under this paragraph 9.4 unless an Event of Default has occurred and is continuing and/or if the exercise of such rights restrain or interfere with the production, completion, exhibition, advertising, promotion, marketing and/or exploitation of the Picture in any manner whatsoever.

9.5    Notwithstanding anything else to the contrary in this Agreement or any other agreement between or among any of the parties hereto, Lender hereby agrees that, notwithstanding any Event of Default hereunder, Lender shall not be entitled to seek to or obtain injunctive relief or seek or to enjoin or otherwise restrain or interfere with the production, completion, exhibition, advertising, promotion, marketing and/or exploitation of the Picture for any reason whatsoever, all of which remedies are hereby irrevocably waived by Lender.

10.    <u>MISCELLANEOUS</u>.

10.1    Notices.  All notices, requests, demands or other communications to the respective parties hereto shall be in writing and shall be deemed to have been given when received by the party to which sent and shall be addressed to Lender or Borrower, as the case may be, at their respective addresses shown opposite their signatures hereto.  A courtesy copy of each notice sent by Borrower to Lender shall be sent to Ramo Law PC, 315 S. Beverly Drive, Suite 412, Beverly Hills, CA 90212, Email: eramo@ramolaw.com; Attn: Elsa Ramo, Esq. A courtesy copy of each notice sent by Lender to Borrower shall be sent to Abrams Garfinkel Margolis Bergson, LLP, 3900 West Alameda Avenue, Suite 2100, Burbank, California 91505; Email: MWeiss@agmblaw.com; Attn: Michael Weiss.

10.2    No Waiver; Amendments in Writing.  Except as expressly provided herein to the contrary, no failure of, nor any delay on the part of, Lender or Borrower in exercising any right, power or privilege hereunder, or under any agreement, contract, indenture, document or instrument mentioned herein, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder, or under any agreement, contract, indenture, document or instrument mentioned herein, preclude other or further exercise thereof or the exercise of any other right, power or privilege; nor shall any waiver of any right, power, privilege or default hereunder, or under any agreement, contract, indenture, document or instrument mentioned herein, constitute a waiver of any other right, power, privilege or default or constitute a waiver of any other default of the same or of any other term or provision.  All rights and remedies herein provided are cumulative and not exclusive of any rights or remedies otherwise provided by law or equity.

10.3    Consent to Jurisdiction and Service of Process. Borrower (i) hereby irrevocably submits itself to the jurisdiction of the state courts of the State of California and to the jurisdiction of the United States District Court for the Central District of California, for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, the Promissory Note or any of the Loan Documents or the subject matter hereof or thereof brought by Lender or its successors or assigns and (ii) hereby waives, and agrees not to assert, by way of motion, a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court (provided, however, that the then applicable jurisdiction minimums are not waived), and (iii) hereby waives any offsets or counterclaims in any such action, suit or proceeding. Borrower hereby consents to service of process by registered mail at the address to which notices are to be given.  Borrower agrees that its submission to jurisdiction and its consent to service of process by mail is made for the express benefit of Lender.  Final judgment against Borrower in any such action, suit or proceeding shall be conclusive, and may be enforced in other jurisdictions (i) by suit, action or proceeding on the judgment, a certified or true copy of which shall be conclusive evidence of the fact and of the amount of any indebtedness or liability of Borrower therein described or (ii) in any other manner provided by or pursuant to the laws of such other jurisdiction; provided, however, that Lender may at its option bring suit, or institute other judicial proceedings against Borrower or any of its assets in any state or Federal court of the United States or of any country or place where Borrower or such assets may be found.  Borrower further covenants and agrees that so long as this Agreement shall be in effect, it shall maintain a duly appointed agent for the receipt and acceptance on its behalf of service of summons and other legal processes (and Borrower hereby appoints Michael Weiss its attorney-in-fact to receive service of the process in any action, suit or proceeding with respect to which Borrower has submitted to jurisdiction, as set forth above), and upon failure to do so the clerk of each court to whose jurisdiction it has submitted shall be deemed to be its designated agent upon whom such process may be served on its behalf, and notification by the attorney for plaintiff, complainant or petitioner therein by mail or confirmed transmission by facsimile (with confirmation provided by the sender's facsimile machine) or by e-mail (unless the sender has received a failure delivery notice and with confirmation of transmission provided by the sender's e-mail) to Borrower of the filing of such suit, action or proceeding shall be deemed sufficient notice thereof.

10.4    Successors and Assigns.  Lender may invite third parties to participate in the Loan without the consent of or notice to Borrower; provided, however, that, Borrower shall continue to make all payments due hereunder directly to Lender.  Borrower may not assign any of its rights or obligations hereunder without the prior written consent of Lender and any purported assignment shall be void and of no force or effect.  This Agreement shall be binding upon and inure to the benefit of Borrower and its permitted successors and assigns and Lender and its successors and assigns.  The Borrower hereby acknowledges that the Lender, without the consent of the Borrower, may sell, transfer and otherwise assign all of Lender's rights in this Agreement and the other Loan Documents including, without limitation, its rights in the Lender Account and the Collateral.

10.5    Severability.  In case any one or more of the provisions hereof should be invalid, illegal or unenforceable in any respect, such provision(s) shall be curtailed and limited only to the extent necessary to bring it within the legal requirements and the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

10.6    Governing Law.  This Agreement and the rights and obligations of the parties hereunder and under the documents executed concurrently herewith shall be construed in accordance with and be governed by the laws of the State of California. California law shall govern (i) the validity and interpretation of the Agreement, (ii) the performance of the parties of their respective obligations hereunder, and (iii) all other causes of action (whether sounding in contract or in tort) arising out of or relating to this Agreement or the termination of this Agreement.

10.7    Waiver of Jury Trial.  To the extent permissible by law, Borrower and Lender each waives their respective rights to a trial by jury of any claim or cause of action based upon or arising out of or related to this agreement or the transactions contemplated hereby, in any action, proceeding or other litigation of any type brought by any of the parties against any other party or any agent-related person, participant or assignee, whether with respect to contract claims, tort claims, or otherwise.  The Borrower and Lender each agree that any such claim or cause of action shall be tried by a court trial without a jury.  Without limiting the foregoing, the parties further agree that their respective right to a trial by jury is waived by operation of this section as to any action, counterclaim or other proceeding which seeks, in whole or in part, to challenge the validity or enforceability of this agreement or any provision hereof.  This waiver shall apply to any subsequent amendments, renewals, supplements or modifications to this Agreement.

10.8    Entire Agreement; Counterparts.  This Agreement, the Promissory Note and the documents, instruments and agreements delivered (or, as the case may be, to be delivered) pursuant hereto shall constitute the entire agreement between the parties hereto with respect to the Loan and shall supersede all other agreements written or oral with respect thereto including, but not limited to the term sheet between the parties dated January 18, 2022 (the "Term Sheet").  This Agreement may be executed in two counterparts, each of which shall be deemed an original and which together shall constitute one and the same instrument.  Delivery of an executed counterpart of this Agreement by facsimile or transmitted electronically in either a Tagged Image Format File ("TIFF") or Portable Document Format ("PDF") shall be equally effective as delivery of a manually executed counterpart of this Agreement.  No party has relied on any representation and/or warranty not expressly set forth herein.

10.9    Confidentiality. The terms of this Agreement are strictly confidential and Borrower agrees not to disclose the terms contained herein to any third party without the prior written consent of Lender, except that Borrower may disclose such terms to its officers, directors, attorneys, members, other advisors, State Authority, unions, guilds, third party investors, and any other governmental entities and other parties with a right to access such information, including Guilds or parties required by law.

10.10    No Third Party Beneficiaries.  This Agreement is not made for the benefit of any third party or parties.

10.11    Relationship of Parties.  The relationship between Borrower and Lender hereunder is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with Borrower, and no term or provision of any of the Loan Documents shall be construed so as to deem the relationship between Borrower, on the one hand, and Lender, on the other hand, to be other than that of debtor and creditor.

10.12    Setoff.  Nothing in this Agreement shall be deemed to constitute a waiver or prohibition of Lender's right of banker's lien or setoff and Borrower hereby expressly acknowledges that Lender has such right, it being understood and agreed that Lender shall not use the Commitment Amount to setoff against any non-Picture related obligations of Borrower to Lender.

10.13    Intentionally Omitted.

10.14    Premiere; One Sheet; Press Release.  Borrower shall use reasonable commercial efforts to cause the Distributor of the Picture to provide the Lender with six (6) tickets to the U.S. premiere of the Picture, if any; provided that any failure to so provide such tickets shall not be a breach hereof.  Borrower shall use reasonable commercial efforts to provide Lender with one (1) high quality image used for the "one-sheet" (or electronic file thereof) for the Picture, if any, which Lender may use for its own marketing purposes, subject to any third party obligations. Borrower shall use reasonable commercial efforts to reference "BondIt Media Capital" as a financier and Executive Producers in any press releases regarding the Picture. Borrower will use commercially reasonable faith efforts to mention Buffalo 8 and BondIt

Media Capital in all social media posts, tagging @Buffalo8Pro on Facebook, @Buffalo8Pro and @Bondit_film on Twitter, and @buffalo8pro on Instagram.

10.15    Credits.

10.15.1    Lender shall receive a company credit on screen, on all positive prints of the Picture, in the main or end titles of the Picture (i.e., in any instance, most favored nations with where all other company credits appear), substantially in the form of "In Association with BondIt Media Capital", though ordering of said company credit is at Borrower's discretion.

10.15.2    Lender shall receive an animated company logo, on screen, prior to the main title sequence of the Picture.

10.15.3    Lender shall receive three (3) executive producer credits designated as follows: Grady Craig, Matthew Helderman, and Luke Taylor on screen, on all positive prints of the Picture, in the main title sequence of the Picture (i.e., wherever all producer credits appear), on a shared card, with no more than two (2) executive producer credits on such shared card and in all paid ads and billing blocks.

10.15.4    Lender shall receive a financing credit and company logo, on screen, on all positive prints of the Picture, and in all paid ads and billing blocks, as well as in the end crawl or in such other position as is determined by Borrower, substantially in the form of "Financing Provided by BondIt Media Capital" accompanied by Lender's logo.  Lender acknowledges and agrees such credits may be shared with other financiers.

10.15.5    All other aspects of the above credits shall be in Borrower's and distributors' sole discretion. No casual or inadvertent failure to comply with the credit provisions set forth in this paragraph 10.15 shall be deemed a breach by Borrower provided that upon receipt of written notice from Lender of Borrower's failure to properly accord credit as specified herein, Borrower shall take such steps as are reasonably practicable to cure such failure on a prospective basis except with respect to any materials already in existence.

10.16    Commitment Fee. Borrower acknowledges that, in committing to make the Loan, Lender may be prevented from accepting other potential funding opportunities. In the event that, through no material fault of Lender: (i) the Conditions Precedent are not satisfied on or before the Expiration Date; or (ii) Borrower does not proceed with the Loan for any reason, then, as consideration of Lender's commitment to make the Loan, Borrower agrees to pay a fee to Lender in the amount of Ten Thousand United States Dollars (US$10,000.00) ("Commitment Fee") as well as all actual, reasonable, direct, verifiable outside legal fees and expenses incurred by Lender that were not covered under the Legal Fee. Payment by Borrower hereunder shall be made concurrently with written notice that Borrower is not proceeding with the Loan or within five (5) Business Days' of the Expiration Date, as applicable. The Expiration Date may be extended by Lender in Lender's sole discretion (on written notice from Lender to Borrower), it being understood that Lender shall have no obligation to extend the Expiration Date. For purposes of clarity, the Commitment Fee shall be payable solely in the event that Borrower does not proceed with the Loan following execution of the Term Sheet and/or Borrower has not satisfied all of the Conditions Precedent on or before the Expiration Date.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers as of the Effective Date.

"BORROWER"                                          "LENDER"

Bad Hombres Productions, LLC                        BondIt LLC

By: David Frigerio                                  By:            Luke            Taylor
Its: Authorized Signatory                           Its: Its Authorized Signatory

By: John Stalberg, Jr.
Its: Authorized Signatory

**EXHIBIT "A"**

**[Assignment of Proceeds]**

**EXHIBIT "B"**

**[Budget]**

**EXHIBIT "C"**

**[Copyright Mortgage]**

DocuSign Envelope ID: 8F16614C-438D-4E4F-B915-285A79B7D543

**EXHIBIT "D"**

**[Power of Attorney]**

**EXHIBIT "E"**

**[Promissory Note]**

**EXHIBIT "F"**

**[Borrowing Certificate]**

## ASSIGNMENT OF PROCEEDS

THIS ASSIGNMENT is made and entered into as of January 26, 2022 (the "Effective Date") by Bad Hombres Productions, LLC, a New Mexico limited liability company having an address at 110 E. Broadway Street, Hobbs, New Mexico 88240, (the "Assignor") to BondIt LLC, a California limited liability company with a business address at 1639 11th Street, #160, Santa Monica, CA 90404 (the "Assignee").

### PURPOSE

WHEREAS, contemporaneously herewith Assignor and Assignee have entered into that certain Loan and Security Agreement (the "Agreement"), dated as of the date hereof, for the financing of the motion picture presently entitled "Bad Hombres" (the "Picture"), the indebtedness under which Agreement is to be primarily repaid by Assignor with the tax credit, Tax Credit Proceeds, minimum guarantee, proceeds from Distribution Agreements, or any other proceeds, that are payable to Borrower for licensing the foreign and domestic distribution rights of the Picture, pursuant to the respective Distribution Agreement(s) between Distributor and Borrower. (the "Proceeds"). All capitalized terms used herein without definition shall have the respective meaning ascribed to such terms in the Agreement.

WHEREAS, subject to the terms and conditions in the Agreement, Assignee will fund up to One Million Four Hundred Eighty-Two Thousand United States Dollars ($1,482,000.00 USD) to the Assignor in advance of receiving the Proceeds all pursuant to the terms of the Agreement.

WHEREAS, Assignor agrees to assign its rights to the Proceeds that Assignor receives in connection with the Picture to Assignee pursuant to the terms and conditions herein to secure the payments made by Assignee under the Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, and as additional security for the payment and performance by Assignor of its obligations under the Agreement, it is agreed by the parties as follows:

1.      Assignment of Proceeds.  Subject to the terms and conditions hereinafter set forth, Assignor does hereby transfer, assign and deliver unto Assignee all of the right, title and interest of Assignor in and to the Proceeds together with all the rights, privileges and appurtenances now or hereafter in any way belonging or pertaining thereto.

