# EXHIBIT A

## DISTRIBUTION AGREEMENT

## "THE BELL KEEPER"

This Distribution Agreement ("Agreement") is entered into as of May 18, 2022, between **REDBOX ENTERTAINMENT, LLC** ("Distributor") and **BUNGALOW MEDIA, LLC** ("Grantor"), a Delaware limited liability company. Unless defined elsewhere in this Agreement, all capitalized terms used herein will have the meaning set forth in the Additional Terms and Conditions attached as Exhibit A.

1. **Picture:** The "Picture" means the motion picture currently entitled "**THE BELL KEEPER**" and all versions thereof, starring Randy Couture in the role of "Hank," Kathleen Kenny in the role of "Brittany," Reid Miller in the role of "Liam," and Mike Manning in the role of "Matthew," written by Joe Davidson, directed by Colton Tran, and produced by Chad Oliver, Nick Theurer, and Kevin Weisberg. Distributor shall have the right, but not the obligation, to utilize the name and/or likeness of all principal cast members and the director, alone or with others at the election of Distributor, in the artwork, on packaging, in trailers and in all other advertising, publicity and promotional materials for the Picture.

2. **Territory:** The "Territory" means the United States, Canada, Bermuda and the Bahamas Islands, and Turks and Caicos (each as defined in the Additional Terms and Conditions).

3. **Term:** The "Term" means the period commencing on the date hereof and continuing until twenty (20) years after the date Complete Delivery is effected. The Term shall be automatically extended for the duration of any force majeure events and/or disputes, third party Claims or litigation which delay, prevent or otherwise materially interfere with the commercial release of the Picture in the Territory.

4. **Rights**: Grantor hereby irrevocably grants to Distributor all Rights in and to the Picture in the Territory during the Term.

5. **Minimum Guarantee:** Provided the Conditions Precedent have been satisfied, Distributor shall pay Grantor a recoupable minimum guarantee in the amount of Five Hundred Thousand U.S. Dollars (US$500,000) ("Minimum Guarantee"), payable as follows: (a) ninety percent (90%) upon the initial commercial release of the Picture in the Territory ("Initial Domestic Release") and ten percent (10%) upon Complete Delivery of the Picture; or (b) if Complete Delevery precedes the Initial Domestic Release, then one hundred percent (100%) upon Complete Delivery of the Picture.

6. **Allocation of Gross Receipts:** All Gross Receipts will be allocated as follows:

    6.1. First, Distributor will deduct and retain a distribution fee equal to thirty-five percent (35%) of Gross Receipts (the "Distribution Fee");

6.2. Second, Distributor will recoup all Distribution Expenses plus Interest thereon. Distributor shall also be entitled to reserve or deduct, as appropriate, for actual or contingent obligations or liabilities to third parties incurred in connection with the Picture, including, without limitation, reserves for returns or defectives in connection with the exploitation of Home Video Rights (which reserves shall be liquidated, on a continuing basis, fifty percent (50%) every six (6) months from creation and fifty percent (50%) every twelve (12) months from creation); and

6.3. Thereafter, all remaining Gross Receipts will be allocated fifty percent (50%) to Grantor ("Grantor's Participation") and fifty percent (50%) to Distributor; provided that Distributor will be entitled to recoup the Minimum Guarantee and Interest thereon out of Grantor's Participation.

7. **Delivery:** Grantor shall effect Complete Delivery not later than August 31, 2022 (the "Delivery Date"), and in connection therewith, Grantor acknowledges that time is of the essence.

8. **Distributor Credits:** Distributor and/or its designees will be entitled to: (a) receive presentation credits in first position in the Territory, and presentation credit outside the Territory in not less than second position, before the title in the main titles and above the title in the billing block of paid advertising and in all excluded advertising in which the complete billing block appears worldwide; (b) place their animated logos on screen in first position in the Territory and outside the Territory in not less than second position at the beginning of the Picture; and (c) place their names and logos on all materials concerning the Picture, including without limitation in the main and end credits, the billing block and on all marketing and advertising materials. No fewer than three (3) designees of Distributor will each be accorded worldwide "Executive Producer" credit, on screen in the main titles on a card to be shared only with each other and in the billing block of all paid advertising, and in all excluded advertising in which the complete billing block appears worldwide, with all other characteristics of such credits (e.g., size, type, duration, prominence) to be no less favorable than that of any other individual executive producer credit.

9. **Budget:** Grantor represents and warrants that the final budget of the Picture (the "Budget") will be no less than One Million U.S. Dollars (US$1,000,000), including without limitation all above-the-line and below-the-line production costs, and Producers' fees not to exceed ten percent (10%) of the Budget. Grantor shall deliver a final negative cost statement to Distributor, which statement shall be verified by the production accountant or completion guarantor.

10. **Approvals:** Grantor shall not issue any press release regarding Distributor's acquisition of the Picture without Distributor's prior written approval therefor. Distributor has a right of prior approval over all material business and creative elements with respect to the Picture and any substitutions or changes thereto, including

DocuSign Envelope ID: 6E268483-1CBC-4547-95A8-25E6E1A11354

without limitation the screenplay, any writers engaged subsequent to the date of this Agreement, the director, all principal cast members and any alterations to their appearance (including without limitation facial hair, wigs, "fat suits," prosthetics or excessive makeup), the detailed line item budget, all approval and consultation rights to be accorded to any person or entity, and all credit, promotion and name and likeness obligations and restrictions to be accorded to any person or entity, including without limitation any restrictions, guarantees and/or ties granted to any cast member in connection with the use of such cast member's name, photograph and/or likeness in connection with the promotion of the Picture (including without limitation in the billing block, artwork title, key artwork, trailers and television spots). At its recoupable cost, Distributor is entitled to have a representative present during pre-production, production and post-production of the Picture.

11. **Editing:** Distributor will be entitled to view the director's cut of the Picture (and, if the director is entitled to multiple cuts, Distributor will be entitled to view each director's cut) and provide notes to Grantor in a timely manner. For the thirty (30) day period commencing upon delivery of the director's cut (the final director's cut if the director is entitled to multiple cuts) of the Picture, Grantor shall provide Distributor ongoing access to the editing room to screen the Picture. During such period, Distributor has the right to submit proposed editing changes to Grantor. Provided that effecting the proposed changes will not cause budget overages or cause Complete Delivery of the Picture to be delayed beyond the Delivery Date, Grantor shall promptly (i.e., as quickly as possible, but in no event in less than two [2] days) make the changes proposed by Distributor. If any proposed change would cause budget overages or cause Complete Delivery of the Picture to be delayed beyond the Delivery Date, Grantor shall give Distributor written notice thereof, and Distributor has the right to cause Grantor to make the proposed changes on the condition that Distributor covers the costs associated with such overages and/or delays (which costs will be treated as a Distribution Expense) and agrees to extend the Delivery Date commensurately. Notwithstanding anything to the contrary contained elsewhere in this Agreement, Distributor has final cut of the Picture in the Territory and has the right to change the title of the Picture in the Territory at Distributor's sole discretion.

12. **Holdbacks:** The following holdbacks shall apply with respect to the Picture:

12.1. Other than at non-public screenings for potential distributors, the Picture shall not be previewed or exhibited in the Territory, or exhibited at any film market or festival, whether or not within the Territory, prior to the initial commercial release of the Picture in the Territory without Distributor's prior, written approval in each instance.

12.2. The Picture shall not be commercially released anywhere in the world in any media until the date the Picture is initially released by Distributor commercially in like media in the Territory.

12.3.  No promotional materials for the Picture shall be released anywhere in the world in any media until the date that is five (5) days after Distributor initially releases the trailer for the Picture in the Territory.

13. **Subsequent Productions:** In the event that Grantor or any of its assignees or licensees intends to exploit, or negotiate with a third party to exploit, or otherwise grant or dispose of the Subsequent Production Rights, Distributor will have a Right of First Negotiation and First Refusal with respect to such Subsequent Production Rights in the Territory.

14. **Security Interest:** Subject to the Permitted Liens, Grantor hereby grants Distributor a first priority security interest in the Collateral to secure Distributor's Rights hereunder, Distributor's rights to retain and/or recoup all payments or amounts to which Distributor is entitled hereunder, and the prompt performance in full of all of Grantor's obligations, agreements, representations, warranties and covenants under this Agreement. Grantor hereby irrevocably authorizes Distributor to file, at any time and from time to time and in any jurisdiction, without the signature of Grantor, one or more financing or continuation statements and amendments thereto relating to the Collateral. To enforce its rights hereunder, Distributor shall have all rights and remedies as a secured creditor available to it at law and in equity. Without limiting any of Distributor's rights or interests hereunder, Distributor and Grantor shall enter into interparty and/or non-disturbance agreements with lenders, completion guarantors, guilds and/or third party financiers (and Grantor shall cause such third parties to enter into such agreements at Distributor's request) on terms reasonably acceptable to Distributor, upon the request of such third party or Distributor; provided, however, that the execution of any such agreement is not a condition precedent to the effectiveness of this Agreement.

15. **Notices:** Any notice or other communication required or permitted hereunder will be given in writing at the applicable address set forth below, and will be deemed given and received on the date of delivery if by mail, courier or messenger, or on the date of transmission if by facsimile or email.

>           To Distributor:        Redbox Entertainment, LLC
>                                   1 Tower Lane
>                                   Suite 800
>                                   Oakbrook Terrace, IL 60181
>                                   Attention: Galen Smith
>                                   Email: gsmith@redbox.com

|  |  |
|---|---|
| With a copy to: | Business Affairs, Inc. |
|  | 1125 E. Broadway #31 |
|  | Glendale, CA 91205 |
|  | Attention: Stephen Monas |
|  | Email: steve@bizaffairs.com |
| To Grantor: | Bungalow Media, LLC |
|  | 100 Universal City Plaza #5183 |
|  | Universal City, CA 91608 |
|  | Fax: (818) 733-3454 |
|  | Attention: Phillip B. Goldfine |
|  | Email: pg2500@aol.com |

16. **Statements & Payments:** Any accounting statements and payments required under this Agreement shall be sent to Grantor at the address set forth above.

17. **Conditions Precedent:** All of Distributor's obligations under this Agreement are conditioned upon satisfaction of the following (collectively, the "Conditions Precedent"): (a) Distributor's receipt of a copy of this Agreement and the Delivery Schedule signed by Grantor; (b) Distributor's receipt of an original, notarized Assignment of Rights and an original, notarized Copyright Mortgage and Assignment for the Picture according to Distributor's customary form; (c) all completed tax forms legally required to make payment of the Minimum Guarantee; (d) Distributor's approval of the chain of title and other underlying rights documentation for the Picture, including without limitation documentation confirming that Grantor has satisfied all of its obligations to third parties in connection with the Picture, Grantor has and/or shall have satisfied all of its payment obligations in connection with the Picture, and all liens (other than the Permitted Liens) and Claims against the Rights have been extinguished and/or settled (or shall be extinguished on payment of the Minimum Guarantee); and (e) Distributor's approval of any existing third party name or likeness obligations or restrictions, as well as any distribution-related third party approval and/or consultation rights relating to marketing materials or release plan. In the event the Conditions Precedent are not satisfied by Grantor in a timely manner in accordance with the provisions of this Agreement, Distributor may terminate this Agreement without any further obligation to Grantor hereunder.

18. **Entire Agreement:** This Agreement consists of these provisions, as well as the Additional Terms and Conditions attached as Exhibit A and the Delivery Schedule attached as Exhibit DS. In the event of any conflict between these provisions and any exhibit, these provisions will control. This Agreement contains the entire understanding of the parties relating to the subject matter hereof and supersedes all prior oral or written agreements between them, and may not be modified except in a writing signed by the parties.

19. **Forum & Governing Law:** This Agreement will be construed in accordance with the laws of the State of California (or United States federal law if there is no California law applicable) pertaining to agreements which are executed and fully performed within the State of California, and the parties hereby waive any argument that conflicts-of-laws principles are, or would be, applicable to any dispute relating to this Agreement, whether the dispute arises out of contract or tort.

20. **Dispute Resolution:** All disputes or controversies of any nature arising at any time under this Agreement or otherwise in connection with the Picture must be resolved by binding arbitration in accordance with the procedures set forth in this Agreement, which will constitute the sole dispute resolution mechanism hereunder. The arbitration must be initiated and conducted in Los Angeles County according to the JAMS Comprehensive Arbitration Rules and Procedures.

21. **Signature:** This Agreement may be signed in two or more counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument. Signed electronic copies of this Agreement will be treated as originals for all purposes, fully binding and with full legal force and effect, and the parties hereby waive any rights they may have to object to such treatment.

**SIGNATURE PAGE FOLLOWS**

IN WITNESS WHEREOF, this Agreement is executed as of the date set forth above.

