**EXHIBIT C**



Reed Smith LLP
599 Lexington Avenue
New York, NY 10022-7650
+1 212 521 5400
Fax +1 212 521 5450
reedsmith.com

**Jordan W. Siev**
Direct Phone:  +1 212 205 6085
Email:  jsiev@reedsmith.com

November 8, 2023

**Via Electronic Mail (apisa@milbank.com; cdomadia@milbank.com; jbritton@milbank.com) and Federal Express**

Al Pisa, Esq.
Chirag Domadia, Esq.
John Britton, Esq.
Milbank LLP
55 Hudson Yards
New York, NY 10001

Re:     **CSSE Credit Agreement**

Dear Messrs. Pisa, Domadia, and Britton:

We have been engaged to represent Chicken Soup for the Soul Entertainment, Inc. ("CSSE").  We write to you in connection with that certain Amended and Restated Credit Agreement dated August 11, 2022 among (i) CSSE as Primary Borrower, (ii) Redbox Automated Retail, LLC ("Redbox") as Original Borrower, (iii) the Lenders party thereto, and (iv) HPS Investment Partners, LLC ("HPS") as Administrative Agent and Collateral Agent (the "Credit Agreement").

As you know, CSSE and HPS executed the Credit Agreement in the context of CSSE's acquisition of Redbox – a transaction which involved CSSE assuming significant debt owed by Redbox under a pre-existing loan facility, with HPS as lead lender, and with specific, contractually mandated and verbally assured obligations by HPS to approve a new ABL facility of up to $40,000,000 so long as such facility bears reasonable and customary terms.  Unfortunately, HPS's bad faith administration of the Credit Agreement, combined with its persistent and malignant refusal to consider in good faith an ABL facility (in direct contravention of HPS's obligations pursuant to Section 6.01(j) of the Credit Agreement) – whether provided by HPS or by a third party – have proven onerous to the point of abuse, presently pushing CSSE to the verge of a Chapter 11 bankruptcy filing.  Emblematic of HPS's bad faith misconduct in these regards, in April 2023 the Company provided HPS with an ABL credit agreement, fully agreed upon by the Company and an ABL provider, along with an accounts receivable collateral due diligence report from a leading market provider, and followed shortly by a draft intercreditor agreement based on an intercreditor term sheet provided by HPS.  None of these was timely nor remotely adequately responded to by HPS.

HPS first enticed CSSE to contribute its assets, in a combination with the assets of Redbox, by providing "better than market" credit facility terms, in the form of a PIK interest component for 18 months and an absence of financial covenants for over two years.  HPS then exploited the leverage afforded to it by its position as lead lender under the Credit Agreement by refusing to approve an ABL and enforcing the terms of the Credit Agreement as strictly as possible.  HPS did all this in a transparent effort to (i) create



conditions wherein HPS could manufacture petty defaults under the Credit Agreement (as it has); (ii) strain the company's liquidity to the point where the Company would be forced to request additional capital from HPS, affording HPS the opportunity to insert new controls and force even further defaults; and (iii) ultimately to gain control and ownership of CSSE's assets.

CSSE entered the Credit Agreement in good faith. But HPS's refusal to reasonably approve (or even respond regarding) the terms of a new ABL facility have stifled CSSE's ability to conduct its business and meet obligations in the ordinary course. HPS has compounded the problem with a persistent pattern of sharp dealing at CSSE's expense. HPS has persistently and malignantly refused to consider in good faith additional financing that was clearly anticipated in the Credit Agreement, or modification of the Credit Agreement's terms in order to ameliorate the clearly intractable burden on CSSE. Dan Wallit told Bill Rouhana that HPS "would never approve an ABL" in their very first Zoom meeting on February 18, 2023. Then on a call on February 22, 2023, Alexey Pazukha said that HPS would not agree to the much needed liquidity provided by the proposed ABL "as Dan had previously communicated to Bill." And in a letter sent by HPS's counsel to CSSE's counsel, dated March 30, 2023, HPS categorically rejected **any** deal that would have extended CSSE any further liquidity, stating that "further leveraging the Company . . . is not in the interest of the Company nor its stakeholders."

Still more remarkably, in a clear breach of its confidentiality obligations and behavior amounting to (or at minimum fast approaching) tortious interference with business relations and commercial slander, a senior representative of HPS has told third party participants in the media financing industry that HPS was not going to allow any ABL for CSSE to close, which resulted in damaging market rumors regarding CSSE's liquidity prospects. This has directly and demonstrably caused financing parties to no longer be willing to provide credit to CSSE, and has created material downward pressure on CSSE's common and preferred stock price.

