**EXHIBIT 3**

**EXECUTION VERSION**

## FORBEARANCE AGREEMENT

This FORBEARANCE AGREEMENT (this "**Agreement**") dated as of April 29, 2024, by and among Chicken Soup for the Soul Entertainment Inc., a Delaware corporation ("**CSSE Borrower**"), Redbox Automated Retail, LLC, a Connecticut limited liability company ("**Redbox Borrower**", and together with the CSSE Borrower, the "**Borrowers**"), the other Guarantors listed on the signature pages hereto (the "**Guarantors**", and together with the Borrowers, the "**Credit Parties**"), the Lenders party to the Credit Agreement (as defined below) listed on the signature pages hereto and HPS Investment Partners, LLC, in its capacity as Administrative Agent and Collateral Agent (in such capacities, the "**Agent**") under the Credit Agreement.

Reference is made to that certain Amended and Restated Credit Agreement, dated as of August 11, 2022, among the Borrowers, the Lenders party thereto and the Agent, as amended, restated, supplemented or otherwise modified by that certain First Amendment, dated as of the date hereof (the "**Amendment**", and as the same may be further amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**").

The Credit Parties have requested that the Lenders and the Agent forbear from exercising certain rights, remedies, powers, privileges and defenses under the Credit Agreement and the other Loan Documents, for the period of time set forth herein and subject to the terms and conditions hereof, solely with respect to the following Events of Default and expected Events of Default (collectively, the "**Specified Defaults**"):

(a)     the Event of Default arising under Section 7.01(c) of the Credit Agreement for the failure of the Borrowers to pay the interest payments due under the Credit Agreement on February 15, 2024 and March 20, 2024, which failure has continued beyond the applicable three Business Day grace periods;

(b)     the Event of Default arising under Section 7.01(d)(ii) of the Credit Agreement for the failure of the Borrowers to deliver quarterly financial statements for the fourth fiscal quarter ending December 31, 2023 required under Section 5.04(b)(ii) of the Credit Agreement;

(c)     the Event of Default arising under Section 7.01(d)(ii) of the Credit Agreement for the inclusion of a going concern qualification in the audited financial statements for the fiscal year ended December 31, 2023 under Section 5.04(a) of the Credit Agreement;

(d)     the Event of Default arising under Section 7.01(e) of the Credit Agreement for the failure to cause the following Subsidiaries of the CSSE Borrower to become Subsidiary Loan Parties within the time periods required under the Credit Agreement: At Home With, LLC; Dirty Pool, LLC; Mutual Aid, LLC; and SMV Content, LLC required under Section 5.10 of the Credit Agreement;

(e)     the Event of Default arising under Section 7.01(d)(i) of the Credit Agreement for the making of distributions prior to the date hereof on the CSSE Borrower's Series A preferred stock in violation of Section 6.06(k) of the Credit Agreement at a time when Events of Default were continuing;

(f)     the Event of Default arising under Section 7.01(e) of the Credit Agreement for the entering into agreements prior to the date hereof for the factoring of receivables with non-commercial banks in violation of the definition of "Permitted Non-Recourse Factoring Transactions"

(g)      the expected Events of Default arising under <u>Section 7.01(c)</u> of the Credit Agreement for the expected failure of the Borrowers to pay the interest payments due under the Credit Agreement during the Forbearance Period (the "**Expected Interest Defaults**"); and

(h)      the expected Events of Default arising under <u>Section 7.01(d)(ii)</u> of the Credit Agreement for the failure of the Borrowers to deliver quarterly financial statements during the Forbearance Period required under <u>Section 5.04(b)(ii)</u> of the Credit Agreement (the "**Expected Reporting Defaults**") and

(i)      expected Events of Default arising under <u>Section 7.01(f)</u> of the Credit Agreement or <u>Section 7.01(j)</u> of the Credit Agreement after the date of this Agreement and so long as the holder(s) of the applicable Indebtedness or judgment have not exercised rights or remedies thereunder with respect to collateral or judgment liens or received any payment or other consideration to waive the underlying default(s) (the "**Potential Cross Defaults**").

The Agent and the Lenders party hereto (collectively, the "**Lender Group**") are willing to, for the period of time set forth herein and subject to the terms and conditions hereof, forbear from exercising certain rights, remedies, powers, privileges and defenses under the Credit Agreement and the other Loan Documents solely with respect to the Specified Defaults.

In consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Credit Parties, the Agent and the Lender Group hereby agree as follows:

Section 1.   <u>Definitions and Rules of Interpretation</u>.   Except as otherwise defined in this Agreement, terms defined in the Credit Agreement are used herein as defined therein.   For purposes of this Agreement, the following terms shall have the following meanings:

1.01.   <u>Defined Terms</u>.

"**Bankruptcy Code**" means the United States Bankruptcy Code (11 U.S.C. § 101, et seq.), as amended, and any successor statute.

"**Claim**" has the meaning specified in <u>Section 8</u> of this Agreement.

"**Effective Date**" means the date on which the conditions specified in <u>Section 5</u> are satisfied (or waived by the Lender Group).

"**Forbearance Period**" has the meaning specified in <u>Section 2.02</u> of this Agreement.

"**Forbearance Termination Date**" means the earliest to occur of (i) 11:59 p.m. (New York time) on June 6, 2024 if each of the Proposed Financings (as defined in the Amendment) are not consummated on or prior to such date or the Initial Prepayment (as defined in the Amendment) has not been made on or prior to such date; <u>provided</u> that in the event the Proposed Financings are consummated and the Initial Prepayment, together with interest thereon, plus the payment of legal fees set forth in <u>Section 3.02(d)</u> are paid prior to the expiration of the Forbearance Period, the date in this clause (i) shall be extended to September 30, 2024 (the "**Extended Forbearance Date**"); (ii) at the election of the Lender Group upon a breach or default by any Credit Party in the performance of its obligations under the Forbearance Agreement that remains uncured for five (5) Business Days after any Credit Party has obtained knowledge thereof; (iii) if any proposed provider

of a Proposed Financing indicates in writing that it shall cease to pursue the consummation of such Proposed Financing or otherwise ceases pursuing such Proposed Financing, on the third Business Day after receipt of such writing or such provider ceasing to pursue such Proposed Financing; or (iv) the occurrence of any Event of Default under the Credit Agreement (including, without limitation, the commencement of any proceeding or the filing of any petition seeking relief under the Bankruptcy Code, or any other federal, state or foreign bankruptcy, insolvency, receivership or similar law) or any other Loan Document, in each case, other than the Specified Defaults.

"**Lender Group**" has the meaning specified in the fourth recital of this Agreement.

"**Lender Parties**" has the meaning specified in Section 8 of this Agreement.

"**Releasing Party**" has the meaning specified in Section 8 of this Agreement.

"**Specified Defaults**" has the meaning specified in the third recital of this Agreement.

1.02.  Rules of Interpretation. Unless otherwise expressly indicated, a reference to any document or agreement shall include such document or agreement as amended, modified, restated or supplemented from time to time in accordance with its terms and the terms of this Agreement. Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.  References herein to any Section or Exhibit shall be to a Section or an Exhibit, as the case may be, hereof unless otherwise specifically provided.  The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.

Section 2.  Acknowledgments and Agreements; Limited Forbearance in Respect of Specified Defaults.

2.01. Acknowledgement of Credit Parties.  To induce the Agent and the Lenders to execute this Agreement, each Credit Party hereby acknowledges, stipulates, represents, warrants and agrees as follows:

(a)  Each Specified Default constitutes an Event of Default that (i) other than the Expected Interest Defaults, the Expected Reporting Defaults and the Potential Cross Defaults, has occurred, remains uncured, has not been waived and is continuing as of the date of this Agreement and cannot be cured or (ii) in the case of the Expected Interest Defaults, the Expected Reporting Defaults and the Potential Cross Defaults, is expected to occur.  Except for the Specified Defaults, no other Defaults or Events of Default have occurred and are continuing as of the date hereof, or to the best of its knowledge are expected to occur.  Except as expressly set forth in this Agreement, the agreements of the Agent and the Lender Group hereunder to forbear in the exercise of their respective rights, remedies, powers, privileges and defenses under the Loan Documents in respect of the Specified Defaults during the Forbearance Period do not in any manner whatsoever limit any right of any of the Agent and the Lenders to insist upon strict compliance with this Agreement or any Loan Document during the Forbearance Period.

**FORBEARANCE AGREEMENT**

(b)     Nothing has occurred that constitutes or otherwise can be construed or interpreted as a waiver of, or otherwise to limit in any respect, any rights, remedies, powers, privileges and defenses any of the Lenders or the Agent have or may have arising as the result of any Event of Default (including any Specified Default) that has occurred or that may occur under the Credit Agreement, the other Loan Documents or applicable law.  Each member of the Lender Group has acted reasonably, in good faith, and in compliance with applicable law in connection with the negotiation and enforcement of the Credit Agreement, the other Loan Documents, and this Agreement.  The Agent's and the Lender Group's actions in entering into this Agreement are without prejudice to the rights of any of the Agent and the Lenders to pursue any and all remedies under the Loan Documents pursuant to applicable law or in equity available to it in its sole discretion upon the termination (whether upon expiration thereof, upon acceleration or otherwise) of the Forbearance Period.

(c)     The aggregate outstanding principal amount of the Loans as of April 24, 2024 was equal to $500,876,623.42.  The foregoing amount does not include fees, expenses, interest (including default interest) and other amounts that are chargeable or otherwise reimbursable under the Loan Documents.

