# EXHIBIT 8

1
              UNITED STATES BANKRUPTCY COURT
2
                 DISTRICT OF DELAWARE

3
                      .  Chapter 11
  IN RE:                 .  Case No. 24-11442 (TMH)
4
                      .
  CHICKEN SOUP FOR THE SOUL   . Joint Administration Requested
  ENTERTAINMENT INC., *et al.*,  .
5
                      .
6
                      .  Courtroom No. 3
                      .  824 North Market Street
7
           Debtors.      .  Wilmington, Delaware 19801
                      .
8
                      .  Tuesday, July 2, 2024
  . . . . . . . . . . . . . . . . .  9:00 a.m.
9
              TRANSCRIPT OF FIRST DAY HEARING
10
         BEFORE THE HONORABLE THOMAS M. HORAN
           UNITED STATES BANKRUPTCY JUDGE
11
  <u>APPEARANCES</u>:
12

13
  For the Debtors:        Ricardo Palacio, Esquire
                    ASHBY & GEDDES, P.A.
14
                    500 Delaware Avenue
                    8th Floor
15
                    Wilmington, Delaware 19801
16
                    Michael Cooley, Esquire
                    REED SMITH LLP
17
                    2850 N. Harwood Street
                    Suite 1500
18
                    Dallas, Texas 75201
19
  (APPEARANCES CONTINUED)
20
  Audio Operator:         Ian Willoughby, ECRO
21
  Transcription Company:   Reliable
22
                    1007 N. Orange Street
                    Wilmington, Delaware 19801
23
                    (302)654-8080
                    Email:  gmatthews@reliable-co.com
24
  Proceedings recorded by electronic sound recording, transcript
25
  produced by transcription service.

1  | <u>APPEARANCES (CONTINUED)</u>:

2  | For the U.S. Trustee:     Jane Leamy, Esquire
   |                          OFFICE OF THE UNITED STATES TRUSTEE
3  |                          844 King Street, Suite 2207
   |                          Lockbox 35
4  |                          Wilmington, Delaware 19801

5  | For HPS Investment
   | Partners:                Dennis Dunne, Esquire
6  |                          MILBANK LLP
   |                          55 Hudson Yards
7  |                          New York, New York 10001

8  |                          Andrew Leblanc, Esquire
   |                          MILBANK LLP
9  |                          1850 K Street, NW
   |                          Washington, DC 20006

10 | For the Debtors
11 | Through Strategic
   | Review Committee:         Richard Pachulski, Esquire
12 |                          PACHULSKI STANG ZIEHL & JONES LLP
   |                          10100 Santa Monica Boulevard
13 |                          13th Floor
   |                          Los Angeles, California 90067
14 |
   | For Mr. Rouhana:          Morgan Patterson, Esquire
15 |                          WOMBLE BOND DICKINSON (US) LLP
   |                          1313 North Market Street
16 |                          Suite 1200
   |                          Wilmington, Delaware 19801
17 |
   | For Owlpoint
18 | Management:               Paul Laurin, Esquire
   |                          BARNES & THORNBURG LLP
19 |                          2029 Century Park East
   |                          Suite 300
20 |                          Los Angeles, California 90067

21 | For MidCap Financial
   | Trust:                    Frank Merola, Esquire
22 |                          PAUL HASTINGS LLP
   |                          1999 Avenue of the Stars
23 |                          27th Floor
   |                          Center City, California 90067
24 |

25 |

1  APPEARANCES (CONTINUED):

2  For Cedar Advance LLC:    Shanna Kaminski, Esquire
                            KAMINSKI LAW PLLC
3                           40950 Woodward Avenue
                            Suite 100
4                           Bloomfield Hills, Michigan 48304

5  For SAG-AFTRA, DGA,
   WGA and Affiliated
6  Funds:                   David Ahdoot, Esquire
                            BUSH GOTTLIEB, A LAW CORPORATION
7                           801 North Brand Boulevard
                            Suite 950
8                           Glendale, California 91203

9  For U.S. Bank:           Kimberly Cohen, Esquire
                            SHIPMAN & GOODWIN LLP
10                          One Constitution Plaza
                            Hartford, Connecticut 06103

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                 INDEX

2    MOTION:                                                      PAGE

3    Agenda
     Item 5: Motion for Joint Administration                        68
4            [Docket No.6; filed June 28, 2024]

5            Court's Ruling:                                         70

6    Agenda
7    Item 2: Motion for Entry of Interim and Final                  80
             Orders (I) Authorizing Debtors to (A)
8            Pay Prepetition Wages, Salaries,
             Reimbursable Expenses, and Other
9            Obligations on Account of Compensation
             and Benefits Programs and (B) Continue
10           Compensation and Benefits Programs; and
             (II) Granting Related Relief [Docket
11           No. 3; filed June 28, 2024]

12           Court's Ruling:                                         95

13

14   EXAMINATION:                                                 PAGE

15       BART SCHWARTZ
16       Cross-examination by Ms. Leamy                             88

17

18

19

20

21

22

23

24

25

1          (Proceedings commenced at 9:00 a.m.)

2               THE COURT:  Good morning, counsel.  This is Judge

3      Horan on the record in Chicken Soup for the Soul

4      Entertainment, case number 24-11442.

5               Mr. Palacio, good morning.  How are you?

6               MR. PALACIO:  I'm doing well, Your Honor, good

7      morning.  For the record, Ricardo Palacio of Ashby & Geddes,

8      here on behalf of Chicken Soup for the Soul Entertainment,

9      Inc., and its affiliated debtors.

10              At the outset, as we did yesterday, Your Honor, I

11     want to thank you for accommodating us and having this

12     hearing this morning.  Your Honor, I'd like to cede the

13     podium as we did yesterday, to Mr. Cooley from Reed Smith.

14     Thank you.

15              THE COURT:  Certainly.  Good morning, Mr. Cooley.

16     It's good to see you again.  How did you make out over the

17     past day?

18              MR. COOLEY:  Good morning, Your Honor.  It's good

19     to see you again as well.  And again, thank you for seeing us

20     on both on such short notice and so early in what I know is a

21     busy day for you.

22              As promised, Your Honor, HPS and the company

23     engaged yesterday on some of the key issues raised in the

24     various documents, obviously primarily centered on the DIP

25     motion and the motion to -- what I'll call the motion to

1 reconstitute.

2        Although I was unsuccessful in getting a meeting

3 between the principals yesterday, which I had hoped to

4 achieve, Mr. Pisa (phonetic) and I, nevertheless, had several

5 conversations through the day and into the evening.

6        Among the other fundamental issues, one of the

7 ones that I understand HPS remains really adamantly opposed

8 to or adamant in their position on is not just that they are

9 opposed to Mr. Rouhana's control of the company, which is

10 obviously something that we dealt with, company dealt with

11 prior to the bankruptcy, with his resignation and replacement

12 as CEO, but also their opposition to the presence and

13 existence of the new board, which the company contends

14 comprises independent board members.  But HPS obviously

15 disagrees.  They want their former directors back.  And I

16 gather that is -- that is sort of where we are.

17        THE COURT:  Hey, Mr. Cooley.  I can't tell if you

18 are frozen or if you have stopped speaking.  Okay.  I think

19 Mr. Cooley's frozen.  Mr. Palacio?

20        MR. PALACIO:  Your Honor, again, for the record,

21 Ricardo Palacio of Ashby & Geddes on behalf of the debtors.

22        Your Honor, I wish I could give you more

23 information in terms of those discussions between HPS and the

24 debtors.  I just was not privy to them.  So I can't sit here

25 and characterize what did or did not happen and what the

1  current state of play is.

2              I reached out to Mr. Cooley to try to get him back

3  online.  If Your Honor may indulge us to try to get him.

4              THE COURT:  Absolutely.  It looks like he's just

5  dropped off and Zoomed to come back in.

6              MR. PALACIO:  Your Honor, one suggestion while we

7  try to get him, and I did speak to Mr. Cooley prior to the

8  hearing, is to allow the other parties to be heard, including

9  HPS as well as Owlpoint, just to keep the hearing going and

10  not to simply delay things.  So that would be my suggestion,

11  Your Honor, but, of course, however you would like to

12  proceed.

13              THE COURT:  All right.

14              MR. COOLEY:  Your Honor, I'm so very sorry.  I'm

15  not sure what happened, but my internet just blinked out on

16  me.  I'm gratified that it came back.  That was a little

17  heart stopping.

18              I think where I was was to say we filed a short

19  while ago a motion or an objection to the motion to shorten

20  notice on the motion to reconstitute.  We obviously have real

21  concerns about the very final, very significant effect of the

22  relief sought by them, including, frankly, not just the

23  implications for the company, but also for potential

24  individuals who I would assume would be called as witnesses

25  in connection with that, including Mr. Rouhana.

1          There are serious allegations, and there were

2    serious personal implications, and the idea of going forward

3    without a chance for people to properly prepare and respond,

4    I think, would be highly prejudicial.  I can come to that at

5    the appropriate time.

6          Otherwise, I think the Court has asked me for an

7    update, and I've provided it.  Perhaps the best thing for me

8    to do is yield to Mr. Dunne and possibly also the counsel for

9    Owlpoint, if the Court wishes to hear from them, or whomever

10   the Court wishes to hear from.  Thank you.

11          THE COURT:  You're welcome.  Sure, I'm happy to

12   hear from anybody who'd like to be heard.  Why don't we start

13   with Mr. Dunne, please?  Good morning, Mr. Dunne.

14          MR. DUNNE:  Good morning, Your Honor.  And again,

15   I echo the comments from debtor's counsel.  We appreciate you

16   accommodating us on such short notice.

17          With the Court's indulgence, I'd like to give a

18   quick overview of the last 24 hours, how I think today could

19   play out for the matters that Your Honor is being asked to

20   adjudicate.  But most importantly, I'd like to just give a

21   little history of the case.  Because while what happened pre-

22   petition didn't happen on your watch, a number of those are

23   going to animate decisions that Your Honor is going to have

24   to decide over the next ensuing weeks.

25          And I'm not going to get into the motion

1  specifically.  It's really just to give the perspective of

2  HPS, who has had, I think, the most interactions with the

3  company and Mr. Rouhana of any of the creditors, though I

4  know that a number of the other creditors have had similar

5  reactions.

6          So with the Court's permission, I just want to

7  cover those three topics.

8          THE COURT:  Yes, sure.

9          MR. DUNNE:  So with respect to the last 24 hours,

10  we were very focused, as I think the court was, on figuring

11  out a way to fund the payroll for the employees and the

12  health insurance for the employees.  And we told the company

13  that we were willing to provide those sums to a DIP.  And

14  with respect to other amounts -- this finally was a surprise

15  to us.  We didn't know when it was going to happen.  There

16  was no pre-petition conversations that you would typically

17  see with your incumbent, large, first lien lender about use

18  of cash collateral, a DIP, and more importantly, what was the

19  financial condition (inaudible) condition and cash flow needs

20  of the company going forward.

21          So for that half of the DIP request, we said we

22  needed that information.  We'd analyze it quickly.  But what

23  we could give them now is enough to kind of clean up the

24  payroll for the employees and the insurance.

25          And we also required, and I'll get into this in

1  detail because it's important -- the SRC that was in place,

2  the director that was in place a few weeks ago to be

3  reactivated because were think they were (inaudible), and

4  I'll come back to the reasons for that in a second.

5          Debtor's counsel also made much about a

6  conversation among principals.  My understanding is that

7  conversation has occurred before the hearing.  And we always

8  intended to have the principals try to get it across the

9  finish line once we got a response from the company on our

10  proposal.

11          That response didn't come in yesterday.  It came

12  in at 6:00 a.m. today.  And it showed that we were nowhere

13  close, which is why we're in front of Your Honor.  And then

14  we set up the conversation among principals, which occurred,

15  I think, shortly before this hearing.

16          Before I get into the history, which I think is

17  the main point of my comments, I want to just make one

18  observation about the filing that the debtors made a few

19  minutes ago.  It's something that I haven't seen at all,

20  which is they're basically saying, Your Honor, let's not

21  compel Mr. Rouhana to testify today because it could be,

22  "grossly unfair" and prejudicial to him to do that.

23          Two points, Your Honor.  He's the debtor's chosen

24  first day declarant.  I don't know how we go forward on the

25  relief requested if he does not testify.  They chose him.  He

1  should be made available.  And if not, they're not going to

2  meet their burden on the DIP (inaudible).  But also

3  importantly, you see, Your Honor, why we're concerned that

4  Mr. Rouhana is still in control of the company.  He got the

5  company to do his bidding and to try to avoid testifying

6  personally because it may have collateral consequences for

7  him in other civil or otherwise contexts.

8          And so that is why we have been focused on

9  governance, even though Mr. Rouhana has handpicked the new

10 board members that replaced the SRC.

11         So Your Honor, just a little history, and I only

12 need a couple of minutes here, and I'm not going to describe

13 all of it.  This is not a full recitation.  That's all for

14 another day.  Just some history that's relevant to questions

15 the Court will face today.

16         One thread is the outpoint and similar financings.

17 In November of last year, 2023, the company reached out to

18 HPS to advise us that a bankruptcy filing is imminent unless

19 we agreed to (inaudible) our debt for a stake in the company.

20 Their accountants were saying they may get a qualified going

21 concern opinion from their auditors.

22         All of these are your traditional bellwethers of

23 the need for a restructuring and a permanent fix to the

24 balance sheet.  We told them that we would discuss the terms

25 of a potential DIP and an orderly Chapter 11 filing.  They

1  went a different path, which I'll describe in a second.  We

2  think the company should have filed then, but they chased

3  some outward financing.

4          What we didn't know then but what we know now,

5  Your Honor, is that the company started right around that

6  time to wrongfully redirect and convert employee payroll

7  taxes to other uses.  The company spent what should have been

8  remitted to various governmental agencies on behalf of their

9  employees, and I haven't seen that level of convergence for

10 that long outside some of the most notorious cases over the

11 past few decades.

12         And instead they wasted the first six months.

13 They chased the GRA financing of Redbox.  We were told

14 repeatedly, 30, 45 days from closing.  Then there was GRA and

15 Owlpoint working together financing that was going to close

16 in early May.  That didn't happen either.  We kept

17 accommodating.

18         There was additional requests and time to try to

19 do something out of court.  But there was a pattern of

20 promises that were broken, sometimes gravely so.  And it's a

21 pattern that we're still seeing that they're not getting on

22 with the kind of traditional paths for companies in this

23 situation in terms of engaging with the 1L's trying to get a

24 use of cash collection or a DIP from your incumbent lenders.

25 And all the while, value deteriorated or was diverted away.

1  And we are seeing that pattern play out now.

2            So my last point, Your Honor, is the most

3  important one.  It's the recent forbearance agreements.  It

4  raises the corporate authority issues and is also relevant to

5  the DIP motion.

6            The HPS loan came in as principal amount of more

7  than 500 million in August of '22.  It provided for PIK

8  interest initially, so the company had no cash interest

9  obligations until this year.

10           In February of this year, the interest obligations

11  switched from PIK to cash pay.  The company couldn't make the

12  payment, which led to a default, and the forbearance

13  (inaudible) come about discussed, and ultimately the pre-

14  petition acceleration of our debt.

15           After the company missed its interest payment, the

16  debtors asked us to forbear from exercising revenues.  We did

17  so.  There were also some various amendments to the credit

18  agreement at that time.  Mr. Rouhana, who's the majority

19  stockholder, also executed an irrevocable proxy which granted

20  the HPS the right to vote his shares in connection with any

21  corporate action.

