# EXHIBIT 9

```
1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2
                                  .  Chapter 11
3    IN RE:                       .  Case No. 24-11442 (TMH)
                                  .
4    CHICKEN SOUP FOR THE SOUL    .  (Jointly Administered)
     ENTERTAINMENT INC., et al.,  .
5                                 .
                                  .  Courtroom No. 3
6                                 .  824 North Market Street
                Debtors.          .  Wilmington, Delaware 19801
7                                 .
                                  .  Wednesday, July 3, 2024
8    . . . . . . . . . . . . . . .   11:00 a.m.

9                        TRANSCRIPT OF HEARING
10          BEFORE THE HONORABLE THOMAS M. HORAN
                 UNITED STATES BANKRUPTCY JUDGE
11
     APPEARANCES:
12
     For the Debtors:           Ricardo Palacio, Esquire
13                              ASHBY & GEDDES, P.A.
                                500 Delaware Avenue
14                              8th Floor
                                Wilmington, Delaware 19801
15
                                Michael Cooley, Esquire
16                              REED SMITH LLP
                                2850 N. Harwood Street
17                              Suite 1500
                                Dallas, Texas 75201
18
19   (APPEARANCES CONTINUED)

20   Audio Operator:           Ian Willoughby, ECRO

21   Transcription Company:    Reliable
                               1007 N. Orange Street
22                             Wilmington, Delaware 19801
                               (302)654-8080
23                             Email: gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

1 | <u>APPEARANCES (CONTINUED)</u>:

2 | For HPS Investment
Partners:                        Andrew Leblanc, Esquire
3 |                                  MILBANK LLP
                                   1850 K Street, NW
4 |                                  Washington, DC 20006

5 | For the Debtors
Through Strategic
6 | Review Committee:                Richard Pachulski, Esquire
                                   PACHULSKI STANG ZIEHL & JONES LLP
7 |                                  10100 Santa Monica Boulevard
                                   13th Floor
8 |                                  Los Angeles, California 90067

9 | For MidCap Financial
Trust:                           Frank Merola, Esquire
10 |                                 PAUL HASTINGS LLP
                                   1999 Avenue of the Stars
11 |                                 27th Floor
                                   Center City, California 90067

12 |
For Cedar Advance LLC:           Shanna Kaminski, Esquire
13 |                                 KAMINSKI LAW PLLC
                                   40950 Woodward Avenue
14 |                                 Suite 100
                                   Bloomfield Hills, Michigan 48304

15 |
For SAG-AFTRA, DGA,
16 | WGA and Affiliated
Funds:                           David Ahdoot, Esquire
17 |                                 BUSH GOTTLIEB, A LAW CORPORATION
                                   801 North Brand Boulevard
18 |                                 Suite 950
                                   Glendale, California 91203
19 |

20 |

21 |

22 |

23 |

24 |

25 |

1                                    INDEX

2    CONTINUED MOTION:                                        PAGE

3    Agenda
     Item 6: Motion for Entry of Interim and Final          4
4            Orders Under 11 U.S.C. §§ 105, 361,
             362, 363 and 364 (I) Authorizing the
5            Debtors, on a Final and Interim Basis,
             to (A) Obtain Post-Petition Financing,
6            (B) Grant Liens And Superpriority
             Administrative Expense Claims To Post-
7            Petition Lenders, And (C) Utilize Cash
             Collateral; (II) Providing Adequate
8            Protection To The Pre-Petition Secured
             Parties; (III) Modifying the Automatic
9            Stay; (IV) Granting Related Relief,
             Pursuant to 11 U.S.C. Sections 105, 361,
10           362, 363, 364 And 507; and (V)
             Scheduling a Final Hearing Pursuant to
11           Bankruptcy Rule 4001 and Local Rule 4001-
             2; and (VI) Granting Related Relief
12           [Docket No.8; filed June 29, 2024]

13           Court's Ruling:  Matter Taken Under Advisement

14

15

16

17

18

19

20

21

22

23

24

25

1            (Proceedings commenced at 11:00 a.m.)

2            THE COURT:  Good morning, counsel.  This is Judge

3  Horan.  We're on the record in Chicken Soup for the Soul

4  Entertainment, Case No. 24-11442.

5            Mr. Palacio, good morning.

6            MR. PALACIO:  Good morning, Your Honor.  May I

7  please the Court, Ricardo Palacio of Ashby & Geddes, proposed

8  Delaware counsel to the debtors and debtors-in-possession.

9            Your Honor, as with the other prior hearings, I

10  would like to cede the podium to Mr. Cooley and he will carry

11  today's agenda.

12            THE COURT:  Thank you very much.

13            Mr. Cooley, good morning.  Good to see you.

14            MR. COOLEY:  Good morning, Your Honor. Its good to

15  see you.  Thank you again for having us back for round three.

16            Let me see, I think probably the best thing for me

17  to do -- just for the record, Michael Cooley from Reed Smith

18  appearing for the debtors and debtors-in-possession in these

19  Chapter 11 cases.  Let me start, I think, with kind of a

20  recap and update of where we are.  Others may wish to chime-

21  in and then the Court can decide how it would like to

22  proceed.

23            This is one of those cases where its -- there is

24  always a bit of a disconnect between what the Court sees here

25  and what goes on behind the scenes.  In some cases, very

1   little effort produces an enormous result and in other cases

2   there is an enormous effort and only very little progress.  I

3   regret to say that so far, we are in the latter category.

4           We still have, by my count, three objectors to the

5   proposed HPS DIP financing, three of our unsecured creditors:

6   they are MidCap Financial, which asserts approximately a $17

7   million claim secured by what is called the Sonar film

8   library; the Film Guilds, which assert liens on all Guild

9   films to secure residuals and other amounts; and Cedar

10  Advance, which asserts an alleged -- a claim under a $5

11  million factory arrangement.  Their argument is a little bit

12  different, rather then asserting a senior lien they assert

13  that their receivables are not property of the estate to

14  begin with.  Same net effect, but a slightly different

15  argument.

