# EXHIBIT 11

```
1                   UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
2

3                                     .  Chapter 11
   IN RE:                             .  Case No. 24-11442 (TMH)
4                                     .
   CHICKEN SOUP FOR THE SOUL          .  (Jointly Administered)
5  ENTERTAINMENT INC., et al.,        .
                                      .
6                                     .  Courtroom No. 3
                                      .  824 North Market Street
7              Debtors.               .  Wilmington, Delaware 19801
                                      .
8                                     .  Wednesday, July 10, 2024
   . . . . . . . . . . . . . . . . .  .  2:00 p.m.
9

10             TRANSCRIPT OF STATUS CONFERENCE HEARING
             BEFORE THE HONORABLE THOMAS M. HORAN
11               UNITED STATES BANKRUPTCY JUDGE

   APPEARANCES:
12

13 For the Debtors:        Richard Pachulski, Esquire
                           PACHULSKI STANG ZIEHL & JONES LLP
14                         10100 Santa Monica Boulevard
                           13th Floor
15                         Los Angeles, California 90067

                           Debra Grassgreen, Esquire
16                         PACHULSKI STANG ZIEHL & JONES LLP
                           One Sansome Street
17                         Suite 3430
                           San Francisco, California 94104
18

19 (APPEARANCES CONTINUED)

20 Audio Operator:         Ashley Alexander, ECRO

21 Transcription Company:  Reliable
                           1007 N. Orange Street
22                         Wilmington, Delaware 19801
                           (302)654-8080
23                         Email:  gmatthews@reliable-co.com

24
   Proceedings recorded by electronic sound recording,
25 transcript produced by transcription service.
```

1  APPEARANCES (CONTINUED):

2  For the Debtors:          Steven Golden, Esquire
                             PACHULSKI STANG ZIEHL & JONES LLP
3                            780 Third Avenue
                             34th Floor
4                            New York, New York 10017

5                            James O'Neill, Esquire
6                            919 North Market Street
                             17th Floor
7                            Wilmington, Delaware 19801

8  For the U.S. Trustee:     Joseph Cudia, Esquire
                             OFFICE OF THE UNITED STATES TRUSTEE
9                            844 King Street, Suite 2207
                             Lockbox 35
10                           Wilmington, Delaware 19801

11 For HPS Investment
   Partners:                 Andrew Leblanc, Esquire
12                           MILBANK LLP
                             1850 K Street, NW
13                           Washington, DC 20006

14 For William Rouhana,
   Chicken Soup for
15 the Soul, LLC:            Morgan Patterson, Esquire
                             WOMBLE BOND DICKINSON (US) LLP
16                           1313 North Market Street
                             Suite 1200
17                           Wilmington, Delaware 19801

18 For Automotive
   Rentals:                  Richard Aguilar, Esquire
19                           ADAMS & REESE LLP
                             Hancock Whitney Center
20                           701 Poydras Street, Suite 4500
                             New Orleans, Louisiana 70139

21

22

23

24

25

1          (Proceedings commenced at 2:17 p.m.)

2               THE COURT:  Counsel, this Judge Horan.  We are

3   going to give it another shot.  We are on the record in

4   Chicken Soup for the Soul Entertainment, Case No. 24-11442.

5               Mr. Pachulski.

6          (No verbal response)

7               THE COURT:  Mr. Pachulski, are you able to hear

8   me?

9               MR. PACHULSKI:  I can hear you fine. Thank you so

10  much, Your Honor.

11              THE COURT:  Wonderful.  I want to apologize for

12  the delay. The technology is great, but every once in a

13  while, it doesn't work and I appreciate your patience.

14              MR. PACHULSKI:  Not at all, Your Honor. I

15  appreciate the opportunity.  I would like to start if you

16  would like.

17              THE COURT:  Yeah, I will be guided by however you

18  would like to address things today.

19              MR. PACHULSKI:  So, Your Honor, sometimes if the

20  day starts out badly it just continues that way and

21  unfortunately the presentation I am going to make, which was

22  not what I anticipated yesterday, the technical issues you

23  had may have been an indication where things may be going.

24  So, I apologize for all of that, but I want to be extremely

25  transparent and I do ask for certain things in my

1  presentation.

2            THE COURT:  Okay.

3            MR. PACHULSKI:  So, as of -- when we first set the

4  status conference, Your Honor, the point of the status

5  conference was to basically tell you where we were, the

6  progress we were or were not making and then go from there.

7  But I am going to start with what the end of the story is

8  which is we are going to ask for the conversion of these

9  cases which to be very frank, Your Honor, I find

10  heartbreaking which I will explain because I think there is

11  value here but the lenders do not agree or, at least, I am

12  not sure that is a fair assessment.  I don't think they are

13  willing to take the risks and costs associated with that.

14            So, what we thought we were going to do, Your

15  Honor, when -- frankly, when we set the status conference we

16  did not know.  We just thought it was in fairness to Your

17  Honor and particularly because we knew Your Honor was going

18  to be away for two weeks and to just drop this on another of

19  the Judges, which clearly are capable of doing it, but we

20  thought at a minimum we should know what you would be

21  advising we do.  So, I thought in all fairness I had pushed

22  this and basically (indiscernible) of the debtors, which I

23  should basically -- for the record put Richard Pachulski of

24  Pachulski Stang Ziehl & Jones on behalf of the debtor

25  entities.

1          I thought we would want to tell you that.  We did

2     not know when we first set this up, I think it was on Monday,

3     we included we could Friday or Monday. I actually thought as

4     of yesterday what we were going to advise Your Honor, and I

5     was hopeful, is that we were going to kind of move forward

6     with a sale process, but in fairness we were going to have to

7     terminate the Redbox entity and we were going to have -- we

8     were going to have to, basically, shut down the Redbox entity

9     and terminate the employees because as in getting kind of a

10    preview from prior counsel the determination was made that

11    there was a company that had been grossing and bringing in on

12    average of about $9 million a year and the payroll itself was

13    $50 million a year.

14         To be very frank, Your Honor, I have entered into,

15    and everybody as of July 3rd, whether it was FTI or our firm,

16    frankly, the board, the new board and the management who have

17    been really, really helpful through this process is we had

18    entered into an unbelievable (indiscernible).  What we

19    thought in going through the process that there was value

20    here and that there may not be enough value to pay secured

21    creditors anywhere near full, to be very frank, but that

22    there was value to, at least, pay some of its obligations.

