**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CSS ENTERTAINMENT INC. (f/k/a CHICKEN SOUP FOR THE SOUL ENTERTAINMENT INC.), *et al* [1]<br><br>Debtors. | Chapter 7<br><br>Case No. 24-11442 (MFW)<br>(Jointly Administered)<br><br>Hearing Date: November 12, 2025 at 2:00 p.m. ET<br>Objection Deadline: October 16, 2025 at 4:00 p.m. ET |

**TRUSTEE'S MOTION FOR APPROVAL OF SHARING AGREEMENT BETWEEN CHAPTER 7 TRUSTEE AND AGENT FOR THE PREPETITION LENDERS PROVIDING FOR (I) DETERMINATIONS AND ALLOWANCE OF SECURED LENDER'S PRE-PETITION CLAIMS AND LIENS; (II) TRUSTEE'S SALE OF CERTAIN OF DEBTORS' ASSETS AND SECURED LENDER'S COLLATERAL; (III) SPECIFIED CARVE-OUT FROM SECURED LENDER LIENS; AND OTHER MATTERS CONCERNING THE TRUSTEE'S CONTEMPLATED SALES AND CERTAIN SETTLEMENTS**

George L. Miller, the duly appointed chapter 7 trustee (the "Trustee") for the estates (the "Estates") of the above-captioned Debtors (the "Debtors"), moves this court for entry of an order (the "Motion") approving that certain *Sharing Agreement Between Chapter 7 Trustee and Agent for the Prepetition Lenders Providing for (I) Determinations and Allowance of Secured Lender's Pre-Petition Claims and Liens; (II) Trustee's Sale of Certain of Debtors' Assets and Secured Lender's Collateral; (III) Specified Carve-Out From Secured Lender Liens; and Other Matters Concerning the Trustee's Contemplated Sales and Certain Settlements* (the "Sharing Agreement")[2] by and between the Trustee and HPS Investment Partners, LLC (the "Agent" or

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number (where applicable), are: 757 Film Acquisition LLC (4300); CSS Entertainment, Inc. (f/k/a Chicken Soup for the Soul Entertainment Inc.) (0811); CSS Studios, LLC (f/k/a Chicken Soup for the Soul Studios, LLC) (9993); CSS Television Group, LLC (f/k/a Chicken Soup for the Soul Television Group, LLC); Crackle Plus, LLC (9379); CSS AVOD Inc. (4038); CSSESIG, LLC (7150); Digital Media Enterprises LLC; Halcyon Studios, LLC (3312); Halcyon Television, LLC (9873); Landmark Studio Group LLC (3671); Locomotive Global, Inc. (2094); Pivotshare, Inc. (2165); RB Second Merger Sub LLC (0754); Redbox Automated Retail, LLC (0436); Redbox Entertainment, LLC (7085); Redbox Holdings, LLC (7338); Redbox Incentives LLC (1123); Redwood Intermediate, LLC (2733); Screen Media Films, LLC; Screen Media Ventures, LLC (2466); and TOFG LLC (0508).

[2] Capitalized terms not otherwise defined in this Motion shall have the meanings provided in the Sharing Agreement.

"HPS"), in its capacity as the administrative and collateral agent under that certain Amended and Restated Credit Agreement, dated as of August 11, 2022 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Credit Agreement") and that certain Amended and Restated Collateral Agreement, dated as of August 11, 2022, and the Supplement to the Amended and Restated Collateral Agreement, dated as of July 26, 2023 (collectively, as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Collateral Agreement"),[3] among the Debtors and the HPS-managed lender parties thereto;[4] (collectively, the "Prepetition Lenders," and together with the Agent, the "Prepetition Secured Parties"; the Prepetition Secured Parties, together with the Trustee, shall be referred to as the "Parties"). In support, the Trustee respectfully states:

**Jurisdiction, Venue, and Core Nature**

1. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). The Trustee consents to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[3] Copies of the Credit Agreement and Collateral Agreement are filed and available of record as Exhibits C and D of HPS Investment Partners LLC's Motion for Relief from the Automatic Stay filed in the Debtors' bankruptcy cases [D.I. 243].

