## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| CSS ENTERTAINMENT INC. (f/k/a CHICKEN SOUP FOR THE SOUL ENTERTAINMENT INC.)*, et al.,*[1] | Case No. 24-11442 (MFW) |
| | (Jointly Administered) |
| Debtors. | **Re: D.I. 687** |
| | **Objection Deadline:**<br>Extended to October 27, 2025 at 4:00 p.m. (ET)<br>**Hearing Date:**<br>November 12, 2025 at 2:00 p.m. (ET) |

**WILLIAM J. ROUHANA, JR., AMY L. NEWMARK, CHICKEN SOUP FOR THE SOUL PRODUCTIONS, LLC, CHICKEN SOUP FOR THE SOUL, LLC, AND CHICKEN SOUP FOR THE SOUL HOLDINGS, LLC'S OBJECTION TO TRUSTEE'S MOTION FOR APPROVAL OF SHARING AGREEMENT BETWEEN CHAPTER 7 TRUSTEE AND AGENT FOR THE PREPETITION LENDERS PROVIDING FOR (I) DETERMINATIONS AND ALLOWANCE OF SECURED LENDER'S PRE-PETITION CLAIMS AND LIENS; (II) TRUSTEE'S SALE OF CERTAIN OF DEBTORS' ASSETS AND SECURED LENDER'S COLLATERAL; (III) SPECIFIED CARVE-OUT FROM SECURED LENDER LIENS; AND OTHER MATTERS CONCERNING THE <u>TRUSTEE'S CONTEMPLATED SALES AND CERTAIN SETTLEMENTS</u>**

William J. Rouhana, Jr., Amy L. Newmark, Chicken Soup for the Soul Productions, LLC, Chicken Soup for the Soul, LLC, and Chicken Soup for the Soul Holdings, LLC (collectively, the "<u>Objectors</u>"), by and through undersigned counsel, hereby file this objection (this "<u>Objection</u>") to the *Trustee's Motion For Approval Of Sharing Agreement Between Chapter 7 Trustee And Agent For The Prepetition Lenders Providing For (I) Determinations And Allowance Of Secured Lender's Pre-Petition Claims And Liens; (II) Trustee's Sale Of Certain Of Debtors' Assets And*

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number (where applicable), are: 757 Film Acquisition LLC (4300); CSS Entertainment, Inc. (f/k/a Chicken Soup for the Soul Entertainment Inc.) (0811); CSS Studios, LLC (f/k/a Chicken Soup for the Soul Studios, LLC) (9993); CSS Television Group, LLC (f/k/a Chicken Soup for the Soul Television Group, LLC); Crackle Plus, LLC (9379); CSS AVOD Inc. (4038); CSSESIG, LLC (7150); Digital Media Enterprises LLC; Halcyon Studios, LLC (3312); Halcyon Television, LLC (9873); Landmark Studio Group LLC (3671); Locomotive Global, Inc. (2094); Pivotshare, Inc. (2165); RB Second Merger Sub LLC (0754); Redbox Automated Retail, LLC (0436); Redbox Entertainment, LLC (7085); Redbox Holdings, LLC (7338); Redbox Incentives LLC (1123); Redwood Intermediate, LLC (2733); Screen Media Films, LLC; Screen Media Ventures, LLC (2466); and TOFG LLC (0508).

*Secured Lender's Collateral; (III) Specified Carve-Out From Secured Lender Liens; And Other*

*Matters Concerning The Trustee's Contemplated Sales And Certain Settlements* (D.I. 687) (the

"Motion")[2] filed by George L. Miller, the duly appointed chapter 7 trustee (the "Trustee") for the

estates (the "Estates") of the above-captioned Debtors (the "Debtors").

### Preliminary Statement

(i)     On its face, and as titled, the Motion seeks approval of a "sharing agreement" (the "Sharing Agreement") between the Trustee and HPS Investment Partners, LLC ("HPS").  According to the title of the Motion, the relief sought includes: (i) the determination and allowance of secured lender's prepetition claims and liens; (ii) the Trustee's sale of certain of the Debtors' assets and secured lender's collateral; (iii) the specified carve-out from secured lender's liens; and (iv) "other matters" concerning the Trustee's contemplated sales and certain settlements.  **The Motion and proposed Sharing Agreement, however, seek approval of far greater relief than identified in the title to the Motion.**  Relief that includes: the proposed use of cash collateral pursuant to section 363(c)(2)(A);

(ii)    the grant of a lien to HPS on the proceeds of potential intellectual property litigation, the IP Litigation Assets, when, upon information and belief, such lien rights did not exist pre-petition;

(iii)   the waiver of the Trustee's and Estates' rights to surcharge HPS's collateral pursuant to section 506(c);[3] and

