## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------x

| | |
|---|---|
| In re: | : Chapter 7 |
| | : |
| CHICKEN SOUP FOR THE SOUL | : Case No. 24-11442 (MFW) |
| ENTERTAINMENT, INC., *et al.*, | : |
| | : (Jointly Administered) |
| Debtors.[1] | : |
| | : **Re: Docket No. 687** |
| | : |

------------------------------------------------------------------x

### HPS INVESTMENT PARTNERS, LLC'S OMNIBUS REPLY TO OBJECTIONS TO TRUSTEE'S MOTION FOR APPROVAL OF SHARING AGREEMENT BETWEEN CHAPTER 7 TRUSTEE AND AGENT FOR THE PREPETITION LENDERS

HPS Investment Partners, LLC ("HPS" or the "Agent"),[2] by and through its undersigned counsel, respectfully submits this reply (the "Reply") in support of the *Trustee's Motion For Approval of Sharing Agreement Between Chapter 7 Trustee and Agent for the Prepetition Lenders Providing for (i) Determinations and Allowance of Secured Lender's Pre-Petition Claims and Liens; (ii) Trustee's Sale of Certain of Debtors' Assets and Secured Lender's Collateral; (iii)*

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number (where applicable), are: 757 Film Acquisition LLC (4300); CSS Entertainment, Inc. (f/k/a Chicken Soup for the Soul Entertainment Inc.) (0811); CSS Studios, LLC (f/k/a Chicken Soup for the Soul Studios, LLC) (9993); CSS Television Group, LLC (f/k/a Chicken Soup for the Soul Television Group, LLC); Crackle Plus, LLC (9379); CSS AVOD Inc. (4038); CSSESIG, LLC (7150); Digital Media Enterprises LLC; Halcyon Studios, LLC (3312); Halcyon Television, LLC (9873); Landmark Studio Group LLC (3671); Locomotive Global, Inc. (2094); Pivotshare, Inc. (2165); RB Second Merger Sub LLC (0754); Redbox Automated Retail, LLC (0436); Redbox Entertainment, LLC (7085); Redbox Holdings, LLC (7338); Redbox Incentives LLC (1123); Redwood Intermediate, LLC (2733); Screen Media Films, LLC; Screen Media Ventures, LLC (2466); and TOFG LLC (0508).

[2] HPS submits this Reply solely in its capacity as the administrative agent under that certain Amended and Restated Credit Agreement, dated as of August 11, 2022 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement,"), and that certain Amended and Restated Collateral Agreement, dated as of August 11, 2022, and the Supplement to the Amended and Restated Collateral Agreement, dated as of July 26, 2023 (collectively, as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Collateral Agreement"), among Debtor Chicken Soup for the Soul Entertainment, Inc. ("CSSE" and, together with its subsidiaries, the "Company" and, together with its Debtor affiliates, the "Debtors") and Redbox Automated Retail, LLC as borrowers, the Agent, and the lender parties thereto (collectively, the "Prepetition Lenders," and together with the Agent, the "Prepetition Secured Parties").

*Specified Carve-Out From Secured Lender Liens; and Other Matters Concerning the Trustee's Contemplated Sales and Certain Settlements* [Docket No. 687] (the "Motion") and in response to the objections filed thereto.[3]  In support of this Reply, the Agent submits the attached *Declaration of Alexey Pazukha in Support of HPS Investment Partners, LLC's Omnibus Reply to Objections to Trustee's Motion for Approval of Sharing Agreement Between Chapter 7 Trustee and Agent for the Prepetition Lenders* (the "Pazukha Dec.") and represents the following:

## BACKGROUND

1.       On June 28 and June 29, 2024 (as applicable, the "Petition Date"), each of the Debtors filed voluntary petitions for relief in the United State Bankruptcy Court for the District of Delaware (the "Court") under chapter 11 of the Bankruptcy Code.  On July 10, 2024, the Court granted the Debtors' motion to convert these bankruptcy cases from chapter 11 to chapter 7.

2.       The Agent, as the administrative agent and collateral agent for the Prepetition Lenders,[4] administers an $80 million revolving credit facility and a $325 million term loan facility under the Credit Agreement.  *See* Pazukha Dec. ¶ 5.  In addition, certain of the Prepetition Secured Parties (the "DIP Lenders") provided the Debtors with both debtor-in-possession funding (the "DIP Funding") and additional funds to enable the Debtors to pay certain D&O insurance premiums (together, the "Postpetition Funding").  *See id.* ¶¶ 8-11.

