**Exhibit A**

**Proof of Claim No. 459-1 Filed January 5, 2026**

Fill in this information to identify the case:

Debtor 1 Chicken Soup for the Soul Entertainment, Inc.

Debtor 2 (Spouse, if filing)

United States Bankruptcy Court for the: District of Delaware

Case number 24-11442-MFW

Official Form 410

# Proof of Claim

04/25

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

## Part 1: Identify the Claim

**1. Who is the current creditor?**

Erica L. Rapp
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Name: Ralph E. Preite, Esq.
Number Street: 333 Earle Ovington Blvd., 2nd Floor
City: Uniondale State: NY ZIP Code: 11553
Contact phone: 516-357-3802
Contact email: rpreite@cullenllp.com

**Where should payments to the creditor be sent?** (if different)

Name
Number Street
City State ZIP Code
Contact phone
Contact email

Uniform claim identifier (if you use one):

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) ______ Filed on MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing?

**Part 2: Give Information About the Claim as of the Date the Case Was Filed**

6. **Do you have any number you use to identify the debtor?**
☑ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

7. **How much is the claim?** $ $278,357

**Does this amount include interest or other charges?**
☐ No
☒ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).
See Addendum, paragraph 11 for itemization.

8. **What is the basis of the claim?**
Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card
Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).
Limit disclosing information that is entitled to privacy, such as health care information.

Investment, Credit Agreement

9. **Is all or part of the claim secured?**
☑ No
☐ Yes. The claim is secured by a lien on property.

**Nature of property:**
☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.
☐ Motor vehicle
☐ Other. Describe: ____________________

**Basis for perfection:** ____________________
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $__________
**Amount of the claim that is secured:** $__________
**Amount of the claim that is unsecured:** $__________ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $__________

**Annual Interest Rate** (when case was filed)______%
☐ Fixed
☐ Variable

10. **Is this claim based on a lease?**
☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $__________

11. **Is this claim subject to a right of setoff?**
☑ No
☐ Yes. Identify the property: ____________________

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | **Amount entitled to priority** |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ |
| ☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ |
| ☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $ |

* Amounts are subject to adjustment on 4/01/28 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(3) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date 12/30.2025 (MM / DD / YYYY)

Signature: Erica L Rapp

**Print the name of the person who is completing and signing this claim:**

| | | | |
|---|---|---|---|
| Name | Erica (First name) | L. (Middle name) | Rapp (Last name) |
| Title | | | |
| Company | Identify the corporate servicer as the company if the authorized agent is a servicer | | |
| Address | 5610 Fleming Rock Lane (Number Street) | | |
| | Fulshear (City) | TX (State) | 77441-1520 (ZIP Code) |
| Contact phone | 281-736-5199 | Email | |

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| In re:<br><br>CSS ENTERTAINMENT INC. (f/k/a CHICKEN SOUP FOR THE SOUL ENTERTAINMENT INC.), *et al*[1],<br><br>Debtors. | Chapter 7<br><br>Case No. 24-11442 (MFW)<br>(Jointly Administered) |
|---|---|

**ADDENDUM TO PROOF OF CLAIM FILED BY ERICA L. RAPP**

The following constitutes a brief summary of the claims held by Erica L. Rapp ("**Ms. Rapp**") against CSS Entertainment Inc., f/k/a Chicken Soup for the Soul Entertainment Inc., *et al* (the "**Debtors**"), in connection with the promissory note due July 31, 2025 issued by the debtor Chicken Soup for the Soul Entertainment, Inc.

1. Ms. Rapp reserves the right to amend and/or supplement this Proof of Claim in all respects, including, without limitation, to add additional components of its claim amount as well as documentation supporting its claim.

**Exhibits**

2. Annexed as Exhibit A is a ***Confirmation Notice*** dated April 22, 2022 issued by American Capital Partners, LLC confirming Ms. Rapp's $ 248,500.00 purchase of 10,000 units at $24.85 per unit of CHICKEN SOUP FOR THE SOUL ENTERTAINMENT INC. 9.50% notes due July 31, 2025, and ***Account Statement*** dated April 2023 issued by American Capital Partners LLC showing the holding.

3. Annexed as Exhibit B is the ***Prospectus Supplement*** annexed to the Prospectus dated June 24, 2021 issued by CHICKEN SOUP FOR THE SOUL ENTERTAINMENT INC. (Registration No. 333-257057).

**The Debtor**

4. On **June 28, 2024** (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §101, *et seq*. (the "**Bankruptcy Code**").

5. Twelve days later, on July 10, 2024, the cases converted to Chapter 7.

---

[1]The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number (where applicable), are: 757 Film Acquisition LLC (4300); CSS Entertainment, Inc. (f/k/a Chicken Soup for the Soul Entertainment Inc.) (0811); CSS Studios, LLC (f/k/a Chicken Soup for the Soul Studios, LLC) (9993); CSS Television Group, LLC (f/k/a Chicken Soup for the Soul Television Group, LLC); Crackle Plus, LLC (9379); CSS AVOD Inc. (4038); CSSESIG, LLC (7150); Digital Media Enterprises LLC; Halcyon Studios, LLC (3312); Halcyon Television, LLC (9873); Landmark Studio Group LLC (3671); Locomotive Global, Inc. (2094); Pivotshare, Inc. (2165); RB Second Merger Sub LLC (0754); Redbox Automated Retail, LLC (0436); Redbox Entertainment, LLC (7085); Redbox Holdings, LLC (7338); Redbox Incentives LLC (1123); Redwood Intermediate, LLC (2733); Screen Media Films, LLC; Screen Media Ventures, LLC (2466); and TOFG LLC (0508).

**Ms. Rapp's Note Claim Against the Debtor**

6. Ms. Rapp holds 10,000 of the debtor's 9.50% Notes due July 31, 2025 (Nasdaq: CSSEN), purchased on April 20, 2022 at $24.85 per $25.00 note for a total purchase price of $248,500.00. As of the April 30, 2023 Account Statement, annexed hereto as Exhibit A, Ms. Rapp continued to hold 10,000 notes, reflecting annualized coupon income of $23,750.00 (9.50% of $250,000 par).

7. The Notes are the debtor's direct, unsecured obligations, rank *pari passu* with the debtor's other unsecured unsubordinated indebtedness and are not guaranteed by any third party. They are effectively subordinated to all existing and future secured indebtedness to the extent of the value of the assets securing such indebtedness and structurally subordinated to the obligations of the debtor's subsidiaries.

8. The Notes bear interest at a fixed rate of 9.50% per year, payable quarterly on March 31, June 30, September 30, and December 31, with a stated maturity of July 31, 2025. The Notes are not subject to a sinking fund, and holders do not have the option to require repayment prior to maturity.

9. Upon an Event of Default—including nonpayment of principal when due, nonpayment of interest not cured within 30 days, certain covenant breaches, or specified bankruptcy events—the trustee or holders of at least 25% in principal amount may declare the Notes immediately due and payable, subject to specified cure and waiver provisions.

10. Accordingly, Ms. Rapp asserts a claim for the outstanding principal amount of the Notes held, together with all accrued and unpaid interest through the Petition Date and any other amounts due under the Indenture governing the Notes. The principal amount associated with the Ms. Rapp's 10,000 notes equals $250,000.00 (10,000 x $25.00), as reflected by the annualized interest shown on the Account Statement annexed hereto as Exhibit A, with a historical purchase price of $248,500.00. Interest in the amount of $29,857.00 accrued pre-petition. The sum due on the Petition Date was and remains $278,357.00., as follows:

| | |
|---|---|
| 248,500.00 | initial indebtedness |
| 29,857.00 | accrued interest pre-petition |
| 278,357.00 | balance due (princ & int) as of petition date |

**Reservation of Rights**

11. The filing of this Proof of Claim is not intended and should not be construed to be an election of remedies, waiver of any past, present or future defaults or events of default, or a waiver or limitation of any rights, remedies, claims or interest of Ms. Rapp.

12. Ms. Rapp reserves all rights accruing to it at law, in equity, and otherwise, including, without limitation, its rights and claims against the Debtor and/or guarantors. Ms. Rapp reserves the right to amend or supplement this Proof of Claim or to file additional proofs of claim for additional claims, at law or in equity, arising prior to, on or after the Petition Date. Ms. Rapp also reserves the right to file further documentation setting forth and documenting its claims to, or to recalculate its claims, costs and legal fees, and/or to amend its claims to these amounts to include other components of the claims.

13. This Proof of Claim is filed under the compulsion of the bar date established in this chapter 7 case and is filed to protect Ms. Rapp from forfeiture of its claim by reason of such bar date. The

Case 24-11442-MFW Doc 736-4 Filed 01/12/26 Page 7 of 49

filing of this Proof of Claim is not and shall not be deemed or construed as (i) a waiver or release of Ms. Rapp's rights against any person, entity or property; (ii) a consent by Ms. Rapp as to the jurisdiction of this Court or any other court with respect to proceedings commenced in any case against or otherwise involving Ms. Rapp; (iii) a waiver or release of Ms. Rapp's right to trial by jury in this Court or any other court in any proceedings as to any and all matters so triable herein, whether or not the same be designated legal or private rights or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. §157(b)(2) and whether such jury trial right is pursuant to statute or the United States Constitution; (iv) a consent by Ms. Rapp to a jury trial in this Court or any other court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. §157(e) or otherwise; (v) a waiver or release of Ms. Rapp's right to have any and all final orders in any and all non-core matters or proceedings entered only after *de novo* review by a United States District Court Judge; (vi) a waiver of the right to move to withdraw the reference with respect to the subject matter of this Proof of Claim; any objection thereto or other proceeding which may be commenced in this case against or otherwise involving Ms. Rapp; (vii) an election of remedies; or (viii) an acknowledgment that Ms. Rapp received adequate notice of the bar date.

14. All notices concerning this Proof of Claim shall be sent to each of the following:

Cullen and Dykman LLP
Attn: Ralph E. Preite, Esq.
333 Earle Ovington Boulevard, 2nd Floor
Uniondale, New York 11553
M: (212) 380-6878
T: (516) 357- 3802
F: (516) 357-3792
E: rpreite@cullenllp.com

and

Cullen and Dykman LLP
Kyri Christodoulou, Esq.
One Battery Park Plaza, 34th Floor
New York, New York 10004
T: 212.701.4170
F: 212.742.1219
E: kchristodoulou@cullenllp.com

and

Ms. Erica L Rapp
5610 Fleming Rock Lane
Fulshear TX 77441-1520

**-o-**

**<u>Exhibit A</u>**

Confirmation Notice dated April 22, 2022 and Account Statement Dated April 2023



ORIGINAL

MEMBER FINRA • SIPC • MSRB

## CONFIRMATION NOTICE

| TRANSACTION DATE | ACCOUNT NUMBER |
|---|---|
| 04/20/2022 | [redacted]205 |
| **SETTLEMENT DATE** | **ACCOUNT TYPE** |
| 04/22/2022 | CASH 0307 |
| **PROCESSING DATE** | **TRANSACTION TYPE** |
| 04/20/2022 | 77 |

ERICA L RAPP

***WE CONFIRM THE FOLLOWING TRANSACTION(S):***

| DESCRIPTION | SYMBOL | CUSIP | |
|---|---|---|---|
| | CSSEN | 16842Q308 | YOU BOUGHT |

CHICKEN SOUP FOR THE SOUL
ENTERTAINMENT INC 9.50% NOTES
DUE 2025
DUE 07/31/2025 09.500%
07/13/20 DATED DATE
SOLD PURSUANT TO REGISTRATION
STATEMENT/PROSPECTUS AVAILABLE
GO TO WWW.SEC.GOV/EDGAR.SHTML
OR FA FOR FINAL PROSPECTUS

MOODY N/A S&P N/A
DONE AWAY
SOLICITED
CALLABLE
STATEMENT/PROSPECTUS AVAILABLE
GO TO WWW.SEC.GOV/EDGAR.SHTML
OR FA FOR FINAL PROSPECTUS
CALLABLE 07/31/22 AT 25.00
**POSSIBLE NON−INVESTMENT GRADE**

PFD, BOND, PKG PROD (FUND,UIT)
**DETAIL AT WWW.RBCWM−USA.COM**
**/LEGAL/RBC−WM/FILE−804881.PDF**
TIME OF EXECUTION 14:47:15
EASTERN DAYLIGHT TIME

| QUANTITY | PRICE | PRINCIPAL/ GROSS AMOUNT | ACCRUED INTEREST | COMMISSION | MARK UP/DOWN PER SHARE | OTHER FEES/ SERVICE CHARGE | SALES CHARGE RATE |
|---|---|---|---|---|---|---|---|
| 10000 | 24.85 | 248500.00 | 0.00 | | | 0.00 | |
| 10000 | | 248500.00 | 0.00 | | | 0.00 | |

THANK YOU

IMPORTANT TAX INFORMATION
PLEASE RETAIN FOR YOUR RECORDS
PLEASE MAKE CHECKS PAYABLE TO:
RBC CLEARING & CUSTODY
PLEASE REVIEW YOUR CONFIRMATION FOR ACCURACY. IF YOU HAVE ANY QUESTIONS PLEASE CONTACT THE COMPLIANCE DEPARTMENT AT 1−866−298−1903

| NET AMOUNT |
|---|
| 248500.00 |

***YOUR FINANCIAL PROFESSIONAL:***
ANTHONY GARDINI / EDWARD CAHILL
T60NY N01
**631−851−0918**
**800−393−0493**
SERVICE CHARGE IS ADDITIONAL REVENUE TO AMERICAN CAPITAL PARTNERS LLC AND MAY VARY BY REPRESENTATIVE AND/OR BRANCH.

**Conditions**

- RBC Capital Markets, LLC (RBC), Member NYSE/FINRA/SIPC, is an indirect, wholly owned subsidiary of Royal Bank of Canada. Trades are cleared and settled and accounts are carried by RBC Clearing & Custody (RBC C&C), a division of RBC Capital Markets, LLC.
- This transaction is subject to the rules, regulations, practices, and customs of the exchange and its clearinghouse, if any, where the transaction was executed, or of the Financial Industry Regulatory Authority if not executed on an exchange. This transaction may have incurred other fees which may include handling fees or transaction fees paid to an exchange. A complete breakdown of fees associated with this transaction will be provided upon your written request.
- RBC C&C will also provide upon written request the date and time when this transaction took place and the name of the other party to the transaction.
- Any order for your account(s) may be aggregated with orders for the account(s) of other clients and executed as one order. As a result, you may receive a price or average price that is different than the price or average price that you would have received had your order not been aggregated. In addition, aggregation of your order with orders of other clients may result in your order being only partially completed.
- RBC C&C has established electronic connectivity with broker-dealers and/or other market centers (collectively, "market centers") for the purpose of routing orders in equity securities and options for executions. These connections have been entered into based upon the execution quality provided by these market centers, evaluated on the basis of price improvement performance, liquidity enhancement, and speed of execution. For options orders, RBC C&C receives payment in the form of rebates and credits against fees in return for routing client orders. Any remuneration that RBC C&C receives for directing orders to any market center will not accrue to your account. RBC C&C contracts with a third-party vendor, S3 Matching Technologies, LP, to receive metrics to meet its best execution requirements under FINRA rules. RBC C&C has arrangements for its market centers to remit payment for a portion of this service based on previous years' volumes routed to each destination. RBC C&C may execute the order itself or with other market centers. The source and nature of the compensation received by RBC C&C in connection with the transaction described on this confirmation will be provided upon your written request. For information with respect to RBC C&C's handling of customer orders see "SEC Oder Handling Disclosures" at www.rbccustodyandclearing.com/legal/. Should you desire a written copy of this information, contact your financial professional.
- Your brokerage firm may choose to execute trades away from RBC C&C. It is the firm's responsibility to disclose any cash payment it may receive for order routing arrangements it directs to persons other than RBC C&C as well as to assess the quality of the market for trades executed away from RBC C&C.
- If this transaction involves when-issued securities, payment therefor and delivery thereof shall be made in accordance with the terms of a subsequent confirmation to be delivered on the date the securities are issued.
- Complete information about call features will be provided upon request. In the case of debt securities, call features may exist which could affect yield. In the case of an asset-backed security (securities which represent an interest in or are secured by a pool or receivables or other financial assets that are subject to continuous payment) may vary according to the rate at which the underlying assets are prepaid. Additional information concerning the factors that affect yield will be provided upon written request.
- If this is an averaged price transaction, details regarding the actual prices are available upon request.
- Payment for securities purchased and delivery of securities sold are due promptly on the settlement date. Until payment is made by you, securities purchases by you or held by us for your account are or may be hypothecated and commingled with securities carried for other clients. If payment or delivery is not made by the settlement date, we reserve the right without further notice to charge interest on the amount due shown on the face hereof, at our current rate on client general accounts, or to sell securities purchased and hold you liable for any loss thereby incurred, or to cancel this transaction.
- This confirmation shall be deemed to be correct unless written notice of correction is immediately delivered to us.
- You may be eligible for breakpoint discounts based on the size of your purchase, current holdings, or future purchases. The sales charge you paid may differ slightly from the prospectus-disclosed rate due to rounding calculations. Please refer to the Prospectus or Statement of Additional Information, or contact your Financial Professional for further information.
- Auction Rate Securities: See "Auction Rate Procedures" on our public website at rbcwm.com/disclosures for a written description of our material auction practices and procedures. Please contact your Financial Professional to request that a copy be mailed to you.
- Variable Rate Demand Bonds/Notes/Obligations: See "Variable Rate Demand Notice" on our public website at rbcwm.com/disclosures for a notice regarding the risk considerations relating to the Remarketing Agent's role and duties. Please contact your Financial Professional to request that a copy be mailed to you.
- This transaction may be subject to the "U.S. Treasury Securities Fails Charge Trading Practice" and the "Agency Debt and Agency Mortgage-Backed Securities Fails Charge Trading Practice," published by the Treasury Market Practices Group and the Securities Industry and Financial Markets Association and available at: www.sifma.org/resources/general/fails-charge-trading-practices/
- For a buy, any mark-up is calculated as the price you paid for the security in this transaction minus the prevailing market price of the security at the time you bought it. For a sell, any mark-down is calculated as the prevailing market price of the security at the time you sold it minus the amount you received in this transaction.

***PLEASE RETAIN THIS CONFIRMATION FOR INCOME TAX PURPOSES.***

***Transaction Type Code (first digit defines Market and second digit defines Capacity)***

**Market**

| Code | Market |
|---|---|
| 1 | New York Stock Exchange |
| 2 | NYSE Alternext/NYSE AMEX Options |
| 3 | Market/Exchange of execution available upon request |
| 4 | Mutual Funds |
| 5 | CBOE Options or Canadian Stock Exchange |
| 6 | Over the Counter |
| 7 | Syndicate |
| 8 | Foreign Stock Exchanges |
| 9 | NASDAQ/NASDAQ Options Market |
| A | Chicago Stock Exchange |
| B | National Stock Exchange |
| C | NASDAQ OMX BX/Boston Options Exchange |
| D | International Securities Exchange |
| E | ARCA/Pacific Stock Exchange |
| F | NASDAQ OMX PHLX Stock Exchange |
| O | Other Exchange |

**Capacity in which we are acting**

| Code | Capacity |
|---|---|
| 1-5 | As agent |
| 6 | We have acted as agent for both buyer and seller; source and amount of our commissions or other remunerations in this trade will be provided upon written request. |
| 7 | We, as principal, have sold to you or bought from you and may have received a profit from the transaction. |
| 8 | Special: No commission is being charged to you. We are being paid a commission by the other party to this transaction. Details available on written request. |
| 9 | As specialist, we are a specialist in this security and we are acting for our own account in this transaction. |

*If the letter "P" appears in the transaction type box, postage and handling fees have been charged and are included in the Commission/Handling amount.*

***Credit Ratings*** – by Moody's/Standard & Poor's (Ratings are either short-term or long-term, depending on the duration of the note.)

| Rating | Description |
|---|---|
| **Non-Rated** | |
| NR | Not being rated by the rating agencies does not necessarily reflect credit-worthiness. |
| **Withdrawn Rating** | |
| WR | Formerly rated by Moody's but withdrawn for either business or credit concerns. |
| **Issue Rating** | The optimal rating available on a note, including all insurance and enhancement programs. |
| **Underlying Rating** | The rating of the note solely based on the issuer's payment ability exclusive of insurance and enhancement programs. |
| **Investment Grade** | |
| Aaa/AAA | Highest possible rating; optimal ability to pay principal and interest until maturity. |
| Aa3 to Aa1/ AA- to AA+ | High quality; excellent ability to pay principal and interest until maturity. |
| A3 to A1/A- to A+ | Good ability to pay principal and interest until maturity. |
| Baa3 to Baa1/BBB- to BBB+ | Adequate ability to pay principal and interest until maturity. |
| **Non-Investment Grade** | |
| Ba3 to Ba1/BB- to BB+ | Speculative; marginal ability to pay principal and interest until maturity. |
| Ba to B3/B- to B+ | Highly speculative; very questionable ability to pay principal and interest until maturity. |
| C to Caa1 /D to CCC+ | Either high risk of default or currently in default. |

Additional information regarding the risks associated with "Non-Investment Grade" bonds is available upon request.

# - Issue secured by escrowed funds held in trust which are reinvested in direct, non-callable U.S. Government obligations or non-callable obligations unconditionally guaranteed by the U.S. Government or Resolution Funding Corporation.



American Capital Partners, LLC
205 Oser Avenue
Hauppauge, New York 11788
MEMBER FINRA • SIPC • MSRB

# INDIVIDUAL RETIREMENT ACCOUNT STATEMENT

**APRIL 1, 2023 - APRIL 30, 2023**

Account number: [redacted]
Page 1 of 6

ERICA L RAPP
[redacted]

T60NY
N01

## ACCOUNT VALUE SUMMARY

| | THIS PERIOD | THIS YEAR |
|---|---|---|
| **Beginning account value** | $[redacted] | [redacted] |
| Income | [redacted] | [redacted] |
| Change in asset value | [redacted] | [redacted] |
| **Ending account value** | [redacted] | [redacted] |

**Estimated annualized income** [redacted]

*Please see "About Your Statement" on page 2 for further information.*

**Individual Retirement Account**

**Your Financial Professional**
Anthony Gardini / Edward Cahill
205 Oser Ave
Hauppauge, NY 11788
Telephone: (631) 851-0918 or (800) 393-0493
Fax: (631) 234-1311
E-mail: ecahill@acpweb.com

## YOUR MESSAGE BOARD

*Consider combining all your brokerage accounts at American Capital Partners, a full-service firm for all your investment needs. For details, call your representative.*

*Whether you want to build, preserve, enjoy, or share your hard-earned wealth, we're here to help. For questions about your account, please contact your financial professional, who will be happy to assist you.*

**ERICA L RAPP**
**INDIVIDUAL RETIREMENT ACCOUNT**

**GO PAPERLESS** – Certain client documents are available for electronic delivery by accessing your account online at www.Investor-Connect.com or your broker dealer's website. Upon signing up for this service, you will choose which documents you do not want to receive in the mail. You will then be notified by email when they are available for viewing and printing via the Internet. You may change your paperless elections at any time by going to the Online Documents page on the website.

**ABOUT YOUR ACCOUNT** – RBC Capital Markets, LLC, through the courtesy of RBC Clearing & Custody, a division of RBC Capital Markets, LLC (RBC), carries your account and acts as your custodian for funds and securities deposited with us directly by you, through your brokerage firm or as a result of transactions we process for your account. Inquiries concerning the positions and balances in your account may be directed to us at 612-371-7830. All other inquiries regarding your account or the activity therein should be directed to your brokerage firm. **Please review your account statement in its entirety. If you note any discrepancies in your money balance, security positions, tax lots chosen for disposition, or unauthorized activity in your account, report it immediately to your brokerage firm and RBC. In addition, you should reconfirm in writing any oral communications with your brokerage firm or us (RBC Clearing & Custody, Attn: Client Service Team, 250 Nicollet Mall, Suite 1700, Minneapolis, MN 55401-1931) to further protect your rights, including your rights under the Securities Investor Protection Act (SIPA).** A Statement of Financial Condition for RBC is available on our public website at https://www.rbcclearingandcustody.com/en-us/legal/.

