**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **In re:** | } | |
| | } | **Chapter 7** |
| **CSS ENTERTAINMENT INC.** | } | |
| **(f/k/a CHICKEN SOUP FOR THE** | } | **Case No. 24-11441(MFW)** |
| **SOUL ENTERTAINMENT INC.), et al[1]** | } | **(Jointly Administered)** |
| | } | |
| **Debtors.** | } | |
| | } | |

**EMERGENCY MOTION OF CHARLES MUSZYNSKI FOR I) INJUNCTIVE RELIEF TO HALT PARALLEL SDFL PROCEEDINGS; II) DISQUALIFICATION OF CONFLICTED SPECIAL COUNSEL FOR FAILURE TO OBTAIN REQUIRED CONSENT; III) RECOGNITION OF AUTOMATIC PRIORITY ADMINISTRATIVE EXPENSE STATUS; IV) IMPOSITION OF CONSTRUCTIVE TRUST ON HPS ASSETS; V) ORDER DIRECTING ENTRY OF WRITTEN ORDER UNDER FRBP 9021; AND VI) APPOINTMENT OF COUNSEL**

**SECTION I - LIMITED APPEARANCE**

Movant Charles Muszynski makes this LIMITED APPEARANCE pursuant to Fed. R. Bankr. P. 7004 and this Court's inherent authority SOLELY for the purpose of seeking the emergency relief requested herein. Movant expressly reserves and does not waive any defense, objection, or privilege, including but not limited to: (a) challenges to personal jurisdiction; (b) improper venue; (c) forum non conveniens; (d) all defenses under the Eleventh Amendment; (e) immunity from service of process; and (f) all appellate rights under FRBP 8002. This appearance is strictly limited to the specific purpose of seeking emergency

---

[1] The Debtors in these chapter 7 cases, along with the case numbers and last four digits of each Debtors' federal tax identification number (where applicable), are #24-11442, Chicken Soup for the Soul Entertainment Inc.; (0811); #24-11443, 757 Film Acquisition LLC; (4300); #24-11444, Chicken Soup for the Soul Studios, LLC; (9993); #24-11445, Chicken Soup for the Soul Television Group, LLC, (N/A); #24- 11446, Crackle Plus, LLC; (9379); #24-11447, CSS AVOD Inc.; (4038); #24-11448, CSSESIG, LLC; (7150); #24-11449, Digital Media Enterprises LLC; N/A; #24-11450, Halcyon Studios, LLC; (3312); #24- 11451, Halcyon Television, LLC; (9873); #24-11452, Landmark Studio Group LLC; (3671); #24-11453, Locomotive Global, Inc.; (2094); #24-11454, Pivotshare, Inc.; (2165); #24-11455, RB Second Merger Sub LLC; (0754); #24-11456, Redbox Automated Retail, LLC; (0436); # 24-11458, Redbox Holdings, LLC; (7338); #24-11460, Redwood Intermediate, LLC; (2733); #24-11461, Screen Media Ventures, LLC; (2466); #24-11462, Screen Media Films, LLC; (N/A); #24-11463, TOFG LLC; (0508).

relief and shall not be construed as a general appearance or submission to this Court's jurisdiction for any other purpose.

## SECTION II - PRO SE PROTECTIONS

Movant appears *pro se* and respectfully puts this Court on notice that his filings must be construed under the liberal standards mandated by the Supreme Court of the United States.

The seminal case of **Haines v. Kerner**, 404 U.S. 519 (1972), holds that pro se pleadings are held to "less stringent standards than formal pleadings drafted by lawyers." This principle was reaffirmed in **Erickson v. Pardus**, 551 U.S. 89 (2007). This Court is charged with interpreting such filings to allow for the development of a potentially meritorious claim. **Boag v. MacDougall**, 454 U.S. 364 (1982); **Gordon v. Leeke**, 574 F.2d 1147 (4th Cir. 1978). As this District has specifically recognized, because Movant proceeds pro se, his "pleading is liberally construed." **Smith v. Laurel Police Dept.**, No. 21-1279-LPS, 2022 WL 1155823 (D. Del. Apr. 19, 2022).

## SECTION III - STATEMENT OF FACTS

1. On July 2, 2024, an indispensably joined creditor, plaintiff Screen Media Ventures, LLC ("SMV") filed for Chapter 7 bankruptcy.

2. On January 8, 2025, this Court made an oral ruling regarding Movant's administrative priority claim (hearing transcript, Exhibit A) . On the same day, the Trustee executed a Sharing Agreement (D.I. 687-4) with HPS Investment Partners, LLC ("HPS"), facilitating the transfer of the estate's most valuable assets (Order, D.I. 750).

3. On January 14, 2025, the Trustee retroactively retained Special Counsel Kerry S. Culpepper ("Culpepper") over objection and without written waiver of 38 other creditors when this Court issued Order, D.I. 547.

4. On May 26, 2025, the Trustee, after submitting to jurisdiction of the Nevis Court post-petition, paid $30,000.00 to the Nevis Court on Movant's behalf.

5. The Trustee failed to investigate the financial viability of HPS, American Films, Inc. (revoked by Florida in 2024), or Grove Street Funding (evidencing $0 assets).

6. The Trustee's prosecution of the Nevis action confirmed the estate's obligation to a further **minimum cash bond of approximately $6 million for costs alone, plus tens of millions in potential damages.**

7. Culpepper indispensably joined 39 claimants in the Nevis action **without obtaining the required written consent** from the 38 other co-creditors whose interests are adverse to the estate's.

8. On April 29, 2026, Culpepper filed a misleading motion in the Southern District of Florida ("SDFL"), seeking to lift a now-moot stay while concealing this Court's controlling stay; treating all 39 creditors uniformly.

9. A response in the SDFL action is due by **May 18, 2026**, creating an immediate emergency.

## SECTION IV - GROUNDS FOR RELIEF

### Ground 1: Disqualification for Failure to Obtain Required Consent (Strongest Ground)

Under 11 U.S.C. § 327(a), professionals employed by the estate must be "disinterested" and not hold interests "adverse to the estate." When counsel represents the estate while simultaneously representing 38 other (purported) creditors with adverse interests, the Bankruptcy Code and professional conduct rules mandate written consent.

The Third Circuit in *In re Congoleum*, 426 F.3d 675 (3d Cir. 2005), held that representation in the face of a conflict requires "truly informed consent" and that courts "will not tolerate consents which are less than knowing, intelligent and voluntary."

In *In re Kobra Properties*, 406 B.R. 396 (Bankr. E.D. Cal. 2009), the court held that "informed written consent is a necessary... precondition" for employment under § 327 when such conflicts exist. Under ABA Model Rule 1.7(b)(4), representation in such a

circumstance is permissible only if **"each affected client gives informed consent, confirmed in writing."**

No such written consent was obtained from any of 38 other co-creditors or filed with this Court yet Culpepper told this court (not under oath) the purportedly independent creditors all agreed. The Trustee's retention of Culpepper is therefore statutorily and ethically impermissible, mandating his immediate disqualification.

### Ground 2: Automatic Stay Violation

The SDFL judgment is property of the estate under § 541. *See Logan v. JKV Real Estate Servs. (In re Bogdan)*, 414 F.3d 507 (4th Cir. 2005). The Trustee's prosecution of the SDFL action is a clear violation of § 362(a)(3). This Court has the power under § 105(a) to enjoin such proceedings. *See In re Spansion, Inc.*, 418 B.R. 84 (Bankr. D. Del. 2009).

### Ground 3: Judicial Estoppel

Having submitted to the jurisdiction of the Nevis court post-petition to determine the judgment's enforceability, the Trustee made a binding election of forum. He cannot now take the inconsistent position in the SDFL that the same judgment is ripe for immediate domestic collection. This is a classic case for judicial estoppel. *See Anonymous v. Anonymous*, 137 A.D.2d 739 (N.Y. App. Div. 1988).

### Ground 4: Automatic Priority Administrative Expense

The Trustee's May 26, 2025 payment of $30,000 was an "actual, necessary" cost to preserve a potential estate asset and therefore became an automatic priority administrative expense under 11 U.S.C. § 503(b)(1)(A). *See In re Tenna Corp.*, 891 F.2d 589 (7th Cir. 1989). The Trustee, having ratified the expense by payment, is estopped from denying the claim. The Trustee may argue the claim is de minimis, but it is **30,000 times** the "peppercorn" required for standing. *See In re McTague*, 198 B.R. 428 (Bankr. W.D.N.Y. 1996). Confirmation of Trustee's payment by his Nevis lawyer is below:



26th May 2025

**Mrs. Melissa Flemming**
Assistant Registrar
Nevis High Court Registry
R G Solomon Arcade
Charlestown
**NEVIS**

Dear Mrs Flemming

**RE: Security for Costs - Claim No. NEVHCV2022/0183 Millennium Funding Inc and Ors v AUH20 LLC and Charles Muszynski**

Reference is made to the captioned matter wherein we continue to act on behalf of the Claimants

By order dated 15th May 2025, the Court ordered that the Claimants pay the sum of US$30,000.00 into Court on or before 15th June 2025.

In this regard, please find enclosed, Republic Bank (EC) Limited cheque No 000949 in the sum of Thirty Thousand Dollars United States Currency (US$30,000.00) which is made payable to the Nevis Island Administration on behalf of the Claimants

### Ground 5: Constructive Trust

A constructive trust is required to remedy the Trustee's reckless transfer of assets to a financially questionable HPS. The three elements are met: (1) a **fiduciary relationship** exists; (2) the Trustee **breached his duty** by transferring assets without due diligence; and (3) this will result in **unjust enrichment** if HPS fails. *See Pearson v. First Westroads Bank*, 868 F.2d 162 (8th Cir. 1989); *In re Pileggi*, 72 B.R. 568 (Bankr. E.D. Pa. 1987).

### Ground 6: Bond/Surcharge for Gross Negligence

A trustee can be required to post a bond or be surcharged personally for losses resulting from gross negligence. *See In re Johnston*, 472 B.R. 778 (Bankr. D. Kan. 2012) (bond); *In re Getty*, 253 B.R. 409 (Bankr. D. Del. 2000) (surcharge). The Trustee's failure to investigate HPS, and his association with revoked and assetless entities like American Films, Inc. and Grove Street Funding, demonstrates a pattern of gross negligence that falls far short of the "punctilio of an honor the most sensitive" standard. *See Meinhard v. Salmon*, 249 N.Y. 458 (1928), cited in *Barnard v. DeCillis (In re Ideal Mortgage Bankers)*, 539 B.R. 213 (Bankr. E.D.N.Y. 2015). This conduct violates the "sound business judgment" required to transfer estate assets. *See Kaye v. Blue Bell Creameries, Inc. (In re BFW Liquidation,*

*LLC)*, 899 F.3d 1178 (11th Cir. 2018).

### Ground 7: FRBP 9021 Violation

This Court's 16-month failure to reduce its January 8, 2025 oral ruling to a written order prejudices Movant's appellate rights. An oral order is not effective until written. *Hausman v. Throesch*, 289 S.W.3d 493 (Ark. App. 2008). A lengthy delay transforms this ministerial act into an improper exercise of discretion. *Berry v. Berry*, 765 So. 2d 855 (Fla. App. 2000). The time to appeal does not begin until a written order is entered. *See In re Pittsburgh-Canfield Corp.*, 309 B.R. 277 (B.A.P. 6th Cir. 2004).

### Ground 8: FRCP 60(b) Hobson's Choice

The Trustee faces an inescapable trap regarding the $30,000 payment: (1) admit the payment was a "mistake" under FRCP 60(b)(1) and seek recovery (which is impossible, as the funds are in Nevis); or (2) stand by the payment as authorized and ratified, thereby conceding its status as a priority administrative expense. He cannot have it both ways.

## SECTION V - RELIEF REQUESTED (Prioritized)

WHEREFORE, Movant respectfully requests that this Court enter an emergency order:

(A) **Disqualifying** Culpepper as Special Counsel for failure to obtain required written consent;

(B) **Enjoining** the Trustee and Culpepper from proceeding in SDFL Case No. 21-cv-20862;

(C) **Recognizing** the $30,000 payment as an automatic priority administrative expense;

(D) **Imposing** a constructive trust on all assets transferred to HPS under the Sharing Agreement;

(E) **Ordering** the Trustee to post a bond and/or show cause why he should not be

surcharged for gross negligence;

**(F) Directing** the entry of a written order under FRBP 9021 on Movant's priority

within 14 days; and

**(G) Appointing** counsel for Movant under 11 U.S.C. § 330.

15 May 2025
Respectfully submitted,

Charles Muszynski, pro se
usfilefolder@protonmail.com
P. O. Box 1423
Basseterre
St. Kitts and Nevis
West Indies

## SECTION VI - EXHIBIT LIST

**A.** January 8, 2025 Hearing Transcript

**B.** Nevis Court Order (May 15, 2025)

**C.** HPS Sharing Agreement (D.I. 687-4)

**D.** American Films Revocation (FL SOS 2024)

**E.** Culpepper SDFL Motion (Doc. #594)

**F.** Heirl Letter (TPLF Evidence)

**SECTION VII - PROPOSED ORDER**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** } | |
| } | **Chapter 7** |
| **CSS ENTERTAINMENT INC.** } | |
| **(f/k/a CHICKEN SOUP FOR THE** } | **Case No. 24-11441(MFW)** |
| **SOUL ENTERTAINMENT INC.), et al** } | **(Jointly Administered)** |
| } | |
| **Debtors.** } | |
| } | |

## [PROPOSED] ORDER GRANTING EMERGENCY MOTION

Upon the Emergency Motion of Charles Muszynski; the Court having reviewed the Motion;

and good cause appearing therefor; **IT IS HEREBY ORDERED THAT** (check one or

more):

[ ] **OPTION 1: SPECIAL COUNSEL DISQUALIFIED.** Kerry S. Culpepper and

Culpepper IP, LLLC are **DISQUALIFIED** from serving as Special Counsel for

failure to obtain the required written consent from all affected creditors.

[ ] **OPTION 2: SDFL PROCEEDINGS ENJOINED.** The Trustee and Special

Counsel are **ENJOINED** from taking any further action in SDFL Case No. 21-cv-

20862.

[ ] **OPTION 3: PRIORITY RECOGNIZED.** Movant's claim for a priority

administrative expense under 11 U.S.C. § 503(b)(1)(A) is **GRANTED**.

[ ] **OPTION 4: HPS TRANSFERS ENJOINED.** A constructive trust

is **IMPOSED** on all assets transferred to HPS Investment Partners, LLC under the

Sharing Agreement. All further transfers are enjoined pending further order.

[ ] **OPTION 5: BOND/SURCHARGE HEARING ORDERED.** The Court will

hold an evidentiary hearing to determine whether the Trustee should be required to

post a bond and/or be surcharged personally for gross negligence.

[ ] **OPTION 6: WRITTEN ORDER ON PRIORITY.** The Court shall enter a separate written order memorializing its January 8, 2025 oral ruling within fourteen (14) days.

[ ] **OPTION 7: COUNSEL APPOINTED.** The Court will consider the appointment of counsel for Movant at a subsequent hearing.

## CERTIFICATE OF EMERGENCY

The May 18, 2026 deadline in the SDFL creates an immediate risk of an adverse ruling based on a misleading filing, and the ongoing transfers to HPS risk the permanent loss of estate assets needed to cover the catastrophic Nevis exposure. Both constitute immediate and irreparable harm.

15 May 2025
Respectfully submitted,

Charles Muszynski, pro se
usfilefolder@protonmail.com
P. O. Box 1423
Basseterre
St. Kitts and Nevis
West Indies

## CERTIFICATE OF SERVICE

The undersigned states that the above filing was served upon the parties/entities related to the proceedings above by way of the Court's CM/ECF system on the date below subsequent to courier delivery to the Court's physical location in Wilmington, Delaware on this date.

15 May 2025
Respectfully submitted,

Charles Muszynski, pro se
usfilefolder@protonmail.com
P. O. Box 1423
Basseterre
St. Kitts and Nevis
West Indies

# EXHIBIT A

January 8, 2025 Hearing Transcript

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                                .     Chapter 7
                                      .
Chicken Soup for the Soul             .     Case No. 24-11442(MFW)
Entertainment, Inc., *et al.*         .     (Jointly Administered)
                                      .
     Debtors.                         .     January 8, 2025
                                      .     2:00 p.m.

. . . . . . . . . . . . . . . . . .  .