2.      Covenants of Assignor.  Assignor represents and warrants that:

(i)      It will not assign, pledge or otherwise encumber (other than in connection with the security interests granted the Guilds [as defined in the Agreement]) the Proceeds without the prior written consent of Assignee;

(ii)      It will not cancel, terminate or accept any surrender of its rights to receive the Proceeds, or amend or modify the same directly or indirectly in any respect whatsoever (including, without limitation, to sell, assign, transfer or allocate any of the Proceeds to any Person [as defined in the Agreement] or entity other than the Assignee or to permit any Proceeds received by the Assignor to be applied to any other tax liability [or other liability] for which the Assignor is liable), without having obtained the prior written consent of Assignee thereto;

(iii)      It will not waive or give any consent with respect to any default or variation in the performance of the receipt of the Proceeds, it will at all times take proper steps to enforce all of the provisions and conditions thereof, and it will forthwith notify Assignee of any defaults with respect to receipt of the Proceeds;

(iv)      It will perform and observe, or cause to be performed and observed, all of the terms, covenants and conditions on its part to be performed and observed with respect to the Proceeds and the rights and obligations to obtain the Proceeds; and

(v)      It will execute any and all additional assignments to Assignee relating to the Proceeds, as

Assignee may at any time reasonably request and which are consistent with the terms and conditions of the Agreement.

3.      No satisfaction; No obligation. The Assignee's acceptance of this Assignment shall not constitute a satisfaction of any indebtedness, liability or obligation, or any part thereof, now or hereafter owed by Assignor to Assignee pursuant to the Agreement. Nothing in this Assignment shall be deemed to obligate Assignee at any time to undertake or perform any of the terms or conditions applicable to Assignor's receipt of the Proceeds, or to enforce compliance therewith.  Assignee may institute such legal action and otherwise exercise any of its rights and powers, under the Agreement or otherwise, in such manner as it may deem advisable at any time it shall see fit to do so, and for any cause for which the same might have been instituted or done had this Assignment not been made.  No waiver or condonation by Assignee of any breach or default, and no waiver of any right of Assignee, hereunder shall be deemed to constitute a waiver of any other or subsequent breach or default or to prevent subsequent exercise of any such right or any other similar right.

4.      Termination of Assignment.  Upon (i) the payment in full of all obligations of Assignor under the Agreement or receipt of the Proceeds by Assignee (or its designee or assignee) pursuant to the Agreement and (ii) the cancellation and discharge of the Indebtedness (as defined in the Agreement) and obligations, this Assignment shall become null and void, and thereupon Assignee shall execute and deliver to Assignor any instruments which may be necessary or appropriate to terminate this Assignment and Assignee will promptly fund to Assignor's production account any Proceeds in excess of the amount required to repay the Indebtedness to the Assignee.

5.      Assignment; Amendment.  The terms, covenants, agreements and conditions contained herein shall extend to, include and inure to the benefit of and be binding upon Assignor and Assignee and their respective heirs, executors, administrators, successors and assigns, as the case may be, and may not be terminated, changed or amended orally. Assignee, in Assignee's sole discretion, may assign this Assignment as security to any of its secured lenders without notice to Assignor.

This Assignment shall be governed and construed in accordance with the laws of the State of California without resort to its conflicts of laws rules. Each party hereto hereby irrevocably agrees that any disputes relating in any manner to the Agreement, Promissory Note, or any of the Loan Documents, will be submitted to binding arbitration by JAMS under its then-applicable rules in the City of Los Angeles. The parties agree that any award rendered as a result of such binding arbitration may be enforced pursuant to Sections 1285, et. seq., California Code of Civil Procedure, by petition brought in any court of the State of California, including, but not limited to, the courts located in Los Angeles County, California. The parties each waive whatever rights each of them might otherwise have to a jury trial with respect to the disputes referred to in this paragraph. This Agreement will be construed under the laws of the State of California for agreements fully performed in this State.

**IN WITNESS WHEREOF**, the parties hereto have executed this instrument as of the Effective Date.

Bad Hombres Productions, LLC                          Bad Hombres Productions, LLC
a New Mexico limited liability company                a New Mexico limited liability company

By: _____                          By: _____
David Frigerio                                        John Stalberg, Jr.
Its: Authorized Signatory                             Its: Authorized Signatory


**BONDIT LLC**
a California limited liability company

By: _____
Luke Taylor
Its: Its Authorized Signatory

## CERTIFICATE OF INCUMBENCY

This certificate is being delivered pursuant to that certain Loan and Security Agreement dated as of January 26, 2022 between Bad Hombres Productions, LLC, an New Mexico limited liability company ("Company"), on the one hand, and BondIt LLC ("Lender"), on the other hand (the "Loan and Security Agreement").

The undersigned, being the manager of the Company, hereby certifies as follows:

1. That manager is charged with maintaining the records, minutes and seal of the Company.

2. That the following named person was duly designated and appointed to the office indicated below, and that said person does continue to hold such office at this time, and the signature set forth opposite the name is a genuine signature.

| Name | Signature | Title |
|------|-----------|-------|
| David Frigerio | ------------------------------------------- | Manager |
| John Stalberg, Jr. | ------------------------------------------- | Manager |

3. That pursuant to the Company's Operating Agreement and certain resolutions adopted by the manager of the Company, the person designated to serve in the above-entitled capacity was given sufficient authority to act on behalf of and to bind the Company with respect to the transaction governed by the Loan and Security Agreement between Company and Lender and that the execution by said person of documents related to such transaction constitute a legally binding and enforceable obligation of the Company.

4. That pursuant to the Company's Operating Agreement, the undersigned has the power and authority to execute this certificate on behalf of the Company.

IN WITNESS WHEREOF, the undersigned has executed this certificate as of January 26, 2022.

Signature:
Name:       David Frigerio
Title:      Manager

Signature:
Name:       John Stalberg, Jr.
Title:      Manager

## CERTIFICATE OF MEMBERS

This certificate is being delivered pursuant to that certain Loan and Security Agreement dated as of January 26, 2022 (the "Loan and Security Agreement"), by and between Bad Hombres Productions, LLC, a New Mexico limited liability company (the "Company"), on the one hand, and BondIt LLC, a California limited liability company ("Lender"), on the other hand, pursuant to which Lender may lend money to the Company.

The undersigned hereby certifies as follows:

1.      The undersigned are the Members of the Company.

2.      Attached hereto as Exhibit A is a true and correct copy of the Company's Articles of Organization as filed with the New Mexico Secretary of State on January 3, 2022. Said Articles of Organization have not in any way been amended, annulled, rescinded, repealed, revoked or supplemented, and remains in full force and effect as of the date hereof.

3.      Attached hereto as Exhibit B is a true and correct copy of the Operating Agreement of the Company and as currently in effect.

4.      Attached hereto as Exhibit C is a full, true and correct copy of the Consent of the Manager adopted by the manager of the Company on January 26, 2022. Said resolutions have not been revoked, modified, rescinded, or amended and are in full force and effect.

5.      The representations and warranties of the Company contained in the certain Loan and Security Agreement between Lender and Company are true and correct in all respects as of the date herein.

IN WITNESS WHEREOF, the undersigned has executed this certificate as of January 26, 2022.

MEMBERS

DocuSigned by:

_____
F959898F3FD24C2...

David Frigerio

DocuSigned by:

*John Stalberg*
_____
EBDF84485BA346A...

John Stalberg, Jr

**EXHIBIT A**

**ARTICLES OF ORGANIZATION**

**EXHIBIT B**

**<u>OPERATING AGREEMENT</u>**

DocuSign Envelope ID: 8F16611C-438D-4E4F-B9A5-285A79B7D543

**EXHIBIT C**

**<u>CONSENT OF MANAGER</u>**

# CONSENT OF MANAGER

The undersigned, being the managers (each respectively and collectively, the "Manager") of Bad Hombres Productions, LLC, a New Mexico limited liability company (the "Company"), does hereby consent in writing to the adoption of the following resolutions:

## LOAN AND SECURITY AGREEMENT

WHEREAS, the Manager has determined that it was, and remains, in the best interests of the Company to enter into that certain Loan and Security Agreement (the "Agreement") with BondIt LLC ("Lender") and Company dated as of January 26, 2022; and

WHEREAS, the Manager has determined that it was, and remains, in the best interests of the Company to enter into each and every document, instrument or agreement required to be delivered in accordance with the Agreement (the "Ancillary Documents"); and

NOW, THEREFORE, BE IT RESOLVED, that the form, terms and provisions of the Agreement and Ancillary Documents are hereby adopted, approved, confirmed and ratified; and it is

FURTHER RESOLVED, that any manager of the Company is hereby authorized, directed and empowered, for and on behalf of the Company, to approve, execute and deliver all other ancillary and subsidiary documents and agreements related to the Agreement, and any and all amendments thereto and assignments thereof, with such changes, if any, in form and content as may be agreed to by any manager of the Company executing such Agreement, the execution thereof to be conclusive evidence of the authority and approval herein granted is hereby adopted, approved, confirmed and ratified; and it is

## GENERAL

FURTHER RESOLVED, that the Manager of the Company is hereby authorized, directed and empowered to take any and all such actions as may be required or as they may deem necessary, advisable or proper to cause the Company to carry out and fully perform its duties and obligations under the Agreement; and it is

FURTHER RESOLVED, that the Manager of the Company is hereby authorized, directed and empowered to take any and all such other steps as may be required or as they may deem necessary, advisable or proper to carry into effect the foregoing resolutions.

IN WITNESS WHEREOF, the undersigned has executed this consent as of January 26, 2022.

MANAGER:

David Frigerio

# COPYRIGHT MORTGAGE AND ASSIGNMENT

KNOW ALL MEN BY THESE PRESENTS that for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned, Bad Hombres Productions, LLC, a New Mexico limited liability company ("Mortgagor"), does hereby mortgage, assign, grant, convey and transfer for security to BondIt LLC, a California limited liability company ("Mortgagee"), and Mortgagee's successors and assigns, exclusively throughout the world in perpetuity, as security for the full, timely and indefeasible repayment and discharge by Mortgagor of the Indebtedness as contained in that certain Loan and Security Agreement, of even date herewith, between Mortgagor and Mortgagee as amended, restated, supplemented or otherwise modified from time to time (the "Loan and Security Agreement"), Mortgagor hereby irrevocably, unconditionally and absolutely grants to Mortgagee a first priority security interest in and to the Proceeds and Mortgagee shall further be granted a valid first priority security interest, subordinate only to the applicable guilds, in all of Mortgagor's assets, whether now owned or hereafter acquired, including, without limitation, all of Mortgagor's right, title and interest in connection with "Bad Hombres" (the "Picture") including but not limited to all works based upon, incorporated in, derived from, incorporating or relating to the Picture and the collateral described in Schedule "A" hereto and by this reference incorporated herein, but subject in all cases to the terms and conditions of the Loan and Security Agreement, whether now owned or from time to time after the date hereof owned or acquired by Mortgagor. Mortgagee may assign its rights and benefits hereunder to the party, if any, to whom it assigns as security the Loan and Security Agreement. This Copyright Mortgage and Assignment is made pursuant to and is subject to all of the terms and conditions of the Loan and Security Agreement. Where such Loan and Security Agreement is in conflict as to the terms set forth herein, the Loan and Security Agreement shall control. Capitalized terms not defined herein shall have the meaning as set forth in the Loan and Security Agreement.

Dated as of January 26, 2022

Bad Hombres Productions, LLC

By: David Frigerio
Its: Authorized Agent

Bad Hombres Productions, LLC

By: John Stalberg, Jr.
Its: Authorized Agent

State of _____          )
                                        ) SS.
County of _____            )

On _____, 20___, before me, _____, a notary public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _____ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)
          Notary Public

Schedule A

Collateral

All of Mortgagor's property, in accordance with the Loan and Security Agreement, including, without limitation, all of Mortgagor's right, title and interest, now owned or hereafter acquired, in and to the following property:

(a)      That certain feature-length motion picture ("Picture") currently entitled "Bad Hombres", based on the screenplay of the same name written by Rex New and N.W. Turner (the "Screenplay"), under whatever title the Picture may be released, and all collateral, allied, ancillary, subsidiary and merchandising rights therein and thereto, and all collateral, allied, ancillary, subsidiary and merchandising rights therein, and all properties and things of value pertaining thereto and all products and proceeds thereof whether now in existence or hereafter made, acquired or produced (as used in this paragraph, the term "Picture" shall mean and include the Picture, all of the aforesaid rights and the rights set forth in subparagraphs (i) through (xiv) below), including, without limitation:

(i)      All rights of Mortgagor of every kind and nature (including, without limitation, copyrights) in and to the Screenplay, any literary, musical, dramatic or other material of any kind or nature upon which, in whole or in part, the Picture is or may be based, or from which it is or may be adapted or inspired, or which may be or has been used or included in the Picture including, without limitation, all scripts, scenarios, screenplays, bibles, stories, treatments, novels, outlines, books, titles, concepts, manuscripts or other properties or materials of any kind or nature in whatever state of completion and all drafts, versions and variations thereof (collectively, the "Literary Property");

(ii)      All rights of Mortgagor of every kind and nature in and to all physical properties of every kind or nature of or relating to the Picture and all versions thereof, including, without limitation, all physical properties relating to the development, production, completion, delivery, exhibition, distribution or other exploitation of the Picture, and all versions thereof or any part thereof, including, without limitation, the Literary Property, exposed film, developed film, positives, negatives, prints, answer prints, special effects, preprint materials (including interpositives, negatives, duplicate negatives, internegatives, color reversals, intermediates, lavenders, fine grain master prints and matrices and all other forms of preprint elements which may be necessary or useful to produce prints or other copies or additional pre-print elements, whether now known or hereafter devised), soundtracks, recordings, audio and video tapes and discs of all types and gauges, cutouts, trims and any and all other physical properties of every kind and nature relating to the Picture in whatever state of completion, and all duplicates, drafts, versions, variations and copies of each thereof (collectively, the "Physical Properties");

(iii)      All rights of Mortgagor of every kind or nature in and to any and all music and musical compositions created for, used in or to be used in connection with the Picture to the extent owned by Mortgagor including, without limitation, all copyrights therein and all rights to perform, copy, record, rerecord, produce, publish, reproduce or synchronize any or all of said music and musical compositions as well as all other rights to exploit such music including record, soundtrack recording, and music publishing rights;

(iv)      All collateral, allied, ancillary, subsidiary, publishing and merchandising rights of Mortgagor of every kind and nature, without limitation, derived from, appurtenant to or related to the Picture or the Literary Property, including, without limitation, all production, exploitation, or reissue production rights by use of film, tape or any other recording devices now known or hereafter devised, whether based upon, derived from or inspired by the Picture, the Literary Property or any part thereof; all rights of Mortgagor to use, exploit and license others to use or exploit any and all novelization, publishing, commercial tieups and merchandising rights of every kind and nature, including, without limitation, all novelization, publishing, merchandising rights and commercial tie-ups arising out of or connected with or inspired by the Picture or the Literary Property, the title or titles of the Picture, the characters appearing in the Picture or said Literary Property and/or the names or characteristics of said characters (all of which rights may be nonexclusive), and including further, without limitation, any and all commercial exploitation in connection with or related to the Picture and/or said Literary Property, but excluding any sequel, prequel and remake rights to the Picture;