REDBOX ENTERTAINMENT, LLC

By: _____

Name: Galen Smith

Its: President


BUNGALOW MEDIA, LLC

By: _____

Name: Kevin Weisberg

Its: CMO


*Signature page to Redbox Distribution Agreement – THE BELL KEEPER*

DocuSign Envelope ID: 6E268483-1CBC-4547-9BA8-26E6E1A11354

## EXHIBIT A – ADDITIONAL TERMS & CONDITIONS

A. **Specifications:** Grantor warrants that the Picture as delivered to Distributor will: (a) have a running time of not less than eighty (80) minutes and not more than one hundred twenty (120) minutes, including main and end titles; (b) qualify for an MPA rating no more restrictive than "R"; (c) be photographed in color on 35mm film or in high definition video in standard theatrical aspect ratio of 1:1.85 or 1:2.35 (with no "letterboxing"); (d) be composed so that it is television safe (i.e., suitable for exploitation in the 1:33 to 1 ratio); and (e) be an entirely new and original sound motion picture of first class technical quality free of defects, telling a complete and continuous story with all necessary dialogue originally recorded in the English language, music, lyrics and sound effects, completely finished and fully edited, titled and assembled with the soundtrack fully synchronized with the photographic action thereof.

B. **Financing:** Distributor has no obligation to provide financing in connection with the production of the Picture, other than payment of the Minimum Guarantee pursuant to the terms and conditions hereof.

C. **Delivery Procedure:**

C1. At such time as Grantor reasonably believes it has delivered all of the Delivery Materials to Distributor, Grantor shall give Distributor a Notice of Complete Delivery. Upon receipt thereof, Distributor will have a period of twenty (20) Business Days to determine whether Complete Delivery has been effected, and, if it has not been effected, to issue a Notice of Defect. Within fifteen (15) Business Days of receiving a Notice of Defect, Grantor shall cure the deficiencies listed therein, and, if Grantor reasonably believes it has cured all such deficiencies, Grantor shall give Distributor a Notice of Cure. Upon receipt thereof, Distributor will have a period of fifteen (15) Business Days to determine whether Complete Delivery has been effected, and, if it has not been effected, to issue a final Notice of Defect.

C2. Once Distributor has issued a final Notice of Defect in accordance with the foregoing procedure, or if Grantor fails to timely comply with its obligations in accordance with the foregoing procedure, Distributor will have the right, but not the obligation, to itself supply any missing Delivery Materials and repair any defective Delivery Materials and deduct the costs thereof from any amounts otherwise payable to Grantor hereunder, including without limitation the Minimum Guarantee. If Grantor shall fail to effect Complete Delivery prior to the Delivery Date, Distributor will have the right, but not the obligation, to terminate this Agreement by written notice to Grantor, in which case Distributor will be relieved of all obligations to Grantor hereunder, and Grantor shall repay the aggregate of any sums advanced or expended by Distributor in connection with the Picture, plus Interest thereon.

C3. Distributor will cover the cost of one quality check of the Delivery Materials, which will be treated as a Distribution Expense; any additional quality check procedures that are deemed necessary by Distributor in its discretion will be at Grantor's cost, and may be deducted by Distributor from any amounts otherwise payable to Grantor hereunder, including without limitation the Minimum Guarantee.

D.  **Credit Obligations:** As a Condition Precedent to this Agreement as set forth in paragraph 17 above, Distributor shall have the right to approve any existing third party name or likeness obligations or restrictions, as well as any distribution-related third party approval and/or consultation rights relating to marketing materials or release plan. As soon as practicable but in no event later than thirty (30) days after the completion of principal photography of the Picture, Grantor shall provide Distributor with a list of all credit and name and likeness obligations and restrictions for trailers and paid advertising for the Picture. No later than the Delivery Date, Grantor shall provide Distributor a complete written statement (as detailed in the Delivery Schedule) containing the full text of all third party credit, name and likeness obligations and restrictions and all third party contractual approval and consultation rights, along with fully executed copies of the underlying agreements that substantiate such obligations, restrictions and rights. Provided all such credit obligations have been approved in writing by Distributor, conform to the requirements set forth in paragraph 1 of this Agreement, are delivered in a timely manner and are customary in the motion picture industry, and do not violate Distributor's company policy and/or any applicable guild rules, Distributor shall honor such credit obligations. Distributor will not be obligated to accord any individual or entity credit in any paid advertising that Distributor customarily deems "excluded advertising," and in no event will Distributor's casual or inadvertent failure to comply with this paragraph constitute a breach of the Agreement. However, Distributor shall take commercially reasonable steps to cure any such failure on a prospective basis following Distributor's receipt of written notice specifying the details thereof.

E.  **Third Party Payments:** All third party participations and payments (whether computed upon net profits, gross proceeds or otherwise) worldwide will be borne solely by Grantor. Distributor will not be responsible for any third party payments, including without limitation any guild residuals, deferments or payments in respect of music, including without limitation any supplemental or additional use payments. Grantor shall indemnify Distributor and hold Distributor harmless against any liability for any such payments (including without limitation any third party payments paid by Distributor to preserve its rights or security interest in the Picture) and for any failure by Grantor or other person or company to make such payments, in whole or in part. Notwithstanding the foregoing, Grantor will not be responsible for music public performance fees which are payable by end users, provided that the public performance

rights to all music contained in the Picture are in the public domain or controlled by ASCAP, BMI, SESAC or their affiliates.

F. **Distribution Matters:** Distributor will have complete, exclusive and unqualified discretion and control as to the time, manner and terms of distribution, exhibition and exploitation of the Picture in any and all media throughout the Territory (including without limitation the right to change the title of the Picture at Distributor's sole discretion), separately or in connection with other motion pictures, in accordance with such policies, terms and conditions and through such parties as Distributor in its sole business judgment may determine proper or expedient and the decision of Distributor in all such matters shall be binding and conclusive upon Grantor. Distributor may distribute the Picture or withhold or withdraw the Picture from distribution or limit or alter the Picture's distribution at its sole discretion. In this regard, Grantor acknowledges and agrees that Distributor shall not have any obligation to ever distribute, market, advertise, promote and/or exploit the Picture in any manner or fashion, or to expend any monies to market, advertise and/or promote the Picture, or in connection with Distributor's distribution and/or exploitation of the Picture. Grantor acknowledges that Distributor and its affiliates are in the business of developing, producing, acquiring, distributing and otherwise exploiting theatrical motion pictures, television programs and other productions, and nothing contained in this Agreement shall be deemed to restrict or limit the right of Distributor and its affiliated and related companies to develop, produce, acquire, distribute and otherwise exploit other theatrical motion pictures, television programs and other productions that may compete with the Picture, regardless of whether the idea, theme, characters or other elements of such other productions are similar to the idea, theme, characters or other elements of the Picture.

G. **Editing:** Distributor has the complete and unconditional right to create and exploit Special Versions, "behind the scenes," "making of" and/or featurette-type footage and/or films concerning the Picture (subject to any third party talent approval rights that Distributor has approved in writing in advance), and to edit the Picture for purposes of compliance with MPA rating requirements, to meet television broadcaster standards, practices and timing requirements, for panning and scanning, to create wireless/Internet downloads, clips and similar applications, to meet airline and/or ship requirements and for potential or actual legal Claims.

H. **Assignment:** Distributor may grant, assign, sublicense, hypothecate or pledge this Agreement or any of its rights, interests or obligations herein to any third party and this Agreement shall be binding upon and shall inure to the benefit of Distributor, its successors and assigns; provided that Distributor shall remain secondarily liable for its obligations hereunder unless such assignment is to a parent, subsidiary or affiliated entity of Distributor, or a company that acquires all or substantially all of Distributor's assets or into which Distributor is merged or consolidated, or a "major" or "mini-major" studio. Distributor shall have the right at any time to sell, transfer or assign all

DocuSign Envelope ID: 6E268483-1CBG-4547-8BA9-2B5E51A11354

or any of its rights in and to the Picture (or any portion thereof). Any such sale, transfer or assignment shall be subject to Grantor's rights hereunder. None of the consideration received by Distributor in connection with such assignment will constitute Gross Receipts hereunder, and Grantor will have no rights with respect thereto. Grantor shall not assign this Agreement or any of its rights, interests or obligations herein, either voluntarily or by operation of law, in whole or in part, without the prior written consent of Distributor. Any purported assignment by Grantor in violation of this Agreement shall be null and void.

I.  **Publicity & Promotional Services:** In addition to customary production still photography, Grantor shall also conduct an on-set, in-character posed photo shoot for all principal cast members. On a daily basis throughout the period of principal photography, Grantor shall send Distributor digital copies of all production stills and/or posed shots that have been taken. If Distributor requests on an expedited basis, Grantor shall seek to obtain the approval of any individuals who have been granted approval rights in connection with those photographs that Distributor intends to use in marketing materials.

J.  **Accounting Statements & Payments:** Commencing upon Distributor's exploitation of the Rights, customary reporting will be calculated on a semi-annual basis for the first two years, and on an annual basis thereafter. Statements and any payments owed will be delivered within ninety (90) days following the conclusion of each reporting period. No statement will be delivered for any accounting period for which no payment is due to Grantor, but Grantor may request one (1) statement per year within ninety (90) days of the close of the applicable accounting period. All amounts payable to Grantor hereunder, including without limitation the Minimum Guarantee, will be reducible by any and all withholding taxes required to be paid by law.

K.  **Audit Rights:** Grantor may have a certified public accountant not retained on a contingency basis of its choice audit Distributor's records with respect to the Picture once per year (and only once with respect to any particular records) at Grantor's sole cost and expense. Such audit must take place at Distributor's principal place of business during normal business hours for not more than ten (10) Business Days and must not materially interfere with Distributor's course of business. Distributor shall accommodate any such audit requests to the extent of its available resources and pursuant to its customary procedures. All notices, statements and payments made pursuant to this Agreement are deemed valid and binding on Grantor and are not subject to dispute or audit unless disputed in writing within twenty-four (24) months after first being issued. Grantor's right to examine Distributor's records is limited solely to the Picture, and Grantor does not have any right to examine records relating to Distributor's business generally or with respect to any other motion picture, whether for purposes of comparison or otherwise. In the event an audit by Grantor reveals an accounting error which results in an underpayment of ten percent (10%) or more of the total monies owed, and further provided that the underpayment equals Ten Thousand

Dollars (US$10,000) or more, Distributor shall reimburse Grantor for its reasonable, verifiable, third party costs of the audit, up to the amount of the underpayment.

L. **Ownership of Gross Receipts:** Grantor expressly acknowledges that Grantor has and will have no right, title or interest of any kind or character whatsoever in or to the Gross Receipts of the Picture, and no lien thereon or other rights in or to the Gross Receipts of the Picture; and that the same shall be and remain Distributor's sole and exclusive property, and Distributor shall not be obligated to segregate the same from its other funds, it being the intent and purpose hereof that "the Gross Receipts of the Picture" is referred to herein merely as a measure in determining the time and manner of payment to Grantor; and that Distributor shall not be deemed a trustee, pledgeholder or fiduciary. Distributor shall have the sole and exclusive right to utilize, sell, license or otherwise dispose of all or any part of its rights in the Picture upon such terms and conditions as it may deem advisable, all without consulting or advising Grantor and without accounting to Grantor in any manner with respect thereto.

M. **Further Instruments:** Grantor shall, at its expense, furnish and execute and provide Distributor with any other instruments or documents consistent herewith that Distributor may reasonably require to perfect, evidence, effectuate or protect any of the rights or interests granted under this Agreement, and Grantor shall take reasonable steps to cause the Picture to be registered for copyright in any part of the Territory and to defend said copyrights and related rights against any and all infringements thereof during the Term and in the Territory. If Grantor fails to deliver any such document or take such steps within ten (10) days of Distributor's request, Grantor hereby irrevocably appoints Distributor to execute such documents and take such steps as Grantor's attorney-in-fact, and Grantor hereby agrees that such appointment constitutes a power coupled with an interest.

N. **Copyright:** The Picture, when delivered to Distributor, shall contain a copyright notice in the name of the rightful copyright owner in compliance with the Universal Copyright Convention and the copyright law of the United States. If Grantor is a copyright owner in the Territory, Grantor shall secure, register, renew and extend all copyrights in the Picture and all related properties and shall protect such copyrights and other related properties (including the characters contained in the Picture) upon eligibility for copyright registration, renewal and extension or other protection.

O. **Anti-Piracy:**

O1. **Anti-Piracy Measures in the Territory:** Grantor hereby irrevocably designates Distributor as its attorney-in-fact to take reasonable steps to cause the Picture to be registered for copyright in any part of the Territory and to defend said copyrights and related rights against any and all infringements thereof during the Term and in the Territory. Grantor agrees that the foregoing designation constitutes a power coupled with an interest, is irrevocable throughout the Term

and may be exercised in Distributor's reasonable discretion. Distributor agrees to make reasonable efforts to keep Grantor informed of any and all actions taken by Distributor. Distributor shall not be liable to Grantor for any action or failure to act on behalf of Grantor within the scope of authority conferred on Distributor hereunder. Distributor shall have the right to settle or compromise any such action on the basis that Distributor in its good faith business judgment deems advisable. Notwithstanding the foregoing, the parties hereto shall meaningfully consult with each other with respect to the defense, institution or settlement of litigation in connection with the rights granted hereunder and Distributor's exploitation thereof during the Term and in the Territory; provided, however, that Distributor shall in any event have the right to select the lead litigating attorney in connecting with any such action. Nothing herein shall diminish Grantor's agreement to indemnify Distributor as set forth in this Agreement. In the event Distributor declines to take such action on behalf of Grantor, Grantor may proceed to defend said copyrights and related rights; provided, however, that Grantor shall give prior written notice to Distributor.