Currently, although the parties are engaged in negotiating a term sheet contemplating additional financing (the "Term Sheet"), HPS has emphasized its reluctance to commit to any such deal, and has made clear that it will only consummate a final agreement if CSSE agrees to even more onerous terms than already exist in the Credit Agreement – terms transparently and expressly designed to ensure that CSSE lands in a freefall, liquidating bankruptcy proceeding, with HPS taking ownership of all of CSSE's highly valuable assets. As more fully elucidated below, this malevolent strategy is purpose built to allow HPS to acquire all or substantially all of CSSE's more than $1 billion of value in exchange for HPS's approximately $405 million of presently outstanding principal.

HPS's inflexible, penurious approach is counterproductive, and will doom its lending position. A Chapter 11 filing by CSSE – which will be demonstrably, proximately caused by HPS – is not desirable for anyone involved and poses numerous material risks to HPS. These include, among others, equitable recharacterization of HPS's debt as equity; equitable subordination of HPS's debt under 11 U.S.C. § 510(c); loss of priority; and potential claims for voidable transfers under 11 U.S.C. §§ 548(b) & 550, as well as applicable New York State Law analogues. These inevitabilities in a Chapter 11 bankruptcy case will result as night follows day if HPS continues its current policy of emphasizing short-term leverage over long-term mutual benefit.

Al Pisa, Esq.
November 8, 2023
Page 3



Prudence dictates that HPS reassess its current position, and approach its relationship with CSSE with greater consideration for the mutual benefits – and mutual upside – that may be realized if HPS recognizes the realities of the true relationship between the parties (historic, current and forward-looking), and furthermore in the immediate-term consents to CSSE having access to additional cash liquidity.

CSSE has received, and is in the process of negotiating, a proposed term sheet with an ABL lender, containing a proposal for an additional credit facility affording up to $50 million.  CSSE has also negotiated the terms of a sale/leaseback arrangement in respect of Redbox kiosks, under a Master Lease Line of Credit of up to $145 million.  The proposed terms of these transactions are commercially reasonable, and these facilities, or other similar-sized facilities, would represent a lifeline for CSSE's business.

Without the clear authority to proceed toward closure of these facilities in the immediate-term, CSSE will most likely be compelled to file its 10Q on November 14 (or at latest on November 20 if utilizing a permitted 5-day extension), with an opinion of substantial doubt as to its ability to continue operations as a going concern, with the likely immediately following result of a bankruptcy filing, and all the consequences outlined above.

Accordingly, CSSE demands that HPS immediately provide written confirmation of its waiver of the $40,000,000 limitation on ABL debt in Section 6.01(j) of the Credit Agreement, and commit to consider and approve any reasonable intercreditor agreement that may be proffered to in connection with any ABL term sheet.  Similarly, CSSE demands that HPS waive the restrictions of Section 6.03 to permit the proposed Sale/Leaseback transaction for Redbox.  Failure to immediately confirm each of the foregoing, and to abide its commitment to negotiate in good faith for an intercreditor agreement, will most likely cause CSSE's Chapter 11 bankruptcy filing in the immediate-term.

We further demand that HPS agree to write off all PIK interest accrued since the closing of the Redbox acquisition, and convert its remaining debt balance under the Credit Agreement to common equity of CSSE, comprising approximately 41% of the total common equity.  This conversion percentage is supported by a current enterprise valuation, from one of the leading authorities on valuations in our industry, estimating CSSE's enterprise value at approximately $850 million per the valuation expert's conservative analysis, and at approximately $1.1 billion based upon CSSE's management analysis – resulting in a midpoint valuation of approximately $975 million.  These valuations are built in material part on the assumption that CSSE continues as a going concern, with the covenant relief concerning an ABL and the proposed sale/leaseback demanded herein having been granted by HPS.  This balance sheet restructuring will result in HPS affirming what already is transparent reality – that HPS's true place in CSSE's capital structure is as a substantial minority partner, enjoying the full exposure to equity upside that is afforded a 41% owner.

Al Pisa, Esq.
November 8, 2023
Page 4

ReedSmith

This letter is written without prejudice to our client's rights, remedies, and arguments, all of which remain expressly reserved.

Very truly yours,

/s/

Jordan W. Siev

Cc:  William Rouhana, Chairman & CEO, CSSE

James Lawlor, Esq.

Kurt Gwynne, Esq.

James C. McCarroll, Esq.