(d)     All of the assets pledged, assigned, conveyed, mortgaged, hypothecated or transferred (or purported to be pledged, assigned, conveyed, mortgaged, hypothecated or transferred) to the Agent pursuant to the Security Documents are (and shall continue to be) subject to valid and enforceable liens and security interests of the Agent, as collateral security for all of the Obligations, subject to no Liens other than Liens permitted by Section 6.02 of the Credit Agreement.  Each Credit Party hereby reaffirms and ratifies its prior conveyance to the Agent of a continuing security interest in and lien on the Collateral, except to the extent of security interests and liens released solely to the extent provided by, and in accordance with, the Amendment.

(e)     The obligations of the Credit Parties under this Agreement of any nature whatsoever, whether now existing or hereafter arising, are hereby deemed to be "Obligations" for all purposes of the Loan Documents and the term "Obligations" when used in any Loan Document shall include all such obligations hereunder.

(f)     Default interest is due and owing on the Obligations and the Obligations shall continue to accrue interest at the Default Rate provided in Section 2.13(c) of the Credit Agreement.

(g)     As of the date hereof, the Lenders shall not have any obligation to make any further Loans under the Credit Agreement.

(h)     There are no claims, demands, offsets or defenses at law or in equity that would defeat or diminish the Obligations under the Credit Agreement nor the Agent's or any Lender's present and unconditional right to collect the indebtedness evidenced by the Loan Documents, and to proceed to enforce the rights and remedies available to the Agent and Lenders as provided in the Loan Documents as of the date hereof.

2.02.  Limited Forbearance.  Subject (i) to the satisfaction of the conditions precedent set forth in Section 5 below and (ii) to the continuing effectiveness and enforceability of the Loan Documents in accordance with their terms, the Agent and the Lender Group agree to forbear in the exercise of their respective rights, remedies, powers, privileges and defenses under the Loan

Documents solely in respect of the Specified Defaults for the period (the "**Forbearance Period**") commencing on the Effective Date and ending automatically and without further action or notice on the Forbearance Termination Date (including, if applicable, the Extended Forbearance Date); <u>provided</u> that (i) each Credit Party shall comply with all limitations, restrictions, covenants and prohibitions that would otherwise be effective or applicable under the Loan Documents and this Agreement, and (ii) nothing herein shall be construed as a waiver by the Agent or any Lender of any Specified Default.

2.03.   <u>Termination of Forbearance Period</u>.   Upon the occurrence of the Forbearance Termination Date (including, if applicable, the Extended Forbearance Date), the agreement of the Agent and the Lender Group to comply with any of their obligations hereunder, including the agreement to forbear, shall automatically and without any further action or notice terminate and be of no force and effect; it being expressly agreed that the effect of the termination of the Forbearance Period will be to permit the Agent and the Lenders to exercise, or cause the exercise of, any rights, remedies, powers, privileges and defenses available to any of them under the Credit Agreement, the other Loan Documents or applicable law, immediately, without any further notice, demand, passage of time, presentment, protest or forbearance of any kind (all of which each Credit Party hereby waives).

2.04.   <u>Limitation of Forbearance</u>. The Credit Parties understand and accept the temporary nature of the forbearance provided hereby and that the Agent and the Lender Group have given no assurances that they will extend such forbearance beyond the Forbearance Period (except as provided in the proviso to clause (i) of the definition of "Forbearance Termination Date") or provide waivers under or amendments to the Credit Agreement or any other Loan Document except as expressly provided in the Amendment. Nothing in this Agreement constitutes a legal obligation on the Agent and the Lender Group to participate in any restructuring or full settlement of the Credit Agreement or to execute any related documents and no such legal obligation shall arise except pursuant to mutually agreed executed definitive documentation, including without limitation the Amendment.

Section 3.  <u>Covenants</u>.

3.01.   <u>Information Rights</u>.   At all times and as reasonably requested by the Agent, the Credit Parties and their financial advisors shall provide the Agent and the Lenders with all information related to the business (including the assets, claims, liabilities and Proposed Financings) of the Credit Parties as Agent may request, including, without limitation, weekly calls with and access to the Restructuring Advisor (as defined in the Amendment) and the Financial Advisor (as defined in the Amendment) (beginning with the first Monday after the Effective Date and on each Monday of each calendar week thereafter, a report from the Financial Advisor on the sale process of the Credit Parties for the immediately preceding calendar week and a report from the Restructuring Advisor regarding the liquidity and liabilities of the Credit Parties and status of the Proposed Financings (including following consummation thereof, the use of proceeds thereof), reasonable access to data rooms organized by such advisors and deliverables produced by such advisors.  The provisions of this <u>Section 3.01</u> shall be in addition to any other information sharing requirements the Borrowers may have under the Loan Documents and this Agreement.

3.02.   <u>Specific Deliverables</u>.

(a)   (x) Not later than May 3, 2024:

(1)   the Borrowers (i) shall have retained, and continued to have retained, the

**FORBEARANCE AGREEMENT**

Financial Advisor and (ii) shall have retained, and continued to have retained, the Restructuring Advisor, in each case, to include within their respective scopes (A) working with the Strategic Review Committee to evaluate strategic alternatives for the Borrowers and their Subsidiaries with respect to asset sales and (B) reporting to the Strategic Review Committee and the Lenders;

(2)    the Agent shall have received duly executed voting proxies by the owners of the majority equity voting interests in the CSSE Borrower in favor of the Restructuring Transactions, in form and substance satisfactory to the Agent.  As used herein, "Restructuring Transactions" shall mean both (i) the sale transactions occurring on and after the Forbearance Termination Date (including, without limitation, the Disposition of non-core assets and/or one or more Company Sale Transactions, each as defined in the Amendment) and (ii) if approved by the Strategic Review Committee (in consultation with the Lenders), a Chapter 11 pre-arranged restructuring of the Credit Parties on terms consistent with the restructuring term sheet attached hereto as Exhibit A; and

(3)    the Strategic Review Committee (as defined in the Amendment) shall be formed with respect to each Credit Party in accordance with and as required by the Amendment; and

(y)    Not later than May 10, 2024, the Chief Restructuring Officer (as defined in the Amendment) shall be retained by each Credit Party in accordance with and as required by the Amendment (it being understood that the effectiveness of the employment of the Chief Restructuring Officer shall occur automatically upon the occurrence of the Forbearance Termination Date, but not earlier than such date).

(b)    Not later than May 31, 2024, the Agent shall have received an updated Perfection Certificate duly executed and delivered on behalf of each of the Credit Parties by a responsible officer thereof, in form and substance reasonably satisfactory to the Agent.

(c)    Not later than 60 days after the Effective Date, the Agent shall have received a working capital aging report for the immediately preceding fiscal month in form reasonably satisfactory to the Agent.

(d)    Concurrent with the execution and delivery of the definitive documentation for the Proposed Financings (and in no event later than June 6, 2024), the Agent shall have received payment, in cash, of up to 1.00% of the aggregate proceeds of the Proposed Financings (being $1,750,000) which shall be used to pay outstanding costs and expenses of the Agent and the Lender Group, including fees, disbursements and expenses of Milbank LLP and Quinn Emanuel Urquhart & Sullivan, LLP, each, in its capacity as counsel to the Agent.  For the avoidance of doubt, any remaining unpaid fees expenses of such counsel after application of the foregoing shall remain outstanding and payable by the Credit Parties.

Section 4.  Representations and Warranties.  Each of the Credit Parties represents and warrants to the Agent and the Lenders that the representations and warranties set forth in Article III of the Credit Agreement, and in each of the other Loan Documents, are true and complete on the Effective Date as if made on and as of the Effective Date (or, if any such representation or warranty is expressly stated to have been made as of a specific date, such representation or warranty shall be true and correct as of such specific date) and as if each reference to Article III of the Credit Agreement to "this Agreement" included reference to this Agreement.

Section 5.  <u>Conditions Precedent</u>.  The effectiveness of this Agreement and the obligations of the Lender Group hereunder is subject to the satisfaction, or waiver by the Lender Group, of the following conditions:

5.01.  <u>Counterparts</u>.  Receipt by Agent of counterparts of this Agreement executed by the Borrowers, each Guarantor, each other party hereto and Lenders constituting the "Required Lenders" under the Credit Agreement.

5.02.  <u>Security Documents</u>.  The Agent and its counsel shall be satisfied that all Control Agreements and other Security Documents required under the Loan Documents have been delivered and are in full force and effect, and all required perfection and priority steps with respect thereto shall have been taken.

5.03.  <u>No Default</u>.  No Default or Event of Default other than the Specified Defaults shall have occurred and be continuing.

5.04.  <u>Representations and Warranties</u>.  As of the Effective Date, the representations and warranties contained in this Agreement, the Credit Agreement and in each other Loan Documents shall be true and correct in all material respects on and as of the Effective Date as if made on and as of the Effective Date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date.

5.05.  <u>Executed Term Sheets</u>.  Each of the term sheets for the Proposed Financings shall be executed by the parties thereto.

5.06.  <u>Other</u>.  All documents, certificates and instruments relating to this Agreement shall be in form and substance acceptable to the Agent, as conclusively evidenced by Agent's delivery of its executed counterparty of this Agreement.

Section 6.  <u>[Reserved]</u>.