22           The credit agreement and (inaudible) were also

23  amended.  The debtors of each of its subsidiaries were

24  required to maintain two independent directors on their

25  boards.  Each board must establish and maintain an

1  independent subcommittee, which is what we have referred to

2  as the SRC, the strategic review committee, which must

3  include those two independent directors, John Young

4  (phonetic) and Rob Rorshower (phonetic).  They were

5  appointed, they were serving, they had counsel, Rich

6  Pachulski of the Pachulski firm.

7          In addition, none of the debtors could file for

8  Chapter 11 without the affirmative resolution of the majority

9  of each of these SRC.  The corporate governing documents of

10  the subsidiary were amended to effectuate these requirements.

11  So the operative internal documents had these requirements in

12  there.

13          And further, the entities agreed to vote in favor

14  of restructuring transactions approved by the SRC and against

15  actions that are inconsistent with the forbearance agreement

16  or the credit agreement.  As I'll describe is Mr. Rouhana

17  willfully and brazenly breached those provisions by

18  terminating all those directors.  But before I get to that

19  point, there's another relevant aspect.

20          HPS agreed as part of that forbearance to accept

21  40 cents on the dollar in satisfaction of its debt, provided

22  they received funding on that by June 6th.  So for a $500

23  million obligation could be retired and satisfied

24  (inaudible).  The debtors couldn't raise the funds by June

25  6th, and they asked HPS to extend the date to (inaudible) to

1    June 11.  We read yet again the debtors couldn't meet that

2    deadline either.

3             That prompted another act of bad things where Mr.

4    Rouhana then reported to terminate all of the directors on

5    the various boards, save himself, on the eve of the

6    expiration of the forbearance agreement in violation of the

7    proxy and the constituent operative documents at the

8    subsidiaries.  He then replaced them with his handpicked

9    directors who are still serving.

10            There's a couple of takeaways here, Your Honor,

11   and then I'll yield the podium.  We had heard at that time,

12   as did Richard Pachulski who was in -- I think he's on the

13   Zoom now and represents the SRC -- that the company and Mr.

14   Rouhana were concerned that the SRC was imminently going to

15   file the company for Chapter 11.  And they didn't want that

16   to happen.

17            Here we are two weeks later, roughly, and we are

18   in Chapter 11.  And what happened in that timeframe is the

19   company missed its payroll and fails to fund health insurance

20   for its employees.  But the real reason he terminated the

21   forbearance agreement and the directors were removed

22   (inaudible) and to not avoid Chapter 11 at all but to place

23   his handpicked directors in the seats for the Chapter 11 to

24   assert more control.

25            The lack of corporate authority, Your Honor, is

1    troubling.  It points to some ultra vires acts as well.  Mr.

2    Rouhana believes that the irrevocable proxy didn't strip him

3    of his ability to vote his shares to move directors because

4    the operative docs at the public company were not changed and

5    prohibited.

6              We disagree and this is an issue for another day.

7    There's Delaware case law that's helpful on the scope of

8    proxies such as the one that Mr. Rouhana granted.  But we can

9    debate that in the future.

10             What I want to just underscore here is that that

11   argument, the only one they have, only exists for the parent.

12   The SRC was also appointed and served at each of the

13   subsidiaries.  Those subsidiaries were LLCs and the operative

14   documents of each of them were amended to include the

15   required provisions and restrict removal of the directors.

16   That was just blatantly ignored, and as a result, had no --

17   didn't have the proper effect to swap out those directors.

18             Two points, Your Honor.  On the willingness of HPS

19   to take a substantial discount, the forbearance and related

20   documents provided the debtors with a unique opportunity, one

21   I rarely see, namely, to retire to a person in debt within a

22   time frame for a substantial discount, in this case for a 60

23   percent discount.

24             Obviously, the debtors and Mr. Rouhana would be

25   extremely motivated to do so.  For payments of roughly 200

1  million, they could have removed over $500 million of

2  liabilities in the balance sheet, but they could not raise

3  the money.  No one was willing to fund that amount.  It is

4  probative of one of the key issues that are contesting DIP

5  financing today.

6          The debtors are alleging that it is so clearly the

7  case that we are over-collateralized and over-secured that

8  they can use the equity (inaudible) and the collateral as

9  addictive protection.  But they couldn't find a way out just

10 weeks ago to take HPS out at 40 cents on the dollar, and they

11 couldn't find a market participant, a third party willing to

12 fund on the (inaudible) package 40 cents.

13         Last point, Your Honor, you heard from the

14 debtor's counsel and their pleadings actions that HPS may

15 have taken or claimed they may have.  We obviously disagree

16 that any claims ever existed and always viewed those

17 assertions as noise, nuisance.  All the while the debtors,

18 you know, kept missing their projections and never actually

19 have a compliant KPL.  But that's an irrelevant side show.

20         The one point I want to drive home to the Court

21 now and for everyone to understand at the outset of the cases

22 is that the debtors and Mr. Rouhana contractually released

23 any claims against HPS as part of the forbearance agreement

24 that was executed a few weeks ago.

25         That ends it, and we shouldn't waste any more

1    court time on that fatuous topic.  It also speaks volumes as

2    to what they really think about those claims.  They were, as

3    is often the case, released in those -- in those forbearance

4    agreements.

5              Your Honor, there's also -- this is going to come

6    up in a bunch of the first day motions with my partner, and

7    (inaudible) will handle.  Mr. Rouhana owns several companies

8    that track and interact with the debtors, and they provide

9    managerial and back-office services.

10             We suspect that significant value leaked to those

11   entities over the past several quarters while other parties

12   were harmed by the continued degradation in operational

13   performance and overall value.  And that will all be the

14   subject of investigation and, no doubt, further litigation.

15             But for today's will be -- we need to ensure

16   against any further leakage or value or erosion to those

17   affiliated parties controlled by Mr. Rouhana.  Your Honor,

18   you'll hear from Mr. LeBlanc later with respect to our DIP

19   objection.  I want to be clear.  We did not consent to the

20   DIP facility.  We're willing to fund an alternative that will

21   pay the employees and then negotiate whatever is the

22   appropriate amount for the balance of the case after we have

23   conversations with respect to the contours of what the

24   Chapter 11 should look like.

25             They are proposing, Your Honor, Hail Mary DIP.

1  They're hoping Your Honor kind of doesn't open the panic

2  doors, precedent on adequate protection and what you need to

3  find in order to approve it.  And they're also not making a

4  witness available, their witness, to testify.

5          And with that, Your Honor, we'll yield the podium

6  to others.  We hope that we can fix the governance issues

7  soon.  We think that that's a gaming item, and if we could

8  reactivate the SRC and its counsel, both who have impeccable

9  reputations, that would go a long way to restoring some

10 transparency and trust.  Thank you, Your Honor.

11         THE COURT:  Thank you for your comments, Mr.

12 Dunne.  I see a few people on screen.  Let me start with Mr.

13 Pachulski.

14         MR. PACHULSKI:  Thank you, Your Honor.  As always,

15 I appreciate Your Honor giving us the opportunity.  Your

16 Honor.  Richard Pachulski, Pachulski, Stang, Ziehl & Jones on

17 behalf of the strategic review committee, which if okay, I'm

18 going to refer to it as the SRC.

19         THE COURT:  Of course.

20         MR. PACHULSKI:  Thank you, Your Honor.  As Mr.

21 Dunne stated, there was a belief that there would be a

22 default under the April 29th forbearance agreement as of June

23 6th.  There was a hope that wouldn't happen.  But in light of

24 that possibility, the SRC retained our firm to assist in the

25 event that that default took place.

1          What I want to do is deal with what I refer to as

2    significant disclosure problems.  And what I've learned in my

3    career is probably the first rule of restructuring is

4    disclosure.  We've seen what happens when you don't disclose

5    and the effects are, to say the least, really bad.

6          So I want to go through some of the lack of

7    disclosure in this case, but I do want to comment something

8    Mr. Cooley said, which is we have independent directors, and

9    we put them in.  Mr. Rouhana, who apparently is concerned

10   about criminal actions, potentially, is the one who put them

11   in.  But I'm not going to even argue that, because I've seen

12   that, and I've made this argument before, many times.  Mr.

13   Cooley has a value, cleaned it all up.

14         In none of those cases was there independent --

15   were there independent directors that were wrongly terminated

16   as part of a forbearance agreement.  So while an interesting

17   argument, and one that lots of debtors' professionals like

18   myself make, it is completely inapplicable in this case.

19         So let's go through some of the lack of

20   disclosure, including in the filing of the papers, which

21   frankly, Your Honor, is one reason I think Your Honor set the

22   hearing for Monday.  Your Honor read the papers.  They were

23   pretty plain vanilla in many respects.  There was no

24   reference at all to some of the things that HPS had been

25   objecting to.

1           And so Your Honor set the hearing, and I think,

2    frankly, was probably pretty surprised when HPS, within 48

3    hours, who had not complained, as far as I know, had to file

4    an objection to a priming (inaudible), which I'll deal with

5    in a moment, and had -- and filed a motion.  And I think this

6    is important -- to not just reconstitute the board, but in

7    the alternative for a Chapter 11 trustee or a Chapter 7.

8           It was so egregious that HPS made the

9    determination that there should be a Chapter 7 trustee

10   potentially.  Now, I've had two of my colleagues call me, one

11   who had nothing to do with his case, and said, is HPS

12   kidding.  My response was no.  They are so disturbed by

13   what's happening here that their only alternative, a horrible

14   alternative for Chapter 7, they will accept it,

15   notwithstanding a $500 million (inaudible).

16           Now, why is that?  Your Honor, if you read the

17   pleadings carefully, which I know Your Honor did, you would

18   have no idea that there was a (inaudible) forbearance.  None.

19   You'd have no idea that that exists.  What Your Honor also

20   wouldn't know because this wasn't disclosed is that there was

21   8K filed with that forbearance agreement that required

22   because it was a public company that provided that a Chapter

23   11 could not be filed unless the two directors, Mr. Rorshower

24   and Mr. Young, approved of that filing.

25           I would suspect Your Honor missed that in the

1  pleadings because it doesn't exist.  It would have been nice

2  if they had stated, even if, just like counsel said, we have

3  independent directors, we have an alternative, they said,

4  yes, this was the case, but we have the argument, which they

5  don't.  But it was clear those two directors had to approve

6  it.  Not disclosed.

7           Here's what else isn't disclosed, Your Honor, for

8  a public company and the 8K requirement.  After the change of

9  the board, wrongly, on June 11th, on June 12th, HPS sent a

10 letter saying that the change was wrong.  That is not

11 disclosed in the 8K.  But if that's not enough, Your Honor,

12 the day after that, on June 13th, HPS sent an acceleration

13 notice.  Amazingly, that's not included in the 8K.  In an 8K.

14          But if we're not done yet, on June 14th, after the

15 first letter on the 12th and the acceleration letter on the

16 13th, on June 14th, they said that they are going to

17 immediately exercise their revenues in a letter.  That, too,

18 is not included in the 8K.

19          Now, interestingly enough, they know how to file

20 8Ks because they filed one on June 17th, not disclosing any

21 of what I just described from the 12th, 13th, and 14th, but

22 describing that the board had been reconstituted.

23          Now, that all should have been disclosed, but what

24 else wasn't disclosed, Your Honor, we show up at a hearing

25 yesterday, and HPS -- they didn't disclose that they really

1 hadn't spoken to HPS, which is a first in my career, and I

2 think I do as much better work as any, that they had no

3 agreement or disagreement.  It was just kind of alluded to in

4 some respects.  But what they clearly didn't disclose is they

5 had not spoken to any of their secured creditors, four of

6 which were on the call yesterday, all of which were being

7 primed.  No disclosure of any of that, Your Honor.  Almost

8 unheard of.

9           So what does the SRC believe?  The SRC believes

10 that Your Honor must hear the motions reconstituted before

11 you can really hear anything else because there is no

12 corporate authority.  And the SRC believes, notwithstanding

13 that it may mean that it will not be reconstituted, but there

14 will be a Chapter 11 trustee or a Chapter 7 trustee, that

15 those are better alternatives than having what this company

16 has.

17           Now why is that, Your Honor?  Here's why.  We have

18 a public company which never stopped Mr. Rouhana from doing

19 dividends or self-serving (inaudible) agreement to pay

20 himself.  Why else?  Because payroll wasn't paid.  No attempt

21 to work through that issue.  Why else?  Because medical

22 benefits where people are basically told, see if you can

23 avoid elective surgery, stopped on May 14th.

24           But the most -- but the interesting thing is they

25 did disclose the $15 million monthly payroll taxes.  But

1   here's what they didn't disclose, Your Honor.  Mr. Rorshower,

2   Mr. Cohen was an independent director on the board, and Mr.

3   Young, were not told about the unpaid payroll taxes.  What

4   originally was -- they were told was 10 million and then 15

5   million sometime, I believe, in early June.  They had never

6   heard about the unpaid payroll taxes which had been going on

7   for months.  For months.  Because this board was never told

8   anything that Mr. Rouhana didn't believe was in his interest.

9           So where does that leave us?  The SRC and I have

10  taken a very hard look at the (inaudible), and maybe in some

11  cases we would have said let's figure out a way to get the

12  money.  But there are two key points, one point that Mr.

13  Dunne has alluded to and another that is in their pleadings,

14  but has not been specifically alluded to in this.

15          The first he alluded to is they are seeking to

16  find a security creditor, a very well-known prime, who looks

17  for yield, who was willing to pay $200 million of an excess

18  of a $500 million obligation.

19          Now, Your Honor, I have done a number of primes

20  with my career, but that's because it's a long career, and I

21  could probably count them on less than two hands at

22  (inaudible).  And when we have, we have had detailed

23  valuations, we've had detailed budgeting to see how it's

24  going to go forward.

25          What do you have, aside from some general

1   characterization by Mr. Rouhana, you have a pleading that

2   says there was a report due in 2023 that is not attached to

3   anything, that is not authenticated in any way, that was done

4   as some kind of pro forma valuation on an assumption that the

5   losses would be in the neighborhood of 70 million when the

6   losses, again not disclosed, were 700 million, 10 times.  I

7   don't see how Your Honor can approve the DIP with the factual

8   basis, aside from the fact Your Honor doesn't even know who

9   the secured creditors are, your priming, because the debtors

10  didn't see fit to put it in a pleading.

11          So Your Honor, I don't like what's happening to

12  1100 employees or the number I believe it is.  It's really

13  unfair.  But what's unfair is that Mr. Rouhana egregiously

14  changed the board and had never had a discussion about filing

15  the Chapter 11.  There's no letter, there's no discussion.

16  It was an excuse, I guess, that Mr. Rouhana made for doing

17  it.  There was no basis for it.  There was no agreement with

18  the lenders to fund a DIP.

19          So I am not in the business of assisting boards in

20  filing Class Chapter 11s.  So this was all just something

21  that was made up.  But I wanted to state the last point,

22  which I found actually in some respects the most surprising

23  which Mr. Dunne referred to.

24          So this morning we did see the pleading that oh,

25  we should delay this hearing.  We should delay, I'm sorry,

1   the board reconstitution motion because there may be criminal

2   issues.  Well, Your Honor, most of the time that there are

3   motions for appointment of trustee, there are criminal

4   issues.  And Mr. Rouhana is going to have to deal with

5   (inaudible) because not filing 8Ks when people are trading on

6   the stock is completely inappropriate.

7          But that is not an excuse to either file a

8   declaration and then say, oh my God, I may have criminal

9   liability down the road because he may have waived.  I'm not

10  a criminal lawyer, but I don't know what his issues are.  But

11  this should happen now.  This should happen.