16          We engaged in numerous calls and conversations

17  with counsel for both MidCap and Guilds last night and this

18  morning providing some additional requested information,

19  exchanged some proposed terms but ultimately have reached no

20  resolution yet with either of them.  We reached out to Cedar

21  Advance, we heard back from them this morning and have only,

22  therefore, had very preliminary discussions with them

23  although, again, their situation is a little bit different

24  because it is the nature of a factory arrangement I think

25  there is a separate threshold question whether it is, in

1  fact, a true sale as they contend or is in the nature of a

2  secured financing in which case it would likely be junior to

3  HPS in right of time and, therefore, be, essentially,

4  coverable via adequate protection liens.

5          Some of the terms that we have gone over with the

6  secured parties, in particular with HPS, include adding

7  marshalling language to the proposed interim order that would

8  help to ensure that the $8 million in question is collected.

9  It has to be out of non-overlapping collateral first.  There

10 have been other adequate protection discussions as well. I

11 will, frankly, let counsel for HPS and MidCap speak to those.

12         So, I will yield in just a moment because I think

13 the Court will need to hear from the other parties but given

14 that state of play its not entirely clear to me where that

15 leads us in view of the Court's comments yesterday.  We have

16 an $8 million DIP proposal on the table and we have two

17 payrolls and health insurance that desperately need to be

18 addressed.  The debtors and HPS very much need time to figure

19 out what the path forward looks like for this company and

20 what it will cost to execute on that path, then we will be

21 back in a week or two on a final DIP for approval of whatever

22 that path may look like.

23         One other thing I will note, Your Honor, is that

24 we also have with us today Mr. Roy Salter.  Mr. Salter is an

25 expert appraiser with deep, deep experience in the

 1  entertainment industry, film libraries, and so forth.

 2  Earlier in his engagement with the debtors, he performed

 3  various analyses of, among other things, fair market

 4  valuation of the film libraries including the Sonar library

 5  which is the subject of MidCap's lien.

 6          I was not able to get to a point where I could

 7  share the report that he had previously prepared with the

 8  other parties; although, I have him here today and to the

 9  extent the Court thinks it would be useful or permissible

10  under the federal rules, we would propose to proffer

11  testimony of Mr. Salter, briefly, on the subject of the value

12  of the Sonar library and then, of course, make him available

13  to MidCap or whomever for cross-examination, but I know the

14  Court is keenly concerned with the evidentiary issues

15  involved.  So, I wanted to give the Court that sort of

16  general overview of where we are from that standpoint.

17          On the other, sort of, ordinary DIP financing

18  elements Mr. Schwartz is here and can attest to the prior

19  marketing efforts and so forth, but on the valuation issue I

20  wanted to alert the Court to Mr. Salter's presence and the

21  ability that we are -- what we are able to do.

22          THE COURT:  Thank you, Mr. Cooley.  I guess my

23  first question to you would be this: Would additional time be

24  helpful today?

25          MR. COOLEY:  Your Honor, I have a law partner who

1  fondly refers to me as a dog with a bone on issues like this,

2  and I am prepared to continue to work these issues for as

3  long as people will work them with me.  I think, however,

4  that the answer to the Court's question may better come from

5  counsel for MidCap, Guilds, or HPS because at the end of the

6  day I am little bit of a middleman in this particular issue.

7  Its my burden, its my motion, but given the nature of the

8  lingering dispute I am, sort of, the middleman.

9          THE COURT:  I understand.

10          Let me first hear from Mr. Leblanc.  Good morning,

11  Mr. Leblanc.

12          MR. LEBLANC:  Good morning, Your Honor.  Andrew

13  Leblanc of Milbank on behalf of HPS.

14          Your Honor, I think Mr. Cooley's summary of where

15  things are is accurate.  HPS continues to be prepared to fund

16  itself $8 million of the DIP loan, which is the amount that

17  was advised to us by the debtors would be sufficient to

18  satisfy the arrearages with respect to the employees, but

19  will only do on a priming basis because of the tremendous

20  uncertainty that exists.

21          Your Honor, you know, we certainly believe that

22  there would not be a basis to prime out loan, which is a loan

23  of $500 million principle amount against all of the value of

24  the assets.  The big problem that we face here, Your Honor,

25  is that we just have very grave concerns about what has

1   happened at this debtor leading into this case.

2          As we have talked about, Your Honor, there is --

3   to use a bad analogy, they appear to have been burning the

4   furniture to keep the offices warm as they went into the

5   bankruptcy and as noted by the failure to remit the

6   withholding taxes.  And what we don't know is what has

7   happened to all of the rest of the assets.

8          We have a very strong view, Your Honor, that is

9   reflected in our DIP term sheet with respect to the Kiosk

10  business, the Redbox business.  We question whether that is a

11  viable business and that is the first order of business from

12  our perspective to determine what to do there.  There is a

13  library -- there are several libraries of assets of videos

14  that likely have value but we just don't know if they have

15  been sublicensed, if they have been liened up, if they have

16  been promised to other parties; we just don't know.  So, our

17  client is prepared to fund the $8 million but is not prepared

18  to lose the $8 million if the value of all of the collateral

19  can't even satisfy that.

20          So, we did, Your Honor, put into our DIP term

21  sheet the marshalling concept that I floated yesterday, Your

22  Honor.  We were able to get our clients to agree with that.

23  Its in the term sheet.  It would need to be dropped into the

24  order.  We just put it into the term sheet, but just

25  everybody knows we are prepared to do that.  So, we would

1  look to the non-primed collateral first, but if the non-

2  primed collateral terms out to be insufficient to satisfy

3  even our DIP loan that is the portion that we just aren't

4  prepared to put at risk.