23         To be very fair again, there had been -- Mr.

24    Rouhana had incumbered this entity with certain contracts

25    just before the filing which we had to evaluate.  There was

1 │ license and sublicense agreements that we had to take a hard

2 │ look at.  So, we -- I thought, again, even with those we

3 │ thought that we were making progress.  FTI worked extremely

4 │ hard. All of us were working around the clock and I mean FTI,

5 │ our firm, the board, management and there was no guarantee of

6 │ payment other then what Your Honor had approved of which

7 │ there is still some shortfall.

8 │          To give you an indication of the kind of problems

9 │ that we have had to -- that we encountered and I have seen a

10 │ lot, Your Honor, but I have not quite seen this before is we

11 │ had told Your Honor originally about CSS, which is basically

12 │ the private company controlled by Mr. Rouhana, that, as Your

13 │ Honor saw with respect to the first day motions, that our

14 │ firm did not file, but informed Your Honor of the management

15 │ services agreement, things are so tied in some respects

16 │ between CSS and CSSE that we have been unable to pay the

17 │ medical benefits because you have to differentiate by the

18 │ employees.

19 │          Anthem has a policy, effectively, and I'm not an

20 │ expert in this -- my partner, Mr. Golden, who has been

21 │ literally around the clock trying to work through this, on

22 │ some other issues that they are tied and Anthem, again, would

23 │ have to figure out how to untie it assuming they were even

24 │ willing to do it.  So, we have made the two payrolls Your

25 │ Honor approved but to be very frank we have not paid the

1   medical benefits payment because we can't.

2           Two problems.  One, the separation.  Two, as I

3   think I pointed out, there was a differential between the

4   $9.4 million and the $8 million that HPS had approved.  So,

5   the other $1.4 would have to come through collections and the

6   medical benefits were $2.4 million.  There was a collection

7   that needed to occur of about $1.4 million.  Even if we could

8   pay it, which we can't because of this tie-in between the two

9   entities, that even if we could we were $1.4 million short

10  and there had only been $350 collected.

11          So, as of the time we had our last hearing on July

12  3rd there was a million-fifty shortfall.  Frankly, Your

13  Honor, I don't know what the shortfall is today, but I can

14  push the issue because we have not resolved the Anthem issue

15  and, frankly, I think the trustee may have to do that.

16          So, FTI, and we worked very hard not just through

17  July 4th but through the weekend trying to work with CSS to

18  get information, doing what we could to get information from

19  Reed Smith, sending litigation letters, for instance, and its

20  been a slow process but I don't think that, frankly, could

21  have been the problem just to be, again, very candid.

22          The problem is, Your Honor, that we knew what we

23  were going to do with Redbox and the hope was that we would

24  go forward and try to sell the other assets which we think

25  has value.  We provided, last night, a DIP budget -- a 13-

1  week DIP budget.  That DIP budget, Your Honor -- again, a lot

2  of it we did not have perfect information. I think FTI did

3  the best they could under the circumstances and it would have

4  shown approximately a $25 million DIP. If you wanted to go

5  all the way to 13 weeks we believe that that would mean that

6  the vast majority of the (indiscernible) employees would be

7  let go, but there would still be a team with respect to the

8  other employees.

9          We spent a lot of time internally determining how

10  we would evaluate value proposition, particularly because we

11  knew we still had to deal with potentially some licenses and

12  sub-licenses, some of which may have been set aside, we

13  believe, as fraudulent conveyances were still made.  Some of

14  it the trustee may have to decide what to do but what we then

15  did is the conclusion that the board, FTI, and we came to is

16  that the only way that we could be completely transparent

17  with HPS and be able to tell them what the value was, because

18  we thought that we could get this sold in a 13-week process,

19  was to basically turn it into two parts: a four week process

20  and then the remaining nine weeks or really five weeks.

21          We spent a week trying to figure out what is going

22  on.  It would take four weeks to really determine -- three to

23  four weeks to determine whether there was value and then nine

24  weeks to go through some type of reasonable sale process

25  because no one is going to ever buy this if you are not going

1  to sell free and clear.  We had spoken to certain parties who

2  expressed real interest. We have lots of parties expressing

3  interest, but in fairness what we discovered from some of

4  those parties and from management is Mr. Rouhana had kept it

5  so close to the vest that nobody really had information. He

6  was in control of the due diligence.

7         So, people are going to have to come in and do due

8  diligence.  We were going to have to figure out what to put

9  into the data room and we were working through that.  We

10  advised HPS that assuming that we let go of the appropriate

11  Redbox employees, there would have been a few that are really

12  important for all of the entities that probably would have

13  been retained, but to be fair the approximate thousand plus

14  employees would probably have gone down to something closer

15  to 100 or 150 employees.

16         Even by doing that, the budget for the periods

17  really go to HPS and say we really strongly feel there is

18  value and here is the value, which is more FTI's job than

19  ours, was approximately ten and a quarter million dollars

20  with which (indiscernible) could then go forward. Again, part

21  of it was a guess.  We had critical vendor payments in the

22  budget of approximately $5 or $6 million. I think it was over

23  $6 million which was just a guess so that we could keep the

24  lights on that the assets could be maintained.

25         So, our view was that the ten and a quarter was a

1  lot of money.  To again be very frank, HPS, in that budget,

2  was going to be paying for the employees who were going to be

3  repaying including through Friday the ones who were not being

4  retained were not going to get paid under the budget that was

5  done because HPS was very clear that they were not going to

6  pay that.  So, we provided for them the mechanism.  We told

7  them why we felt that there was value.

8          We also explained to HPS, Your Honor, which again

9  senior management just before this (indiscernible) we have

10  been doing a lot this morning including the senior management

11  who had worked very hard through this that this was not going

12  to go forward and they have (indiscernible) that there will

13  be virtually no value in the event of a conversion and we

14  have to deal with the reality that I don't even know whether

15  a trustee is going to be interested in dealing with this or

16  not because they are going to have to deal with the employee

17  issues, they are going to have to deal with the medical

18  benefit issues, he or she is going to have to deal with many

19  of the same issues we have been dealing with and that is

20  going to be costly and HPS is going to have to make that

21  determination.

22          HPS, I think, must have made a determination that

23  that is a risk they are willing to take and if there is no

24  value to them, at the end of the day, then there is no value.

25  You know, I don't know what else to tell Your Honor.  We have

1   done the best we can.  All of us have been put at risk.

2   Nobody has been guaranteed any payment of anything. Its not a

3   position that any of us want to be in, but the two board

4   members, Mr. Young and Mr. Warshauer, who are still involved.

5   Mr. Schwartz had advised us, unrelated to any of this, that

6   he was going to step down this morning. He was unaware of any

7   of this because he had no idea that the board was spending

8   way more then any board you will ever see.  The company, he

9   is chair of a particular organization in New York related to

10  the police that he is chairman of and he just didn't have the

11  time.