[4] The HPS managed lender parties include: Aiguilles Rouges Sector B Investment Fund, L.P., American United Life Insurance Company, Brickyard Direct Holdings, L.P., Cactus Direct Holdings, L.P., Cactus Direct Lending, L.P., Core Senior Lending Fund (A-A), L.P., Core Senior Lending Fund, L.P., Core Senior Master Fund (PB), L.P., CSL Fund (PB) Holdings C, L.P. CSL Fund (PB) Holdings, B, L.P., CSL Fund (PB) Holdings, L.P., and Falcon Credit Fund, L.P.

**Background**

A. **Introduction**

2. On June 28 and 29, 2024 (as applicable, the "Petition Date"), each of the Debtors filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware (the "Court") for relief under Chapter 11 of the Bankruptcy Code, commencing the above-captioned bankruptcy cases (the "Bankruptcy Cases"). On July 10, 2024, the Court entered an *Order Converting Cases from Chapter 11 to Chapter 7 of the Bankruptcy Code and Granting Related Relief* [D.I. 120] (the "Conversion").

3. On July 11, 2024, the Trustee was appointed as the interim chapter 7 trustee for the Debtors' Estates, and is currently serving in that role permanently pursuant to section 702(d) of the Bankruptcy Code.

4. Prior to the Conversion, the Debtors' business included the provision of premium entertainment content to value-conscious consumers through multiple streams. Together, the Debtors comprised one of the largest advertising-supported video-on-demand companies in the United States. The Debtors had ceased all operations by the Conversion.

B. **The Debtors' Secured Indebtedness**

5. Prior to the Petition Date, the Debtors entered into the Credit Agreement and the Collateral Agreement, each dated as of August 11, 2022. Under the Credit Agreement, among other things, the Prepetition Lenders provided the Debtors with an $80 million revolving credit facility and a $325 million term loan facility.

6. In the Collateral Agreement, the Debtors pledged certain collateral, and/or provided certain security interests, to the Agent for the benefit of the Prepetition Lenders (as described in the Collateral Agreement, the "Collateral"). The Collateral includes, among other things, the

Debtors' intellectual property, bank accounts and accounts receivable, equipment, chattel papers, fixtures, general intangibles, and inventory. The Sharing Agreement expressly provides certain assets are excluded from Collateral (as defined below, the "Non-Collateral Assets"), including without limitation: (i) rights or claims of the Estates under Chapter 5 of the Bankruptcy Code; (ii) any/all rights, claims, and actions against former directors and officers of the Debtors and entities affiliated with the Estates, including but not limited to those claims and actions set forth in In re: Miller v. William J. Rouhana, Jr. *et al.*, pending before the Court at Adv. No. 25-50399 (the "D&O Litigation"), and (iii) any/all commercial tort claims.

7. Prior to the Conversion, certain of the Prepetition Secured Parties agreed to provide debtor-in-possession funding to the Debtors (the "DIP Funding") pursuant to the Court's *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [D.I. 85] (the "DIP Order," and the lenders thereto, the "DIP Lenders"), and the Debtors affirmed the validity, perfection, and priority of the liens granted pursuant to the Credit Agreement and Collateral Agreement, including the security interests over certain of the Debtors' bank accounts and cash deposited therein. The Prepetition Secured Parties also funded an additional $200,000 after the Conversion for the sole purpose of paying D&O insurance premiums owed by the Debtors (the "D&O Funding") (collectively, the DIP Funding together with the D&O Funding, the "Postpetition Funding").

8. The DIP Order provided to the Agent, for the benefit of the DIP Lenders, and to the extent of the DIP Funding provided to the Debtors: (i) superpriority administrative expense claims; and (ii) security interests on certain of the Debtors' unencumbered property and, on a priming

4

basis, on the Collateral. As adequate protection for the diminution in value of the Prepetition Lenders' interests in the Collateral in connection with the DIP Funding, the DIP Order provided to the Agent, subject to the terms and conditions of the DIP Funding pursuant to the DIP Order: (i) replacement security interests in and liens on the DIP Collateral (as defined in the DIP Order); and (ii) an allowed superpriority administrative expense claim.