(iv)    the entry into a global compromise and settlement with HPS pursuant to Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 9019 that will release and forever discharge all of the Debtors' rights, claims, and causes of action against HPS, the "Claimant Parties," and their unidentified "Representatives."[4]

Despite the generic title to the Motion, the Motion and Sharing Agreement seek approval of far

more than a simple sharing agreement between a debtor and secured lender.  Rather, the Court is

being asked, with incomplete information and scant evidence, to: (i) approve a proposed

compromise and settlement of the Debtors' and their Estates' rights and claims against HPS; and

---

[2] Capitalized terms used but not defined herein are ascribed the definitions given to them in the Motion.
[3] The Motion does not make any mention of the proposed 506(c) waiver.  Rather, the waiver is embedded within the Sharing Agreement.  *See* D.I. 678-4, Sharing Agreement, at ¶ 19.B.
[4] The "Representatives" to be released are not identified in the Motion or Sharing Agreement.

2

(ii) predetermine the Debtors' legal and equitable interests, if any, in certain cash and collateral, in which the Debtors may no longer hold a legal or equitable interest. The Court should be wary of such gamesmanship.

Even if the Court determines the Motion is procedurally proper, which it is not,[5] the Motion fails to satisfy the Trustee's burden before the Court and should be denied.

First, the Motion fails to provide, as it must, sufficient information that would allow the Court to assess the value of the claims being released against the value to the Estates of approval of the proposed settlement. Nor does it provide any meaningful analysis of the factors[6] the Court must consider in approving a settlement under F.R.B.P. 9019. Accordingly, the Court will be well within its bounds to exercise its discretion and deny the Motion outright.

Second, fundamental to a Court granting a debtor the right to use cash collateral is that the debtor's estate must demonstrate that it holds "an interest" in such cash. 11 U.S.C. 363(a) and 363(c)(1) and (2). The same holds true if a debtor seeks authority to sell property under section 363(b) and (f). Here, the Motion simply assumes, without any discussion or analysis, that the Debtors hold a legal or equitable interest in the cash and collateral they intend to use or sell pursuant to the Motion and Sharing Agreement. However, the Debtors may not hold a legal or equitable interest in such cash or property. The Debtors are no longer operating and have not operated since the conversion of their cases. Moreover, the Debtors have long since rejected, and in some instances terminated, the movie, video, television and other media license agreements (collectively the "Media Content Licenses") that generated revenue (cash) for the Debtors. Consequently, many unanswered questions exist as to the Debtors' legal or equitable interest in the

---

[5] *See, infra,* Argument (i).
[6] *See infra*, Argument (iii) (discussing the *Martin* Factors).

3

cash and property the Trustee intends to use or sell pursuant to the Motion and Sharing Agreement, such as:

- When was the cash or property received?
- What is the Debtors' interest in the cash or property?
- Is the cash an account receivable?
- Is the cash or property to be used or sold related to a Media Content License?
- What competing interests, if any, exist to the cash or property?
- Is the cash or property subject to HPS's pre-petition secured liens?

The Motion and Sharing Agreement circumvent these questions and seek to have the Court predetermine that the Debtors and their Estates hold legal and equitable interests in all remaining cash and property when the Debtors may not hold **any** legal or equitable interest in such cash or property to be used or sold pursuant to the Sharing Agreement. Again, the Court should be wary of such gamesmanship, especially since neither the Debtors nor HPS have paid the licensors, producers and distributors of such Media Content for the use of their Media Content post-petition.

Third, in addition to the questions raised by the Trustee's proposed use or sale of any remaining cash or property held by the Debtors and their Estates, the Motion omits essential information necessary for the Court to decide if the relief requested is in the best interests of creditors and the Debtors' Estates, including:

(i)     the amount HPS actually funded under the Interim DIP Financing Order versus the $8.0 million that was to be funded under the Interim DIP Financing Order (the "Interim DIP Financing");[7]

(ii)    what investigation, if any, the Trustee and the Debtors' Estates undertook to determine whether HPS holds a valid enforceable pre-petition secured lien against the IP Litigation Assets;

(iii)   what investigation, if any, the Trustee and the Debtors' Estates undertook to determine the direct and derivative claims the Debtors' Estates may have or hold

---

[7] *See Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (D.I. 85) (the "Interim DIP Financing Order") at ¶ 1(a).

against HPS, the Claimant Parties, or the Representatives, and the estimated value of such direct and derivative claims;

(iv)     what "claims, debts, refunds, demands, liabilities, agreements, obligations, controversies, actions, causes of action, suits, costs, attorneys' fees, expenses, damages, liens, and judgments" (Motion at ¶ 14.x.B; Sharing Agreement at ¶ 19) are being released and discharged under the Sharing Agreement;

(v)      what is the value of the "claims, debts, refunds, demands, liabilities, agreements, obligations, controversies, actions, causes of action, suits, costs, attorneys' fees, expenses, damages, liens, and judgments," (*id.*), being released and discharged under the Sharing Agreement