3.       In total, the claims of the Prepetition Secured Parties arising under the Credit Agreement and the Postpetition Funding exceed $500 million.  *See id.* ¶ 7.  The Prepetition Secured Parties represent the primary holders of the Debtors' senior secured debt.  *See id.*

---

[3]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

[4]     The HPS-managed Prepetition Lenders include: Aiguilles Rouges Sector B Investment Fund, L.P., American United Life Insurance Company, Brickyard Direct Holdings, L.P., Cactus Direct Holdings, L.P., Cactus Direct Lending, L.P., Core Senior Lending Fund (A-A), L.P., Core Senior Lending Fund, L.P., Core Senior Master Fund (PB), L.P., CSL Fund (PB) Holdings C, L.P., CSL Fund (PB) Holdings, B, L.P., CSL Fund (PB) Holdings, L.P., and Falcon Credit Fund, L.P.

4.      The Sharing Agreement is the latest instance of the Prepetition Secured Parties' diligent efforts to develop a viable path forward for the Debtors' estates.  Indeed, the Prepetition Secured Parties have been engaged in negotiating with the chapter 7 trustee (the "<u>Trustee</u>") to find a consensual resolution to these chapter 7 cases for more than a year, which negotiations resulted in the Sharing Agreement.  *See* Pazukha Dec. ¶ 12.  If approved, the Sharing Agreement will empower the Trustee to deploy a portion of what otherwise would be the DIP Lenders' and/or the Prepetition Secured Parties' cash collateral to fund the estates' orderly administration, including the liquidation of the estates' assets, and potentially monetize a portion of the IP Litigation Assets, over which the Prepetition Secured Parties and DIP Lenders have liens, for the benefit of the estates' other creditors.  *See* Motion ¶ 21.

## ARGUMENT

### A. The Sharing Agreement Satisfies the Requirements for Approval Under Rule 9019.

5.      As a general matter, compromises are "favored in bankruptcy."  *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (noting that compromises minimize litigation and expedite the administration of the bankruptcy estate).  Reflecting this policy, courts evaluating a settlement for approval under Federal Rule of Bankruptcy Procedure 9019 ("<u>Rule 9019</u>") analyze whether it "falls within the reasonable range of litigation possibilities."  *In re Coram Healthcare Corp.*, 315 B.R. 321, 329-30 (Bankr. D. Del. 2004) (internal citations omitted).  In other words, courts evaluate whether the settlement is "above the ***lowest*** point in the range of reasonableness." *Id.* (emphasis added).

6.      When evaluating the reasonableness of a settlement, "[t]he Court must determine whether the compromise is fair, reasonable, and in the interests of the estate."  *In re Marvel Entm't Group, Inc.*, 222 B.R. 243, 249 (D. Del. 1998) (internal citation and quotations omitted).  "To

reach such a determination, the Court must assess the value of the claim that is being settled and balance it against the value to the estate of approval of the settlement." *See In re Martin*, 91 F.3d at 393.

7.       Finally, Third Circuit courts are "admonished to avoid second-guessing the [bankruptcy] [t]rustee in the exercise of his or her business judgment." *In re Covenant Partners, L.P.*, 555 B.R. 490, 493 (Bankr. E.D. Pa. 2016) (internal citations omitted); *see In re Coram Healthcare Corp.*, 315 B.R. at 330 ("[T]he court should defer to a trustee's judgment so long as there is a legitimate business justification for his action." (internal citations omitted)).  Deference to the bankruptcy trustee is "particularly appropriate" when—as in this case— "the trustee has been appointed by the court and has served from the outset as an independent party to investigate, prosecute, and resolve the complex affairs of a defunct and troubled entity." *In re Eastwind Grp., Inc.*, 303 B.R. 743, 751 (Bankr. E.D. Pa. 2004).

8.       The Sharing Agreement, negotiated by a Trustee wholly independent of HPS, is fair, reasonable, and in the estates' interests.  The benefits of the agreement are clear:  if approved, the Trustee will gain access to sufficient funds to orderly administer these estates.  Indeed, in exercising his business judgment, the Trustee determined that the funding provided for by the Sharing Agreement is "critical to his ability to administer the Estates and liquidate the Debtors' assets[.]"  Motion ¶ 23.  The Sharing Agreement further benefits the estates by establishing a framework for the sharing of net proceeds of the IP Litigation Assets; under the Sharing Agreement, if the Trustee successfully sells the IP Litigation Assets and such assets generate any net proceeds, the estates will recover a portion of such proceeds to be distributed to unsecured creditors, notwithstanding that, absent this agreement, the Prepetition Secured Parties and/or the DIP Lenders' liens would be in a first priority position on such proceeds.  *See id.* ¶ 14(iv).