Securities and cash in your account(s) are protected up to $500,000 per client (including a $250,000 limit for cash only) by the Securities Investor Protection Corporation (SIPC). RBC has purchased an additional policy covering up to $99.5 million per SIPC-qualified account (of which $900,000 may be cash) subject to a total maximum aggregate for RBC of $400 million which would be distributed on a pro-rata basis across all losses by clients of RBC. This protection applies only to the physical loss or destruction of your securities; it does not apply to any decline in the market value of your securities. Other investments shown on your statement but not held at RBC may not be protected by SIPC or private insurance policies purchased by RBC. Certain investments and transactions are ineligible under SIPC, such as commodity futures contracts and currency, investment contracts (such as limited partnerships), fixed annuity contracts that are not registered with the U.S. Securities and Exchange Commission under the Securities Act of 1933, and foreign currency transactions. For more details, please talk to your Financial Professional, call SIPC at 202-371-8300 for a brochure, or visit www.sipc.org.

All securities we hold for you that are not registered in your name ("street name" securities) are commingled with identical securities being held for other clients. Securities with call features may be called in whole or in part. Please see the "Partial Redemption of Callable Securities Disclosure" on our public website at www.rbcclearingandcustody.com/disclosures for information that describes the partial redemption procedures established at RBC C&C and the firm's lottery procedures for callable securities. A printed copy of these procedures may be requested from your Financial Professional. A printed copy of these procedures may be requested from your Financial Professional.

To report a lost or stolen Visa® Platinum Debit Card, or for questions regarding check activity, money fund balances, and Visa® Platinum Debit Card activity, call Client Support Services at 800-933-9946.

If you have an options account, each of the transaction confirmations we send you itemizes the commissions you have paid. Upon request, we will also provide you with a statement of the total option commissions you have paid this calendar year.

Accounts may be subject to an annual and/or inactive fee. Contact your Financial Professional for information.

**ABOUT YOUR INVESTMENT OBJECTIVE / PROFILE AND RISK TOLERANCE** – The Investment Objective and Risk Tolerance, where applicable, on page 3 of this statement are specific to this account and should reflect your investment goals and the level of overall risk you are willing to assume in seeking returns for this account.

| Investment Objective | Preservation of Principal/ Income | Balanced Growth | Growth | Aggressive Growth/Aggressive Income | Speculation |
|---|---|---|---|---|---|
| Lower Return Potential Lower Risk | ◄ | | | ► | Higher Return Potential Higher Risk |
| Risk Tolerance | Minimal Risk | Low Risk | Moderate Risk | High Risk | Maximum Risk |

The Advisory Risk Profile, also noted on page 3, if applicable, is applied broadly across specified advisory accounts held at RBC and should reflect the basis for the recommendation of an appropriate investment strategy designed to meet your objectives and financial needs as identified in your Risk Profile questionnaire.

| Advisory Risk Profile | Profile 1 | Profile 2 | Profile 3 | Profile 4 | Profile 5 |
|---|---|---|---|---|---|
| Lower Risk and Return Potential Shorter Time Horizon | ◄ | | | ► | Higher Risk and Return Potential Longer Time Horizon |

Please consult promptly with your Financial Professional if the information shown does not accurately reflect your objective or risk tolerance, or if you wish to impose or modify any restrictions on your account.

**ABOUT YOUR STATEMENT** – Statements are mailed monthly to clients who have transactions during the month that affect money balances and/or security positions. Statements are mailed quarterly to all other clients provided that their account contains a money or security balance. Please review these statements carefully and keep them for your records.

Your statement is intended to provide only a summary of activity in your account(s) for the statement period. The information provided on the statement includes, among other things, a snapshot of the value of your account(s); a summary of the income you received for the statement and year-to-date periods; contributions to Traditional, Roth, or other Individual Retirement Account(s); and transactions in mutual funds shares. The presentation of the value of your account(s), as well as changes in value, includes all deposits, withdrawals, and other changes in market value. It may also reflect a reduction in value as a result of the return of principal on certain fixed income securities. However, changes in the value of unpriced securities, special products, or accrued interest are not reflected.

If you have questions about your individual tax situation, please consult your tax advisor.

The prices for most securities and certain securities transactions reported on this statement are obtained from independent quotation services whose appraisal(s) are based on closing prices, bid-ask quotations, or other factors; however, in some cases, RBC calculates prices for certain securities using information from independent and internal sources. If you hold municipal revenue bonds, please be aware that the price you may receive on their sale may vary significantly from the price shown on your statement. Moreover, certain securities may have unique valuation requirements. Certain securities prices may not be current as of the statement date, and certain adjustments to your holdings may not yet have been included. If you purchase and/or hold securities traded in a market outside of the United States, and/or denominated in a currency other than United States dollars, the price of those securities may be converted into United States dollars for inclusion on your statement. The risks of adverse changes in the value of non-United States currencies relative to the United States dollar are borne by you; RBC does not hedge or otherwise mitigate such risks. While we obtain pricing and currency conversion information from sources that we believe are reliable, RBC cannot guarantee the accuracy of the prices and currency conversion information that appear on your statement. You should always request a current valuation of your securities prior to making an investment decision or placing an order to buy or sell securities.

RBC's Dividend Reinvestment Program (DRIP) is available to holders of eligible securities. For more information on the program, please refer to the "Dividend Reinvestment Program Disclosure" which can be found at https://www.rbcclearingandcustody.com/en-us/legal/. If you have additional questions, please contact your Financial Professional.

**Non-priced Securities** – Securities that are not actively traded and for which no independent quotation-service pricing is readily available are excluded from the (i) Market Price, (ii) Market Value, and (iii) Account Value Summary Total sections of your statement. In these instances, the Market Value and Total Account Summary sections will reflect a $0.00 value for these securities until such time that they begin active trading and/or have a readily available independent quotation-service price. Accrued interest for non-priced (N/P) securities will be reflected where applicable. Examples of N/P securities may include, but are not limited to, auction rate securities, auction rate preferred securities and certain structured products, and over-the-counter equity securities.

Your statement also includes a summary of the short- or long-term gain or loss from the sale of selected securities in non-retirement accounts. "Short-term" refers to securities held for one year or less; "long-term" refers to securities held more than one year. RBC provides gain/loss information as a service to you; the information may not be accurate for tax reporting or other purposes and may rely on information, such as the original cost basis for a security that you or another source at your direction provided to RBC. Gain/loss information may also reflect a change in the value of certain fixed income and other securities that return or amortize principal over time.

If you have elected to receive interest on free credit balances maintained in your account, please be advised that under federal securities laws and the rules of FINRA, we are permitted to pay such interest only on balances arising as an incidence of securities trading activities. We may use a free credit balance in your account in the course of our business, subject to limitations of 17CFR Section 240.15c3-3 under the Securities Exchange Act of 1934. You may demand and receive from us during normal business hours the delivery of any free credit balances or fully paid securities in your account, and/or any securities purchased in your loan account upon full payment of any indebtedness to us. Any balance in the RBC Insured Deposits or shares in a money market fund in your account may be liquidated on your order and the proceeds returned to your account or remitted to you upon the full payment of any indebtedness to us.

If this is an RBC Express Credit™ (margin) account and RBC maintains a special memorandum account for you, this is a combined statement of both your general account and the special memorandum account maintained for you under Regulation T of the Federal Reserve system. The permanent record of the special memorandum account as required by Regulation T is available for your inspection at your request. RBC reserves the right to limit RBC Express Credit (margin) purchases and short sales and to alter its margin requirements and due dates for house or other margin calls in accordance with the firm's guidelines, market conditions, and regulatory requirements.

The prices reported on your RBC statement for securities issued through or by a Direct Participation Program, Real Estate Investment Trust, or private securities, including hedge funds, are estimates. RBC does not calculate the prices of these securities, and has not confirmed these prices or verified that they are determined correctly. Instead, RBC relies on independent quotation services or the management, trustee, or general partner of the issuer of the securities to provide such prices. The prices may be based on independent appraisals, the book value of the entity's assets, the prices paid or offered for the securities, or another method or basis (or a combination of any of these). These securities are illiquid, and do not trade in a public market. Consequently, the estimated value of the securities (which is shown on your statement) may not equal the amount(s) that you receive if you attempt to sell your investment. In some cases, accurate valuation information relating to these securities may not be available. For current or estimated price information on the estimated value of the securities, the source of the actual or estimated value of the securities, or the method by which the value was determined or estimated, please contact your Financial Professional.

If this statement contains an estimated value, you should be aware that this value may be based on a limited number of trades or quotes. Therefore, you may not be able to sell these securities at a price equal or near to the value shown. However, the broker-dealer providing this statement may not refuse to accept your order to sell these securities. Also, the amount you receive from a sale generally will be reduced by the amount of any commissions or similar charges. If an estimated value is not shown for a security, a value could not be determined because of a lack of information.

For a schedule of fees charged by RBC and your brokerage firm, you may visit Investor Connect through your Financial Professional's website or directly at www.investor-connect.com where a list of fees is included in the section titled "other". Please contact your Financial Professional with additional questions about the list of fees, or for help accessing Investor Connect.

**FINRA BrokerCheck Hotline** – FINRA has made available to investors a pamphlet describing FINRA BrokerCheck for your information. To obtain a copy of the brochure, please contact FINRA at 800-289-9999 or visit their website at www.finra.org.

**Same-Day Cash Sweep Redemptions** – If your transaction has the description "Same Day," the transaction you requested required same-day payment; RBC retained the last day's dividend to offset the cost of advancing a same-day payment on your behalf. For more information see the "Cash Sweep Program Overview" on our public website at https://www.rbcclearingandcustody.com/en-us/legal/, as well as "Program Banks" under RBC Insured Deposits.



American Capital Partners, LLC
205 Oser Avenue
Hauppauge, New York 11788
MEMBER FINRA • SIPC • MSRB

# INDIVIDUAL RETIREMENT ACCOUNT STATEMENT

**APRIL 1, 2023 - APRIL 30, 2023**

Account number: [redacted]

## ASSET ALLOCATION SUMMARY

| | CURRENT VALUE | PERCENT |
|---|---|---|
| Cash & Cash Alternatives | | |
| Equity | | |
| Fixed Income | | |
| **Current account value** | **$6** | |

*Mutual funds are included in the above categories. Funds that invest in more than one category are reported as "Mixed Assets."*
*The Cash & Cash Alternatives figure is net of debits including any RBC Express Credit (margin) debit, if applicable.*

## INVESTMENT OBJECTIVE / RISK TOLERANCE

The investment objective for this account is: Aggressive Growth / Aggressive Income
The risk tolerance for this account is: Moderate Risk
*Please see "About Your Investment Objective / Profile and Risk Tolerance" on page 2 for further information.*

## GAIN/LOSS SUMMARY

| | THIS PERIOD | THIS YEAR |
|---|---|---|
| Total realized gain or loss | $0.00 | |
| Short–term gain or loss | 0.00 | |
| Long–term gain or loss | 0.00 | |
| | AS O | |
| Unrealized gain or loss | | |

*Please see "About Your Statement" on page 2 for further information.*

## ACTIVITY SUMMARY

| | |
|---|---|
| **Total account value last statement** | |
| **Cash activity** | |
| **Beginning balance** | |
| **Money coming into your account** | |
| Interest | |
| Dividends | |
| **Total** | |
| **Money going out of your account** | |
| Funds to purchase securities | |
| **Total** | |
| **Ending balance** | |
| **Net change cash activity** | |
| **Change in security value** | |
| **Beginning value of priced securities** | |
| Securities purchased | |
| Change in value of priced securities | |
| **Ending value of priced securities** | |
| **Net change in securities value** | |
| **Total account value as of April 30, 2023** | |

ERICA L RAPP
INDIVIDUAL RETIREMENT ACCOUNT

# INDIVIDUAL RETIREMENT ACCOUNT STATEMENT

**APRIL 1, 2023 - APRIL 30, 2023**

Account number:

## ASSET DETAIL

*The Estimated Annualized Income ("EAI") for certain securities could include a return of principal or capital gains, in which case EAI depicted on this account statement would be overstated. EAI is only an estimate of income generated by the investment and the actual income may be higher or lower. In the event the investment matures, is sold or called, the full EAI may not be realized.*

** The Unrealized Gain/Loss may not reflect your investments total return. Specifically, the net cost may include dividend and capital gains distributions which have been reinvestedAdditionally, the information that appears in these columns may be based on information provided by you or at your direction. RBC has not verified such data. Please see "About Your Statement" on page 2 for further information.*

*Your Financial Professional has elected to display Asset Detail with the following options:asset purchases (tax lots) consolidated.*

### CASH & CASH ALTERNATIVES

#### US Cash & Cash Alternatives

| DESCRIPTION | SYMBOL/CUSIP | QUANTITY | MARKET PRICE | CURRENT MARKET VALUE | PREVIOUS STATEMENT MARKET VALUE | YTD INCOME |
|---|---|---|---|---|---|---|
| CASH | | | | | | |
| **TOTAL CASH & CASH ALTERNATIVES** | | | | | | |

### EQUITY

#### US Mid Cap Equity

| DESCRIPTION | SYMBOL/CUSIP | QUANTITY | MARKET PRICE | MARKET VALUE | | NET COST * | UNREALIZED GAIN/LOSS * | ESTIMATED ANNUALIZED INCOME |
|---|---|---|---|---|---|---|---|---|
| GABELLI UTILITIES FUND CL C1 SHS | GAUCX | | | | *Purchase* *Reinvest* | | | |
| UNITY SOFTWARE INC COMMON STOCK | U | | | | | | | |
| **TOTAL US Mid Cap Equity** | | | | | | | | |

#### US Small Cap Equity

| DESCRIPTION | SYMBOL/CUSIP | QUANTITY | MARKET PRICE | MARKET VALUE | NET COST * | UNREALIZED GAIN/LOSS * | ESTIMATED ANNUALIZED INCOME |
|---|---|---|---|---|---|---|---|
| BIGCOMMERCE HOLDINGS INC SERIES 1 COMMON STOCK | BIGC | | | | | | |
| C3 AI INC CLASS A COMMON STOCK | AI | | | | | | |
| **TOTAL US Small Cap Equity** | | | | | | | |
| **TOTAL EQUITY** | | | | | | | |

American Capital Partners, LLC
205 Oser Avenue
Hauppauge, New York 11788
MEMBER FINRA • SIPC • MSRB

# INDIVIDUAL RETIREMENT ACCOUNT STATEMENT

APRIL 1, 2023 - APRIL 30, 2023

Account number: [redacted]

## FIXED INCOME

### US Corporate High Yield Fixed Income

| DESCRIPTION | SYMBOL/CUSIP | QUANTITY | MARKET PRICE | MARKET VALUE/ ACCRUED INTEREST | NET COST * | UNREALIZED GAIN/LOSS * | ESTIMATED ANNUALIZED INCOME |
|---|---|---|---|---|---|---|---|
| CHICKEN SOUP FOR THE SOUL ENTERTAINMENT INC 9.50% NOTES DUE 2025 CALLABLE 05/31/23 AT 25.00 MOODY N/R S&P N/R | CSSEN | | | | | | |
| HARROW HEALTH INC 11.875% SENIOR NOTES DUE 2027 CALLABLE 12/31/24 AT 25.50 MOODY N/R S&P N/R | HROWM | | | | | | |
| SOTHERLY HOTELS INC 8.25% SERIES D CUMULATIVE RED PERPETUAL PREFERRED STOCK CALLABLE 04/18/24 AT 25.00 MOODY N/R S&P N/R | SOHON | | | | | | |
| **TOTAL FIXED INCOME** | | | | | | | |
| **TOTAL ASSETS** | | | | | | | |

## ACTIVITY DETAIL

*Realized gain/loss column includes fees and commissions. It does not include accrued interest.*

*Purchases, sales and other activity all represent an exchange of cash and/or money market funds for securities and, as such, do not represent deposits to or withdrawals from your account. Account value changes due to commissions, mark ups, mark downs and accrued interest are shown in the "Change in value of priced securities" line of the Account Value Summary.*

** Information that appears in these columns may be based on information provided by you or at your direction; RBC has not verified such data. Please see "About Your Statement" on page 2 for further information.*

### PURCHASES

#### Regular Purchases

| DATE | DESCRIPTION | QUANTITY | PRICE | NET COST/ ACCRUED INTEREST | COMMENTS |
|---|---|---|---|---|---|
| 04/27/23 | GABELLI UTILITIES FUND CL C1 SHS REINVEST | | | | REINVEST |
| **TOTAL PURCHASES** | | | | | |

ERICA L RAPP
INDIVIDUAL RETIREMENT ACCOUNT

# INDIVIDUAL RETIREMENT ACCOUNT STATEMENT

**APRIL 1, 2023 - APRIL 30, 2023**

Account number: [redacted]

## ACTIVITY DETAIL

### INCOME

#### Interest

| DATE | DESCRIPTION | | SYMBOL/CUSIP | AMOUNT | COMMENTS |
|---|---|---|---|---|---|
| 04/03/23 | CHICKEN SOUP FOR THE SOUL DUE 2025 REC 03/15/23 PAY 03/31/23 | ENTERTAINMENT INC 9.50% NOTES REG INT ON 10000 BND INTEREST | CSSEN | $5,937.50 | |

#### Dividends

| DATE | DESCRIPTION | | SYMBOL/CUSIP | AMOUNT | COMMENTS |
|---|---|---|---|---|---|
| 04/27/23 | GABELLI UTILITIES FUND RECORD 04/25/23 PAY 04/26/23 DIVIDEND | CL C1 SHS DIVIDEND RATE 0.070000000 | GAUCX | [redacted] | |
| **TOTAL INCOME** | | | | $[redacted] | |

## RETIREMENT ACCOUNT INFORMATION

### CONTRIBUTIONS

| DESCRIPTION | IRA | ROLLOVER | DIRECT ROLLOVER | RECHARACTERIZATION |
|---|---|---|---|---|
| DEPOSITED IN 2022 FOR 2022 | [redacted] | | | |
| DEPOSITED IN 2023 FOR 2022 | | | | |
| DEPOSITED IN 2023 FOR 2023 | | | | |

### PRIMARY BENEFICIARY INFORMATION

| BENEFICIARY | PERCENTAGE | BENEFICIARY | PERCENTAGE | BENEFICIARY | PERCENTAGE |
|---|---|---|---|---|---|
| DAIVD JOHN RAPP | 33.34% | CAROLINE ELIZABETH RAPP | 33.33% | MADALYN CLAIRE RAPP | 33.33% |

**Exhibit B**

Prospectus Supplement annexed to the Prospectus dated June 24, 2021 issued by CHICKEN SOUP FOR THE SOUL ENTERTAINMENT INC.

Filed pursuant to Rule 424(b)(2)
Registration No. 333-[illegible]

Prospectus Supplement
(to Prospectus dated June 24, 2021)

**$10,400,000 Principal Amount**

**9.50% Notes due 2025**

We are offering $10,400,000 in aggregate principal amount of our 9.50% notes due 2025, which we refer to as the "Notes," for gross proceeds of $10,[illegible]. [illegible]

The Notes will be issued under and subject to the terms of the indenture, dated as of July 17, 2020, between us and U.S. Bank National Association, as trustee (the "Indenture"), and the supplemental indenture thereto, dated July 17, 2020, [illegible]

The July 2025 Notes are listed on the Nasdaq Global Market and have been trading under the symbol "CSSEN" since July 21, 2020. On April 19, 2022, the last reported sale price of the July 2025 Notes on the Nasdaq Global Market was $23.25. [illegible]

We are an "emerging growth company" as defined in the Jumpstart Our Business Startups Act of 2012 and have elected to comply with certain reduced public company reporting requirements.

Investing in the Notes involves significant risks. Please read "*Risk Factors*" on page S-[illegible] of this prospectus supplement and in the documents incorporated by reference into this prospectus supplement.

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved the Notes or determined if this prospectus supplement is truthful or complete. Any representation to the contrary is a criminal offense.

You should read this prospectus supplement and any supplements and amendments thereto.

| | Per Note | Total[1][2] |
|---|---|---|
| Public offering price | $ 24.63 | $ 10,2[illegible] |
| Underwriting discount | $ 1.491 | $ 620,2[illegible] |
| Proceeds, before expenses, to us[2] | $ 23.139 | $ 9,[illegible] |

(1) Ladenburg Thalmann, as representative of the underwriters, may exercise an option to purchase up to an additional $1,560,000 in aggregate principal amount of Notes offered hereby, within 30 days of the date of this prospectus supplement. If this option is exercised in full, the total public offering price will be $1,[illegible], the total underwriting discount paid by us will be $93,[illegible] and total proceeds to us, before expenses, will be approximately $1,[illegible].

(2) Total expenses of the offering payable by us, excluding underwriting discounts and commissions, are estimated to be $1[illegible].

THE NOTES ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF A BANK AND ARE NOT INSURED BY THE FEDERAL DEPOSIT INSURANCE CORPORATION OR ANY OTHER GOVERNMENT AGENCY.

Delivery of the Notes in book-entry form only through The Depository Trust Company will be made on or about April [illegible], 2022.

**Ladenburg Thalmann** **B. Riley Securities**

Prospectus Supplement dated April 20, 2022

TABLE OF CONTENTS

PROSPECTUS SUPPLEMENT

| | Page |
|---|---|
| PROSPECTUS SUMMARY | S-1 |
| SPECIFIC TERMS OF THE NOTES AND THE OFFERING | S-6 |
| RISK FACTORS | S-11 |
| USE OF PROCEEDS | S-27 |
| CAPITALIZATION | S-28 |
| DESCRIPTION OF THE NOTES | S-30 |
| CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS | S-[illegible] |
| UNDERWRITING | S-43 |
| LEGAL MATTERS | S-[illegible] |
| EXPERTS | S-47 |
| WHERE YOU CAN FIND MORE INFORMATION; INCORPORATION BY REFERENCE | S-48 |

BASE PROSPECTUS

| | Page |
|---|---|
| ABOUT THIS PROSPECTUS | 1 |
| CERTAIN CORPORATE INFORMATION AND DEFINITIONS | 1 |
| PROSPECTUS SUMMARY | 3 |
| RISK FACTORS | 19 |
| NOTE ON FORWARD-LOOKING STATEMENTS | 21 |
| BACKGROUND OF THE ISSUANCE OF SECURITIES TO THE SELLING SECURITYHOLDER | 23 |
| USE OF PROCEEDS | 24 |
| SELLING SECURITYHOLDER | 25 |
| DESCRIPTION OF CAPITAL STOCK | 26 |
| DESCRIPTION OF OUR 2025 NOTES | 31 |
| DESCRIPTION OF WARRANTS | 53 |
| DESCRIPTION OF DEBT SECURITIES | 55 |
| DESCRIPTION OF THE UNITS | 62 |
| PLAN OF DISTRIBUTION | 63 |
| LEGAL MATTERS | 68 |
| EXPERTS | 68 |
| WHERE YOU CAN FIND MORE INFORMATION | 68 |
| INFORMATION INCORPORATED BY REFERENCE | 68 |

You should rely only on the information contained or incorporated by reference in this prospectus supplement and the accompanying base prospectus. We have not authorized anyone to provide you with different information. We are not making an offer of these securities in any state or jurisdiction where the offer is not permitted.

## ABOUT THIS PROSPECTUS SUPPLEMENT

[illegible]

[illegible]

[illegible]

[illegible]

## CERTAIN CORPORATE INFORMATION AND DEFINITIONS

The company Chicken Soup for the Soul Entertainment, Inc. is referred to in this prospectus supplement as "CSSE," the "Company," "we," "us" or similar pronouns. References to:

- "CSS Productions" means Chicken Soup for the Soul Productions, LLC, our immediate parent;
- "CSS" means Chicken Soup for the Soul, LLC, our intermediate parent company;
- "CSS Holdings" means Chicken Soup for the Soul Holdings, LLC, the parent company of CSS and our ultimate parent company;
- "Screen Media" means Screen Media Ventures, LLC, a wholly owned subsidiary of CSSE;
- "A Plus" means A Plus Inc. (d/b/a A Plus), a wholly owned subsidiary of CSSE;
- "Pivotshare" means Pivotshare, Inc., a wholly owned subsidiary of CSSE;
- "Crackle Plus" means Crackle Plus, LLC, a wholly owned subsidiary of CSSE which was originally formed by CSSE and CPE Holdings, Inc. (an affiliate of Sony Pictures Television Inc.);
- "Landmark Studio Group" means Landmark Studio Group, a majority owned subsidiary of CSSE;
- "Halcyon Television" means Halcyon Television, LLC, a wholly owned subsidiary of CSSE;
- "CSS AVOD" means CSS AVOD Inc., a majority owned subsidiary of CSSE;
- "1091 Pictures" means TOFG, LLC, a wholly owned subsidiary of Screen Media Ventures, LLC; and
- "Locomotive Global" means Locomotive Global Inc., a majority owned subsidiary of CSSE.