TRANSCRIPT OF HEARING
BEFORE THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE


Appearances:


Counsel to Chapter 7        Cozen O'Connor
Trustee:                    BY:   JOHN T. CARROLL, ESQ.
                            1101 N. Market Street, Suite 1001
                            Wilmington, DE   19801
                            Phone:     (302) 295-2028
                            Email:     carroll@cozen.com




Audio Operator:             LESA NEAL, ECRO


Transcription Company:      Reliable
                            1007 N. Orange Street
                            Wilmington, Delaware 19801
                            (302)654-8080
                            Email:  gmatthews@reliable-co.com



Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

2

**Hearing Regarding:**

Trustee's Application for Approval of Retention of Culpepper IP LLC as Special Copyright Litigation Counsel (DI 508);

Motion of 800 Third Party Associates, LLC for Allowing Chapter 7 and Chapter 11 Administrative Claims (DI 515).

**RULINGS**: Granted

3

(Recorded proceedings commence at 2:00 p.m.)

THE COURT:  Good afternoon.  This is Judge Walrath. We're here in my chapter 7 hearings.  The only matter I have going forward is the Chicken Soup case, and I will turn it over to counsel for the trustee to take us through that agenda.

MR. CARROLL:  Thank you, Your Honor.  John Carroll, counsel for the trustee, George Miller.

Your Honor, with respect to the agenda, there really are only two items that are going forward.  I'll start with Item No. 3 which is the trustee's application for the approval of the retention of Culpepper IP as special copyright litigation counsel.

Your Honor, with respect to this application, I received certain informal comments from the Office of the United States Trustee which related to the provisions permitting association with, of the Culpepper firm with other counsel in different jurisdictions to enable the IP litigation to be pursued.

The Office of the United States Trustee requested that we modify the order to provide that basically a verified statement under Bankruptcy Rule 2014 setting forth any connections with the debtor, creditors, parties in interest, their attorneys, accountants of the Office of the U.S. Trustee be filed with respect to any of those associated counsel for those other jurisdictions which the trustee has agreed to do.

4

We need to come up with a language and put it in the order. What I contemplated doing was submitting it under certification of counsel to Your Honor.

We also received an objection which was filed by Mr. Charles Muszynski on a pro se basis. Mr. Muszynski I believe is present on the call.

Mr. Muszynski is a judgment debtor with respect to these debtors in connection with a $250,000 judgment which is held by the debtors. He interposed an objection to Mr. Culpepper's retention. I asked Mr. Culpepper to attend this hearing and he is present, Your Honor.

Candidly, I really have a very difficult time in following the objection, and I'm not sure I understand the objection that was interposed, so I thought I would let Mr. Muszynski put forth his objection and we can respond accordingly if that's okay.

THE COURT: That's fine.

Mr. Muszynski, are you present?

MR. MUSZYNSKI: Good afternoon, Your Honor. Yes, I am. And just as a point of order, it was less than 24 hours ago that the notice was sent out adding witnesses to this. I've had no prior notice of that until nine hours ago when I awoke and found it in my box.

Also, there are intermittent power outages in my country today. And I am not at my normal location. I'm not

normally attired for your appearance, for my appearance in front of you, so I'm at a neighbor's house where they have generator capacity.

I am a little perplexed as to what Mr. Carroll finds confusing about the objection. There's six ways to Sunday proving that Mr. Culpepper is not a disinterested party. He owns 42 Ventures. Although SMV's estate has a $250,000 interest that Mr. Carroll refers to, it is an indispensably joined party with scores of other alleged movie company creditors.

And the objection that I filed thoroughly briefs caselaw and statute, ABA rules, everything that for how frequently and how Mr. Culpepper simply does not qualify to be selected as a special counsel. There are plenty of copyright attorneys.

Mr. Culpepper also has appeared as a fact witness. He has volunteered twice as a witness in the case. He will be called in Nevis, an appended case. He has continuously continued his collection activities despite your automatic stay and the automatic stays of other federal courts. I have documentation of all of that included in the objection.

The -- bear with me just a moment, I have to reference my notes.

And also as far as in the last couple of days, I wanted to make sure that before we proceeded any further, I put

all the parties on notice that I have been cooperating with Chief Inspector Watt (phonetic) with the Royal St. Kitts and Nevis Police White Crimes, White Crimes Division, White Collar Crimes Division and will be working with them on the criminal investigation that will be open into Mr. Culpepper for his violation of the privacy and confidentiality laws under the company's act in Nevis.

Also, it occurred to me that the objection did not include information about the minimum $100,000 bond that will have to be posted if he continues to attempt to make to press his attempt to collect in Nevis. That bond will have to be posted by the estate.

And when the estate loses, which they will, because as a matter of public policy foreign judgements based on statutory damages, and if Mr. Culpepper's case, they're unargued and unnoticed. There was an unnoticed case, it's a default judgment. It doesn't stand a chance here.

If Mr. Carroll has other questions, I'm happy to provide, I mean it's a 38 page brief, there's everything in there.

And when I spoke with the U.S. Trustee, Richard, I apologize, I can't, his last name doesn't immediately come to mind, his concern was that the conflict check hadn't been run with the firm that Mr. Culpepper had subcontracted three years ago in Nevis to pursue his collections. And I'm kind of

7

curious how an attorney is going to perform a conflicts check after the fact when Mr. Culpepper, without your Court's authorization, has been engaged in collection actions contemptuous of the automatic stay and has already hired not only that subcontractor, but another subcontractor in Puerto Rico.

So I mean there's, there's a multitude of vectors here to go down and I don't think it's worth the Court's time to rehash the 38 pages of legal cites and statutory cites. It's kind of self-explanatory.

So if Mr. Carroll is confused, I'd be happy to answer any questions that may have left him in the dark about my pleading. I'm just a pro se ignorant Pollock who is trying to fend off an attack. And I've done my best to provide all the background.

THE COURT: Mr. Carroll?

MR. CARROLL: Your Honor, I've parsed through pretty carefully the objection, and candidly I think that it's not really comprehensible, nor does it make sense. He is not a creditor, nor is he a party in interest. But what I would suggest is Mr. Culpepper who is represented in the debtors and in connection with the judgment that was previously obtained, should probably respond to some of the comments that were just made.

MR. MUSZYNSKI: Well, I would object to Mr.

8

Culpepper's entry here.  He is neither, well, there's also a question that Mr. Culpepper himself may be a pro se creditor, so he would be a party of interest.

And I should also say I may not be a creditor of the estate yet, but when he presses the case in Nevis and it loses, they lose, I will become a creditor.  And that money, those monies will be paid out of the hundred thousand cash bond that has to be posted into the court in Nevis before that case can proceed by plaintiffs.

THE COURT:  Well, you're not currently a creditor, Mr. Muszynski.  You have no claim against the estate that's been confirmed by any court or by this Court.

MR. MUSZYNSKI:  Yes, ma'am.

THE COURT:  Right.  And I will hear Mr. Culpepper.  You've made a lot of allegations, some of which are factual and I haven't put you under oath, so I'm not sure I can rely on the facts as you've recited them.

But let me hear Mr. Culpepper's response since Mr. Carroll is not aware of the situation between the debtor and you as you articulate anyway.

Mr. Culpepper?

MR. CULPEPPER:  May it please the Court, Kerry Culpepper of the law firm Culpepper IP LLC.

I previously represented Screen Media Ventures in law suits against certain service providers.  One of those service

9

providers was a company Mr. Muszynski owned called Liquid VPN. We obtained a judgment in the Southern District of Florida for roughly $225,000 plus attorneys fees and costs based upon Mr. Muszynski's company's willful service for copyright infringement.

We later sought to have that judgment recognized in Nevis. That's when Mr. Muszynski began filing all of his motion practice and allegations against my firm. The subcontracting firm he refers to is the firm that we hired to assert our claim in Nevis where Mr. Muszynski resides.

I disagree with allegations about conflicts of interest in the Screen Media Ventures, full disclosures were made of the other clients that I represent.

In the Southern District Florida litigation, there were other movie companies that were joined with Screen Media Ventures as plaintiffs, you know, that was disclosed.

I'm sorry, does Your Honor have a question for me?

THE COURT: No. Go ahead.

MR. CULPEPPER: The other point. I think he mentioned Puerto Rico. Mr. Muszynski declared bankruptcy and sought to have the judgment discharged in Puerto Rico. So Screen Media Ventures, on behalf of Screen Media Ventures we engaged local counsel to represent Screen Media Ventures to dispute Mr. Muszynski's allegation that the judgment should be discharged. That's ongoing. Mr. Muszynski has appealed the

10

District of Puerto Rico's denial of his bankruptcy petition.

I don't really know how to respond to his other allegations.  If he has a problem with the estate, he can pay the judgment back and he can be done with this entire thing.

If Your Honor has any questions for me, I'm willing to answer anything about this matter.

THE COURT:  Well, you did state that you represented other plaintiffs in the new York action as well.  Is that correct?

MR. CULPEPPER:  Southern District of Florida action, yes.

THE COURT:  I'm sorry, the Southern District of Florida action.

Did they have any conflict with the debtors?

MR. CULPEPPER:  No, Your Honor.

THE COURT:  They were both seeking actions against the defendant, excuse me, for breach of IP rights.  Is that right?

MR. CULPEPPER:  Sorry, the connection became choppy.  They were seeking actions against the defendants?

THE COURT:  Against the defendants in the Southern District of Florida action.  They all brought the same type of action.

MR. CULPEPPER:  Yes, Your Honor, it was the same action.

11

THE COURT:  Okay.

All right.  Mr. Muszynski, do you have any questions of Mr. Culpepper that are relevant to conflicts of interest?

MR. MUSZYNSKI:  If I may be permitted, yes, ma'am.

THE COURT:  Yes.

MR. MUSZYNSKI:  May I proceed?

THE COURT:  Yes.

MR. MUSZYNSKI:  Okay.  Thank you.

Mr. Culpepper, you just stated that I owned the ISP Company, Liquid VPN.  Is that correct?

MR. CULPEPPER:  My position is yes, that you own the company, Liquid VPN.  You may not have owned it directly, but you owned it through the (indiscernible).

MR. MUSZYNSKI:  Is your testimony to this court that I owned Liquid VPN.  That's what you just told the court.

MR. CULPEPPER:  Yes, Mr. Muszynski, believe you own Liquid VPN.

MR. MUSZYNSKI:  So you've spent the last four years investigating me and the best you can say is I believe.  It is not in your knowledge that AUH20 and 1701 Management owned Liquid VPN?

MR. CULPEPPER:  As I just said, you could own the entity that owns it, but you still own it.

MR. MUSZYNSKI:  So in your knowledge, are you testifying that I own the entity that owns it?

MR. CULPEPPER: There's a judgment in the Southern District of Florida that agrees with me in which you were represented by counsel, Mr. Mackler (phonetic). So yes, you controlled Liquid VPN. You're the manager of Liquid VPN. You signed the asset purchase agreement when you purchased, when your company, 1701 Management, purchased the assets of Liquid VPN from the previous party.

MR. MUSZYNSKI: Is it not true that Richard Mackler represented me to have the case thrown out in the Southern District of Florida without agreeing to jurisdiction or venue because I'm a foreign citizen and was never provided proper service, and that you later admitted that I did not live in Texas where you provided the service?

MR. CULPEPPER: The -- I'm willing to answer his questions, Your Honor. Should I try to answer to the best of my ability because he, that was really a packed question?

THE COURT: I think at this point, Mr. Muszynski, I don't think that going into the merits of the judgment against you is relevant to whether or not he has a conflict in representing the estate in pursuing either collection of that judgment or other rights that the estate may have. So I --

MR. MUSZYNSKI: Yes, ma'am. So if I may be --

THE COURT: I'll limit you to conflicts of interest that you allege.

MR. MUSZYNSKI: Understood. Thank you, ma'am.

13

Mr. Culpepper, do you own 42 Ventures LLC?

MR. CULPEPPER:  Yes.

MR. MUSZYNSKI:  Is 42 Ventures LLC a joined member of the final judgment in which Screen Media Ventures LLC is also a joined member?

MR. CULPEPPER:  They're a judgment creditor, yes. Well, they were a plaintiff also in the case.  They had a claim against 1701 and you.  So to that extent, yes.  I wouldn't use the word, joined.

MR. MUSZYNSKI:  Did you write the final judgment that joined these parties?

MR. CULPEPPER:  No.

MR. MUSZYNSKI:  Did you represent the final judgment that joined these parties between, including 42 Ventures LLC and Screen Media Ventures?

MR. CULPEPPER:  Could you repeat your question?

MR. MUSZYNSKI:  Did you represent the parties as joined members to a final judgment in the Southern District of Florida which joined your company which you wholly own, 42 Ventures LLC, and Screen Media Ventures, LLC along with approximately 38 other nonperforming entities that you represented?

MR. CULPEPPER:  I represented the plaintiffs in the case in the Southern District of Florida, including 42 Ventures.

MR. MUSZYNSKI:  And 42 Ventures is a joined party in the judgment with Screen Media Ventures.

MR. CULPEPPER:  Yes.

MR. MUSZYNSKI:  And have you appeared in my cases as a fact witness and pro se?

MR. CULPEPPER:  I, in the evidentiary hearing --

MR. MUSZYNSKI:  Be careful, this is in all in transcript.

THE COURT:  Let him answer your question, Mr. Muszynski.

Go ahead, Mr. Culpepper.

MR. CULPEPPER:  In the, in your bankruptcy, when you say your case, I assume you're referring to your bankruptcy. Am I correct?

MR. MUSZYNSKI:  Yes.

MR. CULPEPPER:  In your bankruptcy, we had an evidentiary hearing in the Eastern District of Texas and I did, I listed myself as a fact witness but I didn't, I wasn't, I didn't ask any questions or I didn't give any testimony if I remember correctly.

MR. MUSZYNSKI:  But if you're a pro se.

MR. CULPEPPER:  You listed, yeah, because you included me as a creditor in your bankruptcy, my name personally.  So I did appear pro se for myself.

MR. MUSZYNSKI:  Did you list PML Process Management

15

Limited as a party that you represent and as an interested party in my bankruptcy?

MR. CULPEPPER:  I didn't list them as, I think what you're referring to is in the, when your bankruptcy was dismissed, you appealed to the bankruptcy appeal panel or the First Circuit, and we're required to include a certificate of any interested parties.  And I think that's what you are referring to.  PML was included as an interested party.  Is that what you're talking about?

MR. MUSZYNSKI:  Yes.  Did you disclose to the Delaware District Bankruptcy Court that PML is an interested party as well?

MR. CULPEPPER:  I haven't filed anything in the Delaware Bankruptcy Court.

MR. MUSZYNSKI:  Did you make representations to the trustee that PML was an interested party as required under statute?

MR. CULPEPPER:  PML is not an interested party of Screen Media Ventures.

MR. MUSZYNSKI:  I'll be with you in just a moment. Did you provide the trustee notice that you will have, the estate will have to post $100,000 bond in order to litigate in Nevis?

MR. CULPEPPER:  I don't believe that's the case.

MR. MUSZYNSKI:  So that's a no?

16

MR. CULPEPPER:   No.

MR. MUSZYNSKI:   Did you inform the trustee that as a matter of public policy in the Federation of St. Kitts to Nevis, foreign statutory judgments are not honored?

MR. CULPEPPER:   I did not say that because I don't agree with what you're saying.

MR. MUSZYNSKI:   Are you and/or your firm a partner with PML Process Management and are you fee splitting with them as part of a third party litigation funding agreement?   PML being located in the Republic of Cyprus?

MR. CULPEPPER:   No.

MR. MUSZYNSKI:   Is there, on behalf of the estate for Screen Media Ventures, is there an accounting for the fees that you have assessed so far in your collection actions for the joined parties in the judgment?   And how are those fees split amongst the other joined parties relative to SMV's interest?

MR. CULPEPPER:   You need to ask the estate how they're doing their accountings.   I don't know anything about that.   I think what you're asking is how are those costs split among the plaintiffs in the litigation against you.   Is that what you're asking?

MR. MUSZYNSKI:   Yes.

MR. CULPEPPER:   There's an agreement to that, that the costs are allocated based upon the number of titles in the law suit.

17

MR. MUSZYNSKI:  Are you continuing to collect settlements on behalf of Screen Media Ventures?

MR. CULPEPPER:  I don't believe that question is relevant to what you're asking.  And there are confidential issues --

THE COURT:  What is, what was the question?