(v)    All rights of Mortgagor of every kind or nature, present and future, in and to all agreements relating to the development, production, completion, delivery and exploitation of the Picture, including, without limitation, all agreements for personal services, including the services of writers, directors, cast, producers, special effects personnel, animators, cameramen and other creative, artistic and technical staff and agreements for the use of studio space, equipment, facilities, locations, animation services, special effects services and laboratory contracts;

(vi)    All insurance and insurance policies heretofore or hereafter placed upon the Picture or the insurable properties thereof and/or any person or persons engaged in the development, production, completion, delivery or exploitation of the Picture and the proceeds thereof;

(vii)    All copyrights, rights in copyrights, interests in copyrights and renewals and extensions of copyrights, domestic and foreign, heretofore or hereafter obtained upon the Picture or the Literary Property or any part thereof, and the right (but not the obligation) to make publication thereof for copyright purposes, to register claims under copyright, and the right (but not the obligation) to renew and extend such copyrights, and the right (but not the obligation) after prior notice, to sue in the name of Mortgagor and/or in the name of Mortgagee for past, present and future infringements of copyright;

(viii)    All rights to produce, acquire, release, sell, distribute, subdistribute, lease, sublease, market, license, sublicense, exhibit, broadcast, transmit, reproduce, publicize or otherwise exploit the Picture, the Literary Property and any and all rights therein (including, without limitation, the rights referred to in subparagraph (a)(iv) above) in perpetuity, without limitation, in any manner and in any media whatsoever throughout the universe, including, without limitation, by projection, radio, all forms of television (including, without limitation, free, pay, toll, cable, sustaining subscription, sponsored and direct satellite broadcast), in theatres, nontheatrically, on cassettes, cartridges and discs and by any and all other scientific, mechanical or electronic means, methods, processes or devices now known or hereafter conceived, devised or created;

(ix)    All rights of Mortgagor of any kind or nature, direct or indirect, to acquire, produce, develop, reacquire, finance, release, sell, distribute, subdistribute, lease, sublease, market, license, sublicense, exhibit, broadcast, transmit, reproduce, publicize, or otherwise exploit the Picture, or any rights in the Picture, including, without limitation, pursuant to the Production Services Agreement and any other agreements between Mortgagor and any company controlling, controlled by, or under common control with Mortgagor (each, a "Subsidiary") which relate to the ownership, production or financing of the Picture;

(x)    All contract rights and general intangibles and all rights in, to and under all security agreements leases and other contracts securing or otherwise relating to any such contract rights and general intangibles, which grant to any Person any right to acquire, produce, develop, reacquire, finance, release, sell, distribute, subdistribute, lease, sublease, market, license, sublicense, exhibit, broadcast, transmit, reproduce, publicize, or otherwise exploit the Picture or any rights in the Picture including, without limitation, all such rights pursuant to agreements between Mortgagor and any Subsidiary which relate to the ownership, production or financing of the Picture;

(xi)    All rent, revenues, income, compensation, products, increases, proceeds and profits or other property obtained or to be obtained by Mortgagor from the production, release, sale, distribution, subdistribution, lease, sublease, marketing, licensing, sublicensing, exhibition, broadcast, transmission, reproduction, publication, ownership, exploitation or other uses or disposition of the Picture and the Literary Property (or any rights therein or part thereof), in any and all media, including, without limitation, the properties thereof and of any collateral, allied, ancillary, merchandising and subsidiary rights therein and thereto, and amounts recovered as damages by reason of unfair competition, the infringement of copyright, breach of any contract or infringement of any rights, or derived therefrom in any manner whatever;

(xii)    Any and all accounts, accounts receivable, tax credit proceeds, general intangibles, contract rights, chattel paper, documents, instruments and goods, including inventory (as those terms are defined in the UCC), not elsewhere included in this definition, which may arise in connection with the creation, production, completion, delivery, financing, ownership, possession or exploitation of the Picture;

(xiii)    Any and all documents, receipts or books and records, including, without limitation, documents or receipts of any kind or nature issued by any pledgeholder, warehouseman or bailee with respect to the Picture and any element thereof and the equipment containing such books and records;

(xiv)    All accounts receivable, all contract rights, all general intangibles (as such terms are defined in the UCC) in connection with or relating to the Picture including, without limitation, all accounts receivable, all contract rights and general intangibles constituting rights to receive the payment of money, or other valuable consideration, all receivables and all other rights to receive the payment of money including, without limitation, under present or future contracts or agreements (whether or not earned by performance), from the sale, distribution, exhibition, disposition, leasing, subleasing, licensing, sublicensing and other exploitation of the Picture or the Literary Property or any part thereof or any rights therein or related thereto in any medium, whether now known or hereafter developed, by any means, method, process or device in any market including, without limitation, all of Mortgagor's right, title and interest in, to and under any existing or future agreements for the distribution or other exploitation of the Picture, as the same may presently exist or hereafter from time to time come into existence, be amended, renewed, modified, supplemented, extended or replaced, including Mortgagor's rights to receive payments thereunder, and all other rights to receive film rentals, license fees, distribution fees, producer's shares, royalties and other amounts of every description including, without limitation, from (a) theatrical exhibitors, nontheatrical exhibitors, television networks and stations and airlines, cable television systems, pay television operators, whether on a subscription, per program charge basis or otherwise, and other exhibitors, (b) distributors, subdistributors, lessees, sublessees, licensees and sublicensees (including any Subsidiary) and (c) any other Person or entity that distributes, exhibits or exploits the Picture or the Literary Property or elements or components of the Picture or the Literary Property or rights relating thereto; and,

(xv)    All proceeds, products, additions and accessions (including insurance proceeds) of the Picture, as defined and referred to in subparagraphs (a)(i) through (a)(xiv) above;

(xvi)    All funds in or to be credited to the Production Account into which the proceeds of all Advances made hereunder shall be or shall have been credited;

(xvii)    All machinery, electrical and electronic components, equipment, fixtures, furniture, office machinery, vehicles, trailers, implements and other tangible personal property of every kind and description now owned or hereafter acquired by Mortgagor and used or useful in connection with the Picture (including, without limitation, all wardrobe, props, mikes, scenery, sound stages, movable, permanent or vehicular dressing rooms, sets, lighting equipment, cameras and other photographic, sound recording and editing equipment, projectors, film developing equipment and machinery) and all goods of like kind or type hereafter acquired by Mortgagor in substitution or replacement thereof, and all additions and accessions thereto (collectively, the "Equipment") and all rents, proceeds and products of the Equipment including, without limitation, the rights to insurance covering the Equipment;

(xviii)    The following personal property, whether now owned or hereafter acquired: (i) the title or titles of the Picture and all of Mortgagor's rights to the exclusive use thereof including rights protected pursuant to trademark, service mark, unfair competition and/or other laws, rules or principles of law or equity or industry practice, and (ii) all inventions, processes, formulae, licenses, patents, patent rights, trademarks, trademark rights, service marks, service mark rights, trade names, trade name rights, logos, indicia, corporate and company names, business source or business identifiers and renewals and extensions thereof, domestic and foreign, whether now owned or hereafter acquired, and the accompanying good will and other like business property rights relating to the Picture, and the right (but not the obligation) to register claims under trademark or patent and to renew and extend such trademarks or patents and the right (but not the obligation) to sue in the name of Mortgagor or in the name of Mortgagee for past, present or future infringement of trademark or patent;

(xix)    All Cash and Cash Equivalents of Mortgagor derived from or relating to the Picture and all drafts, checks, certificates of deposit, notes, bills of exchange and other writings which evidence a right to the payment of money and are not themselves security agreements or leases and are of a type which is in the ordinary course of business transferred by delivery with any necessary endorsement or assignment whether now owned or hereafter

acquired (all such drafts, checks, certificates of deposit, notes, bills of exchange and other writings, whenever acquired, collectively are called "Instruments");

(xx)      Any and all amounts received or receivable by Mortgagor in the form of tax credits or similar tax based subsidy transactions for which Mortgagor is or may be eligible; and

(xxi)     To the extent not included in the items described in paragraphs (a)(i) through (a)(xx) above, all accounts, contract rights, general intangibles, documents, instruments, chattel paper, goods, inventory and equipment (as such terms are defined in the UCC) now owned or hereafter acquired by Mortgagor, and the proceeds and products thereof.

(b)      Notwithstanding anything to the contrary contained in paragraphs (a)(i) through (a)(xxi) above, there shall be excluded from the Collateral described herein the interest of Mortgagor, whether as owner or lessee, in any property constituting real property under the laws of the jurisdiction in which such property is located.

The respective rights of Mortgagor and Mortgagee with respect to the Collateral are subject to the Loan and Security Agreement.  Capitalized terms used herein without definition shall have the respective meanings ascribed to such terms in the Loan and Security Agreement.

# POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS that pursuant and subject to that certain Loan and Security Agreement, dated as of January 26, 2022 (the "Loan and Security Agreement"), entered into by and between Bad Hombres Productions, LLC, a New Mexico limited liability company ("Borrower"), on the one hand, and BondIt LLC, a California limited liability company ("Lender"), on the other hand, concerning the financing of the motion picture tentatively entitled, "Bad Hombres" ("Picture"), Borrower hereby grants this power of attorney ("Power of Attorney") to Lender, and irrevocably constitutes and appoints Lender as its attorney in fact for the following purposes:

1.      To endorse any notes, checks, drafts, money orders or other evidences of payment payable to the Borrower relating to the Collateral that may come into the possession of Lender and obtain, take possession of, substitute the Lender or any designee of the Lender for the Borrower as the owner of, or signatory on, and otherwise apply in any manner, all deposit accounts, cash or cash equivalents, instruments and general tangibles of, relating to or derived from the Picture or any other Collateral, and all proceeds thereof including, but not limited to, interest, chattel paper, notes, certificates, writings, distributions, dividends, profits, rights, benefits, premiums and other payments and rights to payment, held by any Person for or in the name of the Borrower;

2.      To apply for, receive notices from, and communicate with the New Mexico State, New Mexico State Department of Taxation and Revenue, and New Mexico State Governor's Office for Motion Picture and Television Development (individually or collectively, "State Office"), on behalf of Borrower, in order to obtain for Borrower the Tax Credits ("Tax Credits") issued pursuant to the New Mexico State Film Production Tax Credit program.  Lender shall promptly provide Borrower with any copies of any written communications received by Lender from the State Office, and/or any written communications or documents delivered by Lender to the State Office, in connection with the Tax Credits. No casual or inadvertent failure by Lender to provide Borrower with such copies shall constitute a breach hereof or of the Loan and Security Agreement;

3.      To take all actions necessary in order for the Picture to qualify for the Tax Credits in an amount not less than the Estimated Tax Credits, and to comply with all requirements necessary or advisable to obtain and retain the Tax Credits including without limitation, compliance with all the rules and regulations of the State Office in connection with the issuance of Tax Credits;

4.      Without limiting the generality of the foregoing, to submit all documents and reports required by the State Office, complete all audits, procedures and documentation required in connection with the issuance of the tax credit certificate to be issued by the State Office evidencing the Tax Credits earned by Borrower in connection with the Picture, and to comply with the credit requirements of the State Office; and

5.      Enforce all of Borrower's rights under and pursuant to all agreements with respect to the Collateral, all for the sole benefit of the Lender, and to enter into such other agreements as may be necessary to complete the production, distribution, and exploitation of the Picture;

6.      File any claims and/or proofs of claim, documents required to qualify the Collateral for withholding tax exemption, and commence, maintain or discontinue any actions, suits or other proceedings to the extent that the Borrower has the right to do the same, all as deemed by the Lender advisable for the purpose of collecting or enforcing payment of any such money owing under the terms of the Collateral;

7.      Settle, compromise, prosecute or defend any action, claim or proceeding with respect to the Collateral and to sell, assign, pledge, transfer and make any agreement respecting, or otherwise deal with, the same; and

8.      To execute under hand or seal and deliver, conditionally or unconditionally, as fully and completely as if such acts and things were done by the undersigned Borrower, any document required to supplement and put into effect this Power of Attorney, and to take such other steps and actions as Lender may deem advisable or necessary to effect the terms hereof pursuant and subject to the terms and conditions of the Loan and Security Agreement that in the opinion of the Lender is necessary to complete the purpose of this Power of Attorney.  Lender shall promptly provide copies to

Borrower of all documents so executed. No casual or inadvertent failure by Lender to provide Borrower with such copies shall constitute a breach hereof or of the Loan and Security Agreement.

This Power of Attorney is coupled with an interest. Lender shall solely decide the manner, time and purposes in and for which the powers conferred to it shall be used; provided, however, that no term or condition hereof shall be construed in any way which is inconsistent with the terms or conditions of the Loan and Security Agreement. Any capitalized terms not otherwise defined hereunder shall have the meaning as set forth in the Loan and Security Agreement.

BORROWER DECLARES THAT:

(A) The rights and powers given to Lender shall automatically terminate upon repayment of the Indebtedness to Lender in accordance with the terms set forth in the Loan and Security Agreement;

(B) The rights and powers granted to Lender hereby may be exercised by any individual so authorized to act on behalf of Lender;

(C) Borrower hereby ratifies and confirms all actions whatsoever that Lender shall do or cause to be done while acting hereunder. Notwithstanding the termination of this Power of Attorney, any action taken in good faith by Lender pursuant to this Power of Attorney, without notice of such termination, shall be binding upon Borrower, to the same extent as if such termination had not occurred;

(D) It is specifically understood and agreed that Lender shall incur no liability, except to the extent resulting from Lender's gross negligence or willful misconduct or bad faith, as a result of the execution of any instruments or the taking of any action authorized by this Power of Attorney, all of such liability being expressly assumed by Borrower; and

(E) Borrower agrees to indemnify and save harmless Lender of and from any and all liability which it may incur in connection with the exercise of the powers conferred upon it hereunder, except those resulting from Lender's own gross negligence, willful misconduct or bad faith. Borrower further agrees to indemnify and defend any and all persons (natural or corporate) relying upon this Power of Attorney from any and all liability arising from his, her, its or their compliance with directions received from Lender except to the extent resulting from Lender's gross negligence, willful misconduct or bad faith.