O2. **Anti-Piracy Measures Outside the Territory:** Distributor shall have the non-exclusive right, but not the obligation, to take anti-piracy measures outside of the Territory. Such anti-piracy measures may include, without limitation, sending takedown notices, using takedown tools and creating reference files for copyright filters. The rights granted to Distributor pursuant to this paragraph shall include, without limitation, the right to take anti-piracy measures within and outside of the Territory in Distributor's name and/or in the name of Grantor and/or in the name of the copyright holder (if different from Grantor), as determined by Distributor in its sole discretion.

P. **Mutual Representations & Warranties:** Each party makes the following representations and warranties to the other party, all of which will survive the execution and delivery of this Agreement: (a) it is duly organized, validly existing and in good standing under the laws of its jurisdiction; (b) it has all requisite power and authority to own and operate its properties, to carry on its businesses as now conducted and proposed to be conducted, to enter into this Agreement and to carry out the transactions contemplated hereby; (c) this Agreement has been duly authorized and when executed and delivered will be legally valid and binding; and (d) its execution, delivery and performance of this Agreement and the consummation of the transactions contemplated in this Agreement do not and will not violate any provision of law applicable to it, or any order, judgment or decree of any court or other governmental agency or any agreement to which it is bound and which is material to its operations.

Q. **Grantor's Representations & Warranties:** Grantor makes the following representations and warranties to Distributor, all of which will survive beyond any termination of this Agreement:

Q1.    Grantor is the sole and absolute owner of, and has the absolute right to grant or vest in Distributor, all rights, licenses and privileges granted to or vested in Distributor under this Agreement.

Q2.    There are not, and will not be, outstanding at any time during the Term any liens (other than the Permitted Liens), Claims, charges, encumbrances, restrictions, agreements, commitments or arrangements whatsoever with any person or entity, including, without limitation, any guild (e.g., WGA, DGA, and SAG) liens or residuals, or any obligation (past, present or future), or any breaches of any contract, license or agreement that in any way can or will interfere with, impair, abrogate, increase the expense and/or time necessary to, or adversely or otherwise affect Distributor's enjoyment or use of any of the rights granted to Distributor under this Agreement

Q3.    Neither the Picture, nor any part thereof, nor any materials contained therein or synchronized therewith, nor the title thereof, nor the exercise of any right, license or privilege granted to Distributor hereunder, violates or will violate, or infringes or will infringe, any trademark, trade name, service mark, patent, copyright (whether common law or statutory), or, to the best of Grantor's knowledge (including that which Grantor should have known in the exercise of reasonable prudence), the literary, dramatic, musical, artistic, personal, private, civil, "droit moral" or property right or rights of privacy or any other right of any person or entity whatsoever, or unfairly competes with or slanders or libels (or constitutes a trade disparagement of) any person or entity whatsoever.

Q4.    The rights granted to Distributor under the Agreement have not been previously granted, licensed, sold, assigned, transferred, conveyed or exploited by any person or entity and Grantor shall not, or authorize another to, sell, assign, transfer, or convey to any person or entity any right, title or interest in and/or to the Picture or any part thereof or in and/or to the dramatic or literary material upon which the Picture is based, which is adverse to, or otherwise in derogation of, the rights granted to Distributor.

Q5.    The Picture is, or when delivered will be, completely finished, fully edited and titled and fully synchronized with language, dialogue, sound and music, recorded with sound equipment pursuant to valid licenses, and in all respects ready and of a first-class technical quality adequate for general release in all respective media in the Territory.

Q6.    The Picture and all materials concerning the Picture contain, or when delivered will contain, the contractually required credits and logos in their correct forms (i.e., no omissions, misspellings, wrong order, etc.).

Q7.    There are no credit, name or likeness obligations or restrictions or approval or consultation rights applicable to the Picture of which Distributor has not been

made aware in writing on or before the Delivery Date and which have not been approved by Distributor in writing. Distributor shall have the right, but not the obligation (except as otherwise approved by Distributor in writing), to utilize the likeness and name of each of the key above-the-line and below-the-line personnel in the artwork, on packaging, in trailers and in all other advertising, publicity and promotional materials for the Picture.

Q8.    As between Distributor and Grantor, all costs necessary for the successful delivery of the Picture to Distributor (including, but not limited to, the costs of producing and completing the Picture) have been fully paid or discharged, or will be fully paid or discharged by Grantor.

Q9.    There is no litigation, arbitration, Claim, demand, or investigation pending or threatened with respect to the Picture, or the literary, dramatic or musical material upon which the Picture is based or which is contained therein, or concerning the physical properties thereof.

Q10.   Grantor has secured, or by the Delivery Date will have secured, and shall for the duration of this Agreement maintain, all clearances (including, without limitation, all music rights and music clearances) necessary for Distributor to use and enjoy the rights granted to Distributor in and to the Picture throughout the Territory for the duration of the Term and that no supplemental or additional use payments shall be required with respect to the exploitation of the Picture (or any portion or element thereof, including, without limitation, the music contained therein) and/or any use or exploitation of any advertising or promotion of the Picture which contains the music as embodied in the Picture (including both "in-context" and "out-of-context" uses thereof).

Q11.   The copyright in the Picture and the literary, dramatic and musical material upon which it is based or which is contained in the Picture, will be valid and subsisting during the Term throughout the Territory, and no part of any thereof is in the public domain.

Q12.   The Picture has been or will be produced in accordance with all applicable collective bargaining agreements in effect at the time.

Q13.   Grantor is in all respects in compliance with the requirements of the Child Protection and Obscenity Enforcement Act of 1988, as amended, and all rules and regulations promulgated thereunder, and the Picture is in all respects in compliance with the requirements thereof, and does not contain any material that would require Grantor to comply with the recordkeeping requirements thereof.

Q14.   Grantor is in all respects in compliance with the Adam Walsh Child Protection and Safety Act set forth at 18 U.S.C. § 2257, as amended, and all rules and regulations promulgated thereunder.

Q15. Grantor and its owners, employees, directors, officers, agents and others persons, firms and entities working for or on its behalf have not and shall not, directly or indirectly, pay, offer, provide, promise or give, or authorize another to pay, offer, provide, promise or give, any form of consideration, including, but not limited to, money or any other thing of value, to any employee, officer, agent or official (or any person acting in an official capacity for or on behalf of such employee, officer, agent or official) of any government department or agency or any political party (or candidate for political office), state-owned or administered entity, public international organization, or any enterprise, company or partnership owned or controlled, in whole or in part, by any government or government official, for the purpose of influencing any action, omission or decision or for the purpose of obtaining, retaining or directing any such business or to otherwise obtain an improper advantage or in relation to or any matter covered by this Agreement.

## R.   **Indemnification:**

R1.   **By Grantor:** Grantor shall indemnify, defend and hold harmless Distributor's Indemnitees from and against any and all Claims relating to or arising out of or incurred for the purpose of avoiding any suit, claim, proceeding or demand or the settlement thereof which may be brought against any of Distributor's Indemnitees by reason of the actual or proposed production of the Picture, or the use or disposition of the rights granted herein, or in connection with the breach or alleged breach of any of the representations, warranties or agreements made by Grantor, unless resulting from any Claim for which Distributor must indemnify Grantor pursuant to this Agreement. Upon notice from Distributor of any such Claim being advanced or commenced, Grantor shall adjust, settle or defend the Claim at Grantor's sole cost, provided, however, that in no event will Grantor settle any such Claim in derogation of any of Distributor's rights. Notwithstanding the foregoing, Distributor shall have the right, but not the obligation, to adjust, settle or defend such suit, claim, proceeding, demand or cause of action without affecting Grantor's indemnity. In any case, within fifteen (15) days after Distributor's demand (which shall include a reasonably detailed description of Distributor's payments and expenses), Grantor shall reimburse Distributor fully for all such payments and expenses in connection therewith. If Grantor fails to reimburse Distributor, without waiving its right otherwise to enforce such reimbursement, Distributor shall have the right to deduct such amount, or any part thereof, from any sums accruing to or for the account of Grantor under this Agreement or any other agreement. In addition, pending the final determination of any Claim, Distributor may withhold from any monies payable to Grantor the amount Distributor reasonably deems necessary to cover Grantor's potential indemnity owed with respect to such Claim.

R2.    **By Distributor:** Distributor shall indemnify, defend and hold harmless Grantor's Indemnitees from all Claims arising out of or incurred for the purpose of avoiding any suit, claim, proceeding or demand or the settlement thereof, which may be brought against any of Grantor's Indemnitees by reason of Distributor's intentional acts in connection with the distribution, advertising or promotion of the Picture, or in connection with the breach or alleged breach of any of the warranties, representations or obligations of Distributor under this Agreement, except to the extent that such Claims are caused by, arise from or are in connection with Grantor's bad faith, willful misconduct, or such Claims arise from or relate to a Claim for which Grantor owes Distributor an indemnity hereunder.

S.    **Default:**

S1.    No express or implied waiver by either party of any provision of this Agreement or of any breach or default of the other shall constitute a continuing waiver, and no waiver shall be effective unless in writing. Each and all of the several rights and remedies provided for in this Agreement, or by law, shall be cumulative, and no one of them shall be exclusive of any other right or remedy, and the exercise of any one of such rights or remedies shall not be deemed a waiver of, or an election not to exercise, any other such right or remedy.

S2.    In the event of a Grantor Default, Distributor may, without limiting or waiving any other remedies available to Distributor, terminate this Agreement in its entirety and be relieved of all obligations hereunder, including without limitation the obligation, if any, to pay the Minimum Guarantee. Without limiting the foregoing, upon such termination, Grantor shall repay the aggregate of any sums advanced or expended by Distributor (and not recouped) in connection with the Picture, plus Interest thereon.

S3.    Distributor will have thirty (30) days from its receipt of Grantor's written notice that Distributor has breached any material term, condition or covenant hereunder or any representation or warranty in which to cure the default set forth in such notice. The sole remedy available to Grantor for any breach or alleged breach by Distributor shall be the recovery of compensatory damages, if any, and the rights herein granted by Grantor shall not terminate by reason of such breach. In no event (including without limitation when fraud in the inducement of this Agreement is alleged) may Grantor terminate this Agreement, obtain specific performance, obtain punitive or consequential damages, or obtain injunctive or other equitable relief with respect to any breach of Distributor's obligations hereunder.

T.    **Bankruptcy:** In the event of Grantor's bankruptcy, the parties acknowledge and agree that the licensed rights hereunder are fundamentally in the nature of "intellectual

property" as defined in the Bankruptcy Code; that Distributor's continued enjoyment of all licensed rights is fundamental to the basic license hereunder; and therefore all licensed rights should be deemed intellectual property subject to Distributor's election under Section 365(n)(1)(B) of the Bankruptcy Code. The parties hereby acknowledge that for all purposes, including but not limited to, any interpretation related to bankruptcy law (inclusive of issues related to Bankruptcy Code Section 365n), Distributor's right to recoup the Minimum Guarantee, Distribution Expenses and other amounts allowed under this Agreement refers to the equitable doctrine of recoupment and does not constitute a legal or equitable "right of setoff" under any applicable state or federal law.

U.  **Confidentiality:** Neither party shall disclose (other than to their respective employees, directors, and officers, as well as any co-financiers and participants, in their capacity as such on a need-to-know basis) any information with respect to the financial terms and provisions of this Agreement except: (a) to the extent necessary to comply with the law or order of a court of competent jurisdiction, in which events the party making such disclosure shall notify the other party as promptly as practicable (if possible, prior to making such disclosure) and shall seek confidential treatment of such information; (b) to the extent necessary to comply with S.E.C. or similar disclosure requirements; (c) to their parent and affiliated companies, their banks (and their respective advisors and attorneys), prospective financiers and investors (and such persons' investment bankers, agents, attorneys, accountants and necessary experts), auditors, investment bankers, attorneys and similar professionals, provided that such companies, banks, advisors, financiers, investors, investment bankers, experts, auditors, accountants, attorneys and similar professionals agree to be bound by the provisions of this paragraph; and (d) in order to enforce its rights pursuant to this Agreement.

V.  **Relationship of the Parties:** The parties do not intend or wish to establish, and nothing contained in this Agreement will constitute, a partnership between, or joint venture by, the parties hereto. Nothing contained in the Agreement will make either party the agent of the other. Neither party will hold itself out contrary to the terms of this paragraph and neither party will become liable by reason of any representation, act or omission of the other contrary to the provisions hereof. Nothing contained in this Agreement will be construed so as to create any third party beneficiary hereunder. Nothing in or pursuant to this Agreement will entitle any third party to any remedies against Distributor, at law, in equity, or otherwise, including, without limitation, any audit rights or the right to seek or obtain injunctive relief against Distributor's distribution of the Picture.