Section 7.  <u>No Waiver; Reservation of Rights</u>.  The Agent and each of the Lenders has not waived, and is not waiving, by the execution of this Agreement or the acceptance of any payments hereunder or under the Credit Agreement any Default or Event of Default (including any Specified Default) whether now existing or hereafter arising under the Credit Agreement or any of the other Loan Documents, or its respective rights, remedies, powers, privileges and defenses arising as a result thereof or otherwise, and no failure on the part of the Agent or the Lenders to exercise and no delay in exercising, including without limitation the right to take any enforcement actions, and no course of dealing with respect to, any right, remedy, power, privilege or defense hereunder, under the Credit Agreement or any other Loan Document, at law or in equity or otherwise, arising as the result of any Default or Event of Default (including any Specified Default) whether now existing or hereafter arising under the Credit Agreement or any of the other Loan Documents or the occurrence thereof or any other action by Credit Parties and no acceptance of partial performance or partial payment by the Agent or the Lenders, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power, privilege or defense hereunder, under the Credit Agreement or under any other Loan Document, at law, in equity or otherwise, preclude any other or further exercise thereof or the exercise of any other right, remedy, power, privilege or defense nor shall any failure to specify any Default or Event of Default in this Agreement constitute any waiver of such Default or Event of Default. The rights, remedies, powers, privileges and defenses provided for herein, in the Credit Agreement and the other Loan Documents are cumulative and, except as expressly provided hereunder, may be exercised separately, successively or concurrently at the sole discretion of the Agent and

the Lenders, and are not exclusive of any rights, remedies, powers, privileges and defenses provided at law, in equity or otherwise, all of which are hereby expressly reserved. Notwithstanding the existence or content of any communication by or between the Credit Parties and the Agent or any Lender, or any of their representatives, including, but not limited to, any Agent, regarding any Default or Event of Default, no waiver, forbearance, or other similar action by the Agent or any Lender with regard to such Default or Event of Default, whether now existing or hereafter arising under the Credit Agreement or any of the other Loan Documents, shall be effective unless the same has been reduced to writing and executed by an authorized representatives of the percentage of Lenders required under the applicable provisions of the Credit Agreement, the applicable Credit Parties and every other entity deemed necessary or desirable by the percentage of Lenders required under the applicable provisions of the Credit Agreement.

Section 8. Release. (a) Each Credit Party, on behalf of itself, its Subsidiaries and Affiliates (including, without limitation, William J. Rouhana, Jr. and his affiliated entities), and each of their successors, representatives, assignees and, whether or not claimed by right of, through or under any Credit Party, past, present and future employees, agents, representatives, officers, directors, members, managers, principals, affiliates, shareholders, trustees, consultants, experts, advisors, attorneys and other professionals (each, a "**Releasing Party**" and collectively, the "**Releasing Parties**"), does hereby fully, finally, and forever remise, release and discharge, and shall be deemed to have forever remised, released and discharged, the Agent and the Lenders, and the Agent's and each Lender's respective successors, representatives, assignees and past, present and future employees, agents, representatives, officers, directors, members, managers, principals, affiliates, shareholders, trustees, consultants, experts, advisors, attorneys and other professionals and all other persons and entities to whom any of the foregoing would be liable if such persons or entities were found to be liable to any Releasing Party, or any of them (collectively hereinafter the "**Lender Parties**"), from any and all manner of action and actions, cause and causes of action, claims, defenses, rights of setoff, charges, demands, counterclaims, suits, debts, obligations, liabilities, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, damages, judgments, expenses, executions, liens, claims of liens, claims of costs, penalties, attorneys' fees, or any other compensation, recovery or relief on account of any liability, obligation, demand or cause of action of whatever nature, whether in law, equity or otherwise (including, without limitation, any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, actual or constructive fraudulent transfer or fraudulent conveyance or voidable transaction law or similar claim, violation of local, state, or federal or non-U.S. law or breach of any duty imposed by law or in equity, including securities laws, negligence, and gross negligence, any "lender liability" or equitable subordination or recharacterization claims or defenses, including all those arising under the Bankruptcy Code or otherwise and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, joint and/or several, secured or unsecured, due or not due, primary or secondary, liquidated or unliquidated, contractual or tortious, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Lender Parties, whether held in a personal or representative capacity, and which are based on any act, circumstance, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with, in respect of or relating to the Credit Agreement or any other Loan Document and the transactions contemplated thereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing (each, a "**Claim**" and collectively, the "**Claims**").

Notwithstanding the foregoing, in the event that (i) the Lenders terminate the Forbearance Period solely pursuant to clause (iv) of the definition of Forbearance Termination Date (other than as a result of any Event of Default arising from a breach of a Subject Provision or any Event of Default under Section 7.01(h) or (i) of the Credit Agreement) and (ii) such termination by the Lenders is determined by a final, non-appealable

judgment of a court of competent jurisdiction to have resulted from bad faith of the Lenders, then solely in such circumstances the foregoing release shall be null and void. For purposes of the foregoing sentence, the term "**Subject Provision**" shall mean each of Section 5.16, Section 5.17, Section 5.18, Section 5.19, Section 5.20, Section 5.21(a), the final sentence of Section 6.06, Section 6.12 and Section 6.13 of the Credit Agreement as amended on the date hereof.

(b) Each of the Releasing Parties understands, acknowledges and agrees that such Releasing Party is familiar with Section 1542 of the Civil Code of the State of California, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Each of the Releasing Parties expressly waives and relinquishes any rights and benefits that such Releasing Party may have under Section 1542 or any other statute (whether in California, Delaware or elsewhere) or common law principle of any jurisdiction with a similar effect to the full extent that it may lawfully waive all such rights and benefits pertaining to the subject matter hereof. In connection with such waiver and relinquishment, each Releasing Party hereby acknowledges that such Releasing Party may hereafter discover facts in addition to, or different from, those that such Releasing Party now knows or believes to exist with respect to the subject matter of this release, but it is such Releasing Party's intention to fully, finally and forever settle and release any and all Claims and causes of action as set forth in this <u>Section 8</u>, known or unknown, suspected or unsuspected, which do now exist, may exist or heretofore have existed with respect to the subject matter of this release. In furtherance of this intention, the releases herein given shall be and remain in effect as full and complete releases notwithstanding the discovery or existence of any such additional or different claim of fact.

(c) Each of the Releasing Party understands, acknowledges and agrees that the release set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.

(d) Each Releasing Party agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final, absolute and unconditional nature of the release set forth above.

(e) Each Releasing Party hereby absolutely, unconditionally and irrevocably, covenants and agrees with and in favor of each Lender Party that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Lender Party on the basis of any Claim released, remised and discharged by such Releasing Party pursuant to this <u>Section 8</u>.

Section 9. <u>Confirmation of Guaranty and Security Documents</u>. Each of the Credit Parties hereby confirms and ratifies all of its obligations under the Loan Documents to which it is a party, and each of the Guarantors hereby confirms its obligations under <u>Section 2</u> of the Subsidiary Guarantee Agreement. By its execution on the respective signature lines provided below, each of the Credit Parties hereby confirms and ratifies all of its obligations and the Liens granted by it under the Security Documents to which it is a party and confirms that all references in such Security Documents to the "Credit Agreement" (or words of similar import) refer to the Credit Agreement without impairing any such obligations or Liens in any respect.

Forbearance Agreement

Section 10.    <u>Amendments</u>.  No amendment, modification, termination or waiver of any provision of this Agreement, or consent to any departure by any Credit Party therefrom, shall in any event be effective without the written concurrence of the Borrowers and the Required Lenders (or Agent acting at the direction of the Required Lenders).

Section 11. <u>Miscellaneous</u>.  Except as herein expressly provided, the Credit Agreement and each of the other Loan Documents shall remain unchanged and in full force and effect.  This Agreement shall constitute a "Loan Document" under the Credit Agreement.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same amendatory instrument and any of the parties hereto may execute this Agreement by signing any such counterpart.  Delivery of an executed counterpart of a signature page to this Agreement by electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.  This Agreement shall be governed by, and construed in accordance with, the law of the State of New York, without application of any choice of law provisions that would require the application of the law of another jurisdiction.

*[signature pages follow]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

**<u>BORROWERS</u>**:

CHICKEN SOUP FOR THE SOUL
    ENTERTAINMENT INC.

By: _____
     William J. Rouhana, Jr., CEO

REDBOX AUTOMATED RETAIL, LLC

By: _____
     William J. Rouhana, Jr., CEO

**FORBEARANCE AGREEMENT**

**GUARANTORS**:

757 FILM ACQUISITION LLC
A SHARP, INC.
AT HOME WITH, LLC
BD PRODUCTIONS, LLC
CHICKEN SOUP FOR THE SOUL STUDIOS, LLC
CHICKEN SOUP FOR THE SOUL TELEVISION
     GROUP, LLC
CRACKLE PLUS LLC
CSS AVOD INC.
CSSESIG, LLC
DIGITAL MEDIA ENTERPRISES LLC
DIRTY POOL, LLC
GFBS2, LLC
HALCYON STUDIOS, LLC
HALCYON TELEVISION, LLC
ITBB, LLC
LANDMARK STUDIO GROUP, LLC
LGBT TALK, LLC
LOCOMOTIVE GLOBAL, INC.
LSG2020, INC.
MUTUAL AID LLC
PET CAVES, LLC
PH2017, LLC
PIVOTSHARE, INC.
POWERSLAM, LLC
RB SECOND MERGER SUB LLC
REDBOX INCENTIVES, LLC
REDWOOD INTERMEDIATE, LLC
RSHOOD2017, LLC
SAFEHAVEN 2020 INC.
SCREEN MEDIA FILMS, LLC
SCREEN MEDIA VENTURES, LLC
SMV CONTENT, LLC
THE FIXER 2018, LLC
TOFG, LLC
VRP2018, LLC
VRPTC, LLC
WEDDING PRODUCTIONS LLC