12         And I understand it's not going to happen this

13  week, but there should be a hearing on reconstituting the

14  board or, alternatively, to appoint a trustee or convert this

15  case.  Because to allow Mr. Rouhana to be the puppeteer here,

16  which is only doing dramatic damage to all the constituents,

17  not just HPS and not just the employees, but all the

18  creditors who are literally owed hundreds of millions of

19  dollars because of how this company was ran, is fundamentally

20  unfair.

21         And with that, Your Honor, I ask that you simply

22  suspend the hearing on the motion -- that is what the SRC is

23  asking for -- and that you immediately set the motion that

24  counsel would like to have delayed because people have to

25  speak to their criminal counsel, which frankly they could do

1  today.  It's not that complicated.  They will either testify

2  or they won't.

3            And with that, Your Honor, I will cede the podium.

4  But I certainly believe that going forward with a losing DIP

5  is really not in anyone's interest at this point.  Thank you

6  again, Your Honor.  And I'll be happy to answer any questions

7  Your Honor has.

8            THE COURT:  Thank you, Mr. Pachulski.  I'm going

9  to continue to hear from others, but I want to offer this

10 initial observation.  I can't imagine what the path is to

11 approval of the proposed DIP today.  I just can't see it.

12           And really my primary concern right now is the

13 employees.  And what I hope could happen, and I know that

14 there were talks over the last 24 hours, but if something

15 could be agreed today so that we can pay those people and

16 restore their health benefits.

17           It's just kind of staggering to me that that's

18 where this company is.  And Mr. Pachulski referred to what I

19 didn't see in the papers, and he's absolutely right, of

20 course, because they weren't there.  And I was pretty shocked

21 yesterday morning when I started reading the filings that

22 were coming in and learning all the things that were omitted.

23 What frankly looked to me over the weekend like a fairly

24 routine first day hearing was going to turn out to be

25 anything but.

1    Look, I'm going to go on and continue to hear from

2  the others who'd like to be heard, but I just can't imagine

3  what the path is today.  And particularly if Mr. Rouhana

4  doesn't want to testify, if the debtors don't want to

5  testify, what evidence will you be able to give?  You're

6  dependent on him.

7    MR. COOLEY:  Your Honor, if I can speak to just

8  that one point.

9    THE COURT:  Yeah, please do, Mr. Cooley.

10    MR. COOLEY:  Let me clarify at least one thing.

11  And I wanted to say also, I really sort of thought that we

12  were going around the room to sort of say our piece about the

13  current state of play and not make full opening statements.

14  I would note the debtor has not made one yet.  That's

15  normally the debtor's prerogative to go first.  And so I'm

16  going to find myself in the position of just responding to

17  everyone when they were done.  And I'm happy to do that

18  because that's now what we're doing.

19    But let me just be very clear because I could see

20  Your Honor's expression, and perhaps you could see mine when

21  that came up.  What we said in the papers, and I thought we

22  were clear about this, is that Mr. Rouhana, to the extent he

23  may have exposure, and that's true for anyone else, and I

24  don't know who has exposure, who has liability, but given the

25  nonpayment of payroll taxes, I can certainly imagine that

1   there are people who do, and that may include Mr. Rouhana.

2            Our point in the objection was that Mr. Rouhana

3   should not be compelled to testify on 24 or 48 hours' notice

4   regarding those matters, because those matters have

5   implications far beyond the case that could extend to him

6   personally, depending on what the evidence shows.

7            I don't think we ever said, and I want to be very

8   clear, we are absolutely prepared, if necessary, if we get

9   that far, to put Mr. Rouhana on the stand as our first day

10  declarant, as we intended from the start, to testify in

11  support of first day.  That's a very important distinction.

12  And when I heard Mr. Pachulski say that, as I said, I could

13  see the Court's expression, and understandably so, given the

14  confusion.

15           But our first day declarant is absolutely here and

16  available to testify, again, if we get that far.  Our concern

17  is that if we were to go into the motion to reconstitute

18  today, that that would be potentially prejudicial to him,

19  given the lack of opportunity to prepare for hearing on

20  proper notice, et cetera.

21           So I thank you for letting me make that one

22  clarification, Your Honor.  I'm happy to let the Court -- if

23  the Court would like to continue letting people say their

24  piece, and I'll come back around and respond to some other

25  points at the end, I'm happy to do that as well.  But I thank

1  you for letting me clean up, clear up at least that one bit

2  of confusion that clearly existed.

3            THE COURT:  Yeah, I appreciate it, Mr. Cooley,

4  because I shared that misunderstanding of what the debtor's

5  position was.  So I'm happy to hear that.  Mr. Rouhana --

6            MR. COOLEY:  This is what happens when we have to

7  draft things quickly, Your Honor.

8            THE COURT:  I understand.

9            MR. COOLEY:  We do the best we can.

10           THE COURT:  Yeah.

11           MR. LEBLANC:  Your Honor.  Your Honor.

12           THE COURT:  Who's speaking?

13           MR. LEBLANC:  Your Honor, Andrew LeBlanc.  I

14  apologize.  If I could just respond to that point, Your

15  Honor, if possible.

16           THE COURT:  Okay.

17           MR. LEBLANC:  Your Honor, obviously, if Mr.

18  Rouhana were to testify today, we would expect to be able to

19  cross examine him as we would any -- I'm Mr. Dunne's

20  litigation partner, Your Honor.  We'd expect to cross examine

21  him, including with respect to matters that either are in the

22  motion or should have been in the motion.

23           Frankly, the things that we would question him

24  about, many of them are included in their motions, including

25  the nonpayment of payroll taxes.  That's included in the

1  wages motion, one of the motions that we objected to.

2           So I don't know the distinction that counsel is

3  trying to draw.  If they're saying he's willing to put in his

4  declaration but not willing to be cross examined, we

5  obviously -- that's an unacceptable outcome for us.  If he's

6  prepared to be cross examined, then we'll cross examine him.

7  We are here ready to do so, Your Honor.

8           But again, with respect to his testimony on the

9  DIP, I think all of these issues are going to be implicated

10 in because it's this reconstituted board that has approved

11 the Owlpoint proposed DIP.  And so all of these issues are

12 going to be front and center in any objection to the first

13 day claim.

14          So if Mr. Rouhana is called to testify here, Your

15 Honor, we expect to cross examine with him on any and all

16 topics that are relevant to the matter before the Court.  And

17 that includes the unpaid payroll tax taxes, because that, as

18 the debtors noted, that was in their plea.  That's how we

19 learned --

20          MR. COOLEY:  And we did.  We disclosed that in our

21 -- I think it was in our wages motion and frankly disclosed

22 it for the purpose of expressing to the Court that nothing in

23 the motion was meant to seek authority to pay those amounts.

24 Obviously, any first day declarant is available, is subject

25 to cross examination.  Obviously, any cross examination has

1  to be relevant to the issues actually raised in the relief

2  sought in the motions.  I appreciate Mr. LeBlanc's position.

3          THE COURT:  Okay.  Mr. Rouhana's counsel has come

4  on the screen.  So let me hear from Ms. Patterson, please.

5          MS. PATTERSON:  Good morning, Your Honor.  Morgan

6  Patterson, Womble, Bond, Dickinson, on behalf of Mr. Rouhana

7  and non-debtor Chicken Soup for the Soul, LLC.  I'm joined

8  here today by my colleague Claire Rauscher, as well, from

9  Womble.

10          Your Honor, thank you for the time.  Womble was

11  engaged about 48 hours ago to assist Mr. Rouhana.  So we are

12  still finalizing our engagement and trying to get up to speed

13  on the matters here.  You know, I would put simply, Your

14  Honor, I'm sure this comes as no surprise to the Court that

15  Mr. Rouhana vigorously disagrees with the characterizations

16  that have been made, both here and in the meeting.

17          And you know, we of course, leave it to the

18  debtors to support their motions that they have filed today.

19  And what we would reiterate the arguments in the debtor's

20  objection today when it came to the scheduling, we would ask

21  the Court to give Mr. Rouhana and the debtors a full and fair

22  opportunity to respond to that.

23          We would also ask, Your Honor, that if Mr. Rouhana

24  is testifying today, depending on where the hearing goes from

25  here, that myself and Ms. Rauscher are able to participate

1   and assist Mr. Rouhana in defending himself throughout that

2   cross examination.

3          We're certainly here and happy to answer any of

4   the Court's questions, but as I mentioned, we are still

5   getting up to speed.  So that's all I have for Your Honor

6   today.

7          THE COURT:  Okay.  Thank you, Ms. Patterson.

8          MS. PATTERSON:  Thank you.

9          THE COURT:  Is there anyone who hasn't already

10  addressed me that'd like to be heard?  Mr. Laurin, you were

11  waiting for quite a while.

12         MR. LAURIN:  I appreciate that, Your Honor.  And

13  it's a pleasure to be in your court.  We have -- this is

14  really by way of introduction more than anything else.  I

15  mean, the totality of our position is set forth in the four

16  corners of the DIP term sheet.  We have labored long and hard

17  to meet the debtor where it is, and we're hopeful for a

18  positive outcome.

19         THE COURT:  Okay, thank you Mr. Laurin.

20         Mr. Merola?

21         MR. MEROLA:  Your Honor, thank you.  Frank Marolla

22  of Paul Hastings on behalf of MidCap.

23         Your Honor, my head is kind of spinning because

24  this is a first day hearing in a publicly traded company.

25  And while there's a lot of accusations going back and forth,

1   there seem to be certain facts that are undisputed.  First of

2   all, pre-petition, that was complete and total management

3   too.

4          And if I understand it right, the dispute is

5   whether the replacement of the directors and officers was

6   only in violation of the written agreements for the secured

7   creditor, or whether it was also in violation of the very

8   formation documents that controlled these LLCs.

9          We're now told that of all the things that need to

10  be delayed in the whole process, the idea that we might

11  reconstitute or put things back to where they were is the

12  issue that can trail the other substantive matters in the

13  day.

14         And Your Honor, I would submit that that's

15  incorrect.  That in a world where the counsel is appearing

16  today not on behalf of the debtor, they're appearing on

17  behalf of debtor in possession, a fiduciary to all creditors,

18  not on behalf of Mr. Rouhana, not on behalf of his new board,

19  they are appearing as a debtor in possession, as a fiduciary

20  for all creditors.

21         And the idea that we have to somehow handicap this

22  hearing because the principal of a publicly traded company is

23  going to take the Fifth in his testimony for the first day is

24  all you need to hear to resolve the issue of a trustee.

25         Chapter 11 bankruptcy is not made for people to

1  run public companies when they've committed acts that require

2  them to take the Fifth on the first day.

3          Secondly, pre-petition, it doesn't seem anyone at

4  the company that was in control was very concerned about the

5  payroll or the taxes or the benefits.  We see no effort in

6  the declaration of liquidity to make those payments.  We see

7  no engagement with HPS on their offer to overextend to make

8  those payments.

9          And what you have here is whoever's in control of

10 the debtor has decided to hold the employees, their salaries,

11 their taxes, and their benefits hostage in a corporate

12 governance fight.

13          Now, while that would be bad enough, again, Your

14 Honor, after petition date, that's not just a fight between

15 Mr. Rouhana and the SEC and HPS.  It is now a fight with us

16 because when they filed, they became a debtor in possession.

17 They are now a fiduciary.

18          What's the most distressing to me, Your Honor, is

19 not only Mr. Rouhana (inaudible) today, what's most

20 distressing to me is the idea that purportedly independent

21 directors are standing by and telling counsel to go forward

22 with a shoot the moon DIP proposal solely to keep Mr. Rouhana

23 in control.

24          Your Honor, we have to resolve the governance

25 issue before we address any of these issues.  We have to have

1   credible information from inside the company regarding

2   projections and expectations and business plans.  And at this

3   point, Your Honor, the trust between the debtor in possession

4   and the creditors constituencies has been ruptured.  And it's

5   been ruptured in a way that I don't think is repairable.

6            So the question for you, Your Honor, is do we go

7   the reconstituting route?  And I agree that would be more

8   complicated, and that would require a hearing, and that would

9   require witnesses.  Or do we just take the idea that, you

10  know, the principal of the debtor is going to take the Fifth

11  on the first day declaration, and that's all we need to hear.

12           You've heard the secured creditors say they would

13  prefer a Chapter 7 trustee to the continued matter.  That's a

14  pretty strong statement on the first day of the case.  HPS,

15  in many ways, is the tail wagging the dog.  We have a

16  security interest in a film library that we want to be

17  retained on, but the (inaudible) may not be as fortunately

18  positioned as MidCap to represent themselves.

19           There are hundreds of creditors in this case that

20  are being dragged along in the soap opera through no fault of

21  their own.  And most seriously, Your Honor, the employees.

22  (Inaudible) have to do something urgently to put liquidity in

23  (inaudible) employees paid, and put a management in place

24  that is going to think about more than their own personal

25  exposure over pre and post-petition.  Thank you.

1          THE COURT:  Thank you, Mr. Merola.

2          Ms. Leamy, good morning.

3          MS. LEAMY:  Good morning, Your Honor.  Jane Leamy

4    for the United States Trustee.  Suffice it to say, like the

5    others that have spoken, we have a number of unanswered

6    questions about this case.  We have very serious concerns

7    about some of the relief that's sought on a first day basis.

8          This was billed to me at the hearing yesterday

9    would be an emergency wage motion only and financing in

10   connection with that.  I learned shortly before the hearing

11   that the lender, the pre-petition lender, you know, had not

12   agreed to be fined.  And I agree -- I'm not sure how you go

13   forward with the financing that's necessary for the wages

14   absent the consent of the lender as well as the other lender,

15   counsel that appeared yesterday.

16         So I'm not sure, you know, what the answer is, but

17   I just wanted to let Your Honor know our position with

18   respect to the motions set to go forward.  Thank you.

19         THE COURT:  Thank you, Ms. Leamy.  Before I return

20   to Mr. Cooley -- well, let me hear from Ms. Kaminski first.

21         MS. KAMINSKI:  Thank you, Your Honor.  To be

22   honest, I'm really not sure where we're at because no motions

23   have really been called.  But our objection was limited to

24   the motion to use cash collateral.

25         To reiterate our position again, my client

1 | purchased approximately $5 million in accounts pre-petition.

2 | It is our assertion that they are not property of the estate,

3 | and therefore the debtor cannot be authorized to use them

4 | under Section 363.  And that's sort of where we're at.

5 | And again, I'm assuming we'll probably go into

6 | motions more, but that's kind of our position.

7 | THE COURT:  Thank you, Ms. Kaminski.

8 | Anybody else before I return to Mr. Cooley?  Okay,

9 | I hear no response.

10 | Mr. Cooley, I certainly want to hear anything you

11 | have to say, but you know, my primary question for you is

12 | where do you want to see this go today?

13 | MR. COOLEY:  Judge, I'll start with that.  There

14 | are -- I have a lot of things I would say to question,

15 | quibble with, or refute that others have said, probably the

16 | most important of which, and I may come back to a couple of

17 | other things, but something I want to express to you clearly

18 | and probably repeatedly, is a couple of people have referred

19 | to Mr. Rouhana as still being in control.

20 | Mr. Rouhana resigned as CEO prior to the

21 | bankruptcy filing, and the board, comprised of five

22 | individuals, at the time of which Mr. Rouhana was only one,

23 | appointed Bart Schwartz as CEO.  Mr. Schwartz is present, I

24 | believe, and on the line with us today.

25 | Mr. Schwartz is 100 percent in control and has

1  been actively in control of this for the last several days.