5           Given the evidentiary issues, Your Honor, and,

6  obviously, that is of none of the secured lenders doing, we

7  appreciate that finding them non-consensually is likely to be

8  very difficult. If they make the decision that the only way

9  they will do it, they will consent, is on a non-priming basis

10 then we likely do not have a path forward, Your Honor.

11          Mr. Cooley mentioned we did spend some time

12 overnight trying to understand the MidCap claim in particular

13 because I think that has been -- Mr. Merola has been the one

14 most focused on this. I -- what we saw, the Midcap claim

15 arises, it looks like, from a purchase -- I think the

16 obligation by the company to purchase 5 percent equity

17 interest it was put to the company by MidCap.  That purchase

18 price obligation, I think MidCap, in its objection, refers to

19 it as an $11.5 million obligation.

20          I am not casting any aspersions here, everybody is

21 moving very fast.  It was in their DIP objection; it appears

22 from the company's financial statements that about $7.8

23 million or $7.7 million was repaid of the purchase price

24 obligations sometime late last year.  To be crystal clear on

25 this, Your Honor, I am not suggesting anything -- MidCap,

1  obviously, like us had no clue about what was going on with

2  the company, but it sounds like that $7.7 million was paid

3  for money that otherwise could have been remitted to the IRS

4  for payroll.  Obviously, by happenstance from the timing.

5           Our understanding is that the MidCap remaining

6  obligation, I thought, was in the principle amount of

7  approximately $3.8 million.  What we understand is that when

8  it was paid down at the end of last year from $11 and a half

9  million to $3.7 or $3.8 million that there was no release of

10 collateral.  They still have the same lien against the same

11 basket of collateral that existed at that time.

12          I am not suggesting, Your Honor, for a second that

13 that gives grounds to prime them non-consensually. I just

14 thought it was important to have that context.  So, we

15 understand that the principal amount that is at interest for

16 MidCap is approximately $3.8 million but we are unprepared to

17 fund on a non-priming basis because at the end of the day if

18 the only assets that have value when somebody responsible,

19 and the management team starts to look at this is the

20 collateral that is MidCap's collateral we need to be repaid

21 for the $8 million that we are willing to fund.

22          We are more than happy to have anyone else come to

23 fund with us on this DIP on the same terms.  We are happy to

24 have that.  We even talked about, internally, whether there

25 was a way that we could simply just not even touch the MidCap

1  collateral but at the same time not use dollars to support

2  it, but it just doesn't seem feasible because we don't think

3  that is a possibility in light of the circumstances here.

4          So, we are just not prepared to be the only person

5  at risk on the $8 million.  We will fund it, but we're just

6  not prepared to do that.  And I don't know how Your Honor

7  would find non-consensual priming on the evidentiary record

8  that you have before you.  So, I think we are stuck a little

9  bit, Your Honor.

10         HPS is fully prepared to fund the employee costs

11  that we described, just not to do it where our DIP loan is at

12  risk in light of the circumstances.  So, Your Honor, I am

13  happy to answer any questions, but that is where we stand and

14  we completely understand every secured lenders position, but

15  the path forward here has to be everyone takes a little bit

16  of risk.  We are taking the most because we're actually

17  putting the money up but we are not going to take all of the

18  risk.

19         THE COURT:  I understand, certainly, Mr. Leblanc.

20         Let me hear from Mr. Ahdoot first, please.

21         MR. AHDOOT:  Thank you, Your Honor.  David Ahdoot

22  of Bush Gottlieb on behalf of the Directors Guild of America.

23  SAG-AFTRA and the Writers Guild.  We can refer to them as the

24  Guilds.

25         Your Honor, Mr. Cooley is accurate, there has been

1  some minimal progress in these talks late last night and

2  early this morning but it's also challenging in the sense

3  that the concepts being discussed with respect to the $8

4  million are not traditional market-based asset protection

5  concepts that we are used to and there is a significant film

6  library to evaluate.

7          One of the themes that I think the Guilds are

8  struggling with is the information deficit and the lack of

9  certainty with respect to what has been going on.  We have no

10 independent knowledge concerning the burning of the

11 furniture.  Certainly, it is alarming to hear these things

12 being discussed and we are, sort of, wrapping our heads

13 around those issues as we try to come up with creative

14 solutions to help effectuate a path forward.

15         The Guilds are hugely sympathetic to the plight of

16 these particular employees and do not want to be a barrier to

17 getting that funding.  We have our own representative

18 employees that we're highly focused on and there will be

19 obligations coming due to them shortly post-petition. So, one

20 of the issues that we have been exploring is whether in prior

21 budgets those obligations have been considered, whether HPS

22 is focused on those obligations.  What we are hearing is that

23 right now we are focusing only on the $8 million.  We

24 understand that, Your Honor.  We are trying to link arms and

25 focus on the $8 million.

1          In that regard, just this morning, we were

2   provided with a library list of approximately 4,000 titles.

3   We are looking at that list to evaluate the marshalling

4   concept that has been proposed.  I certainly see some sense

5   in the marshalling concept.  We have also looked at the term

6   sheet and saw that there is, you know, great information to

7   access being provided to the DIP lenders and requested that

8   the Guilds be put in a similar posture and consulting party

9   status. The debtor agreed to that concept. We are waiting to

10  hear if the DIP lenders are comfortable with that concept.

11         The information is, of course, being hugely useful

12  to understand the management of our collateral as well as

13  understanding how the Guild post-petition obligations of the

14  members will be managed.  So, that could be helpful to get us

15  there and we are, sort of, waiting on that.  Otherwise, Your

16  Honor, we do understand that there is a big gap between

17  MidCap and the other parties.  They are, sort of, curious to

18  see how that gap is being managed.  We are just one factor in

19  this overall situation.

20         THE COURT:  Thank you very much, Mr. Ahdoot. I do

21  appreciate those comments.