12         So, when I spoke to him, I was unaware this

13  morning when he said that I would be presenting this way I

14  was hoping I would be presenting differently.  So, its an

15  unrelated event, but he has worked hard. Mr. Warshauer and

16  Mr. Young have worked extremely hard during not just the

17  post-petition period but the prepetition period.  This is

18  where we are left and we are going to ask Your Honor, because

19  they are going to resign immediately after this -- we are

20  going to advise all of the employees that the case has to be

21  converted. I understand the process to convert. I don't think

22  it's a pretty picture in terms of what the trustee will be

23  getting because the trustee will have virtually no

24  information other then what we turn over.  We will

25  transition.  We are going to absolutely do our job, but I

1  don't know what else to tell Your Honor.

2         You have always been very thoughtful in the prior

3  case we had in terms of questions you might ask and certainly

4  you may have some.  I didn't come prepared until probably

5  eight this morning my time, eleven Your Honor's time, with

6  something that I don't recall ever having to tell a Judge

7  this way in what I consider a significant case. It probably

8  has about a billion dollars of collective debt.  So, I feel

9  terrible.

10        Forget about any of the professionals.  We're big

11 boys and girls, we will get through this. The employees not

12 getting paid particularly for two weeks that they have worked

13 extremely hard. I can't tell you how heartbroken those of us

14 who were working on this matter professionally, not the least

15 of which are the board members who basically said if we

16 cannot get commitment to pay, we have to shut this down.

17 They have been extremely thoughtful in this process.

18        So, I don't know if there is anything else you

19 want to hear from me, Your Honor, but to say that this is a

20 massive disappointment would be a massive understatement.

21        THE COURT:  Certainly, I share that

22 disappointment.

23        Let me ask you a few questions and if you don't

24 know the answers to the questions just tell me and we can

25 deal with it another time.  On the medical benefits my

1  understanding was that employees made their contributions

2  towards their medical benefits and it sounds like at some

3  point those monies became unavailable to be paid onto Anthem.

4  Am I correct about that?

5          MR. PACHULSKI:  Your Honor, you are correct in the

6  sense that the benefits stopped being paid to Anthem on May

7  14th is my understanding.

8          Mr. Golden is on, so if I state anything

9  incorrectly, he can correct me because nobody knows this

10 issue better then he does.  He has had enumerable calls on

11 this issue, but I believe that that is correct. I know that

12 May 14th correct. I believe that just like the payroll taxes

13 have not been paid, the medical benefits have not been paid.

14         THE COURT:  So, Mr. Golden, good afternoon.  So,

15 would it be your understanding then that the monies were

16 deducted -- I mean to the extent employees have been paid,

17 but funds were deducted from their paychecks for medical

18 benefits which I would imagine under the law of any state in

19 this country are then held in trust.  Those funds were not

20 there to actually remit to maintain the continuation of the

21 medical benefits, is my assumption about that correct?

22         MR. GOLDEN:  Your Honor, Steven Golden of

23 Pachulski Stang Ziehl & Jones on behalf of the debtors.

24         Yes, Your Honor, that is correct.  There were --

25 to my understanding, certainly in connection with the two

1 payrolls that went out post-petition in accordance with the

2 interim order my understanding is that there were deductions

3 from the gross pay that would have Anthem (indiscernible)

4 used to go and pay over to Anthem (indiscernible).  So, yes.

5          MR. PACHULSKI:  I apologize, Your Honor.  Just so

6 we get you a clear answer I believe that that occurred May

7 14th.

8          MR. GOLDEN:  Correct.

9          THE COURT:  Are those monies sitting in an account

10 somewhere or are they comingled with the debtors funds?

11 Again, you may not know.  Were they converted to other uses?

12          MR. PACHULSKI:  We believe -- again, I can't tell

13 you this a hundred percent.  We know there was very little

14 money in the debtors' accounts as of the filing.  We believe

15 the payroll taxes had been converted, which I think was over

16 a nine-month period. The medical benefit deductions had been

17 converted during the two and a half months before the filing.

18          So, again, we have been trying to uncover every

19 rock.  So, I can't tell you we have looked at every account.

20 I can tell you that the bank account purportedly has $25,000.

21 We have not done a forensic audit of this, but the fact is,

22 Your Honor --

23          THE COURT:  $25,000.

24          MR. PACHULSKI:  It doesn't exist and I think

25 because it didn't exist, just to be fair, Your Honor, that is

1   why -- again, to be fair, I think there is a hope that the

2   medical benefit payment will be made.  I don't know what

3   HPS's position is on this because what was going to happen is

4   there was, out of the DIP that Your Honor approved, a million

5   dollars, as far as I know, that was going to go to medical

6   benefits of the $2.4 that was short from May 14th.

7          There have been some collections. I know there was

8   $350 because that is what Mr. Cooley stated on July 3rd.  I

9   don't know what, if anything, has been collected post that.

10  That is an answer I couldn't give Your Honor. Someone else on

11  this call from our team might, but I don't.  I assume the

12  collections will come in. I think a lot of people

13  (indiscernible) goes out to the full public domain that I

14  don't know if will collect any, but there is money to pay the

15  medical benefits.

16         As I said, if we have that money, we still have to

17  disentangle the whole CSS, CSSE connection but to say --

18  that, Your Honor, is one of many (indiscernible) that we have

19  had to try to deal with and, frankly, on that one Mr. Golden

20  unfortunately drew the short straw.

21         THE COURT:  Yeah, I understand.  The debtor also

22  would have deducted from employee paychecks monies that were

23  to be paid in towards a 401-K or other type of retirement

24  plans that they had.  Were those monies paid into the

25  employee accounts or not, do you know?

1       MR. PACHULSKI:  That was in the budget for the two

2  pay periods?

3       THE COURT:  Yeah.

4       MR. PACHULSKI:  I do not know.  Mr. Golden may

5  know.  To be very frank, Your Honor, I would be very highly

6  doubtful, but we did not do that analysis because we wanted

7  to deal with the medical benefits.  Realistically, HPS was

8  not going to fund prepetition obligations that were not

9  funded.  For instance, and this came up pre-filing, they made

10  a request to pay the $15 million payroll taxes that nobody

11  knew about for nine months.

12       So, I cannot, under penalty of perjury, Your

13  Honor, tell Your Honor that they were not paid, but I would

14  be shocked if they were properly deducted but I can't say

15  that for sure.