9. The Sharing Agreement provides that the Trustee acknowledges and agrees, based upon a certain accounting to be provided by the Agent to the Trustee, that the claims of the Prepetition Secured Parties arising under the Credit Agreement and the Postpetition Funding are in the aggregate principal amount of not less than $500,000,000, plus accrued and unpaid interest thereon and any fees, premiums, expenses and disbursements (including attorneys' fees, accountants' fees, appraisers' fees, auditors' fees, and financial advisors' fees), costs, charges, indemnities, and other obligations thereunder (collectively, the "Allowed HPS Claim").

10. On August 20, 2024, the Prepetition Secured Parties filed the *HPS Investment Partners' LLC's Motion for Relief from the Automatic Stay* [D.I. 243] (the "HPS Stay Relief Motion") seeking relief to allow the Prepetition Secured Parties to proceed with liquidation of the Collateral. The HPS Stay Relief Motion was premised in part on the fact that following Conversion, no parties, including the Prepetition Secured Parties, were willing to infuse any material amount of cash into the Bankruptcy Cases to facilitate an orderly administration of the Estates. On September 6, 2024, the Court entered an order granting the HPS Stay Relief Motion [D.I. 316].

C. **Proposed Use of Cash Collateral and Sale of the IP Litigation Assets, and the Parties' Agreement to Share the Sale Proceeds, as set out in the Sharing Agreement**

11. The Trustee needs to use cash collateral (as defined in §363(a) of the Bankruptcy Code) ("Cash Collateral") to administer the Estates in an orderly manner, and to fund tasks

5

including without limitation: preparing Bankruptcy Schedules and Statements of Financial Affairs; identifying, and providing HPS with access to, the Collateral, in order to assist HPS in maintaining, and realizing value from, certain of the Collateral; maintaining unencumbered assets of the Estates; and running a sale process for certain of the Estates' assets as described below.  Accordingly, the Agent on behalf of the Prepetition Lenders and DIP Lenders, has agreed to the Trustee's use of Cash Collateral in accordance with the Carve-Out (as defined in the Sharing Agreement) and is more fully set out in the Sharing Agreement.

12. The Trustee recently received an offer from a third party, Grove Street Partners LLC ("Grove Street"), to purchase certain Estate property (the "IP Litigation Assets") from the Trustee.  The IP Litigation Assets consist of the Estates' rights to pursue litigation for copyright infringement against various third parties related to, among other claims, violations of the Digital Millenium Copyright Act ("DMCA") for media titles owned or controlled by the Estates.

13. The Trustee on the one hand, and the Prepetition Secured Parties on the other hand, have engaged in discussions about the terms and conditions under which the Trustee will pursue the sale of the IP Litigation Assets and under which they will share the proceeds, and related matters.  After arm's length negotiations, the Parties have reached agreement on these terms and conditions, and set them out in the Sharing Agreement, a copy of which is attached to this Motion as Exhibit "A."  Pursuant to the Sharing Agreement, subject to Court approval, among other things, the Trustee will have the ability to use Cash Collateral in accordance with the Carve-Out (as described in the Sharing Agreement) in the exercise of his business judgment to fund the costs of administration of the Debtors' Estates.

14. The principal terms of the Sharing Agreement, *inter alia*, include the following:[5]

---

[5] The terms of the Sharing Agreement control to the extent that any conflict with this summary.

i. <u>Amounts owing under Credit Agreement and Postpetition Funding</u>. The Trustee acknowledges and agrees based upon an accounting to be provided by the Agent to the Trustee contemporaneously with the executing of the Sharing Agreement in the form of the Register under the Credit Agreement in which is recorded the amount outstanding under the Prepetition Senior Credit Facility and amount of principal and interest due and payable by the Debtors thereunder, that the claims of the Prepetition Secured Parties arising under the Credit Agreement and the Postpetition Funding are in the aggregate principal amount of not less than $500,000,000, plus accrued and unpaid interest thereon and any fees, premium, expenses and disbursements (including attorneys' fees, accountants' fees, appraisers' fees, auditors' fees, and financial advisors' fees), costs, charges, indemnities, and other obligations thereunder (collectively, the "<u>Allowed HPS Claim</u>"). *See* Sharing Agreement, ¶9.