(vi)     what are the outstanding fees and costs of APTO Solutions Dropbox Account, which the Trustee intends to pay so that HPS will be granted full administrative access to the APTO Solutions Dropbox Account;

(vii)    what are the outstanding fees and costs currently owed to the Trustee and his professionals;

(viii)   whether the Trustee currently has standing to prosecute the IP Litigation Assets given HPS's foreclosure on the Debtors' Media Content and media library; and

(ix)     why the Trustee seeks enforcement of part of the Interim DIP Financing Order (*i.e.*, the Chapter 11 Carve-Out for the Pachulski Stang Ziehl & Jones LLP law firm) but does not seek to enforce the funding provisions set forth in paragraph 1(a) of the Interim DIP Financing Order against HPS.

In the absence of such critical information, the Court should deny the requested relief pending the Trustee providing full and complete disclosure of the facts and information omitted in the Motion.

Fourth, the relief requested does not benefit the Debtors' Estates or creditors. The Court need only to look at the Estates' claims against HPS relating to the amount of money HPS actually funded versus the amount it agreed to fund under the Interim DIP Financing Order to see that the Motion and Sharing Agreement do not benefit creditors, especially employee creditors, in these cases. In fact, at the First Day Hearings,[8] HPS, through its counsel, expressed concern for ensuring that employee wages and health insurance benefits were going to be paid. Moreover, HPS, through

---

[8] Copies of the transcripts from the First Day Hearings are attached hereto as **Exhibits A–C**.

counsel, assured the Court that HPS was ready and willing to fund the employee wages and insurance benefits. However, despite the approval of the Interim DIP Financing Order, only a portion of the amounts to be funded under paragraph 1(a)(i)-(iii) were actually funded to the Debtors, and the Trustee has failed to enforce the Interim DIP Obligations against HPS. Upon information and belief, the amount unfunded under the Interim DIP Financing Order exceeds $5.0 million, over twice the amount of the $2.3 million the Trustee seeks authority to use as cash collateral pursuant to the Motion. Rather, the Trustee seeks to use $2.3 million of cash collateral that will be used to pay himself, his professionals and certain expenses benefitting HPS, with nothing being used to pay any employee wages or health insurance benefits. While the benefit to employee creditors is only one example of why the relief requested does not benefit the Debtors' Estates or creditors, a host of additional factors exist, as discussed herein, that demonstrate that the relief requested is not in the best interest of the Debtors' Estates or creditors and that the relief requested should be denied.

Finally, to the extent that the Court determines the Motion is procedurally proper and the Trustee has sustained his burden before the Court, any order granting the relief requested should make clear that nothing in such order or the Sharing Agreement waive, release or discharge any rights, claims, causes of action or defenses any creditor, employee, shareholder, party in interest or other third-party may have or hold against the Trustee, the Trustee Parties, HPS, the Claimant Parties or their Representatives, including, without limitation, any and all any and all rights, claims, causes of action or objections relating to the Debtors' legal or equitable interests in the Cash Collateral or Collateral or the Trustee's proposed use or sale of such Cash Collateral or Collateral. To this end, any such order approving the Motion and Sharing Agreement should include language stating:

6

a. Nothing in this Order, or the Sharing Agreement, shall be construed to release, waive, discharge or impair, any and all claims (including any claims for contribution or indemnity), debts, refunds, demands, liabilities, agreements, obligations, controversies, actions, causes of action, suits, costs, attorneys' fees, expenses, damages, liens, and judgments, of any nature whatsoever, at law or in equity or otherwise, whether asserted or unasserted, whether known or unknown, that William J. Rouhana Jr., Amy L. Newmark, Fred M. Cohen, Christina Weiss Lurie, Martin Pompadur, Diana Wilkin, Cosmo DeNicola, Vikram Somaya, Jason Meier, Christopher Mitchell, Amanda Edwards, Chicken Soup for the Soul, LLC, Chicken Soup for the Soul Productions, LLC, Chicken Soup for the Soul Holdings, LLC, or any other former director, officer, executive, employee, shareholder, affiliate, or subsidiary of the Debtors, may have or hold against any or all of the Trustee, the Trustee Parties (as defined in the Motion), HPS, the Claimant Parties or their Representatives, including, without limitation, any and all any and all rights, claims, causes of action or objections relating to the Debtors' legal or equitable interests in the Cash Collateral or Collateral or the Trustee's proposed use or sale of such Cash Collateral or Collateral, all of which are fully preserved and not being released, waived or discharged.

b. Nothing in this Order, or the Sharing Agreement, shall be construed to release, waive, discharge or impair any rights, claims, or judgments William J. Rouhana Jr., Amy L. Newmark, Fred M. Cohen, Christina Weiss Lurie, Martin Pompadur, Diana Wilkin, Cosmo DeNicola, Vikram Somaya, Jason Meier, Christopher Mitchell, Amanda Edwards, Chicken Soup for the Soul, LLC, Chicken Soup for the Soul Productions, LLC, Chicken Soup for the Soul Holdings, LLC, or any other former director, officer, executive, employee, shareholder, affiliate, or subsidiary of the Debtors may have or hold against any or all of the Trustee, the Trustee Parties, HPS, the Claimant Parties or their Representatives all of which are fully preserved and not being released, waived or discharged. , including, without limitation  any and all rights and claims under the Delaware Uniform Contribution Among Tortfeasors Act ("DUCATA"), 10 *Del*. *C*. § 6301.