Case 24-11442-MFW    Doc 700    Filed 11/07/25    Page 5 of 11

9.     The harms of denying approval of the Sharing Agreement are equally plain.  The funds provided to the Trustee under the Sharing Agreement otherwise constitute the cash collateral of the DIP Lenders and/or the Prepetition Secured Parties and cannot be used without the DIP Lenders' and/or the Prepetition Secured Parties' consent or a showing of adequate protection (which is impossible here).  As such, if the Sharing Agreement is not approved, such funds would entirely revert to those parties, and the estates would receive nothing.  Moreover, the Sharing Agreement represents the *only* potential funding source for the orderly administration of the estates; no party is nor has been willing to infuse any material capital into these cases.  "Without the funds provided and made available under the Sharing Agreement, the Trustee would not be able to administer the Estates nor attempt to sell the IP Litigation Assets, and the Estates' unsecured creditors would have no prospect for payment therefrom."  *Id.* ¶ 21.  Thus, absent approval of the Sharing Agreement, this bankruptcy will languish, and the potential value of the estates' assets will remain unrealized.

10.     In addition, approving the Sharing Agreement will not impose any substantial costs on the estates.  In their objections to the Motion, certain objectors[5] argue that the release (the "Release") in the Sharing Agreement of the Debtors' claims and causes of actions against the Prepetition Secured Parties fails to meet the standards of Rule 9019.  Not so.  The Release in effect

---

[5]     *See, e.g., William J. Rouhana, Jr., Amy L. Newmark, Chicken Soup For The Soul Productions, LLC, Chicken Soup For The Soul, LLC, and Chicken Soup For The Soul Holdings, LLC's Objection to Trustee's Motion for Approval of Sharing Agreement Between Chapter 7 Trustee and Agent for the Prepetition Lenders Providing for (I) Determinations and Allowance of Secured Lender's Pre-Petition Claims and Liens; (II) Trustee's Sale Of Certain Of Debtors' Assets and Secured Lender's Collateral; (III) Specified Carve-Out from Secured Lender Liens; and Other Matters Concerning the Trustee's Contemplated Sales and Certain Settlements* [Docket No. 695] (the "Rouhana Obj."); *Limited Objection and Reservation of Rights to Trustee's Motion for Approval of Sharing Agreement Between Chapter 7 Trustee and Agent for the Prepetition Lenders Providing for (I) Determinations and Allowance of Secured Lender's Pre-Petition Claims and Liens; (II) Trustee's Sale Of Certain Of Debtors' Assets and Secured Lender's Collateral; (III) Specified Carve-Out from Secured Lender Liens; and Other Matters Concerning the Trustee's Contemplated Sales and Certain Settlements* [Docket No. 692] (the "Former Employee Obj.");

5

is merely a belt-and-suspenders provision that affirms *prior* releases the Debtors and the estates have *already* granted both the Agent and the Prepetition Lenders. *See* Motion ¶ 24. Indeed, in agreeing to the Release, the Trustee specifically took into consideration that "the Debtors on multiple occasions have already provided releases to [the Agent] and the Pre-Petition Lenders." *Id.*

11.     In particular, as part of the Forbearance Agreement entered into by the Prepetition Secured Parties and CSSE on April 29, 2024 [Docket No. 29-3 at 13] (the "<u>Forbearance Agreement</u>"), the Debtors granted each Prepetition Secured Party a broad release of any action, claim, or cause of action the Debtors may hold against such party arising from or concerning the Credit Agreement, any other loan document, and/or related transactions.[6] Additionally, as part of the DIP Funding agreement, the Debtors agreed to provide releases for any claims or causes of actions relating to or arising out of the DIP Facility or the Prepetition Facility.[7] As the Agent's

---

[6]     *See* Forbearance Agreement § 8:

> "Release. (a) Each Credit Party, on behalf of itself, its Subsidiaries and Affiliates (including, without limitation, William J. Rouhana, Jr. and his affiliated entities) . . . does hereby fully, finally, and forever remise, release and discharge . . . the Agent and the [Prepetition] Lenders . . . from any and all manner of action and actions, cause and causes of action, [and] claims . . . on account of any liability, obligation, demand or cause of action of whatever nature, which are based on any act, circumstance, fact, event or omission or other matter, cause or thing . . . directly or indirectly arising out of, connected with, in respect of or relating to the Credit Agreement or any other Loan Document and the transactions contemplated thereby, and all other agreements, certificates, instruments and other documents and statements . . . related to any of the foregoing . . . ."