Our company and our subsidiaries and affiliates have proprietary rights to the trademarks and trade names used herein, including, among others, Chicken Soup for the Soul®, Crackle®, Popcornflix.com®, Popcornflix Kids®, Truli®, and FrightPix®. Solely as a matter of convenience, trademarks and trade names referred to herein may or may not be accompanied with the marks of "TM" or "®", however, the absence of such marks is not intended to indicate that the Company or its affiliates or subsidiaries will not assert, to the fullest extent possible under applicable law, their respective rights to such trademarks and trade names.

## NOTE ON FORWARD-LOOKING STATEMENTS

[illegible] Forward-looking statements in this prospectus supplement and in the documents incorporated by reference in this prospectus supplement may include, for example, statements about:

- our limited operating history;
- our financial performance, including our ability to generate revenue;
- the outbreak of the novel coronavirus ("COVID-19"), including the measures to reduce its spread, and the impact on the economy and demand for our services, which may precipitate or exacerbate other risks and uncertainties our financial performance, including our ability to generate revenue;
- potential effects of a challenging economy, for example, on the demand for our advertising and marketing services, on our clients' financial condition and on our business or financial condition;
- the ability of our content offerings to achieve market acceptance;
- the impact of increased competition;
- our success in retaining or recruiting, or changes required in, our officers, key employees or directors;
- our potential ability to obtain additional financing when and if needed;
- our ability to protect our intellectual property;
- our ability to complete strategic acquisitions, including joint ventures and co-production arrangements;
- our ability to manage growth and integrate acquired operations;
- interruptions in service by the third-party service providers we rely on for the distribution of our content and delivery of ad impressions;
- the potential liquidity and trading of our securities;
- downward revisions to, or withdrawals of, our credit ratings by third-party rating agencies;
- regulatory or operational risks;
- our estimates regarding expenses, future revenue, capital requirements and needs for additional financing; and
- the time during which we will be an Emerging Growth Company under the Jumpstart Our Business Startups Act of 2012, or JOBS Act.

[illegible]

## PROSPECTUS SUPPLEMENT SUMMARY

[illegible]

[illegible]

### Overview of our Business

[illegible]

[illegible]

[illegible]

[illegible]

[illegible]

[illegible]

[illegible]

Our Strategy

[illegible]

- Content: [illegible]
  - [illegible]
  - [illegible]
  - [illegible]
- Advertising: [illegible]
  - [illegible]

- [illegible]
- [illegible]
- Viewership: [illegible]
  - [illegible]
  - [illegible]
  - [illegible]

Competition

[illegible]

[illegible]

[illegible]

Intellectual Property

[illegible]

[illegible]

Human Capital Management

[illegible]

[illegible]

[illegible]

Implications of Being an Emerging Growth Company

[illegible]

- [illegible]
- [illegible]
- [illegible]
- [illegible]

[illegible]

Summary Risk Factors

An investment in our securities involves various risks that you should consider carefully before investing in us. Many of these risks are discussed in this prospectus supplement under the heading "Risk Factors" beginning on page S-14. If any of these risks occur, our business, financial condition, liquidity, results of operations, prospects and ability to make interest payments to our noteholders and distributions to our shareholders could be materially and adversely affected. In that case, the trading price of our securities could decline, and you may lose a portion or your entire investment. These risks include:

- The Notes will be unsecured and therefore are effectively subordinated to any secured indebtedness we have incurred or may incur in the future.
- The Notes will be structurally subordinated to the indebtedness and other liabilities of our subsidiaries.
- The indenture under which the Notes are issued contains limited protection for holders of the Notes.
- An increase in market interest rates could result in a decrease in the value of the Notes.
- An active trading market for the Notes may not develop or may not be sustained, which could limit your ability to sell the Notes and/or adversely impact the market price of the Notes.
- We may choose to redeem the Notes when prevailing interest rates are relatively low.
- If we default on our obligations to pay our other indebtedness, we may not be able to make payments on the Notes.
- We are not obligated to contribute to a sinking fund to retire the Notes and the Notes are not guaranteed by a third party.
- A downgrade, suspension, or withdrawal of the credit rating assigned by a rating agency to us or the Notes, if any, could cause the liquidity or market value of the Notes to decline significantly.
- We have and may continue to incur losses in the operation of our business.
- We may not be able to generate sufficient cash to service our debt, preferred stock dividend and other obligations or our ability to pay our preferred stock dividends could be adversely affected or prohibited upon default under our current or future indebtedness.
- Difficult conditions in the economy generally and our industry specifically resulting from the COVID-19 pandemic may cause interruptions in our operations, a slow-down in the production or acquisition of new content, and changes in demand for our products and services, which may have a material adverse effect on our business, operations and financial condition.
- Competition could have a material adverse effect on our business, financial condition and results of operations.
- Interruptions in our ability to provide our video on demand products and our service to our customers could damage our reputation, which could have a material adverse effect on us.
- The occurrence of cyber-incidents, or a deficiency in our cybersecurity or in those of any of our third party service providers, could negatively impact our business by causing a disruption to our operations, a compromise or corruption of our confidential information or damage to our business relationships or reputation, all of which could negatively impact our business and results of operations.
- The loss of key personnel, including our executive officers, could have a material adverse effect on us.
- Our inability to recruit or retain qualified personnel or maintain access to key third-party service providers, could have a material adverse effect on us.
- The market price and trading volume of our securities may be volatile.
- We are required to make continuing payments to our affiliates, which may reduce our cash flow and profits. Additionally, conflicts of interest may arise between us and our affiliated companies and we have waived rights [illegible] in the event of such conflicts.

Corporate Information

We are a Delaware corporation formed on May [illegible], 2016. CSS Productions, our predecessor and immediate parent company, was formed in December 2014 by CSS, and initiated operations in January 2015. We were formed to create a discrete entity focused on video content opportunities using the Brand. In May 2016, pursuant to the terms of the contribution agreement among CSS, CSS Productions and the Company, all video content assets owned by CSS, CSS Productions and their CSS subsidiaries were transferred to the Company in consideration for its issuance to CSS Productions of [illegible] shares of the Company's Class B Common Stock (the "Class B Common Stock"). Thereafter, CSS Productions' operating activities ceased, and the Company continued the business operations of producing and distributing the video content.

Our address is 132 East Putnam Avenue, Floor 2W, Cos Cob, CT 06807. Our telephone number is (855) [illegible], and our website address is https://www.[illegible].com. The information contained on, or that can be accessed through, our website is not part of this prospectus supplement.

SPECIFIC TERMS OF THE NOTES AND THE OFFERING

| | |
|---|---|
| Issuer | Chicken Soup for the Soul Entertainment Inc. |
| Title of the Securities | 9.50% Notes due 2025 |
| Initial Aggregate Principal Amount Being Offered | [illegible] |
| Option to Purchase Additional Notes | The underwriters may also purchase from us up to an additional [illegible] aggregate principal amount of Notes within 30 days of the date of this prospectus supplement (the "Option Notes"). |
| Public Offering Price | [illegible] per $25.00 principal amount of the Note, for [illegible] aggregate gross proceeds. |
| Principal Payable at Maturity | The principal amount of each Note will be payable on its stated maturity date at the corporate trust office of the Trustee, Paying Agent, Registrar and Transfer Agent for the Notes or at such other office in New York, New York as we may designate. |
| Type of Note | Fixed rate note. |
| Listing | The issued and outstanding July 2025 Notes are listed on the Nasdaq Global Market and have been trading under the trading symbol "CSSEN" since July [illegible], 2020. We intend to list the Notes on the Nasdaq Global Market under the same trading symbol. The Notes are expected to trade "flat." This means that purchasers will not pay, and sellers will not receive, any accrued and unpaid interest on the Notes that is not included in the trading price. |
| Rating of the Notes | [illegible] from Egan-Jones Ratings Company. An explanation of the significance of ratings may be obtained from the rating agency. Generally, rating agencies base their ratings on such material and information, and such of their own investigations, studies and assumptions, as they deem appropriate. The rating of the Notes should be evaluated independently from similar ratings of other securities. A credit rating of a security is not a recommendation to buy, sell or hold securities and may be subject to review, revision, suspension, reduction or withdrawal at any time by the assigning rating agency. See "Risk Factors — [illegible]" |

| | |
|---|---|
| Interest Rate | 9.50% per year |
| Day Count Basis | 360-day year of twelve 30-day months |
| Original Issue Date | April [illegible], 2022 |
| Stated Maturity Date | July 31, 2025 |
| Date Interest Starts to Accrue | March 31, 2022 |
| Interest Payment Dates | Every March 31, June 30, September 30 and December 31, beginning June 30, 2022. If an interest payment date falls on a non-business day, the applicable interest payment will be made on the next business day and no additional interest will accrue as a result of such delayed payment. |
| Interest Periods | The initial interest period for the Notes will be the period from and including March 31, 2022 to June 30, 2022 and the subsequent interest periods will be the periods from and including an interest payment date to, but excluding, the next interest payment date or the stated maturity date, as the case may be. |
| Regular Record Dates for Interest | March 15, June 15, September 15, and December 15, beginning June 15, 2022. |
| Specified Currency | U.S. Dollars |
| Place of Payment | New York City |
| Ranking of Notes | The Notes will be our direct unsecured obligations and will rank: |

- Pari passu with, which means equal to, all of our currently outstanding unsecured unsubordinated indebtedness issued by us, including the approximately [illegible] principal amount of the July 2025 Notes. The Notes will also rank pari passu with our general liabilities, which consist of trade and other payables, including any outstanding dividend payable on our Series A Preferred Stock, interest and debt fees payable, vendor payables and accrued expenses such as auditor fees, legal fees, director fees, etc. In total, these general liabilities were [illegible] as of December 31, 2021. We will have the ability to issue from time to time other debt securities with terms different from the Notes, including terms providing for seniority of such new debt securities, without the consent of the holders of the Notes, as further described below under "— Further Issuances."
- Senior to any of our future indebtedness that expressly provides it is subordinated to the Notes. We currently do not have outstanding debt that is subordinated to the Notes and do not currently intend to issue indebtedness that expressly provides that it is subordinated to the Notes. Therefore, the Notes, as currently contemplated, will not be senior to any indebtedness or obligations.
- Effectively subordinated to all of our existing and future secured indebtedness (including indebtedness that is initially unsecured to which we subsequently grant a security interest), including our [illegible] million credit facility with [illegible] Financial Trust and our [illegible] film acquisition advance from Great Point Media Limited which is secured by territorial licenses and distribution rights in certain films and productions owned or to be acquired by Screen Media, but only to the extent of the value of the assets securing such indebtedness, as well as any secured indebtedness that we may incur in the future, such as a new loan facility, or any new indebtedness that is initially unsecured to which we subsequently grant a security interest, to the extent of the value of the assets securing such indebtedness. In any liquidation, dissolution, bankruptcy or other similar proceeding, the holders of any of our existing or future secured indebtedness may assert rights against the assets pledged to secure that indebtedness in order to receive full payment of their indebtedness before the assets may be used to pay other creditors, including the holders of the Notes, and any assets of our subsidiaries will not be directly available to satisfy the claims of our creditors, including holders of the Notes.

- Structurally subordinated to all existing and future indebtedness and other obligations of any of our subsidiaries and financing vehicles. Structural subordination means that creditors of a parent entity are subordinate to creditors of a subsidiary entity with respect to the subsidiary's assets.

*Except as described under the captions "Description of the Notes — Events of Default" and "— Merger or Consolidation"* in this prospectus supplement, the indenture does not contain any provisions that give you protection in the event we issue a large amount of debt or we are acquired by another entity.

| | |
|---|---|
| Denominations | We will issue the Notes in denominations of $25.00 and integral multiples of $25.00 in excess thereof. |
| Business Day | Each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which banking institutions in New York City are authorized or required by law or executive order to close. |
| Optional Redemption | The Notes may be redeemed in whole or in part at any time or from time to time at our option on or after July 31, 2022 upon not less than 30 days nor more than 60 days written notice by mail prior to the date fixed for redemption thereof. The redemption price shall be equal to 100% of the outstanding principal amount of the Notes called for redemption on the date fixed for redemption plus (a) all accrued and unpaid interest payments otherwise payable thereon through the date fixed for redemption. In addition, in the event of a merger or sale of the Company or substantially all of its assets or a majority of the Company's equity (on an after-issued basis) in one or a series of related transactions, we will have the right to redeem the Notes prior to July 31, 2022 in connection with the consummation of such transactions on the foregoing terms. |

You may be prevented from exchanging or transferring the Notes when they are subject to redemption. In case any Notes are to be redeemed in part only, the redemption notice will provide that, upon surrender of such Note, you will receive, without charge, a new Note or Notes of authorized denominations representing the principal amount of your remaining unredeemed Notes.

If we redeem only some of the Notes, the Trustee will determine the method for selection of the particular Notes to be redeemed, in accordance with the indenture, and in accordance with the rules of any national securities exchange or quotation system on which the Notes are listed. Unless we default in payment of the redemption price, on and after the date of redemption, interest will cease to accrue on the Notes called for redemption.

| | |
|---|---|
| Sinking Fund | The Notes will not be subject to any sinking fund (i.e., no amounts will be set aside by us to ensure repayment of the Notes at maturity). As a result, our ability to repay the Notes at maturity will depend on our financial condition on the date that we are required to repay the Notes. |
| No Repayment at Option of Holders | Holders will not have the option to have the Notes repaid prior to the stated maturity date. |

| | |
|---|---|
| Defeasance | The Notes are subject to defeasance by us. "Defeasance" means that, by depositing with a trustee an amount of cash and/or government securities sufficient to pay all principal and interest, if any, on the Notes when due and satisfying any additional conditions required under the indenture relating to the Notes, we will be deemed to have been discharged from our obligations under the Notes. |
| Covenant Defeasance | The Notes are subject to covenant defeasance by us. In the event of a "covenant defeasance," upon depositing such funds and satisfying similar conditions discussed below we would be released from the restrictive covenants under the indenture relating to the Notes. The consequences to the holders of the Notes is that, while they no longer benefit from the restrictive covenants under the indenture, and while the Notes may not be accelerated for any reason, the holders of Notes nonetheless could look to us for repayment of the Notes if there were a shortfall in the funds deposited with the trustee or the trustee is prevented from making the payment. |
| Form of Notes | The Notes will be represented by global securities that will be deposited and registered in the name of The Depository Trust Company ("DTC") or its nominee. This means that, except in limited circumstances, you will not receive certificates for the Notes. Beneficial interests in the Notes will be represented through book-entry accounts of financial institutions acting on behalf of beneficial owners as direct and indirect participants in DTC. Investors may elect to hold interests in the Notes through either DTC, if they are a participant, or indirectly through organizations that are participants in DTC. |
| Trustee, Paying Agent, Registrar and Transfer Agent | U.S. Bank National Association |
| Limitation on Restricted Payments | Upon (i) the failure to pay interest on any Note when such interest is due and payable or (ii) the occurrence of an Event of Default and while any such interest payment remains unpaid or such Event of Default is ongoing, the indenture prohibits us from taking the following actions: |

- Declaring or paying any dividend, making any distribution on or in respect of our capital stock or making any similar payment to the direct or indirect holders of our capital stock in their capacity as such;
- Purchasing, repurchasing, redeeming, retiring or otherwise acquiring for value any of our capital stock held by any person (other than by us or a subsidiary of ours) or any capital stock of a subsidiary held by any of our affiliates;
- Making, prior to scheduled maturity, any scheduled repayment of any subordinated obligations; or
- Making any investment in any person.

| | |
|---|---|
| Events of Default | You will have rights if an Event of Default occurs with respect to the Notes. |

The term "Event of Default" in respect of the Notes means any of the following:

- We do not pay the principal (or premium, if any) of any Note, including any July 2025 Note, when due.
- We do not pay interest on any Note, including any July 2025 Note, when due and such default is not cured within 30 days.

- We remain in breach of any other covenant with respect to the Notes (including the July 2025 Notes) for 60 days after we receive a written notice of default stating we are in breach. The notice must be sent by either the Trustee or holders of at least 25.0% of the principal amount of the Notes, including the July 2025 Notes, as a single series.
- We file for bankruptcy or certain other events of bankruptcy, insolvency or reorganization occur and in the case of certain orders or decrees entered against us under any bankruptcy law, such order or decree remains undischarged or unstayed for a period of 60 days.

**Further Issuances**

We have the ability to issue additional debt securities under the Indenture with terms different from the Notes and, without consent of the holders thereof, as well as the ability to reopen the July 2025 Notes and Notes and issue additional notes in the same series. If we issue additional debt securities, these additional debt securities could rank higher in priority of payment or have a lien or other security interest greater than that accorded to the holders of the Notes.

**Global Clearance and Settlement Procedures**

Interests in the Notes will trade in DTC's Same Day Funds Settlement System, and any permitted secondary market trading activity in such Notes will, therefore, be required by DTC to be settled in immediately available funds. None of the Trustee, the Paying Agent or us will have any responsibility for the performance by DTC or its participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

**Risk Factors**

Investing in the Notes involves risks. You should carefully consider the risks described under "*Risk Factors*" in this prospectus supplement, our Annual Report on Form 10-K and our subsequent Quarterly Reports on Form 10-Q as well as the other information contained or incorporated by reference in this prospectus supplement before deciding to invest in the Notes. The Notes are expected to trade "flat." This means that purchasers will not pay, and sellers will not receive, any accrued and unpaid interest on the Notes that is not included in the trading price.

**Use of Proceeds**

We intend to use the net proceeds from the sale of the Notes for working capital and general corporate purposes. We may also use the proceeds to fund dividend payments, including on our Series A Preferred Stock, repurchases and redemptions of our publicly traded securities, and acquisitions.

UNAUDITED PRO FORMA COMBINED FINANCIAL INFORMATION

On May 21, 2021, the Company consummated an acquisition of the principal assets of Sonar Entertainment, Inc. ("SEI") and certain of the direct and indirect subsidiaries of SEI (collectively, "Sonar") pursuant to the terms of asset purchase agreement ("APA") dated as of April 5, 2021, by the Company, Halcyon Television LLC, a Delaware limited liability company and wholly owned subsidiary of the Company ("Halcyon"), and with respect to certain provisions, Pivotshare Entertainment Inc., a Canadian company ("Pivotshare" and, collectively with the Company and Halcyon, the "CSSE Buyer"), on the one hand, and Sonar, on the other hand.

The following unaudited, pro forma combined financial information was prepared using the acquisition method of accounting (ASC 805 "Business Combinations"), with the Company considered the acquirer of SEI.

We are providing this unaudited pro forma combined statement of operations of the Company for the nine months ended September 30, 2021 in accordance with Article 11 of Regulation S-X as an update to the unaudited combined statement of operations of the Company for the quarter ended March 31, 2021, which were included in Exhibit 99.2 to the Current Report on Form 8-K/A filed with the Securities and Exchange Commission ("SEC") on June 11, 2021. This updated unaudited pro forma combined statement of operations shows the pro forma effect of the SEI transaction for the twelve months ended December 31, 2021, as if the transaction had been completed on January 1, 2020, consistent with the initial unaudited pro forma combined statements of operations previously filed.

The unaudited pro forma combined financial information included herein presents the combination of the historical consolidated statements of operations of the Company and statements of operations of SEI adjusted to give effect to events and circumstances that are (i) directly attributable to the acquisition, (ii) factually supportable and (iii) expected to have a continuing impact on the combined company's results.

The unaudited pro forma combined financial information should be read in conjunction with the Company's audited historical consolidated financial statements as of and for year ended December 31, 2021, which were filed with the SEC as part of our Annual Report on Form 10-K on March 31, 2022, and the audited historical financial statements as of and for the years ended December 31, 2021 and 2020 of SEI, which were filed with the SEC as Exhibit 99.1 to the Current Report on Form 8-K/A filed on June 11, 2021.

In management's opinion, all adjustments necessary to reflect the significant effects of the SEI transaction have been made. These combined financial statements are based on assumptions and estimates considered appropriate by our management; however, they are unaudited and are not necessarily, and should not be assumed to be, an indication of our financial position or results of operations that would have been achieved had the acquisition been completed as of the dates indicated or that may be achieved in the future.

The unaudited pro forma combined financial information is being provided for illustrative purposes only and does not purport to represent what the actual results of operations of SEI would have been had the SEI Transaction occurred on the date assumed or any other date, nor is it necessarily indicative of SEI's future results of operations for any future period or as of any future date. The unaudited pro forma combined financial information is based upon currently available information and estimates and assumptions that the Company's management believes are reasonable as of the date hereof. Any of the factors underlying these estimates and assumptions may change or prove to be materially different.

Chicken Soup for the Soul Entertainment, Inc.
Pro Forma Combined Statement of Operations
For The Year Ended December 31, 2021
(unaudited)

| | CSSE [1] Historical | SEI [2][3] Historical | SEI [4] Historical | Transaction Accounting Adjustments | Notes | Pro Forma Combined |
|---|---|---|---|---|---|---|
| Net revenue | $ 110,395,666 | $ 4,899,708 | $ 953,000 | $ — | | $ 116,248,660 |
| Cost of revenue | 79,138,884 | 3,628,690 | 543,813 | | | 83,321,386 |
| Gross profit | 31,256,582 | 1,261,018 | 409,874 | | | 33,027,474 |
| Operating expenses: | | | | | | |
| Selling, general and administrative | 48,611,101 | 2,509,634 | 1,786,458 | (196,903) | A | 52,710,290 |
| Amortization and depreciation | 5,728,051 | | | 500,000 | B | 6,228,051 |
| Impairment of content assets | 8,794,824 | | | | | |
| Impairment of intangible assets and goodwill | 2,044,647 | | | | | |
| Management and license fees | 11,029,547 | | | 595,340 | C | 11,624,887 |
| Total operating expenses | 77,218,208 | 2,509,634 | 1,786,458 | 898,437 | | 84,412,739 |
| Operating loss | (45,961,626) | (1,248,596) | (1,376,584) | (898,437) | | (51,385,255) |
| Interest expense | 4,831,175 | 17,852,345 | 10,203,698 | (27,718,673) | D | 5,168,545 |
| Other non-operating income, net | (379,131) | (340) | (9,556) | 9,896 | E | (379,131) |
| Loss before income taxes and preferred dividends | (50,413,670) | (19,099,599) | (11,568,686) | 26,810,340 | | (56,172,347) |
| Provision for income taxes | 66,000 | 6,847 | — | — | | 72,847 |
| Net loss before noncontrolling interests and preferred dividends | (50,479,670) | (19,096,446) | (11,568,686) | 26,810,340 | | (56,244,694) |
| Net loss attributable to noncontrolling interests | (73,430) | | | | | (73,430) |
| Net loss attributable to Chicken Soup for the Soul Entertainment, Inc. | (50,406,240) | (19,096,446) | (11,568,686) | 26,810,340 | | (56,171,264) |
| Less: preferred dividends | 9,013,540 | | | | | 9,013,540 |
| **Net loss available to common stockholders** | $ (59,419,780) | $ (19,096,446) | $ (11,568,686) | $ 26,810,340 | | $ (65,184,804) |
| Net loss per common share: | | | | | | |
| Basic and diluted | $ (3.96) | | | | | $ (4.34) |
| Weighted-average common shares outstanding: | | | | | | |
| Basic and diluted | 15,018,421 | | | | | 15,018,421 |

(1) The Company's financial information presented is as filed in our audited Annual Report on Form 10-K for the year ended December 31, 2021 filed on March 31, 2022, which includes SEI financial information from the date of acquisition beginning May 21, 2021 through December 31, 2021.
(2) SEI financial information presented is for the period from January 1, 2021 to March 31, 2021 as filed on Form 8-K/A, on June 11, 2021.
(3) Certain reclassifications were made to conform to CSSE's financial statement presentation.
(4) SEI financial information presented is for the period from April 1, 2021 to May 21, 2021.