MR. MUSZYNSKI:  I asked Mr. Culpepper if he is continuing to extract settlement amounts from people that he is sending demand letters to on behalf of Screen Media Ventures and the other joined movie alleged movie company creditors. The scheme that Mr. Culpepper is running --

THE COURT:  I understand.  I understand.

MR. MUSZYNSKI:  Okay.  So those revenues would belong to Screen Media Ventures' estate and he has not said, he has not denied continuing to collect them.

MR. CULPEPPER:  May I answer this question, Your Honor?

THE COURT:  You may.

MR. CULPEPPER:  If I received money on behalf of Screen Media Ventures since the bankruptcy, I have informed the trustee.  I have not received any money on behalf of Screen Media Ventures since the chapter 7, or since the chapter 11 filing.

MR. MUSZYNSKI:  Have you proceeded in other courts with your collection actions even though this court has not

approved your engagement as a special counsel?  Have you proceeded in other courts with collection actions even though this court has not approved you as a special counsel?

MR. CULPEPPER:  With respect to your, the judgment against you, there was an appeal to the bankruptcy appellant panel.  So to the extent that I continue to represent Screen Media Ventures in that issue, the answer would be yes.  You phrased it as collection activities.

MR. MUSZYNSKI:  Okay.  I'll broaden the question. Have you continued litigating in Frontier Communications Corporation's chapter 11 on behalf of Screen Media Ventures in the Southern District of New York?

MR. CULPEPPER:  Yes.

MR. MUSZYNSKI:  Did you have approval from this court to do so on behalf of Screen Media Ventures?

MR. CULPEPPER:  No.  That's why we're here today.

MR. MUSZYNSKI:  How long have you been litigating on behalf of Screen Media Ventures without this court's approval?

MR. CULPEPPER:  The case has been going on since 2020, so the bankruptcy was filed in July when the chapter 7, when the case was converted to chapter 7.  I notified the Southern, I notified the Southern District of New York of the chapter 7 liquidation, requested a stay while this was resolved.  The judge never decided on whether or not the stay would happen.  The case has been ongoing.  So to the extent

19

that something needed to be done, did I proceed with the case, I did proceed with the case.

MR. MUSZYNSKI: Have you continued to litigate in the case of subpoena to Reddit Inc and Voltage Holdings in the Ninth Circuit?

MR. CULPEPPER: Yes. And I filed a motion to substitute the Screen Media Ventures for the chapter, for the chapter 7 trustee that was approved.

MR. MUSZYNSKI: And when did you do that?

MR. CULPEPPER: I don't remember the exact date. I do remember that the motion was approved a week or so ago.

MR. MUSZYNSKI: What is PML's involvement from a financial standpoint as a third party litigation funder on behalf of Screen Media Ventures?

MR. CULPEPPER: Nothing.

MR. MUSZYNSKI: Why is Screen, why is PML appearing as a party of interest?

MR. CULPEPPER: They're not a party in interest in this case. If you're asking why I included them as a party of interest in the bankruptcy appeal panel, that's because they have an interest in the matter. But the interest has nothing to do with Screen Media Ventures or Chicken Soup.

MR. MUSZYNSKI: Does PML provide any funding of any kind to Chicken Soup or Screen Media Ventures?

MR. CULPEPPER: Not to the extent I know of, not for

20

the cases I've been involved in.

MR. MUSZYNSKI:  Is PML going to receive a split of revenues from those that you collect by settlement demand letters on behalf of Screen Media Ventures or Chicken Soup for the Soul or the other joined creditors, nearly 38 of them?

MR. CULPEPPER:  For Screen Media Ventures or Chicken Soup, not to the extent I know.  I don't believe so.  As respect to your other claimants, nothing has to do with this case and I don't think it's relevant to the question here.  So I would, I decline to answer that part because it's subject to attorney-client privilege.

THE COURT:  Okay.

MR. MUSZYNSKI:  Your Honor, that's the basic route.  I can go on and on in other cases where he has continued to litigate in violation of the contempt.  And I don't know that it does any benefit to the court to hear.

THE COURT:  Violation, violation of what contempt?

MR. MUSZYNSKI:  Of the automatic stay in this case.

THE COURT:  Well this, the automatic stay protects the debtor, not the defendants that he is suing.  A debtor can continue to prosecute actions against others.  The automatic stay protects the debtor and the debtor's estate.  So I think you have it in reverse.  It doesn't protect you.

Mr. Carroll, do you want to be heard on --

MR. MUSZYNSKI:  I'm sorry.

MR. CARROLL: No, Your Honor. I don't believe that Mr. Culpepper has a conflict. He was counsel of record in some cases. Candidly, that's what made sense for the trustee to continue in a large part to utilize his services going forward which is why we filed the application to have him employed as special counsel on basically a contingent fee basis.

THE COURT: Mr. Muszynski?

MR. MUSZYNSKI: Your Honor, I believe my filing is fully briefed with statute, ABA rules and precedent and clearly shows examples of how Mr. Culpepper has continued to litigate without the authorization from this court and is conflicted and not a disinterested party. He owns 42 Ventures which is a part of the roughly 41 other joined creditors in this case. He is absolutely not disinterested. He is absolutely conflicted.

THE COURT: Mr. Carroll?

MR. CARROLL: Your Honor, I don't see a conflict in representing another party. He's undertaking to represent the debtor and is doing so based on a percentage of recovery on behalf of the debtor. So I really don't see a conflict at all.

THE COURT: And this is a retention under 327(e). Is that not correct, Mr. Carroll?

MR. CARROLL: Yes.

THE COURT: Well, I will rule this way. I do not see any conflict that Mr. Culpepper has with respect to representing the estate and -- could you turn that down -- with

22

respect to -- just a minute.  All right, let me try again.  I do not find any conflict --

(audio issue)

THE COURT:  Mr. Muszynski, can you mute your line?  I think that's why I'm getting an echo?  Okay.

I do not find any conflict in Mr. Culpepper representing this estate and the other plaintiffs in pursuing other parties that the other plaintiffs and the estate have similar claims against.

As the trustee has stated, it appears there is a savings in having that retention rather than getting another attorney to start from scratch.  Mr. Culpepper has continued to represent those parties prepetition and continuing to protect the interest of the plaintiffs and the estate while his retention application is pending is not a conflict.

As I stated, the automatic stay does not protect the defendants in that action, it only protects the debtor and its estate.  I further do not find any conflict in the retention, the terms of the retention which is that Mr. Culpepper and his firm will receive a percentage of funds collected on behalf of the estate only.

Section 327(e) allows a party who has previously represented the debtor to now represent the trustee in that same manner.  And I think it's perfectly appropriate that the trustee has selected to continue Mr. Culpepper's

23

representation.

So I will overrule the objection and grant the retention application.

All right.  The next matter, Mr. Carroll?

MR. CARROLL:  Thank you, Your Honor.  The next matter is Item No. 5 on the agenda which is the motion of 800 Third Avenue Associates for entry of an order allowing both a chapter 7 administrative claim and a chapter 11 administrative claim.

The trustee filed a limited objection with respect to the motion, and submitted a revised form of proposed order which would allow the chapter 11 administrative claim in the amount sought and also allow the chapter 7 administrative claim.

The basis for the trustee's objection was the request for an order compelling the trustee to make immediate payment of the chapter 7 administrative claim.  The limited objection sets forth the reasons why we would oppose that.  The primary reason is that this is a case where there are not any unencumbered funds presently with which to make such a payment.

Additionally, under the case law, it's really discretionary in terms of the trustee when he's going to make those payment.  It's detrimental to the estate in that if he were to make the payments, he may not have the ability to pursue other causes of action which would enure to the benefit of the estate and to all of the creditors in this matter.

We don't have a problem with allowing the claim, but we have difficulty with respect to the making of an immediate payment, Your Honor.

THE COURT:  Thank you.  Anyone here on behalf of the landlord.

MR. MANN:  Yes, Your Honor, Kevin Mann on behalf of the landlord.  I apologize, my screen says Cross & Simon and I haven't been able to change that.  So you'll just have to bear with me.

Kevin Mann on behalf of 800 Third Avenue Associates LLC.  800 was the landlord for the debtors' New York offices. The debtors filed their chapter 11 petition on June 28th of 2024 and remained in the premises after that.  And then on July 10th, the case was converted, the chapter 7 trustee was appointed.  And then on July 29th, the trustee cleared out the premises and surrendered possession to the landlord.

So, and then I'm not sure if it was Your Honor or Judge Horan, but an order was entered rejecting the lease as of July 31st.  So between the petition date and the conversion date, the debtors accrued rent of $42,519.54.  And then between conversion and surrender, the estate accrued rent of $70,500.40.  And none of this post-petition rent has been paid.

The landlords moved under 365(d)(3) and 503(b)(1)(a) for allowance of the admin claim and for immediate payment of the chapter 7 portion.  As Mr. Carroll noted, the trustee has

25

indicted does not have an objection to the allowance of the admin claim or the amount and no other objections were filed, they didn't hear from anybody else.  But the trustee has objection to the immediate payment so I did want to address that.

First, Your Honor, as Mr. Carroll said, the trustee asserts he has no unencumbered cash and making payment now would be inequitable.

The cases that the trustee cites in his objection give the trustee discretion as to when to pay administrative claims.  And he says that there's nothing in the code that requires immediate payment and that the landlord is not special.  And I think this argument completely ignores Section 365(d)(3).  The landlord is special because it was a post-petition lesser of non-residential real property.

So under 365(d)(3), the trustee is required to timely perform all the obligations of the debtor arising from and after the order for relief under any unexpired lease of non-residential real property until such lease is assumed or rejected.

And under Montgomery Ward, the court, the Third Circuit held the clear and express of 365(d)(3) is to require the trustee to perform the lease in accordance with its terms.  So 365(d)(3) ensures prompt payment of lease obligations so the landlord is not required to provide use of the leased premises

26

to a debtor without receiving timely compensation under the terms of the lease.  And it operates to prevent landlords from becoming involuntary creditors of a debtors' estate.

There is a New Jersey case, in re Pelican Pool and Ski Center, but it does cite to Montgomery Ward that said, "In other words, if the obligations under the lease become due following the petition date and prior to the rejection of the lease, the obligations are payable immediately."

As far as I can tell, there's no Third Circuit case law that says otherwise.  Montgomery Ward also held that, "Congress intended the debtor perform all the obligations at the time required by the lease."

As far as the trustee's assertion that he doesn't have unencumbered cash, and no offense to Mr. Carroll, but we haven't seen any evidence of that or that any evidence of the case of administrative insolvent.  It doesn't appear from my review of the docket that the debtors ever filed schedules, and there's nothing that appears on the docket showing the debtors' liens or the estate's financial position as far as I've been able to tell as well.

But even if the case is administratively insolvent or in danger of becoming administratively solvent, that really shouldn't matter here.  In the other, I'm sorry, other cases in this circuit have upheld the requirement of immediate payment and the landlord's right to retain such payments even when

27

faced with an estate's later administrative insolvency.  And that comes from the Valley Media case from this court, Your Honor.

Finally, if the Court is concerned about how 365(d)(3) operates in chapter 7 versus chapter 11, there's a recent case out of New Jersey called Junk Handle Brewing Company, and it's unpublished but it's at 2024 WL 2819626.  It takes on this issue and that court specifically says, "The structure of 365 as a whole does not support a different application of 365(d)(3) in chapter 7 cases versus chapter 11 cases." It goes on to say, "If congress had intended for different treatment of unexpired leases of non-residential real property in those chapters, it could have made a similar distinction, but it did not."  This evidences an intent on the part of Congress to protect landlords in both chapter 11 cases as well as chapter 7 cases.

So, with that, Your Honor, 800 Third Avenue Associates respectfully requests that the Court grant it its administrative expense claim and direct, I'm sorry, and direct immediate payment of the chapter 7 portion.

THE COURT:  Well, let me ask you this.  Montgomery Ward says it's due when, it's due on the first of the month is it not?

MR. MANN:  I'm not sure under this lease, Your Honor, but I believe so.

28

THE COURT:   The case was converted July 10th and it was rejected July, the lease was rejected July 31st, so what amounts are due under the lease for the chapter 7 period before rejection?

MR. MANN:   Your Honor, that's broken down in the motion.   From the time of the petition date through the date of conversion it was $42,519.

THE COURT:   I understand.   But my question is what specific performance, i.e., the payment of rent, if it was due July 1st, it wasn't due July 10th, 11th, 12th, etc.   You're giving me a pro rata assessment of the rent rather than a when it's due analysis.

MR. MANN:   Your Honor, if that's the case, then the rent would have been due July 1st and it was never paid.

THE COURT:   Correct.   But the trustee was not, the case had not been converted July 1st.   So there's no performance that the trustee has not made.   You may have a chapter 7 claim on a pro rata basis as an administrative claim, but I don't think you have a 365(d)(3) claim, do you?

MR. MANN:   Well, Your Honor, I ask why is the debtor not, I'm sorry, why is the trustee not required to timely perform?   If the, if the rent was due and it was never paid by the debtor, shouldn't it have been paid by the trustee even if it was ten days late?

THE COURT:   Mr. Carroll?

29

MR. CARROLL: One issue that we did not get into is the, you know, there was no post-petition post-conversion agreement with the trustee. The trustee inherited this lease. I'm not sure there was any true benefit. And you know candidly I dealt with this situation many number of times, and this is an amazingly quick resolution. You have the main office of Chicken Soup which the trustee manages to get out of almost immediately, manages to reject almost immediately and it's a fantastic sort of result.

But, you know, we're willing to allow the administrative claim but the reality is there are not funds with which to make the payment. The trustee did to the best of his ability immediately reject, immediately got out by hook or crook and that's where we stand.

The other issue I might want to point out is there is no administrative claim bar date in this case so we do not know what the universe of additional claims might be, that would have to share in parity. That's the reason why it shouldn't be paid at this point in time from a practical perspective either.

THE COURT: Yeah. I think that the landlord may have an administrative claim, but I don't think that the landlord has the right to demand payment under 365(d)(3). In fact, I think that was the whole point of the Montgomery Ward case was that if the bankruptcy was filed on the 10th of July itself, all of the rent for July that was due on July 1st would be a

30

prepetition claim. I don't know why it's different for the conversion date.

MR. MANN: Your Honor, July 1st was after the petition date.

THE COURT: I understand. I'm doing it by analogy.

MR. MANN: Okay.

THE COURT: I'm analogizing the Montgomery Ward ruling to a conversion date. And I think that the analysis applies equally here that because the amount of the rent for July was due July 1st, the trustee had no obligation to pay it promptly.

MR. MANN: So essentially, Your Honor, you're treating, you would treat the post-conversion amount as equivalent to stub rent?

THE COURT: Correct, correct.

MR. MANN: Okay.

THE COURT: You'd have a claim for the stub rent as an administrative expense. Okay? So I will I guess sustain the trustee's objection which is not to allowance of the claim, but to any payment of it immediately.

MR. MANN: Thank you, Your Honor. I'll get with Mr. Carroll and we'll put a, we'll put an order in.

THE COURT: All right.

Anything else then, Mr. Muszynski, do you have something further?

MR. MUSZYNSKI:  Yes, Your Honor.  Thank you.  How long will it be before transcripts are available to order?

THE COURT:  Before what are available?

MR. MUSZYNSKI:  Transcripts of this proceeding.  I'm not familiar with your district, how long those usually take.

THE COURT:  I think they have to be ordered, and then I think --

MR. MUSZYNSKI:  Yes, ma'am.

THE COURT:  -- then I think it takes, I don't know, I'm not sure.

MR. MUSZYNSKI:  Also, I wanted to ensure that the court understood that in the case of Nevis, a $100,000 cash bond must be deposited with the court in Nevis to proceed.  I just want to make sure that was on the record.

THE COURT:  You can say that, but there's no evidence of that and that is not before me today so I don't really --

MR. MUSZYNSKI:  Understand.

THE COURT:  -- need to know that.

MR. MUSZYNSKI:  I just want to make sure I got it preserved on the record.  Thank you.

THE COURT:  Understood.  All right.  We'll stand adjourned then.  Thank you.

(Proceedings adjourned 2:47 p.m.)

* * * * *

32

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.

/s/ Theresa Pullan                    January 17, 2025

Theresa Pullan, CET-780

Certified Court Transcriptionist

For Reliable

**EXHIBIT A**

January 8, 2025 Hearing Transcript

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                              .     Chapter 7
                                    .
Chicken Soup for the Soul           .     Case No. 24-11442(MFW)
Entertainment, Inc., *et al.*       .     (Jointly Administered)
                                    .
      Debtors.                      .     January 8, 2025
                                    .     2:00 p.m.