[SIGNATURES ON FOLLOWING PAGE]

Executed on January 26, 2022 by:

Bad Hombres Productions, LLC                    Bad Hombres Productions, LLC

_____                _____
By: David Frigerio                              By: John Stalberg, Jr.
Its: Authorized Agent                           Its: Authorized Agent


STATE OF _____   )
                                         SS.
COUNTY OF _____   )

On _____, 20___, before me, _____, notary public, _____, personally known to me (or proved on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

_____ (seal)
Notary Public

# PROMISSORY NOTE

**One Million Seven Hundred Fifteen Thousand United States Dollars** ("Commitment Amount")

As of January 26, 2022 (the "Effective Date")

   1.   FOR VALUE RECEIVED, the undersigned, Bad Hombres Productions, LLC, a New Mexico limited liability company with an address at 110 E. Broadway Street, Hobbs, New Mexico 88240, ("Borrower"), hereby promises to pay to the order of BondIt LLC ("Lender"), or holder, at 1639 11th Street, #160, Santa Monica, CA 90404, or at such other address as the holder may specify in writing, the Commitment Amount (i.e., the Loan, plus the Interest Fee and the Extension Reserve), in lawful money of the United States of America, on or prior to the Repayment Dates as determined pursuant to that certain Loan and Security Agreement by and between the Borrower and Lender dated as of January 26, 2022, (the "Loan and Security Agreement"). Any capitalized terms not otherwise defined hereunder shall have the meaning as set forth in the Loan and Security Agreement.

   2.   If the principal balance of this Promissory Note is not paid in full on or before the Maturity Date or, upon the occurrence of an Event of Default, the principal balance of this Promissory Note shall be immediately due and payable and the undersigned promises to pay interest on the principal balance of this Promissory Note at an interest rate ("Default Interest Rate") equal to the lesser of (i) the maximum legal rate of interest permitted by applicable law with respect to lenders or, (ii) three percent (3.0%) per month, as provided for in Paragraph 2.8.1 of the Loan and Security Agreement. The Default Interest, if any, shall be due and owing, and shall accrue and be payable, from the applicable Repayment Date or the date of the respective Event of Default (after expiration of the applicable cure period, if any), to and including the date of payment of all sums due hereunder (or cure of such default, if permitted pursuant to said Loan and Security Agreement). All payments received hereunder shall be applied in the manner and in the order set forth in Paragraph 2.9 of the Loan and Security Agreement.

   3.   If this Promissory Note is not paid in full when due, the Borrower promises to pay all third party, actual, out-of-pocket costs and expenses of collection and reasonable outside attorneys' fees and court costs (including, without limitation, reasonable travel and accommodation expenses) incurred by the holder hereof on account of such collection, whether or not a suit is filed in relation thereto.

   4.   The Lender will make notations of borrowings and payments of the Loan and, if applicable, interest calculated at the applicable Default Interest Rate; provided, however, that the failure to make any such notation shall not limit or otherwise affect the obligations of the Borrower or the rights of the Lender hereunder. This Promissory Note is issued pursuant to said Loan and Security Agreement which, among other things provides for the making of the Loan by Lender to Borrower from time-to-time, such indebtedness of Borrower resulting from each such installment of the Loan being evidenced by this Promissory Note.

   5.   This Promissory Note is secured by the Collateral. Reference is hereby made to the Loan and Security Agreement for a description of the Collateral, the nature and extent of the security for this Promissory Note and the rights of the holder of this Promissory Note in respect of such security.

   6.   The Borrower hereby waives protest, diligence, presentment, demand for payment, notice of default or nonpayment, notice of dishonor and all other demands and notices in connection with the delivery, acceptance, performance and enforcement of this Promissory Note, and to the fullest extent permitted by law, all rights to assert any statute of limitations to an action hereunder.

   7.   If any provision or any word, term, clause or part of any provision of this Promissory Note shall be invalid for any reason, the same shall be ineffective, but the remainder of this Promissory Note and the provision shall not be affected and shall remain in full force and effect.

   8.   This Promissory Note is executed under and shall be governed by and construed in accordance with the laws of the State of California without reference to the conflict of laws provisions thereof. In any action brought

under or arising out of this Promissory Note, the Borrower hereby irrevocably agrees that any disputes relating in any manner to the Agreement, Promissory Note, or any of the Loan Documents, will be submitted to binding arbitration by JAMS under its then-applicable rules in the City of Los Angeles. The parties agree that any award rendered as a result of such binding arbitration may be enforced pursuant to Sections 1285, et. seq., California Code of Civil Procedure, by petition brought in any court of the State of California, including, but not limited to, the courts located in Los Angeles County, California. The parties each waive whatever rights each of them might otherwise have to a jury trial with respect to the disputes referred to in this paragraph. This Agreement will be construed under the laws of the State of California for agreements fully performed in this State.

IN WITNESS WHEREOF, this Promissory Note has been executed and delivered as of the Effective Date.

Bad Hombres Productions, LLC

By: David Frigerio
Its: Authorized Signatory


Bad Hombres Productions, LLC

By: John Stalberg, Jr.
Its: Authorized Signatory

# GUARANTY

THIS GUARANTY (the "**Guaranty**") dated as of the January 25, 2022 is made by David Frigerio, an individual with mailing address at 916 S Highland Avenue, Los Angeles, CA 90036 ("**Guarantor**"), in favor of BondIt LLC a California limited liability company ("**Beneficiary**"), with reference to the following facts:

      A.      Bad Hombres Productions, LLC, a New Mexico limited liability company ("**Borrower**"), is concurrently herewith entering into that certain agreement (such agreement, as the same may be modified, supplemented, amended, restated, or amended and restated from time to time, together with all replacement and substitute agreements therefor, is referred to herein as the "**Loan and Security Agreement**"), dated January 25, 2022 with Beneficiary, relating to the audio-visual work currently entitled "*Bad Hombres*" ("**Project**"), all on the terms and subject to the provisions more particularly set forth in the Loan and Security Agreement and certain other agreements, documents and instruments to which Borrower is party.

      B.      As a condition to Beneficiary's entering into the Loan and Security Agreement and being granted certain rights relating to the Project and entering into other transactions with Borrower (whether or not pursuant to the Loan and Security Agreement), Beneficiary is requiring that Guarantor enter into this Guaranty.

      C.      Guarantor is willing to execute and deliver this Guaranty in order to induce Beneficiary to enter into the Loan and Security Agreement and to engage in other transactions with Borrower.

NOW, THEREFORE, as a material inducement to Beneficiary to enter into and to perform their obligations under the Loan and Security Agreement and the Subject Agreements (as defined herein), and in consideration therefor, and for other good and valuable consideration, the receipt, adequacy and legal sufficiency of which Guarantor hereby acknowledges, Guarantor hereby unconditionally, absolutely and irrevocably covenants and agrees as follows:

      1.      **Definitions.** In addition to the words, terms and phrases (and variations thereof) defined elsewhere herein, the following words, terms and phrases (and variations thereof) shall have the following meanings for purposes of this Guaranty: "**Person**" shall mean any individual, corporation, limited liability company, association, partnership, trust, estate or other entity or organization; and "**Subject Agreements**" shall mean (a) the Loan and Security Agreement, (b) each and all of the agreements, documents and instruments executed and delivered by Borrower, or by any Person acting on behalf of or as agent for Borrower, pursuant to the terms of the Loan and Security Agreement or any of such agreements, documents and instruments, and (c) each and all of such other agreements, documents and instruments as may be executed and delivered by Borrower, or by any Person acting on behalf of or as agent for Borrower, in favor of Beneficiary, as each of the foregoing may be modified, supplemented, amended, restated, or amended and restated from time to time.

      2.      **Unconditional Guaranty.** Guarantor hereby unconditionally, absolutely and irrevocably Guarantees to Beneficiary and its successors and assigns the full, faithful and complete performance by Borrower of each and every covenant, agreement, duty, liability and/or obligation (known, unknown, fixed, contingent or otherwise) of Borrower under or contained in any Subject Agreement including, without limitation, the due and timely payment of amounts payable by Borrower under any Subject Agreement, all in strict accordance with the terms and provisions of such Subject Agreement (collectively the "**Borrower's Obligations**"), and all as if Guarantor were the primary obligor with respect to each and all of the Borrower's Obligations. Guarantor acknowledges and agrees that this Guaranty constitutes a Guaranty of payment and performance and not merely of collection. At the written request of Beneficiary, Guarantor will provide financial reports demonstrating the ability of the Guarantor to cover the Borrower's Obligations.

      3.      **Certain Authorizations.** Guarantor authorizes Beneficiary, without notice or demand and without affecting Guarantor's liability hereunder, without prejudice to Borrower's rights and remedies under any Subject Agreement, from time to time to renew, compromise, extend, accelerate or otherwise change the time for payment of or otherwise change the terms of any of the Borrower's Obligations or any part thereof, including increase or decrease of any rate of interest thereon; take and hold security for the payment of any or all of the

Borrower's Obligations, and exchange, enforce, waive and release any such security; apply such security and direct the order or manner of sale thereof as Guarantor in its discretion may determine; and release and/or substitute any one or more of any endorsers or guarantors for any or all of the Borrower's Obligations.

4.      **Subordination.**  Guarantor hereby subordinates any indebtedness of Borrower now or hereafter held by Guarantor to the Borrower's Obligations, and Guarantor shall collect, enforce and receive such indebtedness of Borrower to Guarantor, if Beneficiary so requests, as trustee for Beneficiary and shall pay over to Beneficiary all collections on and proceeds of such indebtedness of Borrower to Beneficiary, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty.

5.      **No Subrogation; etc.**  Guarantor hereby:  (a) expressly and irrevocably waives, to the fullest extent possible, on behalf of itself and its successors and assigns (including any surety) and any other Person, any and all rights at law or in equity to subrogation, to reimbursement, to exoneration, to contribution, to indemnification, to set off or to any other rights that could accrue to a surety against a principal, to a guarantor against a maker or obligor, to an accommodation party against the party accommodated, to a holder or transferee against a maker, or to the holder of any claim against any Person, and which Guarantor may have or hereafter acquire against Borrower or any Person in connection with or as a result of Guarantor's execution, delivery and/or performance of this Guaranty, or any other documents to which Guarantor is a party or otherwise; (b) expressly and irrevocably waives any "claim" (as such term is defined in the United States Bankruptcy Code) of any kind against Borrower, and further agrees that it shall not have or assert any rights with respect to any such claim against any Person (including any surety), either directly or as an attempted set off to any action commenced against Guarantor by Beneficiary; and (c) acknowledges and agrees (i) that this waiver is intended to benefit Beneficiary and shall not limit or otherwise affect Guarantor's liability hereunder or the enforceability of this Guaranty, and (ii) that the rights of Beneficiary under this sentence shall survive payment and performance in full of the Borrower's Obligations.

6.      **Certain Waivers.**  Neither Beneficiary nor any other Person shall be required to take any action of any kind or nature against Borrower or any other Person, or resort to any security held by Beneficiary or any other Person, at any time before Beneficiary may proceed against Guarantor on this Guaranty.  Guarantor hereby expressly waives, relinquishes and releases, in any action brought on, arising out of or relating to this Guaranty or otherwise: (a) pursuant to California Civil Code Section 2856(a)(1), all of Guarantor's rights of subrogation, reimbursement, indemnification and contribution and any other rights and defenses that are or may become available to Guarantor by reason of California Civil Code Sections 2787 to 2855, inclusive, (b) pursuant to California Civil Code Section 2856(a)(2), all rights or defenses Guarantor may have in respect of its obligations as a guarantor by reason of any election of remedies by the Beneficiary, even if that election of remedies has destroyed Guarantor's rights of subrogation and reimbursement against Borrower, (c) any claim (i) that any obligation of Guarantor hereunder is larger in amount or more burdensome than that of Borrower, (ii) based on Borrower's liability ceasing for any reason, (iii) that this Guaranty may be revoked, (iv) based on any alteration of any original Borrower's Obligation without Guarantor's consent, (v) that acceptance by Beneficiary of anything in partial satisfaction of the Borrower's Obligations reduces the obligations of Guarantor hereunder, (vi) that performance or any offer of performance of any or all of the Borrower's Obligations exonerates Guarantor, (vii) that Guarantor may require Beneficiary to proceed against Borrower or pursue any other remedy, (viii) that Guarantor may compel Borrower to perform any Borrower's Obligation when due, (ix) that if Guarantor satisfies any of the Borrower's Obligations in whole or in part, Borrower is bound to reimburse Guarantor, (x) that Guarantor, upon satisfying all or any part of the Borrower's Obligations, is entitled to enforce any remedy which Beneficiary then has against Borrower, (xi) that Guarantor is entitled to the benefit of any security for the performance of any of the Borrower's Obligations, (xii) that as to any property of Guarantor that has been hypothecated with property of Borrower, Guarantor is entitled to have Borrower's property first applied to discharge of the Borrower's Obligations, (xiii) that Beneficiary, or any other Person, must resort to property upon which Beneficiary, or such other Person, has a lien in any particular order, or must otherwise marshal any such liens, or (xiv) that Guarantor may require Beneficiary, or any other Person, to seek satisfaction from funds to which Guarantor has no claim or to marshal assets, (d) any claim, right or defense based upon any other action or circumstance which might otherwise constitute a legal or equitable discharge, defense or exoneration of a

guarantor surety, (e) notice of the acceptance of this Guaranty by any Person, (f) notice of the Borrower's Obligations now existing or which may hereafter exist or be created or incurred, (g) notice of any adverse change in the financial condition of Borrower or of any other fact that might increase Guarantor's risk hereunder, (h) presentment, notice of demand for payment or performance, notice of default or nonpayment or nonperformance, protest, notice of protest, and notice of dishonor, under the Subject Agreements (or any of them) or otherwise in respect of any of the Borrower's Obligations and (i) all other notices to which Guarantor might otherwise be entitled in connection with this Guaranty, the Subject Agreements (or any of them) or otherwise in respect of any Borrower's Obligation.

7.      **Non-Impairment By Bankruptcy; etc.**    Guarantor's liability hereunder shall continue notwithstanding, and shall be unaltered, unaffected and unimpaired by, (a) the bankruptcy, insolvency, reorganization, merger, liquidation, dissolution, winding-up or cessation of existence of Borrower or any other Person, and/or (b) any fraudulent, illegal or improper act by Borrower, and/or (c) any payment made on the Borrower's Obligations which the recipient repays or is liable to repay to Borrower or any other Person pursuant to any court order or as otherwise required by law.

8.      **Effect of Non-Enforcement; etc.**    Guarantor hereby covenants and agrees that the failure by Beneficiary, or any other Person, to file or enforce a claim against Guarantor or Borrower, or any other Person, shall not affect Guarantor's liability hereunder nor shall Guarantor be released from liability hereunder if recovery from Borrower, any other guarantor, payor, endorser or surety in respect of any of the Borrower's Obligations or any other Person becomes barred by any statute of limitations applicable to any cause of action upon any Borrower's Obligation or upon this Guaranty or any obligation or liability founded upon this Guaranty. The obligations of Guarantor hereunder are independent of the obligations of Borrower under the Subject Agreements (and each of them) and of any security for or other Guaranty of the Borrower's Obligations.  In the event of a default in the performance of any of the Borrower's Obligations, Beneficiary may maintain an action against Guarantor upon this Guaranty, whether or not Borrower is joined therein or a separate action is brought against Borrower.