W.  **Construction:** The headings and subheadings of the sections of this Agreement are inserted for convenience of reference only and do not control or affect the meaning or construction of any of the agreements, terms, covenants and conditions of this Agreement in any manner. This Agreement has been negotiated at arm's length between persons knowledgeable in the matters dealt with herein. In addition, each party

has been represented by experienced and knowledgeable legal counsel or has otherwise knowingly waived such right. Accordingly, any rule of law, including without limitation section 1654 of the California Civil Code, or any legal decision that would require interpretation of any ambiguities in this Agreement against the party that has drafted it, is of no application and is hereby expressly waived. When possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law. If any provision of this Agreement nonetheless shall be or become prohibited or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

X.  **Survival:** All representations, warranties, indemnities and return privileges made or provided herein will survive the termination of this Agreement and will remain in full force and effect. All of a party's rights and privileges, to the extent they are fairly attributable to events or conditions occurring or existing on or prior to the termination of this Agreement, will survive termination and will be enforceable by such party and its successors and assigns.

Y.  **Arbitration:** The party seeking arbitration ("Demanding Party") shall deliver a written notice of demand to resolve the dispute (the "Demand") to the other party ("Non-Demanding Party") and shall advise the JAMS that the parties have agreed to the procedure set forth below for the selection of the arbitrator. In no event may the Demand be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations. The Demand must include a short and plain statement of the dispute or controversy, the amount of money being sought, and the name of the person the Demanding Party proposes to act as arbitrator to resolve such dispute. Within ten (10) Business Days after receipt of the Demand, the Non-Demanding Party shall deliver a written response to the Demanding Party. Such response must include a short and plain statement of the Non-Demanding Party's defenses to the dispute or controversy, any claims the Non-Demanding Party wishes to make that are related to the dispute or controversy identified in the Demand, and must also state whether the Non-Demanding Party agrees to the proposed arbitrator or, if not, the name of a different proposed arbitrator (and, if so, the name of the person the Non-Demanding Party proposes to act as arbitrator). In each case, the arbitrator must be a former judge or justice of a state or federal court in California, or an active member of the State Bar of California, with no less than ten years of experience in the entertainment industry and no less than twenty years of experience handling complex business transactions or litigation (an "Arbitrator"). If the parties cannot agree upon a single Arbitrator, the following will apply: (a) within five (5) Business Days after the earlier of (i) the service of the Non-Demanding Party's pleading, and (ii) the last day for service of the Non-Demanding Party's pleading, each party (who must be represented by counsel or appear pro per) shall transmit to the JAMS a list of four persons on the arbitral panel qualified to serve as the Arbitrator, and if any single name appears

on the list of each party, then the JAMS shall select one of the mutually selected names at random and that person will be appointed as the Arbitrator; (b) if no name appears on the list of both parties, then the lists must be exchanged and each party may strike one name from the list of the other party, and the parties shall, within three (3) Business Days thereafter, submit to the JAMS their ranking of all remaining nominees in descending order of preference with sequential points assigned to each name (assigning "1" to the lowest choice), and the person with the highest total number of points will be appointed as the Arbitrator (or in the event of a tie, one of the names with the highest total number of points will be selected by the JAMS and that person will be appointed as the Arbitrator); (c) if the person selected as the Arbitrator declines to serve or becomes unwilling or unable to serve after selection or appointment, then the nominee with the next highest total number of points (or, if there had been a tie, another nominee with an equal total number of points) will be appointed as the Arbitrator; and (d) if any party to a Dispute materially fails to fully and timely participate in the foregoing selection process, then the JAMS shall appoint an Arbitrator from the participating party's list of qualifying, acceptable Arbitrators. The provisions of California Code of Civil Procedure Section 1283.05 will apply to any arbitration arising under this Agreement, subject to the following: (a) the fifteen day periods set forth in subsections (a)(2)(A) and (B) of section 1282.2 will be deemed to be periods of fifteen (15) Business Days; (b) the only discovery methods to be utilized will be production of documents and depositions unless the Arbitrator finds that another method of discovery (e.g., interrogatories) is the most reasonable and cost efficient method of obtaining the information sought; (c) all discovery requests must be first submitted to the Arbitrator who must authorize the propounding of each request and deposition notice in advance, and for document requests and other written discovery methods, the Arbitrator shall authorize the request only after finding that (i) the request is not intended solely to delay the proceedings or harass the other party, (ii) the material sought is relevant to the issues in dispute, (iii) the nature and scope of such discovery is reasonable under the circumstances, and (iv) for deposition notices, the Arbitrator may authorize the deposition only after finding that the proposed deponent is likely to have personal knowledge of facts relevant to the issues in dispute; (d) only documents relating to the Picture that is the subject of this Agreement (and specifically excluding documents pertaining to Distributor's business generally) may be sought unless the party seeking documents beyond that scope demonstrates, and the Arbitrator finds, a compelling need for their production; and (e) each deposition will be limited to seven (7) hours of actual question and answer time unless the party desiring additional time demonstrates, and the Arbitrator finds, that the deposition has been expeditiously conducted and there is a compelling need for additional time. There must be a court reporter record made of the arbitration hearing and said record will be the official transcript of the proceedings. The Arbitrator shall issue a written opinion specifying the legal and factual basis for the award and the types of damages awarded. The Arbitrator will in no event have the power to enter temporary restraining orders, preliminary or permanent injunctions affecting Distributor's distribution or exploitation of the Picture or any marketing, advertising, promotional or publicity materials in connection therewith. The parties further agree that in any

arbitration or other action regarding or related to this Agreement, the damages that may be awarded to Grantor will be limited to any actual damages suffered and the power of the Arbitrator to award damages will be limited thereto. Without limiting the foregoing, in no event will the Arbitrator have the power to award Grantor any special, incidental, consequential, exemplary or punitive damages, nor will the Arbitrator have the power to confer any award to Grantor based on any claim for loss of profits, lost business or lost business opportunities. All aspects of the arbitration proceedings, including, but not limited to, all testimony, documents and the Arbitrator's award must remain strictly confidential at all times. Only the parties, their counsel, the Arbitrator, witnesses and a court reporter may attend the arbitration hearings. To maintain the confidentiality of the proceedings, the parties agree not to file a petition or motion seeking to confirm the Arbitrator's award for sixty (60) days after issuance of the award. If all monetary or other relief required by the arbitrator's award is fully satisfied within sixty (60) days after issuance of the award, then no petition or motion to confirm the award may be brought. Any permitted petition or motion to confirm the award may be brought solely in a court of competent jurisdiction in Los Angeles County. If either party refuses to perform any or all of its obligations under the final arbitration award within sixty (60) days of issuance of such award, the other party may enforce the final award in any court of competent jurisdiction in Los Angeles County. All documents filed in court relating to the arbitration proceedings must be filed under seal utilizing the procedures set forth in California Rule of Court, Rules 2.550-2551, or other subsequently enacted statues or rules concerning filings under seal. Any breach of the confidentiality of the proceedings by any party may be grounds for sanctions by the Arbitrator or the court. The decision of the Arbitrator will be binding upon the parties, and will constitute a full and final adjudication of the controversy except: (a) when the Arbitrator exceeded its powers during the Arbitration, and/or (b) when the Arbitrator was corrupt in relation to the arbitration proceedings. The arbitrator will not have the power to commit errors of law or legal reasoning, and the Arbitration Award may be vacated or corrected on appeal to a court of competent jurisdiction for any such error, including but not limited to the JAMS appellate process. If an appeal is permissible pursuant to this paragraph, then either party may submit the matter to the JAMS Optional Appeal Procedure using the JAMS' Arbitration Rules. The fees of the Arbitrator must be borne equally by Distributor and Grantor, provided that the Arbitrator may require that such fees be borne in such other manner as the Arbitrator determines is required solely in order for this arbitration clause to be enforceable under applicable law.

Z.   **Definitions:** The following terms shall have the following meanings:

**Airline Rights:** Exploitation of the Picture in airplanes flying the flag of or serviced from a country within the Territory or whose principal offices are located in the Territory (regardless of the country of the "flag flown" or registry).

**Ancillary Rights:** The right to exploit all ancillary and subsidiary rights to the Picture, including without limitation Merchandising Rights, commercial tie-in rights, Print Publishing

Rights, Soundtrack Album Rights, Master Rights, Music Publishing Rights, Music Performance Rights, Clip Rights and Electronic Publishing Rights.

**Bermuda and the Bahamas Islands:** Bermuda and the Bahamas Islands and all military bases, ships, aircraft and oil rigs flying the flag of or serviced from Bermuda and/or the Bahamas Islands or whose principal offices are located in Bermuda and/or the Bahamas Islands (regardless of the country of the "flag flown" or registry), diplomatic posts and camps, installations and reservations of the Armed Forces of Bermuda and/or the Bahamas Islands, including the Veteran's Administration, Red Cross and similar organizations, as well as maritime facilities and other commercial and/or industrial installations wherever located.

**Business Day:** Any day of the week other than a Saturday, Sunday or a legal United States holiday.

**Canada:** Canada (including without limitation Quebec, Prince Edward Island, the Northwest Territories, the Yukon Territories and Newfoundland) and its territories, possessions, trusteeships and commonwealths and all military bases, ships, aircraft and oil rigs flying the flag of or serviced from Canada or whose principal offices are located in Canada (regardless of the country of the "flag flown" or registry), diplomatic posts and camps, installations and reservations of the Armed Forces of Canada, including the Veteran's Administration, Red Cross and similar organizations, as well as maritime facilities and other commercial and/or industrial installations wherever located.

**Claims:** Third party claims, costs, liabilities, obligations, judgments and/or damages, including reasonable outside attorneys' fees but excluding lost profits and consequential damages.

**Clip Rights:** The right to exploit and/or license in any and all media, whether now known or hereafter devised, all footage, trims and outtakes (including without limitation "bloopers," "behind the scenes" and "b-roll" footage) of and from the Picture, and any portions thereof in any manner and style as Distributor shall determine in its sole discretion in connection with the creation of other motion pictures and/or audiovisual works, and to license such footage, trims and outtakes as "stock footage" as that term is commonly understood in the entertainment industry.

**Collateral:** Collectively, the Rights in the Territory during the Term, including without limitation all proceeds therefrom and the underlying rights and physical materials necessary for the exploitation thereof.

**Complete Delivery:** Distributor's receipt and approval of all the Delivery Materials, which must conform to all specifications set forth in the Agreement and be delivered by Grantor at Grantor's sole cost and expense, free and clear of any Claims, liens or encumbrances other than the Permitted Liens.

**Delivery Materials:** All the items listed in the delivery schedule attached as Exhibit DS.

**Digital Locker:** The method of Electronic Sell-Thru where the consumer is licensed, sold or given the right to access a copy of the Picture at any time (regardless of when the Term may expire) as stored or virtually stored in any format by a retailer, vendor or third party on a secured hard drive or by other means.

**Distribution Expenses:** All third party out of pocket costs, charges and expenses incurred, paid, payable or accrued in connection with the distribution, exhibition, advertising, exploitation and turning to account of the Picture, or in the exercise of any of Distributor's rights in the Picture, of whatever kind or nature. If Distributor reasonably anticipates that additional distribution expenses will be incurred in the future, Distributor may, for a reasonable time, set up appropriate reserves therefor. Without limiting the foregoing, Distribution Expenses shall include all costs and expenses in connection with any of the following: (a) creation, duplication and quality checking of all masters, DLTs, sound tracks, prints and other physical properties utilized in connection with the distribution of the Picture and all services and facilities rendered or utilized in connection with such physical properties; (b) advertising, promoting, exploiting and publicizing the Picture in any way, including without limitation tours and personal appearances, audience testing and market research and trailers; (c) preparing and delivering the Picture for distribution, including without limitation screenings, production of foreign language versions of the Picture to the extent necessary or desirable for distribution of the Picture in the Territory, whether dubbed, superimposed or otherwise, obtaining an MPA rating certificate, changing the title of the Picture for release in any part of the Territory or for exhibition on television or other media, or for any other purpose or reason; and (d) any action taken by the Distributor (whether by litigation or otherwise) in enforcing collection of Gross Receipts, or to prevent unauthorized exhibition or distribution of the Picture, or to prevent any impairment of, encumbrance on or infringement upon the rights of Distributor in and to the Picture, or in connection with the auditing of books and records of any exhibitor, subdistributor or licensee, or to recover monies due pursuant to any agreement relating to the distribution or exhibition of the Picture.

**Distributor-Created Materials:** The key art, one-sheets, trailers, and television spots, if any, which are created and exploited by Distributor in connection with the Picture.

**Download-to-Burn:** The method of Electronic Sell-Thru where the consumer is licensed, sold or given the right to burn a limited number of copies (e.g., DVD, VHS or Blu-ray copies) of the Picture after having first received a copy of such Picture by electronic, fiber-optic or other non-tangible transmission.