By: _____
     William J. Rouhana, Jr., CEO

**FOR PURPOSES OF SECTIONS 5.06 AND 8:**

CHICKEN SOUP FOR THE SOUL PRODUCTIONS

By: _____
William J. Rouhana, Jr., CEO

CHICKEN SOUP FOR THE SOUL LLC

By: _____
William J. Rouhana, Jr., CEO

**FOR PURPOSES OF SECTION 8:**

_____

William J. Rouhana, Jr., on behalf of himself and his
affiliated entities

**AGENT**:

HPS INVESTMENT PARTNERS, LLC, as
Administrative Agent and Collateral Agent

By: _____

       Name:  Daniel Wallitt
       Title:   Managing Director

**LENDERS**:

AIGUILLES ROUGES SECTOR B INVESTMENT
FUND, L.P.
AMERICAN UNITED LIFE INSURANCE COMPANY
BRICKYARD DIRECT HOLDINGS, L.P.
BRICKYARD DIRECT LENDING FUND, L.P.
CACTUS DIRECT HOLDINGS, L.P.
CACTUS DIRECT LENDING FUND, L.P.
CORE SENIOR LENDING FUND (A-A), L.P.
CORE SENIOR LENDING FUND, L.P.
CORE SENIOR LENDING MASTER FUND (PB), L.P.
CSL FUND (PB) HOLDINGS C, L.P.
FALCON CREDIT FUND, L.P.
KITTY HAWK CREDIT FUND, L.P.
KITTY HAWK HOLDINGS, L.P.
LINCOLN INVESTMENT SOLUTIONS, INC
MORENO STREET DIRECT LENDING FUND, L.P.
NDT SENIOR LOAN FUND, L.P.
PHILADELPHIA INDEMNITY INSURANCE
COMPANY
PRIVATE LOAN OPPORTUNITIES FUND, L.P.
RED CEDAR FUND 2016, L.P.
RED CEDAR HOLDINGS, L.P.
RELIANCE STANDARD LIFE INSURANCE
COMPANY
SANDLAPPER CREDIT FUND, L.P.
SLF 2016 INSTITUTIONAL HOLDINGS, L.P.
SLF CX - 2 HOLDINGS, L.P.
SLF HCX AGGREGATOR, L.P.
SPECIALTY LOAN FUND - CX-2, L.P.
SPECIALTY LOAN FUND 2016, L.P.
SPECIALTY LOAN FUND 2016-L, L.P.
SPECIALTY LOAN ONTARIO FUND 2016, L.P.
SPECIALTY LOAN VG FUND, L.P.
SWISS CAPITAL HPS PRIVATE DEBT FUND L.P.
TMD-DL HOLDINGS, LLC,
  each, as a Lender

By: HPS Investment Partners, LLC, its Investment
Manager

By: _____
    Name:  Daniel Wallitt
    Title:   Managing Director

Exhibit A

Restructuring Term Sheet

## CHICKEN SOUP FOR THE SOUL ENTERTAINMENT INC.
## RESTRUCTURING TERM SHEET

In the event that (i) the Strategic Review Committee (the "<u>SRC</u>") of Chicken Soup for the Soul Entertainment Inc. and its subsidiaries determines to file a petition for relief under Chapter 11 of the United States Bankruptcy Code (the "<u>Bankruptcy Code</u>") or (ii) such filing is requested as provided in the Forbearance Agreement to which this term sheet is attached, in either case, for the purpose of effectuating the restructuring described herein, the following describes the terms of a debtor-in-possession financing ("<u>DIP Facility</u>") to be used to fund working capital during the pendency of the Chapter 11 Cases ("<u>Chapter 11 Cases</u>").

The following is a summary of the principal terms and conditions of a proposed DIP Facility for the Debtors (as defined below) (the "<u>DIP Term Sheet</u>").  Any commitment to provide such financing shall be subject to, among other conditions, the negotiation and execution of definitive documentation in form and substance satisfactory to the DIP Lenders (as defined below).

The following summary of proposed terms and conditions is not intended to be all-inclusive.  Any terms and conditions that are not specifically addressed herein would be subject to (i) future negotiations with the DIP Administrative Agent (as defined below) and the DIP Lenders and (ii) comprehensive documentation of the transaction that is acceptable to the DIP Administrative Agent and the DIP Lenders.  Reference is made to the Forbearance Agreement made in connection herewith.  Certain capitalized terms used but not defined have the meanings assigned to them in the Forbearance Agreement.

| Parties | **Debtors**: Chicken Soup for the Soul Entertainment Inc., a Delaware corporation ("<u>CSSE</u>" or the "<u>Company</u>") and all of its direct and indirect subsidiaries and affiliates, each as debtors-in-possession (collectively, the "<u>Debtors</u>") in the Chapter 11 Cases to be commenced in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>").[1]  The date the Chapter 11 Cases are commenced is referred to herein as the "<u>Petition Date</u>." |
|---|---|
| | **Borrower**: CSSE (the "<u>Borrower</u>"). |
| | **Guarantors**: All obligations under the DIP Facility and the other DIP Loan Documents (each as defined below) will be unconditionally guaranteed, jointly and severally, on a first priority secured basis by each direct or indirect subsidiary of the Borrower (collectively, the "<u>Guarantors</u>"). |
| | The Borrower and the Guarantors are collectively referred to herein as the "<u>Loan Parties</u>". |
| | **DIP Lenders**: The lenders under the DIP Facility shall be affiliates and affiliated or managed funds of the existing lenders under the Prepetition Facility and separately managed accounts that are managed by such lenders and any assignee thereof (collectively, the "<u>DIP Lenders</u>"); provided that no affiliate of any Loan Party shall become a DIP Lender. |
| | **DIP Administrative Agent**: HPS Investment Partners, LLC (the "<u>DIP Administrative Agent</u>") shall act as administrative agent for the DIP Lenders under the DIP Facility. |

---

[1] NTD – In the event that the Proposed Financings have been consummated prior to the Petition Date, it is expected that the Redbox entities would not be Debtors to the extent the equity in such entities is no longer held directly or indirectly by CSSE on the Petition Date.

| | |
|---|---|
| **Prepetition Facility** | **Prepetition Facility**: The Company is party to that certain Amended and Restated Credit Agreement, dated as of August 11, 2022, among the Company, as primary borrower, Redbox Automated Retail, LLC, as original borrower, the subsidiary guarantors party thereto, HPS Investment Partners, LLC, as administrative agent and as collateral agent (the "Prepetition Agent"), and the lenders party thereto from time to time (the "Prepetition Lenders") (in each case as amended by that certain First Amendment to Amended and Restated Credit Agreement dated as of April 29, 2024 and as further amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "Prepetition Facility"). The Prepetition Facility and all instruments and documents executed at any time in connection therewith, shall be referred collectively as the "Prepetition Loan Documents." |
| **DIP Facility; Use of Proceeds** | **DIP Facility**: The DIP Facility and all instruments and documents executed at any time in connection therewith, shall be referred to collectively as the "DIP Loan Documents." <br><br>The DIP Facility shall be comprised of the following loans (the "DIP Loans"): <br><br>    (a) A superpriority priming term loan in an aggregate principal amount equal to the product of (x) 3.00 and (y) the initial aggregate committed amount of the Revolving Loans described below (the "Term Loan"). Amounts paid or prepaid under the Term Loan may not be reborrowed. <br><br>    (b) A superpriority priming revolving loan in an aggregate principal amount to be agreed between the Debtors (at the direction of the SRC) and the DIP Lenders as the amount necessary to consummate the sale and restructuring transactions contemplated by this DIP Term Sheet (the "Revolving Loans", and the commitment of the DIP Lenders to make the DIP Loans, the "Commitment"). Amounts repaid under the Revolving Loans may be reborrowed. <br><br>**Revolving Loans:** Subject to the terms and conditions herein, the proceeds of Revolving Loans will be used in accordance with the terms of the Budget, including, without limitation: (i) to pay (a) all fees due to DIP Lenders as provided under the DIP Facility and (b) all professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by DIP Lenders, including those incurred in connection with the preparation, negotiation, documentation and court approval of the DIP Facility and (ii) to provide the funding necessary to effect the restructuring transactions contemplated by this DIP Term Sheet, including for working capital and other general corporate purposes of the Debtors and in accordance with the Budget, and to pay administration costs of the Chapter 11 Cases with respect thereto. <br><br>**Term Loans**: The proceeds of the Term Loans will be used to repay an amount equal to, and be used to refinance, the loans under the Prepetition Facility (the "Prepetition Loans") on a dollar-for-dollar basis. <br><br>**Use of Proceeds**: No portion of the Debtors' "cash collateral" (as such term is defined in section 363(a) of the Bankruptcy Code) (the "Cash Collateral"), the proceeds of the DIP Facility, the Collateral (as defined below), or the Carve-Out (as defined below) may be used: <br><br>    (a)    for any purpose that is prohibited under the Bankruptcy Code or the DIP Orders; |