2  And as I understand him to be, and his experience to be, he

3  is both experienced and independent.  Mr. Schwartz, in

4  addition to having extensive board experience, served for

5  three years as the DOJ appointed monitor for General Motors

6  in connection with the deferred prosecution of settlement of

7  charges relating to the defective ignition switch cases.

8  This is someone who is comfortable with and experienced with,

9  frankly, investigating internal claims.

10        He also served as a senior member of the team

11  assisting University of Michigan with implementing

12  remediation after their sexual harassment situation of

13  several years ago.

14        He's joined by others by the board, including Mr.

15  Stephen Goldsmith, who has substantial personal expertise in

16  the development and monetization of media assets.  In other

17  words, Your Honor, we would submit -- and Mr. Schwartz can

18  speak to this further if and when the Court should deem that

19  useful -- about both the experience and the expertise of this

20  board.

21        And I think what he would also tell the Court, in

22  very clear, unambiguous language, is that Mr. Rouhana is not

23  presently in control of this company.

24        And so, setting aside all of the allegations of

25  all of the conduct and all of the things that occurred prior

1   to the filing, an independent board of non-insiders is in

2   control of this case, led by a non-insider, independent, Mr.

3   Schwartz.  And I just wanted to say that at the outset.

4           To your question, Your Honor, I always find it

5   best not to talk about what I want to talk about, but what

6   the judge wants to talk about.  The thing that we are and

7   have been most focused on through this process is precisely

8   what Your Honor just said, the payment of employees.

9           And frankly, I could go through the company's

10  version of the events of the forbearance and the events that

11  followed.  And counsel is right, not everything was in the

12  first day declaration.  And I'll confess, the Court may have

13  picked up on this from the filings.  This was a very, very

14  accelerated preparation, and a first day declaration is

15  ultimately not an SEC public filing.  The company's public

16  filings were complete.

17          And so there were a lot of comments about

18  disclosures and things that were not disclosed.  And I want

19  to make sure we're drawing a distinction between public

20  filing disclosures that are required by the SEC, which I

21  believe have at all times been complied with, and things that

22  may or may not have been included in the first day

23  declaration, which is fundamentally an optional document.

24  And frankly, we were pressed on time.

25          But this case was -- this case has fundamentally

1 been a function of the fact that over the last couple of

2 weeks, the company's condition deteriorated to such a point

3 that it became necessary to take this action, frankly, in an

4 effort to get the financing necessary to, for starters, take

5 care of our employee payroll, both the one that was due June

6 21st and the one that is coming due this Friday, to reinstate

7 the health insurance benefits, which must be a terrifying

8 prospect for anyone in this country to suddenly find

9 themselves without health insurance.

10          These are the issues that counsel and the board

11 are and have been laser focused on, and that is job one.  I

12 heard Mr. Dunne describe some of our efforts and discussions

13 recently, and he described at one point that HPS would be

14 willing to, I think I heard him say, that he would be willing

15 to put forth an alternative DIP proposal that would give the

16 company $8 million to cover payroll today.  I thought I heard

17 him say that, and he'll shake his head vigorously if I

18 misheard him.

19          I think that's certainly interesting.  The great

20 question would be, what happens next?  Because the company

21 sorely needs to make last week's payroll.  It sorely needs to

22 make this week's payroll, and it sorely needs to stabilize.

23          Counsel pointed out that there had been a notice

24 of foreclosure prior to bankruptcy, and in fact, that one of

25 the relief they sought is a motion to convert the case to

1   Chapter 7.  I note they did not ask the Court to dismiss the

2   case outright and simply let them proceed with their

3   foreclosure to simply take the libraries and go.  And I

4   imagine that's because whatever their questions may be about

5   the present condition of the company, there is a belief that

6   it is better to stabilize this business and see what can be

7   done to maximize its value as a going concern, rather than to

8   simply have a secured lender pluck the film libraries out of

9   the smoldering pile of ash and see what it can get for those

10  film libraries in isolation.

11          My sense is that the nature of the relief sought

12  in the motion to reconstitute strongly suggests that HPS

13  believes that this company is better off stabilized.  And so

14  if HPS is indicating that they want to simply cover today's

15  payroll as a first step, that is certainly an interesting

16  proposal.  I'm certain it's something that caught the Court's

17  attention.

18          But it simply begs the question of what happens

19  tomorrow.  If they're proposing to put in a full DIP to fund

20  the company through a 13-week cash flow, that's probably a

21  conversation that any independent board would want to have.

22  And we welcome any conversations between the principals of

23  HPS and the board that anybody would like to have happen.

24          But anything that's -- getting people their

25  payroll is job one for all of us.  We're here to do whatever

1  we can to accomplish that.  But it will be a pyrrhic victory

2  if we find a way to cover everyone's payroll and still send

3  them all home at the close of business today.

4          I'll pause there for a moment, Your Honor.  As I

5  said, I could go through a list of other things and talk

6  about the forbearance and the events leading up to the

7  Chapter 11, but my sense is the Court wants to stay focused

8  on the most pressing issue.

9          THE COURT:  Yeah, I do.  I do want to stay focused

10  on that.

11          MR. COOLEY:  Judge, If I could.  Let me just note

12  that one video monitor that just turned on, Your Honor, the

13  good-looking gentleman in the mustache is Mr. Bart Schwartz,

14  who is our CEO And one of the members of our current board of

15  directors, and I just wanted to point that out to the Court.

16          THE COURT:  Good morning Mr. Schwartz and welcome.

17          MR. SCHWARTZ:  Good morning, Your Honor.  Thank

18  you, and I appreciate the opportunity to speak briefly.

19          THE COURT:  That'll be okay.

20          MR. SCHWART:  Briefly.  I've been a lawyer for

21  many years.  I ran the criminal division in Southern District

22  of New York.  And I like to think that I do the right thing

23  and try to do the right thing.

24          I asked the counsel and others to tell me what

25  path does the judge have to make sure that we get the

1  employees paid and then they get the medical insurance.  And

2  the more I listen and the more I hear, I think the path may

3  fall to me to find a way to do it.

4           You started this hearing by saying you hope there

5  might be some discussion.  I did this morning call Mr.

6  Wallach (phonetic) at HPS and have a brief discussion with

7  him.  And perhaps a good start.  A little late.  I've only

8  been at this a few days, perhaps a little late in the

9  process.  But I'm making my effort to make decisions for the

10  other members of the board.  But the primary goal being to

11  take care of the employees.

12           Mr. Rouhana is not in charge.  As a lawyer once

13  said, I'm not a potted plant.  I'm here to get the work done

14  and get it done correctly.  So I'm not familiar with all the

15  procedures in Bankruptcy Court.  I'm not familiar with what

16  needs to be said or done today.

17           But I think that if we can get that payment now,

18  approximately $8 million, to take care of the employees, then

19  I could sit down with HPS and work through the problems.

20  They actually have the same problem I did.  We don't know how

21  bad this is.  And there are troubling things that were

22  mentioned today, which I've asked others about myself.

23           So I'd like the opportunity to find the path to

24  take care of the employees.  Thank you.

25           THE COURT:  Thank you very much, Mr. Schwartz.

1            MR. DUNNE:  Your Honor, may I be heard in response

2  to this?

3            THE COURT:  Certainly, yes.

4            MR. DUNNE:  Thank you.  So just a couple points.

5  One, in the interest of full disclosure, and this goes

6  (inaudible).  Mr. Schwartz, who just spoke, is actually the

7  father of a Millbank partner.  We had -- one of my litigation

8  partners is his son.  We obviously had no involvement in his

9  appointment or selection.  But I did want to just note that

10 family connection.

11           The other point that -- and I can't believe we're

12 talking this, but we know that Mr. Rouhana resigned as CEO,

13 he remains as chairman of the board as the largest

14 stockholder and that there are -- that his one vote on the

15 board is a minority in the -- among the directors that are

16 there as one of (inaudible).

17           And our issue has been and as you can see it from

18 Mr. Pachulski's comments, the behavior of what we felt were

19 truly independent directors and those who are still -- have

20 been brought in late in the game, and we've seen evidence of

21 them doing Mr. Rouhana's bidding.

22           But the point is, we're happy to have a

23 conversation with Mr. Schwartz or whomever.  We've offered

24 the funds to make those payments for employee payroll and the

25 insurance, and we think we should continue to have those

1  discussions.

2          What would accelerate it would be, and I don't

3  know how we get there, maybe we need to hear it forward, is

4  if the debtors knew that the only viable path is to make a

5  deal with us, I think we'd have a deal done in a few hours.

6  If they think that every term they don't like, there may be

7  an opportunity that the Hail Mary DIP is caught in the end

8  zone and that they can go to the Owlpoint DIP, we're going to

9  be doing (inaudible), I suspect, over several days.  I don't

10 know how to deal with that -- deal with that issue.

11         We think it's patently not a primeable DIP, but we

12 haven't gotten to the motion, but I think it would be helpful

13 to get some evidence or ruling on that because it'll just

14 focus on executable paths as opposed to every path, one of

15 which you don't believe is executable.

16         THE COURT:  Thank you, Mr. Dunne.

17         Mr. Cooley, any response?

18         MR. COOLEY:  I don't think so, Your Honor.  I'm

19 really glad that Mr. Schwartz had the opportunity to address

20 the Court just there, and I appreciate Mr. Dunne's comments.

21 And if what we need to do is go and have further discussions

22 with them, we can absolutely facilitate that.

23         One thing I will note is, while it is true that

24 Mr. Rouhana has -- continues to be the chairman of the board,

25 the three board members who are not either Mr. Rouhana or

1   otherwise an insider of the company, the other, the fifth

2   board member is the CFO of the company, Chris Mitchell.  So

3   the three board members who are truly independent are the

4   three that I have been dealing with, at least, in all of my

5   recent actions, in all of Reed Smith's recent actions over

6   certainly the last few days.

7          And so I just want to make sure the Court

8   understands that the people that are directing actions right

9   now are, in fact, a collection solely of independent

10  individuals like Mr. Schwartz.  And I just wanted to provide

11  that added color.

12         MR. SCHWARTZ:  Your Honor, may I just say one

13  further thing?

14         THE COURT:  Yes.

15         MR. SCHWARTZ:  Usually I'm the one who tells

16  everyone that my son is a partner.  But I make my -- I said

17  what I said in good faith.  No, we're not looking for

18  technicalities.  We're not looking for ways to take advantage

19  of the situation.  Got to find a way to take care of these

20  employees.

21         THE COURT:  Thank you very much.

22         Okay, here's what I'm going to suggest we do.  I'd

23  like to adjourn to 3 o'clock this afternoon.  I'd like you to

24  use the time to see if you can come to agreement on a DIP

25  that will take care of the employees.  Again, that is my

1  primary concern at this point.

2         There are much bigger problems that we're going to

3  be able to solve in the next five hours, and I think it's

4  quite likely that in the absence of a negotiated resolution,

5  in the meantime, we're going to need to get through the HPS

6  motion to be able to determine all the issues.

7         But I would like you to spend the next five hours

8  or so working on the issue about the employee wages, and if

9  you get a deal done, then great.  If you don't, again, I'll

10  just reiterate, based on what I've seen, I'm not prejudging

11  what evidence may come before me, but I just can't imagine

12  how we get to approval of a priming DIP today.

13         I think everybody on this hearing understands that

14  that's probably a fairly unlikely outcome.  So why don't you

15  work on that.  If there are any updates that you feel the

16  Court needs during the day or that might require my

17  assistance, please reach out to chambers.

18         I've got a 1 o'clock hearing that I expect to take

19  probably less than an hour, but other than that, I'm at the

20  parties' disposal.  But that's what I would like you to do

21  for the rest of the morning.

22         MR. COOLEY:  We will turn to that immediately,

23  Your Honor.  May I perhaps close by asking my friend, Mr.

24  Silberglied's question from yesterday, may we all use -- will

25  we all need to re-register if we come -- if and when we come

 1  back at 3:00?  Or will we be able to use these logins?

 2           THE COURT:  I think this would just be considered

 3  a recess, and we'd be able to use the same login, but I'm

 4  just awaiting word from my courtroom deputy, who's typing as

 5  we speak.  I'm looking at the dancing bubbles and (inaudible)

 6  with the responses.  We can use the same link.  Okay?

 7           MR. COOLEY:  Very good, Your Honor.  Thank you.

 8           MALE VOICE:  Thank you, Your Honor.

 9           THE COURT:  Thank you very much.  So we're in

10  recess until 3:00 p.m. Eastern.

11       (Recess taken at 10:07 a.m.)

12       (Proceedings resumed at 3:00 p.m.)

13           THE COURT:  Good afternoon.  We're back on the

14  record in Chicken Soup for the Soul Entertainment.

15           Mr. Cooley, are you there?

16           MR. COOLEY:  Yes, Your Honor, I am.  Good

17  afternoon.

18           THE COURT:  Good afternoon.  So what's the good

19  word?

20           MR. COOLEY:  I'm pleased to say, Your Honor, we

21  just got right to it.  I'm pleased to say that there is a

22  word.

23           This has been a long couple of days since we filed

24  Friday night in a hurry and with a priming DIP and everything

25  else that came along with it.

1        But I want to give a lot of credit to the Milbank

2   team who has continued to work with us through this period

3   and, frankly, when we tried to reset the dialog with them,

4   which has been a difficult one at times over the last several

5   months, they gave us that chance and, you know, our

6   discussions with them over the last few days, while it was

7   challenging and contentious, have been exceedingly productive

8   the whole way through and I really do appreciate their

9   efforts.

10       We, through our discussions with them aided by the

11  observations the Court made toward the end of the hearing, we

12  have been able to arrive at terms with the lender, with HPS,

13  for a proposed consensual post-petition financing arrangement

14  to be provided by HPS to the debtors on the terms set forth

15  in a DIP term sheet, which is essentially a document that is

16  the same document that we started with under the forbearance

17  agreement that was -- and then has been since modified, in

18  part, to accommodate certain of the new terms and agreements

19  reached and, in part, also to accommodate the fact that the

20  original document contemplated a bankruptcy case to be filed,

21  whereas now, of course, we are in the bankruptcy case that

22  has been filed, a lot of past tense -- or future tense to

23  present tense, if you will.

24       I could walk through as much or as little of the

25  details of it as the Court likes, but at a high level, the

1  proposed financing arrangement involves an interim request of

2  -- in the amount of $8 million, and I can walk through --

3  walk the Court through how we came up with that figure, but

4  that is essentially the amount necessary, based on the

5  debtor's DIP budget that was filed earlier in the case,

6  necessary to get back on track with payroll, attend to a few

7  other critical expenses, and basically stabilize things

8  enough that we call can focus on getting the company

9  stabilized and moving forward with Chapter 11.

10          As the Court said, as we all believed since the

11  start, that was job one, and I'll walk through the dollar

12  amounts, but that is the -- an interim financing amount.

13          The final amount is an amount yet to be determined

14  but to be sought for approval, I believe, as a practical

15  matter, when we come back for a final hearing.

16          And the reason, essentially, that it's like that

17  is that, you know, right now, as I think HPS expressed

18  earlier today, HPS doesn't know what it doesn't know yet and,

19  candidly, based on some of the events over the last couple of

20  days, I can't say to a certainty that I don't know what I

21  don't know yet.

22          And so rather than put in place a fixed dollar

23  amount over the next week or so as we get from here to a

24  final, the parties can work together to determine what the

25  right amount is to move the company forward consistent with

1  the concepts laid out in the rest of the DIP term sheet.

2           That could be less than what's in the budget that

3  was filed and it could be more and I think that's sort of the

4  point of the exercise is that, hopefully, we'd be able to

5  come back to you smarter for having that time and then we'll

6  seek final approval.