22         Mr. Merola, I would like to hear from you, please.

23         MR. MEROLA:  Your Honor, Frank Merola from Paul

24  Hastings on behalf of MidCap.

25         Your Honor, what is driving the calendar today is

1  the (indiscernible) fees of the debtors liquidity situation

2  that has fallen so cruelly upon its employees. I don't think

3  anyone on this phone, at this hearing, was responsible for

4  the current liquidity crisis.  At the same time, we are at a

5  hearing, Your Honor, where both the debtors counsel and the

6  special committee's counsel has acknowledged they don't even

7  know who all of the secured creditors are.

8         We are here on a priming hearing.  The idea that

9  either the neither the debtors counsel, nor the special

10 committee's counsel -- papers were filed to put a DIP in

11 place originally that didn't mention the idea of other

12 secured creditors.  We sit here now not even knowing whether

13 other secured creditors have notice of this hearing.  And

14 rather then posture for future fights like some of my

15 opponents, I am going to answer your question directly.  Yes,

16 additional time would be useful.

17        We understand the crisis of the employee

18 situation.  Without breaching settlement privilege we made

19 detailed proposals regarding stipulations, regarding use of

20 our cash collateral.  We have not had a response from the

21 debtor.  We made proposals on priming.  We have not had any

22 interaction (indiscernible) HPS directly.  We have had

23 several conversations with debtors counsel and through the

24 good offices of Mr. Pachulski on behalf of the special

25 committee.

1          I believe that if we have an hour or two on a

2    phone call we could get to a point where this could all get

3    done.  Unfortunately, as Your Honor understands, we were in

4    Court yesterday until 6 o'clock.  We did not get -- we did

5    not receive the actual modified term sheet until after people

6    on the East Coast were dark.  The draft term sheet we

7    received at 6 o'clock was different then the one that was

8    filed at 1 a.m.  And our proposals probably arrived in

9    response to that term sheet after many of our East Coast

10   colleagues were no longer available.  I personally have been

11   up since 5 a.m., LA time, trying to continue this dialog and

12   we stand ready to help solve the problem.

13         The context is important also, Your Honor.  My

14   client has a purchase money security interest for a film

15   library they sold.  That is our only collateral.  Our entire

16   liquidated claim is literally only tens of millions of

17   dollars.  Months after we put that security interest in place

18   HPS came in and funded $500 million and now purports to not

19   know who the other secured creditors were.

20         We are happy to help solve the problem not

21   (indiscernible).  There has got to be a relative allocation

22   of risk and responsibility and that is all we are proposing.

23   The order before you today, Your Honor, still does not

24   address the fact that there are other creditors with

25   collateral.  And as you well know, without either consent or

1   an order for a finding of adequate protection, for each of

2   those creditors there is no ability to use that cash

3   collateral.

4           We do not have an analysis of the various cash

5   collateral flows that go into making an overall budget.  All

6   we are being told by HPS who, through their representation on

7   the oversight committee until the eve of bankruptcy, should

8   have the best insight.  What we are being told is they don't

9   trust the projections or the operating results, that they

10  want to do further due diligence.  Yet, we are being asked to

11  underwrite that risk.

12          I believe, Your Honor, if we had a brief recess,

13  even an hour or two, and we could get on the phone together,

14  HPS, Mr. Pachulski's office, go through the list of open

15  issues, I think we could resolve this issue in time to get a

16  wire request in so people could be paid on Friday. I

17  personally believe that that is time much better spent than

18  casting aspersions or telegraphing potential litigation in

19  the future today.

20          We are clearly going to object to any finding of

21  involuntary priming, especially on the evidentiary record.

22  As Your Honor knows, the credibility of the Delaware Court is

23  of the most central of importance to the Delaware Docket.  We

24  can't have trial by ambush. They are trying to propose a

25  witness that HPS absolutely excoriated when they were using

1  that witness to prime HPS and all we have is a one-page

2  letter.  There is no evidentiary record to support priming

3  here, but if you give us an hour or two, I think we can

4  resolve these issues.

5          THE COURT:  Thank you very much, Mr. Merola.

6          Is there anybody else who would like to be heard

7  before I turn back to the debtors or Mr. Leblanc.

8          Ms. Kaminski.

9          MS. KAMINSKI:  Thank you, Your Honor.  Shanna

10 Kaminski on behalf of Cedar Advance.

11          Again, there is no resolution of the issue that we

12 raised. If the Court is inclined to enter an interim cash

13 collateral order, even on an extremely short-term basis, we

14 ask, we implore the Court to require that the debtor escrow 5

15 percent of collected receipts, that is the amount that is in

16 dispute, as to whether or not it is property of the

17 bankruptcy estate, an analysis that, obviously, can't be done

18 at this point.

19          (Indiscernible) preserved our property, will be

20 claimed with our property during the short-term period and

21 really what we will be asking, they said that there is

22 another interim order, that it be preserved until the issue

23 can be resolved either consensually with the debtor or via

24 the Court making a determination as to whether or not it is

25 property of the estate.  That is all we are asking for right

1    now.

2              Thank you, Your Honor.

3              THE COURT:  Thank you very much, Ms. Kaminski.

4              Mr. Pachulski.

5              MR. PACHULSKI:  Thank you so much, Your Honor.  I

6    appreciate it.  Thank you so much again.  Richard Pachulski

7    on behalf of the SRC.

8              Your Honor, I want to comment on a couple of

9    things that Mr. Merola said, and not in any way negative.

10   Mr. Merola and I were speaking up till about one in the

11   morning.  He is right, then we got up again to try to work

12   through it.  So, the parties are really trying to do this,

13   Your Honor.

14             I do want to comment on a couple of things.

15   Number one, Mr. Merola is correct that the debtors -- Mr.

16   Cooley would have to speak for himself, but the SRC, because

17   we have never had any visibility, we were basically shut out.