16       THE COURT:  Yeah.

17       MR. GOLDEN:  Your Honor, Steve Golden again.  I

18  want to be very precise with Your Honor because I think it's

19  a fair question. On a post-petition basis, what has occurred,

20  just at a very high level, nearly all -- most of the debtors

21  operating bank accounts were previously frozen.  So, what has

22  been happening is in order to make the two pay periods that

23  Your Honor authorized, the June 21st and the July 5th

24  payroll, both of which have been made, they were remitted to

25  UKG, the payroll processor.  HPS made those payments directly

1  in the amounts from the debtors system to UKG; however, my

2  understanding is that at some point prepetition UKG

3  determined not to continue the greater payroll processing

4  relationship that would have included remitting 401-K

5  payments, medical benefit payments, or taxes.  They were just

6  doing the payroll.

7         So, what has happened as of right now, Your Honor,

8  is that those two payrolls have been made.  HPS continues to

9  hold the remaining amounts and, obviously, the 401-K, as Your

10  Honor noted, that amount would have been funded, but as of

11  right now we have been trying to disentangle how to make

12  those other payments.  For instance, one such payment made to

13  generally pay employees, the counterparty, just one UK

14  employee, the party who does that funding, just before this

15  hearing, would not accept the wire but from an account that

16  it had already preapproved.  That one, as I noted, is frozen.

17         So, as of right now there is just those two

18  payments that have gone out post-petition so money remains

19  with HPS and in their (indiscernible).

20         THE COURT:  Okay.

21         MR. PACHULSKI:  To be clear, Your Honor, that is

22  only for the two pay periods that were approved by Your

23  Honor.  Anything before that, Your Honor, the assumption I

24  have made -- I know the payroll taxes haven't been paid. I

25  know that the medical benefits have been deducted and not

1   paid. I do not know what happened with the -- prior to what

2   Your Honor was good enough to approve, whether those were put

3   in I would be highly doubtful.

4           THE COURT:  Yeah.  Obviously, you can tell from my

5   questions I also feel sort of doubtful that those payments

6   were made.  You know, if that is the case I find it

7   sickening, frankly, that money was taken from these paychecks

8   from these people and not put where it belonged; it was taken

9   in trust.  That has nothing to do with anything that the

10  professionals on this hearing had anything to do with.  I

11  will make that clear to anybody listening to this and may not

12  understand, this has nothing to do with the present

13  professionals.

14          Look, there will be a Chapter 7 Trustee in place

15  sometime in the next few weeks.  That trustee will be looking

16  at all this and figuring out a strategy, but it's incredibly

17  disturbing.

18          MR. PACHULSKI:  Your Honor, I very much appreciate

19  the comment.  In no way did anybody -- I would be very

20  surprised if any professional thought it was being directed

21  at them. I will tell you the massive mismanagement -- and I

22  have seen a lot, Your Honor, I have seen a lot of serious

23  mismanagement, this is beyond the pale of anything I have

24  seen.  This is a trainwreck like nothing I have seen.

25          I think what has been done here is criminal, to be

1  very frank. I think there was something to be saved. I think

2  HPS just kind of, to be fair, threw up their hands and had

3  been massively defrauded.  They will have to decide what to

4  do about that.  It's disappointing because I still think

5  there would have been value, but at some point, people say

6  enough is enough and I understand that.

7          What I want Your Honor to really appreciate, and I

8  think you do, is the management.  We primarily dealt, in

9  fairness, with the senior management.  These are people who

10 did not have to come out and help us and they went beyond

11 management that I have dealt with who are paid regularly who

12 don't have any of these issues.  They were loyal and didn't

13 quite after they weren't paid one or two payrolls where Mr.

14 Rouhana finally decided, because he really had no choice, to

15 file Chapter 11.  Frankly, when he fired the board members, I

16 told people I thought he'd never file because he went, to his

17 detriment, be before someone like Your Honor, who is very

18 thoughtful, would not tolerate him.  But he decided to file,

19 which is, I think, a good thing because there will be some

20 justice.

21          To say that this is one of the most horrific

22 experiences of my career is a massive understatement, as I

23 said at the beginning of this. I am highly disappointed. I am

24 disappointed for everyone, not the least of which the

25 employees who stuck this out when they too have been

1  completely defrauded.

2          THE COURT:  I really feel for these employees. Its

3  unacceptable. They deserve a lot better.  These are issues

4  for another day and another setting, but I appreciate the

5  answers that you have been able to provide to me.

6          MR. PACHULSKI:  Your Honor, again, I am not going

7  to put anyone on the spot, but there is, at least, one party

8  that I see that is from CSS who probably could answer some of

9  these questions.  Again, that person is not here with counsel

10 and may feel uncomfortable, but at least one is.  I am

11 looking at the Zoom screen and I, at least, notice one that

12 people have gone through if you want to ask that person or if

13 you just want to leave it alone but I wanted to advise you

14 that there is at least one CSS person who would probably have

15 the information that we have done the best we can to get, but

16 in fairness CSS has not -- we have not gotten all information

17 from CSS at this point.

18         THE COURT:  Well, I will do this, nobody was put

19 on notice that they might have to present to the Court today

20 but if there is anybody who would like to be heard on the

21 issues that I raised I am happy to hear from the.

22         MS. PATTERSON:  Your Honor.

23         THE COURT:  Ms. Patterson, yes.  Good afternoon.

24 Good to see you.

25         MS. PATTERSON:  Good afternoon.  Morgan Patterson

1  of Womble Bond Dickinson on behalf of CSS, Your Honor.

2          There are a number of CSS folks on the call.

3  Though, as Your Honor pointed out, this is the first time we

4  are hearing this information and I don't think that they are

5  prepared at this time to answer the questions. I mean, I, you

6  know, have a lot of reactions but I think that we will save

7  those for a time which is appropriate after we digest this

8  information, Your Honor.

9          THE COURT:  Yes.  No, I appreciate that,

10  Ms. Patterson and, certainly, I'm not seeking to force

11  anybody to come on and talk.  That would just not be

12  appropriate.  So I appreciate you speaking up, Ms. Patterson.

13          Mr. Leblanc, good afternoon.  Would you like to be

14  heard?

15          MR. LEBLANC:  Yes, Your Honor.

16          Andrew Leblanc of Milbank, on behalf of HPS, Your

17  Honor.  Mr. Pachulski has really said it all and we agree

18  with everything that he said.  We find ourselves, we're

19  equally disappointed, Your Honor, that we've reached this

20  point.