ii. <u>Cash Collateral</u>. The Agent on behalf of the Prepetition Lenders and DIP Lenders agrees to the Trustee's use of Cash Collateral in accordance with the Carve-Out (as defined below) in the amount of approximately $2.3 million of cash currently held by the Trustee (the "<u>$2.3 Million Cash Amount</u>"). *See* Sharing Agreement, ¶11.

iii. <u>Asset Sale</u>. The Parties agree, subject to further Bankruptcy Court approval and documentation of a sale agreement in form and substance satisfactory to the Parties, to proceed with a sale of rights to pursue litigation for copyright infringement against various third parties related to, among other claims, violations of the Digital Millenium Copyright Act ("<u>DMCA</u>") for media titles owned or controlled by the Debtors' Estates (the "<u>IP Litigation Assets</u>") free and clear of the security interests of HPS in the IP Litigation Assets to Grove Street Partners LLC or one or more of its affiliates or assignees ("<u>Grove Street</u>") or another purchaser acceptable to the Parties for a purchase price of not less than $100 million payable in five (5) annual installments to the Estates of $20 million each or at such sale price and terms as may otherwise be agreed by the Parties. *See* Sharing Agreement, ¶12.

iv. <u>Carve-Out</u>. The Agent expressly agrees on behalf of the Prepetition Secured Parties and DIP Lenders that any and all liens, security interests (including but not limited to any and all security interests, liens, and superpriority administrative expense claims granted under the DIP Order or hereunder) of the Prepetition Secured Parties in Collateral shall be subordinate and subject to carve-outs from Collateral, use by the Trustee, and sharing with the Estates for the following (collectively, the "<u>Carve-Out</u>"):

A. <u>Cash Collateral</u> – The Trustee may use the $2.3 Million Cash Amount in the exercise of his business judgment to fund the costs of administration of the Debtors' Estates. The Trustee agrees that proceeds of accounts receivables and other Collateral received directly into the bank accounts of the Debtors after the date of the Sharing Agreement shall be paid over to the Agent.

B. <u>IP Litigation Assets</u> – The proceeds from IP Litigation Assets shall be shared and applied as follows:

7

    i *First,* the proceeds from IP Litigation Asset recoveries shall be used to pay the Trustee's statutory commissions and costs, the Trustee's professional fees and costs, and any other expenses related to the identification, preservation including AWS, maintenance, and recovery of IP Litigation Assets (the aggregate amounts paid under this clause (i) the "<u>Administrative Payments</u>").

    ii *Second*, the first $100,000,000 of proceeds from IP Litigation Assets shall be allocated after the payment of (i) above as follows:

    (1) An amount equal to the sum of 20% of Net Proceeds (as defined below) to the Trustee for the benefit of the Debtors' Estates to be distributed in accordance with 11 U.S.C. §726. Net Proceeds are the gross proceeds from the liquidation of IP Litigation Assets minus the Administrative Payments (the "<u>Net Proceeds</u>"); and

    (2) 80% of Net Proceeds to HPS on account of its secured claims until paid in full;

    iii *Third*, any proceeds recovered from IP Litigation Assets in excess of $100,000,000 shall be allocated after the payment of (i) above as follows:

    (1) An amount equal to the sum of 15% of Net Proceeds to the Trustee for the benefit of the Debtors' Estates to be distributed in accordance with 11 U.S.C. §726, and

    (2) 85% of Net Proceeds to HPS on account of its secured claims until paid in full.