## Objection

### A.  The Trustee's Consent To A 506(c) Waiver Should Be Denied Outright.

1.      As an initial matter, the Motion violates Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules").  Local Rule 4001-2 ("Cash Collateral and Financing Orders") provides that a motion to approve the use of cash collateral under section 363 of the Bankruptcy Code must meet certain requirements.  The Motion,

on its face, fails to indicate that the Trustee is seeking relief under section 363.  More importantly, the body of the Motion does not identify that the Trustee intends to waive any right to surcharge HPS' collateral pursuant to section 506(c), as required by Local Rule 4001-2(a)(i)(V).  Rather, the Trustee's intent to waive any surcharge rights under section 506(c) is embedded in the body of the Sharing Agreement.  *See* Sharing Agreement at ¶ 19.B.

2.      Indeed, the request to approve a section 506(c) waiver serves no purpose, other than to eliminate a potential avenue of recovery for the Debtors' Estates by ensuring that the costs of the Trustee's work will be borne by the unsecured creditors alone—even if the unsecured creditors receive no value.  Moreover, the waiver contravenes the intent behind section 506(c) of the Bankruptcy Code.  *See In re Codesco Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs.").

3.      Courts routinely reject attempted waivers of surcharge rights under section 506(c).  *See In re Visual Indus., Inc.*, 57 F.3d 321, 325 (3d Cir. 1995) ("[Section] 506(c) is designed to prevent a windfall to the secured creditor . . . .  The rule understandably shifts to the secured party . . . the costs of preserving or disposing of the secured party's collateral, which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate . . . .") (internal citation omitted); *In re The Colad Group, Inc.*, 324 B.R. 208, 224 (Bankr. W.D.N.Y. 2005) (refusing to approve DIP financing with a section 506(c) wavier intact); *Kivitz v. CIT Group/Sales Fin., Inc.*, 272 B.R. 332, 334 (D. Md. 2000) (a secured party, and not other creditors, must bear the cost of preserving or disposing of its own collateral.); *In re AFCO Enters., Inc.*, 35 B.R. 512, 515 (Bankr. D. Utah 1983) ("When the secured creditor is the only entity which is benefited by the trustee's

8

work, it should be the one to bear the expense.  It would be unfair to require the estate to pay such costs where there is no corresponding benefit to unsecured creditors."); *see also In re Motor Coach Indus. Intl, Inc.*, Case No. 08-12136 (BLS) (Bankr. D. Del. Oct. 22, 2008) (Final Order Authorizing Debtors to Obtain Postpetition Financing) (D.I. 244) (removing a section 506(c) waiver from the final post-petition financing order after the creditors' committee objected to its inclusion); *In re Fedders North America, Inc.*, Case No. 07-11176 (BLS) (Bankr. D. Del. Oct. 5, 2007) (Final Order Authorizing Debtors to Obtain Postpetition Financing) (D.I.. 272) (a section 506(c) waiver in the interim post-petition financing order was removed from the final post-petition financing order after the creditors' committee objected to its inclusion).

4.      While a debtor may waive the right to surcharge under section 506(c) when a lender funds an adequate budget designed to cover expenses of the case, here no such budget is offered, and the Estates' ability to pay administrative expense claims appears highly unlikely.  Therefore, the section 506(c) waiver should be stricken from the Sharing Agreement.

**B.  The Trustee Fails to Sustain His Burden Under Sections 363(c)(2) And 704(a)(1).**

5.      Fundamental to a Court granting a trustee the right to use cash collateral is that the debtor's estate holds "an interest" in such cash.   11 U.S.C. 363(a), (c)(1) and (c)(2).  Moreover, , implicit within the statutory grant of authority to sell property under section 363 is the requirement that the estate actually have an interest in the property to be sold.  *See Gorka v. Joseph (In re Atlantic Gulf Communities Corp.*), 326 B.R. 294, 298-99 (Bankr. D. Del. 2005); *see also In re Goli Nutrition Inc.*, Case No. 24-10438 (LSS), 2024 WL 1748460, at *5 (Bankr. D. Del. April 23, 2024) (Court noting "[w]hile there may be cases to the contrary, I see nothing in section 363 of the Code that permits me to authorize the sale of property that is not property of the estate – in other words that the debtor has no interest in at all.").