[7]     *See* Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief [Docket No. 85] (the "<u>Interim DIP Order</u>") ¶ G(viii):

> "Release. Effective as of the date of entry of this Interim Order, each of the Debtors and . . . their estates . . . hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the Prepetition Secured Parties, the DIP Secured Parties, and each of their respective Representatives (in their capacity as such) (collectively, the 'Released Parties') from any and all liability to the Debtors (and their successors and assigns) and from any and all claims, [ ] actions and causes of action of any kind, nature, and description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen . . . in each case arising out of or related to the Prepetition Loan Documents, the DIP Facility, the DIP Documents, the DIP Loans, the negotiation thereof and the transactions and agreements reflected thereby, that the Debtors at any time had, now have or may have, or that their predecessors, successors or

relationship to the Debtors arises solely under these contracts, the Debtors have already released all claims against the Prepetition Secured Parties. Simply put, the Release does not release any rights or claims that the estates still have; instead, it is effectively a commitment to uphold obligations to which the estates are already subject. It is not unreasonable for the DIP Lenders and the Prepetition Secured Parties, in agreeing to allow the use of their cash collateral and the sale of the IP Litigation Assets, to demand that the Trustee reconfirm these already-provided releases on behalf of the estates.

12.     The Sharing Agreement satisfies the requirements for approval under Rule 9019. It offers significant—if not *essential*—benefits to the estates without imposing substantial costs.

### B. The Trustee Properly Determined that the Prepetition Secured Parties Have Valid and Enforceable Liens Over the Collateral at Issue.

13.     Certain of the objectors also question whether the Agent has a valid lien over the cash and property the Trustee intends to use or sell pursuant to the Motion and Sharing Agreement. *See, e.g.*, Rouhana Obj. at 4. They assert that this issue must be resolved before the Court may grant the requested relief. *See id.*

14.     This argument misconstrues the standard under Rule 9019. To obtain approval of a proposed settlement, the Trustee need only show that he made an "informed judgment after diligent investigation," *see Kowal v. Malkemus (In re Thompson)*, 965 F.2d 1136, 1145 (1st Cir. 1992); the Trustee does not bear the burden of proving the validity of every claim and lien at issue with certainty. Indeed, when evaluating a proposed settlement under Rule 9019, a court's responsibility "is not to decide the numerous questions of law and fact raised [by the settlement's

---

assigns at any time had or hereafter may have against any of the Released Parties for or by reason of any act, omission, matter, or cause arising at any time on or prior to the date of this Interim Order."

objectors] but rather canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983) (internal citation and quotations omitted). And, in conducting this inquiry, courts should "avoid second-guessing the Trustee in the exercise of his or her business judgment." *In re Covenant Partners, L.P.*, 555 B.R. at 493 (internal citations omitted).

15.     The Debtors have already affirmed the validity, perfection, and priority of liens granted pursuant to the Credit Agreement and Collateral Agreement[8] and the DIP Funding.[9] *See* Pazukha Dec. ¶ 6; Motion ¶ 7 ("[T]he Debtors affirmed the validity, perfection, and priority of the liens granted pursuant to the Credit Agreement and Collateral Agreement[.]"). Accordingly, after investigating the claims and liens of the Prepetition Secured Parties and conducting an arm's-length negotiation, the Trustee was satisfied that such claims and liens as described in the Sharing Agreement are legal, valid, binding, and enforceable in accordance with their terms. *See* Motion ¶ 24. As such, the Trustee satisfied his burden under Rule 9019, and the Court may approve the proposed settlement.

### C. The Objections' Allegations Concerning the Agent's Conduct Are Without Merit.

16.     As described above, the Debtors and their estates have *already* granted the Agent broad releases for all claims and causes of action relating to or arising from (i) the Credit Agreement and the transactions contemplated thereby and (ii) the DIP Funding. Ignoring this

---

[8]     Copies of documents evidencing that the Prepetition Secured Parties' security interests in the collateral were perfected were filed as exhibits to *HPS Investment Partners LLC's Motion for Relief from the Automatic Stay* [Docket No. 243].