See accompanying notes to unaudited pro forma combined information.

NOTES TO UNAUDITED PRO FORMA COMBINED FINANCIAL INFORMATION

Note 1 – Unaudited Pro Forma Combined Statement of Operations Adjustments for the Twelve Months Ended December 31, 2021

Adjustments included in the column under the heading "Transaction Adjustments" in the Unaudited Combined Statement of Operations for the year ended December 31, 2021, which assume the transaction occurred as of January 1, 2020 consist of the following:

| | | |
|---|---|---|
| A | Represents adjustment to eliminate historical nonrecurring Sonar Entertainment costs included in the financial statements of the company not directly attributable to the transaction including professional, legal and other overhead expenses. | $ (196,903) |
| B | Represents adjustment to record valued acquisition related intangible asset amortization over the useful life of the intangible assets for the period presented on a straight-line basis. | $ 500,000 |
| C | Represents adjustment to record additional management and license fees to be owed to affiliated company based on revenues earned under existing management & licensing agreements. | $ 595,340 |
| D | Represents adjustment to eliminate interest expense related to Sonar Entertainment debt balances, as the debt was not assumed as part of the business combination. | $ (28,034,001) |
| | Represents adjustment to record interest expense on the revolving loan agreement entered by the Company directly related to the acquisition of Sonar Entertainment. | 315,328 |
| | | $ (27,718,673) |
| E | Represents adjustment to eliminate Sonar Entertainment non-operating income not applicable to the transaction and ongoing business. | $ 9,896 |

## RISK FACTORS

*[illegible]*

### Risks Relating to COVID-19

*Our business, results of operations, and financial condition may be impacted by the evolution of the coronavirus (COVID-19).*

[illegible]

[illegible]

[illegible]

[illegible]

### Risks Relating to Our Business

*We have incurred operating losses in the past, may incur operating losses in the future, and may never achieve or maintain profitability.*

[illegible]

*We may not be able to generate sufficient cash to service our debt and other obligations.*

[illegible]

[illegible]

[illegible]

*We may not realize the advantages we expect from our acquisitions.*

[illegible]

*We are subject to numerous other risks associated with acquisitions, business combinations, or joint ventures.*

[illegible]

[illegible]

*If our efforts to attract and retain VOD viewers are not successful, our business may be adversely affected.*

[illegible]

[illegible]

*Changes in competitive offerings for entertainment video could adversely impact our business.*

[illegible]

*Our long-term results of operations are difficult to predict and depend on the commercial success of our VOD platforms as well as successful monetization of our video content in other ways and the continued strength of the Chicken Soup for the Soul Brand.*

[illegible]

[illegible]

*We may not be successful in our efforts to further monetize our VOD services.*

[illegible]

[illegible]

*Our reliance on third parties for content, production and distribution could limit our control over the quality of the finished video content.*

[illegible]

*An integral part of our strategy is to initially minimize our production, content acquisition and distribution costs by utilizing funding sources provided by others, however, such sources may not be readily available.*

[illegible]

*As we grow, we may seek to fund and produce more of our video content directly, [illegible]*

[illegible]

[illegible]

[illegible]

[illegible]

[illegible]

*Claims against us relating to any acquisition or business combination may necessitate our seeking claims against the seller for which the seller may not indemnify us or that may exceed the seller's indemnification obligations.*

[illegible]

*We may require and not be able to obtain additional funding and may be unable to raise such funding when needed, which could force us to delay, reduce, eliminate, or abandon growth initiatives.*

[illegible]

*Our success depends on our management and relationship with our affiliated companies.*

[illegible]

*To be successful, we need to attract and retain qualified personnel.*

[illegible]

*Since our content is digitally stored and distributed online, and we accept online payments for content subscription services, we face numerous cybersecurity risks.*

[illegible]

S-22

[illegible]

*The occurrence of natural or man-made disasters could result in declines in business that could adversely affect our financial condition, results of operations and cash flows.*

[illegible]

*We are an "emerging growth company" under the JOBS Act and we cannot be certain if the reduced disclosure requirements applicable to emerging growth companies will make our securities less attractive to investors.*

[illegible]

*Our certificate of incorporation provides, subject to limited exceptions, that the Court of Chancery of the State of Delaware is the sole and exclusive forum for certain stockholder litigation matters, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers, employees or stockholders.*

[illegible]

S-23

[illegible]

**Risks Related to the Offering**

*The Notes will be unsecured and therefore are effectively subordinated to any secured indebtedness we have incurred or may incur in the future.*

[illegible]

*The Notes will be structurally subordinated to the existing and future indebtedness and other liabilities of our subsidiaries.*

[illegible]

*The indenture under which the Notes are issued contains limited protection for holders of the Notes.*

[illegible]

S-24

- [illegible]
- [illegible]
- [illegible]
- [illegible]
- [illegible]
- [illegible]
- [illegible]

[illegible]

*An increase in market interest rates could result in a decrease in the value of the Notes.*

[illegible]

*An active trading market for the Notes may not be sustained, which could limit your ability to sell the Notes or the market price of the Notes.*

[illegible]

S-25

*We may choose to redeem the Notes when prevailing interest rates are relatively low.*

On or after July 31, 2022, we may choose to redeem the Notes from time to time, especially when prevailing interest rates are lower than the rate borne by the Notes. If prevailing rates are lower at the time of redemption, you would not be able to reinvest the redemption proceeds in a comparable security at an effective interest rate as high as the interest rate on the Notes being redeemed. Our redemption right also may adversely impact your ability to sell the Notes as the optional redemption date or period approaches.

*If we default on our obligations to pay our other indebtedness, we may not be able to make payments on the Notes.*

Any default under the agreements governing our existing or future indebtedness that is not waived by the required lenders, and the remedies sought by the holders of such indebtedness, could make us unable to pay principal and interest on the Notes and substantially decrease the market value of the Notes. If we are unable to generate sufficient cash flow and are otherwise unable to obtain funds necessary to meet required payments of principal and interest on our indebtedness, or if we otherwise fail to comply with the various covenants, including financial and operating covenants, in the instruments governing our indebtedness, we could be in default under the terms of the agreements governing such indebtedness, including the Notes. In the event of such default, the holders of such indebtedness could elect to declare all the funds borrowed thereunder to be due and payable, together with accrued and unpaid interest. In addition, the lenders under any loan facility or other financing that we may obtain in the future could elect to terminate their commitment, cease making further loans and institute foreclosure proceedings against our assets, and we could be forced into bankruptcy or liquidation. Any such default may constitute a default under the Notes, which could further limit our ability to repay our indebtedness, including the Notes. If our operating performance declines, we may in the future need to seek to obtain waivers from our existing lenders at the time to avoid being in default. If we breach any loan covenants, we may not be able to obtain such a waiver from the lenders. If this occurs, we would be in default under the credit arrangements that we have, the lender could exercise its rights as described above, and we could be forced into bankruptcy or liquidation. If we are unable to repay indebtedness, lenders having secured obligations could proceed against the collateral securing their debt. Because any future credit facilities will likely have customary cross-default provisions, if the indebtedness under the Notes, or under any future credit facility is accelerated, we may be unable to repay or finance the amounts due.

*We will have broad discretion with respect to the use of the proceeds of this offering.*

We will have broad discretion to use the net proceeds from this offering for any of the intended purposes described in the section entitled "Use of Proceeds," and you will not have the opportunity as part of your investment decision to determine how the net proceeds will be used. Because of the number and variability of factors that will determine how we use the net proceeds from this offering, their ultimate use may vary. The failure by us to apply these funds effectively could harm our business.

*We are not obligated to contribute to a sinking fund to retire the Notes and the Notes are not guaranteed by a third party.*

We are not obligated to contribute funds to a sinking fund to repay principal or interest on the Notes upon maturity or default. The Notes are not certificates of deposit or similar obligations of, or guaranteed by, any depository institution. Further, no private party or governmental entity insures or guarantees payment on the Notes if we do not have enough funds to make principal or interest payments.

*A downgrade, suspension or withdrawal of the credit rating assigned by a rating agency to us, the July 2025 Notes, or the Notes, if any, could cause the liquidity or market value of the Notes to decline significantly.*

Our credit rating is an assessment by third parties of our ability to pay our obligations. Consequently, real or anticipated changes in our credit rating will generally affect the market value of the Notes. Our credit rating, however, may not reflect the potential impact of risks related to market conditions generally or other factors discussed above on the market value of or trading market for the Notes. Credit ratings are not a recommendation to buy, sell or hold any security, and may be revised or withdrawn at any time by the issuing organization in its sole discretion.

The Notes have received a rating of BBB from Egan-Jones Ratings Company. An explanation of the significance of ratings may be obtained from the rating agency. Generally, rating agencies base their ratings on such material and information, and such of their own investigations, studies and assumptions, as they deem appropriate. Neither we nor any underwriter undertakes any obligation to maintain our credit rating or to advise holders of the Notes of any changes in our credit rating. There can be no assurance that our credit rating will remain for any given period of time or that such credit rating will not be lowered or withdrawn entirely by the rating agency if in their judgment future circumstances relating to the basis of the credit rating, such as adverse changes in our company, so warrant.

## USE OF PROCEEDS

We intend to use the net proceeds from the sale of the Notes in this offering for working capital and general corporate purposes. We may also use a portion of the proceeds allocated to general working capital for payments in connection with acquisitions made by us from time to time. We may also use proceeds to pay dividends from time to time, including with respect to our Series A Preferred Stock, and for repurchases and redemptions of our Class A common stock and Series A preferred stock or other securities as required by the terms thereof or as approved by our board of directors.

## CAPITALIZATION

The following table shows our cash and cash equivalents and capitalization as of December 31, 2021:

- on an actual basis;
- on an as adjusted basis giving effect to the sale of Notes in this offering and the receipt of net proceeds of approximately $10,237,344 from this offering, after deducting underwriting commissions of $420,210 and estimated offering expenses payable by us of approximately $180,000 (assuming no exercise of the underwriters' option to purchase additional Notes).

You should read the data set forth in the table below in conjunction with "*Use of Proceeds*," appearing elsewhere in this prospectus supplement, as well as our audited financial statements and the accompanying notes and the section entitled "*Management's Discussion and Analysis of Financial Condition and Results of Operations*," included in our Annual Report on Form 10-K for the year ended December 31, 2021, which is incorporated by reference into this prospectus supplement.

| | December 31, 2021 | |
|---|---|---|
| | *Actual* | *As Adjusted* |
| | (Unaudited) | |
| Cash and cash equivalents | $ 44,266,193 | $ 53,023,448 |
| Indebtedness | | |
| Notes Payable due 2025, net of deferred offering costs of $1,407,880 actual and $2,033,116 as adjusted | 31,092,020 | 41,272,764 |
| Revolving loan | 17,383,699 | 17,383,699 |
| Film acquisition advance | 4,198,909 | 4,198,909 |
| Total Indebtedness | [illegible] | [illegible] |
| Stockholders' Equity | | |
| Series A cumulative redeemable perpetual preferred stock, $.0001 par value, liquidation preference of $25.00 per share, 10,000,000 shares authorized; 1,698,318 shares issued and outstanding; redemption value of $42,457,950 | 170 | 170 |
| Class A common stock, $.0001 par value, 70,000,000 shares authorized; 8,964,330 issued and 8,019,828 outstanding shares | 899 | 899 |
| Class B common stock, $.0001 par value, 20,000,000 shares authorized; 7,654,506 shares issued and outstanding | 766 | 766 |
| Additional paid-in capital | 240,899,345 | 240,899,345 |
| Deficit | (139,462,244) | (139,462,244) |
| Accumulated other comprehensive gain | 571 | 571 |
| Class A common stock held in treasury, at cost (944,502 shares) | (11,302,903) | (11,302,903) |
| Total Stockholders' Equity | 90,947,900 | 90,947,900 |
| Noncontrolling interests | (51,877) | (51,877) |
| Total Capitalization | 91,599,123 | 91,599,123 |

- 8,019,828 shares of Class A Common Stock outstanding as of December 31, 2021 and excludes, as of such date:
  - 1,372,339 shares of Class A Common Stock reserved for issuance pursuant to outstanding options and stock awards under our 2017 stock incentive plan, as amended ("2017 Plan");
  - an additional 200,829 shares of Class A Common Stock available for issuance under the 2017 Plan;
  - 529,362 shares of Class A Common Stock underlying our outstanding Class W warrants with an exercise price of $7.50 per share, 123,109 shares of Class A Common Stock underlying our Class Z Warrants with an exercise price of $12.00 per share, 800,000 shares of Class A Common Stock underlying our outstanding Class I Warrants with an exercise price of $8.13 per share, 1,200,000 shares of Class A Common Stock underlying our Class II Warrants with an exercise price of $9.67 per share, 300,000 shares of Class A Common Stock underlying our Class III-A Warrants with an exercise price of $11.61 per share, and 1,500,000 shares of Class A Common Stock underlying our Class III-B Warrants with an exercise price of $11.61 per share;
- 7,654,506 shares of Class B Common Stock outstanding as of December 31, 2021; and
- 1,698,318 shares of Series A Preferred Stock outstanding as of December 31, 2021.

DESCRIPTION OF THE NOTES

The Notes will be issued under the Indenture and supplemental Indenture [illegible] U.S. Bank National Association, as trustee, [illegible] July 17, 2020. [illegible] to the Indenture and the supplemental indenture collectively as the "Indenture" and to U.S. Bank National Association as the "trustee." The Notes will be a further issuance of [illegible] July 2025 Notes [illegible] the Indenture, including, without limitation, waivers, amendments, consents, redemptions and other offers to purchase and voting. We refer to the "Notes" and the "July 2025 Notes" [illegible] only the Notes are being offered hereby [illegible] the Notes [illegible] Trust Indenture Act of 1939, as amended. The trustee has two principal roles. First, the trustee can enforce your rights against us if we default. There are some limitations on the extent to which the trustee acts on your behalf, described in the second paragraph under "— Events of Default — Remedies if an Event of Default Occurs." Second, the trustee performs certain administrative duties for us with respect to the Notes.

This section includes a description of the material terms of the Notes and the Indenture. Because this section is a summary, however, it does not describe every aspect of the Notes and the Indenture. We urge you to read the Indenture because it, and not this description, defines your rights as a holder of the Notes. The Indenture has been filed as an exhibit to a Current Report on Form 8-K filed by us on July 22, 2020.

General

The Notes will mature on July 31, 2025. The principal payable at maturity will be 100% of the aggregate outstanding principal amount. The interest rate of the Notes is [illegible]% per year and will be paid every March 31, June 30, September 30, and December 31, beginning June 30, 2022, and the regular record dates for interest payments will be every March 15, June 15, September 15, and December 15, beginning June 15, 2022. If an interest payment date falls on a non-business day, the applicable interest payment will be made on the next business day and no additional interest will accrue as a result of such delayed payment. The initial interest period will be the period from and including March 31, 2022 to June 30, 2022 and the subsequent interest periods will be the periods from and including an interest payment date to, but excluding, the next interest payment date or the stated maturity date, as the case may be.

We will issue the Notes in denominations of $25 and integral multiples of $25 in excess thereof. The Notes will not be subject to any sinking fund and holders of the Notes will not have the option to have the Notes repaid prior to the stated maturity date.

*Except as described under the captions "Events of Default" and "Merger or Consolidation" in this prospectus supplement, the indenture does not contain any provisions that give you protection in the event we issue a large amount of debt or we are acquired by another entity.*

Optional Redemption

The Notes may be redeemed in whole or in part at any time or from time to time at our option on or after July 31, 2022 upon not less than 30 days nor more than 60 days written notice by mail prior to the date fixed for redemption thereof. The redemption price shall include (i) 100% of the outstanding principal amount of the Notes called for redemption on the date fixed for redemption plus (ii) all accrued and unpaid interest payments otherwise payable thereon through the date fixed for redemption. In addition, in the event of a merger or sale of the company or substantially all of its assets or a majority of the Company's equity [illegible] the Company shall have the right to redeem the Notes prior to July 31, 2022 in connection with the consummation of such transactions on the foregoing terms.

You may be prevented from exchanging or transferring the Notes when they are subject to redemption. In case any Notes are to be redeemed in part only, the redemption notice will provide that, upon surrender of such Note, you will receive, without a charge, a new Note or Notes of authorized denominations representing the principal amount of your remaining unredeemed Notes. Any exercise of our option to redeem the Notes will be done in accordance with the Indenture.

If we redeem only some of the Notes, the trustee will determine the method for selection of the particular Notes to be redeemed, in accordance with the Indenture and in accordance with the rules of any national securities exchange or quotation system on which the Notes are listed. Unless we default in payment of the redemption price, on and after the date of redemption, interest will cease to accrue on the Notes called for redemption.

Rating of the Notes

Our Notes have a credit rating of BBB from Egan-Jones Ratings Company. An explanation of the significance of ratings may be obtained from the rating agency. Generally, rating agencies base their ratings on such material and information, and such of their own investigations, studies and assumptions, as they deem appropriate. The rating of the Notes should be evaluated independently from similar ratings of other securities. A credit rating of a security is not a recommendation to buy, sell or hold securities and may be subject to review, revision, suspension, reduction or withdrawal at any time by the assigning rating agency. See "Risk Factors — A downgrade, suspension or withdrawal of the credit rating assigned by a rating agency to us or the Notes, if any, could cause the liquidity or market value of the Notes to decline significantly."

Global Securities

Each Note will be issued in book-entry form and represented by a global security that we deposit with and register in the name of The Depository Trust Company, New York, New York, known as DTC, or its nominee. A global security may not be transferred to or registered in the name of anyone other than the depositary or its nominee, unless special termination situations arise. As a result of these arrangements, the depositary, or its nominee, will be the sole registered owner and holder of all the Notes represented by a global security, and investors will be permitted to own only beneficial interests in a global security. For more information about these arrangements, see "— Book-Entry Procedures" below.

*Termination of a Global Security*

If a global security is terminated for any reason, interests in it will be exchanged for certificates in non-book-entry form (certificated securities). After that exchange, the choice of whether to hold the certificated Notes directly or in street name will be up to the investor. Investors must consult their own banks or brokers to find out how to have their interests in a global security transferred on termination to their own names, so that they will be holders.

Payment and Paying Agents

We will pay interest to the person listed in the trustee's records as the owner of the Notes at the close of business on a particular day in advance of each due date for interest, even if that person no longer owns the Note on the interest due date. That day, usually about two weeks in advance of the interest due date, is called the "record date." Because we will pay all the interest for an interest period to the holders on the record date, holders buying and selling the Notes must work out between themselves the appropriate purchase price. The most common manner is to adjust the sales price of the Notes to prorate interest fairly between buyer and seller based on their respective ownership periods within the particular interest period. This prorated interest amount is called "accrued interest."

*Payments on Global Securities*

We will make payments on the Notes so long as they are represented by a global security in accordance with the applicable policies of the depositary as in effect from time to time. Under those policies, we will make payments directly to the depositary, or its nominee, and not to any indirect holders who own beneficial interests in the global security. An indirect holder's right to those payments will be governed by the rules and practices of the depositary and its participants, as described under "— Book-Entry Procedures."

*Payments on Certificated Securities*

In the event the Notes become represented by certificated securities, we will make payments on the Notes as follows. We will pay interest that is due on an interest payment date to the holder of the Notes as shown on the trustee's records as of the close of business on the regular record date at our office in New York, New York. We will make all payments of principal and premium, if any, by check at the office of the applicable trustee in New York, New York and/or at other offices that may be specified in the indenture or a notice to holders against surrender of the Note.

Alternatively, at our option, we may pay any cash interest that becomes due on the Notes by mailing a check to the holder at his, her or its address shown on the trustee's records as of the close of business on the regular record date or by transfer to an account at a bank in the United States, in either case, on the due date.

*Payment When Offices Are Closed*

If any payment is due on the Notes on a day that is not a business day, we will make the payment on the next day that is a business day. Payments made on the next business day in this situation will be treated under the indenture as if they were made on the original due date. Such payment will not result in a default under the Notes or the indenture, and no interest will accrue on the payment amount from the original due date to the next day that is a business day.

Book-entry and other indirect holders should consult their banks or brokers for information on how they will receive payments on the Notes.

Events of Default

You will have rights if an Event of Default occurs in respect of the Notes, as described later in this subsection.

The term "Event of Default" in respect of the Notes means any of the following:

- We do not pay the principal (or premium, if any) of any Note, including any July 2025 Note, when due.
- We do not pay interest on any Note, including any July 2025 Note, when due, and such default is not cured within 30 days.
- We remain in breach of a covenant in respect of the Notes, including the July 2025 Notes, for 60 days after we receive a written notice of default stating we are in breach (the notice must be sent by either the trustee or holders of at least 25% of the principal amount of the Notes, including the July 2025 Notes, as a single series).
- We file for bankruptcy or certain other events of bankruptcy, insolvency or reorganization occur and in the case of certain orders or decrees entered against us under bankruptcy law, such order or decree remains undischarged or unstayed for a period of 60 days.

An Event of Default for the Notes does not necessarily constitute an Event of Default for any other series of debt securities issued under the same or any other indenture. The trustee may withhold notice to the holders of the Notes of any default, except in the payment of principal or interest, if it in good faith considers the withholding of notice to be in the best interests of the holders.

*Remedies if an Event of Default Occurs*

If an Event of Default has occurred and is continuing, the trustee or the holders of not less than 25% in principal amount of the Notes and July 2025 Notes, as a single series, may declare the entire principal amount of all the Notes to be due and immediately payable. This is called a declaration of acceleration of maturity. In certain circumstances, a declaration of acceleration of maturity may be rescinded by the holders of a majority in principal amount of the Notes and July 2025 Notes, as a single series, if (1) we have deposited with the trustee all amounts due and owing with respect to the Notes (other than principal that has become due solely by reason of such acceleration) and certain other amounts, and (2) any other Events of Default have been cured or waived.

Except in cases of default, where the trustee has some special duties, the trustee is not required to take any action under the indenture at the request of any holders unless the holders offer the trustee protection from expenses and liability (called an "indemnity"). If indemnity is provided, the holders of a majority in principal amount of the Notes and July 2025 Notes, as a single series may direct the time, method and place of conducting any lawsuit or other formal legal action seeking any remedy available to the trustee. The trustee may refuse to follow those directions in certain circumstances. No delay or omission in exercising any right or remedy will be treated as a waiver of that right, remedy or Event of Default.

Before you are allowed to bypass the trustee and bring your own lawsuit or other formal legal action or take other steps to enforce your rights or protect your interests relating to the Notes, the following must occur:

- you must give the trustee written notice that an Event of Default has occurred and remains uncured;
- the holders of at least 25% in principal amount of all the Notes and July 2025 Notes, as a single series, must make a written request that the trustee take action because of the default and must offer indemnity and/or security to the trustee against the cost and other liabilities of taking that action;

- the trustee must not have taken action for 60 days after receipt of the above notice and offer of indemnity and/or security; and
- the holders of a majority in principal amount of the Notes and July 2025 Notes, as a single series, must not have given the trustee a direction inconsistent with the above notice during that 60-day period.

However, you are entitled at any time to bring a lawsuit for the payment of money due on your Notes on or after the due date.

Book-entry and other indirect holders should consult their banks or brokers for information on how to give notice or direction to or make a request of the trustee and how to declare or cancel an acceleration of maturity.

Each year, we will furnish to the trustee a written statement of certain of our officers certifying that to their knowledge we are in compliance with the indenture and the Notes, or else specifying any default.

*Waiver of Default*

The holders of a majority in principal amount of the Notes and July 2025 Notes, as a single series, may waive any past defaults other than:

- the payment of principal or interest; or
- in respect of a covenant that cannot be modified or amended without the consent of each holder.