. . . . . . . . . . . . . . . . . .

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE

Appearances:

Counsel to Chapter 7        Cozen O'Connor
Trustee:                    BY:   JOHN T. CARROLL, ESQ.
                            1101 N. Market Street, Suite 1001
                            Wilmington, DE   19801
                            Phone:     (302) 295-2028
                            Email:     carroll@cozen.com

Audio Operator:             LESA NEAL, ECRO

Transcription Company:      Reliable
                            1007 N. Orange Street
                            Wilmington, Delaware 19801
                            (302)654-8080
                            Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

2

**Hearing Regarding:**

Trustee's Application for Approval of Retention of Culpepper IP LLC as Special Copyright Litigation Counsel (DI 508);

Motion of 800 Third Party Associates, LLC for Allowing Chapter 7 and Chapter 11 Administrative Claims (DI 515).

**RULINGS:** Granted

3

(Recorded proceedings commence at 2:00 p.m.)

THE COURT:  Good afternoon.  This is Judge Walrath. We're here in my chapter 7 hearings.  The only matter I have going forward is the Chicken Soup case, and I will turn it over to counsel for the trustee to take us through that agenda.

MR. CARROLL:  Thank you, Your Honor.  John Carroll, counsel for the trustee, George Miller.

Your Honor, with respect to the agenda, there really are only two items that are going forward.  I'll start with Item No. 3 which is the trustee's application for the approval of the retention of Culpepper IP as special copyright litigation counsel.

Your Honor, with respect to this application, I received certain informal comments from the Office of the United States Trustee which related to the provisions permitting association with, of the Culpepper firm with other counsel in different jurisdictions to enable the IP litigation to be pursued.

The Office of the United States Trustee requested that we modify the order to provide that basically a verified statement under Bankruptcy Rule 2014 setting forth any connections with the debtor, creditors, parties in interest, their attorneys, accountants of the Office of the U.S. Trustee be filed with respect to any of those associated counsel for those other jurisdictions which the trustee has agreed to do.

4

We need to come up with a language and put it in the order. What I contemplated doing was submitting it under certification of counsel to Your Honor.

We also received an objection which was filed by Mr. Charles Muszynski on a pro se basis. Mr. Muszynski I believe is present on the call.

Mr. Muszynski is a judgment debtor with respect to these debtors in connection with a $250,000 judgment which is held by the debtors. He interposed an objection to Mr. Culpepper's retention. I asked Mr. Culpepper to attend this hearing and he is present, Your Honor.

Candidly, I really have a very difficult time in following the objection, and I'm not sure I understand the objection that was interposed, so I thought I would let Mr. Muszynski put forth his objection and we can respond accordingly if that's okay.

THE COURT: That's fine.

Mr. Muszynski, are you present?

MR. MUSZYNSKI: Good afternoon, Your Honor. Yes, I am. And just as a point of order, it was less than 24 hours ago that the notice was sent out adding witnesses to this. I've had no prior notice of that until nine hours ago when I awoke and found it in my box.

Also, there are intermittent power outages in my country today. And I am not at my normal location. I'm not

5

normally attired for your appearance, for my appearance in front of you, so I'm at a neighbor's house where they have generator capacity.

I am a little perplexed as to what Mr. Carroll finds confusing about the objection. There's six ways to Sunday proving that Mr. Culpepper is not a disinterested party. He owns 42 Ventures. Although SMV's estate has a $250,000 interest that Mr. Carroll refers to, it is an indispensably joined party with scores of other alleged movie company creditors.

And the objection that I filed thoroughly briefs caselaw and statute, ABA rules, everything that for how frequently and how Mr. Culpepper simply does not qualify to be selected as a special counsel. There are plenty of copyright attorneys.

Mr. Culpepper also has appeared as a fact witness. He has volunteered twice as a witness in the case. He will be called in Nevis, an appended case. He has continuously continued his collection activities despite your automatic stay and the automatic stays of other federal courts. I have documentation of all of that included in the objection.

The -- bear with me just a moment, I have to reference my notes.

And also as far as in the last couple of days, I wanted to make sure that before we proceeded any further, I put

6

all the parties on notice that I have been cooperating with Chief Inspector Watt (phonetic) with the Royal St. Kitts and Nevis Police White Crimes, White Crimes Division, White Collar Crimes Division and will be working with them on the criminal investigation that will be open into Mr. Culpepper for his violation of the privacy and confidentiality laws under the company's act in Nevis.

Also, it occurred to me that the objection did not include information about the minimum $100,000 bond that will have to be posted if he continues to attempt to make to press his attempt to collect in Nevis.  That bond will have to be posted by the estate.

And when the estate loses, which they will, because as a matter of public policy foreign judgements based on statutory damages, and if Mr. Culpepper's case, they're unargued and unnoticed.  There was an unnoticed case, it's a default judgment.  It doesn't stand a chance here.

If Mr. Carroll has other questions, I'm happy to provide, I mean it's a 38 page brief, there's everything in there.

And when I spoke with the U.S. Trustee, Richard, I apologize, I can't, his last name doesn't immediately come to mind, his concern was that the conflict check hadn't been run with the firm that Mr. Culpepper had subcontracted three years ago in Nevis to pursue his collections.  And I'm kind of

7

curious how an attorney is going to perform a conflicts check after the fact when Mr. Culpepper, without your Court's authorization, has been engaged in collection actions contemptuous of the automatic stay and has already hired not only that subcontractor, but another subcontractor in Puerto Rico.

So I mean there's, there's a multitude of vectors here to go down and I don't think it's worth the Court's time to rehash the 38 pages of legal cites and statutory cites. It's kind of self-explanatory.

So if Mr. Carroll is confused, I'd be happy to answer any questions that may have left him in the dark about my pleading. I'm just a pro se ignorant Pollock who is trying to fend off an attack. And I've done my best to provide all the background.

THE COURT: Mr. Carroll?

MR. CARROLL: Your Honor, I've parsed through pretty carefully the objection, and candidly I think that it's not really comprehensible, nor does it make sense. He is not a creditor, nor is he a party in interest. But what I would suggest is Mr. Culpepper who is represented in the debtors and in connection with the judgment that was previously obtained, should probably respond to some of the comments that were just made.

MR. MUSZYNSKI: Well, I would object to Mr.

8

Culpepper's entry here. He is neither, well, there's also a question that Mr. Culpepper himself may be a pro se creditor, so he would be a party of interest.

And I should also say I may not be a creditor of the estate yet, but when he presses the case in Nevis and it loses, they lose, I will become a creditor. And that money, those monies will be paid out of the hundred thousand cash bond that has to be posted into the court in Nevis before that case can proceed by plaintiffs.

THE COURT: Well, you're not currently a creditor, Mr. Muszynski. You have no claim against the estate that's been confirmed by any court or by this Court.

MR. MUSZYNSKI: Yes, ma'am.

THE COURT: Right. And I will hear Mr. Culpepper. You've made a lot of allegations, some of which are factual and I haven't put you under oath, so I'm not sure I can rely on the facts as you've recited them.

But let me hear Mr. Culpepper's response since Mr. Carroll is not aware of the situation between the debtor and you as you articulate anyway.

Mr. Culpepper?

MR. CULPEPPER: May it please the Court, Kerry Culpepper of the law firm Culpepper IP LLC.

I previously represented Screen Media Ventures in law suits against certain service providers. One of those service

9

providers was a company Mr. Muszynski owned called Liquid VPN. We obtained a judgment in the Southern District of Florida for roughly $225,000 plus attorneys fees and costs based upon Mr. Muszynski's company's willful service for copyright infringement.

We later sought to have that judgment recognized in Nevis. That's when Mr. Muszynski began filing all of his motion practice and allegations against my firm. The subcontracting firm he refers to is the firm that we hired to assert our claim in Nevis where Mr. Muszynski resides.

I disagree with allegations about conflicts of interest in the Screen Media Ventures, full disclosures were made of the other clients that I represent.

In the Southern District Florida litigation, there were other movie companies that were joined with Screen Media Ventures as plaintiffs, you know, that was disclosed.

I'm sorry, does Your Honor have a question for me?

THE COURT: No. Go ahead.

MR. CULPEPPER: The other point. I think he mentioned Puerto Rico. Mr. Muszynski declared bankruptcy and sought to have the judgment discharged in Puerto Rico. So Screen Media Ventures, on behalf of Screen Media Ventures we engaged local counsel to represent Screen Media Ventures to dispute Mr. Muszynski's allegation that the judgment should be discharged. That's ongoing. Mr. Muszynski has appealed the

District of Puerto Rico's denial of his bankruptcy petition.

I don't really know how to respond to his other allegations.  If he has a problem with the estate, he can pay the judgment back and he can be done with this entire thing.

If Your Honor has any questions for me, I'm willing to answer anything about this matter.

THE COURT:  Well, you did state that you represented other plaintiffs in the new York action as well.  Is that correct?

MR. CULPEPPER:  Southern District of Florida action, yes.

THE COURT:  I'm sorry, the Southern District of Florida action.

Did they have any conflict with the debtors?

MR. CULPEPPER:  No, Your Honor.

THE COURT:  They were both seeking actions against the defendant, excuse me, for breach of IP rights.  Is that right?

MR. CULPEPPER:  Sorry, the connection became choppy.  They were seeking actions against the defendants?

THE COURT:  Against the defendants in the Southern District of Florida action.  They all brought the same type of action.

MR. CULPEPPER:  Yes, Your Honor, it was the same action.

11

THE COURT:  Okay.

All right.  Mr. Muszynski, do you have any questions of Mr. Culpepper that are relevant to conflicts of interest?

MR. MUSZYNSKI:  If I may be permitted, yes, ma'am.

THE COURT:  Yes.

MR. MUSZYNSKI:  May I proceed?

THE COURT:  Yes.

MR. MUSZYNSKI:  Okay.  Thank you.

Mr. Culpepper, you just stated that I owned the ISP Company, Liquid VPN.  Is that correct?

MR. CULPEPPER:  My position is yes, that you own the company, Liquid VPN.  You may not have owned it directly, but you owned it through the (indiscernible).

MR. MUSZYNSKI:  Is your testimony to this court that I owned Liquid VPN.  That's what you just told the court.

MR. CULPEPPER:  Yes, Mr. Muszynski, believe you own Liquid VPN.

MR. MUSZYNSKI:  So you've spent the last four years investigating me and the best you can say is I believe.  It is not in your knowledge that AUH20 and 1701 Management owned Liquid VPN?

MR. CULPEPPER:  As I just said, you could own the entity that owns it, but you still own it.

MR. MUSZYNSKI:  So in your knowledge, are you testifying that I own the entity that owns it?

MR. CULPEPPER: There's a judgment in the Southern District of Florida that agrees with me in which you were represented by counsel, Mr. Mackler (phonetic). So yes, you controlled Liquid VPN. You're the manager of Liquid VPN. You signed the asset purchase agreement when you purchased, when your company, 1701 Management, purchased the assets of Liquid VPN from the previous party.

MR. MUSZYNSKI: Is it not true that Richard Mackler represented me to have the case thrown out in the Southern District of Florida without agreeing to jurisdiction or venue because I'm a foreign citizen and was never provided proper service, and that you later admitted that I did not live in Texas where you provided the service?

MR. CULPEPPER: The -- I'm willing to answer his questions, Your Honor. Should I try to answer to the best of my ability because he, that was really a packed question?

THE COURT: I think at this point, Mr. Muszynski, I don't think that going into the merits of the judgment against you is relevant to whether or not he has a conflict in representing the estate in pursuing either collection of that judgment or other rights that the estate may have. So I --

MR. MUSZYNSKI: Yes, ma'am. So if I may be --

THE COURT: I'll limit you to conflicts of interest that you allege.

MR. MUSZYNSKI: Understood. Thank you, ma'am.

13

Mr. Culpepper, do you own 42 Ventures LLC?

MR. CULPEPPER:  Yes.

MR. MUSZYNSKI:  Is 42 Ventures LLC a joined member of the final judgment in which Screen Media Ventures LLC is also a joined member?

MR. CULPEPPER:  They're a judgment creditor, yes. Well, they were a plaintiff also in the case.  They had a claim against 1701 and you.  So to that extent, yes.  I wouldn't use the word, joined.

MR. MUSZYNSKI:  Did you write the final judgment that joined these parties?

MR. CULPEPPER:  No.

MR. MUSZYNSKI:  Did you represent the final judgment that joined these parties between, including 42 Ventures LLC and Screen Media Ventures?

MR. CULPEPPER:  Could you repeat your question?

MR. MUSZYNSKI:  Did you represent the parties as joined members to a final judgment in the Southern District of Florida which joined your company which you wholly own, 42 Ventures LLC, and Screen Media Ventures, LLC along with approximately 38 other nonperforming entities that you represented?

MR. CULPEPPER:  I represented the plaintiffs in the case in the Southern District of Florida, including 42 Ventures.

MR. MUSZYNSKI:  And 42 Ventures is a joined party in the judgment with Screen Media Ventures.

MR. CULPEPPER:  Yes.

MR. MUSZYNSKI:  And have you appeared in my cases as a fact witness and pro se?

MR. CULPEPPER:  I, in the evidentiary hearing --

MR. MUSZYNSKI:  Be careful, this is in all in transcript.

THE COURT:  Let him answer your question, Mr. Muszynski.

Go ahead, Mr. Culpepper.

MR. CULPEPPER:  In the, in your bankruptcy, when you say your case, I assume you're referring to your bankruptcy. Am I correct?

MR. MUSZYNSKI:  Yes.

MR. CULPEPPER:  In your bankruptcy, we had an evidentiary hearing in the Eastern District of Texas and I did, I listed myself as a fact witness but I didn't, I wasn't, I didn't ask any questions or I didn't give any testimony if I remember correctly.

MR. MUSZYNSKI:  But if you're a pro se.

MR. CULPEPPER:  You listed, yeah, because you included me as a creditor in your bankruptcy, my name personally.  So I did appear pro se for myself.

MR. MUSZYNSKI:  Did you list PML Process Management

15

Limited as a party that you represent and as an interested party in my bankruptcy?

MR. CULPEPPER:  I didn't list them as, I think what you're referring to is in the, when your bankruptcy was dismissed, you appealed to the bankruptcy appeal panel or the First Circuit, and we're required to include a certificate of any interested parties.  And I think that's what you are referring to.  PML was included as an interested party.  Is that what you're talking about?

MR. MUSZYNSKI:  Yes.  Did you disclose to the Delaware District Bankruptcy Court that PML is an interested party as well?

MR. CULPEPPER:  I haven't filed anything in the Delaware Bankruptcy Court.

MR. MUSZYNSKI:  Did you make representations to the trustee that PML was an interested party as required under statute?

MR. CULPEPPER:  PML is not an interested party of Screen Media Ventures.

MR. MUSZYNSKI:  I'll be with you in just a moment.

Did you provide the trustee notice that you will have, the estate will have to post $100,000 bond in order to litigate in Nevis?

MR. CULPEPPER:  I don't believe that's the case.

MR. MUSZYNSKI:  So that's a no?

MR. CULPEPPER:  No.

MR. MUSZYNSKI:  Did you inform the trustee that as a matter of public policy in the Federation of St. Kitts to Nevis, foreign statutory judgments are not honored?

MR. CULPEPPER:  I did not say that because I don't agree with what you're saying.

MR. MUSZYNSKI:  Are you and/or your firm a partner with PML Process Management and are you fee splitting with them as part of a third party litigation funding agreement?  PML being located in the Republic of Cyprus?

MR. CULPEPPER:  No.

MR. MUSZYNSKI:  Is there, on behalf of the estate for Screen Media Ventures, is there an accounting for the fees that you have assessed so far in your collection actions for the joined parties in the judgment?  And how are those fees split amongst the other joined parties relative to SMV's interest?

MR. CULPEPPER:  You need to ask the estate how they're doing their accountings.  I don't know anything about that.  I think what you're asking is how are those costs split among the plaintiffs in the litigation against you.  Is that what you're asking?

MR. MUSZYNSKI:  Yes.

MR. CULPEPPER:  There's an agreement to that, that the costs are allocated based upon the number of titles in the law suit.

17

MR. MUSZYNSKI:  Are you continuing to collect settlements on behalf of Screen Media Ventures?

MR. CULPEPPER:  I don't believe that question is relevant to what you're asking.  And there are confidential issues --

THE COURT:  What is, what was the question?