9.      **Acceleration of Maturity.**  In the event that the maturity of any Borrower's Obligation is accelerated by bankruptcy or otherwise, such maturity shall also be accelerated for purposes of this Guaranty (and the Guaranty of Guarantor hereunder), and without demand or notice to Guarantor.

10.     **Legal Fees.**  In the event that any action, suit, or other proceeding is brought by Beneficiary to enforce the obligations of Guarantor under this Guaranty, the prevailing party shall be entitled to recover all of such party's costs and expenses (including, without limitation, court costs and attorneys' fees) incurred in each and every such action, suit or other proceeding, including any and all appeals or petitions therefrom.  As used herein, attorneys' fees shall mean the full and actual cost of any legal services actually performed in connection with the matters involved, calculated on the basis of the fees charged by the attorneys performing such services and shall not be limited to "reasonable attorneys' fees" as defined in any statute or rule of court.

11.     **Governing Law.**  THIS GUARANTY HAS BEEN MADE AND ENTERED INTO IN THE STATE OF CALIFORNIA, AND THE INTERNAL SUBSTANTIVE LAWS (AS DISTINGUISHED FROM THE CHOICE OF LAW RULES) OF SAID STATE SHALL GOVERN THE VALIDITY AND INTERPRETATION HEREOF, AND THE PERFORMANCE BY GUARANTOR OF ITS DUTIES AND OBLIGATIONS HEREUNDER.  WHENEVER POSSIBLE, EACH PROVISION OF THIS GUARANTY SHALL BE INTERPRETED IN SUCH MANNER AS TO BE EFFECTIVE AND VALID UNDER APPLICABLE LAW. IF ANY PROVISION OF THIS GUARANTY SHALL BE INVALID OR UNENFORCEABLE UNDER APPLICABLE LAW, SUCH PROVISION SHALL BE INEFFECTIVE ONLY TO THE EXTENT OF SUCH INVALIDITY OR UNENFORCEABILITY WITHOUT INVALIDATING OR RENDERING

UNENFORCEABLE THE REMAINDER OF SUCH PROVISION OR THE REMAINING PROVISIONS OF THIS GUARANTY.

12.    **Certain Information.**  Guarantor has informed itself of, and hereby assumes all responsibility for being and keeping informed of, the financial condition and assets of Borrower and of all of the circumstances bearing upon the risk of nonpayment or nonperformance of the Borrower's Obligations thereby and the nature, scope and extent of the risks which Guarantor assumes and incurs hereunder.  Beneficiary shall have no duty to advise Guarantor of any information regarding such circumstances or risks.

13.    **Legal Proceedings.**  Guarantor hereby agrees that any legal action, suit or proceeding against Guarantor (or any successor-in-interest thereto) arising out of or relating to this Guaranty may (but need not) be initiated by Beneficiary in a state or federal court located in the County of Los Angeles, State of California.  By execution and delivery of this Guaranty, Guarantor hereby (a) waives any objection that it may now or hereafter have to the laying of venue of any such action, suit or proceeding in any such court, (b) waives any claim that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum, (c) submits to the personal jurisdiction of any such court in any such action, suit or proceeding, and (d) agrees to be bound by any judgment, order or decree rendered by any such court in any such action, suit or proceeding.

14.    **Successors and Assigns.**  This Guaranty shall bind Guarantor and any and all heirs, administrators, executors, successors and assigns (whether or not by operation of law) of Guarantor.  No delegation or assignment by Guarantor of this Guaranty or any of its obligations hereunder shall relieve Guarantor of any of its obligations hereunder, all of which shall survive any such delegation or assignment.  This Guaranty shall inure to the benefit of Beneficiary and Beneficiary's successors and assigns.  Beneficiary may without notice assign the benefit of this Guaranty in whole or in part.

15.    **Entire Agreement.**  This Guaranty embodies the entire understanding of Beneficiary and Guarantor with respect to Guarantor's obligation to Guaranty the full payment, performance and satisfaction of the Borrower's Obligations and there are no further or other agreements or understandings, written or oral, in effect between said parties relating to the Guaranty by Guarantor of the Borrower's Obligations unless otherwise referred to herein or in any agreement executed by each of Beneficiary and Guarantor.

IN WITNESS WHEREOF, this Guaranty has been executed and delivered by Guarantor as of the January 25, 2022.

ACCEPTED BY:                                ACCEPTED BY:

BENEFICIARY                                 GUARANTOR
BondIt LLC                                  David Frigerio

_Luke Taylor_                               _[signature]_
Luke Taylor                                 David Frigerio

Its: Authorized Signatory

# GUARANTY

THIS GUARANTY (the "**Guaranty**") dated as of the January 25, 2022 is made by John Stalberg, Jr., an individual with mailing address at 8787 Appian Way, Los Angeles, CA 90046 ("**Guarantor**"), in favor of BondIt LLC a California limited liability company ("**Beneficiary**"), with reference to the following facts:

      D.     Bad Hombres Productions, LLC, a New Mexico limited liability company ("**Borrower**"), is concurrently herewith entering into that certain agreement (such agreement, as the same may be modified, supplemented, amended, restated, or amended and restated from time to time, together with all replacement and substitute agreements therefor, is referred to herein as the "**Loan and Security Agreement**"), dated January 25, 2022 with Beneficiary, relating to the audio-visual work currently entitled "*Bad Hombres*" ("**Project**"), all on the terms and subject to the provisions more particularly set forth in the Loan and Security Agreement and certain other agreements, documents and instruments to which Borrower is party.

      E.     As a condition to Beneficiary's entering into the Loan and Security Agreement and being granted certain rights relating to the Project and entering into other transactions with Borrower (whether or not pursuant to the Loan and Security Agreement), Beneficiary is requiring that Guarantor enter into this Guaranty.

      F.     Guarantor is willing to execute and deliver this Guaranty in order to induce Beneficiary to enter into the Loan and Security Agreement and to engage in other transactions with Borrower.

NOW, THEREFORE, as a material inducement to Beneficiary to enter into and to perform their obligations under the Loan and Security Agreement and the Subject Agreements (as defined herein), and in consideration therefor, and for other good and valuable consideration, the receipt, adequacy and legal sufficiency of which Guarantor hereby acknowledges, Guarantor hereby unconditionally, absolutely and irrevocably covenants and agrees as follows:

      16.     **Definitions.**  In addition to the words, terms and phrases (and variations thereof) defined elsewhere herein, the following words, terms and phrases (and variations thereof) shall have the following meanings for purposes of this Guaranty: "**Person**" shall mean any individual, corporation, limited liability company, association, partnership, trust, estate or other entity or organization; and "**Subject Agreements**" shall mean (a) the Loan and Security Agreement, (b) each and all of the agreements, documents and instruments executed and delivered by Borrower, or by any Person acting on behalf of or as agent for Borrower, pursuant to the terms of the Loan and Security Agreement or any of such agreements, documents and instruments, and (c) each and all of such other agreements, documents and instruments as may be executed and delivered by Borrower, or by any Person acting on behalf of or as agent for Borrower, in favor of Beneficiary, as each of the foregoing may be modified, supplemented, amended, restated, or amended and restated from time to time.

      17.     **Unconditional Guaranty.**  Guarantor hereby unconditionally, absolutely and irrevocably Guarantees to Beneficiary and its successors and assigns the full, faithful and complete performance by Borrower of each and every covenant, agreement, duty, liability and/or obligation (known, unknown, fixed, contingent or otherwise) of Borrower under or contained in any Subject Agreement including, without limitation, the due and timely payment of amounts payable by Borrower under any Subject Agreement, all in strict accordance with the terms and provisions of such Subject Agreement (collectively the "**Borrower's Obligations**"), and all as if Guarantor were the primary obligor with respect to each and all of the Borrower's Obligations.  Guarantor acknowledges and agrees that this Guaranty constitutes a Guaranty of payment and performance and not merely of collection. At the written request of Beneficiary, Guarantor will provide financial reports demonstrating the ability of the Guarantor to cover the Borrower's Obligations.

      18.     **Certain Authorizations.** Guarantor authorizes Beneficiary, without notice or demand and without affecting Guarantor's liability hereunder, without prejudice to Borrower's rights and remedies under any Subject Agreement, from time to time to renew, compromise, extend, accelerate or otherwise change the time for payment of or otherwise change the terms of any of the Borrower's Obligations or any part thereof, including increase or decrease of any rate of interest thereon; take and hold security for the payment of any or all of the

Borrower's Obligations, and exchange, enforce, waive and release any such security; apply such security and direct the order or manner of sale thereof as Guarantor in its discretion may determine; and release and/or substitute any one or more of any endorsers or guarantors for any or all of the Borrower's Obligations.

19.     **Subordination.** Guarantor hereby subordinates any indebtedness of Borrower now or hereafter held by Guarantor to the Borrower's Obligations, and Guarantor shall collect, enforce and receive such indebtedness of Borrower to Guarantor, if Beneficiary so requests, as trustee for Beneficiary and shall pay over to Beneficiary all collections on and proceeds of such indebtedness of Borrower to Beneficiary, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty.

20.     **No Subrogation; etc.** Guarantor hereby:  (a) expressly and irrevocably waives, to the fullest extent possible, on behalf of itself and its successors and assigns (including any surety) and any other Person, any and all rights at law or in equity to subrogation, to reimbursement, to exoneration, to contribution, to indemnification, to set off or to any other rights that could accrue to a surety against a principal, to a guarantor against a maker or obligor, to an accommodation party against the party accommodated, to a holder or transferee against a maker, or to the holder of any claim against any Person, and which Guarantor may have or hereafter acquire against Borrower or any Person in connection with or as a result of Guarantor's execution, delivery and/or performance of this Guaranty, or any other documents to which Guarantor is a party or otherwise; (b) expressly and irrevocably waives any "claim" (as such term is defined in the United States Bankruptcy Code) of any kind against Borrower, and further agrees that it shall not have or assert any rights with respect to any such claim against any Person (including any surety), either directly or as an attempted set off to any action commenced against Guarantor by Beneficiary; and (c) acknowledges and agrees (i) that this waiver is intended to benefit Beneficiary and shall not limit or otherwise affect Guarantor's liability hereunder or the enforceability of this Guaranty, and (ii) that the rights of Beneficiary under this sentence shall survive payment and performance in full of the Borrower's Obligations.

21.     **Certain Waivers.** Neither Beneficiary nor any other Person shall be required to take any action of any kind or nature against Borrower or any other Person, or resort to any security held by Beneficiary or any other Person, at any time before Beneficiary may proceed against Guarantor on this Guaranty.  Guarantor hereby expressly waives, relinquishes and releases, in any action brought on, arising out of or relating to this Guaranty or otherwise: (a) pursuant to California Civil Code Section 2856(a)(1), all of Guarantor's rights of subrogation, reimbursement, indemnification and contribution and any other rights and defenses that are or may become available to Guarantor by reason of California Civil Code Sections 2787 to 2855, inclusive, (b) pursuant to California Civil Code Section 2856(a)(2), all rights or defenses Guarantor may have in respect of its obligations as a guarantor by reason of any election of remedies by the Beneficiary, even if that election of remedies has destroyed Guarantor's rights of subrogation and reimbursement against Borrower, (c) any claim (i) that any obligation of Guarantor hereunder is larger in amount or more burdensome than that of Borrower, (ii) based on Borrower's liability ceasing for any reason, (iii) that this Guaranty may be revoked, (iv) based on any alteration of any original Borrower's Obligation without Guarantor's consent, (v) that acceptance by Beneficiary of anything in partial satisfaction of the Borrower's Obligations reduces the obligations of Guarantor hereunder, (vi) that performance or any offer of performance of any or all of the Borrower's Obligations exonerates Guarantor, (vii) that Guarantor may require Beneficiary to proceed against Borrower or pursue any other remedy, (viii) that Guarantor may compel Borrower to perform any Borrower's Obligation when due, (ix) that if Guarantor satisfies any of the Borrower's Obligations in whole or in part, Borrower is bound to reimburse Guarantor, (x) that Guarantor, upon satisfying all or any part of the Borrower's Obligations, is entitled to enforce any remedy which Beneficiary then has against Borrower, (xi) that Guarantor is entitled to the benefit of any security for the performance of any of the Borrower's Obligations, (xii) that as to any property of Guarantor that has been hypothecated with property of Borrower, Guarantor is entitled to have Borrower's property first applied to discharge of the Borrower's Obligations, (xiii) that Beneficiary, or any other Person, must resort to property upon which Beneficiary, or such other Person, has a lien in any particular order, or must otherwise marshal any such liens, or (xiv) that Guarantor may require Beneficiary, or any other Person, to seek satisfaction from funds to which Guarantor has no claim or to marshal assets, (d) any claim, right or defense based upon any other action or circumstance which might otherwise constitute a legal or equitable discharge, defense or exoneration of a

guarantor surety, (e) notice of the acceptance of this Guaranty by any Person, (f) notice of the Borrower's Obligations now existing or which may hereafter exist or be created or incurred, (g) notice of any adverse change in the financial condition of Borrower or of any other fact that might increase Guarantor's risk hereunder, (h) presentment, notice of demand for payment or performance, notice of default or nonpayment or nonperformance, protest, notice of protest, and notice of dishonor, under the Subject Agreements (or any of them) or otherwise in respect of any of the Borrower's Obligations and (i) all other notices to which Guarantor might otherwise be entitled in connection with this Guaranty, the Subject Agreements (or any of them) or otherwise in respect of any Borrower's Obligation.

22.    **Non-Impairment By Bankruptcy; etc.**    Guarantor's liability hereunder shall continue notwithstanding, and shall be unaltered, unaffected and unimpaired by, (a) the bankruptcy, insolvency, reorganization, merger, liquidation, dissolution, winding-up or cessation of existence of Borrower or any other Person, and/or (b) any fraudulent, illegal or improper act by Borrower, and/or (c) any payment made on the Borrower's Obligations which the recipient repays or is liable to repay to Borrower or any other Person pursuant to any court order or as otherwise required by law.

23.    **Effect of Non-Enforcement; etc.**    Guarantor hereby covenants and agrees that the failure by Beneficiary, or any other Person, to file or enforce a claim against Guarantor or Borrower, or any other Person, shall not affect Guarantor's liability hereunder nor shall Guarantor be released from liability hereunder if recovery from Borrower, any other guarantor, payor, endorser or surety in respect of any of the Borrower's Obligations or any other Person becomes barred by any statute of limitations applicable to any cause of action upon any Borrower's Obligation or upon this Guaranty or any obligation or liability founded upon this Guaranty. The obligations of Guarantor hereunder are independent of the obligations of Borrower under the Subject Agreements (and each of them) and of any security for or other Guaranty of the Borrower's Obligations. In the event of a default in the performance of any of the Borrower's Obligations, Beneficiary may maintain an action against Guarantor upon this Guaranty, whether or not Borrower is joined therein or a separate action is brought against Borrower.