**Download-to-Own:** The method of Electronic Sell-Thru where the consumer is licensed, sold or given the right to store a copy of the Picture on the consumer's hard drive, cellular phone, Digital Locker, or other storage receptacle, media or device for an indefinite period of time after first having received a copy of the Picture by electronic, fiber-optic or other

non-tangible transmission (irrespective of whether there is a download), but the consumer is either not entitled to transfer such copy, or is only entitled to transfer such copy a limited number of times, onto other storage devices, such as a disc or tape or virtually.

**Electronic Publishing Rights:** The right to license, reproduce, use, adapt, distribute, display, perform or create the Picture or any derivative works based on the Picture or any portion thereof in photographic, audio, video, optical, digital or interactive form or in any other form or method of copying, recording, manipulation, transmission or use, whether now known or hereafter devised, the purpose of which is to allow the user to selectively display, manipulate or perform such electronic work or derivative material based on such electronic work or portions thereof, alone or in conjunction with other audio, video, photographic, digital, computer software, firmware, hardware or any other systems now known or hereafter devised, including without limitation all forms of video games on any and all platforms, CD-I, CD-ROM, game consoles, handheld devices and multimedia but specifically excluding all uses encompassed by the Home Video Rights and NFT Rights. Electronic Publishing Rights include Mobile Applications.

**Electronic Sell-Thru:** The electronic, fiber-optic or other non-tangible transmission of the Picture to a device (e.g., a set-top box, computer, cellular phone, mp3 player, PDA or other device) from an outside source, for viewing, taping, recording or storage on such device or on tape, disc, card, drive, or any other means of permanent data retention for subsequent replay at any time as well as the right to access the Picture stored in a Digital Locker at any time, whether or not a download is required. Electronic Sell-Thru includes, but is not limited to, those instances where an entity (regardless of whether such entity is also selling the Picture in packaged media) gives or sells the consumer the right to access such Picture digitally at any time through a Digital Locker, regardless of whether or not there is a download required and irrespective of whether or not there is an upcharge. Electronic Sell-Thru includes, but is not limited to Download-to-Own and Download-to-Burn.

**Grantor Default:** The occurrence of any of the following: (a) a breach by Grantor of the performance of any material term, condition or covenant hereunder, including without limitation any representation or warranty, which is not cured within fifteen (15) days after written notice thereof; (b) the Picture or any portion thereof is attached or levied upon and such attachment or levy is not released within thirty (30) days after such levy; or (c) at any time prior to Complete Delivery: (i) an adjudication that Grantor is bankrupt; (ii) a petition by Grantor for or consent by Grantor to any relief under any bankruptcy, reorganization, receivership, liquidation, compromise or arrangement or moratorium statutes; (iii) an assignment for the benefit of Grantor's creditors; (iv) a petition by Grantor for or a subjection by Grantor to the appointment of a receiver, liquidator, trustee or custodian for all or a substantial part of its assets that is not discharged within sixty (60) days from the date of appointment thereof; (v) a written admission by Grantor of its inability to pay its debts generally when due; or (vi) abandonment of the Picture.

**Gross Receipts:** All non-refundable amounts actually received by or credited to Distributor from or in connection with the exploitation of the Rights granted under this Agreement, excluding all of the following: (a) advance payments and security deposits until earned, if ever, by the exhibition of the Picture or forfeited; (b) amounts collected from exhibition of the Picture contributed to charitable organizations; (c) any amounts collected in connection with the Picture as taxes or for payment of taxes (e.g., admission, sales, use or value added taxes); and (d) receipts of: broadcasters and other transmitters, including, but not limited to, radio and television, e.g. "free," "pay," "basic cable," and Pay-Per-View, by any means or device, whether now known or hereafter devised including, but not limited to, over-the-air, cable, closed circuit, satellite, microwave, laser, and the like; book or music publishers; entities who make payments to music publishers; wholesale or retail distributors, licensors, or sellers of phonograph records, printed editions of music, or audio-visual cassettes, DVDs, laser discs, video discs, or any similar devices hereafter devised; ISPs, websites, channels, or portals; record companies and merchandisers or any other similar user, whether or not any or all of such foregoing entities are owned, operated, or controlled in whole or in part by Distributor.

**Home Video Rights:** The right to reproduce, distribute, display, promote, market and advertise the Picture (and authorize others to do so) in all languages, in all home video media, whether now known or hereafter devised, including without limitation, all rental and sell-thru methods of distribution by means of Video Devices (including, without limitation, all kinds of tapes, cassettes, discs, chips, cards and other devices, whether now known or hereafter devised, including but not limited to, all formats of videotapes, videocassettes and videodiscs, including, but not limited to, Blu-ray, HD-DVD, DVD and VHS, as such terms are commonly understood in the video industry, which contain the Picture or portions thereof and are intended primarily for home viewing of the Picture or on PSPs and other hand-held devices capable of playing the Picture in their original continuity or otherwise (including, without limitation, devices that are installed in non-traditional home video outlets which enable the viewer to view the Picture (either in a fixed copy or in a non-tangible copy) such as home video players installed in automobiles capable of playing DVDs and/or receiving satellite or internet transmissions, etc.)), and by any and all non-tangible methods of home video distribution, including without limitation, by means of Electronic Sell-Thru, Video-On-Demand and other free or pay-per-transaction methods of distribution, by any and all methods of delivery, whether now known or hereafter devised, including, without limitation, fiberoptics and any and all Internet Delivery Mechanisms.

**Indemnitees:** A party and its parent, subsidiaries, affiliates, assignees, licensees, sublicensees, distributors, subdistributors and dealers, and the directors, officers, members, employees, agents, attorneys, consultants and representatives of the foregoing.

**Internet:** A non-licensed, open or closed-access data delivery network or networks (including broadband delivery networks) for point-to-point or point-to-multipoint transfer of digital information (including but not limited to video, audio and text) using open

protocols (e.g., TCP or IP or any successor protocols thereto, whether now known or hereafter devised) to any device capable of accommodating open protocol, including televisions, personal computers, set-top boxes, and other Internet-enabled devices, and any private or proprietary network that connects to such network(s) through bridges or gateways, including, without limitation, the technologies currently known as the internet, and Internet II.

**Internet Delivery Mechanisms:** The facilities of a communications system of one or more computer networks that utilize TCP/IP or other architecture or that use computer terminals, terminal servers, routers, multicasting technology or other high speed data connections, that allow the user to engage in two-way transmissions over the system, irrespective of the operator of the system or the means by which signals are carried or received. Without limiting the generality of the foregoing, the Internet Delivery Mechanisms shall include the Internet as presently configured and all modifications and additions thereto and substitutions thereof (including, without limitation, the Internet II, any proprietary computer services, any local area network, any computer-assisted interconnected network, DSL and any and all other on-line systems), whether using means, methods, processes media or technology now known or hereafter devised. It is specifically acknowledged and agreed that distributing a Picture by means of Internet Delivery Mechanisms shall include such processes as "downloading" (as such term is used in the Internet industry) a Picture, as well as, "streaming" (as such term is used in the Internet industry) a Picture, whether at a time determined by the end user or any third party.

**Interest:** Interest at the prime rate of Union Bank plus two and a half percent (2.5%).

**Master Rights:** One hundred percent (100%) of the copyright in the Territory (including any and all renewals and extensions thereof) in and to all sound recordings embodying music that are created for, and embodied in or used in connection with, the Picture (e.g., underscore), including, for the avoidance of doubt, the right to administer such copyrights.

**Merchandising Rights:** The right to manufacture, sell, market and exploit commercial and non-commercial goods and services created in connection with the Picture including, without limitation, the right to produce and exploit clothing, toys, books, food, novelty items, and games based on the Picture or utilizing, depicting or embodying any of the characters, situations or events depicted or portrayed in the Picture and the artwork, scenery, props and objects appearing or portrayed therein, excluding customary commercial tie-ins and products manufactured for the purpose of promoting and publicizing the Picture (which rights are also granted to Distributor).

**Mobile Applications:** Any audiovisual work of authorship embodied in software or other digital electronic form (whether now known or hereafter invented) that has been either pre-installed or downloaded to a Mobile Device and is capable of interaction with and/or manipulation by a user on said device.

**Mobile Device:** Any mobile or handheld device that is capable of receiving audiovisual programming by any means and exhibiting such programming on such device, including, without limitation, cellular phones, pagers, personal digital assistants and other mobile devices now known or hereafter devised.

**Mobile Platform:** A cellular communications system, personal digital communication system, satellite or terrestrial-based multimedia broadcasting service or any other system, network, or service of any kind utilizing any protocol now known or hereafter in existence, including, without limitation, Media Flo, Wireless Application Protocol, Wi-Fi (e.g., 802.11(g)), Wi-Max, 2G, 3G, 4G, DVB-H, DMB, EV-DO, GPRS, GSM, EDGE, CDMA, HSCSD, PCN, UMTS, Bluetooth, IP Datacast, or any successor or similar or dissimilar technology now known or hereafter devised, to transmit audiovisual programming to customers of, or subscribers to services offered by, the operator of such Mobile Platform for reception and exhibition on Mobile Devices.

**Music Performance Rights:** The right to use and perform any and all music, lyrics and musical compositions contained in the Picture and/or recorded in the soundtrack thereof to the extent necessary to exercise any of Distributor's rights hereunder.

**Music Publishing Rights:** One hundred percent (100%) of the copyright in the Territory (including any and all renewals and extensions thereof) in and to all musical compositions (including lyrics, if any) created for, and embodied in or used in connection with, the Picture (e.g., underscore), including, for the avoidance of doubt, the right to administer such copyrights.

**NFT Rights:** All rights in and to NFTs related to, associated with, or arising from the Picture or Distributor's rights in and to the Picture, of any kind or nature, now known or hereafter devised, including but not limited to the right to create, mint, exploit, reproduce, distribute, display, promote, market, and/or advertise NFTs, by any means or method now known or hereafter devised, including but not limited to Internet Delivery Mechanisms and Mobile Platform.

**Non-Fungible Tokens (NFT[s]):** Unique, non-interchangeable units of data that are stored on a digital ledger, called a blockchain, that can be used to represent items (including, but not limited to, photos, videos, audio, and digital files), certify authenticity and ownership of specific digital assets and the rights relating to such assets, or enable access or utility.

**Non-Theatrical Rights:** The sole and exclusive right to exploit the Picture in any and all non-theatrical markets, including, without limitation, in educational and religious institutions, prisons, hospitals, hotels, restaurants, bars, clubs, dormitories, passenger carrying vehicles, railroads, governmental bodies (including, but not limited to, diplomatic posts and camps, military bases, military vessels and other military installations and reservations of the Armed Forces of the countries within the Territory, including the U.S.O., Veteran's Administration, Red Cross and similar organizations), drilling platforms at sea (including, but not limited to, oil rigs), oil fields, fishing fleets and the like, and which exploitation shall include Ship Rights

DocuSign Envelope ID: 6E268483-1CBG-4547-8BA9-2B5E51A113E4

and Airline Rights, and shall in no event include the Theatrical Rights, Television Rights, or Home Video Rights.

**Notice of Complete Delivery:** A written notice from Grantor to Distributor that Grantor has delivered all of the Delivery Materials.

**Notice of Cure:** A written notice from Grantor to Distributor that Grantor has cured all of the deficiencies in the Delivery Materials that were listed in the most recent Notice of Defect.

**Notice of Defect:** A written notice from Distributor to Grantor that Complete Delivery has not been effected, specifying in reasonable detail which Delivery Materials are missing, defective and/or not technically acceptable.

**Permitted Liens:** Customary security interests in the Picture granted to the Screen Actors Guild, Directors Guild of America and/or Writers Guild of America, as well as customary security interests in the Picture granted to a completion guarantor, financier and/or a financial institution that are subject to an interparty agreement or subordination and nondisturbance agreement with Distributor.

**Picture:** The motion picture referenced in paragraph 1 of the Agreement, including without limitation the director's cut, final cut, rated and unrated versions, "behind the scenes" and "making of" footage, any documentary or short films concerning the Picture, and all footage, bloopers, trims, outtakes and trailers related to any of the foregoing.

**Print Publishing Rights:** The right to publish or license for publication the screenplay and/or novelization of the Picture in any and all languages, and to publish in such form any publications (including, without limitation, books, newspapers, fan magazines, trade periodicals, books on tape, and electronic verbatim displays), and to copyright synopses, novelizations, serializations, dramatizations, sketches and other adaptations of and selections from the literary property on which the Picture is based and from the screenplay of the Picture, and to use excerpts from such literary property and the Picture in heralds, programs, booklets, posters, lobby displays, pressbooks, EPKs and all other media of advertising and publicity.