2

| | |
|---|---|
| | (b)     to finance or reimburse for expenses incurred or to be incurred, in both instances, directly or directly and in any way: (i) any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of any or all of the DIP Administrative Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders or their respective rights and remedies under DIP Loan Documents, the DIP Order, or the Prepetition Loan Documents or (ii) any other action, which with the giving of notice or passing of time, would result in an Event of Default under the DIP Loan Documents; |
| | (c)     to make any payment to any board member or shareholder of any Loan Party in any capacity; <u>provided</u> that solely to the extent such amounts are transferred to CSS in the ordinary course of business to be used by CSS to pay ordinary course expenses of the Loan Parties included in the "Employee Payroll and Employee Benefits" or the "Service/Tech Costs & Other OPEX" line item of the Proposed Financing Sources and Uses, in accordance with the Budget, such proceeds may be transferred to CSS for such purpose; |
| | (d)     to make any distribution under a plan in the Chapter 11 Cases (a "<u>Plan</u>"), except that proceeds of the Carve-Out may be used to make payments under a Plan for those items enumerated below as comprising such Carve-Out; and |
| | (e)     to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Administrative Agent, acting at the direction of DIP Lenders holding over 50% of the outstanding DIP Loans (the "<u>Required DIP Lenders</u>"); |
| | provided, that advisors to the official unsecured creditors' committee, if one is appointed, may investigate the liens granted pursuant to the Prepetition Facility at an aggregate expense for such investigation not to exceed $25,000. |
| | Except as provided in the approved Budget, no portion of the proceeds of the DIP Loan or any cash collateral shall be used to fund the Kiosk Business (as defined below). |
| **Availability** | <u>**Interim Facility**</u>: During the period commencing on the date (the "<u>Interim Order Entry Date</u>") of the Bankruptcy Court's entry of an interim order ("<u>Interim Order</u>") approving the DIP Facility but prior to the entry of a final order ("<u>Final Order</u>", and together with the Interim Order, the "<u>DIP Order</u>", as applicable) approving the DIP Facility or such earlier date upon the occurrence of a maturity event, the maximum amount available to be drawn under the Revolving Loans shall be limited to an amount to be agreed between the Debtors (at the direction of the SRC) and the DIP Lenders (the "<u>Interim Facility</u>"), subject to compliance with the terms, conditions and covenants described in the DIP Loan Documents and in accordance with the Budget. All Revolving Loans made under the Interim Facility will be due and payable on the date that is 30 days after the entry of the Interim Order or such earlier date upon the occurrence of a maturity event unless a Final Order approving the DIP Facility in form and substance satisfactory to the DIP Administrative Agent shall have been entered by the Bankruptcy Court on or before such date.<br><br><u>**Full Availability**</u>: Upon the Bankruptcy Court's entry of the Final Order (the "<u>Final Order Entry Date</u>"), the full remaining amount of the Revolving Loan commitments shall be available to the Debtors, subject to compliance with the terms, conditions and covenants described in the DIP Loan Documents and the Budget (the "<u>Full Availability</u>"). |

| | |
|---|---|
| **Budget** | The 13-week statement of the Loan Parties' anticipated cash receipts and disbursements for the first 13 weeks of the Chapter 11 Cases, set forth on a weekly basis, including the anticipated uses of the DIP Facility for such period (a "13-Week Projection"), and thereafter, at the end of each weekly period, an updated 13-Week Projection for the subsequent 13-Week period (which in each case must be satisfactory to the sole discretion of the DIP Administrative Agent).<br><br>The availability of Revolving Loans during each weekly period (each a "Budget Period") will be limited to the maximum amount of Revolving Loans projected (and after taking into account any Permitted Deviation from an amount set forth in a Budget line item) to be outstanding during such Budget Period in the most recent 13-Week Projection.<br><br>As used herein, "Permitted Deviation" means 10.0%. |
| **Collateral; Priority** | "Collateral" shall mean any and all assets of the Loan Parties, unless otherwise agreed by the DIP Administrative Agent; provided that if the Proposed Financings have been consummated prior to the Petition Date then any lien in favor of the DIP Lenders on the assets subject to such Proposed Financings shall be junior to any permitted lien granted in connection with such Proposed Financings ("Permitted Proposed Financing Liens"), which liens shall be deemed Permitted Liens for all purposes hereunder.<br><br>**Priority/Collateral**:  All obligations of the Loan Parties to the DIP Lenders and the DIP Administrative Agent under the DIP Loan Documents, including all loans made under the DIP Facility, shall, subject in all respects to the Carve-Out and any Permitted Proposed Financing Liens, at all times:<br><br>(a) pursuant to Bankruptcy Code section 364(c)(1), be entitled to joint and several superpriority administrative expense claim status in the Chapter 11 Cases, which claims in respect of the DIP Facility shall be superior to all other administrative claims allowable under Bankruptcy Code sections 503(b) or 507(b);<br><br>(b) pursuant to Bankruptcy Code section 364(c)(2), have a first priority lien on all unencumbered assets of the Loan Parties (now or hereafter acquired and all proceeds thereof);<br><br>(c) pursuant to Bankruptcy Code section 364(c)(3), have a junior lien on all encumbered assets of the Loan Parties (now or hereafter acquired and all proceeds thereof) with respect to the Proposed Financings if consummated prior to the Petition Date; and<br><br>(d) pursuant to Bankruptcy Code section 364(d), have a first priority priming lien on all assets of the Loan Parties (now or hereafter acquired and all proceeds thereof) that were subject to a lien as of the Petition Date, subject to Permitted Proposed Financing Liens.<br><br>It is understood and agreed that the priming liens described herein shall prime the liens securing the Prepetition Facility, but that the liens so created as described in clauses (b), (c), and (d) above shall be subject to "Permitted Liens" (as such term is defined under the Prepetition Facility) as of the Petition Date, except those securing the Prepetition Facility.<br><br>The liens to be granted by the Bankruptcy Court shall cover all property of the Loan Parties (now or hereafter acquired and all proceeds thereof), including property or assets that do not secure the Prepetition Facility, including the proceeds of all claims and causes of action |

4

| | |
|---|---|
| | under Sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code (the "<u>Avoidance Proceeds</u>"), and as otherwise agreed to by the DIP Administrative Agent in its sole discretion. |
| **Carve-Out** | As used in the DIP Order, the "<u>Carve-Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under Section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether on an interim or final basis, all fees and expenses (the "<u>Allowed Professional Fees</u>") earned, accrued, or incurred by persons or firms retained by the Debtors (at the direction of the SRC) pursuant to Sections 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>") at any time before or on the first business day following delivery by the DIP Administrative Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) Allowed Professional Fees of Debtor Professionals in an aggregate amount not to exceed $1,000,000 incurred after the first business day following delivery by the DIP Administrative Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve-Out Trigger Notice Cap</u>").  For purposes of the foregoing, "<u>Carve-Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the DIP Administrative Agent to the Debtors, their lead restructuring counsel, and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the obligations under the DIP Facility, stating that the Post-Carve-Out Trigger Notice Cap has been invoked. Notwithstanding anything to the contrary set forth herein or in any other order of the Bankruptcy Court, the foregoing Carve-Out is binding upon the Debtors, the Prepetition Lenders, the Prepetition Agent, the DIP Lenders, the DIP Administrative Agent, and their respective successors, including any chapter 7 trustee, and shall survive dismissal or conversion to chapter 7 of the Chapter 11 Cases.<br><br>All of the liens described herein with respect to the assets of the Loan shall be effective and perfected as of the Interim Order Entry Date and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements.<br><br>The DIP Order shall contain provisions prohibiting the Debtors and their subsidiaries from incurring any indebtedness which (x) ranks pari passu with or senior to the DIP Loans under the DIP Facility or (y) benefits from a first priority lien under section 364 of the Bankruptcy Code. |
| **Adequate Protection** | The Prepetition Agent under the Prepetition Facility for the benefit of itself, the Prepetition Lenders and the holders of all other secured obligations thereunder (the "<u>Prepetition Primed Obligations</u>"), shall be granted the following protection (collectively, the "<u>Prepetition Lender Protection</u>"), pursuant to sections 361, 507, 363(e) and 364(d)(1) of the Bankruptcy Code or otherwise, of its pre-petition security interests for the consent of such Prepetition Lenders to the priming effectuated by the DIP Facility, consent to the use of its collateral (including Cash Collateral), consent to the transactions contemplated by the DIP Facility, and for the diminution in the value (each such diminution, a "<u>Diminution in Value</u>") of the pre-petition security interests of such party, whether or not such Diminution in Value results from the sale, lease or use by the Loan Parties of the collateral securing the Prepetition Primed Obligations (including, without limitation, Cash Collateral), the priming of the pre- |

5

petition security interests of such lender or the stay of enforcement of any pre-petition security interest arising from section 362 of the Bankruptcy Code, or otherwise:

(a) <u>Adequate Protection Lien</u>.  The Prepetition Agent under the Prepetition Facility, on behalf of itself and the applicable secured creditors and holders shall be granted for their benefit and the benefit of the applicable secured creditors, effective and perfected as of the Interim Order Entry Date and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements, a security interest in and lien on all assets of the Loan Parties (together, the "<u>Adequate Protection Liens</u>"), subject and subordinate only to (x) the Carve-Out and (y) the liens securing the DIP Facility, which Adequate Protection Liens shall rank in the same relative priority and right as are set forth in the Section titled "Collateral; Priority".

(b) <u>Super-Priority Claim</u>.  The Prepetition Agent under the Prepetition Facility, on behalf of itself and the applicable secured creditors and holders, shall be granted, subject to the payment of the Carve-Out, a superpriority administrative expense claim junior only to the claims under section 364(c)(1) of the Bankruptcy Code held by the DIP Administrative Agent; provided that the Prepetition Agent, Prepetition Lenders and secured creditors and holders under the Prepetition Facility shall not receive or retain any payments, property or other amounts in respect of such superpriority claims unless and until the obligations under the DIP Facility have indefeasibly been paid in cash in full.

(c) <u>Fees and Expenses</u>.  Payment shall be made to the agents under the Prepetition Facility (for the benefit of the Prepetition Lenders thereunder) for all professional fees and expenses payable to any agent under the Prepetition Facility, including, but not limited to, the fees and disbursements of (i) Milbank LLP and Quinn Emanuel Urquhart & Sullivan, LLP, each, in connection with the Prepetition Agent in its role as agent and its administration of the Prepetition Loan Documents, (ii) local counsel of the Prepetition Agent in connection with the Prepetition Agent in its role as agent and its administration of the Prepetition Loan Documents, and (iii) any financial advisor retained by the Prepetition Agent, in each case promptly upon receipt of summary form invoices which may be redacted for privileged information.