7           There -- the form of the loan is going to be in

8  the nature of a revolver, such that amounts repaid can be re-

9  borrowed.  And as I read this, once upon a time back in the

10 forbearance term sheet, there was actually a rollup

11 associated with it and I want to tell the Court that, based

12 on the redline I got -- and Mr. Leblanc is going to flinch if

13 I'm reading this incorrectly, but the rollup has been

14 eliminated, and I thank HPS for that.

15          So it's just a -- to begin with, an $8 million

16 revolving loan protected by -- on a super priority basis, of

17 course, protected by all of the traditional means under

18 364(c)(2) and (c)(3) and (d)(1), with HPS consenting to its

19 own priming.

20          Use of proceeds, there had been some prior

21 discussions about whether the use of proceeds would include

22 payments allowable in accordance with the budget to the

23 Chicken Soup parent for what has been described as other

24 motions that operate as some necessary operating expenses.

25          For the time being, that has been stricken.  I

1  think if I understand correctly, as -- again, as a function

2  of HPS wanting to understand what those amounts are, I'm

3  confident if the company and HPS determine that those are

4  amounts that are necessary, we know how to find the Court to

5  get approval and, if not, then we'll deal with that in due

6  course.

7          There will be a budget attached to it, as I said.

8  The liens are the traditional means under 364(c) and (d).

9  There are provisions, of course, for the professional fees of

10 the DIP lender, the pre-petition lender, to pay for adequate

11 protection to be provided to the DIP lender as well, and a

12 maturity time to the earliest to occur of sort of a four-

13 month baseline, the consummation of one or more sales,

14 termination event, and so forth.  So it gives us a basic

15 runway.  And then there are other planned milestones for the

16 parties to begin to work toward and undertake one or more

17 sale processes.  Obviously, to the extent that the parties

18 don't, over the next few weeks and months, determine that

19 some other path may be more beneficial to creditors, there is

20 a baseline.  It is a sale-based series of planned milestones.

21         One other significant item in here, because it's

22 the first thing I'm going to describe, that you wouldn't

23 normally find in a DIP term sheet regards corporate

24 government -- corporate governance.  Excuse me.

25         Under the agreement, a Strategic Review Committee,

1   along the lines of that that existed prior to the bankruptcy

2   filing, will be reinstated.  The membership will be three

3   members.  Mr. John Young and Robert Warshauer, who were HPS'

4   two designated pre-petition independent directors, and the

5   third member of the Strategic Review Committee will be Bart

6   Schwartz, who appeared before Your Honor earlier today.

7          Once that committee is formed, then Mr. Schwartz

8   will resign as CEO and the Board, or the Strategic Reivew

9   Committee, will then appoint a new CEO.  And I think that

10  there may have been some preliminary discussions about who

11  that might be and what sort of skill set that might entail,

12  but I'm going to leave that for the Board to sort out in the

13  coming days.

14         The -- and that's the -- that's kind of the key

15  elements in here.  I just want to flip through the rest of

16  the term sheet and, obviously, Your Honor, we'll get this on

17  file with the Court, of course, earliest opportunity.  I

18  confess we got this finalized with the documentation about 11

19  minutes ago.

20         Let me see.  I'm just sort of flipping through to

21  see if there are any other high points.

22         As far as the economics of it, there -- the DIP

23  facility provides for interest to occur -- accrue, excuse me,

24  at a base rate no less than -- at either the define based

25  rate, plus 9 percent or at SOFA, plus 10.  I think that will

1  be fleshed out a little bit more with interest to be paid --

2  payable in cash monthly.  And then there will also be a

3  closing fee equal to 3 percent of the aggregate principle

4  amount committed and an undrawn line fee of 1 percent.  And I

5  can represent to the Court, just from the redline I'm looking

6  at, that these were the same -- these are essentially the

7  same economics that were in the original deal that was

8  included with the forbearance agreement.  These were

9  customary agency fees, reimbursement of professional fees,

10  and so forth.

11       So that, as a high level, is where we are.  It is

12  my understanding, and Mr. Leblanc will hopefully corroborate

13  this, that this resolves our present issues with respect to

14  the debtor's request for access to cash collateral and post-

15  petition financing.  And it is my understanding that this

16  also will resolve the issues and requests for relief raised

17  in the motion for reconstitution that was filed by HPS

18  seeking the various forms of relief described therein.

19       So it's the debtor's belief that, in entering into

20  this, the debtors will retain access to urgently needed

21  capital to take care of their employees and, more importantly

22  perhaps, a path forward to additional liquidity to be

23  provided by HPS in an amount to be determined and a control

24  structure that will bring both sides, I think, together more

25  closely than perhaps we have been in past months to work

1  together going forward so that the path that the debtor

2  ultimately takes and the exit that we ultimately pursue,

3  whether it is the sales that are planned or some other path,

4  is going to be one that I hope is the most beneficial to all

5  stakeholders, to HPS, to employees, to unsecured creditors

6  who are of enumerable numbers right now, and all other fee

7  stakeholders in the case.

8           Judge, we're very pleased with the outcome and

9  that's sort of where we are.

10          I'll yield the podium in just a moment, but from a

11 process standpoint, Your Honor, Mr. Schwartz is on the line,

12 and so at the appropriate time, if the Court would like a

13 brief proffer of evidence just to sort of close the loop,

14 we'll be happy to do that.  Obviously, at this point, I think

15 we're all most concerned about is this moving forward for the

16 benefit of employees, but we are prepared for that if the

17 Court wishes.

18          THE COURT:  Okay.

19          MR. COOLEY:  So with that, I'll stop and yield to

20 the Milbank firm for comments.

21          THE COURT:  Okay.  Mr. Leblanc?

22          MR. LEBLANC:  Good afternoon, Your Honor.  Andrew

23 Leblanc, of Milbank, on behalf of HPS.

24          Mr. -- Your Honor, Mr. Dunne has a conflict right

25 now but he'll -- I think he'll be joining us shortly.  But,

1  for now, you're -- you'll be stuck with me.

2          Your Honor, I can confirm what Mr. Cooley

3  described, but I have -- and I just -- I want to make a few

4  clarifications.  I think this was clear, but the amounts that

5  we're funding are sufficient not just to pay the payroll

6  amounts, but also to reinstate the health insurance premiums.

7          THE COURT:  Yes.

8          MR. LEBLANC:  So we -- the number that we've been

9  given was -- the $8 million was provided to make sure that

10  those employee issues are the first things that are dealt

11  with.

12          The -- in the term sheet that we've drafted, Mr.

13  Pachulski pointed out to us that we have a prohibition in the

14  term sheet on payments made to board members or shareholders.

15  That's obviously with the legacy and corporate governance.

16  With the SRC coming in and controlling the company, we're not

17  going to prohibit payments that are -- when they're due to

18  SRC members.  We can make that change, Your Honor.

19          Mr. Cooley correctly described the governance

20  changes, but I just want to emphasize a couple of things.

21          Mr. Young and Mr. Warhauser were approved by HPS.

22  They weren't designated by HPS.  That's a minor point.  We do

23  not have designation rights.  They were approved by us but

24  actually put on by the shareholder and we approved their

25  being put on again, reinstated to the SRC.  But the documents

1  and the order will be clear that the SRC has the control over

2  the debtor, the case, you know, everything that's happening

3  here and can't be removed.  We're -- obviously, with the

4  history that we've had here, that's a critical proponent for

5  us.

6          The trade, if you will, Your Honor, we were

7  prepared to make is we were going to fund these amounts but

8  only with the governance that we think is appropriate, and

9  the debtors have now agreed with that.

10          With respect to the motion to reconstitute, Your

11  Honor, I -- we certainly -- the motion to shorten I think has

12  been mooted.  We don't need to schedule a hearing on the

13  motion to reconstitute.  We'd like to get through the rest of

14  the First Day motions before -- we'll decide when to withdraw

15  or whether to withdraw that.  But at this point, I don't

16  anticipate we prosecute that objection or that motion, Your

17  Honor, given the governance changes that have been agreed to.

18          The -- it's our understanding, and the debtors can

19  correct us if this is wrong, but that none of the payments

20  that are being contemplated to be made here are going to be

21  made through non-debtor entities.  That was one of the

22  concerns that we had in -- both in the cash management order

23  and the wages motion, the management services motion.  All of

24  those had some contemplation of dollars going through non-

25  debtor entities.  Obviously, that wouldn't be acceptable to

1   us.  These are payments being made by the debtors for the

2   debtor's employees.

3          Your Honor, I did want to be clear -- Mr. Cooley I

4   think said this, but I just want to be crystal-clear.  Given

5   the level of uncertainty that we have today about the

6   company's assets and about the status of the amount of the

7   secured debt that they have, because we've heard a number of

8   people get on the line and say -- and raise arguments that

9   they have security interests in the debtor's collateral, we

10  are contemplating -- this is proposed to be consensual

11  priming as to us, but not a consensual priming as to all

12  other secured lenders.

13         So if we -- the important thing for HPS, Your

14  Honor, is we are lending $8 million to this debtor at a time

15  of great uncertainty.  The SRC will be in control.  They'll

16  select a new CEO and they will make decision on how to

17  disburse that cash with the focus on paying the employees.

18         HPS wasn't in a position to put at risk that $8

19  million.  If there are liens -- because there are liens that

20  have been announced over the course of the last two days that

21  we were completely unaware of.  And so it is contemplated

22  that this is a priming facility and we expect and hope that

23  we will work out all of these issues between now and the

24  final, but HPS wasn't comfortable putting at risk the $8

25  million of funding because of the tremendous uncertainty as

1  to -- and the amount of people who have spoken up saying that

2  they have liens on the debtor's assets.

3        We don't know and, obviously, if there's hundreds

4  of millions of dollars of HPS collateral, that will be

5  sufficient to satisfy this DIP loan and we'll be fine with

6  that.  We just don't know today what other liens other

7  parties are going to assert in light of the conduct of the

8  debtors over the course of the last nine months.

9        So I hope Your Honor understands that that's how

10  it is proposed by us, and certainly other parties may want to

11  be heard, but I didn't want that to be unclear to anyone and

12  I wanted to be crystal-clear about what we are proposing in

13  this DIP.

14        Your Honor, my partners, Mr. Pisa and Mr. Brod,

15  are also on.  I have not seen any emails telling me that

16  we're missing anything else and so others may come up, but

17  that's the totality of the agreements that we've reached.

18        We -- I'll echo Mr. Cooley's comments that it has

19  been useful to engage in this dialog.  We've moved a long way

20  compared to where we have been over the course of the last

21  several months.  Your Honor, at some point, may see the

22  letter exchanges between us, but it's a -- hopefully, this is

23  the start of a new dialog with Chicken Soup for the Soul and

24  its largest secured lender, HPS.

25        THE COURT:  Very good.  Thank you Leblanc.

1          MR. COOLEY:  Judge, if I could piggyback just on

2     the last point, or maybe it was the second to the last point

3     that Mr. Leblanc made?

4          At least one of the secured creditors that stood

5     up the other day was new information to me as well, and so we

6     are working through some of those issues also.

7          We obviously understand HPS' position with respect

8     to the priming and what I want to say to the Court is, at the

9     same time, we, as debtors, also recognize that there are

10    adequate protection issues that we may need to work through

11    for one or more or all of those secured creditors who stood

12    up the other day and it is our expectation that over the next

13    whatever it is, two weeks between now and the final or what

14    have you, that we will be engaging with each of them.  We've

15    already reached out to some of them, at least as recently as

16    yesterday, to try and make sure we understand exactly what

17    those claims are -- I know that's important to Milbank also,

18    and what the rights are that are asserted and then to figure

19    out how best to work with those in the context of this

20    financing arrangement.

21         But we recognize there are adequate protection

22    issues that still may have to be worked through and we are

23    committed to doing that.

24         THE COURT:  Thank you, Mr. Cooley.

25         Mr. Pachulski, you've been waiting patiently.

1  Would you like to be heard?

2        MR. PACHULSKI:  Your Honor, I think, actually, Mr.

3  Cooley and Mr. Leblanc have stated where we are, which I

4  think is a real positive.

5        The one thing I want to comment on, and I don't

6  know what Mr. Cooley's thoughts were on this because we

7  haven't spoken about it, but there are other First Days that

8  are on.  I have -- frankly, and now that the SRC has been

9  changed to flip one member of the SRC who will be stepping

10  down, who is the independent originally selected by the

11  debtor, that had been on the board previously by now Mr.

12  Schwartz, and so I'd at least like the opportunity before

13  those motions go forward to speak with them and to confirm

14  that they would be appropriate in light of the fact they are

15  now -- as Your Honor will see with respect to the term sheet,

16  they are the ones who will now be making decisions on issues

17  like that.

18        So I don't want to have it lost in the process.  I

19  think it is a very fair deal for all concerned and the big

20  issue and where the SRC at least had numerous conversations,

21  particularly with Mr. Warshauer and with Mr. Young, are very

22  satisfied that we can move forward in a thoughtful way and

23  try to get the best possible result for the various

24  constituents in the case, Your Honor, so I appreciate Your

25  Honor calling on me and asking for where we are.

1          But I think we're in a positive place, but I am a

2   little nervous about letting motions go forward that the --

3   what is effectively now the board has not really opined on.

4          MR. COOLEY:  Judge, I can speak to that.  I had

5   given that some thought this afternoon as well and we

6   recognize that not only is there that issue, but there's also

7   the fact that, you know, ordinarily, HPS, as the pre-petition

8   lender, would have been involved through the preparation of

9   the First Days and, obviously, that wasn't the case here and

10  I suspect that they might find it useful if we had the chance

11  to walk them through some of them and make sure we've

12  answered their questions and provided the information they

13  need.

14         For today's purposes, aside from wages and DIP,

15  which are the two obvious ones, the one that I would really

16  like to do if we could, because I think it will be

17  administratively helpful for everyone, is if we could knock

18  out joint administration because, at the moment, we still

19  technically have 22 separate dockets and I know we have been

20  behaving as though we have one, but I suspect that the

21  clerk's office would really appreciate it because that would

22  --

23         THE COURT:  Yes, they certainly would.

24         Okay.  Well, I'll tell you what.  Let me get

25  through the comments from some of the other parties that want

1   to be heard and then we'll go back to the agenda insofar as

2   we can do the agenda today.

3           So first let me hear from Mr. Larin, please.

4           MR. LARIN:  Thank you, Judge Horan.

5           Again, Paul Larin, on behalf of Owl Capital

6   Management, the prospective DIP lender under the pending

7   motion.  I'm also here with Kevin Collins, my colleague in

8   Delaware.

9           Your Honor, we are pleased -- obviously, we are

10  pleased that the enterprise seems to be presenting a path

11  forward to the Court.

12          I simply want to speak to protect and preserve our

13  rights under the current DIP motion and the proposed DIPI

14  term sheet to assert our breakup fee claim as a stalking

15  horse-type lender.

16          Now, it is an exotic, somewhat unusual, request in

17  this setting.  I think the Court has certainly heard over the

18  last couple of days, and the characterizations of the movable

19  object and the irresistible course, that something had to

20  break the deadline and I would submit, Your Honor, it was the

21  participation of my client, after much effort, much hard

22  work, assisting with the preparation of the DIP motions.

23          We just want to make sure that one of the things

24  that doesn't get lost here as the Court deals with the

25  pending DIP motion, is our negotiated contractually provided

1  right to a breakup fee.

2          THE COURT:  Understood.  Thank you.

3          Mr. Merola?

4          MR. MEROLA:  Your Honor, Frank Merola, on behalf

5  of MidCap.