18   So, I appreciate where Mr. Leblanc is coming from.  I think

19   that was the same with respect to HPS that we don't know who

20   the secured creditors are, but that said I think we have now

21   had multiple hearings and I can only tell you, because its

22   been said to me, there must be at least 20 reorg articles

23   about this case.  So, if anybody doesn't know about it, they

24   are not on this earth as far as I can tell. So, I don't think

25   there is a huge risk if there is a determination.

1          Now, I agree with Mr. Merola that -- and I was

2    concerned about this yesterday, Your Honor, when we set this

3    for 11 Eastern, 8 Pacific, that this would happen, but

4    notwithstanding that people did work, literally, through the

5    evening and into the morning. I do think time may make a

6    difference.

7          I want to add one thing, what is being proposed

8    here by HPS is very different then what was proposed in the

9    DIP motion in terms of the priming.  That being that you will

10   be priming all of the $500 million in debt.  Again, that in

11   and of itself doesn't make priming okay or not okay versus

12   this being okay or not okay.  What effectively is happening,

13   and its just a reality here, is what Mr. Leblanc's client is

14   saying is we need to get paid our $8 million out of our own

15   collateral.  We are basically priming ourselves, if we get

16   paid the $8 million then the priming effectively goes away.

17   That is very different then what was proposed.

18          Now, there is a reality here, forgetting even what

19   the valuation says, and I have no idea what Mr. Salter is

20   going to say, but that's correct, there is no evidence right

21   now. The only evidence we actually have, which is kind of

22   ironic, is that (indiscernible) was prepared to prime with

23   $20 million.  So, they thought that it was $8 million.

24          So, what they have, and unfortunately, is that

25   there won't be a deal and assuming HPS wants to go forward

1  with it there will be a priming fight next week which,

2  frankly, I think HPS will (indiscernible) on because, again,

3  thinking about generating $8 million and as I've said to Mr.

4  Merola during negotiations, if HPS can't get $8 million I am

5  not very optimistic for which Mr. Merola's assets look like

6  either.  HPS has a pretty wide array of collateral as

7  compared to Mr. Merola.

8         That doesn't change the fact that there is a

9  burden. So, I think if we had time I don't think its must a

10  matter of trying to get a settlement, but if there isn't

11  going to be a settlement then we, at least, have to come back

12  and determine if HPS is prepared to still go forward and seek

13  a prime, but I do think ultimately, unless this is just in

14  greater shambles then anything I can ever recall seeing, that

15  we can prove that there is, at least, $8 million of value

16  that HPS has so that at the end of the day the priming fight

17  is going to be much to do about that.

18         I think we have to (A) try to settle and (B) if

19  not try to figure out how we're going to do it. Its not going

20  to happen by the end of this week. It will probably have to

21  be early next week, which would be extraordinarily

22  unfortunate to the employees.  The SRC is beside itself that

23  the employees weren't paid, the health benefits weren't paid,

24  and when they were on the board none of this was ever

25  provided to them, but it is what it is.  There is nothing we

 1   can do about the past history.  We just have to make the

 2   future better in that respect.

 3          So, that is my two cents on it, Your Honor, that

 4   everybody is trying.  We need time to see if we can settle.

 5   We need time to determine whether or not there should be a

 6   priming fight sometime early next week, which I would hope

 7   doesn't happen.  This is not how this case should start and

 8   certainly not the way it should end.

 9          THE COURT:  I appreciate all the comments that I

10   have heard. I would just note that I haven't heard much that

11   I would disagree with from any of the people who have spoken.

12   I appreciate that there has been a lot of focus on the

13   employees and, you know, it weighs on me. I am not in a

14   position to ask anybody for favors, but it weighs on me.

15          I would really hope that there is a commercially

16   viable path to getting these people paid and the healthcare

17   benefits reinstated.  You know, I imagine that there are some

18   really tough conversations going on in a lot of households of

19   employees regarding medical care and things that they need to

20   take care of and they don't know what on earth to do.  That

21   is not the fault of anybody on this hearing as far as I can

22   tell.  I think the professionals here are working really hard

23   and they are focused.

24          I have concerns and certainly Mr. Leblanc and Mr.

25   Cooley have expressed those concerns, can we get to this on a

1   non-consensual basis.  You know, I don't know whether we can.

2   So, I am going to take up the suggestions that I have heard

3   to take some time and let people talk.  If there is a -- if

4   the parties should find that they may need or want assistance

5   from a Judge of this Court or some other intermediary, its

6   July 3rd I don't know who is around the building and who is

7   doing what, but I would certainly go to my colleagues and see

8   if I can get a volunteer to get on the phone.

9         I would ask that we take the extra time and I

10  appreciate that this week has just happened in time drifts,

11  in small increments working towards progress. I am grateful

12  to everybody for indulging that, but I think we ought to take

13  some time and come back on the record later and see how you

14  have done.

15        MR. COOLEY:  I was just going to say that the

16  debtors certainly are ready and willing to engage that

17  conversation, be happy to circle up with people, pick a time.

18  We can start in a half an hour or whenever people's schedules

19  permit, circulate a link and dig into it.

20        THE COURT:  Mr. Leblanc.

21        MR. LEBLANC:  Andrew Leblanc from Milbank for HPS.

22        I meant to introduce my colleague, Mr. Dunne, is

23  on as well, Your Honor.  We are honestly happy to do that.  I

24  would say for everyone's benefit, I think (indiscernible)

25  said it best, that there are going to be some off-market

1  terms on this in terms of what is adequate protection.  We

2  are not expecting professional fees to be paid on an interim

3  basis, things like that.  This is just a different kind of

4  case and I hope everybody can appreciate that.