21          Obviously, the trouble for us, and Mr. Pachulski

22  described this, you know, we got a DIP funded yesterday that

23  looked at approximately an incremental -- just to be clear,

24  that's incremental to the $8 million that's already been

25  funded -- 26-plus-million-dollars in funding to get us to a

1  point to understand if there is value here.  And, yes, we

2  could have funded $10 million of incremental cash to get us

3  through a shorter period of time, just for the first week

4  to -- and, again, this is what Mr. Dunne talked about when he

5  first appeared before Your Honor and what I reiterated, which

6  is we simply don't know if there's value here.

7  　　　　　What we'd be certain of is that that money would

8  be spent and we wouldn't even know if there's value to these

9  assets, because we also learned last night from Mr. Pachulski

10 and the work that they have been doing with FTI and others

11 about the two leases or licenses that were granted in the

12 weeks leading up to the bankruptcy petition.  Obviously, one

13 of the core assets of this company is a film library.  If you

14 license that film library to someone in an effort to raise

15 short-term cash, then the value of that film library has been

16 diminished.

17 　　　　　And so, we don't know the extent to which these

18 assets have simply been hauled out by prior management,

19 because, as Your Honor, I think, is well aware, nobody was

20 aware of what was going on at this company, not the least of

21 which was our client and certainly not the Board that

22 Mr. Pachulski represents, that was put in place back in

23 April, and then unceremoniously fired on June 11th.

24 　　　　　So, Your Honor, when we looked at that as an

25 option, just funding more money into a situation that there's

1  just no clarity that we ever even -- and Your Honor will

2  recall that we dealt with the $8 million, even with respect

3  to that, we had concerns about whether we would ever get

4  repaid, so we did the priming with the marshaling, because we

5  have tremendous uncertainty.

6          And so the question of whether we fund more

7  dollars into this, the level of uncertainty that exists just

8  wasn't acceptable.  And the reality is, we are very hopeful

9  that in a Chapter 7, value can be realized for the company's

10  assets, but we just don't know that to be the case and we

11  decided that it wasn't appropriate for HPS and its investors

12  to put additional money at work here.

13          I do want to be clear, Your Honor, the $8 million,

14  we learned at the time that Mr. Pachulski asked the questions

15  of Mr. Cooley (phonetic), that the $8 million that we were

16  asked to fund was insufficient to pay the medical insurance

17  without the expected collections.  We were unaware of that.

18  We were asked by the company's prior advisors to fund an $8

19  million DIP, which we actually thought was a little bit more

20  than the 7.6 they told us they needed, so there was some

21  question, we thought, in that, and that's what we funded.

22  That's the reason.  It wasn't our intent to shortchange the

23  payment of medical insurance.  It was certainly our

24  expectation, Your Honor, based on the discussions that we

25  had, that we were being asked to fund an amount that was

1  sufficient to make the two payrolls and to fund these medical

2  insurance premiums.  We had no idea.

3           And we learned, you know, among other things that

4  we learned is the issue that Mr. Pachulski described about

5  how, even the medical insurance is intertwined with

6  Mr. Rouhana's own separately owned entity CSS, entities that,

7  you know, as far as we're aware, continue to get payments

8  throughout the prepetition period, even while employees'

9  payments were being withheld or the tax remittances were

10 being withheld.

11          So, Your Honor, we certainly have an unbelievable

12 amount of disappointment and frustration and we feel for

13 everybody who's suffering here.  Obviously, HPS is looking at

14 a significant loss, even beyond the 60 percent loss that we

15 had agreed to take in connection with the forbearance entered

16 into in late-April.  We're looking at even a greater loss,

17 and so we share the frustration Mr. Pachulski has expressed.

18          I know Mr. Dunne has got a few years on me.  He,

19 too, had never seen a situation like this.  I haven't been

20 involved in some of the more contentious bankruptcies that

21 existed in the last 20 years.  This is a unique one, Your

22 Honor, and we regret that we're in the position that we're

23 in, but we just couldn't credibly advise our client to put

24 more money at risk here without even any measure of certainty

25 that that money would be repaid.

1    So, that's, unfortunately, where we find us, Your

2    Honor.  I'm happy to answer any questions that the Court may

3    have.  We're obviously very disappointed to have to reach

4    this conclusion, but that's where we are.

5        THE COURT:  Yeah, I understand, Mr. Leblanc.

6        And, certainly, last week, you know, you talked

7    about the fact that with this $8 million DIP, you knew you

8    were taking on risk and the other secured creditors who were

9    part of putting that deal together, also took on additional

10   risk and I understood why you did it and not in significant

11   part, I truly think it was to do the right thing, also, to

12   try to maintain some value and see what you could make of the

13   situation.  But I think the secured creditors, with that $8

14   million DIP were trying to do the right thing.

15       MR. LEBLANC:  Thank you, Your Honor.

16       And I will say on behalf of my client, we

17   absolutely were.  We were focused on making sure the

18   employees were going to get those payrolls and then withheld

19   and the medical benefits reinstated.  It's almost shocking

20   that the debtor even -- the debtor-in-possession, under prior

21   counsel and their prior management, weren't able to do that.

22       THE COURT:  Yes.

23       MR. PACHULSKI:  Your Honor?

24       THE COURT:  I'm sorry -- Mr. Pachulski, yes?

25       MR. PACHULSKI:  Yeah, all I was going to say, and,

1    again, I want to make something really, really clear, you

2    were very kind about the professionals.  What I think, and I

3    have to hand it to the two board members who were involved

4    for, number one, the train wreck that we've all witnessed,

5    Mr. Rouhana kept that from everybody, including those

6    directors.  They had no idea about the medical benefits.

7    They found out after the fact about the payroll taxes.

8           So it is kind of incomprehensible how all that

9    happened, but I think it's got to be -- and I want to make it

10   very clear, no one had -- but for both (indiscernible) on

11   different matters for years and they would never

12   (indiscernible) on anything like this to happen.

13          And I totally understand where HPS is.  I do want

14   to make something clear.  I think we would have done well

15   before $26 million.  That would have gotten a sale closed,

16   but the sale would be shut down.  But it doesn't matter,

17   because they weren't just going to throw the money out and I

18   can't blame them.  I think that it is very unlikely there

19   will be value, but I think they made the economic

20   determination that it wasn't worth spending the money to

21   figure out if there is value or if there's not, and there's

22   just not.

23          So it doesn't matter if it's $26 million or $15

24   million or $10 million; at some point, there was going to be

25   a hole, in addition to the $8 million.  That's the reality.