In the event that the aggregate claims in any of clauses (1) or (2) above are paid in full then the proceeds otherwise allocable under such clause shall be re-allocated to the other clause until paid in full. *See* Sharing Agreement, ¶13.

  v. <u>Allowed Fees of Pachulski Stang Ziehl & Jones LLP</u>. For the avoidance of doubt, the use of the $2.3 Million Cash Amount by the Trustee permitted by HPS under the Sharing Agreement shall not reduce any obligation of HPS to reimburse the allowed fees of Pachulski Stang Ziehl & Jones LLP to the extent provided for in the carve-out as defined in the DIP Order (the "<u>Chapter 11 Carve-Out</u>") from the proceeds of Collateral under the DIP Order and the Order granting HPS Stay Relief Motion [D.I. 316]. HPS shall make payment of the allowed Chapter 11 fees of Pachulski Stang Ziehl & Jones LLP upon approval of such fees by the Bankruptcy Court from proceeds of Collateral other than the $2.3 Million Cash Amount. *See* Sharing Agreement, ¶14.

  vi. <u>Non-Collateral Assets</u>. For the avoidance of doubt, property of the Estates of the Debtors which is not prepetition collateral of HPS (the "<u>Non-Collateral Assets</u>") shall not be subject to any sharing of proceeds or other benefits with HPS on account of its Allowed HPS Claim except to the extent HPS shall be entitled to a distribution under 11 U.S.C. §726(a)(2) as a general unsecured creditor on account of its Allowed HPS Deficiency Claim (as defined below); provided that, for the avoidance of doubt, the HPS

8

Deficiency Claim may include any outstanding amounts on account of its Postpetition Funding. The Non-Collateral Assets include but are not limited to (i) rights or claims of the Debtors' Estates under Chapter 5 of the Bankruptcy Code, (ii) any rights, claims and actions against former directors and officers of the Debtors, and entities affiliated with the Debtors' Estates including but not limited to those claims and actions set forth in, In re: Miller v. William J. Rouhana, Jr. *et al.*, pending before the Court at Adv. No. 25-50399 (the "D&O Litigation"), and (iii) any commercial tort claims. In furtherance of the foregoing, the Trustee and HPS agree in the event an interim distribution is made by the Trustee from proceeds of Non-Collateral Assets to general unsecured creditors under 11 U.S.C. §726(a)(2) before the Collateral is liquidated and the proceeds thereof are distributed to enable a final calculation of the Allowed HPS Deficiency Claim, then the Trustee will reserve or holdback sufficient funds from such interim distributions, as reasonably determined between the Trustee and HPS, on an estimated basis to enable a distribution on the HPS Deficiency Claim in an amount proportionally the same as is being made in such interim distribution to other general unsecured creditors. *See* Sharing Agreement, ¶15.

vii. **HPS Deficiency Claim**. To the extent the proceeds from the Collateral of HPS are not sufficient to fully pay the Allowed HPS Claim, then HPS shall be entitled to receive a distribution as a prepetition general unsecured claim for any unpaid deficiency amount (the "Allowed HPS Deficiency Claim"). HPS shall provide the Trustee with statements of the outstanding balance of the Allowed HPS Claim and confirmation as to whether or not the Collateral of HPS has been fully liquidated by HPS within ten (10) days of the Trustee's written requests for such information to enable the Trustee to make distributions from the Estates; provided, however, that to the extent the Trustee wishes to make distributions from the Estates at a time when the Collateral of HPS has not been fully liquidated by HPS, HPS shall provide the Trustee with a good faith estimate of the value of any remaining Collateral of HPS for purposes of calculating the Allowed HPS Deficiency Claim. In making such distributions, the Trustee shall be entitled to rely on the foregoing statements. In the event the Trustee makes a distribution to other holders of allowed general unsecured claims then HPS shall be entitled to receive a pro-rata distribution on account of its Allowed HPS Deficiency Claim. HPS shall not be required to file a proof of claim evidencing the Allowed HPS Deficiency Claim and such claim shall be deemed allowed and not subject to any challenge. HPS upon execution of this Agreement shall provide the Trustee with a report of all funds received by HPS after June 21, 2024 from Collateral and Non-Collateral on account of the Debtors. In the event HPS has received proceeds from Non-Collateral Assets (except with respect to its Postpetition Funding), such proceeds shall be promptly remitted to the Trustee upon Court approval of this Agreement. *See* Sharing Agreement, ¶16.