6.     Here, the Motion and Sharing Agreement belie the Trustee's assumption that the Cash Collateral and Collateral to be used or sold by the Trustee is property of the Debtors' estates. Specifically, and by way of limited example, as noted in paragraph 4 of the Motion, "[p]rior to the Petition Date, the Debtors' business included the provision of premium entertainment content to value-conscious consumers through multiple streams.  Together, the Debtors comprised one of the largest advertising-supported video-on-demand companies in the United States."  The Debtors licensed the vast majority of the Media Content (*i.e.*, videos, movies, television series and other media titles) they streamed to their consumers from third parties, including studios, producers, distributors, and licensors.  Upon information and belief, post-petition the Debtors have received revenue from third parties accessing the Media Content.  HPS has swept up such revenue and the Cash Collateral that the Trustee intends to use may consist of proceeds received from such Media Content.   The licensors of the Media Content, however, have not received payment for the post-petition use of their Media Content.  Such entities and individuals likely hold competing claims and interests against the Debtors' Estates and HPS relating to the apparent ongoing use of the Media Content and the proceeds the Debtors have received therefrom without formal disclosures or reporting prior to announcement of this Sharing Agreement.  Accordingly, the Trustee's blanket request for authority to use the cash proceeds generated from such Media Content, or to pay over all proceeds received from such Media Content to HPS in the future (*see* Sharing Agreement at ¶ 13.A) should not be approved until the ownership of the proceeds and collateral is determined. *See In re Goli Nutrition Inc.*, Case No. 24-10438 (LSS), 2024 WL 1748460, at *6 (Bankr. D. Del. April 23, 2024) (concluding court must decide ownership interest before it can authorize property to be sold).

10

7.      Thus, while HPS may agree to the Trustee's use of HPS's Cash Collateral, any order approving the Motion and Sharing Agreement should make clear that the Trustee is not authorized to use any cash until the ownership interest in the property the generated such cash is determined by the Court.  Moreover, any order approving the Motion and Sharing Agreement should make clear that the Trustee is not authorized to sell any collateral and may not pay any proceeds received therefrom over to HPS, until the ownership interest in such property is determined by the Court.

8.      The Trustee similarly fails to sustain his burden under section 704(a)(1) that the cash and collateral he seeks to collect and reduce to money is property of the estate.  Again, the Motion simply assumes all cash or property to be used or sold by the Trustee is property of the Debtors' Estates.   The facts and circumstances of these cases, however, raise serious questions as to what property is property of the Debtors' Estates.  To the extent the Trustee desires to use any cash or sell any property he must first account for the Debtors' interest in such cash or property (*i.e.*, where did the cash or property originate from; when did the Debtors obtain the cash or property; what interest, if any, do the Debtors hold in the cash or property).  While HPS certainly wants to claim such cash or property as its collateral, others may have competing claims to such cash or property.

9.      Because the Trustee fails to sustain his burden under 363(c)(2) and 704(a)(1), the Motion should be denied.  Alternatively, any order approving the Motion and Sharing Agreement should make clear that the Trustee is not authorized to use any cash, or sell any property, until the Debtors' legal and equitable interest in such cash or property is determined by the Court.

### C.  The Trustee Fails To Sustain His Burden Under F.R.B.P. 9019.

10.     The Trustee similarly fails to sustain his burden that the proposed settlements set forth in the Sharing Agreement satisfy the standards applicable under F.R.B.P. 9019.  The standards

are well-established.  The Court must determine "whether the compromise is fair, reasonable, and in the interests of the estate."  *In re Marvel Entm't Group, Inc.*, 222 B.R. 243, 249 (D. Del. 1998) (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)).  The approval of compromises and settlements is committed to the sound discretion of the Court.  *See*, *e.g.*, *In re Louise's, Inc.*, 211 B.R. at 801.  To reach such a determination, the Court must assess the value of the claim that is being settled and balance it against the value to the estate of approval of the settlement.  *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).  In striking the balance, courts should consider the *Martin* factors—the probability of success in the litigation; the complexity, expense, and likely duration of the litigation; the possibilities of collecting any judgment which might be obtained; all other factors relevant to making a full and fair assessment of the wisdom of the compromise; and whether the compromise is fair and equitable to the debtors, their creditors, and other parties-in-interest.  *See Martin*, 91 F.3d at 393; *Protective Comm. For Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968).  The Court need only "canvass the issues and see whether the settlement 'falls below the lowest point in a range of reasonableness.'"  *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983) (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972) (brackets omitted), *cert. denied sub nom. Benson v. Newman*, 409 U.S. 1039 (1972)).