[9]     *See* DIP Term Sheet [Docket No. 85-1] at 4 ("All of the liens described herein with respect to the assets of the Loan Parties shall be effective and perfected as of the Interim Order Entry Date."); Interim DIP Order ¶ G(iv).

reality, certain of the objections,[10] pointing to spurious allegations of the Agent's failure to fully fund the DIP Funding and failure to approve other financing, assert that valuable estate claims or causes of action may exist against the Agent and/or the Prepetition Lenders.  This assertion is false.

17.    Contrary to the objections' claims, the Agent did not "fail to fund the Interim DIP Financing" (Rouhana Obj. ¶ 18; *see also* Former Employee Obj. ¶¶ 10, 19).  In fact, the opposite is true: the Agent promptly funded the DIP Funding each time it received a borrowing notice. Pazukha Dec. ¶¶ 8-10.  The Interim DIP Order authorized the DIP Funding to be used only for certain permitted uses: up to $3.5 million for past due payroll and payroll due on July 5, 2024; up to $2.85 million for payroll deductions; and up to $1.65 million for payments for healthcare premiums.  *See* Interim DIP Order ¶ 1(a).  Moreover, the Interim DIP Order authorized the Debtors to obtain the DIP Funding subject to the terms and conditions set forth in the term sheet attached thereto.  *See id.* at 2-3.  Pursuant to that term sheet, a condition precedent to the Prepetition Secured Parties' funding of any portion of the DIP Funding was the Agent's receipt of a borrowing notice from the Debtors.  *See* DIP Term Sheet [Docket No. 85-1] at 8.  The Agent received three such borrowing notices from the Debtors, totaling approximately $3.295 million.  Pazukha Dec. ¶ 10. The Agent promptly funded all amounts in response to such borrowing notices.  *Id*.  The Agent never received any further borrowing notices.  *Id.*  As such, the Agent *cannot* be said to have "failed" to fund; it promptly funded every time it was asked.[11]  It was simply never *asked* to fund

---

[10]    *See* Rouhana Obj. ¶ 18; Former Employee Obj. ¶ 10 (noting that the Sharing Agreement may "release or compromise potential claims the Estate may have against HPS relating to the failure to provide interim DIP financing").

[11]    Indeed, the Agent has consistently acted to promptly provide funding to the Debtors in these cases.  For example, on July 31, 2024, the Prepetition Secured Parties funded $200,000 to the Trustee for the sole purpose of paying outstanding Directors & Officers ("D&O") insurance premiums owed by the Debtors.  *See* Pazukha Dec. ¶ 11. Had those outstanding premiums not been paid, the Debtors' D&O insurance policy likely would have been canceled and all claims thereunder lost.

the additional amounts—perhaps because the additional amounts could not be used for their permitted uses or perhaps for other reasons unknown to the Agent.

18.     The objections' false and misleading attempts to illustrate causes of action against the Agent, the Prepetition Lenders, and/or the DIP Lenders should be overruled.  Indeed, no valid claims against such parties exist.  And even if they did, as described *supra*, the Prepetition Secured Parties and the DIP Lenders have already been granted prior releases by the Debtors and the estates.

## CONCLUSION

19.     For these reasons and those stated in the Motion, the Agent respectfully requests that the Court grant the relief requested by the Motion and deny the objections.  The Agent reserves all rights in connection with the Motion and the Reply, including the right to supplement this Reply and participate in any related hearing.

*[Remainder of page intentionally left blank]*

Dated: November 7, 2025
       Wilmington, Delaware

*/s/ Russell C. Silberglied*
Mark D. Collins (No. 2981)
Russell C. Silberglied (No. 3462)
Emily R. Mathews (No. 6866)
Alexander R. Steiger (No. 7139)
**RICHARD, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Email:  collins@rlf.com
       silberglied@rlf.com
       mathews@rlf.com
       steiger@rlf.com

-and-

Dennis F. Dunne (admitted *pro hac vice*)
Matthew Brod (admitted *pro hac vice*)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone:  (212) 530-5000
Email:  ddunne@milbank.com
       mbrod@milbank.com

Andrew M. Leblanc (admitted *pro hac vice*)
**MILBANK LLP**
1101 New York Ave. NW
Washington, D.C. 20005
Telephone:  (202) 835-7500
Email:  aleblanc@milbank.com

*Counsel to HPS Investment Partners, LLC*