Merger or Consolidation

Under the terms of the indenture, we are generally permitted to consolidate or merge with another entity. We are also permitted to sell all or substantially all of our assets to another entity. However, we may not take any of these actions unless all the following conditions are met:

- Where we merge out of existence or convey or transfer our assets substantially as an entirety, the resulting entity must agree to be legally responsible for our obligations under the Notes.
- The merger or sale of assets must not cause a default on the Notes and we must not already be in default (unless the merger or sale would cure the default). For purposes of this no-default test, a default would include an Event of Default that has occurred and has not been cured, as described under "Events of Default" above. A default for this purpose would also include any event that would be an Event of Default if the requirements for giving us a notice of default or our default having to exist for a specific period of time were disregarded.
- We must deliver certain certificates and documents to the trustee.

Modification or Waiver

There are three types of changes we can make to the indenture and the Notes.

*Changes Requiring Your Approval*

First, there are changes that we cannot make to the Notes without your specific approval. The following is a list of those types of changes:

- change the stated maturity of the principal of or interest on the Notes;
- reduce any amounts due on the Notes;
- reduce the amount of principal payable upon acceleration of the maturity of a Note following a default;
- change the place or currency of payment on a Note;
- impair your right to sue for payment;
- reduce the percentage of holders of Notes whose consent is needed to modify or amend the indenture; and
- reduce the percentage of holders of Notes whose consent is needed to waive compliance with certain provisions of the indenture or to waive certain defaults.

*Changes Not Requiring Approval*

The second type of change does not require any vote by the holders of the Notes. This type is limited to clarifications and certain other changes that would not adversely affect holders of the Notes in any material respect.

*Changes Requiring Majority Approval*

Any other change to the indenture and the Notes would require the following approval:

- If the change affects only the Notes, it must be approved by the holders of a majority in principal amount of the Notes; and
- If the change affects more than one series of debt securities issued under the same indenture, it must be approved by the holders of a majority in principal amount of all of the series affected by the change, with all affected series voting together as one class for this purpose.

In both cases, the required approval must be given by written consent.

The holders of a majority in principal amount of all of the series of debt securities issued under an indenture, voting together as one class for this purpose, may waive our compliance with some of our covenants in that indenture. However, we cannot obtain a waiver of a payment default or of any of the matters covered by the bullet points included above under "— Changes Requiring Your Approval."

*Further Details Concerning Voting*

When taking a vote, we will use the following rules to decide how much principal to attribute to the Notes:

The Notes will not be considered outstanding, and therefore not eligible to vote, if we have deposited or set aside in trust money for their payment or redemption. The Notes will also not be eligible to vote if they have been fully defeased as described later under "Defeasance — Full Defeasance."

We will generally be entitled to set any day as a record date for the purpose of determining the holders of the Notes that are entitled to vote or take other action under the indenture. However, the record date may not be more than 30 days before the date of the first solicitation of holders to vote on or take such action. If we set a record date for a vote or other action to be taken by holders of the Notes, that vote or action may be taken only by persons who are holders of the Notes on the record date and must be taken within eleven months following the record date.

Book-entry and other indirect holders should consult their banks or brokers for information on how approval may be granted or denied if we seek to change the indenture or the Notes or request a waiver.

*Defeasance*

"Defeasance" means that, by depositing with a trustee an amount of cash and/or government securities sufficient to pay all principal and interest, if any, on the Notes when due and satisfying any additional conditions noted below, we will be deemed to have been discharged from our obligations under the Notes. In the event of a "covenant defeasance," upon depositing such funds and satisfying similar conditions discussed below we would be released from the restrictive covenants under the indenture relating to the Notes.

The following defeasance provisions will be applicable to the Notes.

*Covenant Defeasance*

Under the indenture, we can make the deposit described below and be released from some of the restrictive covenants in the indenture under which the Notes were issued. This is called "covenant defeasance." In that event, you would lose the protection of those restrictive covenants but would gain the protection of having money and government securities set aside in trust to repay your Notes. If we achieve covenant defeasance and your Notes were subordinated as described under "Indenture Provisions — Ranking" below, such subordination will not prevent the trustee under the indenture from applying the funds available to it from the deposit described in the first bullet below to the payment of amounts due in respect of such debt securities for the benefit of the subordinated debt holders. In order to achieve covenant defeasance, we must do the following:

- Since the Notes are denominated in U.S. dollars, we must deposit in trust for the benefit of all holders of the Notes either cash or a combination of cash and U.S. government or U.S. government agency notes or bonds that will generate enough cash to make interest, principal and any other payments on the Notes on their various due dates.
- We must deliver to the trustee a legal opinion of our counsel confirming that, under current U.S. federal income tax law, we may make the above deposit without causing you to be taxed on the Notes any differently than if we did not make the deposit.
- We must deliver to the trustee a legal opinion and officers' certificate stating that all conditions precedent to covenant defeasance have been complied with.
- Defeasance must not result in a breach or violation of, or result in a default under, the indenture or any of our other material agreements or instruments.
- No default or event of default with respect to the Notes shall have occurred and be continuing and no defaults or events of default related to bankruptcy, insolvency or reorganization shall occur during the next 90 days.

If we accomplish covenant defeasance, you can still look to us for repayment of the Notes if there were a shortfall in the trust deposit or the trustee is prevented from making payment. For example, if one of the remaining Events of Default occurred (such as our bankruptcy) and the Notes became immediately due and payable, there might be a shortfall. Depending on the event causing the default, you may not be able to obtain payment of the shortfall.

*Full Defeasance*

We can legally release ourselves from all payment and other obligations on the Notes (called "full defeasance") if we put in place the following other arrangements for you to be repaid:

- Since the Notes are denominated in U.S. dollars, we must deposit in trust for the benefit of all holders of the Notes a combination of money and U.S. government or U.S. government agency notes or bonds that will generate enough cash to make interest, principal and any other payments on the Notes on their various due dates.
- We must deliver to the trustee a legal opinion confirming that there has been a change in current U.S. federal tax law or an IRS ruling that allows us to make the above deposit without causing you to be taxed on the Notes any differently than if we did not make the deposit. Under current U.S. federal tax law the deposit and our legal release from the Notes would be treated as though we paid you your share of the cash and notes or bonds at the time the cash and notes or bonds were deposited in trust in exchange for your Notes and you would recognize gain or loss on the Notes at the time of the deposit.
- We must deliver to the trustee a legal opinion and officers' certificate stating that all conditions precedent to defeasance have been complied with.
- Defeasance must not result in a breach or violation of, or constitute a default under, of the indenture or any of our other material agreements or instruments.
- No default or event of default with respect to the Notes shall have occurred and be continuing and no defaults or events of default related to bankruptcy, insolvency or reorganization shall occur during the next 90 days.

If we ever did accomplish full defeasance, as described above, you would have to rely solely on the trust deposit for repayment of the Notes. You could not look to us for repayment in the unlikely event of any shortfall. Conversely, the trust deposit would most likely be protected from claims of our lenders and other creditors if we ever became bankrupt or insolvent. If your Notes were subordinated as described later under "— Indenture Provisions — Ranking," such subordination would not prevent the trustee under the indenture from applying the funds available to it from the deposit referred to in the first bullet of the preceding paragraph to the payment of amounts due in respect of such Notes for the benefit of the subordinated debtholders.

Limitation on Restricted Payments Covenant

In addition to any other covenants described in this prospectus supplement, as well as standard covenants relating to payment of principal and interest, maintaining an office where payments may be made or where securities can be surrendered for payment, payment of taxes by us and related matters, upon (i) the failure to pay interest on any Note when such interest is due and payable or (ii) the occurrence of an Event of Default and while any such interest payment remains unpaid or such Event of Default is ongoing the indenture prohibits us from:

(1) declaring or paying any dividend, making any distribution on or in respect of our capital stock or making any similar payment to the direct or indirect holders of our capital stock in their capacity as such;

(2) purchasing, repurchasing, redeeming, retiring or otherwise acquiring ("Purchase") for value any capital stock of the Company held by any Person (other than capital stock held by the Company or a subsidiary) or any capital stock of a subsidiary held by any Affiliate of the Company;

(3) purchasing for value, prior to scheduled maturity, any scheduled repayment of any subordinated obligations; or

(4) making any investment in any Person.

Form, Exchange and Transfer of Certificated Registered Securities

If registered Notes cease to be issued in book-entry form, they will be issued:

- only in fully registered certificated form;
- without interest coupons; and
- unless we indicate otherwise, in denominations of $25 and amounts that are multiples of $25.

Holders may exchange their certificated securities for Notes of smaller denominations or combined into fewer Notes of larger denominations, as long as the total principal amount is not changed and as long as the denomination is equal to or greater than $25.

Holders may exchange or transfer their certificated securities at the corporate trust office of the trustee. We have appointed the trustee to act as our agent for registering Notes in the names of holders transferring Notes. We may appoint another entity to perform these functions or perform them ourselves.

Holders will not be required to pay a service charge to transfer or exchange their certificated securities, but they may be required to pay any tax or other governmental charge associated with the transfer or exchange. The transfer or exchange will be made only if our transfer agent is satisfied with the holder's proof of legal ownership.

We may appoint additional transfer agents or cancel the appointment of any particular transfer agent. We may also approve a change in the office through which any transfer agent acts.

If any certificated securities of a particular series are redeemable and we redeem less than all the debt securities of that series, we may block the transfer or exchange of those debt securities during the period beginning 15 days before the day we mail the notice of redemption and ending on the day of that mailing, in order to freeze the list of holders to prepare the mailing. We may also refuse to register transfers or exchanges of any certificated securities selected for redemption, except that we will continue to permit transfers and exchanges of the unredeemed portion of any debt security that will be partially redeemed.

If a registered debt security is issued in book-entry form, only the depositary will be entitled to transfer and exchange the debt security as described in this subsection, since it will be the sole holder of the debt security.

Resignation of Trustee

The trustee may resign or be removed with respect to the Notes provided that a successor trustee is appointed to act with respect to the Notes. In the event that two or more persons are acting as trustee with respect to different series of indenture securities under the indenture, each of the trustees will be a trustee of a trust separate and apart from the trust administered by any other trustee.

Indenture Provisions — Ranking

The Notes will be our direct unsecured obligations and will rank:

- *Pari passu* with, which means equal to, all of our currently outstanding unsecured unsubordinated indebtedness issued by us, including the approximately $[illegible] principal amount of the July 2025 Notes. The Notes will also rank *pari passu* with our general liabilities, which consist of trade and other payables, including any outstanding dividend payable on our Series A Preferred Stock, interest and debt fees payable, vendor payables and accrued expenses such as auditor fees, legal fees, director fees, etc. In total, these general liabilities were $[illegible] as of December 31, 20[illegible]. We have the ability to issue from time to time other debt securities with terms different from the Notes and, without consent of the holders thereof, as well as the ability to reopen the Notes and issue additional Notes. If we issue additional debt securities, these additional debt securities could rank higher in priority of payment or have a lien or other security interest greater than that accorded to the holders of the Notes.
- Senior to any of our future indebtedness that expressly provides it is subordinated to the Notes. We currently do not have outstanding debt that is subordinated to the Notes and do not currently intend to issue indebtedness that expressly provides that it is subordinated to the Notes. Therefore, the Notes, as currently contemplated, will not be senior to any indebtedness or obligations.
- Effectively subordinated to all of our existing and future secured indebtedness (including indebtedness that is initially unsecured to which we subsequently grant security interest), including our $[illegible] million credit facility with [illegible] and our $[illegible] [illegible] advance from [illegible] which is secured by [illegible] and [illegible] rights to certain films and productions expected to be acquired by [illegible] Media, but only to the extent of the value of the assets securing such indebtedness. Because the Notes will not be secured by any of our assets, they will be effectively subordinated to any existing secured indebtedness, any indebtedness that we may incur in the future, such as a new credit facility or any indebtedness that is initially unsecured to which we subsequently grant a security interest, to the extent of the value of the assets securing such indebtedness. In any liquidation, dissolution, bankruptcy or other similar proceeding, the holders of any of our existing or future secured indebtedness may assert rights against the assets pledged to secure that indebtedness in order to receive full payment of their indebtedness before the assets may be used to pay other creditors, including the holders of the Notes, and any assets of our subsidiaries will not be directly available to satisfy the claims of our creditors, including holders of the Notes.
- Structurally subordinated to all existing and future indebtedness and other obligations of any of our subsidiaries and financing vehicles. Structural subordination means that creditors of a parent entity are subordinate to creditors of a subsidiary entity with respect to the subsidiary's assets.

Book-Entry Procedures

The Notes will be represented by global securities that will be deposited and registered in the name of DTC or its nominee. This means that, except in limited circumstances, you will not receive certificates for the Notes.

Beneficial interests in the Notes will be represented through book-entry accounts of financial institutions acting on behalf of beneficial owners as direct and indirect participants in DTC. Investors may elect to hold interests in the Notes through either DTC, if they are a participant, or indirectly through organizations that are participants in DTC.

The Notes will be issued as fully registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered certificate will be issued for each issuance of the Notes, in the aggregate principal amount of such issue, and will be deposited with DTC. Interests in the Notes will trade in DTC's Same Day Funds Settlement System, and any permitted secondary market trading activity in such Notes will, therefore, be required by DTC to be settled in immediately available funds. We will not have and neither the Trustee nor the Paying Agent will have any responsibility for the performance by DTC or its participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act. DTC holds and provides asset servicing for over [illegible] million issues of U.S. and non-U.S. equity, corporate and municipal debt issues, and money market instruments from over [illegible] countries and territories that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC").

[illegible]

CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

[illegible]

[illegible]

[illegible]

*Qualified Reopening.* [illegible]

*Pre-issuance Accrued Interest.* [illegible]

*Foreign Account Tax Compliance Act*

[illegible]

[illegible]

UNDERWRITING

Ladenburg Thalmann is acting as representative of the underwriters named below. [illegible]

| Underwriter | Principal Amount of Notes |
|---|---|
| Ladenburg Thalmann & Co. Inc. | $ [illegible] |
| B. Riley Securities, Inc. | $ [illegible] |
| Total | $ [illegible] |

The underwriting agreement provides that the obligations of the underwriters to purchase the Notes included in this offering are subject to approval of legal matters by counsel and to other conditions. [illegible]

The underwriters have agreed to purchase the Notes from us [illegible]

The underwriters propose to offer the Notes for sale, from time to time, [illegible]

[illegible]

[illegible]

The July 2025 Notes are listed on the Nasdaq Global Market [illegible]

The following table shows the public offering price, the underwriting discounts and commissions to be paid to the underwriters and the proceeds, before expenses, to us in connection with this offering. [illegible]

| | Per Note | Without Option | With Option |
|---|---|---|---|
| Public offering price | $ [illegible] | $ [illegible] | $ [illegible] |
| Underwriting discount (sales load) paid by us(1) | $ [illegible] | $ [illegible] | $ [illegible] |
| Estimated Proceeds to us, before expenses | $ [illegible] | $ [illegible] | $ [illegible] |

(1) The expenses associated with the offering, including the underwriting discount, are paid by us [illegible]

We have agreed to reimburse the underwriters [illegible]

We estimate expenses payable by us in connection with this offering, other than the underwriting discounts and commissions referred to above, will be approximately [illegible]

We and our investment adviser have each agreed to indemnify the underwriters against certain liabilities, including liabilities under the Securities Act of 1933, [illegible]

Certain underwriters may make a market in the Notes. [illegible]

In connection with the offering, Ladenburg Thalmann & Co. Inc., on behalf of the underwriters, may purchase and sell Notes, [illegible]

The underwriters also may impose a penalty bid. [illegible]

Any of these activities may have the effect of preventing or retarding a decline in the market price of notes, [illegible]

A prospectus in electronic format may be made available on the websites maintained by one or more of the underwriters. [illegible]

Certain underwriters may, from time to time, engage in transactions with or perform services for us [illegible]

The principal business address of Ladenburg Thalmann & Co. Inc. is [illegible], New York, New York [illegible]

**Settlement**

We expect that delivery of the Notes will be made against payment therefor [illegible]

**Other Jurisdictions**

The Notes offered by this prospectus supplement may not be offered or sold, directly or indirectly, [illegible]

**Potential Conflicts of Interest**

The underwriters and their respective affiliates are full service financial institutions [illegible]

Ladenburg Thalmann acted as sole underwriter [illegible]

B. Riley Securities served as our agent pursuant to an At-the-Market Sales Agreement [illegible]

LEGAL MATTERS

The legality of the Notes will be passed on for us by our counsel, [illegible]

EXPERTS

The consolidated financial statements of Chicken Soup for the Soul Entertainment Inc. and subsidiaries [illegible]

The financial statements of Screen Entertainment, Inc. [illegible]

WHERE YOU CAN FIND MORE INFORMATION; INCORPORATION BY REFERENCE

The SEC allows us to incorporate by reference the information we file with it, which means that we can disclose important information to you by referring you to those documents. The information incorporated by reference is an important part of this prospectus supplement, and information that we file later with the SEC will automatically update and supersede this information. This prospectus supplement incorporates by reference the documents listed below, all filings we make under Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act after the initial filing date of the registration statement of which this prospectus supplement forms a part and prior to effectiveness of such registration statement, and all filings we make with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act after effectiveness of such registration statement and prior to the sale of all of the shares offered hereby, including all documents filed as exhibits to any of the foregoing:

- our annual report on Form 10-K for the fiscal year ended December 31, [illegible], filed with the SEC on March [illegible];
- our definitive proxy statement on Schedule 14A filed with the SEC on April [illegible];
- our current reports on Form 8-K or 8-K/A, as applicable, filed with the SEC on [illegible];
- our current report on Form 8-K filed with the SEC on [illegible];
- our registration statement on Form 8-A [illegible] under Section 12(b) of the Exchange Act; and
- our [illegible] dated April [illegible].

Any statements contained in a document filed before the date of this prospectus supplement and incorporated by reference herein shall be deemed to be modified or superseded for purposes of this prospectus supplement to the extent that a statement contained herein modifies or supersedes such statement. Any statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this prospectus supplement. Any information that we file after the date of this prospectus supplement with the SEC will automatically update and supersede the information contained in this prospectus supplement. Notwithstanding the foregoing, we are not incorporating any document or portion thereof or information deemed to have been furnished and not filed in accordance with SEC rules.

In addition to accessing the above information through the SEC's website at www.sec.gov, you may obtain a copy of any or all of the information that has been incorporated by reference in this prospectus supplement, without charge, upon written or oral request directed to Chicken Soup for the Soul Entertainment, Inc., 132 E. Putnam Ave., Floor 2W, Cos Cob, Connecticut 06807, telephone number (203) 861-4000.

Prospectus

$1,000,000,000

COMMON STOCK, PREFERRED STOCK, WARRANTS, DEBT SECURITIES AND UNITS (For Issuance)

and

1,758,956 shares of 9.75% Series A cumulative redeemable perpetual preferred stock
Offered by Selling Stockholder

We will offer and sell from time to time shares of common stock, shares of preferred stock, warrants, debt securities and/or units comprised of one or more of the other classes of securities offered hereby, at a maximum aggregate offering size not to exceed $1,000,000,000. The securities may be offered separately, together, or in series, and in amounts, at prices and on other terms to be determined at the time of each offering. We will provide the specific terms of the securities to be sold in a prospectus supplement.

We may sell the securities directly to investors, to or through underwriters or dealers or through agents designated from time to time, among other methods. The prospectus supplement for each offering will describe in detail the specific plan of distribution for the securities. The prospectus supplement also will set forth the price to the public of such securities, any placement agent's fees or underwriter's discounts and commissions, and the net proceeds we expect to receive from the sale of the securities.

This prospectus also covers an offering for resale by a selling securityholder of up to 1,758,956 shares of our 9.75% Series A cumulative redeemable perpetual preferred stock ("Series A preferred stock") issued to the selling securityholder in connection with our repurchase of such holder's equity interest in Crackle Plus LLC and the reimbursement of certain expenses incurred by selling securityholder in connection with the creation of Crackle Plus. All such shares of Series A preferred stock may be offered for resale or otherwise disposed of by the selling securityholder as set forth under the caption "Selling Securityholder" beginning on page [illegible] of this prospectus, including its pledgees, assignees, or successors in interest.

We will not receive any proceeds from the sale or other disposition of the Series A preferred stock by the selling securityholder.

The selling securityholder may be deemed to be an "underwriter" within the meaning of the Securities Act. We will pay the expenses of registering the holder's shares of Series A preferred stock for resale (including the selling stockholder's legal fees, subject to an agreed cap), but all selling commissions and other similar expenses incurred by the selling securityholder will be paid by the selling securityholder.

Our Class A common stock is listed for trading on the Nasdaq Global Market under the symbol "CSSE," our Series A Preferred Stock is listed for trading on the Nasdaq Global Market under the symbol "CSSEP," and our 9.50% Notes Due 2025 ("2025 Notes") are listed for trading on the Nasdaq Global Market under the symbol "CSSEN." On June [illegible], 2021, the last reported sale prices of our Class A common stock, Series A preferred stock and 2025 Notes were $[illegible], $[illegible] and $[illegible], respectively.

In addition to our Class A common stock, we have outstanding Class B common stock. Our Class B common stock is not publicly traded and it is controlled and beneficially owned by our chief executive officer. Holders of shares of Class A common stock and Class B common stock have substantially identical rights, except that holders of shares of Class A common stock are entitled to one vote per share and holders of shares of Class B common stock are entitled to ten votes per share. Holders of shares of Class A common stock and Class B common stock vote together as a single class on all matters (including the election of directors) submitted to a vote of stockholders, unless otherwise required by law or our charter. Each share of Class B common stock may be converted into a share of Class A common stock at any time at the election of the holder.

**We are an "emerging growth company" as defined in the Jumpstart Our Business Startups Act of 2012 and have elected to comply with certain reduced public company reporting requirements.**

**Investing in our securities involves a high degree of risk. See "*Risk Factors*" on page [illegible] in this prospectus, any prospectus supplements, and in our annual report on Form 10-K for the year ended December 31, [illegible], for a discussion of information that should be considered in connection with an investment in our securities.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy or accuracy of this prospectus. Any representation to the contrary is a criminal offense.**

The date of this prospectus is June 25, 2021

TABLE OF CONTENTS

| | |
|---|---|
| ABOUT THIS PROSPECTUS | 1 |
| CERTAIN CORPORATE INFORMATION AND DEFINITIONS | 1 |
| PROSPECTUS SUMMARY | 3 |
| RISK FACTORS | 16 |
| NOTE ON FORWARD LOOKING STATEMENTS | 21 |
| BACKGROUND OF THE ISSUANCE OF SECURITIES TO THE SELLING SECURITYHOLDER | 23 |
| USE OF PROCEEDS | 24 |
| SELLING SECURITYHOLDER | 25 |
| DESCRIPTION OF CAPITAL STOCK | 26 |
| DESCRIPTION OF DEBT SECURITIES | [illegible] |
| DESCRIPTION OF WARRANTS | [illegible] |
| DESCRIPTION OF [illegible] | [illegible] |
| DESCRIPTION OF THE UNITS | [illegible] |
| PLAN OF DISTRIBUTION | [illegible] |
| LEGAL MATTERS | [illegible] |
| EXPERTS | [illegible] |
| WHERE YOU CAN FIND MORE INFORMATION | [illegible] |
| INFORMATION INCORPORATED BY REFERENCE | [illegible] |

ABOUT THIS PROSPECTUS

This prospectus is part of a registration statement that we filed with the Securities and Exchange Commission ("SEC") using a "shelf" registration process. Under this shelf process, we may, from time to time, sell or issue any of the combination of securities described in this prospectus in one or more offerings with a maximum aggregate offering size of up to $1,000,000,000. In addition, the selling securityholder may sell, in one or more offerings pursuant to this prospectus, up to an aggregate of [illegible] shares of our Series A preferred stock, as described in this prospectus.

This prospectus provides you with a general description of the securities we or the selling securityholder may offer. Each time we sell securities off of the "shelf", we will provide a prospectus supplement that will contain specific information about the terms of that offering. The prospectus supplement may also add, update or change information contained in this prospectus. If there is any inconsistency between the information in this prospectus and any prospectus supplement, you should rely on the information in that prospectus supplement. You should read both this prospectus and any prospectus supplement, together with the additional information described below under the heading "*Where You Can Find More Information*" and "*Information Incorporated by Reference*."