MR. MUSZYNSKI:  I asked Mr. Culpepper if he is continuing to extract settlement amounts from people that he is sending demand letters to on behalf of Screen Media Ventures and the other joined movie alleged movie company creditors. The scheme that Mr. Culpepper is running --

THE COURT:  I understand.  I understand.

MR. MUSZYNSKI:  Okay.  So those revenues would belong to Screen Media Ventures' estate and he has not said, he has not denied continuing to collect them.

MR. CULPEPPER:  May I answer this question, Your Honor?

THE COURT:  You may.

MR. CULPEPPER:  If I received money on behalf of Screen Media Ventures since the bankruptcy, I have informed the trustee.  I have not received any money on behalf of Screen Media Ventures since the chapter 7, or since the chapter 11 filing.

MR. MUSZYNSKI:  Have you proceeded in other courts with your collection actions even though this court has not

approved your engagement as a special counsel? Have you proceeded in other courts with collection actions even though this court has not approved you as a special counsel?

MR. CULPEPPER: With respect to your, the judgment against you, there was an appeal to the bankruptcy appellant panel. So to the extent that I continue to represent Screen Media Ventures in that issue, the answer would be yes. You phrased it as collection activities.

MR. MUSZYNSKI: Okay. I'll broaden the question. Have you continued litigating in Frontier Communications Corporation's chapter 11 on behalf of Screen Media Ventures in the Southern District of New York?

MR. CULPEPPER: Yes.

MR. MUSZYNSKI: Did you have approval from this court to do so on behalf of Screen Media Ventures?

MR. CULPEPPER: No. That's why we're here today.

MR. MUSZYNSKI: How long have you been litigating on behalf of Screen Media Ventures without this court's approval?

MR. CULPEPPER: The case has been going on since 2020, so the bankruptcy was filed in July when the chapter 7, when the case was converted to chapter 7. I notified the Southern, I notified the Southern District of New York of the chapter 7 liquidation, requested a stay while this was resolved. The judge never decided on whether or not the stay would happen. The case has been ongoing. So to the extent

19

that something needed to be done, did I proceed with the case, I did proceed with the case.

MR. MUSZYNSKI:  Have you continued to litigate in the case of subpoena to Reddit Inc and Voltage Holdings in the Ninth Circuit?

MR. CULPEPPER:  Yes.  And I filed a motion to substitute the Screen Media Ventures for the chapter, for the chapter 7 trustee that was approved.

MR. MUSZYNSKI:  And when did you do that?

MR. CULPEPPER:  I don't remember the exact date.  I do remember that the motion was approved a week or so ago.

MR. MUSZYNSKI:  What is PML's involvement from a financial standpoint as a third party litigation funder on behalf of Screen Media Ventures?

MR. CULPEPPER:  Nothing.

MR. MUSZYNSKI:  Why is Screen, why is PML appearing as a party of interest?

MR. CULPEPPER:  They're not a party in interest in this case.  If you're asking why I included them as a party of interest in the bankruptcy appeal panel, that's because they have an interest in the matter.  But the interest has nothing to do with Screen Media Ventures or Chicken Soup.

MR. MUSZYNSKI:  Does PML provide any funding of any kind to Chicken Soup or Screen Media Ventures?

MR. CULPEPPER:  Not to the extent I know of, not for

the cases I've been involved in.

MR. MUSZYNSKI: Is PML going to receive a split of revenues from those that you collect by settlement demand letters on behalf of Screen Media Ventures or Chicken Soup for the Soul or the other joined creditors, nearly 38 of them?

MR. CULPEPPER: For Screen Media Ventures or Chicken Soup, not to the extent I know. I don't believe so. As respect to your other claimants, nothing has to do with this case and I don't think it's relevant to the question here. So I would, I decline to answer that part because it's subject to attorney-client privilege.

THE COURT: Okay.

MR. MUSZYNSKI: Your Honor, that's the basic route. I can go on and on in other cases where he has continued to litigate in violation of the contempt. And I don't know that it does any benefit to the court to hear.

THE COURT: Violation, violation of what contempt?

MR. MUSZYNSKI: Of the automatic stay in this case.

THE COURT: Well this, the automatic stay protects the debtor, not the defendants that he is suing. A debtor can continue to prosecute actions against others. The automatic stay protects the debtor and the debtor's estate. So I think you have it in reverse. It doesn't protect you.

Mr. Carroll, do you want to be heard on --

MR. MUSZYNSKI: I'm sorry.

21

MR. CARROLL:  No, Your Honor.  I don't believe that Mr. Culpepper has a conflict.  He was counsel of record in some cases.  Candidly, that's what made sense for the trustee to continue in a large part to utilize his services going forward which is why we filed the application to have him employed as special counsel on basically a contingent fee basis.

THE COURT:  Mr. Muszynski?

MR. MUSZYNSKI:  Your Honor, I believe my filing is fully briefed with statute, ABA rules and precedent and clearly shows examples of how Mr. Culpepper has continued to litigate without the authorization from this court and is conflicted and not a disinterested party.  He owns 42 Ventures which is a part of the roughly 41 other joined creditors in this case.  He is absolutely not disinterested.  He is absolutely conflicted.

THE COURT:  Mr. Carroll?

MR. CARROLL:  Your Honor, I don't see a conflict in representing another party.  He's undertaking to represent the debtor and is doing so based on a percentage of recovery on behalf of the debtor.  So I really don't see a conflict at all.

THE COURT:  And this is a retention under 327(e).  Is that not correct, Mr. Carroll?

MR. CARROLL:  Yes.

THE COURT:  Well, I will rule this way.  I do not see any conflict that Mr. Culpepper has with respect to representing the estate and -- could you turn that down -- with

respect to -- just a minute.  All right, let me try again.  I do not find any conflict --

(audio issue)

THE COURT:  Mr. Muszynski, can you mute your line?  I think that's why I'm getting an echo?  Okay.

I do not find any conflict in Mr. Culpepper representing this estate and the other plaintiffs in pursuing other parties that the other plaintiffs and the estate have similar claims against.

As the trustee has stated, it appears there is a savings in having that retention rather than getting another attorney to start from scratch.  Mr. Culpepper has continued to represent those parties prepetition and continuing to protect the interest of the plaintiffs and the estate while his retention application is pending is not a conflict.

As I stated, the automatic stay does not protect the defendants in that action, it only protects the debtor and its estate.  I further do not find any conflict in the retention, the terms of the retention which is that Mr. Culpepper and his firm will receive a percentage of funds collected on behalf of the estate only.

Section 327(e) allows a party who has previously represented the debtor to now represent the trustee in that same manner.  And I think it's perfectly appropriate that the trustee has selected to continue Mr. Culpepper's

23

representation.

So I will overrule the objection and grant the retention application.

All right.  The next matter, Mr. Carroll?

MR. CARROLL:  Thank you, Your Honor.  The next matter is Item No. 5 on the agenda which is the motion of 800 Third Avenue Associates for entry of an order allowing both a chapter 7 administrative claim and a chapter 11 administrative claim.

The trustee filed a limited objection with respect to the motion, and submitted a revised form of proposed order which would allow the chapter 11 administrative claim in the amount sought and also allow the chapter 7 administrative claim.

The basis for the trustee's objection was the request for an order compelling the trustee to make immediate payment of the chapter 7 administrative claim.  The limited objection sets forth the reasons why we would oppose that.  The primary reason is that this is a case where there are not any unencumbered funds presently with which to make such a payment.

Additionally, under the case law, it's really discretionary in terms of the trustee when he's going to make those payment.  It's detrimental to the estate in that if he were to make the payments, he may not have the ability to pursue other causes of action which would enure to the benefit of the estate and to all of the creditors in this matter.

We don't have a problem with allowing the claim, but we have difficulty with respect to the making of an immediate payment, Your Honor.

THE COURT: Thank you. Anyone here on behalf of the landlord.

MR. MANN: Yes, Your Honor, Kevin Mann on behalf of the landlord. I apologize, my screen says Cross & Simon and I haven't been able to change that. So you'll just have to bear with me.

Kevin Mann on behalf of 800 Third Avenue Associates LLC. 800 was the landlord for the debtors' New York offices. The debtors filed their chapter 11 petition on June 28th of 2024 and remained in the premises after that. And then on July 10th, the case was converted, the chapter 7 trustee was appointed. And then on July 29th, the trustee cleared out the premises and surrendered possession to the landlord.

So, and then I'm not sure if it was Your Honor or Judge Horan, but an order was entered rejecting the lease as of July 31st. So between the petition date and the conversion date, the debtors accrued rent of $42,519.54. And then between conversion and surrender, the estate accrued rent of $70,500.40. And none of this post-petition rent has been paid.

The landlords moved under 365(d)(3) and 503(b)(1)(a) for allowance of the admin claim and for immediate payment of the chapter 7 portion. As Mr. Carroll noted, the trustee has

25

indicted does not have an objection to the allowance of the admin claim or the amount and no other objections were filed, they didn't hear from anybody else. But the trustee has objection to the immediate payment so I did want to address that.

First, Your Honor, as Mr. Carroll said, the trustee asserts he has no unencumbered cash and making payment now would be inequitable.

The cases that the trustee cites in his objection give the trustee discretion as to when to pay administrative claims. And he says that there's nothing in the code that requires immediate payment and that the landlord is not special. And I think this argument completely ignores Section 365(d)(3). The landlord is special because it was a post-petition lesser of non-residential real property.

So under 365(d)(3), the trustee is required to timely perform all the obligations of the debtor arising from and after the order for relief under any unexpired lease of non-residential real property until such lease is assumed or rejected.

And under Montgomery Ward, the court, the Third Circuit held the clear and express of 365(d)(3) is to require the trustee to perform the lease in accordance with its terms. So 365(d)(3) ensures prompt payment of lease obligations so the landlord is not required to provide use of the leased premises

26

to a debtor without receiving timely compensation under the terms of the lease.  And it operates to prevent landlords from becoming involuntary creditors of a debtors' estate.

There is a New Jersey case, in re Pelican Pool and Ski Center, but it does cite to Montgomery Ward that said, "In other words, if the obligations under the lease become due following the petition date and prior to the rejection of the lease, the obligations are payable immediately."

As far as I can tell, there's no Third Circuit case law that says otherwise.  Montgomery Ward also held that, "Congress intended the debtor perform all the obligations at the time required by the lease."

As far as the trustee's assertion that he doesn't have unencumbered cash, and no offense to Mr. Carroll, but we haven't seen any evidence of that or that any evidence of the case of administrative insolvent.  It doesn't appear from my review of the docket that the debtors ever filed schedules, and there's nothing that appears on the docket showing the debtors' liens or the estate's financial position as far as I've been able to tell as well.

But even if the case is administratively insolvent or in danger of becoming administratively solvent, that really shouldn't matter here.  In the other, I'm sorry, other cases in this circuit have upheld the requirement of immediate payment and the landlord's right to retain such payments even when

27

faced with an estate's later administrative insolvency.  And that comes from the Valley Media case from this court, Your Honor.

Finally, if the Court is concerned about how 365(d)(3) operates in chapter 7 versus chapter 11, there's a recent case out of New Jersey called Junk Handle Brewing Company, and it's unpublished but it's at 2024 WL 2819626.  It takes on this issue and that court specifically says, "The structure of 365 as a whole does not support a different application of 365(d)(3) in chapter 7 cases versus chapter 11 cases." It goes on to say, "If congress had intended for different treatment of unexpired leases of non-residential real property in those chapters, it could have made a similar distinction, but it did not."  This evidences an intent on the part of Congress to protect landlords in both chapter 11 cases as well as chapter 7 cases.

So, with that, Your Honor, 800 Third Avenue Associates respectfully requests that the Court grant it its administrative expense claim and direct, I'm sorry, and direct immediate payment of the chapter 7 portion.

THE COURT:  Well, let me ask you this.  Montgomery Ward says it's due when, it's due on the first of the month is it not?

MR. MANN:  I'm not sure under this lease, Your Honor, but I believe so.

28

THE COURT: The case was converted July 10th and it was rejected July, the lease was rejected July 31st, so what amounts are due under the lease for the chapter 7 period before rejection?

MR. MANN: Your Honor, that's broken down in the motion. From the time of the petition date through the date of conversion it was $42,519.

THE COURT: I understand. But my question is what specific performance, i.e., the payment of rent, if it was due July 1st, it wasn't due July 10th, 11th, 12th, etc. You're giving me a pro rata assessment of the rent rather than a when it's due analysis.

MR. MANN: Your Honor, if that's the case, then the rent would have been due July 1st and it was never paid.

THE COURT: Correct. But the trustee was not, the case had not been converted July 1st. So there's no performance that the trustee has not made. You may have a chapter 7 claim on a pro rata basis as an administrative claim, but I don't think you have a 365(d)(3) claim, do you?

MR. MANN: Well, Your Honor, I ask why is the debtor not, I'm sorry, why is the trustee not required to timely perform? If the, if the rent was due and it was never paid by the debtor, shouldn't it have been paid by the trustee even if it was ten days late?

THE COURT: Mr. Carroll?

MR. CARROLL:  One issue that we did not get into is the, you know, there was no post-petition post-conversion agreement with the trustee.  The trustee inherited this lease.  I'm not sure there was any true benefit.  And you know candidly I dealt with this situation many number of times, and this is an amazingly quick resolution.  You have the main office of Chicken Soup which the trustee manages to get out of almost immediately, manages to reject almost immediately and it's a fantastic sort of result.

But, you know, we're willing to allow the administrative claim but the reality is there are not funds with which to make the payment.  The trustee did to the best of his ability immediately reject, immediately got out by hook or crook and that's where we stand.

The other issue I might want to point out is there is no administrative claim bar date in this case so we do not know what the universe of additional claims might be, that would have to share in parity.  That's the reason why it shouldn't be paid at this point in time from a practical perspective either.

THE COURT:  Yeah.  I think that the landlord may have an administrative claim, but I don't think that the landlord has the right to demand payment under 365(d)(3).  In fact, I think that was the whole point of the Montgomery Ward case was that if the bankruptcy was filed on the 10th of July itself, all of the rent for July that was due on July 1st would be a

prepetition claim. I don't know why it's different for the conversion date.

MR. MANN: Your Honor, July 1st was after the petition date.

THE COURT: I understand. I'm doing it by analogy.

MR. MANN: Okay.

THE COURT: I'm analogizing the Montgomery Ward ruling to a conversion date. And I think that the analysis applies equally here that because the amount of the rent for July was due July 1st, the trustee had no obligation to pay it promptly.

MR. MANN: So essentially, Your Honor, you're treating, you would treat the post-conversion amount as equivalent to stub rent?

THE COURT: Correct, correct.

MR. MANN: Okay.

THE COURT: You'd have a claim for the stub rent as an administrative expense. Okay? So I will I guess sustain the trustee's objection which is not to allowance of the claim, but to any payment of it immediately.

MR. MANN: Thank you, Your Honor. I'll get with Mr. Carroll and we'll put a, we'll put an order in.

THE COURT: All right.

Anything else then, Mr. Muszynski, do you have something further?

31

MR. MUSZYNSKI:  Yes, Your Honor.  Thank you.  How long will it be before transcripts are available to order?

THE COURT:  Before what are available?

MR. MUSZYNSKI:  Transcripts of this proceeding.  I'm not familiar with your district, how long those usually take.

THE COURT:  I think they have to be ordered, and then I think --

MR. MUSZYNSKI:  Yes, ma'am.

THE COURT:  -- then I think it takes, I don't know, I'm not sure.

MR. MUSZYNSKI:  Also, I wanted to ensure that the court understood that in the case of Nevis, a $100,000 cash bond must be deposited with the court in Nevis to proceed.  I just want to make sure that was on the record.

THE COURT:  You can say that, but there's no evidence of that and that is not before me today so I don't really --

MR. MUSZYNSKI:  Understand.

THE COURT:  -- need to know that.

MR. MUSZYNSKI:  I just want to make sure I got it preserved on the record.  Thank you.

THE COURT:  Understood.  All right.  We'll stand adjourned then.  Thank you.

(Proceedings adjourned 2:47 p.m.)

* * * * *

32

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.