24.    **Acceleration of Maturity.**    In the event that the maturity of any Borrower's Obligation is accelerated by bankruptcy or otherwise, such maturity shall also be accelerated for purposes of this Guaranty (and the Guaranty of Guarantor hereunder), and without demand or notice to Guarantor.

25.    **Legal Fees.**    In the event that any action, suit, or other proceeding is brought by Beneficiary to enforce the obligations of Guarantor under this Guaranty, the prevailing party shall be entitled to recover all of such party's costs and expenses (including, without limitation, court costs and attorneys' fees) incurred in each and every such action, suit or other proceeding, including any and all appeals or petitions therefrom. As used herein, attorneys' fees shall mean the full and actual cost of any legal services actually performed in connection with the matters involved, calculated on the basis of the fees charged by the attorneys performing such services and shall not be limited to "reasonable attorneys' fees" as defined in any statute or rule of court.

26.    **Governing Law.**    THIS GUARANTY HAS BEEN MADE AND ENTERED INTO IN THE STATE OF CALIFORNIA, AND THE INTERNAL SUBSTANTIVE LAWS (AS DISTINGUISHED FROM THE CHOICE OF LAW RULES) OF SAID STATE SHALL GOVERN THE VALIDITY AND INTERPRETATION HEREOF, AND THE PERFORMANCE BY GUARANTOR OF ITS DUTIES AND OBLIGATIONS HEREUNDER. WHENEVER POSSIBLE, EACH PROVISION OF THIS GUARANTY SHALL BE INTERPRETED IN SUCH MANNER AS TO BE EFFECTIVE AND VALID UNDER APPLICABLE LAW. IF ANY PROVISION OF THIS GUARANTY SHALL BE INVALID OR UNENFORCEABLE UNDER APPLICABLE LAW, SUCH PROVISION SHALL BE INEFFECTIVE ONLY TO THE EXTENT OF SUCH INVALIDITY OR UNENFORCEABILITY WITHOUT INVALIDATING OR RENDERING

UNENFORCEABLE THE REMAINDER OF SUCH PROVISION OR THE REMAINING PROVISIONS OF THIS GUARANTY.

27.     **Certain Information.**  Guarantor has informed itself of, and hereby assumes all responsibility for being and keeping informed of, the financial condition and assets of Borrower and of all of the circumstances bearing upon the risk of nonpayment or nonperformance of the Borrower's Obligations thereby and the nature, scope and extent of the risks which Guarantor assumes and incurs hereunder.  Beneficiary shall have no duty to advise Guarantor of any information regarding such circumstances or risks.

28.     **Legal Proceedings.**  Guarantor hereby agrees that any legal action, suit or proceeding against Guarantor (or any successor-in-interest thereto) arising out of or relating to this Guaranty may (but need not) be initiated by Beneficiary in a state or federal court located in the County of Los Angeles, State of California.  By execution and delivery of this Guaranty, Guarantor hereby (a) waives any objection that it may now or hereafter have to the laying of venue of any such action, suit or proceeding in any such court, (b) waives any claim that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum, (c) submits to the personal jurisdiction of any such court in any such action, suit or proceeding, and (d) agrees to be bound by any judgment, order or decree rendered by any such court in any such action, suit or proceeding.

29.     **Successors and Assigns.**  This Guaranty shall bind Guarantor and any and all heirs, administrators, executors, successors and assigns (whether or not by operation of law) of Guarantor.  No delegation or assignment by Guarantor of this Guaranty or any of its obligations hereunder shall relieve Guarantor of any of its obligations hereunder, all of which shall survive any such delegation or assignment.  This Guaranty shall inure to the benefit of Beneficiary and Beneficiary's successors and assigns.  Beneficiary may without notice assign the benefit of this Guaranty in whole or in part.

30.     **Entire Agreement.**  This Guaranty embodies the entire understanding of Beneficiary and Guarantor with respect to Guarantor's obligation to Guaranty the full payment, performance and satisfaction of the Borrower's Obligations and there are no further or other agreements or understandings, written or oral, in effect between said parties relating to the Guaranty by Guarantor of the Borrower's Obligations unless otherwise referred to herein or in any agreement executed by each of Beneficiary and Guarantor.

IN WITNESS WHEREOF, this Guaranty has been executed and delivered by Guarantor as of the January 25, 2022.


ACCEPTED BY:                                ACCEPTED BY:

BENEFICIARY                                 GUARANTOR
BondIt LLC                                  John Stalberg, Jr.

_____                     _____
Luke Taylor                                 John Stalberg, Jr.

Its: Authorized Signatory

## BORROWING CERTIFICATE

Pursuant to the Loan and Security Agreement dated as of January 25, 2022, by and between Bad Hombres Productions, LLC, a limited liability company organized and existing under the laws of New Mexico ("Borrower"), on the one hand, and BondIt LLC, a limited liability company organized and existing under the laws of California ("Lender") (which agreement, as it may modified, supplemented, extended, renewed, or replaced is herein referred to as the "Loan and Security Agreement", and the defined terms therein being used herein with the same meanings), the undersigned hereby requests the Loan set forth below and certifies as of the date of the Loan requested hereby that:

a.        The undersigned is a duly authorized signatory of the Borrower;

b.        the undersigned has reviewed the terms of the Loan and Security Agreement and of the other documents and agreements relating thereto, and has made, or caused to be made under its supervision, an investigation of the transactions and conditions of the Borrower as of the date hereof;

c.        the representations and warranties of the Borrower contained in the Loan and Security Agreement are true and correct in all material respects on and as of the date of the Loan requested hereby as if such representations and warranties had been made on and as of such date (except to the extent that any such representation or warranty expressly relates to an earlier date);

d.        no Event of Default or event which, the giving of notice, the passage of time, or both, would become an Event of Default has occurred;

e.        the requested amount of the Loan is One Million Four Hundred Eighty-Two Thousand United States Dollars ($1,482,000.00 USD); and such Loan shall be disbursed as follows: (i) Nine Hundred Sixty Thousand United States Dollars ($960,000.00 USD) by January 31, 2022; (ii) Two Hundred Thirty Seven Thousand United States Dollars ($237,000.00 USD) by February 14, 2022; (iii) One Hundred Fifty Thousand United States Dollars ($150,000.00 USD) by February 28, 2022; (iv) One Hundred Thirty-Five Thousand United States Dollars ($135,000.00 USD) by April 1, 2022.

f.        after giving effect to the Loan requested hereby, the aggregate amount of the Loan outstanding will not exceed the One Million Four Hundred Eighty Two Thousand United States Dollars ($1,482,000.00 USD) (i.e., the Commitment Amount, less the Interest Fee and Extension Reserve); and

g.        together with this Borrowing Certificate, Borrower is providing Lender with a detailed cost report and any other relevant information that may be/have been requested by Lender to conduct an audit of expenses funded by Borrower to date in connection with the Picture.

IN WITNESS WHEREOF, the undersigned has caused this Borrowing Certificate to be executed as of January 26, 2022.

Bad Hombres Productions, LLC

By: _____
David Frigerio
Its: Authorized Signatory

By: _____
John Stalberg, Jr.
Its: Authorized Signatory

Dated: January 26, 2022

BondIt LLC
1639 11th Street, #160,
Santa Monica, CA 90404
Attn: Luke Taylor
Email: luketaylor@bondit.us

      Re:      **"Bad Hombres"**

Dear Mr. Luke Taylor:

      We have acted as counsel to Bad Hombres Productions, LLC, a limited liability company organized under the laws of the State of New Mexico ("Borrower"). Borrower is to enter into agreements in connection with the financing by BondIt LLC ("Lender") to partly fund the production of a feature length motion picture currently entitled, "*Bad Hombres*" (the "Picture"), to be produced by Borrower.

      This opinion is rendered pursuant to the provisions of Section 6.2.11of that certain Loan and Security Agreement dated as of January 26, 2022 between Borrower and Lender (the "Loan Agreement"). Capitalized terms, to the extent not otherwise defined herein, shall have the meanings ascribed to them in the Loan Agreement.

      In connection with rendering this opinion, we have examined original documents, or copies properly certified or otherwise identified to our satisfaction as being in the form of original documents set forth in subparagraphs (A) through (G) below (collectively, the "Loan Documents") among Lender and Borrower (and certain other parties) relating to the loan:

1. Loan and Security Agreement;

2. Promissory Note in favor of Lender, dated as of January 26, 2022;

3. Initial Borrowing Certificate;

4. Assignment of Proceeds in favor of Lender, dated as of January 26, 2022;

5. Power of Attorney, dated as of January 26, 2022, executed by Borrower in favor of Lender;

6. UCC-1 Financing Statement in connection with the Borrower ("Financing Statements") with respect to the security interests granted under the Loan Documents; and

7. Such other corporate documents and instruments as we have deemed appropriate in connection with the requested opinion.

      In rendering this opinion and examining the Loan Documents, we have assumed without any inquiry, investigation or verification the following: (i) the genuineness of all signatures, (ii) the legal capacity and competency of natural persons, (iii) the authenticity of all documents submitted to us as originals, (iv) the conformity to the originals of all documents submitted to us as copies or facsimiles or conformed copies, (v) the authenticity of the originals of all documents referred to in (iv) above, (vi) that each party (other than Borrower) to any Loan Document has full right, power, authority and capacity to enter into the applicable Loan Document, (vii) that all such Loan Documents have been duly authorized, executed and delivered by the applicable parties thereto (other than Borrower), and are valid, binding and enforceable upon the applicable parties (other than Borrower), and (viii) that each Loan Document constitutes the complete agreement for all parties thereto, with respect to the subject matter thereof. In addition, as to various factual matters material to our opinion, we have relied, without independent investigation or verification, upon the truth and accuracy of the representations and warranties contained in the Loan Documents and upon statements and certificates of

the officers or representatives of Borrower, and such other certificates, corporate documents and records of Borrower, and certificates of public officials, as we have deemed necessary or appropriate for the purposes of this opinion, none of which we believe to be incorrect.

In basing the opinions set forth herein on matters "to the best of our knowledge" or words of similar import, such words refer only to the actual current knowledge of attorneys in this firm who have represented the Borrower in connection with the transactions described in the Loan Documents. Except as otherwise stated herein, we have undertaken no independent investigation or verification of such matters.

On the basis of the foregoing and in reliance thereon, we are of the opinion that, subject to the assumptions, exceptions and qualifications set forth herein, as of the date hereof:

7.1 The Bad Hombres Productions, LLC is a limited liability company duly organized, validly existing and in good standing under the laws of the State of New Mexico.

7.2 Borrower has adequate limited liability company power and limited liability company authority to own, lease and operate its properties and conduct its business as presently conducted. To the best of our knowledge, no consent, license, approval, authorization, registration or declaration of, with or from any governmental authority, bureau or agency is required in the United States for the execution or delivery by Borrower of the Loan Documents to which it is a party or the performance by Borrower of its obligations thereunder, except (a) to the extent that licenses or permits are necessary in connection with the day-to-day production of the Picture and, (b) for such consents, licenses, approvals, authorizations, registrations or declarations contemplated by the Loan Documents and where the failure to obtain such consent, license, approval, authorization, registration or declaration would not have a material adverse effect on the business or financial condition of Borrower.

7.3 The execution and delivery of the Loan Documents, and compliance with the terms and provisions thereof, does not violate any provision of Borrower's Articles of Organization or Operating Agreement and will not (i) violate any provisions of United States federal law or the law of the State of California or of any applicable regulation, order or decree of any court or governmental instrumentality or administrative body or agency, (ii) to the best of our knowledge, result in any breach of the terms, covenants, conditions or provisions of any material mortgage, indenture, deed of trust, agreement or other instrument to which Borrower is a party or by which it may be bound or to which it may be subject, or (iii) result in the creation or imposition of (or the obligation to create or impose) any lien, charge, mortgage, pledge, encumbrance, security interest or other charge of any nature upon or with respect to the property of Borrower, except for those set forth in or arising from the Loan Documents.

7.4 To the best of our knowledge, we are not aware of any actions, suits or proceedings pending or threatened against or affecting Borrower in any court of law or before any governmental agency which, if adversely determined, would materially interfere with Borrower's or ability to enter into and perform its obligations under the Loan Documents to which Borrower is a party or would materially adversely affect the rights of Lender under the Loan Documents.

7.5 Borrower has adequate limited liability company power and limited liability company authority to enter into, execute, deliver and perform its obligations under the Loan Documents to which Borrower is a party. The Loan Documents to which Borrower is a party have been duly authorized, executed and delivered by Borrower and constitute the legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their terms, except to the extent that:

7.5.1    enforceability of obligations under any agreements or documents may be subject to or limited by procedural due process, bankruptcy, insolvency, reorganization, or moratorium or other similar laws now or hereafter in effect relating to or affecting creditors rights generally (including fraudulent transfer laws), or the appointment of a receiver or conservator pursuant to State or Federal law;

DocuSign Envelope ID: 8F16611C-438D-4E4F-B915-285A79B7D543

7.5.2    we express no opinion regarding the availability of the remedy of specific performance, injunctive relief, or any other equitable remedy or relief to enforce any right under Loan Documents or otherwise;

7.5.3    the enforceability under certain circumstances of provisions to the effect that rights or remedies are not exclusive, that rights or remedies may be exercised without notice, that every right or remedy is cumulative and may be exercised in addition to or with any other right or remedy, and the election of any particular remedy or remedies does not preclude recourse to one or more other remedies, or that failure to exercise or delay in exercising rights or remedies will not operate as a waiver of such rights or remedies, may each be limited by the court before which any proceedings therefor may be brought;

7.5.4    the enforceability of certain covenants may be limited to the extent that the court before which any proceeding therefor is brought concludes that such enforcement would be unreasonable, unconscionable or unnecessary for the protection of the other parties to such agreement under these and existing circumstances;

7.5.5    the parties thereto seek to enforce their rights under the Loan Documents other than in good faith and in a manner which it is commercially reasonable to do so; and

7.5.6    rights to indemnify and contribution under the same may be limited by federal or state securities laws or the public policy underlying such laws.

7.6    Without rendering any opinion as to the priority of security interests, upon due execution and delivery by the parties of the Loan Agreement, the Borrower will have granted a valid security interest in favor of the Lender in the Collateral (as defined in the Loan Agreement), securing the performance of the obligations purported to be secured thereby, to the extent a security interest can be created therein under Article 9 of the Uniform Commercial Code ("UCC"), as in effect in the State of New Mexico as of the date hereof.  Upon the filing of the Financing Statements with the Secretary of State of the State of New Mexico, together with all required filing fees and taxes with respect thereto, such security interests in the relevant Collateral will be perfected to the extent security interests therein can be perfected by the filing of UCC-1 financing statements under Article 9 of the UCC, if and when Lender incurs an obligation, advances money or otherwise gives value under the Loan Agreement.