**Right of First Negotiation and First Refusal:** Prior to exploiting or disposing of the specified right, Grantor shall send Distributor written notice of Grantor's intention to do so, and Grantor and Distributor shall negotiate in good faith regarding Distributor's acquisition of the specified right. If the specified right relates to Subsequent Production Rights, such written notice from Grantor must include the following elements: budget, screenplay, principal cast, director and (if available) the most recent cut of such production. If Grantor and Distributor do not reach a mutually satisfactory agreement within thirty (30) days of Distributor's receipt of Grantor's written notice, Grantor will be free thereafter to exploit the specified right or to enter into an agreement with a third party regarding the specified right; provided that Distributor has the right to match any third party offer that is

equal to or less than Distributor's best financial offer (and Distributor shall not be required to match any term that is not reasonably performable by Distributor), exercisable by Distributor within ten (10) Business Days of Distributor's receipt of the material financial terms of any agreement that Grantor is prepared to accept. Distributor's first refusal rights shall revive and apply in perpetuity to every further offer Grantor is prepared to accept and, if applicable, every time any of the foregoing production elements change in any material respect.

**Rights:** All of the following: (a) all distribution-related rights of each and every kind, nature and character whatsoever in and to the Picture and all elements thereof (including without limitation the title, characters, script, outtakes and soundtrack), exclusively, under copyright and otherwise, including without limitation the copyright (and any and all extensions and/or renewals thereof) and all neighboring rights, retransmission rights, and trademarks in and to the Picture and the benefit of all rights, privileges, representations and warranties licensed or assigned to Grantor with respect to the Picture; (b) the sole and exclusive right under copyright and otherwise to reproduce, distribute, display, exhibit, promote, market, advertise, broadcast, sell, rent, give away, edit, delete, modify, disguise, create, develop, adapt, perform, produce, subdistribute and otherwise exploit the Picture and all elements thereof (and authorize others to do so) in all manner and style (including without limitation in the form of Special Versions), in all sizes and gauges of film, tape and material now known or hereafter devised, through any and all means, methods and manners of exhibition, distribution and exploitation, whether now known or hereafter devised; and (c) the following exclusive exploitation rights with respect to the Picture: Theatrical Rights, Home Video Rights, Non-Theatrical Rights, Ancillary Rights, radio rights, Television Rights, and NFT Rights, but excluding the Subsequent Production Rights.

**Ship Rights:** The right to exploit the Picture on sea or ocean going vessels flying the flag of or serviced from any country within the Territory or whose principal offices are located in the Territory (regardless of the country of the "flag flown" or registry).

**Soundtrack Album Rights:** The right to reproduce, distribute, and otherwise exploit phonorecords, or their equivalent, derived from or based upon the Picture (e.g., a soundtrack album), and to license and sublicense the same to any third party (including any subsidiary, affiliate, or other entity which may be related to Distributor).

**Special Versions:** Dubbed, translated, narrated and/or subtitled versions of the Picture and any trailers thereof, created by Distributor or any other party, including but not limited to cut-in, synchronized and superimposed versions thereof in any language for use in such parts of the Territory as Distributor deems advisable, for which Grantor shall provide dubbed, translated, subtitled and/or narrated materials in existence at the date of this Agreement or subsequently created.

**Subscription Video-On-Demand:** That method of exhibition of the Picture where the consumer pays a fixed periodic subscription fee or no fee to a service that permits the consumer to view the Picture among other motion pictures and programs, via wire, cable or over-the-air means (including, without limitation, via microwave, satellite, fiberoptics or the Internet) in its original continuity or otherwise, within a reasonable period of time following the viewing consumer's selection and the viewing consumer can then view the Picture at that time or at a later point in time.

**Subsequent Production Rights:** The sole right to exploit all productions that are derivative of the Picture hereunder (e.g., theatrical remakes, sequels, prequels, direct-to-video productions, television productions, spin-offs, live stage productions, musical productions and productions produced for any other media) regardless of form (e.g., theatrical, made-for-cable, episodic television).

**Television Rights:** The right to exploit the Picture over all forms of television, regardless of the delivery system or payment system (if any) involved, including without limitation, the transmission, retransmission and/or streaming of synchronized audiovisual signals to any audiovisual display device and/or receiver now known or hereafter devised, by any technological means now known or hereafter devised, and regardless of whether, how or how much viewers are charged for the privilege of viewing all or any part of such signals or any television service exploiting them (but specifically excluding the Home Video Rights and any transmission over a Mobile Platform to a Mobile Device). Without limiting the generality of the preceding sentence: the Television Rights shall mean and include, without limitation: (a) the exclusive right to exploit the Picture over advertising supported programming, premium programming, network television, ad hoc network television, television syndication, closed circuit, closed-captioning, secondary audio programming (SAP), basic subscription television, and/or premium subscription television; (b) by all methods of delivery, now known or hereafter devised, whether re-uplinked or otherwise, including without limitation HDTV, fiberoptics, terrestrial, digital terrestrial, satellite, cable, MMDS, MDS, DBS, DDT, DIVA, DIVX, SMATV, MATV, ADSL, LPTV, CATV, and any and all other telecommunication systems and methods of delivery, whether now known or hereafter devised, including, without limitation, by Internet Delivery Mechanisms; and (c) the signals transmitted, retransmitted and/or streamed may be analog and/or digital, point-to-multipoint, and/or point-to-point.

**Theatrical Rights:** All rights to exploit the Picture by means of direct exhibition in theaters (including, without limitation, indoor, outdoor and drive-in theaters), licensed as such in the place where the exhibition occurs, that are open to the general public to view the Picture.

**Turks and Caicos:** The Turks and Caicos Islands.

**United States:** The United States of America (including without limitation Guam, Saipan, Midway Island, Baker Island, Wake Island, the Republic of the Marshall Islands, the Commonwealth of the Northern Mariana Islands, the Federated States of Micronesia, the

Republic of Palau, the Caroline Islands, the Virgin Islands, Puerto Rico and American Samoa) and its territories, possessions, trusteeships and commonwealths and all military bases, ships, aircraft and oil rigs flying the flag of or serviced from the United States or whose principal offices are located in the United States (regardless of the country of the "flag flown" or registry), diplomatic posts and camps, installations and reservations of the Armed Forces of the United States, including the USO, Veteran's Administration, Red Cross and similar organizations, as well as maritime facilities and other commercial and/or industrial installations wherever located.

**Video Devices:** All kinds of tapes, cassettes, discs, chips, cards, flash memory units and other devices, whether now known or hereafter devised, including but not limited to, all formats of videotapes, videocassettes, videodiscs, chips, cards, and other technologies in which the Picture is embodied in a tangible medium of expression (including, without limitation, VHS, DVD, PSP, Blu-ray, HD-DVD and laser discs), as these terms are commonly understood in the video industry which contain the Picture, or portions thereof and are intended primarily for viewing the Picture in its original continuity or otherwise.

**Video-On-Demand:** That method of exhibition of the Picture in which the viewing consumer (as opposed to the exhibitor of the Picture) has the ability to select the time and day of the exhibition of the Picture and the Picture is then transmitted to the viewing consumer (regardless of whether or not a download is required) via wire, cable or over-the-air (including, without limitation, via microwave, satellite, fiberoptics, the Internet or any other non-tangible method of transmission) following the viewing consumer's selection, the viewing consumer can then view the Picture at such time or at a later point in time, and the viewing consumer may or may not be entitled to embody the Picture in a tangible medium, including, but not limited to, discs, tapes, chips, usb ports and other memory devices. Video-On-Demand expressly excludes all forms of Electronic Sell-Thru, including without limitation Download-to-Own and Download-to-Burn.

## EXHIBIT "DS"

## REDBOX DELIVERY SCHEDULE

### "THE BELL KEEPER"

The terms of this delivery schedule are integrated into the Agreement to which this exhibit is attached. Unless otherwise defined, capitalized terms shall have the meaning set forth in the Agreement.

\* *If applicable, items marked with one asterisk are Mandatory Delivery Materials.*

### 1.    GENERAL PROVISIONS

1.1.    All Delivery Materials must conform to the specifications set forth in the Agreement (including the Additional Specifications), as well as custom and standard of the local film industries throughout the Territory.

1.2.    To the extent that laboratory access is granted for any Delivery Materials, Grantor must provide Distributor unrestricted and irrevocable access to such Delivery Materials at a reputable laboratory for the duration of the Term, pursuant to a signed laboratory access letter in Distributor's customary form, and such Delivery Materials must not be removed from the designated laboratory at any time during the Term without the prior written consent of Distributor.

1.3.    In the event the Picture was shot on film (i.e., 35mm, 16mm, etc.) please contact Distributor for specific delivery protocols.

1.4.    In the event the original Delivery Materials are not in English, then in addition to such original Delivery Materials, Grantor must provide a certified English translation prepared by a reputable professional translation company that has been approved by Distributor.

1.5.    All Delivery Materials must be delivered fully cleared for Distributor's exploitation of the Rights throughout the Territory during the Term without any additional clearance costs or other supplemental payments payable in connection therewith. All Delivery Materials must be produced in compliance with applicable guild rules and approved in writing by any third parties who have approval rights. In the event that any Delivery Material is not fully cleared and/or approved as set forth above, Grantor must provide a detailed written statement outlining the same at the time of delivery.

1.6.    All Publicity Materials and Legal Materials must be delivered by a secure electronic downloadable link (e.g., Aspera, hightail, wetransfer, etc.).  **Distributor does not accept delivery via file-sharing platforms (i.e., dropbox, google drive, workshare, etc.).**

1.7.    The Budget for the Picture shall provide for not less than one day of on-set photography for every week of shooting and include images of all key cast members both in front of and behind the camera, and videography for sufficient amount of time to record commentary for marketing from all key cast and crew.

## 2. PHYSICAL MATERIALS

*Deliver to: Redbox, Content Operations – On Demand, Email: contentops@redbox.com.*

2.1.    **\*Digital Source Master (DSM) Texted Data Files used to create the DCDM**:  Access to the original source file set of native resolution (which native files must be a minimum of 2k) **un-color corrected** DPX files (other files (i.e., TIFF Files) can be delivered in lieu of DPX files). The DSM shall be in the highest resolution possible (a minimum of 10 bit log), RGB and rendered to log printing density. The DSM shall be fully color corrected, rendered and fully titled, with the sound track in perfect synchronization with photographic action and conformed to the final edited version of the Picture approved by Distributor and in all respects ready and suitable to produce a new feature master for digital projection.  The DSM files shall be delivered on the most current LTO (currently, no less than LTO-9) formatted to LTFS.  Note: If the DSM files are rendered for viewing in P3 color space, the transform Look Up Table (LUT) used for the Digital Negative film record must also be delivered on backup tapes.

2.2.    **\*Digital Source Master (DSM) Textless Section Files**: Access to the original textless section files. The files must include (i.e., without any superimposed lettering) main and end title backgrounds, all in-show scenes, narrative and all descriptive titles with textless backgrounds, conformed in all respects to the background of the Digital Intermediate Negative. The Textless Background elements must be fully formatted to produce new DCDM/DCP credit sections. The files shall be in the highest resolution possible (the native files must be a minimum of 2k), RGB and rendered to log printing density. If the DSM files are rendered for viewing in P3 color space, the transform Look Up Table (LUT) used for the Digital Negative film record must also be delivered on back up tapes.  The Textless DSM files shall be delivered on the most current LTO (currently, no less than LTO-9) formatted LTFS and shall include a QuickTime reference of the textless sections and the corresponding texted sections for reference only and must include a MD-5 check sum.

2.3.    **\*Digital Intermediate File Masters:** Access to the color corrected full resolution DPX files in Log or P3 color space of the final edited version of the Picture archived on the most current LTO (currently, no less than LTO-9) sequence of the final color-timed Picture and 16-bit tiff sequence of the final color-timed Picture delivered on hard drive.

2.4.    **\*Digital Cinema Distribution Master:** Access to one DCDM of the feature delivered on hard drive and the most current LTO (currently, no less than LTO-9), formatted LTFS, fully titled, with the sound track in perfect synchronization with photographic action and conformed to the final edited version of the Picture and in all respects ready and suitable for creating Digital Cinema Packages for digital theatrical exhibition.

2.5.    **\*Digital Cinema Package:** One DCP/DKDM of the Picture delivered on CRU drive and via digital delivery, fully titled, with the sound track in perfect synchronization with photographic action and conformed to the final edited version of the action work print of the Picture and in all respects ready and suitable for digital distribution and exhibition. The DCP must be encrypted for security purposes and DKDM delivered separately via email.

2.6.    **\*Ultra-High Definition (UHD) / High Dynamic Range (HDR) Masters:** Intentionally Deleted.

2.6.1.1.    **UHD/SDR ProRes XQ Master File:** One (1) UHD 3840x2160 ProRes 4:4:4:4 XQ files in the Original Aspect Ratio of the film (2.40, 2.35, 1.85, or 1.78). The UHD/SDR master shall contain proper head slates (which include, without limitation, the title, running time, aspect ratio, audio configuration, name of the record vendor, the date of creation, etc.). Channels 1 & 2 shall contain the 2-track Printmaster LT/RT limited to +20db. Channels 3 & 4 shall contain 100% fully filled stereo M&E limited to +20db. Channels 5 thru 10 shall contain the 5.1 Printmaster limited to +20db. All textless backgrounds shall be attached to the tail.