(d) <u>Financial Reporting</u>.  The Loan Parties shall continue to provide the Prepetition Agent under the Prepetition Facility with financial and other reporting substantially in compliance with the Prepetition Facility and any reporting described herein.

As additional adequate protection, all obligations, including accrued but unpaid interest, under the Prepetition Facility owing by the Debtors thereunder and other fees owing by the Debtors thereunder shall continue to accrue interest (and interest on interest) at the default rate applicable on the Petition Date under the Prepetition Facility.

All intercompany liens of the Debtors and other Loan Parties, if any (other than any liens securing the Prepetition Facility), will be contractually subordinated to the DIP Facility and to the Adequate Protection on terms satisfactory to the DIP Lenders.

| **Closing Date** | The closing date of the DIP Facility (the "<u>Closing Date</u>") shall occur within three (3) business days of the Interim Order Entry Date and shall be the first business day on which |
| --- | --- |

6

| | |
|---|---|
| | the conditions precedent set forth in the DIP Loan Documents have been satisfied or waived by the Required DIP Lenders. |
| **Maturity** | Borrowings shall be repaid in full and in cash, and the commitments shall terminate, on the earliest to occur (the "<u>Maturity Date</u>") of the following: (i) the date that is four months after the Closing Date; (ii) the consummation of the final sale contemplated hereby to the winning bidder; (iii) the date the Bankruptcy Court orders the conversion of the bankruptcy case of any of the Loan Parties to a Chapter 7 liquidation; (iv) the date the Bankruptcy Court orders the dismissal of the bankruptcy case of any of the Loan Parties; (v) the acceleration of the loans or termination of the commitments under the DIP Facility, including as a result of the occurrence of an Event of Default; (vi) the date that is 30 calendar days after the Interim Order Entry Date if the Final Order Entry Date shall not have occurred by such date; and (vii) other maturity events customary for a debtor-in-possession financing.<br><br>Any order confirming a Plan shall not discharge or otherwise affect in any way the joint and several obligations of the Loan Parties to the DIP Lenders under the DIP Facility and the DIP Loan Documents, other than after the payment in full and in cash to the DIP Lenders of all obligations under the DIP Facility and the DIP Loan Documents on or before the effective date of a Plan and the termination of the Commitments. |
| **Interest Rate/Default Interest Rate/Fees** | The interest rate, default rate, and fees under the DIP Facility are set forth in <u>Annex I</u> hereto. |
| **Conditions Precedent** | **<u>Conditions to Interim Facility</u>:**<br><br>1. <u>Interim Order/Bankruptcy Matters</u>.<br><br>   (a) The Chapter 11 Cases shall have been commenced in the Bankruptcy Court and all of the "first day orders" (including a cash management order (the "<u>Cash Management Order</u>")) and all related pleadings to be filed at the time of commencement of the Chapter 11 Cases or shortly thereafter shall have been reviewed in advance by the DIP Administrative Agent and shall be in form and substance acceptable to the DIP Administrative Agent.<br><br>   (b) Borrower shall continue to retain the chief restructuring officer as required by the Prepetition Facility and the DIP Facility.<br><br>   (c) The Bankruptcy Court shall have entered an Interim Order that shall be in form and substance satisfactory to the sole discretion to the DIP Administrative Agent, shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed, or subject to a stay pending appeal or otherwise challenged or subject to any challenge. The Loan Parties shall be in compliance in all respects with the Interim Order.<br><br>   (d) All orders entered by the Bankruptcy Court pertaining to the Cash Management Order and adequate protection ("<u>Adequate Protection Order</u>") and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance satisfactory to the DIP Administrative Agent. |

7

(e)  The Prepetition Agent and Prepetition Lenders shall have received adequate protection in respect of the liens securing the prepetition obligations pursuant to the Adequate Protection Orders.

(f)  The DIP Administrative Agent shall have received UCC, intellectual property, tax and judgment lien searches and other appropriate evidence in form and substance satisfactory to the Required DIP Lenders in their sole discretion evidencing the absence of any other liens or mortgages on the Collateral, except the liens securing the Prepetition Facility and other existing liens acceptable to the DIP Administrative Agent.

2.  <u>Budgets and Financial Information</u>.

(a)  The DIP Lenders shall have received the Budget as of the Closing Date, which Budget shall be in form and substance satisfactory to the DIP Administrative Agent in its sole discretion.

(b)  Each of the DIP Lenders shall have received financial information reasonably requested by it.

3.  <u>Customary Closing Documents</u>.

(a)  All costs, fees, expenses (including reasonable and documented legal fees and expenses) and other compensation contemplated by the DIP Loan Documents and this DIP Term Sheet (and any such amounts owing pursuant to the Prepetition Facility) to be payable shall have been paid to the extent due and the Loan Parties shall have complied in all respects with all of their other obligations to the DIP Administrative Agents and DIP Lenders.

(b)  The DIP Administrative Agent shall be satisfied that the Loan Parties have complied with all other customary closing conditions set forth in the DIP Loan Documents, including: (i) the delivery of legal opinions, corporate records and documents from public officials, secretary's certificates, and officer's certificates; (ii) evidence of authority; and (iii) obtaining of any material third-party and governmental consents necessary in connection with the DIP Facility, the financing thereunder, and related transactions.  The Loan Parties and the transactions contemplated by this DIP Term Sheet shall be in compliance with all applicable laws and regulations.

(c)  Except as permitted with respect to the Proposed Financings, the Loan Parties have not transferred assets or incurred any debt or obligations outside the ordinary course of business since the date of the Forbearance Agreement.

(d)  The DIP Lenders shall have received prior to the Closing Date all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the Patriot Act, in each case satisfactory to each DIP Lender.

(e)  Execution and delivery by the Loan Parties of the DIP Loan Documents and promissory notes (if requested by any DIP Lender) evidencing the loans made and to be made under the DIP Facility.

#4889-0374-9268v21

(f)   The DIP Administrative Agent shall have received a borrowing notice.

(g)   Such other conditions as are reasonably requested by the DIP Administrative Agent shall have been satisfied by the Loan Parties.

4.   <u>Engagement Letters</u>.

(a)   All letters providing for the payment of the fees and expenses of the proposed Debtors' Professionals shall be in form and substance satisfactory to the Required DIP Lenders.

**<u>Conditions to Full Availability</u>**

(a)   Not later than 30 days following the Interim Order Entry Date, a Final Order as to the DIP Facility which Final Order shall be in form and substance satisfactory to the sole discretion of the DIP Administrative Agent.

(b)   The Final Order shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any challenge.

(c)   The Loan Parties shall be in compliance in all respects with the DIP Order.

**<u>Conditions to All Loans and Withdrawals</u>**:

(a)   With respect to borrowings and withdrawals that occur on or after the date that is 30 days following the Petition Date, the Final Order shall be in full force and effect and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed, or subject to a stay pending appeal or otherwise challenged or subject to any challenge.

(b)   The Loan Parties shall be in compliance with each order entered in the Chapter 11 Cases, including the DIP Orders, the Cash Management Order and the Adequate Protection Order.

(c)   The DIP Administrative Agent and the DIP Lenders shall have received all periodic updates required under the Budget and any variance reports, each in form and substance satisfactory to the DIP Lenders and the Loan Parties shall be in compliance with the Budget.

(d)   Except as disclosed in the DIP Loan Documents, since the date of the Forbearance Agreement no material adverse change in the operations, assets, revenues, financial condition, profits or prospects of the Loan Parties (other than by virtue of the Chapter 11 Cases) shall have occurred.

(e)   The following statements shall be true and correct: (i) the representations and warranties contained in the DIP Loan Document are true and correct in all material respects (unless otherwise qualified by materiality in which case such representations and warranties shall be true and correct in all respects) on and as of such date, as though made on and as of such date, except to the extent that any such representation or warranty expressly relates to an earlier date (in which case such

9

<table>
<tr><td></td><td>representation or warranty shall be true and correct in all material respects (unless otherwise qualified by materiality in which case such representations and warranties shall be true and correct in all respects) on and as of such earlier date) and (ii) no default or Event of Default shall have occurred and be continuing on such date, or would result from the making of such borrowing or withdrawal on such date.

(f)  Such other conditions customary or appropriate in the context of the proposed DIP Facility as may be requested by the DIP Administrative Agent.</td></tr>
</table>

| **Covenants** | Expected to be largely consistent with the covenants contained in the Prepetition Facility but also to include other covenants customary or appropriate in the context of the proposed DIP Facility or as otherwise required by the DIP Administrative Agent, including, without limitation: |
|---|---|

**Information Covenants**:

(a)  <u>Chapter 11 Cases Filings</u>.  Delivery by the Loan Parties to the DIP Administrative Agent copies of all pleadings, motions, applications, judicial information, financial information, and other documents filed by or on behalf of any other Loan Party with the Bankruptcy Court in the Chapter 11 Cases, or distribute by or on behalf of any Loan Party to any official committee appointed in the Chapter 11 Cases, including all motions for "first day" and "second day" relief.

(b)  <u>Budget Variance</u>.  The Debtors shall deliver a report/reconciliation setting forth for the immediately preceding week, the actual and budgeted results for such week by line item in the Budget, together with a reasonably detailed written explanation of all material variances.

(c)  <u>Conference Call</u>.  The Loan Parties shall schedule weekly teleconferences between their advisors and management team and the DIP Administrative Agent and DIP Lenders and their respective advisors.