6          Obviously, we're very happy that the senior --

7  that the secured creditor, the primary secured creditor and

8  the debtor have come around on both governance and the

9  liquidity solution.

10          Unfortunately, Your Honor, we can't let them do

11 that on the back of other secured creditors.

12          In 2021 when HPS put their money in place and put

13 their loan in place, my client's claim was already there.

14          The idea that HPS, as sophisticated as they are,

15 advised by such sophisticated counsel, "didn't know the lien

16 was there", we're insolvent.

17          On Friday evening when we opened up these

18 pleadings, we had a priming DIP and it was a priming DIP of

19 the HPS loans, Your Honor, only the HPS loans.

20          In those documents was the concept of permitting

21 encumbrances and permitting encumbrances were liens that had

22 existed, other than the HPS' lien, that would not be prime.

23          So if the solution that was reached, without any

24 papers on file by the way, Your Honor, goes from a priming

25 loan that did not affect other secured creditors to a priming

1  loan that primes all secured creditors, with no evidentiary

2  showing as to adequate protection, I think we're all going to

3  have a problem here.

4          While we're eager to see the employees and the

5  benefits paid, we still have to observe the procedures and

6  the policies of 364 and 363 here, and this falls short.

7          To the extent they want to reserve the right to

8  request priming on a final, I think that's completely

9  appropriate.  But to the extent they want prime from the

10  First Day, from the first dollar, that's not acceptable.

11  There's not been a showing that would justify that and

12  there's nothing in the record that would allow Your Honor to

13  make that finding of adequate protection to other secured

14  creditors.

15          THE COURT:  Okay.  Thank you, Mr. Merola.

16          Mr. Ahdoot?

17          MR. AHDOOT:  Thank you, Your Honor.  David Ahdoot,

18  of Bush Gottlieb, on behalf of the Directors Guild, the

19  Actors, and the Writers.  We can just refer to them as

20  Guilds.

21          Your Honor, my clients are in an interesting

22  position in the sense that we are secured creditors, but we

23  are also labor unions, and from that perspective, we're

24  gratified, and in the midst of all of these very serious

25  issues, the parties are focused on employee obligations and

1  we're very pleased to see that that issue has been brought

2  out front and center and there seems to be a pathway to a

3  resolution there.

4         That being said, we haven't been involved in any

5  discussions beyond cursory ones with respect to our

6  collateral usage or cash collateral usage and adequate

7  protection.  We appreciate Mr. Cooley's comments that he

8  understands and he'd be reaching out to work those things

9  through.

10         And, Your Honor, we're sort of in a tough position

11  here as, you know, I'm certain my clients would not want to

12  stand in the way of making sure these employees get paid and

13  get paid speedily.  On the other hand, you know, we've got a

14  lot of issues that haven't been addressed with respect to our

15  interest in the motion for cash collateral.  From that

16  perspective, I think the right position for us to take is to

17  revert in our status as senior secured and, again, applaud

18  the efforts of the parties to try and reach a consensual

19  solution and commit to them all that we're here and we're

20  ready to engage to find those solutions as fast as possible.

21         THE COURT:  Thank you, Mr. Ahdoot.

22         Is there anybody else that would like to be heard

23  before I return to Mr. Cooley?

24     (No verbal response)

25         THE COURT:  Okay.  Mr. Cooley?

1           MR. COOLEY:  Yes, Your Honor.

2           THE COURT:  Okay.  Well, it seems to me that what

3   we can do is go ahead on joint administration.

4           When it comes to the DIP, it seems like that's

5   something that's got to be documented and presented, and we

6   can certainly hear that in short order.  Clearly, the other

7   secured creditors are hoping to hear from you and have a

8   discussion.

9           You know, to Mr. Merola's comments, it would be

10  unusual indeed to have non-consensual priming on the first

11  day of the case.  So I'm sure you're not -- I'd be surprised

12  if you were contemplating seeking something like that, but we

13  will certainly see what it is that ultimately you'll propose

14  and we'll go ahead with the hearing on that.

15          But I think at this juncture, we can do joint

16  administration and then talk about your expectations on

17  getting a new DIP motion on file and putting together a

18  prompt hearing for that.

19          Does that sound about right to you?

20          MR. COOLEY:  Certainly, we can certainly up the

21  DIP -- excuse me, joint admin first and knock that out.  I

22  think that's -- I think we all agree that's pretty easy.

23          And then, at the appropriate time, the wages as

24  well.  I guess the question would be how fast to do it most

25  expeditiously.  So I'll just simply start with joint

1  administration, Your Honor.

2        This is the debtor's motion for joint

3  administration of the cases of Chicken Soup for the Soul

4  Entertainment, Inc. and its 21 affiliates, which have all

5  filed voluntary Chapter 11 cases here in the Northern

6  District -- or excuse me, the District of Delaware.

7        This one doesn't require much commentary.  They

8  are all affiliates as defined under Section 1012 of the

9  Bankruptcy Code permitting joint administrations are

10  warranted to ease administrative burden under Bankruptcy Rule

11  1015, Tab 1.

12        This is ordinary relief in this sort of a case and

13  I believe that this order has already -- this was one of the

14  ones that was socialized with the Office of the United States

15  Trustee and Mrs. Leamy prior to its filing and so I hope that

16  she will be able to confirm that this included that our order

17  -- proposed form of order included the comments that she did

18  provide to us and I -- she should also not go unnoticed to

19  this, Your Honor.  We put a great deal of demand on her both

20  on Friday evening and over the weekend and she rose to the

21  challenge to the very first order.

22        Anyway, so assuming we have all those covered, and

23  I believe we do, then we would ask for entry of the order

24  administratively consolidating these cases in the form that

25  was filed, together with the motion at Docket Entry 6.

1          THE COURT:  Okay.  Ms. Leamy, any comment on the

2    joint administration motion?

3          MS. LEAMY:  Your Honor, Jane Leamy, for the U.S.

4    Trustee.

5          Just to confirm, I have no objection to entry of

6    that order.

7          Thank you.

8          THE COURT:  Thank you.  Is there anybody else that

9    would like to be heard regarding the joint administration

10   order?

11     (No verbal response)

12         THE COURT:  Okay.  I hear no response.  It is, of

13   course, a routine motion and, under the circumstances of

14   these cases, I have authority to grant that relief under

15   Bankruptcy Rule 1015(b) and Local Rule 1015-1 and, therefore,

16   I grant the motion and will enter the order.

17         MR. COOLEY:  Thank you, Your Honor.

18         THE COURT:  Okay.  And well, as for the rest of it

19   -- well, how do you --

20         MR. COOLEY:  As for the rest of it.

21         THE COURT:  Yeah.  How do you suggest we --

22         MR. COOLEY:  So --

23         THE COURT:  Go ahead.

24         MR. COOLEY:  Well, in a perfect world, I would

25   present it all right now and try to (indiscernible) deadline.

1  But I appreciate the comments made by counsel and also the

2  comments of the Court as well and if I -- if I'm

3  understanding the Court correctly, and I think, properly,

4  given the procedural issues here, that notwithstanding the

5  exigency of taking care of employees, I think that employees

6  will be able to take at least brief solace in the fact that

7  we have a path and a consensual agreement reached with our

8  lender, our primary lender, and so I'm going to be moving in

9  short order to get it approved.

10         If we -- I can tell the Court that we have a term

11  sheet, that we have a proposed interim order already and so,

12  you know, if we need to get a fresh motion on file, I would

13  imagine that we could put together a very simple form of

14  motion very quickly.  I cannot imagine it would be on file

15  any later than tonight.  And, frankly, in large part, it will

16  probably be something we could do -- swapping out terms with

17  the motion already on file, although Milbank may tell me they

18  already have a form in the wings.  We haven't gotten that far

19  yet.

20         But in any event, I am confident we can put it

21  together quickly and see no reason why we couldn't have it on

22  file as early as tonight.

23         Based upon the terms of this DIP, as I understand

24  it, and it may be -- maybe it's better if Mr. Leblanc speaks

25  to this particular issue, vis a vis, the priming.  I know

1  that the primary is sought, as I understand it, on a very

2  limited basis, only with respect to what would at the moment

3  be just $8 million of indebtedness.

4       But as I understand this, it would seek to prime

5  others, vis a vis, that $8 million.  Mr. Leblanc should speak

6  to that and then the Court may have a view as to how best we

7  handle that efficiently because, obviously, I don't want to

8  walk out of one big knock-down, drag-out fight into another.

9       THE COURT:  Yes.  Mr. Leblanc?

10       MR. LEBLANC:  Yes, Your Honor.  Andrew Leblanc, of

11  Milbank, on behalf of HPS, and Mr. Dunne has also joined now,

12  Your Honor.

13       THE COURT:  Yes.

14       MR. LEBLANC:  With respect to priming, we -- for

15  the reasons I mentioned, Your Honor, we have a tremendous

16  amount of trepidation around the idea of lending money to

17  this company with an amount of secured debt away from us that

18  we literally do not know.

19       As Mr. Cooley said, he learned of some of the

20  liens.  And Mr. Merola's client's liens may be well-known and

21  we certainly would be happy to talk with him about carving

22  his outlet, but the Guild liens, for example, I'm not sure

23  they know what amount of liens they have or are asserted and

24  we certainly don't, Your Honor, and we don't know what the

25  value of the collateral is.

1          And the idea of asking our client to lend into

2   this situation without knowing that it can at least get the

3   $8 million repaid is one that we just can't advise them to do

4   that, Your Honor, even with the exigencies.

5          What I think -- what -- Your Honor, I'll make the

6   suggestion that I'm not negotiating with the Court.  I know

7   Your Honor wouldn't expect that.

8          What I -- what -- we could certainly take back to

9   our clients the idea of a marginal proposal where as long as

10  there is $8 million of value in HPS' own collateral, that we

11  would look to that first for repayment of the DIP --

12          THE COURT:  Um-hum.

13          MR. LEBLANC:  -- Before we look to take from

14  anyone else's collateral so that, as long as there is --

15  again, if the collateral that HPS has that is not subject to

16  someone else's liens were $50 million, the no one would be

17  affected by the priming.

18          But in a circumstance where there are liens that

19  we're -- that, again, we don't know of today that have been

20  imposed on our assets such that the value of the HPS

21  collateral doesn't even equal $8 million, we would look to be

22  paid by other peoples' collateral if we are paying the

23  employee expenses of this debtor at the First day.

24          THE COURT:  Yes.

25          MR. LEBLANC:  And I know Your Honor hasn't asked,

1  but I'd be prepared to take that to my client on the

2  understanding that that would satisfy the concerns of the

3  other parties.

4        And, again, if anyone -- if any other secured

5  lender is interested in funding alongside us or instead of

6  us, we're more than happy to take that, Your Honor.  We'll --

7  they can join with us and fund on exactly the same terms that

8  we are funding.

9        That's -- the concern, Your Honor -- I think Your

10  Honor can probably understand the level of uncertainty and

11  lack of knowledge here is so extreme that I can't put my

12  client in the position of funding $8 million on a DIP that

13  they may not actually get back.

14        THE COURT:  Look, I agree with you entirely, Mr.

15  Leblanc.  We are trying to balance on the one hand the

16  exigencies and on the other, frankly, due process.  Parties

17  need to be notified particularly if they're seeking to claim

18  them.

19        MR. MEROLA:  Your Honor, may I be heard?

20        THE COURT:  Yes, Mr. Merola.

21        MR. MEROLA:  I agree with Mr. Leblanc.  This is an

22  unfortunate situation where we are negotiating across the

23  bench.  I don't think my client -- I would have to check with

24  them.  We have no objection. I don't think we have any

25  objection on an interim basis in granting HPS all of the

1 protections of 364 other then priming; administrative claim,

2 superpriority claim, lien on unencumbered assets.

3          In a situation where the real benefit and burden

4 of a going concern falls on the lenders that put $500 million

5 into this after our lien was already was already in place to

6 now purport they don't understand our lien and now have to

7 prime us rings hollow.  From my client's perspective is that

8 the library is our collateral.  We want to stay senior in

9 that collateral because there are very complicated financing

10 arrangements related to that including the claims of the

11 Guild that in some cases actually prime our liens, but to go

12 in there now and lay in for an $8 million advance that we are

13 going to do that without any showing as to why we're

14 (indiscernible) is problematic.

15          Again, I am willing -- I want to be

16 (indiscernible) as possible and we are willing to give them

17 all of the 364 protection on an interim basis and to the

18 extent they want to reserve the right to prime at the final

19 they're not going to be able to put on a priming show between

20 now and Friday.

21          So, Your Honor, I think what makes the most sense

22 --

23          MR. STEIGER:  (Inaudible).

24          THE COURT:  Mr. Steiger, thank you for going

25 unmute.  I can hear you.

1      MR. MEROLA:  -- is to the extent the Court can

2   move on to hear the employee motion today and approve it,

3   subject to the availability of cash for payment we have no

4   opposition to that.  We have no opposition, after we see the

5   term sheet, to having a non-priming DIP entered, you know,

6   today or tomorrow.  Unfortunately we have to see it before we

7   can read through it.

8      THE COURT:  Look, I am happy to make time. Its 20

9   of 4 now, but I have time tomorrow if you want to come back.

10   It just sounds like there needs to be a few conversations and

11   probably best not had on the record.  It seems that the major

12   players all have a desire to make this happen, particularly

13   to get the employees paid and the health benefits restored.

14      Let me just ask here your views on this.  If we

15   were to go ahead and hear the employee wage motion and

16   perhaps get that approved, I mean that is all subject to the

17   DIP being entered anyway, but at least maybe you can walk

18   away with an order in hand that might give some comfort to

19   the workforce that, yes, this is a focus and the company is

20   doing what it can to try to get approval.

21      MR. COOLEY:  Yes.  I entirely agree, Your Honor.

22      THE COURT:  Would you like then maybe to do that

23   and then adjourn for the day and have those conversations,

24   file whatever you need to file with respect to a DIP, and

25   then maybe put on time tomorrow to reconvene.

1          MR. COOLEY:  I think that sounds right, Your

2   Honor.

3          THE COURT:  Okay.

4          MR. PACHULSKI:  Your Honor?

5          THE COURT:  Yes, of course.

6          MR. PACHULSKI:  Thank you, Your Honor.  Again,

7   Richard Pachulski on behalf of the SRC.

8          With respect, again, with the wage motion, which I

9   think absolutely should be approved, and I haven't had an

10  opportunity to speak, but the three members are on the call.

11  I do think, at least, so that they get to review it, it

12  should be limited to the portions necessary so that payments

13  can be made tomorrow. There may be additional issues that

14  they may want that are really significant, but not

15  significant for the (indiscernible).

16         Obviously, the health benefits, obviously the

17  payment being made, but at least so that we have the

18  opportunity we can then take the rest of the motions up when

19  the DIP is being heard.  Frankly, Your Honor, what I was

20  going to say, but I think Mr. Merola and more specifically

21  Your Honor dealt with it, is there has to be some time to

22  speak to the parties. I totally get where Mr. Leblanc is

23  coming from. I have spoken to the counsel for APF pretty

24  extensively over the last few days and including today. So, I

25  understand the balance of the priming which we dealt with

1  this morning.  On the other hand, I also understand that HPS

2  is going to be out a significant a money however this case

3  comes out.  That is just the reality based on fact they are

4  willing to take $200 million.

5         I think it would be helpful, as Your Honor said,

6  to have that conversation but I do think it would be a great

7  idea to have a holding time, but we have to deal with both

8  the wiring versus the time to speak because what I am worried

9  about is, personally on behalf of the SRC, it would be fairly

10  hard to have this argument in front of Your Honor tomorrow

11  unless everybody has staked out their positions, everyone

12  knows what it is, it will be summarized, and Your Honor will

13  rule on the prime if that is where HPS goes.  Parties

14  (indiscernible) are not willing to agree to it.