5          I will say with respect to getting people

6  together, I think it would be very useful for principals to

7  have direct discussions and we certainly would very much want

8  that to happen.  We had a discussion with Mr. Merola, my

9  partner did, last night.  That was, frankly, the reason that

10  Mr. Pachulski became the intermediary and we very much want

11  to have those, but I would certainly encourage we will have

12  our principals available to talk to MidCap's principals or

13  anyone else's.  I think that would be very productive to try

14  to move this thing forward.

15          We are trying to provide value to satisfy the

16  employee payments that are necessary for the benefit of

17  everyone, not for the benefit of HPS and its collateral; for

18  the benefit of the employees, for the benefit of anyone who

19  has an interest in this estate, but we are not prepared to do

20  it on the terms where it's at risk.

21          So, we would love to have these discussions, but

22  we also think it would be important to have principals

23  involved, Your Honor.

24          THE COURT:  I think that is probably a good idea.

25          MR. COOLEY:  Judge, the debtors certainly stand

1  ready to participate in that manner.

2          THE COURT:  Okay.  When would you like to go back

3  on the record?  Do you want to give this until 3 p.m.

4  Eastern, 4 p.m. Eastern?  What do you think would work for

5  you?

6          MR. MEROLA:  Your Honor, being mindful of the

7  weekend I think we can be back on at 3 p.m. if we do have a

8  holding time.

9          THE COURT:  Okay.  Mr. Cooley, 3 p.m. sound okay

10  to you?

11          MR. COOLEY:  Yes, Your Honor.

12          THE COURT:  Mr. Leblanc.

13          MR. LEBLANC:  Yes, Your Honor.  We are available

14  at any time the Court is.

15          THE COURT:  Look, I appreciate it.  To be clear, I

16  am not asking for anybody to take on undue risk. I understand

17  everybody's positions but I am grateful for everybody for

18  continuing to work so hard at this and taking my comments to

19  heart.

20          So, let's recess till 3 o'clock. I mean it, if you

21  find at any point that you just need an intermediary let me

22  know and I will see what I can do.

23          Anybody else wish to be heard before we break?

24      (No verbal response)

25          THE COURT:  Okay. I hear no response.  We are in

1  recess until 3 p.m. and you can use the same links to return

2  to the hearing.

3          COUNSEL:  Thank you, Your Honor.

4      (Recess taken at 11:36 a.m.)

5      (Proceedings resumed at 3:00 p.m.)

6          THE COURT:  Okay.  Counsel, this is Judge Horan.

7  We are back on the record in Chicken Soup for the Soul

8  Entertainment.

9          Mr. Cooley, good to see you.

10          MR. COOLEY:  Thank you.  Thank you once again for

11  your continued patience and allowance of the parties to do

12  what they have tried to do here over the past few days.  I

13  would like to report that Mr. Merola's words were prescient.

14  We are not quite there yet, but we have, I believe,

15  agreements subject to confirmation of language which is

16  furiously being drafted and circulated as we speak with

17  MidCap, whom we had a lengthy discussion with.  There has

18  been involvement, frankly, on all sides which we, as the

19  debtors, very much appreciate.  Also, Cedar Advance to whom

20  we provided language along the lines of a conversation I had

21  with their counsel just a short while ago.

22          I have also had a conversation with Mr. Ahdoot and

23  he has asked to see the MidCap and other revisions just to

24  get a sense of the general context.  And I will let him speak

25  for his position, but I am cautiously optimistic that as we

1 continue to knock down these dominos we will be able to carry

2 the momentum through.

3        I wish I could tell you that I would be ready to

4 put a form of order up on the shared screen to walk the Court

5 through, but we are not quite there yet.  I am also guardedly

6 watching the clock and, of course, we all appreciate that not

7 only is the day getting long but we are on the cusp of a

8 federal holiday tomorrow, and trying to very much balance

9 parties schedules, the Court's schedule, the Court's staff as

10 well, of course, while at the same time working feverishly,

11 if at all possible, to conclude this today if we possibly

12 can.

13        That is probably enough of an update from me, Your

14 Honor.  I will pause there and others can chime in as they

15 wish.

16        THE COURT:  Who would like to be heard?

17        MR. LEBLANC:  Your Honor, its Andrew Leblanc of

18 Milbank.  Can you hear me okay?

19        THE COURT:  Yes, I can.

20        MR. LEBLANC:  Thank you, Your Honor.  I had a

21 power outage, so I had to move to a different location and

22 wanted to make sure everything is working.

23        We can confirm we had a very productive call that

24 was hosted by Mr. Cooley and Mr. Pachulski with the great

25 assistance of the Strategic Review Committee members actually

1  were on with us, with MidCap's counsel, and we were able to

2  get to a resolution on all of the outstanding issues there.

3  As Mr. Cooley said, we are drafting language.

4          I think there is another issue that I think Mr.

5  Cooley is going to address, I don't know if he will do it now

6  or later, with respect to the funding and the revenue coming

7  in this week. I just want to make sure the Court and everyone

8  else is aware, but assuming we can get this done, it's our

9  anticipation that HPS will be able to fund the overall

10 majority of the DIP monies by Friday.  There may be a piece

11 of it that I think, for the reasons Mr. Cooley will go into,

12 may not matter with respect to the payments that can be made

13 this week in any event.

14          The funding of one piece of it may slip to Monday

15 just because of the timing of a particular fund and federal

16 holidays, but I think $7 of the $8 million, I understand, can

17 be funded by Friday assuming we have an order that we can use

18 to facilitate the funding on Friday morning, really today, so

19 that we can cause that to happen on Friday morning.

20          I want to thank everybody and in particular the

21 strategic review committee for their assistance in helping

22 get us to this point and that is all I will say at this

23 point, Your Honor.