1  You could (indiscernible) how much it would take till you

2  knew it, I think it would have taken a lot less, but it

3  doesn't matter.  They didn't want to spend either -- it was

4  going to take high seven figures, low eight figures in best

5  case to get there.  That just -- that's the reality.  We can

6  debate whether it's $8 million, $10 million, $12 million.  I

7  don't think it was $26 million, but eight to $12 million is a

8  lot of money after you've spent $8 million on a complete

9  flyer, because that's what they did --

10            THE COURT:  Yes.

11            MR. PACHULSKI:  -- they thoughtfully were willing

12  to pay.  So I just want to make it clear, but, particularly,

13  I want to make it clear that the directors who stuck with

14  this, who never received a penny from anybody, they were

15  trying to do the right thing, were -- the facts were

16  absolutely hidden from them and that, I find, completely

17  outrageous.  So I apologize, but I wanted to just get that on

18  the record.

19            THE COURT:  Yeah, I understand.  And, like I said,

20  I would expect that these issues will be flushed out in

21  detail in an evidentiary setting at another time.

22            Mr. Cudia, good afternoon.

23            MR. CUDIA:  Good afternoon, Your Honor.  Joseph

24  Cudia for the United States Trustee.

25            I did want to let you know we were informed of

1  this a little over an hour ago, this is the way that things

2  were heading, and the U.S. Trustee has been notified.  So

3  he's making the necessary preparations, as far as the trustee

4  is concerned.  And, also, the things that I've learned during

5  this hearing will be brought to the attention of the United

6  States Trustee, as well.

7          THE COURT:  Thank you.  I appreciate that, Mr.

8  Cudia.

9          Mr. Aguilar, would you like to be heard?

10         MR. AGUILAR:  Yes, Your Honor.

11         I'm Richard Aguilar.  I'm in New Orleans.  I have

12 local counsel of Fox Rothschild, Seth Niederman.  We just

13 filed our appearance today.  We represent a company -- two

14 companies called -- one called Automotive Rentals, Inc. and

15 another one called ARI Fleet LT.

16         We leased over 400 vehicles to the debtor, who

17 we've been fighting with the debtor to get our vehicles back.

18 The lease has been terminated.  We got an order from Judge

19 O'Hearn in the United States District Court in New Jersey in

20 Camden (indiscernible) and we were working with the debtor

21 just prior to the filing of getting and retrieving our

22 vehicles.  And we're going to file a motion to lift stay

23 today to get the rest of our vehicles.  We've got something

24 like 25 of them back.

25         But, Judge, these vehicles are spread out all over

1  the country in 48 states, and plus Hawaii, and we would

2  like -- I'd just ask if I could get in touch with the

3  debtors' counsel, Mr. Pachulski or Mr. Golden or someone, to

4  help us coordinate to get these vehicles back, especially in

5  light of the fact that the case is going to be converted to a

6  Chapter 7.  The employees will be terminated and our vehicles

7  are in possession of those employees.

8         We've been fighting with Mr. Rouhana for months to

9  get our vehicles back, and, as I said, we've got an order.  I

10  would just ask if the debtors' counsel, will cooperate with

11  us to get those vehicles back so we're not further injured by

12  the mismanagement of this company.

13         MR. GOLDEN:  Mr. Aguilar, Steve Golden from

14  Pachulski Stang Ziehl & Jones, I regret that the timing did

15  not work out, but we had actually reached out to your co-

16  counsel at Fox Rothschild earlier today.  And we are --

17  please feel free to reach out to me and we'll be happy to

18  help coordinate that.

19         MR. AGUILAR:  Thank you, Steve.

20         And if you would also -- the person who's helping

21  us internally at Redbox to recover the vehicles was a woman

22  named Heidi Sogalles (phonetic).  I don't know if she's still

23  employed, but she has -- she knows where all the vehicles are

24  and all those things, and we would be grateful if you would

25  help us with that and enlist her help with that, as well.

1        MR. GOLDEN:  (Indiscernible) thank you.

2        MR. AGUILAR:  Thank you so much.

3        Steven, I'll call you after this hearing, if

4   that's okay?

5        MR. GOLDEN:  Very well.  Thank you.

6        MR. AGUILAR:  Thank you, Your Honor.

7        THE COURT:  Thank you, Mr. Aguilar.

8        Okay.  Before I return to Mr. Pachulski, I am just

9   going to ask if there's anybody else who'd like to be heard

10  at this point?

11      (No verbal response)

12       THE COURT:  Okay.  I'm seeing no response.

13       What do you want to do from here, Mr. Pachulski?

14  When would you like to be heard on a motion to convert?

15       MR. PACHULSKI:  You know, to be very frank, Your

16  Honor, I'd like to be heard now.  I don't know whether Your

17  Honor is willing to do it, but we've been speaking to the

18  U.S. Trustee.  We're working on an order of conversion.  I

19  don't know what good it would do to go through the formal --

20  and I've done motions to convert, Your Honor, I understand

21  the process, but I think at this point, particularly since

22  we're getting people like Mr. Aguilar and others, we would or

23  wouldn't to be able to step down and we would like to turn

24  this over to the trustee, and the sooner we could do it, the

25  better.

1          And so what I'd like to do is make an oral motion.

2  I think most of the parties in interest are on this call, and

3  that way, the U.S. Trustee can start the process of

4  appointing the trustee.  Because at some point -- and we are

5  very uncomfortable, Your Honor.  We would have to terminate

6  all the employees today.  We'd rather have a conversion

7  motion and the trustee deal with it.

8          Just like Mr. Aguilar is having us turn over,

9  which we would do -- we planned to turn them over.  Again, we

10  don't have control over them; they are all over the country,

11  he's correct.  And so we immediately found out, and the last

12  thing we wanted, Your Honor, is to be in control of, either

13  remotely be in control of vehicles that people might be

14  driving that are uninsured, and that's the kind of situation

15  that we inherited.

16          THE COURT:  Yeah.

17          MR. PACHULSKI:  So, I cannot recall the last time

18  I asked for an oral motion to convert, but if there was ever

19  exigent circumstances, this is that case, Your Honor, and the

20  U.S. Trustee is aware that that is what we would seek to do

21  and that's my understanding with Ms. Grassgreen.

22          We've tried to divide and conquer before this

23  hearing, which we've done throughout this case, and so she

24  was in charge of the issues associated with the conversion.

25  Your Honor, I, basically, as Mr. Merola put it, said we've

1  put the band together, so hopefully we can have a better

2  result, and that we were going to have a better result than

3  this one, as we did in our -- when we thought we didn't have

4  a very (indiscernible) in our prior case.

5        But I just -- it's an automatic.  I don't think

6  there's any real basis to object to the conversion, based on

7  the colloquy, but I don't know that I have to do a formal,

8  written notice -- a written motion.  But in fairness, I did

9  not review that before this hearing.

10       THE COURT:  Yeah.  I'm having a look at my copy of

11  the Bankruptcy Code and seeing what it has to say about

12  notice.