viii. **AWS, Dropbox, Cloudfare, and Outlook Exchange**. Upon execution of the Sharing Agreement, the Trustee agrees to (i) upon HPS' written request (which may be via e-mail), provide consents, authorizations, and instructions directed to Amazon Web Services Inc. ("AWS"), Dropbox, Cloudfare and Outlook Exchange and, also upon HPS' written request (which may be via e-mail), any other digital accounts of the Debtors

9

(collectively, the "Digital Accounts"),[6] authorizing the Digital Accounts to provide HPS with full administrative access to such Digital Accounts and (ii) provide HPS with all credentials, registration information, and administration rights related to the Digital Accounts that are readily available and known to the Trustee. In addition, with respect to the account of Apto Solutions maintained with Dropbox (the "Apto Solutions Dropbox Account"), the Trustee agrees that upon HPS providing consent to the Trustee to use a portion of the $2.3 Million Cash Amount to pay the outstanding fees and costs of Apto, the Trustee will cause Apto to provide HPS with full administrative access to the Apto Solutions Dropbox Account. Any fees required to be paid to the Digital Accounts for data accessed by HPS shall be the responsibility of HPS and not the Estates. *See* Sharing Agreement, ¶17.

        ix.    Good Faith Collaboration. HPS and the Trustee and their respective counsel will work in good faith to (i) obtain reasonable access to information necessary or desirable to allow value to be realized from the Collateral, the IP Litigation Assets and Non-Collateral Assets, including resolution of AWS issues, if possible (including, without limitation, the materials and deliverables specified in Annex II to the Notice of Foreclosure Sale By Credit Bid dated June 17, 2025 delivered to the Trustee by HPS) and (ii) maintain standing to enable the IP Litigation Assets to proceed to be pursued for the benefit of the Parties. *See* Sharing Agreement, ¶18.

        x.    Mutual Releases. The following mutual releases shall become effective upon Bankruptcy Court approval of the Sharing Agreement:

        A.    HPS, on behalf of itself and the Prepetition Lenders (collectively, the "Claimant Parties"), hereby releases, remises and forever discharges the Debtors' Estates and the Trustee and his financial advisors, attorneys, accountants and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such, but excluding any of the Debtors' current or former directors and officers of the Debtors' Estates and entities affiliated with the Debtors' Estates (specifically including but not limited to the Defendants named in the D&O Litigation) (collectively, the "Trustee Parties"), of and from any and all claims, debts, refunds, demands, liabilities, agreements, obligations, controversies, actions, causes of action, suits, costs, attorneys' fees, expenses, damages, liens, and judgments, of any nature whatsoever, at law or in equity or otherwise, whether asserted or unasserted, whether known or unknown, that the Claimant Parties may have against any or all of the Trustee Parties as of the effective date, with the exception of the Allowed HPS Claim (including the Allowed HPS Deficiency Claim), the claims arising under the Postpetition Funding, and the Trustee's obligations under the Sharing Agreement; provided, however, that the foregoing release shall not limit the Claimant Parties from asserting any

---

[6] The Digital Accounts shall include, without limitation, (i) cloud storage accounts, (ii) domain name registrar accounts, (iii) social media accounts, (iv) email accounts used in connection with the Debtors' business, (v) software development, project management, and collaboration accounts, and (vi) any other digital platform, online service, or account used or maintained by the Debtors for business, media, communications, or operations.

released claim as a defense against a non-Party to this Agreement in any litigation brought by such Non-Party.