11.     By the Motion and Sharing Agreement, the Trustee seeks to release all of the Debtors' claims and causes of actions against HPS, direct and derivative.  **Yet the Motion fails to identify the claims the Debtors hold or have against HPS.  The Motion similarly fails to identify the value of the claims the Trustee seeks to release.**  Rather, paragraph 24 of the Motion offers the Trustee's conclusory view on only a single *Martin* factor—the complexity, expense, and likely duration of the litigation—as follows:

12

> The settlements embodied in the Sharing Agreement are far preferable to expensive and time-consuming litigation with Prepetition Secured Parties and/or a possible inability to use Cash Collateral and/or proceeds of Collateral in the absence of the Carve-Out and sharing provided for in the Sharing Agreement. Furthermore, the Trustee has taken into consideration in exercising his business judgment in entering into the Sharing Agreement and granting releases to HPS and the Pre-Petition Lenders that the Debtors on multiple occasions have already provided releases to HPS and the Pre-Petition Lenders.

Motion at ¶ 24. In essence, the Trustee prefers the settlements now in lieu of the unidentified complexity, expense, and likely duration of the litigation embodied in the Sharing Agreement, in return for immediate use of $2.3 million, which may not even be property of the Debtors' Estates—a meager pittance compared to the value of the claims against HPS the Trustee proposes to abandon by this deficient deal. *See* Motion at ¶ 14.viii; Sharing Agreement at ¶ 17. As the Court is aware, however, the Trustee has commenced the D&O Litigation, which implicates: HPS's pre-petition conduct; the August 2022 merger between Debtor Chicken Soup for the Soul Entertainment, Inc. ("CSSE") and Redbox Entertainment Inc. and related entities (the "Redbox Merger"); releases granted in favor of D&O defendants as part of the Redbox Merger;[9] and the D&O Litigation defendants' potential third-party claims against HPS. Discovery in the D&O Litigation, should the D&O Litigation not be fully dismissed pursuant to the defendants' motions to dismiss (*see* D&O Litigation D.I. 31, 33, 36, 38, 43, 45), will certainly include HPS and the damages suffered by the Debtors as a result of HPS's violations of its obligations pursuant to the Redbox Merger and related agreements to cooperate with the Debtors in approving $40.0 million in third party financing and HPS's wrongful failure to fund under the Interim DIP Financing Order as agreed. Thus, the Trustee's suggestion that complexity, expense, and likely duration of litigation will be

---

[9] Releases granted to the D&O Litigation defendants as part of the Redbox Merger, which the Trustee seeks to undo in the D&O Litigation, but not the same releases granted to HPS as part of the Redbox Merger.

avoided by the proposed settlement rings hollow. The same issues sought to be released will remain alive and a central defense theme in the D&O Litigation if not dismissed. The Trustee will end up litigating the same issues anyway given how he framed the claims in the D&O Litigation.

12. A meaningful review of the other *Martin* factors further compels denial of the Motion and the proposed settlements:

### i. Probability Of Success

13. The Trustee holds claims against HPS for the failure to honor its funding commitments under the Interim DIP Financing Order—an order approved and entered by this Court. Upon information and belief, however, HPS failed to fund over $5.0 million of the $8.0 million set forth in paragraph 1(a)(i)-(iii) of the Interim DIP Financing Order, which unfunded amounts were intended to pay employee wages and benefit obligations. Such amounts remain unpaid. For reasons unknown, and despite the passage of 15 months, the Trustee has not sought to enforce the terms of the Interim DIP Financing Order against HPS. Yet, the Motion and Sharing Agreement selectively seek to compel HPS to fund the Chapter 11 Carve-Out for the benefit of the Trustee's counsel. The Objectors respectfully submit the probability of success of enforcing the Interim DIP Financing Order and compelling HPS to fund the amounts for employee wages and benefits (over $5.0 million) weigh against approval of the settlement and in favor of the Trustee's enforcement of the Interim DIP Financing Order.

14. Absent HPS funding the remaining amounts set forth in the Interim DIP Financing Order, the Motion should be denied.

15. The probability of success in litigating the Debtors' claims and causes of action against HPS, or even seeking subordination or recharacterization of HPS's claims, also weighs against approval of the settlements. As explained in prior filings in these bankruptcy cases and the

14

D&O Litigation, HPS's actions caused the Debtors' severe financial distress and, ultimately, these bankruptcy cases.  Prior to the Redbox Merger, Redbox owed HPS and other lenders more than $350 million, secured by liens on substantially all of Redbox's assets.  *See* D.I. 283 at ¶ 13.  As part of the Redbox Merger, CSSE assumed Redbox's debt and entered into an Amended and Restated Credit Agreement ("Credit Agreement") with HPS and other lenders, pursuant to which CSSE and its subsidiaries became co-obligors on more than $350.0 million of indebtedness to HPS and pledged their ownership interests in substantially all the assets of non-Redbox subsidiaries as security in favor of HPS, which gained liens on the assets.  *See* D.I. 283 at ¶ 14; D&O Litigation D.I. 39 at 2.