You should rely only on the information contained or incorporated by reference in this prospectus and any prospectus supplement relating to a particular offering. We and the selling securityholder have not authorized anyone to provide you with different information and, if provided, such information or representations must not be relied upon as having been authorized by us or the selling securityholder. Neither this prospectus nor any prospectus supplement nor any related issuer free writing prospectus shall constitute an offer to sell or a solicitation of an offer to buy offered securities in any jurisdiction in which it is unlawful for such person to make such an offering or solicitation. This prospectus does not contain all of the information included in the registration statement. For a more complete understanding of the offering of the securities, you should refer to the registration statement, including its exhibits.

You should not assume that the information appearing in this prospectus is accurate as of any date other than the date on the front cover of this prospectus. You should not assume that the information contained in any prospectus supplement or in the documents incorporated by reference herein or therein is accurate as of any date other than the respective dates of those documents. Our business, financial condition, results of operations, and prospects may have changed since that date.

CERTAIN CORPORATE INFORMATION AND DEFINITIONS

Our company, Chicken Soup for the Soul Entertainment, Inc. is referred to in this prospectus as "CSSE," the Company," or "we" or similar pronouns. References to:

- "CSS Productions" means Chicken Soup for the Soul Productions, LLC, our immediate parent;
- "CSS" means Chicken Soup for the Soul, LLC, our intermediate parent company;
- "CSS Holdings" means Chicken Soup for the Soul Holdings, LLC, the parent company of CSS and our ultimate parent company;
- "Screen Media" means Screen Media Ventures, LLC, a wholly owned subsidiary of CSSE;
- "A Plus" means A Sharp Inc. (d/b/a A Plus), a wholly owned subsidiary of CSSE;
- "Pivotshare" means Pivotshare, Inc., a wholly owned subsidiary of CSSE;
- "Crackle Plus" means Crackle Plus, LLC, a wholly owned subsidiary of CSSE which was originally formed by CSSE and CPE Holdings, Inc. (an affiliate of Sony Pictures Television Inc.);

- "Landmark Studio Group" means Landmark Studio Group, a majority owned subsidiary of CSSE;
- "Halcyon Television" means Halcyon Television LLC, a wholly owned subsidiary of CSSE;
- "Halcyon Studios" means Halcyon Studios LLC, a majority owned subsidiary of Halcyon Television; and
- "CSS AVOD" means CSS AVOD Inc., a majority owned subsidiary of CSSE.

We and our subsidiaries and affiliates have proprietary rights to the trademarks and trade names used herein, including, among others, Chicken Soup for the Soul®, Crackle®, Popcornflix.com®, Popcornflix Kids®, Truli®, and FrightPix®. Solely as a matter of convenience, trademarks and trade names referred to herein may or may not be accompanied with the marks of "TM" or "®", however, the absence of such marks is not intended to indicate that the Company or its affiliates or subsidiaries will not assert, to the fullest extent possible under applicable law, their respective rights to such trademarks and trade names.

PROSPECTUS SUMMARY

*This summary description about us and our business highlights selected information contained elsewhere in this prospectus or incorporated in this prospectus by reference. This summary does not contain all of the information you should consider before deciding to invest in our securities. You should carefully read this entire prospectus and any applicable prospectus supplement, including each of the documents incorporated herein or therein by reference, before making an investment decision. Investors should carefully consider the information set forth under the caption "Risk Factors" below and appearing elsewhere in our annual report on Form 10-K for the year ended December 31, 2020, our quarterly report on Form 10-Q for the quarter ended March 31, 2021, and in those described in documents incorporated by reference herein filed by us from time to time, and those described in any applicable prospectus supplement.*

**Overview**

Chicken Soup for the Soul Entertainment, Inc. is a leading streaming video-on-demand (VOD) company. We operate Crackle Plus, a portfolio of ad-supported and subscription-based VOD streaming services, as well as Screen Media, Halcyon Television, and a number of affiliates that collectively enable us to acquire, produce, co-produce and distribute content, including our original and exclusive content, all in support of our streaming services.

Crackle Plus is comprised of unique networks, each delivering popular and original premium content focused on different themes such as family, kids, horror and comedy. Crackle Plus brands include Crackle, among the most watched ad-supported independent VOD networks, Popcornflix, Popcornflix Kids, Truli, Pivotshare, Españolflix and FrightPix. As of March 31, 2021, Crackle Plus served more than 30 million monthly active visitors through many distribution platforms including Roku, Amazon Fire, Vizio and others. These visitors viewed content produced through our various television production affiliates, acquired by Screen Media, or licensed from Sony Pictures Television (SPT), Lionsgate, Paramount, Fox, Warner Brothers and more than 100 other production and distribution companies. For the period ended March 31, 2021, viewers of Crackle Plus networks have access to more than 10,000 films and 23,000 episodes of licensed or company-owned original or exclusive programming. Additionally, the Company's original and exclusive programming made up approximately 18.4% of total ad impressions served in 2020.

Screen Media manages one of the industry's largest independently owned television and film libraries consisting of approximately 1,550 feature films and 275 episodes of television programming. Screen Media also acquires between 20 and 30 new films each year. Screen Media provides content for the Crackle Plus portfolios and also distributes its library to other exhibitors and third party networks to generate additional revenue and operating cash flow.

Halcyon Television, our company's new subsidiary, manages the extensive film and television library recently acquired from Sonar Entertainment. This library is distributed by Screen Media. The library contains more than 1,000 titles, and 4,000 hours of programming, ranging from classics, including *The Little Rascals*, *Laurel & Hardy* and *Blondie* (produced by Hal Roach Studios), to acclaimed epic event mini-series such as *Lonesome Dove* and *Dinotopia*. The Halcyon library titles have received 400 Emmy Award nominations, 89 Emmy Awards and 13 Golden Globe Awards. Halcyon Television, and its subsidiary Halcyon Studios, are headed by David Ellender. Ellender and his team have developed, produced, financed and distributed shows such as *The Shannara Chronicles* (MTV/Netflix), *Taboo* (BBC/FX), *The Son* (AMC), *Mr. Mercedes* (DirecTV), *Das Boot* (Sky Europe), *Hanna* (Amazon Prime), [illegible] (Netflix) and *Mysterious Benedict Society* (Disney+). Halcyon Studios, a subsidiary of Halcyon Television, will continue developing and producing the current and future high-caliber content for all platforms across a broad spectrum in the U.S. and internationally.

[illegible]

Our Strategy

[illegible]

- Content – [illegible]
  - Original & Exclusive programming. [illegible]
  - Expanding production capacity. [illegible]
  - Content acquisition and rights ownership. [illegible]
- Advertising – Utilize existing technology and data to deliver innovative advertising formats and relevant ads that engage viewers.
  - Attractive audience. [illegible]
  - Diverse sales channels. [illegible]
  - Technology investment. [illegible]

- Viewership – Grow distribution to gain new viewers and employ sophisticated data analytics to deliver more compelling experiences.
  - Content and Distribution. [illegible]
  - New Genre-specific Networks. [illegible]
  - Personalized Viewer Experience. [illegible]

Operations

[illegible]

- Crackle – [illegible]
- Popcornflix – [illegible]

- FAST Networks – [illegible]

[illegible]

[illegible] Halcyon Television [illegible] Sonar Entertainment. [illegible]

Recent Developments

On April 8, 2021, we entered into an asset purchase agreement [illegible] Halcyon Television [illegible] On May 21, 2021, pursuant to the Asset Purchase Agreement, [illegible]

Sonar is an award-winning independent television studio that owns, develops, produces, finances and distributes content for global audiences. [illegible]

We believe that our acquisition of the Sonar assets accelerates our strategy to build the leading independent AVOD streaming service in four key ways:

- expanding our original television content development pipeline;
- improving margins by increasing our IP rights ownership;
- accelerating our ability to launch the Chicken Soup for the Soul branded AVOD network; and
- providing a faster path to growing our international television production and distribution activities.

Pursuant to the Asset Purchase Agreement, [illegible]

In consideration for the Purchased Assets, [illegible]

During the 18-month period following the closing, [illegible]

In connection with the transaction, [illegible]

Certain of the Purchased Assets, [illegible]

[illegible]

On May 21, 2021, in connection with the closing of the Sonar asset acquisition, [illegible]

The Credit Agreement provides the Borrowers with revolving loans [illegible]

The proceeds of the Loans [illegible]

The Loans bear interest [illegible]

The Borrowers may borrow, repay and reborrow under the Loans prior to the maturity date, [illegible]

A description of the asset purchase and a summary of the principal terms of the Asset Purchase Agreement [illegible]

The results of operations of Sonar's operations will be included in our consolidated statements of operations [illegible]

The transaction was structured to ensure that Sonar Canada's operations [illegible]

Competition

We are in a highly competitive business. [illegible]

In addition, our video content competes [illegible]

Given such competition, [illegible]

Intellectual Property

[illegible]

We rely on a combination of copyright, trademark, trade secret laws, [illegible]

Human Capital Management

At Chicken Soup for the Soul Entertainment, [illegible]

As of March 31, 2021, [illegible]

We value our employees and invest in them and their communities. [illegible]

Corporate Information

We are a Delaware corporation formed on May 4, 2016. [illegible]

[illegible]

Use of Non-GAAP Financial Measures

[illegible]

[illegible]

[illegible] Adjusted EBITDA [illegible] operating income (loss) [illegible] Adjusted EBITDA [illegible] operating income (loss).

Adjusted EBITDA has important limitations as an analytical tool, and you should not consider it in isolation or as a substitute for analysis of our results as reported under U.S. GAAP. Some of these limitations are:

- Adjusted EBITDA does not reflect our cash expenditures or future requirements for capital expenditures or contractual commitments;
- Adjusted EBITDA does not reflect changes in, or cash requirements for our working capital needs;
- Adjusted EBITDA does not reflect the effects of preferred dividend payments, or the cash requirements necessary to fund;
- Although amortization and depreciation is a non-cash charge, the assets being depreciated will often have to be replaced in the future, and Adjusted EBITDA does not reflect any cash requirements for such future replacements;
- Adjusted EBITDA does not reflect the effects of the amortization of our film library, which include cash and non-cash amortization of our initial film library investments, participation costs and theatrical release costs;
- Adjusted EBITDA does not reflect the impact of stock-based compensation upon our results of operations;
- Adjusted EBITDA does not reflect the significant interest expense, or the cash requirements necessary to service interest or principal payments on our debt;
- Adjusted EBITDA does not reflect our income tax expense (benefit) or the cash requirements to pay our income taxes;
- Adjusted EBITDA does not reflect the impact of acquisition related expenses; and the cash requirements necessary;
- Adjusted EBITDA does not reflect the impact of other non-recurring, infrequent in nature and unusual income and expenses; and
- Other companies in our industry may calculate Adjusted EBITDA differently than we do, limiting its usefulness as a comparative measure.

- In evaluating Adjusted EBITDA, you should be aware that in the future we may incur expenses similar to those eliminated in this presentation.

Reconciliation of Historical GAAP Net Income as reported to Adjusted EBITDA

The following tables present a reconciliation of Adjusted EBITDA to net income, the most directly comparable GAAP measure, for the periods presented:

| | Three Months Ended March 31, | |
|---|---|---|
| | 2021 | 2020 |
| Net loss available to common stockholders | $ (9,193,383) | $ (11,417,380) |
| Preferred dividends | 2,331,385 | 914,773 |
| Provision for income taxes | 14,000 | 49,000 |
| Other taxes | 84,491 | 21,431 |
| Interest expense[a] | 1,080,866 | 329,125 |
| Film library and program rights amortization[b] | 8,922,667 | 2,494,833 |
| Share-based compensation expense[c] | 731,866 | 214,853 |
| Acquisition-related costs[d] | — | 89,926 |
| Reserve for bad debt and video returns | 484,212 | 1,721,393 |
| Amortization and depreciation[e] | 3,671,500 | 5,204,724 |
| Other non-operating income, net[f] | (270) | (6,438) |
| Transitional expenses[g] | — | 2,113,499 |
| All other nonrecurring costs | 890,030 | 186,948 |
| Adjusted EBITDA | $ 8,563,668 | $ 2,037,327 |

(a) Includes amortization of deferred financing costs of $98,189 and $10,152 for the three months ended March 31, 2021 and 2020, respectively.

(b) Represents amortization of our film library, which include cash and non-cash amortization of our film library investments, participation costs and theatrical release costs as well as amortization for our acquired program rights.

(c) Represents expense related to common stock equivalents issued to certain employees and officers under our Long-Term Incentive Plan. In addition to common stock grants issued to employees, non-employee directors and third-party consultants.

(d) Represents aggregate transaction related costs, including legal fees, accounting fees, investment advisory fees and various consulting fees.

(e) Includes depreciation and amortization of intangibles, property and equipment and amortization of technology expenditures included in cost of revenue.

(f) Other non-operating income is primarily comprised of interest income earned on cash deposits.

(g) Represents transitional related expenses primarily associated with the Crackle Plus business combination and our strategic shift related to our production business. Costs include non-recurring payroll, redundant non-recurring technology costs and other transitional costs.

| | Year Ended December 31, | |
|---|---|---|
| | 2020 | 2019 |
| Net loss available to common stockholders | $ (44,332,353) | $ (34,958,814) |
| Preferred dividends | 4,143,370 | 3,304,947 |
| Provision for income taxes | 99,000 | 385,000 |
| Other taxes | 712,860 | 460,203 |
| Interest expense[a] | 2,325,106 | 814,017 |
| Film library and program rights amortization[b] | 21,543,773 | 10,483,277 |
| Share-based compensation expense[c] | 4,131,213 | 1,061,000 |
| Acquisition-related costs[d] | 98,928 | 2,968,280 |
| Expense for bad debt and video returns | 3,384,584 | 2,669,699 |
| Amortization and depreciation[e] | 13,217,247 | 11,393,219 |
| Other non-operating income, net[f] | (4,254,202) | (46,197) |
| Loss on extinguishment of debt | 169,218 | 219,900 |
| Impairment of content assets[g] | 4,971,818 | — |
| Transitional expenses[h] | 4,353,345 | 4,385,835 |
| All other nonrecurring costs | 5,389,568 | 276,400 |
| Adjusted EBITDA | $ 17,731,378 | $ 3,961,128 |

(a) Includes amortization of deferred financing costs of $113,790 and $87,400 for the years ended December 31, 2020 and 2019, respectively.

(b) Represents amortization of our film library, which include cash and non-cash amortization of our initial film library investments, participation costs and theatrical release costs as well as amortization for our acquired program rights.

(c) Represents expense related to common stock equivalents issued to certain employees and officers under our Long-Term Incentive Plan. In addition to common stock grants issued to employees, non-employee directors and third party consultants.

(d) Represents aggregate acquisition related costs, including legal fees, accounting fees, investment advisory fees and various consulting fees.

(e) Includes depreciation and amortization of intangibles, property and equipment and amortization of technology expenditures included in cost of revenue.

(f) Other non-operating income is primarily comprised of various extinguished liabilities as part of a settlement, see Results of Operations in our Annual Report on Form 10-K for the year ended December 31, 2020 for further detail.

(g) Represents impairment charges related to our content assets, comprised of program and film library assets.

(h) Represents transitional related expenses primarily associated with the Crackle Plus business combination and our strategic shift related to its production business. Costs include non-recurring payroll, redundant non-recurring technology costs and other transitional costs.

Implications of Being an Emerging Growth Company

We are an "emerging growth company," as defined in the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"). As long as we are an emerging growth company, we are eligible to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies. These include, but are not limited to:

- Not being required to comply with the auditor attestation requirements in the assessment of our internal control over financial reporting;

- Not being required to comply with any requirement that may be adopted by the Public Company Accounting Oversight Board regarding [illegible] or a supplement to the auditors' report providing additional information about the audit and the financial statements;
- Reduced disclosure obligations regarding executive compensation; and
- Exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved.

We may remain an "emerging growth company" until as late as December 31, 2022, the fiscal year end following the fifth anniversary of the completion of our initial public offering, though we may cease to be an emerging growth company earlier under certain circumstances, including if (a) we have more than $1 billion in annual gross revenue in any fiscal year, (b) the market value of our common stock that is held by non-affiliates exceeds $700 million as of any June 30 or (c) we issue more than $1 billion of non-convertible debt over a three-year period.

The Securities We May Offer

We may offer up to $1,000,000,000 of common stock, preferred stock, warrants, debt securities and/or units comprised of one or more of the foregoing classes of securities, in one or more offerings and in any combination. This prospectus provides you with a general description of the securities we may offer. A prospectus supplement, which we will provide each time we offer securities, will describe the specific amounts, prices and terms of these securities.

Common Stock

[illegible] Class A common stock [illegible] Class B common stock [illegible] The Class A common stock is listed for trading on the Nasdaq Global Market under the symbol "CSSE."

Preferred Stock

We have one class of preferred stock outstanding, our Series A preferred stock. [illegible] The Series A preferred stock is listed for trading on the Nasdaq Global Market under the symbol "CSSEP."

[illegible] See "Description of Capital Stock — Series A Preferred Stock" for more information.

We will be restricted in our ability to issue or create any class or series of capital stock ranking senior to the Series A preferred stock with respect to dividends or distributions, so long as the Series A preferred stock is outstanding [illegible] stock consent to same. Subject to such limitations, our preferred stock will have such designations, rights and preferences as may be determined from time to time by our board of directors, without stockholder approval. We have summarized [illegible] may issue in "Description of Capital Stock." A prospectus supplement will describe [illegible] time and may supplement or change the terms outlined below.

Warrants

We have outstanding:

- 227,232 Class W Warrants sold by us in private placements [illegible] thereof to purchase one share of our Class A common stock for $7.50 through [illegible];
- 121,115 Class Z Warrants sold by us in private placements [illegible] to purchase one share of our Class A common stock for $12.00 through June 30, 2024;
- Class I Warrant issued by us to CPEH in connection with the formation of Crackle Plus [illegible] certain affiliates thereof, which entitles the holder thereof to purchase 800,000 shares of our Class A common stock [illegible] May 14, 2024;
- Class II Warrant issued by us to CPEH in connection with the formation of Crackle Plus [illegible] which entitles the holder thereof to purchase 1,200,000 shares of our Class A common stock [illegible] May 14, 2024;
- Class III-A Warrant issued by us to CPEH in connection with the formation of Crackle Plus [illegible] May 14, 2024; and
- Class III-B Warrant issued by us to CPEH in connection with the formation of Crackle Plus [illegible] through May 14, 2024.

We may issue warrants for the purchase of common stock, preferred stock, debt securities or any other class of security offered hereby. We have summarized some of the general terms and provisions of the warrants that we may issue in "Description of Warrants." A prospectus supplement will describe the particular terms of any warrants offered [illegible] Class W Warrants and Class Z Warrants on the OTC Markets [illegible]

Debt Securities

On July 17, 2020, the Company completed an underwritten public offering of [illegible] Notes due 2025 (the "July Notes") [illegible] Underwriting Agreement, dated as of July 15, 2020, between the Company and Ladenburg Thalmann & Co. Inc. [illegible] the Indenture [illegible] U.S. Bank National Association, as trustee [illegible]

On December 22, 2020, the Company completed an underwritten public offering of [illegible] Notes due 2025 (the "December Notes" [illegible] Underwriting Agreement, dated as of December 17, 2020, between the Company and Ladenburg Thalmann & Co. Inc. [illegible]

The 2025 Notes have been assigned a rating of [illegible] by Egan-Jones Ratings Co. See "Description of our 2025 Notes — Rating of the 2025 Notes". The 2025 Notes are listed for trading on the Nasdaq Global Market under the symbol "CSSEN."

We may offer any combination of senior debt securities or subordinated debt securities [illegible] "Description of Debt Securities." A prospectus supplement will describe the particular terms of any debt securities offered from time to time and may supplement or change the terms outlined below.

Units

We may issue units comprised of one or more of the other classes of securities offered hereby in any combination. We have summarized some of the general terms and provisions of the units that we may issue in "Description of Units." A prospectus supplement will describe the particular terms of any units offered from time to time and may supplement or change the terms outlined below.

Securities the Selling Securityholders May Offer

The selling securityholder may sell, in one or more offerings pursuant to the registration statement of which this prospectus forms a part, up to an aggregate of [illegible] shares of our Series A preferred stock [illegible] Crackle Plus [illegible] We will not receive any proceeds from the sale by the selling securityholder of such securities.

RISK FACTORS

Any investment in our securities involves a high degree of risk. Potential investors are urged to carefully consider the risks and uncertainties [illegible]

Risks Relating to Our Recent Acquisition of Assets from Sonar Entertainment

We may not be able to efficiently integrate the assets acquired from Sonar Entertainment into our operations.

[illegible]

We may have material financial obligations related to the purchase of the Sonar Entertainment assets.

[illegible] CSS AVOD Shares [illegible]

Certain of the assets we acquired from Sonar Entertainment have first priority liens on them, which can render such assets and place certain limitations on such assets.

Certain of the assets we acquired from Sonar Entertainment and the related contracts and the proceeds of the foregoing remain subject to certain liens in favor of MidCap [illegible]

Risks Relating to the Offering by the Selling Securityholders

*Sales of substantial amounts of our Series A preferred stock by the selling securityholder, or the perception that these sales could occur, could adversely affect the price of our securities.*

The sale by the selling securityholder of a significant number of shares of our Series A preferred stock, or the perception in the public markets that the selling securityholder may sell all or a portion of such securities as a result of the registration of such shares hereunder, could have a material adverse effect on the market price of our securities.

NOTE ON FORWARD-LOOKING STATEMENTS

[illegible]

- content strategy;
- operating income and margin;
- seasonality;
- liquidity, including cash flows from operations, available funds and access to financing sources;
- free cash flows;
- revenues;
- net income;
- profitability;
- our inability to pay dividends if we fall out of compliance with our loan covenants in the future and then are prohibited by our bank lender from paying dividends;
- user growth and the ability of our content offerings to achieve market acceptance;
- partnerships;
- user viewing patterns;
- success in retaining or recruiting, or changes required in, our officers, key employees or directors;
- potential ability to obtain additional financing when and if needed, including use of the debt markets;
- ability to protect our intellectual property;
- ability to complete strategic acquisitions;
- ability to manage growth and integrate acquired operations;
- stock price volatility, potential liquidity and trading of our securities;
- future regulatory changes;
- pricing changes;
- actions by competitors;
- our content and marketing investments, including investments in original programming;

- downward revisions in, or withdrawals of, our credit ratings by third-party rating agencies;
- our estimates regarding expenses, future revenues, capital requirements and needs for additional financing; and
- the time during which we will be an Emerging Growth Company ("EGC") under the Jumpstart Our Business Startups Act of 2012, or JOBS Act.

The forward-looking statements contained in this prospectus and in the documents incorporated by reference in this prospectus are based on current expectations and beliefs concerning future developments and their potential effects on us. There can be no assurance that future developments will be those that have been anticipated. These forward-looking statements involve a number of risks, uncertainties (some of which are beyond our control) or other assumptions that may cause actual results or performance to be materially different from those expressed or implied by these forward-looking statements. These risks and uncertainties include, but are not limited to, those factors incorporated by reference or described in "*Risk Factors*." Should one or more of these risks or uncertainties materialize, or should any of our assumptions prove incorrect, actual results may vary in material respects from those projected in these forward-looking statements. We do not undertake any obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws.

BACKGROUND OF THE ISSUANCE OF SECURITIES TO THE SELLING SECURITYHOLDER

[illegible]

[illegible]

[illegible]

[illegible]

## USE OF PROCEEDS

Unless otherwise indicated in the applicable prospectus supplement, the net proceeds from the sale of the securities offered hereby will be used for working capital and other general corporate purposes, including [illegible] and acquisitions, debt repayments, dividends, and share repurchases. [illegible] of the net proceeds of an offering of securities to a specific purpose will be determined at the time of a particular offering and will be described in the prospectus supplement relating to such offering. Pending the application of such proceeds, we expect to invest the proceeds in short-term, interest-bearing, investment-grade marketable securities or money market obligations.

Up to 1,798,856 shares of Series A preferred stock issued to the selling securityholder may be sold or otherwise disposed of for the account of the selling securityholder or its pledgees, assignees, or successors-in-interest. We will not receive any of the proceeds from the sale or other disposition of the Series A preferred stock by the selling securityholder.