/s/ Theresa Pullan                    January 17, 2025

Theresa Pullan, CET-780

Certified Court Transcriptionist

For Reliable

**EXHIBIT B**

Nevis Court Order (May 15, 2025)

Case 24-11442-MFW    Doc 789    Filed 05/15/26    Page 79 of 120

Case Number :NEVHCV2022/0183

**FILED**

HIGH COURT

ST.CHRISTOPHER / NEVIS

(NEVIS CIRCUIT)

THE EASTERN CARIBBEAN SUPREME COURT
ST. CHRISTOPHER AND NEVIS
NEVIS CIRCUIT

Submitted Date:20/05/2025 16:23

IN THE HIGH COURT OF JUSTICE   Filed Date:21/05/2025 08:30

CLAIM NO. NEVHCV2022/0183

Fees Paid:27.00

BETWEEN:

MILLENNIUM FUNDING, INC.
VOLTAGE HOLDINGS, LLC
AMBI DISTRIBUTION CORP
AFTER PRODUCTIONS, LLC
AFTER II MOVIE, LLC
MORGAN CREEK PRODUCTIONS, INC
BEDEVILED LLC
MILLENNIUM MEDIA, INC
COLOSSAL MOVIE PRODUCTIONS, LLC
YAR PRODUCTIONS, INC.
FSMQ FILM, LLC
FW PRODUCTIONS, LLC
MILLENNIUM IP, INC.
I AM WRATH PRODUCTIONS, INC
KILLING LINK DISTRIBUTION, LLC
BADHOUSE STUDIOS, LLC
LF2 PRODUCTIONS, INC
LHF PRODUCTIONS, INC
VENICE PI, LLC
RAMBO V PRODUCTIONS, INC
RUPTURE CAL, INC
MON, LLC
SF FILM, LLC
SPEED KILLS PRODCUTIONS, LLC
MILLENIUM SPVH, INC.
NIKOLA PRODUCTIONS, INC.
WONDER ONE, LLC
BODYGUARD PRODUCTIONS INC.
OUTPOST PRODUCTIONS, INC.
GLACIER FILMS 1, LLC
DEFINITION DELAWARE, LLC
HANNIBAL CLASSICS INC.
JUSTICE EVERYWHERE PRODUCTIONS LLC
STATE OF THE UNION DISTRIBUTION AND COLLECTIONS, LLC
PARADOX STUDIOS, LLC
DALLAS BUYERS CLUB, LLC
HITMAN TWO PRODUCTIONS, INC.
SCREEN MEDIA VENTURES, LLC
42 VENTURES LLC

Claimants/ Applicants

and

AUH2O LLC
CHARLES MUSZYNSKI also known as FREDERICK DOUGLAS

Defendants/ Respondents

ORDER

**BEFORE** The Honourable Justice Patrick Thompson Jr

**DATED** the 15th May 2025

**ENTERED** the        day of May 2025

**Appearances:** Edisha K. Greene for the Claimants
              Angela Cozier for the Defendants

**Present:**      Kerry Culpepper, representative of the Claimants
              Charles Muszynski, 2nd Defendant and representative of the 1st Defendant

**UPON** this matter coming on for the hearing of the Claimants' Notice of Application for Costs to be Assessed, the Defendants' Notice of Application to set aside the world-wide freezing order and strike out the Claimants' Claim, and the Defendants' Application for Security of Costs.

**AND UPON HEARING** Counsels for the Claimants and the Defendants.

**AND UPON** the Court being satisfied the Defendants were not successful on their Application to strike out the Claimants' Claim, but were successful on their Application for Security of Costs.

**AND UPON** the Court finding that although the Defendants succeeded on their Application for Security of Costs, the Court was clear that CPR Rule 24 applied as the Claimants were ordinarily resident outside of the jurisdiction. Consequently, the only matter for determination was the quantum of such costs and ensuring that the Claimants' representative was present to advise on the sum. Further, considering that any order for costs against the Claimants would be swallowed up by the extant orders for costs to be assessed against the Defendants and the extant applications, the court is not minded to grant costs to the Defendants on this application.

**AND UPON** the Court considering its order of 25th April 2025 and being satisfied that its order was not complied with by the Defendants.

**AND UPON** the Court being shown a sworn, but unfiled affidavit of Charles Muszynski dated 7th May 2025.

**AND UPON** the Court being satisfied that the affidavit of the 2nd Defendant, Charles Muszynski of 7th May 2025 does not appear to comply with the Court's order of 25th April 2025.

**AND UPON** the Court not being satisfied with the explanation provided by the Defendants' Counsel Ms. Cozier, as to why the affidavit was not filed within the timeline provided in the

Court's order of 25th April 2025, and further why the affidavit contains details that do not comply with the said order.

**AND UPON** this Court being minded to consider whether Ms. Cozier or the 2nd Defendant wilfully disobeyed the Court's order of 25th April 2025, and upon this court stating that it is minded to proceed with proceedings for civil contempt.

## IT IS HEREBY ORDERED THAT:

1. The Defendants' Application to strike out the Claimants' Claim is dismissed.
2. The Claimants are awarded costs against the Defendants' on the Application to strike out the Claimants' Claim, to be assessed if not agreed in 7 days.
3. The Defendants are to file any affidavits on the matters raised in the Court's order of 25th April 2025 together with any explanation as to why that order was not complied with by the Defendants on or before Monday 19th May 2025.
4. The Claimants are at liberty to file any reply by 23rd May 2025.
5. The Claimants are ordered to pay the sum of US$30,000.00 into Court on or before 15th June 2025.
6. The Claimants' Notice of Application for Costs to be Assessed and the Defendants' application to set aside the freezing order are fixed for a further blended hearing on 27th May 2025 at 1:30pm.
7. The freezing order shall continue until the adjourned hearing of this matter.
8. The Claimants shall have carriage of this Order.

**BY ORDER OF THE COURT**

M Flemming

ASSt REGISTRAR

THE EASTERN CARIBBEAN SUPREME COURT
ST. CHRISTOPHER AND NEVIS
NEVIS CIRCUIT

IN THE HIGH COURT OF JUSTICE

CLAIM NO. NEVHCV2022/0183

BETWEEN:

MILLENNIUM FUNDING, INC.
VOLTAGE HOLDINGS, LLC
AMBI DISTRIBUTION CORP
AFTER PRODUCTIONS, LLC
AFTER II MOVIE, LLC
MORGAN CREEK PRODUCTIONS, INC
BEDEVILED LLC
MILLENNIUM MEDIA, INC
COLOSSAL MOVIE PRODUCTIONS, LLC
YAR PRODUCTIONS, INC.
FSMQ FILM, LLC
FW PRODUCTIONS, LLC
MILLENNIUM IP, INC.
I AM WRATH PRODUCTIONS, INC
KILLING LINK DISTRIBUTION, LLC
BADHOUSE STUDIOS, LLC
LF2 PRODUCTIONS, INC
LHF PRODUCTIONS, INC
VENICE PI, LLC
RAMBO V PRODUCTIONS, INC
RUPTURE CAL, INC
MON, LLC
SF FILM, LLC
SPEED KILLS PRODCUTIONS, LLC
MILLENIUM SPVH, INC.
NIKOLA PRODUCTIONS, INC.
WONDER ONE, LLC
BODYGUARD PRODUCTIONS INC.
OUTPOST PRODUCTIONS, INC.
GLACIER FILMS 1, LLC
DEFINITION DELAWARE, LLC
HANNIBAL CLASSICS INC.
JUSTICE EVERYWHERE PRODUCTIONS LLC
STATE OF THE UNION DISTRIBUTION AND COLLECTIONS, LLC
PARADOX STUDIOS, LLC
DALLAS BUYERS CLUB, LLC
HITMAN TWO PRODUCTIONS, INC.
SCREEN MEDIA VENTURES, LLC
42 VENTURES LLC

Claimants/ Applicants

and
AUH2O LLC
CHARLES MUSZYNSKI also known as FREDERICK DOUGLAS

Defendants/ Respondents

## ORDER

Edisha K. Greene
**JOSEPH ROWE**
Attorneys-at-Law for the Claimants
Unit 5, Long Stone House,
Main Street, Charlestown, Nevis
Telephone: (869)469-1015
Email: e.greene@josephrowelaw.com

**EXHIBIT C**

HPS Sharing Agreement (D.I. 687-4)

Execution Version

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>CSS ENTERTAINMENT INC. (f/k/a CHICKEN SOUP FOR THE SOUL ENTERTAINMENT INC.), *et al* [1]<br><br>Debtors. | Chapter 7<br><br>Case No. 24-11442 (MFW)<br>(Jointly Administered) |

## SHARING AGREEMENT BETWEEN CHAPTER 7 TRUSTEE AND AGENT FOR THE PREPETITION LENDERS PROVIDING FOR (I) DETERMINATIONS AND ALLOWANCE OF SECURED LENDER'S PRE-PETITION CLAIMS AND LIENS; (II) TRUSTEE'S SALE OF CERTAIN OF DEBTORS' ASSETS AND SECURED LENDER'S COLLATERAL; (III) SPECIFIED CARVE-OUT FROM SECURED LENDER LIENS; AND OTHER MATTERS CONCERNING THE TRUSTEE'S CONTEMPLATED SALES AND CERTAIN SETTLEMENTS

This Sharing Agreement (the "Agreement") is entered into effective as of the 5th day of September, 2025, by and between (a) George L. Miller (the "Trustee"), solely in his capacity as the Chapter 7 Trustee for the bankruptcy estates (collectively, the "Estates") of the above-captioned debtors (the "Debtors"), and (b) HPS Investment Partners, LLC (the "Agent" or "HPS"), in its capacity as the administrative and collateral agent under that certain Amended and Restated Credit Agreement, dated as of August 11, 2022 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Credit Agreement") and that certain Amended and Restated Collateral Agreement, dated as of August 11, 2022, and the Supplement to the Amended

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number (where applicable), are: 757 Film Acquisition LLC (4300); CSS Entertainment, Inc. (f/k/a Chicken Soup for the Soul Entertainment Inc.) (0811); CSS Studios, LLC (f/k/a Chicken Soup for the Soul Studios, LLC) (9993); CSS Television Group, LLC (f/k/a Chicken Soup for the Soul Television Group, LLC); Crackle Plus, LLC (9379); CSS AVOD Inc. (4038); CSSESIG, LLC (7150); Digital Media Enterprises LLC; Halcyon Studios, LLC (3312); Halcyon Television, LLC (9873); Landmark Studio Group LLC (3671); Locomotive Global, Inc. (2094); Pivotshare, Inc. (2165); RB Second Merger Sub LLC (0754); Redbox Automated Retail, LLC (0436); Redbox Entertainment, LLC (7085); Redbox Holdings, LLC (7338); Redbox Incentives LLC (1123); Redwood Intermediate, LLC (2733); Screen Media Films, LLC; Screen Media Ventures, LLC (2466); and TOFG LLC (0508).

1

Execution Version

and Restated Collateral Agreement, dated as of July 26, 2023 (collectively, as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Collateral Agreement")[2], among the Debtors and the HPS-managed lender parties thereto[3]; (collectively, the "Prepetition Lenders", and together with the Agent,  the "Prepetition Secured Parties").  The Trustee and the Prepetition Secured Parties (singularly a "Party", collectively, the "Parties") by and through their respective undersigned counsel, intending to be legally bound, for good and valuable consideration the receipt of which is acknowledged hereby stipulate and agree subject to Bankruptcy Court approval (as set forth below) as follows:

## I.     BACKGROUND

1.     On June 28 and 29, 2024 (as applicable the "Petition Date") each of the Debtors filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") commencing the above-captioned bankruptcy cases (the "Bankruptcy Cases").

2.     On July 2, 2024, the Bankruptcy Court entered an order [D.I. 73] providing for the joint administration of the Bankruptcy Cases.

3.     On July 10, 2024, the Court entered an *Order Converting Cases from Chapter 11 to Chapter 7 of the Bankruptcy Code and Granting Related Relief* [D.I. 120] (the "Conversion").

---

[2] Copies of the Credit Agreement and Collateral Agreement are extremely voluminous and accordingly are not attached hereto; however such agreements are filed and available of record as Exhibits C and D of the HPS Investment Partners LLC's Motion for Relief from the Automatic Stay [D.I. 243, filed 8/20/2024].

[3] The HPS managed lender parties include: Aiguilles Rouges Sector B Investment Fund, L.P., American United Life Insurance Company, Brickyard Direct Holdings, L.P., Cactus Direct Holdings, L.P., Cactus Direct Lending, L.P., Core Senior Lending Fund (A-A), L.P., Core Senior Lending Fund, L.P., Core Senior Master Fund (PB), L.P., CSL Fund (PB) Holdings C, L.P. CSL Fund (PB) Holdings, B, L.P., CSL Fund (PB) Holdings, L.P., and Falcon Credit Fund, L.P.

Error! Unknown document property name.

Execution Version

4. On July 11, 2024, George L. Miller was appointed as the interim chapter 7 trustee of the Debtor's Estates [D.I. 130] and is currently serving as permanent trustee of the Debtors' Estates.

5. As referenced above, the Debtors entered into the Credit Agreement, which included provisions for an $80 million revolving credit facility and a $325 million term loan facility.

6. As part of the borrowing transaction, the Prepetition Secured Parties' obligations to extend credit under the Credit Agreement to the Debtors was conditioned upon execution and delivery of the corresponding Collateral Agreement. As described in the Collateral Agreement, certain collateral has been pledged and/or security interests have been provided to the Agent for the benefit of the Prepetition Lenders (the "Collateral"). See, Collateral Agreement Art. II (Pledge of Securities, including Pledged Stock, Pledged Debt, and Proceeds thereof, each as defined therein) and also Art. III (Security Interest in Article 9 Collateral and Intellectual Property Collateral, each as defined therein).[4] The Collateral represents substantially all of the Debtors' assets, including, among other things, the Debtors' intellectual property, bank accounts and accounts receivable, equipment, chattel papers, fixtures, general intangibles, and inventory

7. Prior to the Conversion, certain of the Prepetition Secured Parties agreed to provide certain debtor-in-possession funding to the Debtors (the "DIP Funding") pursuant to the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Certain Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [D.I. 85] (the "DIP Order," and the

---

[4] Capitalized terms used but not defined herein shall have the meanings given to such terms in the DIP Order (as defined herein).

Error! Unknown document property name.

Execution Version

lenders thereto, the "DIP Lenders") and the Debtors affirmed the validity, perfection and priority of the liens granted pursuant to the Credit Agreement and Collateral Agreement, including the security interests over certain of the Debtors' bank accounts and cash deposited therein. The Prepetition Secured Parties also funded an additional $200,000 after the Conversion for the sole purpose of paying D&O insurance premiums owed by the Debtors (the "D&O Funding") (collectively, the DIP Funding together with the D&O Funding, the "Postpetition Funding").

8.     Under the DIP Order, the Agent, for the benefit of the DIP Lenders, to the extent of the DIP Funding provided to the Debtors, was afforded (i) superpriority administrative expense claims and (ii) security interests on certain of the Debtors' unencumbered property and, on a priming basis, on the Collateral. *See* DIP Order at para. 4, 5. As adequate protection for the diminution in value of the Prepetition Lenders' interests in the Collateral in connection with the DIP Funding, the Agent received subject to the terms and conditions of the DIP Funding pursuant to the DIP Order (i) replacement security interests in and liens on the DIP Collateral (as defined in the DIP Order) and (ii) an allowed superpriority administrative expense claim. *See* DIP Order at para. 11.

9.     The Trustee acknowledges and agrees based upon an accounting to be provided by the Agent to the Trustee contemporaneously with the executing of this Agreement in the form of the Register under the Credit Agreement in which is recorded the amount outstanding under the Prepetition Senior Credit Facility and amount of principal and interest due and payable by the Debtors thereunder, that the claims of the Prepetition Secured Parties arising under the Credit Agreement and the Postpetition Funding are in the aggregate principal amount of not less than $500,000,000, plus accrued and unpaid interest thereon and any fees, premium, expenses and disbursements (including attorneys' fees, accountants' fees, appraisers' fees, auditors' fees, and

Error! Unknown document property name.

Execution Version

financial advisors' fees), costs, charges, indemnities, and other obligations thereunder (collectively, the "Allowed HPS Claim").

10.    On August 20, 2024 the Prepetition Secured Parties filed the *HPS Investment Partners' LLC's Motion for Relief from the Automatic Stay* [D.I. 243] (the "HPS Stay Relief Motion") seeking relief to allow the Prepetition Secured Parties to proceed with liquidation of the Collateral. The HPS Stay Relief Motion was premised in part on the fact that no party, including the Prepetition Secured Parties, was willing to infuse any material amount of cash into the Chapter 7 Bankruptcy Cases to facilitate an orderly administration of the Debtors' Estates. On September 6, 2024, an order was entered granting the HPS Stay Relief Motion [D.I. 316].