The opinions expressed hereinabove are subject to the following qualifications, exceptions and reservations, as applicable:

7.6.1.1   Your procedural and remedial rights set forth in the Loan Documents are all subject to (A) exemption, bankruptcy, insolvency, reorganization, fraudulent conveyance, preference, moratorium and other similar laws of general application relating to or affecting the enforcement of creditors' right generally; (B) general principles of equity (regardless of whether enforcement is considered in a proceeding in equity or at law), (C) provisions of applicable law relating to the waiver, modification and/or enforcement of certain rights, remedies, releases and indemnities, and (D) the requirement that the rights of the parties to the Loan Documents be exercised in good faith.

7.6.1.2   Title 11 U.S.C. Section 552 may affect the validity of your security interest with respect to the proceeds realized and additional collateral acquired after the commencement of a case under such title.

7.6.1.3   Title 11 U.S.C. Sections 547 and 553 and analogous provisions of New Mexico law may affect your right to retain transfers of property of Borrower received by you during the periods of time specified in said sections and provisions.

7.6.1.4   The enforcement of any obligations may be limited by provisions of the UCC or by judicial decisions interpreting such law which modify or affect the remedial provisions provided for, or which invalidate waivers set forth, in the Loan Documents, although we believe the inclusion of such remedial provisions in the Loan Documents does not affect the validity of the Loan Documents.

DocuSign Envelope ID: 8F16611C-438D-4E4F-B915-285A79B7D543

7.6.1.5  We express no opinion regarding the availability of the remedy of specific performance, or of any other equitable remedy or relief to enforce any right under any agreement or document. Moreover, a court may fail or refuse to enforce provisions of agreements or documents if enforcement thereof is based upon defaults or breaches which are immaterial to the ultimate performance contemplated thereby or for other reasons deemed equitable by the court.

7.6.1.6  Our opinion in Paragraphs 1 and 2 with respect to the good standing of Borrower under the laws of the State of New Mexico is based on our causing the articles of organization to be filed with the Secretary of State of the State of New Mexico, dated as of January 25, 2022.

7.6.1.7  We are members of the Bar of the State of California. The opinions expressed in this letter are limited to the present effect of the laws of the State of California and the relevant federal laws of the United States, and no opinion is herein expressed with respect to the laws of any other jurisdiction.  To the extent that the Loan Documents recite that they are to be governed by the laws of any State other than the State of California, with your permission we have reviewed the Loan Documents as if each stated that it is to be governed by the law of the State of California.

7.6.1.8  We express no opinion as to the creation, validity, perfection or enforceability of (A) any security interest in proceeds other than identifiable cash proceeds to the extent provided in Section 9-315 of the UCC; (B) any security interest in any right the assignment of which requires the consent of another person which has not been duly obtained; or (C) any security interest to the extent limited by Section 552 of the United States Bankruptcy Code.  In the case of property which becomes part of the Collateral after the commencement of a United States bankruptcy proceeding involving Borrower, Section 552 of the United States Bankruptcy Code limits the extent to which property acquired by a debtor after the commencement of a case under the United States Bankruptcy Code may be subject to a security interest arising from a security agreement entered into by the debtor before the commencement of such case.  In addition, we express no opinion with respect to (x) the validity or enforceability of any provision of the Loan Documents purporting to give a security interest in a claim or right with respect to any insurance policy, (y) the validity or enforceability of those provisions of the Loan Documents relating to the creation or existence of security interests in tax refunds or commercial tort claims, or (z) the priority of any security interest.

7.6.1.9  We call to your attention that in many cases where the UCC renders anti-assignment provisions contained in agreements, instruments or other documentation creating or evidencing collateral ineffective for the purposes of the creation, attachment or perfection of a security interest, the security interest is not enforceable against the account debtor or other person or entity obligated under such agreement, instrument or other documentation.

7.6.1.10 The opinions set forth above are subject to (A) the provisions of Section 9-610 of the UCC which limit the ability of a secured party to collect a deficiency from a "debtor" or "obligor" in the event a sale of collateral is not conducted in a commercially reasonable manner or in the event of certain dispositions to the secured party or a person or entity related to a secured party, (B) provisions of the Loan Documents which purport to define whether any disposition constitutes a commercially reasonable disposition and (C) provisions of the Loan Documents which purport to waive any rights of Borrower, or any other obligor or duties of any secured party, in violation of Section 9-602 of the UCC or other applicable law.  We note that sales by the Lender or any other secured party under the Loan Documents of Collateral constituting "securities" under applicable federal or state securities laws require compliance with such laws or an exemption therefrom

7.6.1.11 We express no opinion as to any laws or regulations (A) relating to the types of investments which can be properly made by the Lender, (B) establishing the legal interest rate that may be charged by the Lender or (C) regulating the Lender's legal lending limits.

7.6.1.12 We express no opinion as to the effect of non-compliance by Borrower or any of the distributors, and their respective affiliates or subsidiaries, with respect to the requirements of the Patriot Act, the Bank Secrecy Act of 1970, the Money Laundering Control Act of 1986, the Office of Foreign Asset Control's Specially

Designated Nationals and Block Persons List, or any other law, rule or regulation promulgated or related with respect thereto, as to any of the rights, interests, security interests or obligations created under the Loan Documents.

Our opinions expressed herein are as of the date of this letter and are rendered to you and are solely for your benefit and may not be relied on by any other person (other than an assignee or successor-in-interest of the Lender). The foregoing are our opinions only and not a statement of fact or law. This opinion may not be paraphrased, quoted, or summarized nor may copies hereof be furnished to any other person without the prior written consent of the undersigned, except that you may furnish a copy hereof (a) to your independent auditors and attorneys, (b) to any governmental agency or authority having regulatory jurisdiction over you, (c) pursuant to order or legal process of any court or governmental agency or authority; (d) in connection with any legal action to which you are a party arising out of the transactions referred to above; (e) to a financial institution in connection with a proposed assignment of your interest or a proposed transfer of a participation, (f) to a proposed purchaser in connection with any disposition of collateral and/or (g) to the parties involved in the foregoing loan transaction and to their respective counsel.

Sincerely,

Michael Weiss

By: _____
Michael Weiss, Esq.
Abrams Garfinkel Margolis Bergson, LLP,
3900 West Alameda Avenue, Suite 2100, Burbank, California 91505

## FIRST AMENDMENT TO LOAN AND SECURITY AGREEMENT

This First Amendment (the "Amendment") is entered into as of March 13, 2023 (the "Effective Date"), by  Bad Hombres LLC, a limited liability company organized and existing under the laws of  the state of New Mexico ("Borrower") on one hand, and BondIt LLC, a limited liability company organized and existing under the laws of the State of California ("Lender"), on the other hand, with respect to the Loan and Security Agreement, dated as of January 26, 2022 (the "Loan Agreement"), between Borrower and Lender. Borrower and Lender are sometimes individually referred to in this Amendment as a "Party" and are collectively referred to as the "Parties." Capitalized terms used in this Amendment without definition have the same meanings that are given to those terms in the Loan Agreement. The Parties' agreement is as follows:

1.      **FACTUAL BACKGROUND.**  Borrower and Lender previously entered into the Loan Agreement in which Lender agreed to make a loan to Borrower to be used to fund a portion of the cost of production of the theatrical, feature-length motion picture entitled "Bad Hombres" (the "Picture"), for use in the payment of pre-production, production and post-production costs of the Picture, all as described more fully in the Loan Agreement.  Borrower, Accommodation Party and Lender hereby agree to make the following change to the Loan Agreement.

2.      **CONDITIONS PRECEDENT.**  Lender shall not be obligated to advance any funds in connection with the Increased Facility (defined below) unless and until (a)  Lender receives a final budget for the estimated completion of the Picture, (b) Lender receives a letter of good standing from the Secretary of State of Borrower's state of organization, and (c) execution of this First Amendment to the Loan and Security Agreement, Amended and Restated Assignment of Proceeds, Assignment of Tax Credit Proceeds, Amended and Restated Promissory Note, Borrowing Certificate, Certificate of Incumbency, Consent of Managers, and Certificate of Members, in form and substance satisfactory to Lender.

3.      **AMENDMENTS TO THE LOAN AGREEMENT.**

a)      Recital B of the Loan Agreement is hereby deleted and replaced with the following (the increase of the Commitment Amount [i.e., US $200,000.00] shall be referred to herein as the "Additional Commitment "):

B.  The Commitment Amount shall be in the amount of One Million Nine Hundred Fifteen Thousand United States Dollars ($1,915,000.00) (the "Commitment Amount").

b)      Recital C of the Loan Agreement is hereby deleted and replaced with the following (the increase of the Loan amount [i.e., US $258,000.00] shall be referred to herein as the "Increased Facility"):

C. Borrower has requested that Lender lend and advance senior secured funds to Borrower for use in the payment of pre-production, production, post-production and delivery costs of the Picture in the aggregate principal amount not to exceed One Million Seven Hundred Forty Thousand United States Dollars (US$1,740,000.00) (the "Loan", i.e., the "Commitment Amount", less the "Interest Fee," each as further defined below).

c)      Section 1.8 of the Loan Agreement is hereby deleted and replaced with the following:

1.10 "Budget" means the production budget of the Picture in the amount of _____ United States Dollars (US$_____), as approved by Lender, attached hereto as Exhibit "B" and incorporated herein by this reference.

d)      Section 2.1 of the Loan Agreement is hereby deleted and replaced with the following:

2.1 <u>Commitment.</u> Subject to the terms and conditions of this Agreement, following execution and delivery of the Loan Documents to Lender, and the satisfaction of the "Conditions Precedent" (as defined below), and further subject to an uncured "Event of Default" (as defined below), Lender hereby agrees to disburse the Loan to Borrower in the following installments on our about the target dates set forth below ("Lender Funding Schedule"):

| MG Funding Schedule | | |
|---|---|---|
| **Tranche** | **Amount** | **Date** |
| 1 ("First Tranche") | $960,000.00 USD (Borrower hereby acknowledges receipt) | January 28, 2022 |
| 2 | $75,000.00 USD (Borrower hereby acknowledges receipt) | February 3, 2022 |
| 3 | $146,000.00 USD | March 13, 2023 (target funding date) |
| *Sub Total "MG Funding"* | **$1,181,000.00 USD** | |

| Tax Credit Funding Schedule | | |
|---|---|---|
| **Tranche** | **Amount** | **Date** |
| 1 | $43,500.00 USD (Borrower hereby acknowledges receipt) | February 3, 2022 |
| 2 | $150,000.00 USD (Borrower hereby acknowledges receipt) | February 8, 2022 |
| 3 | $150,000.00 USD (Borrower hereby acknowledges receipt) | February 10, 2022 |
| 4 | $103,500.00 USD (Borrower hereby acknowledges receipt) | February 28, 2023 |
| 5 | $112,000.00 USD | March 13, 2023 (target funding date) |
| *Sub Total "Tax Rebate Advance"* | **$559,000.00 USD** | |
| **Total Loan** | **$1,740,000.00 USD** | |

e)      Section 2.7 of the Loan Agreement is hereby deleted and replaced with the following:

2.7 <u>Repayment Date(s)</u>. The Indebtedness shall be immediately due and payable to Lender in of the amounts and on the dates as follows:  (i) the entire Commitment Amount shall become due on the date on which payment is accelerated by Lender as a result of the occurrence of an Event of Default (unless such Event of Default has been cured within the applicable time period [if any] expressly permitted hereunder) and (ii) in the repayment amounts ("<u>Repayment Amounts</u>") specified in the following repayment schedule: (i) One Million One Hundred and Seventy-Five Thousand United States Dollars (US $1,175,000.00) on or before March 31, 2023; (ii) Six Hundred Forty Four Thousand United States Dollars (US $644,000.00) on or before May 1st, 2023; (iii) Ninety Six Thousand United States Dollars (US $96,000.00) on or before June 30th, 2023.

f)      Section 2.8.1 of the Loan Agreement is hereby deleted and replaced with the following:

2.8.1 <u>Return Interest Fee; Default Interest Rate</u>. The unpaid Indebtedness shall bear no interest until the applicable Repayment Date other than a flat return interest fee equal to One Hundred Seventy Five Thousand United States Dollars ($175,000.00) (the "Interest Fee"), which Interest Fee may be deemed interest; provided that from and after any of the Repayment Dates in the Initial Repayment Schedule, the unpaid Indebtedness will bear interest ("Extension Interest") at a rate equal to three percent (3.0%) per 30-day month, non-compounding, until the later of (i) June 30th, 2023 and (ii) the depletion of the Extension Reserve (the "Final Maturity Date"), at which point an Event of Default will have occurred. For avoidance of doubt, the Borrower has not triggered an Event of Default for payment latency until the Final Maturity Date has surpassed. Extension Interest accrual will apply for any payment made beyond the Repayment Date as scheduled in the Initial Repayment Schedule. Upon the occurrence of an Event of Default (and without constituting a waiver of such Event of Default), the unpaid Indebtedness will bear interest ("Default Interest") at a rate equal to three percent (3.0%) per month, compounding monthly and payable on demand, until the Event of Default has been cured.

g)      Section 2.8.3 of the Loan Agreement is hereby deleted and all references to the "Extension Reserve" shall be removed.

h)      The following is hereby inserted directly after 4.1.5 of the Loan Agreement:

4.1.6 <u>SAG Security Deposit.</u> First priority position and assignment of Borrower's rights to its deposits, reserves, or other proceeds to be received from SAG in relation to the Picture.

i)      4.1.6 of the Loan Agreement is hereby changed to 4.1.7 and replaced with the following:

4.1.7 To the extent not included in the items described in paragraphs 4.1.1 through 4.1.6 above, all accounts, contract rights, general intangibles, documents, instruments, chattel paper, goods, inventory and equipment (as such terms are defined in the UCC) now owned or hereafter acquired by Borrower, and the proceeds and products thereof.

j)      Exhibit "B" of the Loan Agreement is deleted in its entirety and is replaced with the Amended and Restated Budget attached hereto as Exhibit "A" and incorporated by reference.

k)      Exhibit "E" of the Loan Agreement is deleted in its entirety and is replaced with the Amended and Restate Promissory Note attached hereto as Exhibit "B" and incorporated by reference.

l)      Exhibit "A" of the Loan Agreement is deleted in its entirety and is replaced with the Amended and Restated Assignment of Proceeds and Assignment of Tax Credit Proceeds attached hereto as Exhibit "C" and incorporated by reference.

4.      **REPRESENTATIONS AND WARRANTIES.**

Borrower represents and warrants to Lender that:

a)      Borrower's representations and warranties contained in the Loan Agreement are true, correct and complete on and as of the date of this Amendment, to the same extent as though the representations and warranties were made on and as of the date of this Amendment.

b)      Borrower's execution, delivery and performance of this Amendment is within its corporate power and has been duly authorized by all necessary corporate action, and this Amendment constitutes Borrower's valid and binding agreement, enforceable against Borrower in accordance with its terms subject to the effect of any applicable bankruptcy, insolvency, reorganization or other laws relating to or affecting the enforcement of creditors' rights generally.