2.6.1.2.    The UHD/HDR-10 MXF Mezzanine File & UHD/SDR ProRes File shall be delivered on the most current LTO (currently, no less than LTO-9) formatted LTFS.

2.7.    **\*Digital HD Video Masters:** Two ProRes HQ video masters in the 23.98P format in a 4:4:4 color space: (a) one in the 1.78:1 full frame format; and (b) one in the 2.35:1 letterbox format. Each video master must contain proper head slates (including the title, running time, aspect ratio, audio configuration, name of the record vendor, date of creation, etc.). Channels 1-2 must contain the stereo printmaster. Channels 3-4 must contain fully filled stereo music and effects. Channels 5-10 must contain the 5.1 printmaster. All textless backgrounds must be color timed, in the proper aspect ratio, and attached to the tail of each video master.

2.8.    **Digital HD Video Masters – Unrated:** To the extent applicable and/or manufactured, two ProRes HQ video masters in the 23.98P format in a 4:4:4 color space: (a) one in the 1.78:1 full frame format; and (b) one in the 2.35:1 letterbox format. Each video master must contain proper head slates (including the title, running time, aspect ratio, audio configuration, name of the record vendor, date of creation, etc.). Channels 1-2 must contain the stereo printmaster. Channels 3-4 must contain fully filled stereo music and effects. Channels 5-10 must contain the 5.1 printmaster. All textless backgrounds must be color timed, in the proper aspect ratio, and attached to the tail of each video master. The unrated version must contain such outtakes, scenes and footage that would result in a rating of "NC-17" if the Picture were rated by the MPAA. In the event that the music, footage, dialogue, etc., in the unrated version varies from that contained in the original delivered version, a music cue sheet, the applicable music licenses, a dialogue continuity spotting list and all other respective documentation shall be delivered. A list (sorted by time code) identifying the footage that has been added to the unrated version shall be delivered.

2.9.    **\*Titles / Textless Backgrounds:** The textless DPX files conformed in all respects to the background of the digital intermediate negative archived on the most current LTO (currently, no less than LTO-9). The textless DCDM files shall be included on the DCP hard drive (in a separate folder along with a QuickTime reference) and archived to the most current LTO (currently, no less than LTO-9) formatted to LTFS.

2.10.    **\*Printmaster:** One two-track (LT/RT) and one six-track (5.1) stereo master of the dubbed sound track of the Picture. The printmaster must be in perfect synchronization and must conform in all respects to the final delivered version of the Picture. The Protools files along with the .wav or .aiff files must be delivered on hard drive. If the original language of the Picture (or any portion thereof) is other than English, an English two-track and six-track printmaster of the dub is also required.

2.11.    **\*Six-Track (5.1) Sound Track Stems:** The separate six-track stereo discrete dialogue tracks, six-track stereo discrete sound effects tracks and six-track stereo discrete music effects, and six-track stereo discrete background/Foley tracks from which the original composite sound track master was made, and

a separate dialogue track for each language into which the Picture has been dubbed. The Protools files along with the .wav or .aiff files must be delivered on hard drive.

2.12.    **Music and Effects Master:** The combined mixed music tracks and the fully filled effects tracks (including any effects recorded on the dialogue track), including a separate dialogue guide track, but excluding any and all English dialogue. If any dialogue is treated or used as a sound effect, it must be contained in an additional sweetener channel. If the Picture is to be released with digital sound, an additional multi-channel fully filled music and effects track, minus any English dialogue or narration, shall be delivered in order to recreate the appropriate digital format. The Protools files along with the .wav or .aiff files must be delivered on hard drive.

2.13.    **Dialogue, Music and Effects Tracks:** The discrete stereo dialogue, discrete stereo music and discrete stereo effects. The Protools files along with the .wav or .aiff files must be delivered on hard drive.

2.14.    **Source Music Tracks:** A copy of the original licensed music (with each song in its entirety and all the songs assembled in the order that they appear in the Picture) and a copy of the original licensed music (with each song mixed as it appears in the Picture and all the songs assembled in the order that they appear in the Picture) which Distributor can utilize in connection with creating trailers and/or a soundtrack album for the Picture. The music tracks shall be delivered to Distributor on a compact disc as CD audio files, on DVD-R as data files, and on hard drive as Protools sessions, along with a detailed track listing.

2.15.    **Score Music Tracks:** A copy of the original score (with each song in its entirety and all the songs assembled in the order that they appear in the Picture) and one copy of the original score (as mixed in the Picture) which Distributor can utilize in connection with creating trailers and/or a soundtrack album for the Picture. The score shall be delivered to Distributor on a compact disc as CD audio files, on DVD-R as data files, and on hard drive as Protools sessions, along with a detailed track listing.

2.16.    **Foreign Language Dialogue Tracks:** If currently available or subsequently created by Grantor (or by any distributor of the Picture), one two-track (LT/RT) and one six-track (5.1) full mix foreign language track for each applicable language in the Territory. If the full mix track is not available, one dialogue stem for each language into which the Picture has been dubbed must be delivered. The Protools files along with the .wav or .aiff files must be delivered on hard drive.

2.17.    **Trims and Outs:** Access to all unused takes and trims, and all other film, video and sound track materials produced for or used in the process of preparing the Picture (e.g., all original camera negative and/or digital camera media with the corresponding original production sound, and all first generation video dailies made directly from the production camera source and the production mixer's recorded sound).

2.18.    **Editorial Paperwork and Files:** Access to copies of the code books and flex files, the final line script from the production, the negative cutter's inventory (if applicable), the final non-linear editing project files and/or EDLs, the camera reports, the sound reports, the re-recording sound reports (including all ADR and TV lines), and all other paperwork used in connection with the post production of the Picture.

2.19.    **Closed Captioned Files:** All closed captioned files in .cap or .scc format (for each applicable language in the Territory), along with the identity and contact information for the vendor who created such files.

2.20. **Television Coverage:** To the extent created, all elements necessary for the Picture to be exhibited on network television, including "cover shots" (for content) and dialogue coverage (for language). All coverage shall be compiled by an editor in chronological order in accordance with the sequence of events in which scenes occurred in the feature. For dialogue coverage, the Protools files along with the .wav or .aiff files must be delivered on hard drive, and access to the original production sound must be provided. A clearly noted, marked up final line script of all dialogue coverage will be supplied along with the dialogue coverage elements, as well as all other applicable editorial paperwork and/or files as are required in connection with the feature version of the Picture. A list (sorted by time code) identifying the original dialogue and the replacement dialogue must be delivered.

2.21. **EPK and Added Value Materials:** An electronic press kit and added value materials in ProRes HQ 23.98 1920x1080 QT format (with English stereo audio) containing all of the following: (a) a fully edited behind-the-scenes featurette including interviews with the principal cast and key crew; (b) home video commentary tracks with the principal cast and key crew; (c) extended interviews with the principal cast and key crew; and (d) a minimum of twenty minutes of behind the scenes footage, deleted scenes, bloopers, outtakes, "making of" footage, etc.

2.22. **Digital Trailer Video Masters:** To the extent created, one ProRes HQ video master (panned and scanned if the Picture is in 1.85 ratio or in scope). Channels 1-2 shall contain stereo audio. Channels 3-4 shall contain the fully filled stereo music and effects. All textless backgrounds shall be attached to the tail of the trailer video master.

2.23. **Trailer Sound Track:** To the extent created, the separate dialogue tracks, sound effect tracks, narration tracks and music tracks, from which the original trailer sound track was made.

2.24. **Trailer Textless Background:** To the extent created, textless pro-res of the completed trailer conformed in all respects to the background of the trailer.

2.25. **Trailer DCSL:** If a trailer is delivered, an electronic copy of a detailed, final dialogue and action continuity, in an acceptable format, of the completed trailer and an electronic copy of a detailed, final spotting list, in an acceptable format, of the trailer.

2.26. **Trailer Music Cue Sheet:** If a Trailer is delivered, a copy of the music cue sheet for the trailer, including the title of each composition (inclusive of any "samples"), the composers, publishers, copyright owners, form of usage (e.g., background, instrumental, etc.), performing rights society (e.g., BMI, ASCAP, etc.), as well as film footage and running time.

2.27. **Trailer Music Licenses:**  If a Trailer is delivered, copies of fully executed music licenses (synchronization, master and mechanical) for all music (inclusive of "samples") used in the Trailer and proof of payment of the licensing fees. All licenses shall provide for all media (on a full buy-out basis) necessary to effect the terms of the Agreement (including without limitation Internet and future media as devised throughout the Term and out-of-context rights) throughout the Territory during the Term without any future payment obligations (e.g., "step" payments, video bonuses, box office bonuses, etc.). All licenses and agreements must include language that prevents injunctive relief and shall preclude the licensor from terminating the license.

{BAI-684303-2}

DocuSign Envelope ID: 6E268483-1CBG-4547-8BA9-26F9F1A113F4

### 3. PUBLICITY MATERIALS

*Deliver to: Redbox, Content Operations – On Demand, Email: contentops@redbox.com.*

3.1 **\*Color Photography:** A minimum of three hundred different approved production color digital photographs depicting scenes in the Picture with members of the principal cast appearing therein; plus a minimum of fifty different approved stills per principal cast member from an on-set, in-character posed still photography session. The photography shall be delivered digitally in .tiff format in the highest resolution format possible (a minimum of 300dpi). The contact sheets and a photo identification caption list shall be provided, and the distinction between "kill shots" and "approved shots" must be clearly made (either directly on the contact sheets or on a separate list).

3.2 **\*Advertising Materials:** To the extent created and available to Grantor, a copy of all, if any, advertisements, paper accessories and other advertising materials prepared by Grantor or any other party affiliated with the Picture, including without limitation press clippings, newspaper advertising (including the artwork, billing and title treatment), cast and crew interviews, commentaries, one-sheet posters, flyers, behind-the-scene footage, key art elements (if available, in a high resolution layered Photoshop file) and transparencies, television spots, promotional reels, etc.

3.3 **\*Press Books:** A press book for the Picture, including approved biographies of the principal cast and crew members, a complete cast and crew list, the running time, production notes, approved synopsis, etc.

3.4 **\*Production Notes:** A copy of the approved production notes prepared by the unit publicist, including items relating to the underlying work(s) (original screenplay, book, etc.), places where the Picture was photographed and anecdotes about the production background of the Picture.

### 4 LEGAL MATERIALS

*Deliver to: IndieWorks, LLC, 12301 Wilshire Blvd., Suite 650, Los Angeles, CA 90025, Attention: Kirk Hamilton, Email: kirk@indieworks.biz.*

4.1 **Formation Documents:** An endorsed copy of Grantor's company formation documents (e.g., Articles of Organization).

4.2 **IRS Documents:** A signed original IRS Form W-9 or W-8BEN for Grantor.

4.3 **Assignment of Rights:** One original notarized short form assignment of the rights granted to Distributor under the Agreement, to be prepared by Distributor and signed by Grantor.

4.4 **Copyright Mortgage and Assignment:** One original notarized copyright mortgage granting Distributor a first position lien on the rights granted to Distributor under the Agreement, to be prepared by Distributor and signed by Grantor.

4.5 **Screenplay Copyright Registration Certificate:** A copy of the stamped USCO copyright registration certificate for the screenplay. If such certificate has not yet been issued by the USCO, Grantor must deliver a copy of the completed application, along with proof that the application was submitted to the USCO, the application fee has been paid, and the deposit copy has been received by the USCO. Grantor shall deliver a copy of the registration certificate to Distributor immediately upon receipt from the USCO.

DocuSign Envelope ID: 6E268483-1CBC-4547-8BA9-26F9F1A1135A

4.6 **Motion Picture Copyright Registration Certificate:** A copy of the stamped USCO copyright registration certificate for the Picture. If such certificate has not yet been issued by the USCO, Grantor must deliver a copy of the completed application, along with proof that the application was submitted to the USCO, the application fee has been paid, and the deposit copy has been received by the USCO. Grantor shall deliver a copy of the registration certificate to Distributor immediately upon receipt from the USCO.

4.7 **Chain of Title:** Complete chain of title materials (including without limitation a summary memo, a Certificate of Authorship signed by each writer, and to the extent applicable, a signed Publisher's Release) reasonably suitable to Distributor and Distributor's insurance carrier indicating that Grantor has full right, title and interest in and to the Picture and all underlying property in connection therewith (including without limitation proof of payment of all fees due in connection with the purchase of the screenplay and any underlying materials upon which the screenplay is based). To the extent that the Picture is based on real events and/or people, Grantor shall deliver an annotated screenplay (in a form reasonably acceptable to Distributor) indicating which elements are real and which elements are fictional, as well as signed copies of any releases that are deemed reasonably necessary by Distributor. All chain of title documents must include language that prevents injunctive relief.  All assignments of rights must be recorded with the United States Copyright Office ("USCO").

4.8 **Lien Clearance:** A list of all persons and entities who have been granted a security interest in the Picture, signed copies of all agreements whereby such security interest(s) are granted, and a signed non-disturbance agreement in form and substance acceptable to Distributor from each such lienholder.