(d)  <u>Access.</u>  DIP Administrative Agent and DIP Lenders shall have reasonable access to the Company's financial advisors, management team and books and records.

(e)  <u>Sale Process Reporting</u>.  Delivery by the Loan Parties to the DIP Lenders and their advisors, as and when available, of status updates regarding the sale process contemplated by the Bid Procedures Order (as defined below), including reports of inbound interest, outbound solicitation, and status of diligence and bids.

(f)  <u>Reporting Frequency.</u>  Delivery by the Loan Parties to the DIP Lenders and their advisors of daily liquidity reporting and weekly for all other reporting requirements under the Prepetition Facility.

(g)  <u>Disbursements Reporting.</u>  Delivery by the Loan Parties to the DIP Lenders and their advisors of weekly itemized list of disbursements in a form satisfactory to the Required DIP Lenders.

(h)  <u>Receivables Reporting.</u>  Delivery by the Loan Parties to the DIP Lenders and their advisors of weekly list of receivables and payables in a form satisfactory to the Required DIP Lenders.

10

**Affirmative Covenants**:

(a) Comply with each order entered by the Bankruptcy Court in the Chapter 11 Cases.

(b) Access to information (including historical information) and personnel regarding strategic planning, cash, and liquidity management, and operational and restructuring activities.

(c) Comply with the Budget.

(d) Pay all fees and expenses of estate professionals when due in accordance with the interim compensation procedures approved in the Chapter 11 Cases.

(e) Continue to employ the CRO in the capacity contemplated by the Closing Date engagement.

(f) To the extent requested by the Required DIP Lenders and funded with proceeds provided under the DIP Facility, if the Owlpoint Facility was consummated prior to the Petition Date, the Debtors shall exercise their right to terminate the sublicense arrangement contemplated by the Owlpoint Facility promptly following such request.

**Negative Covenants**:

(a) Absent the consent of the Required DIP Lenders, (a) assume or reject any executory contract or unexpired lease or (b) consent to termination or reduction of the exclusivity period to file and solicit a plan of reorganization or fail to object to any motion seeking to terminate or reduce such exclusivity period.

(b) Modify or alter (i) in any material manner the nature and type of its business or the manner in which such business is conducted or (ii) organizational documents, except as required by the Bankruptcy Code.

(c) Assert any right of subrogation or contribution against any other Loan Party until all borrowings under the DIP Facility are indefeasibly paid in full and in cash as provided herein and the commitments are terminated.

(d) Make any payment of principal or interest or otherwise on account of any prepetition indebtedness or payables, other than as contemplated under "Adequate Protection" herein or payments agreed in writing by the DIP Administrative Agent and authorized by the Bankruptcy Court.

(e) Make any payment to any board member or shareholder of any Loan Party in any capacity.

(f) Incur any new debt.

(g) Incur any new liens on any assets of any Loan Party.

11

| | |
|---|---|
| | (h) No asset sales other than in accordance with the Bid Procedures Order. |
| | (i) Abandonment of any assets or any similar action absent written approval of the Required DIP Lenders. |
| | (j) Certain other negative covenants consistent with the Prepetition Facility, subject to thresholds and exceptions satisfactory to the Required DIP Lenders. |
| | <u>Financial Covenants</u>: |
| | (a) The proceeds of DIP Loan and all proceeds of Collateral shall be used by the Debtors solely for the purposes and, subject to the variances, up to the amounts set forth in the Budget for the applicable line item. |
| **Milestones** | The DIP Loan Documents will include milestones (the "<u>Milestones</u>") related to the Debtors' Chapter 11 Cases, including the following:<br><br>(a) No later than three (3) business days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order.<br><br>(b) No later than 30 calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final Order.<br><br>(c) On the Petition Date, the Debtors shall file (x) one or more motions (each, a "<u>Sale Motion</u>"), in form and substance satisfactory to the DIP Administrative Agent, requesting one or more orders from the Bankruptcy Court approving one or more sales (each, a "<u>Sale</u>") of substantially all of the Debtors' assets (which may include the Kiosk Business to the extent the Proposed Financings with respect thereto have not been consummated prior to the Petition Date and the Debtors (at the direction of the SRC) and the DIP Lenders so agree) pursuant to Section 363 of the Bankruptcy Code, (y) if agreed between the Debtors (at the direction of the SRC) and the DIP Lenders, one or more stalking horse agreements (each, a "<u>Stalking Horse Agreement</u>"), in form and substance acceptable to the DIP Administrative Agent, providing for the buyer named therein to acquire some or all of the assets of the Debtors and (z) a motion (the "<u>Bid Procedures Motion</u>") requesting an order from the Bankruptcy Court approving bidding procedures relating to the solicitation of qualified bids of the assets being sold and approving the related stalking horse protections, if any[2].<br><br>(d) No later than 24 calendar days after the Petition Date, the Debtors shall have obtained an order of the Bankruptcy Court approving the Bid Procedures Motion (the "<u>Bid Procedures Order</u>"), in form and substance satisfactory to the DIP Administrative Agent. The Bid Procedures Order shall, among other things, approve any related Stalking Horse Agreement. |

---

[2] NTD – The Debtors (at the direction of the SRC) and the DIP Lenders, in consultation with their respective financial advisors, shall prior to the Petition Date determine the approved manner of the sale of substantially all of the Debtors assets and whether such sale shall be in whole through one sale or in part through multiple contemporaneous sales. Milestones shall be adjusted accordingly as agreed by the Debtors (at the direction of the SRC) and the DIP Lenders if multiple sales are contemplated on differing timetables.

|  | |
|---|---|
|  | (e) No later than 45 calendar days after the Petition Date, one or more auctions with respect to the Sale of substantially all of the assets of the Debtors shall have been completed in accordance with the Bid Procedures Order.<br><br>(f) No later than 50 calendar days after the Petition Date, the Debtors shall have obtained an order of the Bankruptcy Court approving each related Sale Motion (each a "Sale Order"), in form and substance satisfactory to the DIP Administrative Agent.<br><br>(g) No later than 60 calendar days after the Petition Date, the Debtors shall have consummated each Sale and applied the proceeds thereof (net of the Winddown Reserve) to the repayment of the DIP Facility and, to the extent the DIP Facility shall have been repaid in full and in cash, to the extent authorized by the Court, to the Prepetition Facility.<br><br>(h) To the extent the Debtors retain ownership of such business on the Petition Date, the Debtors shall be in compliance with the Kiosk Business Plan.  For purposes hereof, "Kiosk Business Plan" means the wind-down, liquidation and/or sale of the Redbox business (the "Kiosk Business") pursuant to a plan and timetable to be agreed between the Debtors (at the direction of the SRC) and the DIP Lenders prior to the Closing Date. |
| **Representations and Warranties** | The DIP Loan Documents shall contain representations and warranties substantially similar to those made by the Loan Parties under the Prepetition Facility, modified as necessary to reflect the commencement of the Chapter 11 Cases and such other representations and warranties as the DIP Administrative Agent and the Required DIP Lenders shall require, including, without limitation, as to Priority; Collateral; Interim Order and Final Order; DIP Loan Documents; Budget and Use of Proceeds. |
| **Prepayments** | **Voluntary Prepayment**: The Loan Parties may, at any time, (i) repay the loans under the DIP Facility and/or (ii) reduce the Commitments, in each case in full but not in part, so long as at the time of such repayment there remain no obligations outstanding under the Prepetition Facility.<br><br>**Mandatory Prepayment**: The DIP Loan Documents shall contain mandatory prepayment covenants substantially similar to those made by the Loan Parties under the Prepetition Facility, modified for thresholds and exceptions acceptable to the Required DIP Lenders and as appropriate to reflect the commencement of the Chapter 11 Cases and otherwise as customary in the context of the proposed DIP Facility, including, without limitation, with respect to (i) asset sales, (ii) insurance and condemnation proceeds, (iii) incurrence of indebtedness, and (iv) issuance of equity. |
| **Events of Default** | The DIP Loan Documents will contain events of default ("Events of Default") substantially similar to those in the Prepetition Facility (subject to modifications necessary to reflect customary debtor-in-possession financing provisions, this specific transaction, and current market conditions) and other customary Events of Defaults in the context of the proposed DIP Facility, including:<br><br>(a) Budget.  The proceeds of any DIP Loan shall have been expended in a manner that is not in accordance with the Budget. |

(b) <u>Collateral Documents</u>.  The DIP Order shall cease to create a valid and perfected lien with such priority required by this term sheet, subject to permitted liens, on a material portion of the Collateral purported to be covered thereby.

(c) <u>Entry of Final Order</u>.  The entry of the Final Order shall not have occurred within 30 calendar days after the Interim Order Entry Date.

(d) <u>Conversion to Chapter 7</u>.  An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court converting such Chapter 11 Case to a Chapter 7 case.

(e) <u>Alternate Financing</u>.  Any Loan Party shall file a motion in the Chapter 11 Cases, without the express written consent of Required DIP Lenders, to obtain additional financing from a party other than DIP Lenders under section 364(d) of the Bankruptcy Code or to use cash collateral of a DIP Lender under Section 363(c) of the Bankruptcy Code.

(f) <u>Prepetition Claims</u>.  Any Loan Party shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any prepetition claim other than (x) as provided for in the "first-day orders" and included in the Budget or (y) otherwise consented to by the Required DIP Lenders in writing, (ii) granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets having a book value in excess of $100,000 in the aggregate or to permit other actions that would have a material adverse effect on the Loan Parties or their estates, or (iii) except with respect to the Prepetition Facility as provided in the DIP Order, approving any settlement or other stipulation not approved by the Required DIP Lenders and not included in the Budget with any secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor.