15         So, I am trying to find a balance so that the

16  employees get paid, but people aren't bound by off orders

17  that they really haven't had time to think about in light of

18  the fact that governance has changed and also accommodate

19  both HPS and the secured creditors and the employees.  It's a

20  hard tread because we're coming up against July 4th, but I do

21  think having been before Your Honor a lot if there is anyone

22  who is going to make sure that happens it's Your Honor, but

23  it's not going to be an easy task because as you have seen

24  there are a lot of very opinionated, I can include myself,

25  parties in this case that are going to want to try to protect

1   their clients as they should.

2          THE COURT:  As they should.  Okay.  Well, I guess

3   what I'm understanding currently, Mr. Pachulski, on the wage

4   motion is that there may be elements of relief that you feel

5   comfortable committing to for the SRC, but there may be other

6   elements of the relief sought that do require a conversation

7   with them and seeing if they will sign-off.

8          You have a client that you haven't spoken to yet,

9   so do you feel that you are in a position to have Mr. Cooley

10  go ahead with, at least, certain elements of the wage motion

11  seeking more limited relief at this point or does that need

12  to wait for tomorrow too?

13         MR. PACHULSKI:  I am going to be presumptuous

14  enough to say that we should go forward with that.  I think

15  it's the right thing, the employees need to know it.

16  Unfortunately, all three numbers are on here and if I have

17  been too presumptions, they will override me, but I think we

18  need to do it.

19         Again, I don't think there is anything, for the

20  most part, unusual about the wage motion. I just want to make

21  it clear I'm not here to, in any respect, try to set that

22  aside ultimately, but I want to do as little as possible to

23  try to get the employees comfortable and to at least have the

24  SRC make a determination with respect to the other issues

25  that are going to come up, whether its cash management or

1   other unrelated relief motions.

2           So, in that respect, yes, I am -- I probably

3   wouldn't have done that many years ago, but I am at a point

4   in my career that I want to take the chance here.

5           THE COURT:  Okay.  Very good.

6           MR. COOLEY:  And I think, Your Honor -- oh, I'm --

7           THE COURT:  No. Please go ahead, Mr. Cooley.  I

8   was going to turn it to you.

9           MR. COOLEY:  All right.  I was just going to say

10  as a practical matter, as we get into it, the vast bulk --

11  well, I will just go ahead and get started and then I can say

12  what I was going to say within the rubric of the

13  presentation.

14          Your Honor, we are here on the debtors motion for

15  authority to pay certain employee related compensation

16  benefits arising in the ordinary course to pay certain fees

17  related to it and other associated relief found at Docket 3

18  in the lead case, Chicken Soup for the Soul Entertainment

19  Inc.  The motion that is on file, Your Honor, I will note for

20  the record, has -- provides a fair amount of information and

21  in particular, on page 5 of that motion, contains a table

22  that summarizes the various baskets, if you will, of employee

23  compensation withholding and benefits programs amounts that

24  comprise the total figure for which relief is sought.

25          As the Court will see, and as I will walk through

1  briefly, and then also with Mr. Schwartz and a proffer of

2  evidence, the bulk of the dollar amounts contained in that

3  request for relief fall into really three baskets.

4           The first is approximately $3.5 million

5  representing the take home pay portion of the employee wages

6  prepetition for the June 21st payroll, which was obviously

7  entirely prepetition, and the upcoming July 5th payroll,

8  which because the payroll is roughly one week in arears, that

9  pay period as well happens to have been essentially fully

10 precipitation.  This is one of those unusual cases where the

11 filing was right at the end of the pay period so we,

12 essentially, have two full prepetition pay periods although

13 one of them is not due till Friday.  So, the basic take home

14 portion is approximately $3.5 million or $1.75 million per

15 pay period.

16          The second of the three large baskets is

17 approximately $2.8 million, $2.85 million, and that

18 represents payroll deductions and withholding obligations

19 associated with those two payrolls.  We made this point in

20 the motion and I want to make it again here in open court

21 that by this motion the Court, obviously, has been made aware

22 that the company has something on the order of about $15 and

23 a half million of outstanding back payroll taxes that have

24 not been paid.  That is a matter that has been brought to the

25 Court's attention.  We are aware of that issue.  That is

1  something that the debtors will have to deal with in the

2  course of this case.  We are not seeking authority to pay

3  that amount by this motion, but only that portion that

4  corresponds to the June 21st and the upcoming July 5th

5  payrolls.  In other words, the amounts associated with the

6  two current payrolls, that is the only portion.

7        The third of the three large items is

8  approximately $2.2 million, the bulk of which is a payment of

9  $2 million which the company's informed is required to be

10  paid to Anthem, which was the company's existing healthcare

11  provider for its health insurance related benefits to

12  employees in which canceled service earlier in June.  The

13  company is informed and believes that the payment of that

14  amount will earn them the reinstatement of that policy.

15        Obviously, we fully expect and I think this is

16  (indiscernible), but we fully expect that that payment will

17  be made only upon confirmation that the policy will be

18  reinstated.  Obviously, not unlike a critical vendor

19  arrangement, such payments are made only when services are

20  going to be rendered and we understand that, but that is the

21  third of the three large components of the wages motion.

22        The other elements generally are smaller amounts,

23  contractor and staffing obligations of approximately $90,000.

24  I will note for the record that the actual prepetition

25  accrued contractor and staffing obligations are about

1  $330,000.  $90,000 represents the amount permissible within

2  the statutory cap.  So, we are only seeking that portion

3  within the statutory cap.

4          There are reimbursable business expenses,

5  employees that have to pay for a meal, or gas, or so forth,

6  approximately $5,500.  Payroll processing fees to the

7  company's payroll processor, which is a company called UKG

8  and, essentially, processes the payroll not unlike ADP which,

9  of course, is familiar to the Court.  Then finally, there are

10 funded, but unpaid health -- excuse me, 401-K plan

11 contributions of about $594,000 making up the balance of the

12 request.

13         Those are the basic elements and as I said, the

14 health and welfare benefits are the typical panoply of

15 health, vision, dental, and so forth.  There are certain non-

16 cash items that are described in the motion similar to what

17 the Court has seen in the past such as accrued paid time off.

18 I understand there is a fairly sizeable balance of accrued

19 paid time off; however, the debtor, as is typical, is,

20 obviously, not asking for permission to pay that amount but

21 simply to continue honoring what is, essentially, a

22 prepetition claim in the ordinary course of business.

23         Similarly, before, Worker's Comp claims the

24 company had a Worker's Comp policy that was cancelled in June

25 and now, essentially, purchases Worker's Comp on an ad hoc

1   basis as required.  There are currently 33 open claims under

2   the existing Worker's Comp and the order provides for a

3   limited stay relief to permit claimants to proceed with those

4   claims under the applicable policies.  Then there is a small

5   amount of severance relating to non-insider severance payable

6   under the company's ordinary course severance program which,

7   essentially, is based on a formula of two weeks of severance

8   per year of service, up to 12 weeks. The debtors request in

9   the order to continue honoring that in the ordinary course

10  and there is a small prepetition amount of approximately

11  $24,000.

12          That is the basis contour of the motion. Again,

13  this was something that I think -- well, now I confess, I am

14  not going to speculate, I do not recall if this is one of the

15  ones that we were able to provide to Ms. Leamy before or

16  after the filing. I know we received some comments from her.

17  I want to make sure that we have them incorporated, but that

18  is the sum and substance of the debtors' request, Your Honor,

19  as set forth fully in the motion and the proposed form of

20  order.

21          As I said at the outset, Bart Schwartz, is present

22  here in the virtual courtroom and to the extent that the

23  Court would like a proffer of testimony, largely consistent

24  with what I just laid out, Mr. Schwartz is available and

25  prepared to do that.

1            THE COURT:  I do require that evidence to make the

2   necessary findings. So, why don't you do the proffer and we

3   will make him available for cross-examination should anybody

4   wish.

5            MR. COOLEY:  Mr. Schwartz, can you hear me all

6   right.

7            MR. SCHWARTZ:  Yes, I can.

8            MR. COOLEY:  Very good.  Your Honor, do -- is your

9   preference to swear him in before the proffer or after?

10           THE COURT:  Okay.  Maybe we are talking about two

11  different things.  I thought that you were going to make his

12  -- provide his testimony by way of proffer.

13           MR. COOLEY:  Yes, Your Honor.

14           THE COURT:  Why don't we swear Mr. Schwartz in.

15           Ms. Gadson.

16        (No verbal response)

17           THE COURT:  Oh, I apologize.  My courtroom deputy

18  did have to step away and I knew that.  Let me ask if my ECRO

19  can swear the witness.

20             BART SCHWARTZ, DEBTOR WITNESS, SWORN

21           THE COURTROOM DEPUTY:  Please state your full name

22  and spell your last name for the record.

23           THE WITNESS:  Bart Michael Schwartz, S-C-H-W-A-R-

24  T-Z.

25           THE COURTROOM DEPUTY:  Thank you.

1        THE COURT:  I will confess that I have yet to

2   swear a witness.  So, I wouldn't know what to ask Mr.

3   Schwartz to do.

4        Please go ahead, Mr. Cooley.

5        MR. COOLEY:  Thank you, Your Honor.  This will

6   constitute the proffer of testimony of Mr. Bart Schwartz.  If

7   called to the stand to testify Mr. Schwartz would testify as

8   follows:

9        My name is Bart Schwartz and I am the current

10  chief executive officer of Chicken Soup for the Soul

11  Entertainment Inc., and each of its debtor affiliates.  I am

12  familiar with the related requests in the wages and benefits

13  motion.

14        Chicken Soup and its debtor affiliates currently

15  have approximately 1,000 full and part-time employees.  Its

16  employees are generally paid on a biweekly basis and are

17  eligible for and receive a variety of standard health and

18  other benefits as more fully described in the motion,

19  including health insurance, 401-K plans, paid time off and so

20  forth.

21        In this company, in this case, the debtors did not

22  make their June 21st payroll to employees at the normally

23  scheduled time.  In addition, a second payroll covering the

24  last two weeks is scheduled for this Friday, July 5th.  As

25  set forth in the motion, these payroll amounts include

1 approximately $3.5 million total net wages plus $2.8 million

2 in payroll deduction and other withholding obligations

3 associated with those two payrolls.

4        I am aware that prior to my involvement with the

5 company the debtors failed to remit approximately $15 million

6 in payroll taxes. The amounts requested in this motion do not

7 include any of those amounts except for the payroll taxes and

8 withholding associated with the aforementioned to current

9 payrolls.  The company also has approximately $330,000 in

10 prepetition contractor and staffing obligations and requests

11 authority to pay approximately $90,900 in accordance with the

12 applicable statutory caps.

13        There are also reimbursable business expenses that

14 employees incur in the course of their duties presently

15 totaling approximately $5,500.  And payroll processing fees

16 of approximately $130,000 due to UKG, which is the company's

17 payroll processing firm.  For employee benefits programs the

18 debtors seek to maintain and honor their existing programs,

19 including paid time off, health and welfare, 401-K and non-

20 insider severance, and most particularly request authority to

21 reinstate their health insurance previously provided through

22 Anthem at which the debtor understands may be reinstated for

23 the benefit of employees with a payment of $2 million at this

24 time.  The requested relief also includes certain non-cash

25 items such as accrued paid time off which the debtors seek

1  only to honor in the ordinary course of business.

2          Finally, the debtors owe approximately $146,000 in

3  claims under dental plans and $40,000 under a vision plan,

4  again, as set forth more fully in the motion.  And they

5  request also to permit employees to prosecute the

6  approximately 33 Worker's Comp claims currently outstanding

7  through the applicable programs.  Finally, the debtors owe

8  approximately $592,000 in accrued, but unpaid employee 401-K

9  contributions for which the debtors also seek authority to

10  pay.

11          The debtor believes that the relief requested is

12  not only necessary but critical to maintain the good order of

13  the company and its ability to continue to function through

14  this Chapter 11 case in order to realize the maximum possible

15  value for the benefit of its stakeholders including

16  creditors, employees, and others.

17          This concludes the proffer of testimony.

18          THE COURT:  Thank you.

19          Is there anybody that would like to cross-examine

20  Mr. Schwartz?

21          MS. LEAMY:  Yes, Your Honor.

22          THE COURT:  Ms. Leamy.

23                    CROSS-EXAMINATION

24  BY MS. LEAMY:

25  Q    Good afternoon, Mr. Schwartz.  My name is Jane Leamy.  I

1  am an attorney with the Office of the United States Trustee.

2       I just have one question about the payroll, the deeds,

3  and generally they (indiscernible), but given the withholding

4  obligation issues I do have a question.

5       So, as I understand it, the payroll for July 5th is for

6  the last two weeks in June, is that correct?

7  A     Actually, I would defer to Mr. Cooley on that.  I

8  believe that is correct.

9  Q     And then the payroll that was due on June 21st is for

10 the first two weeks of June, is that correct?

11 A     I believe that is correct, yes.

12 Q     So, in the motion, Paragraph 26 of the first day wages

13 motion says that as of the petition date the debtors estimate

14 they owe approximately $15.5 million in accrued but unpaid

15 withholding obligations from October 1st, 2023 through June

16 7th, 2024.  So, my question is -- and then the next sentence

17 says the debtors are not seeking authority in this motion to

18 pay the accrued withholding obligations except for that

19 portion while presenting approximately $1.3 million in

20 withholding obligations that are accrued but unpaid from June

21 8th, 2024.

22      So, my question is what is the significance of that

23 June 8th date? It doesn't seem to match up with the pay

24 period day or the payroll date.  So that is my question.

25 A     Frankly, I would have to look at the records myself to

1  answer that question.

2  Q     What records would you have to look at to answer that

3  question?

4  A     I would have to look at the payroll records and I would

5  ask the question you're asking.

6  Q     Okay.  Do you have certainty that the $1.374 million

7  number is the correct number to be paid for the June -- the

8  two paychecks that would be paid to the employees. Is that a

9  correct withholding number?

10  A     Yes. I believe that is correct.

11           MS. LEAMY:  I have no further questions, Your

12  Honor.

13           THE COURT:  Okay.  Thank you, Ms. Leamy.

14           Does anyone else wish to cross-examine Mr.

15  Schwartz?

16      (No verbal response)

17           THE COURT:  Mr. Cooley, any redirect?

18           MR. COOLEY:  No, Your Honor.  Thank you.

19           THE COURT:  Okay.  Thank you, Mr. Schwartz.  You

20  are excused.

21           THE WITNESS:  Thank you, Your Honor.

22      (Witness excused)

23           THE COURT:  Okay. Is there any other evidence that

24  you would like to admit in support of the wages motion?

25           MR. COOLEY:  No, Your Honor.  Thank you.

1        THE COURT:  Would you like to make any further

2  comments in support of the motion, Mr. Cooley?

3        MR. COOLEY:  In the interest of brevity and

4  preserving everyone's time, Your Honor, I think I'm fine to

5  stand on the arguments and authorities that are presented in

6  the motion without restating anything further here.

7        THE COURT:  Very good.  Is there anybody else that

8  would like to be heard regarding the wage motion?