24          THE COURT:  Thank you, Mr. Leblanc.

25          Is there anybody else that would like to be heard?

1          Mr. Merola.

2          MR. MEROLA:  Frank Merola on behalf of MidCap.

3          Your Honor, compromises were made both ways to get

4   this interim funding done.  Unfortunately, we haven't

5   resolved all of the issues of the case and to the extent

6   there will be a final DIP with incremental funding we reserve

7   the issues regarding priming in that context for a later

8   date.  We are only allowing the priming up to $8 million in

9   exchange for the negative marshalling concept that the DIP

10  lender agreed to in order to get this payroll made and then

11  we will see where we are as we head towards the end of the

12  month on the final DIP matter.

13          THE COURT:  Thank you, Mr. Merola.

14          Mr. Ahdoot.

15          MR. AHDOOT:  Thank you, Your Honor.  David Ahdoot

16  on behalf of the Guilds.

17          Your Honor, it seems the morning was largely taken

18  up by MidCap and we respect that.  Mr. Cooley is accurate in

19  the sense that, you know, the Guilds aren't quite there yet

20  but I think that is a matter of just attention and focus and

21  hopefully we will get that attention and focus directly.

22          That is all I have to add, Your Honor.

23          THE COURT:  Thank you, Mr. Ahdoot.

24          Ms. Kaminski, would you like to be heard as well?

25      (No verbal response)

1          THE COURT:  Okay.  We don't seem to have anything

2    from Ms. Kaminski.

3          Mr. Cooley, I will send it back to you.  What do

4    you suggest we do next?

5          MR. COOLEY:  Well, before I turn to scheduling,

6    let me go ahead and I appreciate Mr. Leblanc making sure that

7    this stayed on my radar because this was something that I

8    wanted to make sure that we covered at some point.

9          Under the cash flow forecast that was attached to

10   the original DIP motion, in week one of the forecast the

11   debtors had forecasted revenue collections of approximately

12   $1.9 million, coupled with an $8 million DIP that is $9.9

13   million; about a half million dollars more then would be

14   necessary to fund the $9.4 required under the wages order.

15         I learned this morning that at least for the first

16   two days for which we have information for this week, Monday

17   and Tuesday, cash receipts have been below the forecast,

18   meaningfully below the forecast.  We are at approximately

19   $350,000 for the week in terms of collections so far.  Now, I

20   don't know what today looks like and then, of course, we will

21   have a holiday on Friday.  So, there is still wood left to

22   chop before we know what the actual number is, but certainly

23   from a pace standpoint we are certainly below pace if you

24   imagine that funds come in at regular equal intervals.

25         I discussed this issue with -- I, obviously,

1  raised this issue and brought this to Mr. Schwartz's

2  attention. I spoke briefly about it to Milbank and HPS's

3  counsel to make them aware of the situation and I think what

4  we were anticipating, at the moment, and Mr. Leblanc eluded

5  to this, is that to the extent that cash receipts this week

6  are less than enough to cover all of those amounts that have

7  been approved under the wages order  we will, essentially,

8  prioritize them starting, I think, with the delayed -- the

9  late payroll, the June 21st payroll and most likely the

10  reinstatement of Anthem because the health insurance has just

11  such profound and unpredictable impacts for people.

12         Then at that point, as we get into next week,

13  there really is nothing in the budget in the first couple of

14  weeks other then payroll items.  So, as cash receipts,

15  presumably, continue to come in next week, as soon as we hit

16  the necessary threshold, we will be able to get that July 5th

17  payroll but that is the situation that we are facing right

18  now. It just -- we just learned this morning that the cash

19  receipts are below forecast, that happens sometimes in

20  Chapter 11 cases at the beginning, and it's happening to us

21  in this one.

22         THE COURT:  Okay.  Look, here is my suggestion: we

23  do need an evidentiary record to support the request.  So, I

24  would suggest that you put on the evidentiary presentation

25  that you want to put on and then I will take the matter under

1  advisement.  The order can be presented consensually, you can

2  file it under certification of counsel letting me know that

3  this is something that the parties will agree to and we will

4  enter the order. If you get stuck you know where to find me

5  and we will deal with it.

6          Does that sound like a good plan, Mr. Cooley?

7          MR. COOLEY:  Your Honor, I think that is an

8  excellent suggestion.  Mr. Schwartz should be on the line and

9  hopefully his video will turn on in a moment.

10         THE COURT:  There he is.

11         MR. COOLEY:  Your Honor, what I would propose to

12  do is our evidentiary presentation will -- well, it will be a

13  simple proffer if I may proceed in that fashion as we did

14  yesterday.

15         THE COURT:  Yes.  We will consider Mr. Schwartz to

16  still be under oath from yesterday's hearing.

17         MR. COOLEY:  Very good, Your Honor.  So, this is

18  in connection with the debtors' motion for authority to use

19  cash collateral to obtain post-petition financing from HPS

20  Investment and for related adequate protection and other

21  forms of relief as set forth, at least generally in the

22  motion, previously filed by the debtors.  Last night, of

23  course, the debtors filed a notice of proposed interim DIP

24  order and term sheet that reflect the proposed financing to

25  be provided by HPS.  That is the subject of the negotiations

1  that have been going on among the parties over the last 18

2  hours.

3         So, with that, Your Honor, I will turn to the

4  proffer of Mr. Schwartz.  If called to the stand to testify

5  Mr. Schwartz would testify as follows:

6         "My name is Bart Schwartz and I am the chief

7  executive officer of Chicken Soup for the Soul Entertainment,

8  Inc., and its debtor affiliates. I am familiar with the

9  proposed DIP financing and participated in the negotiations

10 of that financing with HPS and with other parties.

11        "Through my negotiations with HPS, the company and

12 HPS have arrived at an agreement for interim DIP financing of

13 $8 million to be provided on a superpriority secured basis on

14 the terms set forth more fully in the proposed term sheet and

15 interim order.  Following the consummation of that DIP

16 financing, on an interim basis, a new board will be formed

17 with myself, John Young, and Robert Warshauer, at which point

18 I will resign as CEO and the three member SRC, or Strategic

19 Review Committee, will appoint a new chief executive officer

20 for the debtor.