13       Ms. Grassgreen, maybe -- I'm going to put you on

14  the spot -- maybe you've looked at this and what we needed to

15  do.  Is it something that the Court can consider today on an

16  oral motion or does it require that it go out on notice?

17       MS. GRASSGREEN:  Your Honor, I believe that

18  that -- well, first of all, Your Honor, Deborah Grassgreen,

19  Pachulski Stang Ziehl & Jones, on behalf of the debtors.  And

20  Mr. O'Neill should be on the phone; he has really primarily

21  been dealing with the conversion issues.

22       We had a formal motion ready for, potentially, a

23  Redbox conversion, but this, as you know, is moving very,

24  very quickly.  We did reach out to the U.S. Trustee,

25  literally, within five minutes of this decision being made.

1  We felt that that was the primary issue.  And the U.S.

2  Trustee responded very quickly and has provided us with a

3  form of order and some particular U.S. Trustee provisions

4  that need to go in it, so just that by way of background.

5          But I'll ask Mr. O'Neill actually to respond to

6  the notice, because he's looked at it.  I do believe that it

7  requires a motion, but I think it can be an oral motion and

8  it can be, you know, (indiscernible) and it's appropriate

9  under the circumstances.  But I'll let Mr. O'Neill respond,

10  since he's primarily been dealing with that notice issue.

11          THE COURT:  Mr. O'Neill, it's good to see you.

12          MR. O'NEILL:  Yes, thank you, Your Honor.

13          And I am double-checking the Rules as we speak.

14          THE COURT:  Yep.

15          MR. O'NEILL:  And I know that notice of the

16  conversion of a case is required to be given, but I'm just

17  double-checking to see about notice of a motion or the

18  debtors' request to request convert.  And I'm also mindful

19  that given the exigencies of this case, where employees are

20  going unpaid and other administrative expenses are going

21  unpaid and the debtors' assets are at risk because of that,

22  we do feel that an immediate conversion would be appropriate,

23  and to allow a time period to elapse prior to that would be

24  detrimental to the estate and also would put assets further

25  at risk.

1        I would also state that to the extent that the

2  Rules would require any kind of notice, we would, in any

3  event, be asking the Court to shorten the notice period in

4  order to get a conversion put in place.  So I think that

5  between the Court's authority to shorten and the exigent

6  circumstances of this case and the number of parties that are

7  appearing today via the Zoom, I would say that in this case,

8  adequate notice would have been given about the oral motion.

9        I note that the U.S. Trustee has also come back on

10  camera.

11        THE COURT:  Uh-huh.

12        MR. O'NEILL:  I don't know if Mr. Cudia has an

13  appointment, but as Mr. Pachulski and Ms. Grassgreen

14  indicated, we did speak with him prior to the hearing, just

15  prior to the hearing, and he has shared a form of order with

16  us that we're currently reviewing and can incorporate certain

17  terms that the U.S. Trustee generally requests.

18        So we're ready to work with the U.S. Trustee to

19  finalize that order and just submit it to the Court if that's

20  acceptable to Your Honor.

21        THE COURT:  Okay.  Let me first here from

22  Mr. Cudia.

23        MR. CUDIA:  Yes, Joseph Cudia for the United

24  States Trustee.

25        Yes, at this point, we would not be opposing an

1   immediate conversion.  I note that 1112(b) does require

2   notice and a hearing, but not such under 1112(a).  And,

3   again, as long as we can cooperate on the form of order, my

4   instructions are not to oppose an immediate conversion.

5          THE COURT:  Okay.  Is there anybody else who'd

6   like to be heard on the issue whether the motion should be

7   heard today?

8       (No verbal response)

9          THE COURT:  Okay.  I'm not seeing any response.

10          Here's what I'd like to do -- give me a few

11  minutes, please.  I'll come back on the record at 3:20

12  Eastern -- 15 minutes, okay?

13          MR. PACHULSKI:  Perfect.  Thank you, Your Honor.

14          THE COURT:  Okay.  We're in recess.

15      (Recess taken at 3:06 p.m.)

16      (Proceedings resumed at 3:19 p.m.)

17          THE COURT:  Okay.  Counsel, this is Judge Horan.

18  We're back on the record.

19          I have before me an oral motion to convert the

20  case to a case under Chapter 7 and that request is under

21  Section 1112(a), which provides that a debtor may convert a

22  case under Chapter 11 to a case under Chapter 7.

23          Under Rule 2002(a)(4), normally, a notice of 21

24  days would be required for such a motion; however, based upon

25  the facts before me, I find there is an exigency here and

1  that I should consider the motion today.

2          I would note that there is a lengthy list of

3  participants in the hearing and it appears upon my review of

4  who those parties are and who they represent, that major

5  constituencies are represented and I'd note that the U.S.

6  Trustee has consented to me considering this motion today.

7          And based upon the colloquy that we've had today

8  and my understanding of the position of the company, which is

9  that presently, there is no means to continue to pay

10 employees, pay any bills, otherwise, finance this case, it is

11 hopelessly insolvent and, frankly, based upon the allegations

12 that we've heard, it would be very important that a Chapter 7

13 Trustee be appointed and that that trustee undertake the

14 appropriate investigation of the company to determine if

15 there are any assets that may be garnered to pay what are

16 very significant debts in this case, both, secured and

17 unsecured.  And given the fact that there may also be, at

18 least, the possibility of misappropriation of funds that were

19 held in trust for employees, there is more than ample reason

20 why this case should be converted, so I'm going to grant the

21 motion.

22          I will need the debtors to submit a proposed form

23 of order under certification of counsel and I will enter that

24 promptly.

25          Mr. Aguilar has come on screen.  I would note that

1  he raised his client's issue earlier and I will simply

2  encourage the Chapter 7 Trustee to engage with Mr. Aguilar on

3  the issues that he raised regarding his client's vehicles.

4          But, Mr. Aguilar, did you wish to be heard?

5          MR. AGUILAR:  Yes, Your Honor.

6          I'd just note that the debtors' counsel and the

7  debtor, well, I assume the current debtors' management will

8  be willing to accommodate us and help us to recover all these

9  vehicles, because once the employees are gone, I mean,

10 especially with, like, Heidi, the woman who was helping us

11 with the recovery of the vehicles, it's going to be highly --

12 very difficult, more difficult for us to recover our

13 vehicles.