B. The Trustee, on behalf of itself and the Trustee Parties, hereby releases, remises and forever discharges the Claimant Parties and each of their Representatives of and from any and all claims, debts, refunds, demands, liabilities, agreements, obligations, controversies, actions, causes of action, suits, costs, attorneys' fees, expenses, damages, liens, and judgments, of any nature whatsoever, at law or in equity or otherwise, whether asserted or unasserted, whether known or unknown, that the Trustee Parties may have against any or all of the Claimant Parties as of the effective date, with the exception of the Claimant Parties' obligations under this Agreement. Without limiting the foregoing, the Trustee Parties waive any right to surcharge the Collateral pursuant to section 506(c) of the Bankruptcy Code except to the extent provided in the Carve-Out or otherwise in the Sharing Agreement. As used herein, "Representatives" shall refer to the Claimant Parties or their respective subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such.

*See* Sharing Agreement, ¶19.

xi. <u>Bankruptcy Court Approval</u>. The Sharing Agreement is subject in all respects to the approval of the Court, which the Trustee will promptly seek after the full execution of the Sharing Agreement.

## **Summary of Relief Requested**

15. The Trustee respectfully requests by this Motion that the Court enter an order, in substantially the attached form: (i) approving the Sharing Agreement; (ii) authorizing him to enter into, and take all actions necessary to carry out the terms of, the Sharing Agreement, and (iii) providing related relief.

## **Applicable Authority**

16. Sections 105, 704(a)(1), and 363(c)(2)(A) of the Bankruptcy Code, and Federal Rule of Bankruptcy Procedure 9019, provide authority for the Court to grant the Trustee's requested relief.

11

17.     Section 704(a)(1) provides that a trustee "shall collect and reduce to money the property of the estate . . . ." Section 105(a) provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." Section 363(c)(2)(A) provides that a trustee may use cash collateral if "each entity that has an interest in such cash collateral consents."

18.     Rule 9019(a) provides, "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." The United States Court of Appeals for the Third Circuit has emphasized that "to minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'" Myers v. Martin (In re Martin), 91 F. 3d 389, 393 (3d Cir. 1996) (quoting 9 COLLIER ON BANKRUPTCY ¶ 9019.03[1] (15th ed. 1993)). The approval of compromises and settlements is committed to the sound discretion of the bankruptcy court. See, e.g., In re Louise's, Inc., 211 B.R. 798, 801 (D. Del. 1997).

19.     Before approving a settlement under Rule 9019, a court must determine whether "the compromise is fair, reasonable, and in the interests of the estate." In re Marvel Entm't Group, Inc., 222 B.R. 243, 249 (D. Del. 1998) (quoting Louise's, 211 B.R. at 801). To reach such a determination, the court must assess the value of the claim that is being settled and balance it against the value to the estate of the approval of the settlement. Martin, 91 F.3d at 393. In striking this balance, the court should consider the following factors: (a) the probability of success in the litigation; (b) the complexity, expense and likely duration of the litigation; (c) the possibilities of collecting on any judgment which might be obtained; (d) all other factors relevant to making a full and fair assessment of the wisdom of the proposed compromise; and (e) whether the proposed compromise is fair and equitable to the debtors, their creditors, and other parties in interest.

Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-425 (1968).  See also Martin, 91 F.3d at 393.

20. Fundamental to the process of evaluating proposed settlements is "the need to compare the terms of the compromise with the likely rewards of litigation." TMT Trailer Ferry, 390 U.S. at 425. The TMT rule does not require the court to hold a full evidentiary hearing before a compromise can be approved. Rather, the court's obligation is "to canvas the issues and see whether the settlement 'falls below the lowest point in a range of reasonableness.'" 10 COLLIER ON BANKRUPTCY, ¶ 9019.2, 9019-4 (15th ed.) (quoting In re Drexel Lambert Group, Inc., 134 B.R. 493 (Bankr. S.D.N.Y. 1991)).

**Analysis**

21. The Trustee submits that his entering into the Sharing Agreement would be in the best interests of the Estates and their creditors. The Sharing Agreement would provide the Trustee with funds via the Carve-Out to administer these Estates including but not limited to marketing and attempting to sell the IP Litigation Assets. If the Trustee is successful in administering the Estate and liquidating assets, a percentage of the proceeds by virtue of the provisions of the Sharing Agreement from Collateral and Non-Collateral will be available for the cost of administration and possible distribution to creditors. Without the funds provided and made available under the Sharing Agreement, the Trustee would not be able to administer the Estates nor attempt to sell the IP Litigation Assets, and the Estates' unsecured creditors would have no prospect for payment therefrom.