16.    The viability of the Redbox Merger—and ability to service this HPS debt— expressly depended on CSSE's ability to consummate certain accounts receivable financing.  *See* D.I. 283 at ¶¶ 14-15; D&O Litigation D.I. 37 at 10.  This capital need was shared with HPS prior to the Redbox Merger, and the Credit Agreement called for CSSE to obtain working capital of up to $40.0 million pursuant to an ABL structure with a non-HPS lender, which funds were necessary to obtain new release content to revive the Redbox kiosk business.  *See* D.I. 283 at ¶¶ 14-15; D&O Litigation D.I. 37 at 10.

17.    However, once the Redbox Merger closed and HPS had upgraded its Redbox collateral to Debtors' valuable media library and assets, HPS refused to approve an ABL facility in breach of the Credit Agreement and tortiously interfered with CSSE's business relationships.  *See* D.I. 283 at ¶¶ 17-23; D&O Litigation D.I. 37 at 11.  As a result, HPS starved the Debtors of the working capital necessary for its operations, including to procure new content, leading to movie studios and others terminating their relationships with the Debtors due to their inability to pay license fees.  *See* D&O Litigation D.I. 37 at 11.  Without new content to offer customers, revenues

fell, and CSSE was unable to service the HPS debt, leading to the Debtors' bankruptcy cases.  *See id.*

18.    Between HPS's failure to fund the Interim DIP Financing in full and its wrongful conduct leading to the Debtors' financial distress and bankruptcy, the Trustee's probability of success in pursuing litigation against HPS weighs against granting Trustee's Motion.  Therefore, the Motion should be denied.

### ii.  The Possibilities Of Collecting Any Judgment Which Might Be Obtained

*19.*    This factor weighs against approval of the settlement.  HPS is an American investment firm headquartered in New York City.  The firm focuses on investments in private credit, public credit, private equity and real assets.  In 2022, HPS was ranked by *Private Debt Investor* as the third largest private debt investment company based on total fundraising over the most recent five-year period.  *See Private Debt Investor*, Dec. 2022/Jan. 2023; https://www.privatedebtinvestor.com/download-the-december-2022-january-2023-issue-of-private-debt-investor/ (last accessed Oct. 27, 2025).  In 2025, HPS became a subsidiary of BlackRock.  *See BlackRock Strikes $12 Billion Deal for HPS, Betting Big on Wall Street's Hottest Market*, THE WALL STREET JOURNAL, Dec. 3, 2024, https://www.wsj.com/business/deals/blackrock-strikes-12-billion-deal-for-hps-doubling-down-on-wall-streets-hottest-market-b5d758cd (last accessed Oct. 27, 2025)  HPS appears more than capable of satisfying any judgment the Trustee may obtain against it.

20.    While not discussed in the Motion, the Debtors' Estates hold various claims and causes of action against HPS arising out of and related to its failure to honor its funding commitments and its wrongful conduct leading to the Debtors' financial distress and bankruptcy.  HPS asserts an secured claim in excess of $500.0 million against the Debtors' estates.  In addition

to the affirmative claims and causes of action the Debtors may have or hold against HPS, the Trustee and the Debtors' Estates can seek to subordinate or recharacterize the claims asserted by HPS in these bankruptcy cases. Subordinating or recharacterizing HPS's claims does not require the collection of any judgment.

21.     To this end, to the extent the D&O Litigation is not dismissed, the D&O Litigation defendants will likely assert third-party claims against HPS, including claims for contribution. To the extent HPS is found liable for the harm and damages caused to the Debtors, and the D&O Litigation defendants are also found to be liable for such harm and damages (so that the parties are jointly and severally liable to the Debtors), then any judgment against the D&O Litigation defendants should be reduced in accordance with the Delaware Uniform Contribution Among Tortfeasors Act, 10 *Del*. *C*. § 6301 ("DUCATA"). Alternatively, the D&O Litigation defendants should be entitled to collect on any judgment they may obtain against HPS without fear that such third-party claims and judgment have been released pursuant an order approving the Motion and Sharing Agreement. Thus, to the extent the Court determines the Trustee has satisfied his burden before the Court and the Motion should be granted, the Objectors respectfully request that any order approving the Motion and Sharing Agreement contain a provision that, notwithstanding the Court's approval of the Motion and Sharing Agreement, nothing in the order or Sharing Agreement shall impair any rights, claims, or judgment that the D&O Litigation defendants may have, obtain, or hold against HPS, including any rights under the DUCATA.

### iii. All Other Factors Relevant To Making A Full And Fair Assessment Of The Wisdom Of The Compromise

22.     This *Martin* factor also weighs against approval of the settlement. Absent dismissal of the D&O Litigation and the Employee Wage and Benefit Litigation,[10] such litigation does not

---

[10] *See Skajem,* et al. *v. Chicken Soup for the Soul Entertainment, Inc.,* et al*.*, Adv. Pro. No. 24-50128 (MFW).