## SELLING SECURITYHOLDER

When we refer to the "selling securityholder" in this prospectus we mean the person listed in the table below, and the pledgees, assignees, donees, permitted transferees, successors, and others who later come to hold any of the selling securityholder's Series A preferred stock being offered by this prospectus.

This prospectus covers an aggregate of 1,798,856 shares of our Series A preferred stock that may be sold or otherwise disposed of by the selling securityholder.

The following table sets forth, as of the date of this prospectus, (i) the number of shares of Series A preferred stock beneficially owned by the selling securityholder prior to the offering, (ii) the number of shares of Series A preferred stock offered for resale to the public by the selling securityholder, and (iii) the number of shares of Series A preferred stock and the percentage of our Series A preferred stock to be beneficially owned by the selling securityholder after the offering.

The information in the table is based on information supplied to us by the selling securityholder. Other than as described in the footnotes below, or as otherwise described in this prospectus, the selling securityholder has not, within the past three years, had any position, office or other material relationship with us or any of our predecessors or affiliates other than as a holder of our securities. The selling securityholder is not a broker-dealer or an affiliate of a broker-dealer.

The selling securityholder may sell all, some, or none of the shares of Series A preferred stock offered hereby in this offering. The selling securityholder identified in the table below may sell, transfer, or otherwise dispose of some or all its shares of Series A preferred stock in transactions exempt from, or not subject to the registration requirements of, the Securities Act. See "*Plan of Distribution of Securities*". Information concerning the selling securityholder may change from time to time and, if necessary and required, we will amend or supplement this prospectus accordingly.

| Selling Securityholder | Before Offering (1) Shares of Series A Preferred Stock Beneficially Owned Prior to the Offering | Shares of Series A Preferred Stock Being Registered | Percent | After Offering (1) Shares of Series A Preferred Stock Owned After the Offering | Percent |
|---|---|---|---|---|---|
| CPE Holdings, Inc.(2) | 1,798,856 | 1,798,856 | 48.0% | 0 | 0% |

(1) Beneficial ownership is determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended, or the "Exchange Act," and generally includes shares over which the selling securityholder has voting or dispositive power, including any shares that the selling securityholder has the right to acquire within 60 days of the date hereof. The percentage of ownership before and after the offering is calculated based on [illegible] shares of Series A preferred stock outstanding on June 21, 2021.

(2) CPE Holdings, Inc. was a member of the joint venture entity Crackle Plus, LLC, from May 2019 to January 2021. CPE Holdings, Inc. is a direct, wholly-owned subsidiary of Sony Pictures Entertainment Inc., which is a direct, wholly-owned subsidiary of Sony Entertainment Inc., which is a direct, wholly-owned subsidiary of Sony Corporation of America, Inc., which is a direct, wholly-owned subsidiary of Sony Americas Holding, Inc., which is a direct, wholly-owned subsidiary of Sony Corporation.

## DESCRIPTION OF CAPITAL STOCK

**Introduction**

In the discussion that follows, we have summarized selected provisions of our certificate of incorporation, bylaws and the Delaware General Corporation Law, or "DGCL," relating to our capital stock. This summary is not complete. This discussion is subject to the relevant provisions of Delaware law and is qualified in its entirety by reference to our certificate of incorporation and our bylaws. You should read the provisions of our certificate of incorporation and our bylaws as currently in effect for provisions that may be important to you.

General

We are authorized to issue [illegible] million shares of Class A common stock, par value $.0001, [illegible] million shares of Class B common stock, par value $.0001, and 10 million shares of preferred stock, par value $.0001, of which [illegible] shares has been designated Series A preferred stock.

Our Class A common stock and Series A preferred stock were each approved for listing on the Nasdaq Global Market under the symbols "CSSE" and "CSSEP", respectively.

As of the date of this prospectus, [illegible] shares of our Class A common stock are outstanding, [illegible] shares of our Class B common stock are outstanding and [illegible] shares of our Series A preferred stock are outstanding.

We also have outstanding:

- Class W warrants to purchase an aggregate of [illegible] shares of our Class A common stock;
- Class Z warrants to purchase an aggregate of [illegible] shares of our Class A common stock; and
- Class I, II, III-A and III-B warrants to purchase an aggregate of [illegible] shares of Class A common stock.

Common Stock

*Voting Rights*

Holders of shares of Class A common stock and Class B common stock have substantially identical rights, except that holders of shares of Class A common stock are entitled to one vote per share and holders of shares of Class B common stock are entitled to ten votes per share. Holders of shares of Class A common stock and Class B common stock vote together as a single class on all matters (including the election of directors) submitted to a vote of stockholders, unless otherwise required by law or our charter. See "— *Certain Anti-Takeover Provisions of our Certificate of Incorporation and By-Laws*," below. There is no cumulative voting with respect to the election of directors, with the result that the holders of more than 50% of the voting power voting for the election of directors can elect all of the directors.

*Dividend Rights*

Shares of Class A common stock and Class B common stock shall be treated equally, identically and ratably, on a per share basis, with respect to any dividends or distributions as may be declared and paid from time to time by the board of directors out of any assets legally available therefor.

*No Preemptive or Similar Rights*

Our common stock is not entitled to preemptive rights and is not subject to conversion, redemption or sinking fund provisions.

*Right to Receive Liquidation Distributions*

Subject to the preferential or other rights of any holders of preferred stock then outstanding, including the Series A preferred stock, upon our dissolution, liquidation or winding up, whether voluntary or involuntary, holders of Class A common stock and Class B common stock will be entitled to receive ratably all of our assets available for distribution to our stockholders unless disparate or different treatment of the shares of each such class with respect to distributions upon any such liquidation, dissolution or winding up is approved in advance by the affirmative vote (or written consent if action by written consent of stockholders is permitted at such time under our certificate of incorporation) of the holders of a majority of the outstanding shares of Class A common stock and Class B common stock, each voting separately as a class.

*Merger or Consolidation*

In the case of any distribution or payment in respect of the shares of Class A common stock or Class B common stock upon our consolidation or merger with or into any other entity, or in the case of any other transaction having an effect on stockholders substantially similar to that resulting from a consolidation or merger, such distribution or payment shall be made ratably on a per share basis among the holders of the Class A common stock and Class B common stock as a single class; *provided*, *however*, that shares of one such class may receive different or disproportionate distributions or payments in connection with such merger, consolidation or other transaction if (i) the only difference in the per share distribution to the holders of the Class A common stock and Class B common stock is that any securities distributed to the holder of a share Class B common stock have ten times the voting power of any securities distributed to the holder of a share of Class A common stock, or (ii) such merger, consolidation or other transaction is approved by the affirmative vote (or written consent if action by written consent of stockholders is permitted at such time under our Certificate of Incorporation) of the holders of a majority of the outstanding shares of Class A common stock and Class B common stock, each voting separately as a class.

*Conversion*

The outstanding shares of Class B common stock are convertible at any time as follows: (a) at the option of the holder, a share of Class B common stock may be converted at any time into one share of Class A common stock or (b) upon the election of the holders of a majority of the then outstanding shares of Class B common stock, all outstanding shares of Class B common stock may be converted into shares of Class A common stock. Once converted into Class A common stock, the Class B common stock will not be reissued.

Warrants

*Class W and Class Z Warrants*

Each outstanding Class W warrant entitles the registered holder to purchase one share of our Class A common stock at a price of $7.50 per share, subject to adjustment as discussed below. Each Class W warrant is exercisable at any time through June 30, 2023 at 5:00 p.m., New York City time.

Each outstanding Class Z warrant entitles the registered holder to purchase one share of our Class A common stock at a price of $12.00 per share, subject to adjustment as discussed below. Each Class Z warrant is exercisable at any time through June 30, 2023 at 5:00 p.m., New York City time.

*Cancellation*

We may call for cancellation of all or any portion of the Class W warrants or Class Z warrants for which a notice of exercise has not yet been delivered to us for consideration equal to $.01 per Class W warrant or Class Z warrant, as the case may be, in accordance with the provisions of such warrants, if (i) our Class A common stock is traded, listed or quoted on any U.S. market or electronic exchange, and (ii) the closing per share sales price of the Class A common stock for any twenty (20) trading days during a consecutive thirty (30) trading days period exceeds $15.00, for Class W warrants, or $18.00, for Class Z warrants, in each case subject to adjustment for forward and reverse stock splits, recapitalizations, stock dividends and the like.

[illegible]

[illegible]

[illegible]

[illegible]

[illegible]

[illegible]

*Liquidation Preference*

[illegible]

[illegible]

[illegible]

*Redemption*

The Series A preferred stock is not redeemable by us prior to June [illegible], except as described below under "—*Special Optional Redemption*."

Optional Redemption. On and after June [illegible], we may, at our option, upon not less than 30 nor more than 60 days' written notice, redeem the Series A preferred stock, in whole or in part, at any time or from time to time, for cash at a redemption price equal to $25.00 per share, plus any accumulated and unpaid dividends thereon to, but not including, the date fixed for redemption.

Special Optional Redemption. Upon the occurrence of a Change of Control, we may, at our option, upon not less than 30 nor more than 60 days' written notice, redeem the Series A preferred stock, in whole or in part, within 120 days after the first date on which such Change of Control occurred, for cash at a redemption price of $25.00 per share, plus any accumulated and unpaid dividends thereon to, but not including, the redemption date.

A "Change of Control" is deemed to occur when the following have occurred and are continuing:

- [illegible]
- [illegible]

Redemption Procedures. [illegible]

- the redemption date;

[illegible]

- the number of shares of Series A preferred stock to be redeemed;
- the redemption price;
- [illegible]
- [illegible]
- [illegible]
- [illegible]

[illegible]

[illegible]

[illegible]

[illegible]

[illegible]

*Voting Rights*

[illegible]

[illegible]

[illegible]

[illegible]

[illegible]

[illegible]

[illegible]

[illegible]

*Information Rights*

[illegible]

*No Conversion Rights*

The Series A preferred stock is not convertible into our common stock or any other security.

*No Preemptive Rights*

No holders of the Series A preferred stock will, as holders of Series A preferred stock, have any preemptive rights to purchase or subscribe for our common stock or any other security.

*Credit Rating of Our Series A Preferred Stock*

Our Series A Preferred Stock has been rated [illegible] by Egan-Jones Rating Co., a Nationally Recognized Statistical Rating Organization. [illegible]

Certain Anti-Takeover Provisions of our Certificate of Incorporation and By-Laws

*Special meeting of stockholders*

Our bylaws provide that special meetings of our stockholders may be called only by a majority vote of our board of directors, or by our chairman and chief executive officer [illegible]

*Advance notice requirements for stockholder proposals and director nominations*

[illegible]

*Dual Voting Structure*

[illegible]

*Removal and Appointment of Directors*

[illegible]

*Class B Approval Required for Charter Amendments*

Any amendment to our certificate of incorporation requires the approval of the majority of the outstanding Class B common stock. [illegible]

*Exclusive Forum Selection*

[illegible]

Limitations on Directors' Liability and Indemnification

[illegible]

[illegible]

[illegible]

Certain Anti-Takeover Provisions of Delaware Law

[illegible]

*Delaware Anti-Takeover Statute*

[illegible]

*Amendments to Our Certificate of Incorporation*

[illegible]

- [illegible]
- [illegible]
- [illegible]

[illegible]

Listing

Our Class A common stock is listed for trading on the Nasdaq Global Market under the symbol "[illegible]" and our Series A preferred stock is listed for trading on the Nasdaq Global Market under the symbol "[illegible]". On June 18, 2021, the last reported sale prices of our Class A common stock and Series A preferred stock were $[illegible] and $[illegible], respectively.

Transfer Agent and Registrar and Warrant Agent

The transfer agent and registrar for our Class A common stock and Series A preferred stock is Continental Stock Transfer & Trust Company. The transfer agent and registrar for any other series of preferred stock will be set forth in the applicable prospectus supplement. The warrant agent for any preferred stock of warrants, if any, will be set forth in the applicable prospectus supplement.

DESCRIPTION OF OUR 2025 NOTES

Our 2025 Notes were issued under the Indenture and Supplemental Indenture, each between us and U.S. Bank National Association, as trustee, and each dated July [illegible], 2020. We refer to the indenture and the supplemental indenture collectively as the "indenture" and to U.S. Bank National Association as the "trustee." As of June 21, 2021, we had outstanding $[illegible] principal amount of 2025 Notes.

The 2025 Notes are governed by the indenture, as required by federal law for all bonds and 2025 Notes of companies that are publicly offered. An indenture is a contract between us and the financial institution acting as trustee on your behalf and is subject to and governed by the Trust Indenture Act of 1939, as amended. The trustee has two main roles. First, the trustee can enforce your rights against us if we default. There are some limitations on the extent to which the trustee acts on your behalf, described in the second paragraph under "— *Events of Default — Remedies if an Event of Default Occurs*." Second, the trustee performs certain administrative duties for us with respect to the 2025 Notes.

*General*

The 2025 Notes will mature on July 31, 2025. The principal payable at maturity will be 100% of the aggregate outstanding principal amount. The interest rate of the 2025 Notes is 9.50% per year and will be paid every March 30, June 30, September 30, and December 30, and the regular record dates for interest payments will be every March 15, June 15, September 15, and December 15. If an interest payment date falls on a non-business day, the applicable interest payment will be made on the next business day and no additional interest will accrue as a result of such delayed payment.

The 2025 Notes were issued in denominations of $25 and integral multiples of $25 in excess thereof. The 2025 Notes are not be subject to any sinking fund and holders of the 2025 Notes will not have the option to have the 2025 Notes repaid prior to the stated maturity date.

Except as described under the captions "*Events of Default*" and "*Merger or Consolidation*" in this prospectus, the indenture does not contain any provisions that give you protection in the event we issue a large amount of debt or we are acquired by another entity.

*Optional Redemption*

The 2025 Notes may be redeemed in whole or in part at any time or from time to time at our option on or after July 31, 2022 upon not less than 30 days nor more than 60 days written notice by mail prior to the date fixed for redemption thereof. The redemption price shall include (i) 100% of the outstanding principal amount of the 2025 Notes called for redemption on the date fixed for redemption plus (ii) all accrued and unpaid interest payments otherwise payable thereon through the date fixed for redemption. In addition, in the event of a merger or sale of the company or substantially all of its assets, or a majority of the Company's equity (on an when issued basis) in one or a series of related transactions, the Company shall have the right to redeem the 2025 Notes prior to July 31, 2022 in connection with the consummation of such transactions on the foregoing terms.

Holders of our 2025 Notes may be prevented from exchanging or transferring the 2025 Notes when they are subject to redemption. In case any 2025 Notes are to be redeemed in part only, the redemption notice will provide that, upon surrender of such 2025 Note, the holder will receive, without a charge, a new 2025 Note or 2025 Notes of authorized denominations representing the principal amount of your remaining unredeemed 2025 Notes. Any exercise of our option to redeem the 2025 Notes will be done in accordance with the indenture.

If we redeem only some of the 2025 Notes, the trustee will determine the method for selection of the particular 2025 Notes to be redeemed, in accordance with the indenture and in accordance with the rules of any national securities exchange or quotation system on which the 2025 Notes are listed. Unless we default in payment of the redemption price, on and after the date of redemption, interest will cease to accrue on the 2025 Notes called for redemption.

Rating of the 2025 Notes

Our 2025 Notes have a credit rating of [illegible] from Egan-Jones Ratings Company. An explanation of the significance of ratings may be obtained from the rating agency. Generally, rating agencies base their ratings on such material and information, and such of their own investigations, studies and assumptions, as they deem appropriate. The rating of the 2025 Notes should be evaluated independently from similar ratings of other securities. A credit rating of a security is paid for by the issuer and is not a recommendation to buy, sell or hold securities and may be subject to review, revision, suspension, reduction or withdrawal at any time by the assigning rating agency.

Global Securities

Each 2025 Note was issued in book-entry form and represented by a global security that we deposit with and register in the name of The Depository Trust Company, New York, New York, known as DTC, or its nominee. A global security may not be transferred to or registered in the name of anyone other than the depository or its nominee, unless special termination situations arise. As a result of these arrangements, the depository, or its nominee, is the sole registered owner and holder of all the 2025 Notes represented by a global security, and investors are permitted to own only beneficial interests in a global security. For more information about these arrangements, see "— *Book-Entry Procedures*" below.

Termination of a Global Security

If a global security is terminated for any reason, interests in it will be exchanged for certificates in non-book-entry form (certificated securities). After that exchange, the choice of whether to hold the certificated 2025 Notes directly or in street name will be up to the investor. Investors must consult their own banks or brokers to find out how to have their interests in a global security transferred on termination to their own names, so that they will be holders.

Payment and Paying Agents

We pay interest to the person listed in the trustee's records as the owner of the 2025 Notes at the close of business on a particular day in advance of each due date for interest, even if that person no longer owns the 2025 Note on the interest due date. That day, usually about two weeks in advance of the interest due date, is called the "record date." Because we will pay all the interest for an interest period to the holders on the record date, holders buying and selling the 2025 Notes must work out between themselves the appropriate purchase price. The most common manner is to adjust the sales price of the 2025 Notes to prorate interest fairly between buyer and seller based on their respective ownership periods within the particular interest period. This prorated interest amount is called "accrued interest."

Payments on Global Securities

We make payments on the 2025 Notes so long as they are represented by a global security in accordance with the applicable policies of the depository as in effect from time to time. Under those policies, we will make payments directly to the depository, or its nominee, and not to any indirect holders who own beneficial interests in the global security. An indirect holder's right to those payments will be governed by the rules and practices of the depository and its participants, as described under "— *Book-Entry Procedures*."

Payments on Certificated Securities

In the event the 2025 Notes become represented by certificated securities, we will make payments on the 2025 Notes as follows. We will pay interest that is due on an interest payment date to the holder of the 2025 Notes as shown on the trustee's records as of the close of business on the regular record date at our office in New York, New York. We will make all payments of principal and premium, if any, by check at the office of the applicable trustee in New York, New York and/or at other offices that may be specified in the indenture or a notice to holders against surrender of the 2025 Note.

Alternatively, at our option, we may pay any cash interest that becomes due on the 2025 Notes by mailing a check to the holder at his, her or its address shown on the trustee's records as of the close of business on the regular record date or by transfer to an account at a bank in the United States, in either case, on the due date.

Book-entry and other indirect holders should consult their banks or brokers for information on how they will receive payments on the 2025 Notes.

Events of Default

Holders of our 2025 Notes will have rights if an Event of Default occurs in respect of the 2025 Notes, as described later in this subsection.

The term "Event of Default" in respect of the 2025 Notes means any of the following:

- We do not pay the principal (or premium, if any) of any 2025 Note when due.
- We do not pay interest on any 2025 Note, including any 2025 Note, when due, and such default is not cured within 30 days.
- We remain in breach of a covenant in respect of the 2025 Notes, including the 2025 Notes, for 60 days after we receive a written notice of default stating we are in breach (the notice must be sent by either the trustee or holders of at least 25% of the principal amount of the 2025 Notes, as a single series).
- We file for bankruptcy or certain other events of bankruptcy, insolvency or reorganization occur and in the case of certain orders or decrees entered against us under bankruptcy law, such order or decree remains undischarged or unstayed for a period of 60 days.

An Event of Default for the 2025 Notes does not necessarily constitute an Event of Default for any other series of debt securities issued under the same or any other indenture. The trustee may withhold notice to the holders of the 2025 Notes of any default, except in the payment of principal or interest, if it in good faith considers the withholding of notice to be in the best interests of the holders.

*Remedies if an Event of Default Occurs*

If an Event of Default has occurred and is continuing, the trustee or the holders of not less than 25% in principal amount of the 2025 Notes, as a single series, may declare the entire principal amount of all the 2025 Notes to be due and immediately payable. This is called a declaration of acceleration of maturity. In certain circumstances, a declaration of acceleration of maturity may be canceled by the holders of a majority in principal amount of the 2025 Notes, as a single series, if (1) we have deposited with the trustee all amounts due and owing with respect to the 2025 Notes (other than principal that has become due solely by reason of such acceleration) and certain other amounts, and (2) any other Events of Default have been cured or waived.

Except in cases of default, where the trustee has some special duties, the trustee is not required to take any action under the indenture at the request of any holders unless the holders offer the trustee protection from expenses and liability (called an "indemnity"). If indemnity is provided, the holders of a majority in principal amount of the 2025 Notes, as a single series, may direct the time, method and place of conducting any lawsuit or other formal legal action seeking any remedy available to the trustee. The trustee may refuse to follow those directions in certain circumstances. No delay or omission in exercising any right or remedy will be treated as a waiver of that right, remedy or Event of Default.

Before you are allowed to bypass the trustee and bring your own lawsuit or other formal legal action or take other steps to enforce your rights or protect your interests relating to the 2025 Notes, the following must occur:

- you must give the trustee written notice that an Event of Default has occurred and remains uncured;
- the holders of at least 25% in principal amount of all the 2025 Notes, as a single series, must make a written request that the trustee take action because of the default and must offer indemnity and/or security to the trustee against the cost and other liabilities of taking that action;
- the trustee must not have taken action for 60 days after receipt of the above notice and offer of indemnity and/or security; and
- the holders of a majority in principal amount of the 2025 Notes, as a single series, must not have given the trustee a direction inconsistent with the above notice during that 60-day period.

However, holders of our 2025 Notes are entitled at any time to bring a lawsuit for the payment of money due on your 2025 Notes on or after the due date.

**Book-entry and other indirect holders should consult their banks or brokers for information on how to give notice or direction to or make a request of the trustee and how to declare or cancel an acceleration of maturity.**

Each year, we will furnish to the trustee a written statement of certain of our officers certifying that to their knowledge we are in compliance with the indenture and the 2025 Notes, or else specifying any default.

*Waiver of Default*

The holders of a majority in principal amount of the 2025 Notes, as a single series, may waive any past defaults other than:

- the payment of principal or interest; or
- in respect of a covenant that cannot be modified or amended without the consent of each holder.

*Merger or Consolidation*

Under the terms of the indenture, we are generally permitted to consolidate or merge with another entity. We are also permitted to sell all or substantially all of our assets to another entity. However, we may not take any of these actions unless all the following conditions are met:

- Where we merge out of existence or convey or transfer our assets substantially as an entirety, the resulting entity must agree to be legally responsible for our obligations under the 2025 Notes.
- The merger or sale of assets must not cause a default on the 2025 Notes and we must not already be in default (unless the merger or sale would cure the default). For purposes of this no-default test, a default would include an Event of Default that has occurred and has not been cured, as described under "Events of Default" above. A default for this purpose would also include any event that would be an Event of Default if the requirements for giving us a notice of default or our default having to exist for a specific period of time were disregarded.
- We must deliver certain certificates and documents to the trustee.

**Modification or Waiver**

There are three types of changes we can make to the indenture and the 2025 Notes.

*Changes Requiring Your Approval*

First, there are changes that we cannot make to the 2025 Notes without your specific approval. The following is a list of those types of changes:

- change the stated maturity of the principal of or interest on the 2025 Notes;
- reduce any amounts due on the 2025 Notes;
- reduce the amount of principal payable upon acceleration of the maturity of a 2025 Note following a default;
- change the place or currency of payment on a 2025 Note;
- impair your right to sue for payment;
- reduce the percentage of holders of 2025 Notes whose consent is needed to modify or amend the indenture; and
- reduce the percentage of holders of 2025 Notes whose consent is needed to waive compliance with certain provisions of the indenture or to waive certain defaults.

*Changes Not Requiring Approval*

The second type of change does not require any vote by the holders of the 2025 Notes. This type is limited to clarifications and certain other changes that would not adversely affect holders of the 2025 Notes in any material respect.

*Changes Requiring Majority Approval*

Any other change to the indenture and the 2025 Notes would require the following approval:

- if the change affects only the 2025 Notes, it must be approved by the holders of a majority in principal amount of the 2025 Notes; and
- if the change affects more than one series of debt securities issued under the same indenture, it must be approved by the holders of a majority in principal amount of all of the series affected by the change, with all affected series voting together as one class for this purpose.

In both cases, the required approval must be given by written consent.

The holders of a majority in principal amount of all of the series of debt securities issued under an indenture, voting together as one class for this purpose, may waive our compliance with some of our covenants in that indenture. However, we cannot obtain a waiver of a payment default or of any of the matters covered by the bullet points included above under "— Changes Requiring Your Approval."