## II.    USE OF CASH COLLATERAL AND CARVE-OUT

11.    The Parties recognize the need for the Trustee's use of cash collateral as defined in §363(a) of the Bankruptcy Code ("Cash Collateral") to permit the administration of the Estates in an orderly manner, including but not limited to enabling the preparation of Bankruptcy Schedules and Statements of Financial Affairs and the identifying and providing of access to the Agent of the Collateral consisting of both tangible assets and largely intangible assets to enable the value of (i) certain of the Collateral to be maintained and realized by HPS and (ii) other unencumbered assets of the Estates to be maintained and realized by the Estates. Accordingly, the Agent on behalf of the Prepetition Lenders and DIP Lenders agrees to the Trustee's use of Cash Collateral in accordance with the Carve-Out (as defined below) in the amount of approximately $2.3 million of cash currently held by the Trustee (the "$2.3 Million Cash Amount").

12.    The Parties agree, subject to further Bankruptcy Court approval and documentation of a sale agreement in form and substance satisfactory to the Parties, to proceed with a sale of rights to pursue litigation for copyright infringement against various third parties related to, among other claims, violations of the Digital Millenium Copyright Act ("DMCA") for media titles owned

Error! Unknown document property name.

Execution Version

or controlled by the Debtors' Estates (the "IP Litigation Assets") free and clear of the security interests of HPS in the IP Litigation Assets to Grove Street Partners LLC or one or more of its affiliated or assignees ("Grove Street") or another purchaser acceptable to the Parties for a purchase price of not less than $100 million payable in five (5) annual installments to the Estates of $20 million each or at such sale price and terms as may otherwise be agreed by the Parties.

13.    The Agent expressly agrees on behalf of the Prepetition Secured Parties and DIP Lenders that any and all liens, security interests (including but not limited to any and all security interests, liens, superpriority administrative expense claims granted under the DIP Order or hereunder) of the Prepetition Secured Parties in Collateral shall be subordinate and subject to carve-outs from Collateral, use by the Trustee and sharing with the Estates for the following (collectively, the "Carve-Out"):

A.    Cash Collateral – The Trustee may use the $2.3 Million Cash Amount in the exercise of his business judgment to fund the costs of administration of the Debtors' Estates. The Trustee agrees that proceeds of accounts receivables and other Collateral received directly into the bank accounts of the Debtors after the date hereof shall be paid over to the Agent.

B.    IP Litigation Assets – The proceeds from IP Litigation Assets shall be shared and applied as follows:

i.    First, the proceeds from IP Litigation Assets recoveries shall be used to pay the Trustee's statutory commissions and costs, the Trustee's professional fees and costs, and any other expenses related to the identification, preservation including AWS, maintenance and recovery of IP Litigation Assets (the aggregate amounts paid under this clause (i) the "Administrative Payments");

6

Execution Version

ii.    *Second,* the first $100,000,000 of proceeds from IP Litigation Assets shall be allocated after the payment of (i) above as follows:

(1)    An amount equal to the sum of 20% of Net Proceeds (as defined below) to the Trustee for the benefit of the Debtors' Estates to be distributed in accordance with 11 U.S.C. §726.  Net Proceeds are the gross proceeds from the liquidation of IP Litigation Assets minus the Administrative Payments (the "Net Proceeds"); and

(2)    80% of Net Proceeds to HPS on account of its secured claims until paid in full;

iii.    *Third,* any proceeds recovered from IP Litigation Assets in excess of $100,000,000 shall be allocated after the payment of (i) above as follows:

(1)    An amount equal to the sum of 15% of Net Proceeds to the Trustee for the benefit of the Debtors' Estates to be distributed in accordance with 11 U.S.C. §726, and

(2)    85% of Net Proceeds to HPS on account of its secured claims until paid in full.

In the event that the aggregate claims in any of clauses (1) or (2) above are paid in full then the proceeds otherwise allocable under such clause shall be re-allocated to the other clause until paid in full.

14.    For the avoidance of doubt, the use of the $2.3 Million Cash Amount by the Trustee permitted by HPS under this Agreement shall not reduce any obligation of HPS to reimburse the allowed fees of Pachulski Stang Ziehl & Jones LLP to the extent provided for in the carve-out as defined in the DIP Order (the "Chapter 11 Carve-Out") from the proceeds of Collateral under the DIP Order and the Order granting HPS Stay Relief Motion [D.I. 316].  HPS shall make payment

7

Execution Version

of the allowed Chapter 11 fees of Pachulski Stang Ziehl & Jones LLP upon approval of such fees

by the Bankruptcy Court from proceeds of Collateral other than the $2.3 Million Cash Amount.

15.    For the avoidance of doubt, property of the Estates of the Debtors which is not

prepetition collateral of HPS (the "Non-Collateral Assets") shall not be subject to any sharing of

proceeds or other benefits with HPS on account of its Allowed HPS Claim except to the extent

HPS shall be entitled to a distribution under 11 U.S.C. §726(a)(2) as a general unsecured creditor

on account of its Allowed HPS Deficiency Claim (as defined below); provided that, for the

avoidance of doubt, the HPS Deficiency Claim may include any outstanding amounts on account

of its Postpetition Funding.  The Non-Collateral Assets include but are not limited to (i) rights or

claims of the Debtors' Estates under Chapter 5 of the Bankruptcy Code, (ii) any rights, claims and

actions against former directors and officers of the Debtors, and entities affiliated with the Debtors'

Estates including but not limited to those claims and actions set forth in, In re: Miller v. William

J. Rouhana, Jr. et al, Adv. No. 25-50399 (the "D&O Litigation"), and (iii) any commercial tort

claims.  In furtherance of the foregoing, the Trustee and HPS agree in the event an interim

distribution is made by the Trustee from proceeds of Non-Collateral Assets to general unsecured

creditors under 11 U.S.C. §726(a)(2) before the Collateral is liquidated and the proceeds thereof

are distributed to enable a final calculation of the Allowed HPS Deficiency Claim, then the Trustee

will reserve or holdback sufficient funds from such interim distributions, as reasonably determined

between the Trustee and HPS, on an estimated basis to enable a distribution on the HPS Deficiency

Claim in an amount proportionally the same as is being made in such interim distribution to other

general unsecured creditors.

16.    To the extent the proceeds from the Collateral of HPS are not sufficient to fully pay

the Allowed HPS Claim, then HPS shall be entitled to receive a distribution as a prepetition general

8

Error! Unknown document property name.

Execution Version

unsecured claim for any unpaid deficiency amount (the "Allowed HPS Deficiency Claim"). HPS shall provide the Trustee with statements of the outstanding balance of the Allowed HPS Claim and confirmation as to whether or not the Collateral of HPS has been fully liquidated by HPS within ten (10) days of the Trustee's written requests for such information to enable the Trustee to make distributions from the Estates; provided, however, that to the extent the Trustee wishes to make distributions from the Estates at a time when the Collateral of HPS has not been fully liquidated by HPS, HPS shall provide the Trustee with a good faith estimate of the value of any remaining Collateral of HPS for purposes of calculating the Allowed HPS Deficiency Claim. In making such distributions, the Trustee shall be entitled to rely on the foregoing statements. In the event the Trustee makes a distribution to other holders of allowed general unsecured claims then HPS shall be entitled to receive a pro-rata distribution on account of its Allowed HPS Deficiency Claim. HPS shall not be required to file a proof of claim evidencing the Allowed HPS Deficiency Claim and such claim shall be deemed allowed and not subject to any challenge. HPS upon execution of this Agreement shall provide the Trustee with a report of all funds received by HPS after June 21, 2024 from Collateral and Non-Collateral on account of the Debtors. In the event HPS has received proceeds from Non-Collateral Assets (except with respect to its Postpetition Funding), such proceeds shall be promptly remitted to the Trustee upon Court approval of this Agreement.

17.    Upon execution of this Agreement, the Trustee agrees to (i) upon HPS' written request (which may be via e-mail), provide consents, authorizations, and instructions directed to Amazon Web Services Inc. ("AWS"), Dropbox, Cloudfare and Outlook Exchange and, also upon HPS' written request (which may be via e-mail), any other digital accounts of the Debtors

9

Error! Unknown document property name.

(collectively, the "Digital Accounts"),[5] authorizing the Digital Accounts to provide HPS with full administrative access to such Digital Accounts and (ii) provide HPS with all credentials, registration information, and administration rights related to the Digital Accounts that are readily available and known to the Trustee.   In addition, with respect to the account of Apto Solutions maintained with Dropbox (the "Apto Solutions Dropbox Account"), the Trustee agrees that upon HPS providing consent to the Trustee to use a portion of the $2.3 Million Cash Amount to pay the outstanding fees and costs of Apto, the Trustee will cause Apto to provide HPS with full administrative access to the Apto Solutions Dropbox Account.  Any fees required to be paid to the Digital Accounts for data accessed by HPS shall be the responsibility of HPS and not the Estates.

18.    HPS and the Trustee and their respective counsel will work in good faith to (i) obtain reasonable access to information necessary or desirable to allow value to be realized from the Collateral, the IP Litigation Assets and Non-Collateral Assets, including resolution of AWS issues, if possible (including, without limitation, the materials and deliverables specified in Annex II to the Notice of Foreclosure Sale By Credit Bid dated June 17, 2025 delivered to the Trustee by HPS) and (ii) maintain standing to enable the IP Litigation Assets to proceed to be pursued for the benefit of the Parties hereto.

19.    **Mutual Releases**.  The following mutual releases shall become effective upon Bankruptcy Court approval of this Agreement:

A.    HPS, on behalf of itself and the Prepetition Lenders (collectively, the "Claimant Parties"), hereby releases, remises and forever discharges the Debtors' Estates and the

---

[5] The Digital Accounts shall include, without limitation, (i) cloud storage accounts, (ii) domain name registrar accounts, (iii) social media accounts, (iv) email accounts used in connection with the Debtors' business, (v) software development, project management, and collaboration accounts, and (vi) any other digital platform, online service, or account used or maintained by the Debtors for business, media, communications, or operations.

Execution Version

Trustee and his financial advisors, attorneys, accountants and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such, but excluding any of the Debtors' current or former directors and officers of the Debtors' Estates and entities affiliated with the Debtors' Estates (specifically including but not limited to the Defendants named in the D&O Litigation) (collectively, the Trustee Parties"), of and from any and all claims, debts, refunds, demands, liabilities, agreements, obligations, controversies, actions, causes of action, suits, costs, attorneys' fees, expenses, damages, liens, and judgments, of any nature whatsoever, at law or in equity or otherwise, whether asserted or unasserted, whether known or unknown, that the Claimant Parties may have against any or all of the Trustee Parties as of the date hereof, with the exception of the Allowed HPS Claim (including the Allowed HPS Deficiency Claim), the claims arising under the Postpetition Funding, and the Trustee's obligations under this Agreement; provided, however, that the foregoing release shall not limit the Claimant Parties from asserting any released claim as a defense against a non-Party to this Agreement in any litigation brought by such Non-Party.

B.     The Trustee, on behalf of itself and the Trustee Parties, hereby releases, remises and forever discharges the Claimant Parties and each of their Representatives of and from any and all claims, debts, refunds, demands, liabilities, agreements, obligations, controversies, actions, causes of action, suits, costs, attorneys' fees, expenses, damages, liens, and judgments, of any nature whatsoever, at law or in equity or otherwise, whether asserted or unasserted, whether known or unknown, that the Trustee Parties may have against any or all of the Claimant Parties as of the date hereof, with the exception of the Claimant Parties' obligations under this Agreement. Without limiting the foregoing, the Trustee Parties waive any right to surcharge the Collateral pursuant to section 506(c) of the Bankruptcy Code except to the extent provided in the Carve-Out

11

Execution Version

or otherwise in this Agreement. As used herein, "Representatives" shall refer to the Claimant Parties or their respective subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such.

20. Any notices in connection herewith may be transmitted by personal delivery, overnight courier, or, email with first class mail:

| If to the Trustee: | George L. Miller, Trustee<br>8 Penn Center<br>1628 John F. Kennedy Blvd.<br>Suite 950<br>Philadelphia, PA 19103-2110<br>Email: gmiller@mctllp.com |
| --- | --- |
| with a copy to<br>Trustee's Counsel: | John T. Carroll, III<br>Cozen O'Connor<br>1201 North Market Street<br>Suite 1001<br>Wilmington, DE 19801<br>Tel: (302) 295-2028<br>Fax: (215) 701-2140<br>Email: jcarroll@cozen.com |
| If to the Agent: | Daniel Wallitt<br>HPS Investment Partners, LLC<br>40 West 57th Street, 33rd Floor<br>New York, NY 10019<br>Tel: (212) 287-5133<br>Email: daniel.wallitt@hpspartners.com |

12

Error! Unknown document property name.

Execution Version

with a copy to Agent's    Matthew Brod
Counsel:                  Milbank LLP
                         55 Hudson Yards
                         New York, NY 10001-2163
                         Tel: (212) 530-5460
                         Fax: (212) 530-5219
                         Email: MBrod@milbank.com

Notices shall be effective (a) immediately upon personal delivery, (b) one day after deposit with

an overnight courier, or (c) upon receipt of email if during normal business hours (so long as notice

by first class mail is deposited with the United States Postal Service on the same day as the email

is sent).

21.    This Agreement may be executed in any number of separate counterparts, any of

which may be transmitted by facsimile or email, and each of which when so executed and delivered

shall be an original, but all of which shall together constitute, one and the same agreement.

22.    Headings, if any, used in the Agreement are for reference purposes only and do not

comprise part of the terms hereof.

23.    No failure of the Prepetition Secured Parties or the Trustee to enforce any right

granted under this Agreement, any of the Prepetition Loan Documents, or otherwise shall represent

a waiver of such right.

24.    The Parties hereto agree to execute any and all documents that are reasonably

necessary to implement the terms and provisions of this Agreement.

25.    No modification or amendment of any of the provisions hereof shall be effective

unless set forth in writing and signed by the Parties hereto and approved by the Bankruptcy Court.

26.    This Agreement between the Parties is subject in all respects to the approval of the

Bankruptcy Court, which Trustee will promptly seek after the execution hereof.

13

Error! Unknown document property name.

Execution Version

27.   The Bankruptcy Court shall have jurisdiction over all matters arising from or relating to this Agreement and order approving same.

28.   This Agreement shall become effective as follows:

(i)   Paragraph 17 of this Agreement, and any related provision of this Agreement necessary to accomplish the matters set forth in paragraph 17, shall be implemented by the Trustee and HPS upon the execution of this Agreement by counsel to the Trustee and counsel to the Agent respectively; and

(ii)   All other provisions of this Agreement are subject to Bankruptcy Court approval of this Agreement.

*[Remainder of page intentionally left blank; signature pages to follow]*

14

Error! Unknown document property name.

Execution Version

**IN WITNESS WHEREOF**, the Parties have executed this Agreement, intending to be legally bound, as of the date first above written.

**COZEN O'CONNOR**                          **MILBANK LLP**

By: _____        By: _____
John T. Carroll, III                        Matthew Brod
(Del. Bar No. 4060)                         55 Hudson Yards
Suite 1001                                  New York, NY 10001-2163
1201 North Market Street                    Tel: (212) 530-5460
Wilmington, Delaware 19801                  Fax: (212) 530-5219
Tel: (302) 295-2028                         Email: MBrod@milbank.comm
Fax: (302) 295-2013                         *Counsel to Agent (HPS Investment*
Email: jcarroll@cozen.com                   *Partners LLC) for itself and on behalf of*
*Counsel to the Trustee,*                   *Prepetition Secured Parties*
*George L. Miller*

15

**Error! Unknown document property name.**

**EXHIBIT D**

American Films Revocation (FL SOS 2024)



# Detail by Entity Name

Foreign Profit Corporation
AMERICAN FILMS, INC.