5.      **COUNTERPARTS.**

This Amendment may be executed in any number of counterparts, and by different Parties, in separate counterparts, each of which when executed and delivered will be deemed an original, but all of which counterparts together will constitute one and the same instrument. A signed and delivered facsimile copy of this Agreement, or a signed copy transmitted electronically in either a tagged image format file (TIFF) or a portable document format (PDF), will be binding on the Party signing the facsimile or electronically transmitted copy, and that copy will have the same effect as a signed original. A Party who delivers a facsimile or electronically transmitted signature page agrees to later deliver a signed original to any Party who requests it.

6.      **EFFECTIVE AMENDMENT.**

The Parties agree that, except as specifically provided in this Amendment, this Amendment does not in any way affect or impair the terms and conditions of the Loan Agreement, and all of the terms and conditions of the Loan Agreement are to remain in full force and effect unless otherwise specifically amended, waived or changed pursuant to the terms and conditions of this Amendment.

7.      **APPLICABLE LAW.**

This Amendment and the Parties' rights and obligations and all other aspects of this Amendment are deemed to be made under, are governed by and must be construed and enforced in accordance with the laws of the State of California.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers as of the Effective Date.

"BORROWER"                                             "LENDER"

Bad Hombres Productions, LLC                           BondIt LLC
110 E. Broadway Street                                 1639 11th St., Unit 160
Hobbs, New Mexico 88240                                Santa Monica, CA 90404

By: David Frigerio                                     By: Matthew Helderman
Its: Authorized Agent                                  Its: Authorized Agent

EXHIBIT "A"

**AMENDED AND RESTATED BUDGET**

[attached]

DocuSign Envelope ID: D9E5C7A0-A2E2-4C08-89FB-4C9C503A2E8D

EXHIBIT "B"

**AMENDED AND RESTATED PROMISSORY NOTE**

EXHIBIT "C"

**AMENDED AND RESTATED ASSIGNMENT OF PROCEEDS
and
TAX CREDIT ASSIGNMENT OF PROCEEDS**

# Exhibit 2 – Notice of Irrevocable Assignment

## NOTICE OF IRREVOCABLE ASSIGNMENT

Date: April 22, 2022

REDBOX ENTERTAINMENT, LLC
One Tower Place, Suite 800
Oakbrook Terrace, IL 60181

Re:    *"BAD HOMBRES" (the "Picture")/DIRECTION TO PAY*

Reference is hereby made to that certain Distribution Agreement **(the "Agreement")** dated as of January 20, 2022 between REDBOX ENTERTAINMENT, LLC **("Distributor")** and BAD HOMBRES PRODUCTIONS, LLC **("Assignor")** with respect to the Picture.

Distributor is hereby notified that Assignor has assigned its right to receive the License Fee pursuant to the Agreement to:

      BONDIT LLC **("Assignee")**

      Account Number: 6259475066
      Wells Fargo Bank
      1300 4th St. - 1st Floor.
      Santa Monica, CA 90401
      ABA # 121000248
      SWIFT Code: WFBIUS6S

and Distributor is hereby irrevocably authorized and directed to pay all such amounts to Assignee via wire transfer pursuant to the above instructions or such other wire transfer instructions as Assignee may specify by written notice to Distributor.

Assignor hereby warrants and represents that Assignor has not heretofore assigned, transferred or otherwise disposed of the above amounts payable to Assignor pursuant to the Agreement.

Very truly yours,

BAD HOMBRES PRODUCTIONS, LLC **("Assignor")**

By: _____

Title: Managing Member
_____

## DISTRIBUTOR'S ACCEPTANCE

Date: April 22, 2022

Reference is hereby made to that certain Distribution Agreement **(the "Agreement")** dated as of January 20, 2022 between REDBOX ENTERTAINMENT, LLC **("Distributor")** and BAD HOMBRES PRODUCTIONS, LLC **("Assignor")** with respect to the motion picture currently entitled "BAD HOMBRES" **(the "Picture")**. Distributor hereby acknowledges receipt of that certain Notice of Irrevocable Assignment dated April 22, 2022 from Assignor to Distributor regarding an assignment and direction to pay to BONDIT LLC **("Assignee")**.  Distributor agrees that it will pay directly to Assignee the sums authorized to be so paid in the Notice of Irrevocable Assignment.

In consideration of Distributor's agreement to pay directly, as aforesaid, and of the mutual covenants and agreements hereinafter set forth, Assignor, Assignee and Distributor agree as follows:

1.     <u>APPLICABLE TERMS AND CONDITIONS:</u> Assignee's rights hereunder shall be subject to all of the terms and conditions contained in the Agreement.

2.     <u>DISTRIBUTOR'S RIGHTS:</u> Assignee's rights hereunder are and shall be subject and subordinate to (a) all rights of Distributor to distribute the Picture throughout the territory without interference by Assignee or any person, firm or corporation claiming through Assignee; and (b) all rights of Distributor to recoup and deduct from the revenue of the Picture any and all sums pursuant to the terms and provisions of the Agreement.

3.     <u>DISTRIBUTOR'S RIGHT OF OFFSET:</u> Distributor hereby specifically reserves all rights to deduct and retain for its own account from any sums that may become due or payable by Distributor to Assignee an amount equal to any claim for indemnity or offset that Distributor may now or hereafter have against Assignor and/or Assignee.

4.     <u>AUDIT RIGHTS:</u> Assignee shall have no independent right under the Notice of Irrevocable Assignment to examine or audit the books and records of Distributor relating to the Picture. Any examination or audit of such books and records on behalf of Assignee shall be undertaken only through Assignor in accordance with the applicable provisions of the Agreement.

This Distributor's Acceptance and the Notice of Irrevocable Assignment shall be of no force and effect until Distributor receives copies signed by all parties hereto.

REDBOX ENTERTAINMENT, LLC **("Distributor")**

By: _Galen Smith_____

Title: _President_____

ACCEPTED AND AGREED:

BAD HOMBRES PRODUCTIONS, LLC **("Assignor")**

By: _____

Title: _Managing member_____

BONDIT LLC **("Assignee")**

By: _____

Title: _Luke Taylor, COO_____

{BAI-660317-1}

# Exhibit 3 – Non-Disturbance Letter

<u>NON-DISTURBANCE LETTER</u>
("BAD HOMBRES")

Date: As of April 22, 2022

Redbox Entertainment, LLC
1 Tower Lane, Suite 800,
Oakbrook Terrace, IL 60181
Attention: Galen Smith

Greetings:

Reference is hereby made to that certain Distribution Agreement dated as of January 20, 2022 (the "**Agreement**") by and between BAD HOMBRES PRODUCTIONS, LLC ("**Licensor**"), on the one hand, and REDBOX ENTERTAINMENT, LLC, and each of its successors, assignees, licensees and/or sublicensees (collectively, "**Distributor**"), on the other hand, with respect to that certain motion picture presently entitled "BAD HOMBRES" (the "**Picture**"). Capitalized terms used herein but not defined shall have the meanings given to them in the Agreement.

1. Licensor has granted to Distributor certain Rights in and to the Picture as provided in the Agreement, throughout the Territory as defined therein.

2. Licensor and BondIt LLC ("**Financier**") have entered into a Loan and Security Agreement (the "**Loan Agreement**"), dated as of January 26, 2022 in respect of the Picture.

3. Distributor has requested that Financier grant to Distributor quiet enjoyment of its interest in the Picture and the Rights granted by Licensor to Distributor therein pursuant to the Agreement.

4. Subject to Distributor's payment of the License Fee when due pursuant to the terms of the Agreement, and this Non-Disturbance Letter, as applicable, Financier shall not take any action under the Loan Agreement and/or any supplemental documents granting Financier a security interest in the Picture (the "**Collateral Agreements**") at any time during the Term of the Agreement which shall interfere with, derogate from, diminish or otherwise impair the Rights of Distributor to distribute, exhibit and/or exploit the Picture in the Territory, including, without limitation, the right to receive and retain all materials or have access to all materials relating to the Picture to which it has been granted Rights pursuant to the Agreement and the right to collect, receive and retain any and all products and proceeds of the exploitation of all the Rights granted to Distributor in and to the Picture. Even if Financier shall become the owner of the collateral in case of an event of default under the Loan Agreement and/or the Collateral Agreements, and subject to Distributor's payment of the License Fee, Financier's ownership rights in the Picture and Financier's security interest in the Picture shall be subject and subordinate to the Rights of the Distributor in and to the Picture. Financier shall not be entitled to seek or obtain injunctive relief against Distributor's exploitation or distribution of the Picture or to terminate the Agreement. In the event that the Picture is commercially released by Distributor prior to Complete Delivery (as defined in the Agreement) being effected, Distributor shall pay Licensor the License Fee less an amount equal to ten percent (10%) thereof (i.e., One Hundred Seventeen Thousand Five Hundred Dollars [US$117,500]), to be held by Distributor until Complete Delivery has been effected. Notwithstanding anything to the contrary contained herein, upon Distributor's payment of the License Fee to Licensor in full, Financier represents and warrants to Distributor that Financier shall extinguish the Financier security interest in and to the Picture as it relates only to Distributor's Rights in and to the Picture in the Territory for the Term set out in the Agreement. All rights in and to the Picture other than

the Rights granted to Distributor throughout the Territory shall be referred to herein as the "**Remaining Rights**".

5.   If any dispute arises between any of the parties hereto as to whether Complete Delivery has been made in accordance with the requirements set forth in the Agreement, then such dispute shall be submitted to binding arbitration (the "**Arbitration**") in accordance with the following provisions:

   5.1.   <u>Arbitration Procedure</u>. The Arbitration shall be conducted by a single, neutral arbitrator (the "**Arbitrator**") and shall be conducted under the auspices of the American Arbitration Association ("**AAA**") and its Rules for Large, Complex Commercial Disputes then in effect (the "**AAA Rules**"). The Arbitrator shall be a member of the entertainment panel at AAA with knowledge and experience in the United States motion picture industry and the technical delivery issues relating to motion pictures and shall be appointed in accordance with the applicable procedures set forth in the AAA Rules. The Arbitration shall be conducted exclusively within the County of Los Angeles, State of California. The Arbitrator shall limit the amount of and time for discovery, the number and expertise of the witnesses and the number of days during which the Arbitration proceeding is to be conducted, such that all discovery is completed, the Arbitration proceeding has been held and concluded and the Arbitrator has made findings and issued an order issued no later than one hundred eighty (180) days after the issuance of notice by any of the parties hereto that such party has elected to submit the issue of whether Complete Delivery has been effected for expedited arbitration in accordance with this paragraph 5.

      5.1.1. Each of Licensor, Distributor and Financier shall be parties to the Arbitration. The only issue that may be determined in the Arbitration is whether Complete Delivery to Distributor has or has not been effected (i.e., whether Delivery that meets all of the requirements and conditions set forth in the Agreement has been timely effected and was tendered on or before the Delivery Date). None of Licensor, Distributor, or Financier may assert in the Arbitration any counterclaim, defense or offset based upon any contention or theory other than an assertion that Complete Delivery was or was not timely effected. The Arbitration must result in a finding by the Arbitrator either that (a) Complete Delivery to Distributor has been effected or deemed effected to Distributor (i.e., that Delivery was timely effected or deemed effected, in accordance with the requirements and specifications set forth in and pursuant to the Agreement), and, if so, the date of such Complete Delivery; or (b) Complete Delivery to Distributor was not effected or deemed effected. The Arbitrator shall promptly notify Licensor, Distributor and Financier in writing of the finding(s) made.

      5.1.2. The Arbitrator shall issue a final award with respect to the issue of whether Complete Delivery to Distributor has or has not been effected. Such award shall be issued in accordance with the timetable for the issuance of awards set forth in the AAA Rules, and shall be required to follow the applicable substantive law and procedural rules as agreed upon by the parties in and pursuant to this Letter. If the Arbitrator finds that Complete Delivery has been effected, or deemed effected then the Arbitrator shall issue a final award to such effect and Distributor shall pay the License Fee to Licensor within five (5) business days after the date of issuance of the award, together with interest costs and expenses provided for in paragraph 5.2. below. If, on the other hand, the Arbitrator finds that Complete Delivery has not been effected, then the Arbitrator shall award such remedies against Licensor to the Distributor as the Arbitrator deems appropriate. In such event, Financier shall be subrogated to all of Distributor's rights and interests in and to the collateral, including, without limitation, the Picture.

DocuSign Envelope ID: 628EFE60-E8FF-4FA6-B783-390C67430A89

    5.2.  <u>Costs and Expenses of Arbitration</u>.  The Arbitrator shall award to the prevailing party or parties in the Arbitration (i.e., all parties to the Arbitration other than the losing party) its or their reasonable outside attorneys' fees and costs incurred in and with respect to the Arbitration, including, without limitation, its expert witness fees, its share of the Arbitrator's fees, any court reporter's fees, and any AAA administrative fees and costs.

    5.3.  <u>Confirmation of Award</u>.  The award issued by the Arbitrator may be enforced in the Superior Court for the County of Los Angeles or the United States District Court for the Central District of California and the parties waive any and all objections to personal jurisdiction in such case which they may otherwise have; provided, however, that service of process is made in the same manner that a notice is given pursuant to the Agreement.  Distributor waives application of the procedures for service of process pursuant to the Hague Convention for Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.

6.    For so long as Licensor has any obligation to Financier under the Loan Agreement and/or the Collateral Agreements, Distributor shall not take any action under the Agreement in respect of its Rights in the Picture which shall interfere with, derogate from, diminish or otherwise impair the rights of Financier from exercising its rights and/or security interests in or to the Remaining Rights, if any.

7.    This Non-Disturbance Letter (the "**Letter**") shall bind and inure to the benefit of each of the parties hereto and their respective successors, licensees and assigns. The parties hereto acknowledge and agree that Distributor's financiers shall be third party beneficiaries of this Letter. No amendment, modification, or waiver of any provision of the Letter shall be effective unless in writing and signed by each party hereto against whom it sought to be enforced.

8.    This Letter may be executed in any number of counterparts which together shall constitute one and the same instrument. Facsimile or electronically transmitted (PDF) copies hereof shall be treated as originals, fully binding and with full legal force and effect, and the parties hereby waive any rights they may have to object to said treatment.

9.    This Letter shall be governed by the laws of the State of California.

*[Signature page to follow]*

IN WITNESS WHEREOF, the parties have caused this Letter to be executed as of the date first hereinabove mentioned.

**BONDIT LLC**

By: _____

Its:  Luke Taylor, COO
    _____

**BAD HOMBRES PRODUCTIONS, LLC**

By: _____
    F959898F3FD24C2...

Its:  Managing Member
    _____

**REDBOX ENTERTAINMENT, LLC**

By: _____
    0514AF05E845425...

Its:  President
    _____

{BAI-640300-4}                                                   Non-Disturbance Letter – BAD HOMBRES