4.9 **Copyright Report:** A copyright report dated within sixty days of the Delivery Date from a reputable service approved by Distributor (CompuMark is approved), showing that Grantor has clear title to the Picture and all underlying rights. The Copyright Report must include the specifics of any referenced filings.

4.10 **Title Report:** A title report dated within sixty days of the Delivery Date from a reputable service approved by Distributor (CompuMark and Dennis Angel are approved) (or the title report used to obtain title coverage from the errors and omissions insurance provider) showing that the title of the Picture is available for use without infringing the rights of any other person or entity.

4.11 **E&O Insurance Application:** A copy of the signed application submitted to the producer's errors and omissions insurer.

4.12 **E&O Insurance Policy:** A copy of the full producer's errors and omissions policy for the Picture and all endorsements thereto, with coverage of at least US$3,000,000 for a single occurrence and US$5,000,000 for aggregate claims, with a deductible not exceeding US$25,000, for a minimum term of three years from the Delivery Date, but no less than two years from Distributor's initial commercial release of the Picture. The policy must be primary and not contributory to any other insurance provided for the benefit of or by any additional insured, and Grantor shall be responsible for all deductibles and retentions under the policy. The policy must cover all aspects of the Picture and any and all materials relating thereto (including all underlying material with respect thereto, the release of a soundtrack album, if applicable, and all behind-the-scenes footage, "making of" documentaries, bloopers, and all trims and outtakes, as well as the title thereof, the music therein, and the distribution/release of the motion picture on Videograms and future technology) and endorsements to this effect must be delivered. Documentation

evidencing that the premium has been paid in full for the entire term and a guarantee of at least thirty days written notice prior to cancellation or any other material change to the policy must be provided. The insurance carrier must agree to name any other person and/or entity as an additional insured, at no additional cost, and provide a certificate of insurance with respect thereto, as requested by Distributor throughout the policy term. Coverage under a blanket policy is not acceptable. The policy must be on a per-claim basis.

4.13 **E&O Insurance Certificates:** Certificates of producer's errors and omissions insurance (and the corresponding endorsement) reflecting the required coverage and naming the following additional insureds: (a) "Redbox Entertainment LLC, each partner therein and division thereof, and its respective parents, subsidiaries, and related entities, its distributors, licensees and assigns, and the respective officers, directors, shareholders, employees and agents of the foregoing, 1 Tower Lane, Suite 800, Oakbrook Terrace, IL 60181"; and (b) "MUFG Union Bank, N.A., its successors and/or assigns, Mail Code V01-161, Attn: CLTS - 192, P.O. Box 30115, Los Angeles, CA 90030-0115".

4.14 ***Talent Agreements:** Copies of fully executed agreements for all principal cast, narrators, cameo appearances and key crew, and releases for all individuals appearing in the Picture. Without limiting the foregoing, fully executed agreements for every individual and/or entity that is to receive credit (including without limitation logo credit) in the main titles or in paid advertising must be delivered. All agreements and releases must be freely assignable and include work-for-hire language and language that prevents injunctive relief.

4.15 ***Cast and Crew List:** A complete list of all cast and all crew, including contact information (agent name, address, email and phone number), their affiliation to the Picture and union affiliation, if any.

4.16 ***Approved Synopsis:** One full approved synopsis of the Picture.

4.17 ***Feature DCSL:** An electronic copy of a detailed, final dialogue and action continuity, in an acceptable format, of the completed Picture and an electronic copy of a detailed, final spotting list, in an acceptable format, of the Picture. If the original language of the Picture or any part thereof is not English, the English subtitles must be included.

4.18 ***Main Titles:** A Word file of the main titles exactly as they appear on screen.

4.19 ***End Titles:** A Word file of the end titles exactly as they appear on screen.

4.20 ***Billing Block:** A Word file of the approved and final billing block, including all required logos and the copyright notice for the Picture. The camera-ready artwork for all logos must be delivered electronically as an EPS file and a jpeg and/or pdf file, independently from the billing block.

4.21 ***Screen Credit Obligations Memo:** An electronic copy of a memo containing all contractual main titles credit obligations and restrictions (verbatim) for all individuals and entities affiliated with the Picture.

4.22 ***Advertising Credit Obligations Memo:** An electronic copy of a memo containing all contractual obligations, restrictions, approval and/or consultation rights (verbatim) pertaining to paid and/or excluded advertising, cross-promotions, audio advertising, trailers, television spots, artwork, billing block, commercial tie-ins, merchandising, bloopers, trims and outtakes, "making of" films, behind-the-scenes

footage, etc., for all individuals and entities affiliated with the Picture. If there are no advertising credit provisions, a written statement to that effect on which Distributor can rely must be delivered.

4.23 **\*Name and Likeness Obligations Memo:** An electronic copy of a memo containing all name and likeness obligations and/or restrictions (verbatim) for all individuals and entities affiliated with the Picture (including any still, likeness and/or artistic rendering approval rights). If there are no name and likeness obligations and/or restrictions, a written statement to that effect on which Distributor can rely must be delivered.

4.24 **Premiere and Film Festival Obligations Memo:** An electronic copy of a memo containing all premiere and festival obligations and/or restrictions (verbatim), including without limitation all obligations pertaining to the number of invitations to be issued, travel accommodations, hotel accommodations, per diem, etc., for all individuals and entities affiliated with the Picture. If there are no premiere or festival obligations and/or restrictions, a written statement to that effect on which Distributor can rely must be delivered.

4.25 **\*Dubbing and Subtitling Obligations Memo:** An electronic copy of a memo containing all dubbing and subtitling obligations and/or restrictions (verbatim) relating to the replacement of any voice, including the dubbing of any dialogue in a language other than the language in which the Picture was originally recorded. If there are no dubbing or subtitling obligations and/or restrictions, a written statement to that effect on which Distributor can rely must be delivered.

4.26 **\*Cutting and Editing Obligations Memo:** An electronic copy of a memo containing all third party cutting and editing obligations and/or restrictions (verbatim) including without limitation, any and all consultation rights accorded to any individual or entity (whether by contract or by guild affiliation). If there are no cutting or editing obligations and/or restrictions, a written statement to that effect on which Distributor can rely must be delivered.

4.27 **Guild Affiliation Letter:** A signed letter from Grantor that either: (a) lists all guilds and/or unions whose members rendered services on the Picture; or (b) affirmatively states that no members of any guilds and/or unions rendered services on the Picture.

4.28 **Guild Payroll Report:** If the Picture was produced under the jurisdiction of the DGA, WGA, SAG-AFTRA, or any other applicable guild, a full payroll report for all union members, including the names, loanout information, social security and employer identification numbers, and job descriptions of all guild members engaged on the Picture.

4.29 **SAG-AFTRA Final Cast Report:** If the Picture was produced under the jurisdiction of SAG-AFTRA, a copy of the completed final cast report covering all performers on the Picture, including without limitation any singing, looping and/or voice-over services in post-production.

4.30 **\*Guild Credit Approvals:** If the Picture is under the jurisdiction of any guild, Grantor shall deliver documentation evidencing that: (a) the main and end titles have been approved by the applicable guild(s); (b) all credits have been approved by the applicable guild(s), including without limitation (if the Picture is subject to the WGA) a copy of the Notice of Tentative Writing Credit, final determination of writing credit and proof of payment of the script publication fee; and (c) all necessary credit waivers have been obtained.

{BAI-684303-2}

4.31 **Nudity and/or Simulated Sex Riders:** Signed riders must be delivered for all actors who perform nude and/or in simulated sex scenes.

4.32 **Minor Documentation:** Fully executed copies of all agreements for all minors appearing in the Picture must be provided, including work permits, guardian release forms, parental consent and inducement agreements, production permits and trust account documents. Acting agreements for all minors must be confirmed by a California court, as well as by a court in the jurisdiction of principal photography. In the event that court confirmation is not available in the jurisdiction in which principal photography took place, a letter from an attorney in the jurisdiction in which principal photography took place stating that the agreements are valid, binding and enforceable under the laws of such jurisdiction must be provided. Employment of a minor must adhere to all applicable state, local, and federal guidelines.

4.33 **Adam Walsh Compliance:** Grantor shall deliver documentary evidence of compliance with the Adam Walsh Act in one of the following forms: (a) a signed certification (according to Distributor's form) that the Picture does not contain content subject to the act; (b) a signed copy of the certification timely filed with the Attorney General of the United States evidencing that Grantor is permitted to avail itself of the exemption set forth at 28 C.F.R. § 75.9; or (c) copies of all records, reports and labels required to be kept thereunder, including a list of all names ever used by each performer, a list of each performer's address, and a legible copy of each performer's government issued identification card containing a date of birth and a recent, recognizable photograph of the performer.

4.34 **American Humane Association Disclaimer:** If the Picture contains the AHA disclaimer that "no animals were harmed in the making of this film" or any similar language, a copy of the disclaimer approval letter issued by the AHA must be provided.

4.35 ***Laboratory Access Letter:** A fully executed letter (according to Distributor's standard form) granting Distributor irrevocable laboratory access during the Term to all applicable Delivery Materials. The laboratory access letter(s) must be signed by Grantor and the applicable lab(s).

4.36 ***Music Cue Sheet:** A copy of the music cue sheet for the Picture, including a time code entry for the "in" and "out" of each cue, the title of each composition (inclusive of any "samples"), the composers, publishers, performers, arrangers, copyright owners, form of usage (e.g., background, instrumental, etc.), performing rights society (e.g., BMI, ASCAP, etc.), as well as film footage and running time.

4.37 ***Music Licenses:** Copies of fully executed music licenses (synchronization, master and mechanical) for all music (inclusive of "samples") used in the Picture and proof of payment of the licensing fees. All licenses shall provide for all media (on a full buy-out basis) necessary to effect the terms of the Agreement (including, but not limited to, Internet [without limitation] and future media as devised throughout the Term) throughout the Territory during the Term without any future payment obligations (e.g., "step" payments, video bonuses, box office bonuses, mechanical royalties, etc.). All licenses and agreements (and, to the extent applicable, Confirmation Letters) must include language that prevents injunctive relief and shall preclude the licensor from terminating the license. For purposes of clarification, all music as embodied in the Picture shall be cleared for "in context" use for all purposes and uses under the Distribution Agreement, including, without limitation, marketing, advertising and promotional purposes.

4.38 ***Composer Agreement:** A copy of the fully executed Composer Agreement (including of a Certificate of Authorship) and all other agreements for all other music personnel (including, without limitation, the

music supervisor, any and all releases for vocalists, musicians, etc., and any co-publishing or administration agreements, and to the extent applicable, any soundtrack album agreement). The agreements shall be on a full buyout basis and shall include language that prevents injunctive relief and, to the extent applicable, work-for-hire language in accordance with U.S. copyright law. For the purposes of clarification, the agreements shall include language that no additional payment, royalty, and/or fee shall become due in connection with the exploitation of the Picture and any advertising thereof, including, without limitation, mechanical reproduction fees. All music as embodied in the Picture shall be cleared for "in-context" use and "out-of-context" use for all purposes and uses, including, without limitation, DVD menus, marketing, advertising and promotional purposes.

4.39   **Out of Context Music Memo:** A list of all licensed and/or score compositions and/or master recordings used in the Picture that are cleared for use "out of context" in connection with advertising, promotion and publicity for the Picture.

4.40   ***Stock Footage / Clips / Releases / Clearances:** If the Picture contains any stock footage, film clips, TV clips, news clips, media clips, radio clips, print media, paintings, posters, logos, artwork, copyrighted and/or trademarked materials, any materials which include a trademark (whether common law, registered or pending), photographs, portraits, books, publications, any third party likeness, etc., copies of all licenses (and proof of payment of the licensing fee) shall be provided. In the event that the Picture contains any stock footage, a stock footage cue sheet must be provided. All licenses and releases must include language that prevents injunctive relief and precludes the licensor from terminating the license.

4.41   **Certificate of Origin:** An original, notarized certificate of origin issued from an authorized agent in the country of origin (or Certificates of Nationality certified by the official applicable government agency) and, if applicable, the Canadian Content Certificate.

4.42   ***List of Distributors:** A list (which shall be updated regularly) of all distributors outside the Territory (including their respective addresses, email addresses, phone numbers, fax numbers and known or tentative release dates for the Picture).

4.43   ***Shooting Script:** A copy of the final shooting script for the Picture.

4.44   **Fact Sheet:** A completed fact sheet (according to Distributor's form).

4.45   ***MPA Rating Certificate:** A copy of the MPA certificate of approval and rating.

4.46   **Residual Worksheet:** Regardless of whether Distributor is assuming residuals on the Picture, a completed residual worksheet (according to Distributor's form), along with the production payroll records showing the respective social security numbers, addresses, compensation and evidence of payment in full, the number of days worked, the loan-out information where appropriate, all talent and crew agreements for those cast and crew members who are entitled to payment of residuals, the SAG-AFTRA final cast report (if applicable), all contracts for all AF of M members (if applicable), a non-union final cast report (if applicable) and all other information and documentation required under the residual worksheet.

{BAI-684303-2}