(g) <u>Appointment of Trustee or Examiner</u>.  An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court appointing, or any Loan Party, any subsidiary of a Loan Party, or any affiliate of a Loan Party shall file an application for an order with respect to any Chapter 11 Case seeking the appointment of, (i) a trustee under Section 1104, or (ii) an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code.

(h) <u>Dismissal of Chapter 11</u>.  An order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases which does not contain a provision for termination of the Commitment, and payment in full of all obligations of the Loan Parties under the DIP Facility.

(i) <u>Jurisdiction of Chapter 11 Cases</u>.  An order shall be entered by the Bankruptcy Court transferring the Chapter 11 Cases to any other court.

(j) <u>Order With Respect to Chapter 11 Cases</u>.  An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court without the express prior written consent of the Required DIP Lenders (and with respect to any provisions that affect the rights or duties of the DIP Administrative Agent, the DIP

14

Administrative Agent), (i) to revoke, reverse, stay, modify, supplement or amend any of the DIP Order, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Loan Parties equal or superior to the priority of the Chapter 11 Cases shall be entered by the Bankruptcy Court without the express prior written consent of the DIP Administrative Agent and the DIP Lenders in respect of the Prepetition Facility (other than the Carve-Out) or (iii) to grant or permit the grant of a lien on the Collateral (other than permitted liens).

(k) <u>Application for Order by Third Party</u>.  An application for any of the orders described in clauses (h) through (j) above shall be made by a person other than the Loan Parties and such application is not contested by the Loan Parties in good faith or the relief requested is not withdrawn, dismissed or denied within 30 days after filing or any person obtains a final order under § 506(c) of the Bankruptcy Code against the DIP Administrative Agent or obtains a final order adverse to the DIP Administrative Agent or the DIP Lenders or any of their respective rights and remedies under the DIP Loan Documents or in the Collateral.

(l) <u>Right to file Chapter 11 Plan</u>.  The entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Loan Party to file a Chapter 11 plan pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Required DIP Lenders.

(m) <u>Liens</u>.  (i) Any Loan Party shall attempt to invalidate, reduce or otherwise impair the liens or security interests of the DIP Administrative Agent and/or the DIP Lenders, claims or rights against such person or to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (ii) any lien or security interest created by the Collateral Documents or the DIP Order with respect to Collateral shall, for any reason, cease to be valid or (iii) any action is commenced by the Loan Parties which contests the validity, perfection or enforceability of any of the liens and security interests of the DIP Administrative Agent and/or the DIP Lenders created by any of the Interim Order, the Final Order, or the DIP Loan Documents.

(n) <u>Invalidation of Claims</u>.  Any Loan Party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Loan Parties) any other person's motion to, disallow in whole or in part the DIP Lenders' claim in respect of the obligations or contest any material provision of any DIP Loan Document or any material provision of any DIP Loan Document shall cease to be effective.

(o) <u>Amendment of the Bankruptcy Court Orders</u>.  The DIP Order is amended, supplemented, reversed, vacated or otherwise modified without the prior written consent of the Required DIP Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of the DIP Administrative Agent, the DIP Administrative Agent).

15

|  | (p) <u>Bid Procedures Order</u>. The Bid Procedures Order, or all such Bid Procedures Orders considered in the aggregate, does not permit the sale of substantially all of the Debtors' assets.<br><br>(q) <u>Modifications</u>.  The Bid Procedures Order or the Sale Order is amended, supplemented, or otherwise modified without the prior written consent of the Required DIP Lenders.<br><br>(r) <u>Sale Proceeds</u>. The Debtors fail to promptly apply any cash proceeds from a sale of their assets (other than the Winddown Reserve) towards repayment of all outstanding obligations under the DIP Facility and, to the extent of any remaining proceeds after repayment in full of the DIP Facility, and following entry of a Bankruptcy Court order authorizing such application of proceeds, the Prepetition Facility.<br><br>(s) <u>Payments</u>.  Any Loan Party or any of their affiliates shall have filed a motion seeking the entry of, or the Bankruptcy Court shall have entered, an order approving a payment to any person that would be inconsistent with the Budget.<br><br>(t) <u>Plan</u>.  The filing of any plan that does not propose to indefeasibly repay the obligations under the DIP Facility and Prepetition Facility in full in cash.<br><br>(u) <u>Withdrawal or Termination of Bids</u>. The withdrawal or termination by the Debtors of any binding bid received by the Debtors pursuant to the Bid Procedures Order without the consent of the Required DIP Lenders.<br><br>(v) <u>Withdrawal or Termination of Stalking Horse Agreement</u>.  The withdrawal or termination by the Debtors of any Stalking Horse Agreement without the consent of the Required DIP Lenders.<br><br>(w) <u>Budget Deviation</u>.  For any rolling four-week test period (with a buildup for the initial three weeks) there shall occur an unfavorable deviation to aggregate collections, aggregate disbursements and certain other line items of the Budget to be agreed of more than the Permitted Deviation.<br><br>(x) <u>Milestones</u>.  Failure to meet a Milestone when required, unless extended or waived in writing by the Required DIP Lenders.<br><br>(y) <u>Maintenance of the SRC</u>.  The SRC ceases to exist or the SRC is reconstituted without the consent of the Required DIP Lenders.<br><br>(z) <u>Other Events of Default</u>.  Such other usual and customary Events of Default that are requested by the DIP Administrative Agent and the Required DIP Lenders. |
| **Indemnity** | The Loan Parties shall, jointly and severally, be obligated to indemnify and hold harmless the DIP Administrative Agent, each of the DIP Lenders, and each of their respective affiliates, officers, directors, fiduciaries, employees, agents, advisors, attorneys, and representatives from and against all losses, claims, liabilities, damages, and expenses (including out-of-pocket fees and disbursements of counsel) in connection with any investigation, litigation, or proceeding, or the preparation of any defense with respect |

16

| | |
|---|---|
| | thereto, arising out of or relating to the DIP Facility or the transactions contemplated in this DIP Term Sheet. |
| **Credit Bidding** | The DIP Administrative Agent, upon the instruction of the Required DIP Lenders, shall have the right and authority from time to time to credit bid up to the full amount of the obligations outstanding under the DIP Facility. |
| **Assignments and Participations** | The DIP Loan Documents shall include rights of assignment, subject to the DIP Administrative Agent's consent (such consent not to be unreasonably withheld or delayed) as set forth in the DIP Loan Documents and participation rights. |
| **Governing Law** | The DIP Loan Documents will provide that the Loan Parties will submit to the non-exclusive jurisdiction and venue of the Bankruptcy Court or, in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the state, county, and city of New York, borough of Manhattan, and shall waive any right to trial by jury. New York law shall govern the DIP Loan Documents (other than security documents to be governed by local law, to be determined by the DIP Administrative Agent). |
| **Release** | The Loan Parties will provide customary releases for any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness or obligations related to or arising out of the DIP Loans or the Prepetition Facility (the "<u>Release</u>"). |
| **Remedies** | Immediately upon the occurrence and during the continuation of an Event of Default, the DIP Administrative Agent may, and at the direction of the DIP Lenders shall, (i)(1) declare all obligations to be immediately due and payable, (2) declare the termination, reduction or restriction of any further Commitment, to the extent any such Commitment remains, and (3) terminate the DIP Facility as to any future liability or obligation of the DIP Administrative Agent and the DIP Lenders, but without affecting any of the obligations under the DIP Facility, the liens under the DIP Facility, or post-petition administrative superpriority claim status; and (ii) declare a termination, reduction or restriction on the ability of the Loan Parties to use any cash collateral derived solely from the proceeds of Collateral (any such declaration shall be made to the Loan Parties, the official committee of creditors of the Loan Parties (if applicable) and the United States Trustee (if applicable)). |
| **Winddown Reserve** | Notwithstanding anything to the contrary contained herein, a portion of the proceeds of the asset sales contemplated by this DIP Term Sheet shall be reserved in an amount to be agreed between the Debtors (at the direction of the SRC) and the DIP Lenders to provide for payment of administrative expenses of the winddown of the Debtors' estates following the sale of substantially all assets of the Debtors (the "<u>Winddown Reserve</u>"). |

#4889-0374-9268v21

**Annex I**

**Interest, Discount, Premiums, Fees**

| | |
|---|---|
| **Interest Rate**: | All amounts outstanding under the DIP Facility will bear interest, at the Debtor's option, as follows: |
| | (i) at the Base Rate (which in no event shall be less than 1.0%) plus 9.0% per annum; or |
| | (ii) at the SOFR Rate (which in no event shall be less than 1.0%) plus 10.0% per annum. |
| | As used herein, the terms "Base Rate" and "SOFR Rate" will have meanings customary and appropriate for financings of this type, and the basis for calculating accrued interest and the interest periods for loans bearing interest at the SOFR Rate will be customary and appropriate for financings of this type. |
| **Default Interest**: | During the continuance of an Event of Default, the DIP Loans and all other outstanding obligations under the DIP Facility will bear interest at an additional 2.0% *per annum* above the interest rate otherwise applicable. |
| **Closing Fee:** | An amount equal to 3.0% of the aggregate committed amount of the Revolving Loans, payable to each DIP Lender according to its pro rata share of the Commitment on the Closing Date. |
| **Undrawn Fee**: | A fee of 1.0% on all undrawn amounts under the DIP Facility, which fee shall accrue at the SOFR rate *per annum* and shall be paid monthly. |
| **Agency Fees**: | As agreed with the DIP Administrative Agent. |
| **Nature of Interest and Fees**: | Payable in cash and non-refundable under all circumstances. |