9        MR. PACHULSKI:  Your Honor, I simply have a

10  question for Mr. Cooley because I had reviewed the motion

11  before and I know that HPS, I suspect, has discussed this

12  with Mr. Cooley, but I don't have an answer and maybe I am

13  just missing something in the pleading.  If you look at page

14  5 of the wage motion it requests $9.4 million, but the DIP

15  portion is $8 million and there must be a number that just

16  isn't being paid or I'm missing something, but I'm trying to

17  reconcile the $9.4 million with the $8 million so we don't

18  have a problem tomorrow.  So, maybe (indiscernible) doesn't

19  understand that, but I can't reconcile the $9.4 and the $8.

20        MR. COOLEY:  Your Honor, my understanding is that

21  the difference would be, essentially, a function of the

22  projected revenue contained in the DIP budget.  The proposed

23  interim financing amount is, obviously, in addition to the

24  revenue generated by the company in the ordinary course of

25  business.  So, if you go off of the projections in the DIP

1  budget that is, essentially, the delta. I had the same

2  question.  Mr. Pachulski and I had to walk through all of

3  this yesterday to make sure I understood it.

4        MR. PACHULSKI:  I could have asked Mr. Cooley

5  beforehand, but hopefully the money is there, Your Honor.  I

6  just didn't know where the $1.4 was coming from.  It wasn't

7  clear from the wage motion.  So, I didn't connect the dots.

8  Sorry for distracting, but I didn't get how it was going to

9  happen. Hopefully the $1.4 million is there.  With that I

10 have no idea.

11        THE COURT:  Okay.  Thank you, Mr. Pachulski.

12        Mr. Merola.

13        MR. MEROLA:  Your Honor, as indicated, we have no

14 objection to the entry of the wage order, but we want to be

15 clear that as in further order of the Court we are not

16 consenting to the use of our cash collateral for the payment

17 of any post-petition expenses.

18        THE COURT:  Understood.

19        MR. MEROLA:  Thank you.

20        THE COURT:  Mr. Ahdoot.

21        MR. AHDOOT:  Your Honor, we find ourselves in the

22 same position as Mr. Merola and have to come to the same

23 reservation.  Thank you.

24        THE COURT:  Thank you, Mr. Ahdoot.

25        Is there anybody else that would like to be heard

1  regarding he wages motion?

2          MR. LEBLANC:  Your Honor, its Andrew Leblanc of

3  Milbank on behalf of HPS.

4          I just wanted to make sure that -- there's two

5  issues.  Our understanding, from the presentation, is that

6  the 401-K plan contributions that those are employee

7  contributions that have been withheld and are not company

8  matching contributions.  We just want confirmation of that

9  and with respect to the severance it doesn't look like there

10 is any -- there is no -- we have not been asked, in

11 connection with the DIP proposal to satisfy any employee

12 severance payment.

13         So, I would ask that for these purposes that just

14 be struck from this order, let Mr. Pachulski and the SRC take

15 a look at it and include that.  We just don't know what those

16 issues are.  I know in Paragraph 7 it says -- it looks like

17 its only $24,000 but we just don't know what those are at

18 this point and we have not been asked to approve those.

19         THE COURT:  Yeah, in Paragraph 7 of the interim

20 order, as I read it, does exclude for the purposes of the

21 interim order the payment of any severance obligations.

22         Mr. Cooley, is that your intention with Paragraph

23 7?

24         MR. COOLEY:  I believe that is correct, Your

25 Honor. I am going to flip to it myself just to -- I believe

1   that is correct, Your Honor.  As reading it and seeing the

2   reference to 503(c), that provision is probably clarifying

3   that its not picking up any type of, frankly, insider

4   severance, or bonus, or that sort of thing, anything under

5   employment contracts which it's not.

6           However, hearing Mr. Leblanc's concern, which

7   again I apricate and I appreciate that they're trying to get

8   up to speed on some data points that they don't  presently

9   have, if that is something that we need to kick to a final

10  hearing or take up at a later date it is a relatively small

11  amount.  We will do what the Court instructs.

12          THE COURT:  On the 401-K portion of the budget the

13  594, can you confirm that that is employee withholding.

14          MR. COOLEY:  That is consistent with my

15  understanding of it, Your Honor, as what is presented in the

16  motion, but those are the employee portions withhold rather

17  than matching contributions.

18          THE COURT:  Mr. Leblanc, do those answers

19  adequately address your concerns?

20          MR. LEBLANC:  Your Honor, that does.  Thank you

21  very much.

22          THE COURT:  Okay.  Thank you, Mr. Leblanc.

23          Is there anybody else who would like to be heard

24  regarding employee wage motion?

25      (No verbal response)

1        THE COURT:  Okay.  I hear no response.  Based upon
2  the record before me in the form of Mr. Schwartz's testimony
3  I do find that there is more then adequate cause to grant the
4  employee wage motion and I do so on an interim basis because
5  its self-evident that immediate and irreparable harm would
6  come to the debtors from their continued inability or failure
7  to meet their payroll obligations.  So, therefore, I am happy
8  to grant this relief on an interim basis and will enter the
9  order.

10        One thing you are going to need to fill in is a
11  final hearing date.  So, if you want to talk about scheduling
12  now we can do that or if you have any other business you
13  would like to handle before we talk about scheduling, I will
14  leave it up to you.

15        MR. COOLEY:  Your Honor, since we are not going to
16  do an oral DIP motion today, I think that that probably takes
17  us to the end of today's agenda and as the parties described,
18  cash management, the other procedural motions and such really
19  don't have to happen today.  Those are more administrative in
20  nature.  This was the important one.  So, I think that will
21  conclude our agenda.  So, yes, if the Court is prepared to
22  talk about scheduling we can do that.

23        THE COURT:  Okay.  I would be looking at the week
24  of the 29th.  Would that work for the debtors and the other
25  parties?

1          MR. PACHULSKI:  Your Honor, if I could -- since

2   the members of the SRC may want to be there, fi we could

3   schedule tomorrow so I could speak to them that would be

4   helpful.

5          THE COURT:  That is fine.  If you would like, we

6   can -- Mr. Cooley, we can enter the wages order without the

7   hearing date and we can make that subject to a further notice

8   that you can send out.

9          MR. COOLEY:  That's fine, Your Honor.

10          THE COURT:  Okay.  So, I would just ask your

11   colleagues in Delaware to upload the interim wage order so

12   that my staff can go ahead and address it with me.

13          MR. COOLEY:  We will do that.

14          THE COURT:  Okay.

15          MS. COHEN:  Your Honor, if I could be heard.

16          THE COURT:  Yes, Ms. Cohen.

17          MS. COHEN:  Apologies for interrupting.  Good

18   afternoon, Your Honor.  Kim Cohen of Shipman & Goodwin on

19   behalf of U.S. Bank in its capacity as indenture trustee and

20   the largest unsecured creditor in this case.

21          So far, the focus has been on the secured

22   creditors, as you heard extensively. I just wanted to note,

23   and I think it will be taken up another day, today before we

24   adjourn that in the context of the (indiscernible) DIP that

25   has yet to be papered the typical rights reserved for any

1  unsecured creditors committee, which would typically be

2  reserved should be addressed as well.  I'm sure that is

3  something the U.S. Trustees counsel will be looking at as

4  well, but we just wanted to note that today.

5          THE COURT:  Thank you, Ms. Cohen.

6          Mr. Cooley, do you want to talk about getting a

7  hearing scheduled for tomorrow or Friday for the DIP.

8          MR. COOLEY:  Yes, please.

9          THE COURT:  Tell me what is your ask?

10          MR. COOLEY:  Tomorrow for sure if we possibly can,

11  Your Honor, and simply because, obviously, with each passing

12  day, you know, this business, we're into the first of the

13  month.  People have had rent checks come due and so I feel a

14  special urgency this time of the month. So, if we could do it

15  tomorrow, recognizing the burden that puts on parties here

16  from a notice and response perspective for something that has

17  not yet been filed, but if we can do that I think that is the

18  very best thing for the employees if we can pull it off and

19  I'm prepared to do the work necessary to make that possible.

20          THE COURT:  I can offer you 11 a.m.  Do you think

21  that would be -- I realize its rough for everybody and so I

22  understand that, particularly the ones on the West Coast.

23  There are quite a few on here that may only see a filing in

24  the morning, but if 11 a.m. works I can schedule it then.

25          MR. COOLEY:  Certainly, from the debtors'

1   perspective that works.  The other advantage, I think, we

2   have is, and the proof will be in the pudding, that my

3   present sense of the proceedings thus far is that it is

4   likely to be a fairly straightforward review, negation and

5   dispute other then the priming issue that has really been

6   raised, which, frankly, we know who the people are who have

7   spoken up who are raising the issue.  They are here with us

8   today.  As I have said, I have been in touch with at least

9   some of them already and Milbank may have as well.

10          So, I suspect that we will be able to start or

11  continue working through that process as we are preparing the

12  filing as opposed to the normal course of -- the normal

13  sequence of events where we file it and then we begin to

14  talk.  Here, we should be able to dual track all of that

15  which I think will help give us the most value for the

16  limited time available.

17          THE COURT:  I agree.  So, lets set it for 11

18  o'clock. I will ask for you and your colleagues to prepare an

19  agenda and I think we will have to get you a new hearing

20  link. So, if you coordinate with my Chambers, we will get

21  that over to you.

22          Before I wrap up, is there anybody else who wishes

23  to offer any comment? I have seen a couple of faces pop-up on

24  the screen.

25          (No verbal response)

1           THE COURT:  Okay. I don't hear any response. I do
2   want to express my appreciation to all the parties. This has
3   been unusual.  The parties have been very patient in working
4   with it and I will also particularly want to express my
5   appreciation to Ms. Leamy. I can tell that she must have
6   spent quite a bit of time on this over the weekend and I
7   think the work of the U.S. Trustee, particularly on weekends
8   on these sorts of matters, is often unnoted and
9   unappreciated, but I do note it, and I do appreciate it, and
10  I think we all should be aware of the great work that they do
11  to make sure that these hearings come off the way they do.
12          So, with that --
13          MR. AHDOOT:  Your Honor.
14          THE COURT:  Yes.
15          MR. AHDOOT:  I'm so sorry to interrupt.  I have a
16  very small process request (indiscernible) Guilds.
17          THE COURT:  Yes.
18          MR. AHDOOT:  I happen to be on the West Coast and
19  so I have just been sort of racking my brain on the timeline.
20  If there is any way that Mr. Cooley could forward us drafts
21  of the deals or anything that we could consider in advance we
22  would very much appreciate that.  I just thought it was
23  appropriate to ask.  Again, I am sorry for interrupting.
24          THE COURT:  Not a worry, Mr. Ahdoot.  Thank you
25  for your comment.

1         Mr. Cooley, before I move onto somebody else who

2   has raised their hand, would you like to respond.

3         MR. COOLEY:  Yes, Your Honor.  Certainly,

4   obviously, I will just want to coordinate with Milbank on

5   that to make sure that its either ready to go or ready to go

6   subject to any caveats because we have been moving quickly.

7   So, there may be proofreading, etc., but I suspect people

8   will be more interested in the order and term sheet then in

9   the motion. So, if we can -- I see nodding heads.  If we

10  could do that then I certainly have no objection and would be

11  more then happy to do that if that helps expedite the

12  process.  Again, we are going to be continuing these dialogs

13  in tandem with preparing and filing the motion. So, whatever

14  we can do in advance that serves all of us.

15        THE COURT:  Mr. Laurin, you asked to be heard.

16        MR. LAURIN:  Yes. Thank you, Your Honor.

17        Again, this is in the category of a housekeeping

18  matter, I think. I think it somewhat implies as well, but to

19  my point of wanting to be able to present the breakup fee

20  position and make our request consistent with the motion that

21  is pending, and there will be, obviously, another motion

22  being filed, is it the Court's preference that that be set

23  for a hearing at the time of the final DIP hearing.  Would

24  that be an appropriate way to --

25        THE COURT:  I suspect that by the time we set that

1  that will provide adequate time to put it out on notice

2  without having to seek any sort of short notice or expedited

3  treatment.

4            MR. LAURIN:  Okay.  That's fine. Thank you.

5            MR. LEBLANC:  Your Honor, Andrew Leblanc of

6  Milbank.

7           I didn't say it earlier, but I think it probably

8  goes without saying that we, obviously, will object to Mr.

9  Laurin's clients request for payment post-petition and the

10  prepetition agreement that was approved by, what we think was

11  a flawed governance process, but we will deal with that at

12  the appropriate time.

13          Your Honor, I think for Mr. Cooley's benefit I

14  think we are fine with the order and the term sheet going

15  around to the parties so that they can review that. I wonder,

16  our friends at Richards, Layton do we really need to have a

17  motion or can we just get the order and term sheet around so

18  people can focus on trying to do that.  I am fine either way,

19  but if that would -- I think, Your Honor, might save the

20  parties a lot of time.

21          Obviously, if its sent out by the debtors counsel

22  to all the parties now it can begin -- those that have

23  requested it may raise their hand.  We are fine with that.

24  That is, obviously, subject to our -- we will continue to

25  review and make sure we didn't miss any changes.  We would

1  like to see if there is a possibility of getting this done

2  because, obviously, the priming issue is an issue for us. I

3  don't anticipate our clients will fund on the basis of it

4  being junior to any other secured debt.

5          We want to have the dialog with parties.  Again,

6  if people want to fund to preserve their own collateral value

7  we are happy to have that happen.  My suggestion is we do

8  that rather than a motion, Your Honor.

9          THE COURT:  Yeah, I'm fine with -- I have had a

10  chance to think about it in the last few minutes.  So, I am

11  fine with you filing it under a notice of revised proposed

12  order, but it does need to get filed so that parties have the

13  opportunity to review it.

14          MR. COOLEY:  That's what we will do, Your Honor.

15  As he was describing that, that is what was going through my

16  head.  We can just do precisely what the Court suggests.

17  That should be something as soon as the -- that will allow us

18  all to focus our attention on any necessary proofing for the

19  term sheet and order which is more important for everybody,

20  and probably get it on file much sooner.

21          THE COURT:  Yes.

22          MR. MEROLA:  Your Honor.

23          THE COURT:  Yes, Mr. Merola.

24          MR. MEROLA:  Apologies, Your Honor. I understand

25  that sometimes due process (indiscernible).  If we are going

1  to ask to be primed there is no evidence in the record of

2  valuation other then what Mr. Leblanc referred to is some

3  dated appraisal that isn't even in the record. If we are

4  going to have a hearing that people are seriously considering

5  priming tomorrow, I think we are entitled to know what the

6  case is and what the argument is by the debtor and the

7  secured lender.

8         While we are happy to look at the term sheet and

9  the order and be as responsive as we can, the factual issue

10  of adequate protection and value to support that adequate

11  protection we need to know what people are going to argue

12  tomorrow.

13         THE COURT:  Yeah, and I think you need to have

14  those conversations with Mr. Cooley and Mr. Leblanc and their

15  colleagues.  Is it an evidentiary issue for tomorrow that --

16  nothing I said today should be heard to imply that the

17  debtors (indiscernible) evidentiary burden of proving up why

18  I should approve any DIP that they propose.  So that is

19  certainly evidence that is very much on the table for

20  tomorrow.  I think it would be worth having those

21  conversations with the parties tonight to understand where

22  everybody is and what the proposed resolution is.

23         Okay.  Then we will be back together at 11 a.m.

24  Eastern tomorrow.  Till then I wish all a good night. It will

25  be a busy night for you, but I will look forward to seeing

1    what everybody comes up with.  With that -- (Audio stops)

2          (Proceedings concluded at 4:21 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATION

2            We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                    July 3, 2024

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                    July 3, 2024

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Tammy L. Kelly                        July 3, 2024

18   Tammy L. Kelly

19   Court Transcriptionist For Reliable

20

21

22

23

24

25