21        "Based upon my involvement directly, both in

22 negotiations with HPS as well as with Owlpoint, the DIP

23 lender first proposed in these cases, as well as my

24 understanding of the company's prepetition efforts to obtain

25 any other source of potential DIP financing whether on a

1   priming basis or otherwise. I believe that the debtors cannot

2   obtain financing on more favorable terms then those that are

3   being proposed to the Court here today.

4          "I would also state that the company has no

5   unencumbered cash and that interim relief is absolutely

6   necessary today to allow the company the ability to use cash

7   collateral as available together with the proceeds of the

8   financing arrangement to satisfy the company's payroll and

9   other related operating needs as approved in the order."

10         This concludes the proffer.

11         THE COURT:  Thank you.  Is there anybody who would

12  like to cross-examine Mr. Schwartz?

13      (No verbal response)

14         THE COURT:  Okay. I hear no response. Mr.

15  Schwartz, you are excused.

16         MR. SCHWARTZ:  Thank you, Your Honor.  Thank you

17  for all your help.

18      (Witness excused)

19         THE COURT:  Thank you, sir.

20         Okay.  So, yeah, the next steps will be for the

21  parties to agree to a form of order, we hope, and, like I

22  said, submit it under certification of counsel. If anything

23  goes wrong let me know and we will get back on it and address

24  it. Otherwise, I certainly look forward to seeing a

25  consensual order and having the opportunity to sign it.

1          MR. COOLEY:  As do we, Your Honor.

2          THE COURT:  Is there anybody else that wishes to

3   be heard before I conclude?

4      (No verbal response)

5          THE COURT:  Okay. I hear no response. I sincerely

6   want to thank the parties for their very hard work and I

7   should say the parties, through their business people and

8   their representatives that worked very  hard in this, along

9   with their professionals.  You know, we all made it a

10  priority to see that the employees get paid and their

11  healthcare gets reinstated and it looks like we are very,

12  very close to getting there.  So, thank you all for that and

13  I truly appreciate all the hard work that went into this.

14          Let's talk about next steps.  What is the duration

15  of this first interim order going to be?

16          MR. COOLEY:  Your Honor, there is not a specific -

17  - this is an unusual order because its really not tied to a

18  series of weeks' worth of operating budget as one would

19  normally expect. It rather is literally tied to a series of

20  enumerated expenses.  So, as a practical matter I think the

21  debtors will -- we will need to get back to the Court, sort

22  of, as soon as the parties and the Court are able both as a

23  function of calendaring and as a function of the time it may

24  take for the parties to figure out what the next step is

25  because, of course, even once we cover the July 5th payroll

1  there are people working today and there will be people

2  working next Monday presumably for which we do not yet have

3  the funding for payroll.

4          So, time remains very much of the essence for

5  this.  Perhaps at an outside date the federal rules allow us

6  a final hearing 14 days after the petition date.  We can

7  always do a further interim, but I would hesitate to do that

8  now.  Certainly, that is going to be driven in large part by

9  HPS, but perhaps as an outside date set that calendaring at

10 or about the 14-day mark as the optimistic point and would

11 hope to get back.

12         Now, I am saying all of that not having conferred

13 with Mr. Leblanc about that and he may have some opinions as

14 well, but certainly from the debtors' standpoint those are

15 the exigencies that we are closely observing.

16         THE COURT:  I will share with you my availability

17 and I will talk about what all this will mean for us.  I am

18 available next week and the weeks of the 15th and the 22nd I

19 am not available. I will be back the week of the 29th.

20 Having said all that, in the likely event that you need a

21 hearing the week of the 15th or the 22nd I am fortunate to

22 have seven wonderful colleagues and I am sure that one or

23 more of them would be very happy to sit in for me and address

24 whatever relief the debtors need while I am away.

25         So, why don't you have some discussions and touch

1 base with my Chambers and then we will be able to work on

2 dates and coordinate with a Judge who would sit in for me in

3 my absence.

4          MR. LEBLANC:  Your Honor, its Andrew Leblanc of

5 Milbank.

6          Your Honor, obviously, we appreciate your

7 colleagues willingness to accommodate. I think the SRC --

8 once this order is entered the SRC becomes operative.  I

9 think -- I am going to predict, Your Honor, that it would be

10 likely that we will be in to see you next week just because I

11 think there may be -- we think there are issues that this

12 company needs to decide upon very, very quickly and we don't

13 know what the SRC's approach to it is going to be and that

14 they be guided by their counsel, Mr. Pachulski, but it would

15 not be surprising if we were actually before you as early as

16 next week to deal with some issues.  So, you may not be done

17 with us before your vacation.

18          THE COURT:  Sure, that's fine.  I would note that

19 on the first day we were presented with a very limited suite

20 of requests for relief and in the end, I have only thus far

21 approved joint administration and employee wages on an

22 interim basis, with the hope that we will be approving this

23 interim DIP as well.  So, it certainly wouldn't be surprising

24 if the SRC determined that there was additional relief that

25 the debtors would need which would be similar to other sorts

1  of first day type issues or other issues that have to be

2  addressed.

3          So, just let me know what you need and we will get

4  you scheduled.

5          MR. LEBLANC:  Thank you, Your Honor.  We will.

6          THE COURT:  Anything else before we adjourn?

7      (No verbal response)

8          THE COURT:  Well, good work everyone.  I wish you

9  a good evening.  Happy 4th of July. I will on the lookout.

10 Certainly, email your contacts and Chambers to let you know

11 when an order has been uploaded, please.

12          (Proceedings concluded at 3:20 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2            We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                    July 7, 2024

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25