14         And them driving them around, as Mr. Pachulski

15 said, you know, uninsured and all these things, which creates

16 another problem, so I would ask the Court -- and I appreciate

17 Your Honor's statement that you will encourage the Chapter 7

18 Trustee to assist us, but I'd ask Your Honor to give the

19 debtors' counsel authority to assist us immediately so we

20 don't lose any advantage we get from immediately trying to

21 recover the vehicles now, without any fear of any issues with

22 regard to the, you know, the ability to bind the Chapter 7

23 Trustee or anywhere else with respect to the recovery of

24 these vehicles, if that's possible, Your Honor.

25         THE COURT:  Well, the debtors remain debtors-in-

1  possession and they have the authority that a debtor-in-

2  possession has under the Bankruptcy Code and they possess

3  that authority until such time as the conversion order is

4  entered and then it becomes an issue for the Chapter 7

5  Trustee.

6  MR. PACHULSKI:  And, Your Honor, if I may, Richard

7  Pachulski, on behalf of the debtors?

8  We certainly understand, and one of the things,

9  and this is what may not -- which may be difficult for

10 Mr. Aguilar, it's less of an issue for us.  We have somebody

11 who may want to participate in this process.  We're going to

12 be sending out, and in fairness, an employee communication

13 that is going to advise everybody that there will be a

14 trustee and that there is no money to pay them, and unless

15 some arrangement is made, they should assume and based on

16 conversion, that they will not be paid.  That is only fair.

17 So, I'm very uncomfortable asking someone to help

18 us, who we know, factually, will not be paid.  That's just --

19 so, we will cooperate with Mr. Aguilar, of course, but we

20 can't -- to make a call and say, Hey, you know, let's do

21 this.  If Your Honor says do it, I will absolutely do it, but

22 these are people who not only are not going to get paid

23 today, but they're not going to get paid for anything from

24 approximately June 29th through today.

25 THE COURT:  Yeah, I'm not ask --

1          MR. AGUILAR:  (Indiscernible) and I understand

2    Mr. Pachulski's position, and I would only ask that if in

3    that letter that they send to the employees they say if you

4    have a vehicle that belongs to ARI, please do not use it, and

5    please, you know, if they contact you, make it available to

6    recover.

7          Because what we're going to do is we send -- we

8    have agents.  Our agents are going out to recover the

9    vehicles from them and, you know, make arrangements with

10   those employees to recover the vehicles.  And the judge

11   ordered that all their personal belongings all be removed

12   from the vehicles.

13         So if Mr. Pachulski would just add that sentence

14   to the, whatever, notice that he gives the employees, it

15   would be very helpful.

16         THE COURT:  I'll tell you what, Mr. Aguilar.

17   That's a conversation that you can have with Mr. Pachulski

18   online.  I'm not going to dictate what the debtor says.

19         MR. AGUILAR:  (Indiscernible.)

20         THE COURT:  And I'll make it very clear,

21   Mr. Pachulski.  I do not want you to ask the employees to

22   work a moment longer.  I appreciate the importance of the

23   issues about the vehicles of Mr. Aguilar's client and I don't

24   mean to sound as if I'm not taking it seriously, but a

25   thousand people are about to lose their jobs and they're not

1  even going to be paid for work that they did.  And we are not

2  going to ask them to start doing additional work to recover

3  the vehicles; we're just not doing it.

4         So, I'll leave it at that and I'm sure you

5  understand, Mr. Aguilar.

6         MR. AGUILAR:  Yes, Your Honor.

7         MR. PACHULSKI:  Your Honor, we will definitely

8  speak to Mr. Aguilar.  We would just as well have the cars

9  go.  I just can't justify asking people to do more work.

10        And we actually think there may have been a time

11 where people were asked not to drive them because there

12 wasn't insurance.  Whether -- I don't know that anyone dealt

13 with Mr. Aguilar's problem, but the lack of -- well, Your

14 Honor has stated it.  I don't have to say it, again, Your

15 Honor, what's been done in this case, so I apologize.

16        THE COURT:  That's fine, Mr. Pachulski.

17        Okay.  So when do you -- well, it sounds like

18 you've discussed an order with the United States Trustee.

19 When do you anticipate submitting an order under

20 certification of counsel?

21        MS. GRASSGREEN:  Before the end of the day, Your

22 Honor.

23        THE COURT:  Okay.  We'll be looking out for that

24 and we'll address it very promptly.

25        MS. GRASSGREEN:  It will be our number one

1   priority as soon as we get off this call, at least for some

2   of us, and the others will begin trying to communicate with

3   the employees (indiscernible).

4               THE COURT:  Yeah.  Okay.

5               MR. AGUILAR:  And, Your Honor, I only have one

6   thing to say to Mr. Pachulski.  I apologize for

7   mispronouncing your name.

8               MR. PACHULSKI:  Oh, Mr. Aguilar, you are -- you're

9   more than -- there are more than a hundred of you who have

10  done that, so I (indiscernible).

11          (Laughter)

12              MR. PACHULSKI:  It's phonetic, but I get it, so

13  don't worry about it.

14              MR. AGUILAR:  So sorry about that.

15              MR. PACHULSKI:  Oh, no, nothing to be sorry about;

16  it's not a problem.

17              THE COURT:  Maybe someday they'll name a parade

18  after you anyway, Mr. Pachulski.

19          (Laughter)

20              MR. PACHULSKI:  Thank you, Your Honor.

21              THE COURT:  Okay.  Is there anything else for me?

22              MR. PACHULSKI:  Not from the debtors, Your Honor.

23              THE COURT:  Okay.  Well, look --

24              MR. PACHULSKI:  And I --

25              THE COURT:  I'm sorry, go ahead.

1     MR. PACHULSKI:  All I was going to say, Your

2  Honor, is that -- and I know that I would have liked to have

3  told you at the end of the case that I appreciate all you've

4  done, but in the short time you did basically six hearings,

5  if my count is right, and all of us really thank you for

6  that.  And it didn't end up the way we wanted, but I wanted

7  you to know that we very much appreciated all of your efforts

8  in here.  It was just one of those cases that just wasn't

9  meant to be.

10     THE COURT:  Yep, I understand.

11     Okay.  Well, look, I appreciate the efforts of the

12  professionals.  I can tell that people were working very hard

13  over the past week or so to try to find a path for this case

14  and it didn't happen and it's unfortunate, but I do

15  appreciate the work that everybody put in to try to make it

16  work.

17     Okay.  So, again, I'll look out for the order and

18  we'll enter it when we see it.

19     MR. PACHULSKI:  Thank you, Your Honor.

20     THE COURT:  Okay.  Well, thank you, all very, very

21  much --

22     (Proceedings concluded at 3:30 p.m.)

23

24

25

1                                    CERTIFICATION

2              We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                    July 11, 2024

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                    July 11, 2024

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17

18

19

20

21

22

23

24

25