22. The Trustee's entering into the Sharing Agreement is authorized under the Bankruptcy Code and Rules, and meets the applicable standards. Section 704(a) of the Bankruptcy Code provides that the Trustee shall collect and reduce to money the property of the Estates. In

the absence of the Carve-Out and sharing provided in the Sharing Agreement, the Trustee will not have the ability to administer the Estates for the benefit of creditors, including the Prepetition Secured Parties. Accordingly, an order approving the Sharing Agreement pursuant to section 105(a) should be issued as necessary and appropriate for the Trustee to carry out the provisions of the Bankruptcy Code, including the fulfillment of the Trustee's duties under section 704.

23. The Trustee in the exercise of his business judgment has determined that gaining the ability to use Cash Collateral and the IP Litigation Assets, subject to the terms and conditions of the Sharing Agreement, is critical to his ability to administer the Estates and liquidate the Debtors' assets in an expeditious and prudent manner for the benefit of the Estates.

24. The Sharing Agreement constitutes a settlement and the Trustee submits that the settlements embodied in the Sharing Agreement meet the standards applicable under Rule 9019. The Trustee is satisfied that the claims and liens of the Prepetition Secured Parties as described in the Sharing Agreement are legal, valid, and binding, and are enforceable in accordance with their terms. The settlements embodied in the Sharing Agreement are far preferable to expensive and time-consuming litigation with the Prepetition Secured Parties and/or a possible inability to use Cash Collateral and/or access proceeds of Collateral in the absence of the Carve-Out and sharing provided for in the Sharing Agreement. Furthermore, the Trustee has taken into consideration in exercising his business judgment in entering into the Sharing Agreement and granting releases to HPS and the Pre-Petition Lenders that the Debtors on multiple occasions have already provided releases to HPS and the Pre-Petition Lenders. For these reasons, the Trustee's entry into the Sharing Agreement is well within the reasonable exercise of his business judgment.

25. The Trustee notes that under the Sharing Agreement, the Lenders explicitly consent to the Trustee's use of Cash Collateral, subject to the terms of the Sharing Agreement.

Accordingly, the Trustee's use of Cash Collateral pursuant to the Sharing Agreement is authorized under section 363(c)(2)(A) of the Bankruptcy Code.

26. Based on the foregoing, the Trustee respectfully submits that the Court should approve the Sharing Agreement as being in the best interests of the Estates, and authorize the Trustee to enter into, and take any and all actions necessary to implement, the Sharing Agreement.

## NOTICE

27. The Trustee will provide notice of this Motion to the following parties: (i) the Office of the United States Trustee; (ii) the Debtors' counsel; (iii) counsel for the Prepetition Secured Parties; (iv) the Debtors' twenty largest unsecured creditors as appearing on the Debtors' filed listing of creditors; and (v) all parties who have requested notice pursuant to Bankruptcy Rule 2002 as of the date of this Motion. In light of the nature of the relief requested, the Trustee submits that no further notice need be given.

WHEREFORE, the Trustee respectfully requests that the Court enter an order substantially in the form attached: (i) approving the Sharing Agreement; (ii) authorizing him to enter into, take all actions necessary to carry out the terms of, the Sharing Agreement; (iii) granting related relief; and (iv) granting any further relief as may be appropriate.

Dated: October 1, 2025

COZEN O'CONNOR

*/s/ John T. Carroll, III*
John T. Carroll, III (No. 4060)
Simon E. Fraser (No. 5335)
1201 N. Market St., Ste. 1001
Wilmington, DE  19801
Telephone:  (302) 295-2000
jcarroll@cozen.com
sfraser@cozen.com

*Counsel for the Trustee,*
*George L. Miller*

LEGAL\80072203\2 6010823/00617521