WBD (US) 4929-6263-7940

appear to be going away any time soon.  All third-party claims and discovery against, and including, HPS weighs against approval of the settlements.

23.    The undisputed fact that HPS failed to honor its funding commitments under the Interim DIP Financing Order—funding that was intended to pay employee wage and benefits obligations—also weighs against the wisdom of the compromise and approval of the settlement.

### iv.    <u>Whether The Compromise Is Fair And Equitable To The Debtors, Their Creditors, And Other Parties-In-Interest</u>

24.    Other than cursory statements that the Sharing Agreement is in the best interest of the Debtors' Estates (*see* Motion at ¶¶ 21, 26; Trustee's Declaration in Support of Motion, D.I. 687-3, at ¶ 2), the Motion offers no support for the proposition that the compromise is fair and equitable to the Debtors, their creditors, and other parties-in-interest.   The Motion seeks to grant the Trustee the ability to use $2.3 million of HPS's presumed cash collateral.  As noted above, though, others may have competing interests in the Cash Collateral, the proceeds received in the Debtors' bank accounts, or the Debtors' other Collateral, which the Trustee seeks to pay over to HPS.  While not mentioned in the Motion, the fees and expenses incurred by the Trustee and his retained professionals to date likely nears, if not exceeds, the $2.3 million use of Cash Collateral.  If not exhausted, the Cash Collateral will be fully utilized in the administration of the Debtors' Estates and not available to creditors.

25.    The Debtors' ability to realize value for the IP Litigation Assets—described in the Motion as consisting of "the Estates' rights to pursue litigation for copyright infringement against various third parties related to, among other claims, violations of the Digital Millenium Copyright Act for media titles owned or controlled by the Estates" (Motion at ¶ 12)—is suspect.  The Estates no longer own, nor control, any Media Content, and HPS has long since foreclosed on such Media Content.  The IP Litigation Assets, like other assets formerly held by the Estates, have evaporated.

18

More importantly, the terms and provisions of the Grove Street "offer" (*see* Motion at ¶ 12; Sharing Agreement at ¶ 14.iii) or any future sale of the IP Litigation Assets, are not before the Court, and, as such, are completely unknown.

26.     Sadly, rather than promptly monetizing the Media Content assets that were once in hand, the Debtors willingly relinquished ownership and control of such assets, leaving them vulnerable to HPS strongarming the Trustee into abandoning Debtors' claims against it in exchange for a Cash Collateral release that will bring no value to the Estate for any of the other creditors or interested parties.  Value that could and should have been realized has been lost, and the proposed settlement does nothing other than release HPS from the Estates' valuable claims and causes of action.

27.     The proposed settlement only inures to the benefit of HPS, the Trustee and his professionals, to the detriment of the Estates' creditors and other parties-in-interest.  Accordingly, the Motion should be denied, and the Trustee should reconsider a fair and equitable approach to the cases that benefits creditors and parties-in-interest.  For example, the Trustee can look to sell, through an auction or private sale, the Estates' claims and causes of action against HPS to a third party, or explore litigation funding for such claims and causes of action, or cede the Estates' derivative claims against HPS to the Estates' shareholders, creditors, or others to those who may have an interest in the derivative claims which would inure to the benefit of the Debtors' Estates. Unless and until the Trustee can prove that the Cash Collateral currently held in the Debtors' bank accounts is property of the Debtors' Estates, including that any future proceeds of accounts receivables are property of the Debtors' Estates, the Motion should be denied.

*[Remainder of page intentionally left blank]*

## Conclusion

28.    By this Objection, and for all of the foregoing reasons, the Objectors respectfully request that the Court enter an order denying the relief sought in the Motion.

Dated: October 27, 2025
Wilmington, Delaware

**WOMBLE BOND DICKINSON (US) LLP**

/s/ *Donald J. Detweiler*
Donald J. Detweiler (DE Bar No. 3087)
1313 N. Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
Email: don.detweiler@wbd-us.com

-and-

Cathy A. Hinger
(admitted *pro hac vice*)
2001 K. Street NW, Suite 400 South
Washington, D.C. 20006
Telephone: (202) 467-6900
Facsimile: (202) 467-6910
Email: cathy.hinger@wbd-us.com

-and

James S. Derrick
(admitted *pro hac vice*)
301 South College Street, Suite 3500
Charlotte, North Carolina 28202
Telephone: (704) 331-4913
Facsimile: (704) 338-7819
Email: james.derrick@wbd-us.com

*Counsel for William J. Rouhana, Jr., Amy L. Newmark, Chicken Soup for the Soul Productions, LLC, Chicken Soup for the Soul, LLC, and Chicken Soup for the Soul Holdings, LLC*

20