*Further Details Concerning Voting*

When taking a vote, we will use the following rules to decide how much principal to attribute to the 2025 Notes:

The 2025 Notes will not be considered outstanding, and therefore not eligible to vote, if we have deposited or set aside in trust money for their payment or redemption. The 2025 Notes will also not be eligible to vote if they have been fully defeased as described later under "Defeasance — Full Defeasance."

We will generally be entitled to set any day as a record date for the purpose of determining the holders of the 2025 Notes that are entitled to vote or take other action under the indenture. However, the record date may not be more than 30 days before the date of the first solicitation of holders to vote on or take such action. If we set a record date for a vote or other action to be taken by holders of the 2025 Notes, that vote or action may be taken only by persons who are holders of the 2025 Notes on the record date and must be taken within eleven months following the record date.

**Book-entry and other indirect holders should consult their banks or brokers for information on how approval may be granted or denied if we seek to change the indenture or the 2025 Notes or request a waiver.**

**Defeasance**

"Defeasance" means that, by depositing with a trustee an amount of cash and/or government securities sufficient to pay all principal and interest, if any, on the 2025 Notes when due and satisfying any additional conditions noted below, we will be deemed to have been discharged from our obligations under the 2025 Notes. In the event of a "covenant defeasance," upon depositing such funds and satisfying similar conditions discussed below we would be released from the restrictive covenants under the indenture relating to the 2025 Notes.

The following defeasance provisions will be applicable to the 2025 Notes.

*Covenant Defeasance*

Under the indenture, we can make the deposit described below and be released from some of the restrictive covenants in the indenture under which the 2025 Notes were issued. This is called "covenant defeasance." In that event, you would lose the protection of those restrictive covenants but would gain the protection of having money and government securities set aside in trust to repay your 2025 Notes. If we achieve covenant defeasance and your 2025 Notes were subordinated as described under "Indenture Provisions — Ranking" below, such subordination would not prevent the trustee under the indenture from applying the funds available to it from the deposit described in the first bullet to the payment of amounts due in respect of such debt securities for the benefit of the subordinated debtholders. In order to achieve covenant defeasance, we must do the following:

- Since the 2025 Notes are denominated in U.S. dollars, we must deposit in trust for the benefit of all holders of the 2025 Notes either cash or a combination of cash and U.S. government or U.S. government agency 2025 Notes or bonds that will generate enough cash to make interest, principal and any other payments on the 2025 Notes on their various due dates.
- We must deliver to the trustee a legal opinion of our counsel confirming that, under current U.S. federal income tax law, we may make the above deposit without causing you to be taxed on the 2025 Notes any differently than if we did not make the deposit.
- We must deliver to the trustee a legal opinion and officers' certificate stating that all conditions precedent to covenant defeasance have been complied with.
- Defeasance must not result in a breach or violation of, or result in a default under, the indenture or any of our other material agreements or instruments.
- No default or event of default with respect to the 2025 Notes shall have occurred and be continuing and no defaults or events of default related to bankruptcy, insolvency or reorganization shall occur during the next 90 days.

If we accomplish covenant defeasance, holders of our 2025 Notes can still look to us for repayment of the 2025 Notes if there were a shortfall in the trust deposit or the trustee is prevented from making payment. For example, if one of the remaining Events of Default occurred (such as our bankruptcy) and the 2025 Notes became immediately due and payable, there might be a shortfall. Depending on the event causing the default, holders may not be able to obtain payment of the shortfall.

*Full Defeasance*

We can legally release ourselves from all payment and other obligations on the 2025 Notes (called "full defeasance") if we put in place the following other arrangements for you to be repaid:

- Since the 2025 Notes are denominated in U.S. dollars, we must deposit in trust for the benefit of all holders of the 2025 Notes a combination of money and U.S. government or U.S. government agency 2025 Notes or bonds that will generate enough cash to make interest, principal and any other payments on the 2025 Notes on their various due dates.
- We must deliver to the trustee a legal opinion confirming that there has been a change in current U.S. federal tax law or an IRS ruling that allows us to make the above deposit without causing holders to be taxed on the 2025 Notes any differently than if we did not make the deposit. Under current U.S. federal tax law the deposit and our legal release from the 2025 Notes would be treated as though we paid holders their share of the cash and 2025 Notes or bonds at the time the cash and 2025 Notes or bonds were deposited in trust in exchange for your 2025 Notes and you would recognize gain or loss on the 2025 Notes at the time of the deposit.
- We must deliver to the trustee a legal opinion and officers' certificate stating that all conditions precedent to defeasance have been complied with.

- [illegible] instruments.
- No default or event of default with respect to the 2025 Notes shall have occurred and be continuing and no defaults or events of default related to bankruptcy, insolvency or reorganization shall occur during the next 90 days.

If we ever did accomplish full defeasance, as described above, holders of our 2025 Notes would have to rely solely on the trust deposit for repayment of the 2025 Notes. [illegible]

Limitation on Restricted Payments Covenant

In addition to any other covenants described in this prospectus, [illegible]

(1) declaring or paying any dividend, making any distribution on or in respect of our capital stock [illegible]

(2) purchasing, repurchasing, redeeming, retiring or otherwise acquiring ("Purchase") for value any capital stock of the Company held by any Person [illegible] any Affiliate of the Company;

(3) purchasing for value, prior to scheduled maturity any scheduled repayment of any subordinated obligations; or

(4) making any investment in any Person.

Form, Exchange and Transfer of Certificated Registered Securities

If registered 2025 Notes cease to be issued in book-entry form, they will be issued:

- only in fully registered certificated form;
- without interest coupons; and
- unless we indicate otherwise, in denominations of $25 and amounts that are multiples of $25.

Holders may exchange their certificated securities for 2025 Notes of smaller denominations or combined into fewer 2025 Notes of larger denominations, as long as the total principal amount is not changed [illegible]

Holders may exchange or transfer their certificated securities at the corporate trust office of the trustee. [illegible]

Holders will not be required to pay a service charge to transfer or exchange their certificated securities, [illegible]

We may appoint additional transfer agents or cancel the appointment of any particular transfer agent. [illegible]

[illegible]

If a registered debt security is issued in book-entry form, only the depositary will be entitled to transfer and exchange the debt security as described in this subsection, since it will be the sole holder of the debt security.

Resignation of Trustee

The trustee may resign or be removed with respect to the 2025 Notes provided that a successor trustee is appointed to act with respect to the 2025 Notes. [illegible]

Indenture Provisions—Ranking

The 2025 Notes are our direct unsecured obligations and rank:

- [illegible]
- [illegible]

- Effectively subordinated to all of our existing and future secured indebtedness [illegible]
- Structurally subordinated to all existing and future indebtedness and other obligations of any of our subsidiaries and financing vehicles, since the 2025 Notes are obligations exclusively of Chicken Soup for the Soul Entertainment, Inc. [illegible]

Book-Entry Procedures

The 2025 Notes are represented by global securities that will be deposited and registered in the name of DTC or its nominee. This means that, except in limited circumstances, you will not receive certificates for the 2025 Notes.

Beneficial interests in the 2025 Notes are represented through book-entry accounts of financial institutions acting on behalf of beneficial owners as direct and indirect participants in DTC. [illegible]

The 2025 Notes were issued as fully registered securities registered in the name of Cede & Co. (DTC's partnership nominee) [illegible]

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act. [illegible]

DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, [illegible]

Purchases of the 2025 Notes under the DTC system must be made by or through Direct Participants, [illegible]

To facilitate subsequent transfers, all 2025 Notes deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co. [illegible]

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Redemption notices shall be sent to DTC. [illegible]

Redemption proceeds, distributions, and interest payments on the 2025 Notes will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from us or the Trustee on the payment date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC nor its nominee, the Trustee, or us, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds, distributions, and interest payments to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of us or the Trustee, but disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the 2025 Notes at any time by giving reasonable notice to us or to the Trustee. Under such circumstances, in the event that a successor securities depository is not obtained, certificates are required to be printed and delivered. We may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository). In that event, certificates will be printed and delivered to DTC.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that we believe to be reliable, but we take no responsibility for the accuracy thereof.

Listing

Our 2025 Notes are listed for trading on the Nasdaq Global Market under the symbol "CSSEN."

DESCRIPTION OF WARRANTS

We may issue warrants for the purchase of common stock, preferred stock, debt securities or any other security offered hereby. Warrants may be issued independently or together with other securities and may be attached to or separate from any offered securities. We may issue the warrants directly or under warrant agreements to be entered into between a warrant agent and us. Any warrant agent will act solely as our agent in connection with the warrants and will not have any obligation or relationship of agency or trust for or with any holders or beneficial owners of warrants.

The following outlines some of the general terms and provisions of the warrants that we may issue. A prospectus supplement will describe the particular terms of any warrants offered from time to time and may supplement or change the terms outlined below. We will file as an exhibit to the registration statement of which this prospectus is a part, or will incorporate by reference from reports that we file with the SEC, a form of the warrant or form of the warrant agreement and warrant certificate that sets forth the terms of the particular warrants we are offering. The summary of such terms contained in this prospectus and in the applicable prospectus supplement is qualified in its entirety by reference to such warrant or warrant agreement and warrant certificate. We urge you to read the warrant or warrant agreement and warrant certificate and the additional description of the terms of the warrants included in the prospectus supplement.

General

The prospectus supplement relating to a particular issue of warrants will describe the terms of the warrants, including the following:

- the title of the warrants;
- the offering price for the warrants, if any;
- the aggregate number of the warrants;
- the designation and terms of the common stock, preferred stock or other class of security that may be purchased upon exercise of the warrants;
- if applicable, the designation and terms of the securities that the warrants are issued with and the number of warrants issued with each security;
- if applicable, the date from and after which the warrants and any securities issued with the warrants will be separately transferable;
- the number of shares and price of common stock or preferred stock, or the designation and number or amount of other debt securities, that may be purchased upon exercise of a warrant;
- the dates on which the right to exercise the warrants commence and expire;
- if applicable, the minimum or maximum amount of the warrants that may be exercised at any one time;
- if applicable, a discussion of material U.S. federal income tax considerations;
- anti-dilution provisions of the warrants, if any;
- redemption or call provisions, if any, applicable to the warrants; and
- any additional terms of the warrants, including terms, procedures and limitations relating to the exchange and exercise of the warrants.

Exercise of Warrants

Each warrant will entitle the holder of the warrant to purchase at the exercise price set forth in the applicable prospectus supplement the principal amount of debt securities or shares of common stock or preferred stock being offered. Holders may exercise warrants at any time up to the close of business on the expiration date set forth in the applicable prospectus supplement. After the close of business on the expiration date, unexercised warrants will be void. Holders may exercise warrants as set forth in the prospectus supplement relating to the warrants being offered.

Until a holder exercises the warrants to purchase any securities underlying the warrants, the holder will not have any rights as a holder of the underlying securities by virtue of ownership of warrants.

DESCRIPTION OF DEBT SECURITIES

We may offer any combination of senior debt securities or subordinated debt securities. We may issue the senior debt securities and the subordinated debt securities under separate indentures between us, as issuer, and the trustee or trustees identified in a prospectus supplement. Further information regarding the trustee may be provided in the prospectus supplement. The form for each type of indenture is filed as an exhibit to the registration statement of which this prospectus is a part.

The following outlines some of the general terms and provisions of the debt securities that we may issue. A prospectus supplement will describe the particular terms of any debt securities offered from time to time and may supplement or change the terms outlined below. We will file as an exhibit to the registration statement of which this prospectus is a part or will incorporate by reference from reports that we file with the SEC, a form of the indenture supplement that sets forth the terms of the particular debt securities we are offering. The summary of such debt securities contained in this prospectus and in the applicable prospectus supplement is qualified in its entirety by reference to the indenture and the applicable indenture supplement. We urge you to read the indenture, the applicable indenture supplement and the additional description of the debt securities in the prospectus supplement.

General

Within the total dollar amount of this shelf registration statement, we may issue an unlimited principal amount of debt securities in separate series. We may specify a maximum aggregate principal amount for the debt securities of any series. The debt securities will have terms that are consistent with the indentures. Senior debt securities will be unsubordinated obligations and will rank equal with all our other unsubordinated debt. Subordinated debt securities will be paid only if all payments due under our senior indebtedness, including any outstanding senior debt securities, have been made.

The indentures might not limit the amount of other debt that we may issue or whether that debt is senior to the debt securities offered by this prospectus and might not contain financial or similar restrictive covenants. The indentures might not contain any provision to protect holders of debt securities against a sudden or dramatic decline in our ability to pay our debt.

The prospectus supplement will describe the debt securities and the price or prices at which we will offer the debt securities. The description will include:

- the title and form of the debt securities;
- any limit on the aggregate principal amount of the debt securities or the series of which they are a part;
- the date or dates on which we must repay the principal, the maturity date and the principal amount due at maturity and whether the securities will be offered at a price such that they will be deemed as "original issue discount";
- the person to whom any interest on a debt security of the series will be paid;
- the rate or rates at which the debt securities will bear interest;
- if any, the date or dates from which interest will accrue, and the dates on which we must pay interest;
- the place or places where we must pay the principal and any premium or interest on the debt securities;
- the terms and conditions on which we may redeem any debt security, if at all;

- [illegible]
- [illegible]
- [illegible]
- [illegible]
- [illegible]
- [illegible]
- [illegible]
- [illegible]
- [illegible]
- [illegible]
- [illegible]
- [illegible]

[illegible]

Conversion and Exchange Rights

[illegible]

Subordination of Subordinated Debt Securities

[illegible]

[illegible]

Form, Exchange and Transfer

[illegible]

[illegible]

[illegible]

Global Securities

[illegible]

[illegible]

- [illegible]
- [illegible]

[illegible]

[illegible]

[illegible]

[illegible]

Payment and Paying Agents

[illegible]

[illegible]

[illegible]

[illegible]

Consolidation, Merger and Sale of Assets

[illegible]

- [illegible]
- [illegible]

Events of Default

[illegible]

- [illegible]
- [illegible]
- [illegible]
- [illegible]
- [illegible]

[illegible]

[illegible]

[illegible]

- [illegible]
- [illegible]
- [illegible]
- [illegible]

Modification and Waiver

[illegible]

- [illegible]
- [illegible]

[illegible]

- [illegible]
- [illegible]
- [illegible]

The holders of a majority in principal amount of the outstanding debt securities of any series may waive any past default under the indenture with respect to debt securities of that series, except a default in the payment of principal, premium or interest on any debt security of that series or in respect of a covenant or provision of the indenture that cannot be amended without each holder's consent.

Except in limited circumstances, we may set any day as a record date for the purpose of determining the holders of outstanding debt securities of any series entitled to give or take any direction, notice, consent, waiver or other action under the indentures. In limited circumstances, the trustee may set a record date. To be effective, the action must be taken by holders of the requisite principal amount of such debt securities within a specified period following the record date.

**Defeasance**

To the extent stated in the prospectus supplement, we may elect to apply the provisions in the indentures relating to defeasance and discharge of indebtedness, or to defeasance of restrictive covenants, to the debt securities of any series. The indentures provide that, upon satisfaction of the requirements described below, we may terminate all of our obligations under the debt securities of any series and the applicable indenture, known as legal defeasance, other than our obligation:

- to maintain a registrar and paying agents and hold moneys for payment in trust;
- to register the transfer or exchange of the notes; and
- to replace mutilated, destroyed, lost or stolen notes.

In addition, we may terminate our obligation to comply with any restrictive covenants under the debt securities of any series or the applicable indenture, known as covenant defeasance.

We may exercise our legal defeasance option even if we have previously exercised our covenant defeasance option. If we exercise either defeasance option, payment of the notes may not be accelerated because of the occurrence of events of default.

To exercise either defeasance option as to debt securities of any series, we must irrevocably deposit in trust with the trustee money and/or obligations backed by the full faith and credit of the United States that will provide money in an amount sufficient in the written opinion of a nationally recognized firm of independent public accountants to pay the principal of, premium, if any, and each installment of interest on the debt securities. We may only establish this trust if, among other things:

- no event of default shall have occurred or be continuing;
- in the case of legal defeasance, we have delivered to the trustee an opinion of counsel to the effect that we have received from, or there has been published by, the Internal Revenue Service a ruling or there has been a change in law, which in the opinion of our counsel, provides that holders of the debt securities will not recognize gain or loss for federal income tax purposes as a result of such deposit, defeasance and discharge and will be subject to federal income tax on the same amount, in the same manner and at the same times as would have been the case if such deposit, defeasance and discharge had not occurred;
- in the case of covenant defeasance, we have delivered to the trustee an opinion of counsel to the effect that the holders of the debt securities will not recognize gain or loss for federal income tax purposes as a result of such deposit, defeasance and discharge and will be subject to federal income tax on the same amount, in the same manner and at the same times as would have been the case if such deposit, defeasance and discharge had not occurred; and
- we satisfy other customary conditions precedent described in the applicable indenture.

Notices

We will mail notices to holders of debt securities as indicated in the prospectus supplement.

Title

We may treat the person in whose name a debt security is registered as the absolute owner, whether or not such debt security may be overdue, for the purpose of making payment and for all other purposes.

Governing Law

The indentures and the debt securities will be governed by and construed in accordance with the laws of the State of New York.

DESCRIPTION OF THE UNITS

We may issue units comprised of one or more of the other classes of securities offered hereby in any combination. Each unit will be issued so that the holder of the unit is also the holder of each security included in the unit. Thus, the holder of a unit will have the rights and obligations of a holder of each included security.

The units may be, but are not required to be, issued under unit agreements to be entered into between us and a unit agent, as detailed in the prospectus supplement relating to the units being offered. We will file as an exhibit to the registration statement of which this prospectus is a part, or will incorporate by reference from reports that we file with the SEC, a form of the unit agreement and unit certificate, if any, that sets forth the terms of the particular units we are offering. The summary of such terms contained in this prospectus and in the applicable prospectus supplement is qualified in its entirety by reference to such unit agreement and unit certificate. We urge you to read the unit agreement and unit certificate, if any, and the additional description of the terms of the units included in the prospectus supplement.

The prospectus supplement will describe the units and the price or prices at which we will offer the units. The description will include:

- the designation and terms of the units and of the securities comprising the units, including whether and under what circumstances the securities comprising the units may be held or transferred separately;
- a description of the terms of any unit agreement governing the units;
- a description of the provisions for the payment, settlement, transfer or exchange of the units;
- a discussion of material federal income tax considerations, if applicable; and
- whether the units if issued as a separate security will be issued in fully registered or global form.

The descriptions of the units in this prospectus and in any prospectus supplement are summaries of the material provisions of the applicable agreements.

PLAN OF DISTRIBUTION OF SECURITIES

We are registering up to $[illegible] of our common stock, shares of preferred stock, warrants, debt securities and/or units comprised of one or more of the other classes of securities offered hereby. We may sell or issue the securities offered by this prospectus from time to time in any one or more of the following ways:

- through underwriters or dealers;
- through agents;
- directly to purchasers or a single purchaser; or
- through a combination of any of these methods.

The manner in which we may sell some or all of the securities covered by this prospectus includes, without limitation, through:

- a rights offering;
- exercise of warrants or other rights;
- an "at the market" offering, within the meaning of Rule 415(a)(4) of the Securities Act of 1933, as amended, or the "Securities Act," to or through a market maker or into an existing trading market on an exchange or otherwise;
- a block trade in which a broker-dealer will attempt to sell as agent, but may position or resell a portion of the block, as principal, in order to facilitate the transaction;
- purchases by a broker-dealer, as principal, and resale by the broker-dealer for its account;
- ordinary brokerage transactions and transactions in which a broker solicits purchasers; and
- privately negotiated transactions.

The distribution of the securities may be effected from time to time in one or more transactions:

- at a fixed price, or prices, which may be changed from time to time;
- at market prices prevailing at the time of sale;
- at varying prices determined at the time of sale; or
- at negotiated prices.

For each offering of securities hereunder, we will describe the method of distribution of such securities, among other things, in a prospectus supplement. A prospectus supplement will set forth the terms of the offering of the securities, including:

- the name or names of any agents or underwriters;
- the purchase price of the securities being offered and the proceeds we will receive from the sale;
- any over-allotment options under which underwriters may purchase additional securities from us;
- any agency fees or underwriting discounts and other items constituting agents' or underwriters' compensation;
- any initial public offering price;
- any discounts or concessions allowed or reallowed or paid to dealers; and
- any securities exchanges or markets on which such securities may be listed.

Sales Through Underwriters or Dealers

If underwriters are used in the sale of the securities, the securities will be acquired by the underwriters [illegible]

If a dealer is used in the sale of the securities, we will sell such securities to the dealer, as principal. [illegible]

Direct Sales and Sales Through Agents

We may sell the securities directly, in which case no underwriters or agents would be involved, [illegible]

Delayed Delivery Contracts

[illegible]

At-the-Market Offerings

[illegible]

Rights Offerings

[illegible]

Compensation

In compliance with the guidelines of the Financial Industry Regulatory Authority, Inc. or FINRA, [illegible]

Indemnification

Any underwriters and agents may be entitled to indemnification by us against certain civil liabilities, including liabilities under the Securities Act, or to contribution with respect to payments which the agents or underwriters may be required to make in respect of their liabilities.

Stabilization Activities

[illegible]

Passive Market Making

Any underwriters who are qualified market makers may engage in passive market making transactions in the securities in accordance with Rule 103 of Regulation M.

Trading Markets

[illegible]

Other Matters

[illegible]

We will bear all costs, expenses and fees associated with the registration of the securities offered.

Sales by Selling Securityholders

We are also registering for resale 1,700,958 shares of Series A preferred stock by the selling securityholder and any of its pledgees, assignees and successors-in-interest.

The selling securityholder and its pledgees, assignees, and successors-in-interest may, from time to time, sell any or all of the securities covered hereby on the Nasdaq Global Market [illegible]

- Ordinary brokerage transactions and transactions in which the broker-dealer solicits purchasers;
- Block trades in which the broker-dealer will attempt to sell the securities as agent but may position and resell a portion of the block as principal to facilitate the transaction;
- Purchases by a broker-dealer as principal and resale by the broker-dealer for its account;
- An exchange distribution in accordance with the rules of the applicable exchange;
- Privately negotiated transactions;
- Settlement of short sales;
- In transactions through broker-dealers that agree with the selling securityholder to sell a specified number of such securities at a stipulated price per security;
- Through the writing or settlement of options or other hedging transactions, whether through an options exchange or otherwise;
- A combination of any such methods of sale; or
- Any other method permitted pursuant to applicable law.
- The selling securityholder may also sell securities under Rule 144 or any other exemption from registration under the Securities Act, if available, rather than under this prospectus.

Broker-dealers engaged by the selling securityholder may arrange for other broker-dealers to participate in sales. [illegible]

In connection with the sale of the securities or interests therein, the selling securityholder may enter into hedging transactions with broker-dealers or other financial institutions, [illegible]

The selling securityholder may also enter into option or other transactions with broker-dealers or other financial institutions [illegible]

The selling securityholder and any broker-dealers or agents that are involved in selling the securities may be deemed to be "underwriters" within the meaning of the Securities Act [illegible]

Pursuant to a registration rights agreement we previously entered into with the selling securityholder, [illegible]

We have agreed to keep the registration statement, of which this prospectus forms a part, effective until [illegible]

Under applicable rules and regulations under the Exchange Act, [illegible]

LEGAL MATTERS

[illegible]

EXPERTS

[illegible]

[illegible]

WHERE YOU CAN FIND MORE INFORMATION

We file annual, quarterly and current reports, proxy statements and other information with the Securities and Exchange Commission. Our SEC filings are available to the public over the Internet at the SEC's web site at http://www.sec.gov.

[illegible]

[illegible]

INFORMATION INCORPORATED BY REFERENCE

[illegible]

- [illegible]
- [illegible]

- [illegible]
- [illegible]
- [illegible]
- [illegible]
- [illegible]

[illegible]

[illegible]

Chicken Soup
for the Soul
Entertainment

PROSPECTUS SUPPLEMENT

[illegible]

Ladenburg Thalmann

B. Riley Securities

[illegible]