### Filing Information

| | |
|---|---|
| **Document Number** | F22000005623 |
| **FEI/EIN Number** | 80-0978149 |
| **Date Filed** | 09/07/2022 |
| **State** | NV |
| **Status** | INACTIVE |
| **Last Event** | REVOKED FOR ANNUAL REPORT |
| **Event Date Filed** | 09/27/2024 |
| **Event Effective Date** | NONE |

### Principal Address

1132 KANE CONCOURSE, SUITE 201
BAY HARBOR ISLANDS, FL 33154

### Mailing Address

1132 KANE CONCOURSE, SUITE 201
BAY HARBOR ISLANDS, FL 33154

### Registered Agent Name & Address

TAMAROFF, DAVID
1132 KANE CONCOURSE, SUITE 201
BAY HARBOR ISLANDS, FL 33154

### Officer/Director Detail

**Name & Address**

Title CHRM/D

CAMPBELL, CRAIG
1132 KANE CONCOURSE, SUITE 201
BAY HARBOR ISLANDS, FL 33154

Title D/CEO

LEE, GEOFF
1132 KANE CONCOURSE, SUITE 201
BAY HARBOR ISLANDS, FL 33154

Title D

SAFALOW, BRADLEY
1132 KANE CONCOURSE, SUITE 201
BAY HARBOR ISLANDS, FL 33154

Title D

FAULK, MARSHALL
1132 KANE CONCOURSE, SUITE 201
BAY HARBOR ISLANDS, FL 33154

Title VP/S/GC

TAMAROFF, DAVID
1132 KANE CONCOURSE, SUITE 201
BAY HARBOR ISLANDS, FL 33154

Title VP/CFO

WARREN, JAMIE
1132 KANE CONCOURSE, SUITE 201
BAY HARBOR ISLANDS, FL 33154

## Annual Reports

| Report Year | Filed Date |
|---|---|
| 2023 | 04/30/2023 |

## Document Images

| | |
|---|---|
| 04/30/2023 -- ANNUAL REPORT | View image in PDF format |
| 09/07/2022 -- Foreign Profit | View image in PDF format |

**EXHIBIT E**

Culpepper SDFL Motion (Doc. #594)

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF FLORIDA

Case No.: 21-cv-20862-BLOOM/Otazo-Reyes

MILLENNIUM FUNDING, INC., et al.,

    Plaintiffs,

vs.

1701 MANAGEMENT LLC, et al.,

    Defendants,

---

## PLAINTIFFS' OPPOSED MOTION TO LIFT STAY OF POST-JUDGMENT PROCEEDINGS

Plaintiffs/Judgment Creditors MILLENNIUM FUNDING, INC., VOLTAGE HOLDINGS, LLC, AMBI DISTRIBUTION CORP., AFTER PRODUCTIONS, LLC, AFTER II MOVIE, LLC, MORGAN CREEK PRODUCTIONS, INC., MILLENNIUM FUNDING, INC., BEDEVILED LLC, MILLENNIUM MEDIA, INC., COLOSSAL MOVIE PRODUCTIONS, LLC, YAR PRODUCTIONS, INC., FSMQ FILM, LLC, FW PRODUCTIONS, LLC, MILLENNIUM IP, INC., I AM WRATH PRODUCTION, INC., KILLING LINK DISTRIBUTION, LLC, BADHOUSE STUDIOS, LLC, LF2 PRODUCTIONS, INC., LHF PRODUCTIONS, INC., VENICE PI, LLC, RAMBO V PRODUCTIONS, INC., RUPTURE CAL, INC., MON, LLC, SF FILM, LLC, SPEED KILLS PRODUCTIONS, INC., MILLENNIUM IP, INC., NIKOLA PRODUCTIONS, INC., WONDER ONE, LLC, BODYGUARD PRODUCTIONS, INC., OUTPOST PRODUCTIONS, INC., GLACIER FILMS 1, LLC, DEFINITION DELAWARE LLC, HANNIBAL CLASSICS INC., JUSTICE EVERYWHERE PRODUCTIONS LLC, STATE OF THE UNION DISTRIBUTION AND COLLECTIONS, LLC, PARADOX STUDIOS, LLC, DALLAS BUYERS CLUB, LLC, HITMAN TWO PRODUCTIONS, INC., SCREEN MEDIA VENTURES, LLC and 42 VENTURES, LLC (collectively "Plaintiffs"), move this honorable Court to lift the Stays of Post-Judgment Proceedings the Court issued on June 7, 2023 and Oct. 25, 2023. *See* Docs. ##502, 576.

20-023DBa



## I.   BRIEF RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

1.     On March 28, 2022, this Court granted Plaintiffs' motion for default judgment and awarded a money judgment of $15,172,403.00 in favor of Plaintiffs and against Defendants Charles Muszynski ("Muszynski"), 1701 Management LLC, and AUH2O LLC. *See* Doc. #213.

2.     On March 14, 2023, the Court referred all post-judgment matters to Magistrate Judge Alicia M. Otazo-Reyes. *See* Doc. #432.

3.     On May 30, 2023, Defendant Muszynski filed an Amended Motion to Stay and Second Notice of Bankruptcy. *See* Doc. #496.

4.     On June 7, 2023, the Court granted Muszynski's motion [Doc. #496] and stayed the case to the extent Plaintiffs seek to collect on the judgment against Muszynski. *See* Docs. #502.

5.     On Sept. 12, 2023, the Court ordered that following the stay being lifted, that the Parties "file a Joint Notice of Pending Motions and advise the Court of the outstanding motions which require adjudication." Doc. #543.

6.     On Oct. 25, 2023, the Court granted Plaintiffs' motion [Doc. #572] and ordered a "General Stay of Post-Judgment Proceedings Pending Resolution of Muszynski Bankruptcy." Doc. #576.

7.     On Mar. 4, 2026, the First Circuit Court of Appeals ("First Circuit") [No. 25-9003] issued a judgment affirming the decision of the First Circuit Bankruptcy Appellate Panel [BAP NO. PR 24-011] which denied Muszynski's appeal and affirmed the opinion and order of the United States Bankruptcy Court for the District of Puerto Rico dismissing Defendant Muszynski's bankruptcy petition [23-02870-MCF7]. *See* Doc. #593.

8.     On April 28, 2026, the First Circuit issued the mandate. *See* Ex. "1".

## II.   ARGUMENT

9.     The purpose of the Court's first limited stay and second general stay, *see* Docs. ##502, 576, was to allow Muszynski's bankruptcy proceedings to conclude before holding a trial on the writs of garnishments.  Now that the First Circuit has issued its mandate affirming the dismissal of his bankruptcy petition, the case can resume. *See* Ex. "1".

## III.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court lift the stays, *see* Docs. ##502, 576.  Plaintiffs' counsel can file a status of pending motions which require adjudication.



## RULE 7.1(a)(3) CERTIFICATION

Pursuant to Local Rule 7.1(a)(3), Local Rules of the District Court of the Southern District of Florida, I, Kerry Culpepper, counsel for the movants, attempted to confer with Muszynski and counsels for Garnishees Terry Lacy, Buhosabio LLC and Antilles Management, LLC on their position on this motion.

Counsel for Terry Lacy (Louis R. Gigliotti) stated by email that he objected to the motion without any reason. When asked to meet and confer, counsel for Lacy stated that he intended to withdraw as representative.

Counsel for Buhosabio stated that he intended to withdraw as representative.

I sent email to Muszynski on 4/28/2026. As of the date of the motion, he has not responded to my email, despite sending me emails about different matters.

I sent email to counsel for Antilles Management, LLC (Mr. Palomares-Starbuck) on 4/28/2026. As of the date of the motion, he has not responded.


DATED:      April 29, 2026            Respectfully submitted,



                                      _/s/ Joel B. Rothman_
                                      JOEL B. ROTHMAN
                                      Florida Bar No. 98220
                                      joel.rothman@sriplaw.com


                                      **SRIPLAW**
                                      21301 Powerline Road, Suite 212
                                      Boca Raton, FL 33433
                                      561.404.4335 – Telephone
                                      561.404.4353 – Facsimile

                                      and

                                      Kerry S. Culpepper
                                      _Admitted pro hac vice_
                                      **CULPEPPER IP, LLLC**
                                      75-5915 Walua Road, Unit 128
                                      Kailua-Kona, HI  96740
                                      808.464.4047 – Telephone
                                      kculpepper@culpepperip.com

3

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on <u>April 29, 2026</u> and by the methods of service noted below, a true and correct copy of the foregoing was served on Defendants 1701 MANAGEMENT LLC d/b/a LIQUIDVPN, AUH2O LLC, and CHARLES MUSZYNSKI a/k/a FREDERICK DOUGLAS.

<u>Via Airmail</u>
CHARLES MUSZYNSKI
Post Office Box 1423, Basseterre, St. Kitts & Nevis

<u>Via E-mail</u>
usfilefolder@protonmail.com

DATED: April 29, 2026

*/s/ Joel B. Rothman*
JOEL B. ROTHMAN
Florida Bar No. 98220
joel.rothman@sriplaw.com

**SRIPLAW**
21301 Powerline Road, Suite 212
Boca Raton, FL 33433
561.404.4335 – Telephone
561.404.4353 – Facsimile

and

Kerry S. Culpepper
*Admitted pro hac vice*
**CULPEPPER IP, LLLC**
75-5915 Walua Road, Unit 128
Kailua-Kona, HI 96740

**EXHIBIT F**

Heirl Letter (TPLF Evidence)

**From:** Michael A. Hierl <mhierl@HSPLEGAL.COM>
**Sent:** Thursday, March 7, 2024 9:33 AM
**To:** Victor J. Pioli
**Cc:** John K. Hughes; Garrett Kern; Joseph R. Marconi
**Subject:** FW: CMS/PML/Millennium
**Attachments:** Millennium v. Hierl complaint as served.pdf

Victor – A copy of the 11/17/21 email from Kozacky follows. Mike

**From:** Paul J. Kozacky <pkozacky@kwmlawyers.com>
**Sent:** Wednesday, November 17, 2021 8:13 AM
**To:** Michael A. Hierl <mhierl@HSPLEGAL.COM>
**Cc:** John K. Hughes <JHughes@HSPLEGAL.COM>; Matthew J. Piers <MPiers@HSPLEGAL.COM>; Christine Blank <cblank@HSPLEGAL.COM>
**Subject:** RE: CMS/PML/Millennium

Dear Mr. Hierl—

Attached is a complaint my clients intend to file in the absence of hearing from you in the next seven days. Please let me know if you and your firm would be amenable to service of process and this complaint via email. Thank you,

**Paul J. Kozacky**
Attorney at Law – Proctor in Admiralty


Kozacky Weitzel McGrath

Kozacky Weitzel McGrath, P.C.
77 West Wacker Drive, Suite 4500
Chicago, IL 60601
312.696.0900 (General Office)
312.907.0651 (Cell)
312.696.0901 (Direct Dial)
pkozacky@kwmlawyers.com
www.kwmlawyers.com


Member, Society of Primerus Law Firms

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Millennium Media, Inc. and ) | |
| PML Process Management Ltd., ) | |
| ) | |
| plaintiffs, ) | |
| ) | |
| vs. ) | Case No. 21-cv-_____ |
| ) | |
| Michael A. Hierl, Esq. and ) | |
| Hughes Sokol Piers Resnick & Dym, Ltd., ) | |
| ) | |
| defendants. ) | |

## COMPLAINT

### Facts Common to All Counts

1. Millennium Media, Inc. (Millennium") is a Nevada corporation with its principal place of business in Los Angeles, California.

2. PML Process Management Ltd. ("PML") is a corporation organized under the laws of Cyprus with its principal place of business in Larnaca, Cyprus.

3. Michael A. Hierl, Esq. ("Hierl") is a citizen of Illinois and an Illinois attorney who practices as a partner with Hughes Sokol Piers Resnick & Dym, Ltd.

4. Hughes Sokol Piers Resnick & Dym, Ltd. ("HSPR&D") is an Illinois corporation with its principal place of business in Chicago, Illinois. Hierl and HSPR&D collectively are referred to herein as "the lawyers."

5. This Court has jurisdiction under 28 U.S.C. § 1332 as the action is between citizens of different states and countries and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.      Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b)(1).

7.      Beginning around February 2012, Hierl and HSPR&D, under the direction and supervision of Hierl, undertook legal representation of various copyright owners (termed "rightsholders") whose copyrights may have been infringed. The rightsholder's agent would supply the lawyers with the internet protocol addresses of suspected infringers, the lawyers would then file a John Doe complaint and propound subpoenas to non-party internet service providers to determine the identity of the suspected infringer based on his or her internet address, and upon learning the identity of the suspected infringer, the lawyers were to amend the complaint to name that individual as a defendant. Thereafter the lawyers were to settle the claim with the amended defendant, retaining certain percentages as their contingency fee and for reimbursable costs, and remitting the balance to the rightsholder's agent for distribution to the agent, the rightsholder and the data processing companies which collected information about suspected infringer internet addresses.

8.      Millennium became one of Hierl and HSPR&D's rightsholder clients pursuant to an engagement entered into by its prior agent.

9.      In late 2019, Millennium switched agents to PML. On December 7, 2020, the lawyers received an email from Millennium's general counsel formally confirming that it had appointed a new agent, and providing:

> notice to HSPRD that PML has assumed the former obligations and liabilities in respect of the copyright enforcement matters and that all payments for past infringements and going forward shall be remitted to PML on behalf of Millenium.

10.     The lawyers also agreed to provide Millennium and its agent a monthly report of actions undertaken, expenses incurred, and collections made.

11. On April 23, 2019, the lawyers and Millennium's prior agent agreed that, going forward, the lawyers' contingency fee would be based on net collections as opposed to gross collections. In other words, reimbursable expenses such as the court filing fee and subpoena fees would be deducted from any settlement first, and the lawyers' contingency fee then would be calculated based on the lower, or "net," collections.

12. On August 16, 2021, the lawyers also agreed to send counsel for Millennium and PML twelve specified case files so a review of the lawyers' activities and settlements could be further evaluated.

13. Millennium and PML have performed all conditions required of them under the parties' agreement.

## COUNT I
### Breach of Contract

14. Millennium and PML reallege paragraphs 1 through 13, inclusive, as though fully set forth herein.

15. Despite the December 7, 2020 instruction and subsequent demands, the lawyers have refused to remit to PML $69,765.78, which remains due and owing.

16. Despite demand, the lawyers also have refused to remit to PML approximately $61,358.73 that remains owed to Millennium, and in part to PML, based on the calculation of the lawyers' contingency fee from net collections (gross collections minus reimbursable expenses) as opposed to gross collections (the total amount of monies received from amended defendants in settlement).

17. Despite demand, the lawyers have refused to turn over to counsel for Millennium and PML the twelve requested case files, specifically, Northern District of Illinois

3

Case Nos. 18-cv-2370, 18-cv-4271, 18-cv-5068, 18-cv-5073, 19-cv-3796, 19-cv-5777, 19-cv-7163, 19-cv-7514, 20-cv-0369, 20-cv-1394, 20-cv-1395 and 20-cv-1401.

18. Millennium and PML have been damaged by the lawyers' breach of contract in the amount of $131,124.51 and possibly more as might be shown by a review of the requested case files and other case files.

WHEREFORE, for the foregoing reasons, Millennium Media, Inc. and PML Process Management Ltd. request that judgment be entered in their favor and against Michael A. Hierl, Esq. and Hughes Sokol Piers Resnick & Dym, Ltd., jointly and severally, for at least $131,124.51 in money damages and whatever other damages as may be proven at trial, their costs, their attorneys' fees and whatever other relief this Court deems appropriate.

## COUNT II
### Accounting

19. Millennium and PML reallege paragraphs 1 through 13, inclusive, as though fully set forth herein.

20. As lawyers for their client Millennium, the lawyers owe Millennium a fiduciary duty as a matter of law and, accordingly, a duty to account.

21. Whether the lawyers owe Millennium and its agent PML more money from settlements with amended defendants is complex and cannot be determined without review of the case files. Due to the unascertainable quantum of unaccounted-for settlements, Millennium and PML lack an adequate remedy at law.

22. Millennium and PML have demanded the case files for the twelve civil actions listed in paragraph 17 and, despite an early indication that the case files would be tendered to counsel for Millennium and PML, the lawyers continue to withhold the requested case files.

4

WHEREFORE, for the foregoing reasons, Millennium Media, Inc. requests that judgment be entered in its favor and against Michael A. Hierl, Esq. and Hughes Sokol Piers Resnick & Dym, Ltd., jointly and severally, requiring them to account for all matters they undertook on behalf of Millennium, and whatever other damages as may be proven at trial following that accounting, plus costs, attorneys' fees and whatever other relief this Court deems appropriate.

Respectfully submitted,

MILLENNIUM MEDIA, INC. and
PML PROCESS MANAGEMENT LTD.

By: /s/ Paul J. Kozacky
One of their attorneys

Paul J. Kozacky
Brian P. O'Connor
Caitlin Brown
Kozacky Weitzel McGrath, P.C.
77 West Wacker Drive, Suite 4500
Chicago, Illinois 60601
312-696-0900
pkozacky@kwmlawyers.com
boconnor@kwmlawyers.com
cbrown@kwmlawyers.com

5