**Exhibit 19:**

**Restatement (Second) of Agency § 144;** *In re Bennett Funding Group,*
*Inc.,* **336 F.3d 94 (2d Cir. 2003)**

336 F.3d 94 (2003)

## In re: THE BENNETT FUNDING GROUP, INC., Debtor.
## Richard C. Breeden, Trustee of The Bennett Funding Group, Inc., et al., Plaintiff-Appellant,
### v.
## Kirkpatrick & Lockhart LLP, Richard D. Marshall, Eugene R. Licker, Storch & Brenner, LLP, Irving M. Pollack, Arthur Andersen & Company, Robinson, St. John & Wayne, et al., Defendant-Appellees.

Docket Nos. 01-5062, 01-5064, 01-5066, 01-5068.

**United States Court of Appeals, Second Circuit.**

Argued: September 13, 2002.
Decided: July 15, 2003.

*95 *96 Jay G. Strum, Kaye Scholer, LLP, New York, New York, Dennis R. McCoy, Hiscock, Barclay, Saperston & Day, LLP, Buffalo, N.Y. for plaintiff-appellant.

Janice J. DiGennaro, Rivkin Radler LLP, Uniondale, N.Y. for defendant-appellees Robinson, St. John & Wayne, et al.

Irwin H. Warren, Weil, Gotshal & Manges LLP, New York, N.Y. (Robert F. Carangelo, Jeffrey M. Greilsheimer on the brief), for defendant-appellee Arthur Andersen LLP.

Richard Spinogatti, Proskauer Rose LLP, New York, N.Y. (Allison B. Feld, on the brief), for defendant-appellees Kirkpatrick & Lockhart LLP, et al.

Gary Naftalis, Kramer Levin Naftalis & Frankel LLP, New York, N.Y. (Gregory A. Horowitz, on the brief), for defendant-appellees Storch & Brenner, LLP, et al.

Before: JACOBS and POOLER, Circuit Judges, and BAER, Jr.,[*] District Judge.

BAER, District Judge.

Richard C. Breeden is trustee of the Bennett Funding Group, Inc. (hereinafter "BFG"), a defunct company that was used as the vehicle for a Ponzi scheme. Breeden sued, *inter alia,* the company's lawyers and an accounting firm on the theory that they should have detected the fraud. The trustee alleges that Arthur Anderson (hereinafter "AA") was negligent in (1) issuing "clean" opinions for BFG's 1989 and 1990 audit years and (2) failing to notify appropriate authorities at BFG or law enforcement authorities when it (a) discovered problems with BFG's statements and its compliance with securities laws and regulations in 1992, (b) refused to issue a statement for 1991, and (c) withdrew its statement for 1990. The trustee's *97 complaint against the law firms alleges that they submitted a letter to the Securities and Exchange Commission ("SEC") which was false and designed to delay or hinder the SEC investigation of BFG. On August 21, 2001, the United States District Court for the Southern District of New York (Sprizzo, *J.*) granted summary judgment dismissing the complaint (*Breeden v. Kirkpatrick & Lockhart LLP,* 268 B.R. 704 (S.D.N.Y.2001)) on the ground that the trustee lacked standing to sue third parties where the fraud was perpetrated by the debtor itself. *See Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114 (2d Cir.1991). By then, the remaining defendants were Kirkpatrick & Lockhart LLP ("Kirkpatrick"), Robinson, St John & Wayne LLP ("Robinson") and Storch & Brenner LLP ("Storch") (collectively "the law firm defendants") and the accountants.

The court had previously denied a motion to dismiss on standing grounds, but a year later entertained the motions presently under review on the papers as supplemented by a four-day evidentiary hearing at which the court heard witnesses and received in evidence a number of documents and deposition transcripts. Thus, the trustee was afforded the further opportunity to establish the existence of a genuine issue of material fact. On August 21, 2002, the court granted summary judgment. *See Breeden,* 268 B.R. at 714.

The trustee appeals on the grounds (i) that the rule of *Wagoner* applies only if all the company's decision-makers were implicated, a circumstance shown to be lacking here; and (ii) that conducting an evidentiary hearing in the context of a summary judgment motion deprived him of the constitutional right to a jury trial.

## FACTUAL BACKGROUND

This case involves what at the time it was uncovered was characterized as the greatest Ponzi scheme on record and resulted from the sale and resale of the same office equipment leases. BFG, a closely-held family business, raised capital for its operations from private investors and institutions. (A1020-21; A1024-25). It is undisputed that Bud and Kathleen Bennett were the sole shareholders of BFG; that one son, Patrick Bennett, was CFO; and another son, Michael, Deputy CEO. Together they had control over every decision made at BFG. Although BFG is only one of several Bennett entities collectively referred to as the "Bennett Companies," each such entity "was held, directly or indirectly, by members of the Bennet family, who treated the [entities] as alter egos." Aff. Of Stewart M. Weissman, in Supp. Of Trustee's Mot. For an Ord. Substantively Consolidating the Debtors' Estates ¶ 17. The record is replete with references such as, "[T]he Bennett family treated its complex network of companies as a single empire ...." (A1032). Every Bennett family member was on the BFG Board, more specifically, Bud Bennett was BFG's Chairman and CEO, and Kathleen Bennett was BFG's President. (A2301-02; A6438-6439). The trustee concedes that BFG was a Bennett family "dictatorship." (A6761). In a report submitted pursuant to 11 U.S.C. § 1106, the trustee admitted "Patrick Bennett's control of the finances of the Bennett companies was complete...." (A1037). According to appellees, the Bennetts' fraudulent activities must be imputed to BFG — and, by extension, to the trustee — rather than to the professionals who were alleged to be complicit in the fraud. (Appellees' Brief at 36). The trustee, not surprisingly, disagrees.

The Board of Directors plays an integral part in this elaborate scheme. While the Bennett family always held at least 50% of the seats on the Board, there were other *98 directors. It is undisputed, however, that each director was handpicked by Bud and each was a BFG employee; there were no "outside directors." (A2899-2902; A7416; A7489-90). The Board meetings were scripted in advance and each Board member was provided with his "speaking parts" in advance of the meeting. (A2191-95; A2900; A7525; A7615-16; A7875-81). The hearing also brought to light the following facts.

First, it became clear that "[t]he Bennett family, in particular Bud and Patrick Bennett, did no[t] tolerate any questioning that could have uncovered the fraud." (A1032). For instance, at least one employee, Keith Braudrick, BFG's Comptroller from 1990 to 1994, was fired because he sought additional information and documentation with respect to certain transactions that he was directed to record on the books of the company. (A2913-18).

Second, when confronted with clear evidence of fraud in late 1995, Bud and Kathleen sought to guarantee control over BFG and its finances in perpetuity and placed all of BFG stock in a trust, the language of which expressly assured that Patrick was to be appointed Chairman of the Board and CEO of BFG. (A2416).

Third, as far back as 1992, the auditor's report found that "[t]he unassigned inventory list from the [computer system] is not correct [and] contains both leases which have not been sold and leases that have been sold." (A2205). According to appellees, the outside audit clearly demonstrated how assignment of the same leases was made to multiple buyers and lenders and yet nothing was done to correct the problem. (A2088-89).

Fourth, Bud and Kathleen were on notice of the Ponzi scheme when in October 1995, two groups of employees discovered that BFG had pledged more than $50 million in leases that had already been sold to investors. (A2095; A7387-88; A7421; A7593; A7719). Once again the Bennetts did nothing and Patrick remained in control. (A8146; A8053-54; A8060; A8086-88). Further, the trustee concedes that the Bennetts diverted funds to themselves or to entities that they owned — including funds to maintain Bud and Kathleen's yacht, *The Lady Kathleen.* (A6962 at ¶ 70; A1101).

Fifth, in 1995, BFG finally hired Arkin, Schaeffer & Kaplan, a New York law firm ("Arkin law firm"), to investigate the double pledging. (A2067-68; A2117; A2126; A2140; A2148; A2153-54). The Arkin law firm was retained after several BFG employees threatened to resign over the discrepancies that had come to light. Thereafter, Bud and Patrick agreed to an oversight committee. (A2405-06; A7443-47; A7917). The trustee maintains that the fact that Bud and Kathleen Bennett retained an outside law firm to investigate the allegations of double-pledging strongly suggests that they themselves were unaware of the fraud that was being perpetrated. In its report dated March 7, 1996, the Arkin law firm concluded that "[w]hether the double pledging was intentional or the result of an innocent error is inconclusive; however, at a minimum [BFG] was grossly negligent in allowing the double pledging to occur." (A2100).

When AA refused to issue a clean opinion in 1991, Bud personally fired AA without ever even a mention to the Board. (A6564-65). Consequently, the Board neither discussed nor investigated the reasons behind AA's discharge. (A6566-67; A7616-17). The oversight committee that was created in 1995 by the Bennetts after the double-pledging came to light was without power according to one of its members to fire Patrick or "to carry out the recommendations" it might have made. (A7937-39).

*99 The trustee contends that there were innocent insiders at BFG — including William Lester, Richard MacPherson, Kevin Kuppel, and Paul Usztok — who would have tried to put an end to the fraud had they been privy to it. However, appellees maintain that it is clear that the trustee's purportedly innocent insiders — who might have had the best of intentions — were without any power to do anything anyway. For instance, Kevin Kuppel, BFG's treasurer, testified at the hearing that he had no "responsibility for the cash flow, ... no authority or responsibility regarding bank accounts, ... [and] didn't even know what the cash disbursement process was at the Bennett Funding Group." (A7606-07). Similarly, Richard MacPherson, formerly head football coach at Syracuse University, was given a large office, a seat on the Board and the title "Senior Vice President of Corporate Communications," but admitted that he was a "mere public relations figurehead." (A7565-66; A7849). Indeed, Joseph Rocco, the Comptroller until the mid-1990s, testified that as early as March 1990, he knew that the company's financial statements failed to reflect truthfully the financial condition of the company and had written a memo to Bud expressing this view. See memo of 3/8/90, Ex. AA-105. The trustee adverts to the testimony of Lester, MacPherson, Kuppel, and Usztok — each of whom testified that he was unaware that a fraud had been committed. Indeed, testimony at the hearing could be read to suggest that, if the innocent Board members had clearly understood about the fraud, they would have tried to stop it. For instance, Lester stated that he did not believe that the double pledging was intentional after he became aware of it in early 1996. (A7462-63). Lester, Kuppel, and Usztok testified that when they did discover the double-pledging, they allowed it might have been a mistake. (A7378; A7380; A7387; A7580; A7599-7600; A7910).

## DISCUSSION

## A. STANDARD FOR REVIEW OF SUMMARY JUDGMENT

In deciding that summary judgment is appropriate, the Court must determine that there is no genuine issue of material fact, taking the pleadings, depositions, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits. Following such a finding, the moving party is entitled to judgment as a matter of law. See *Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir.1994).* We review the district court's grant of summary judgment *de novo* and apply the same standard as the district court is required to apply. See *Diesel v. Town of Lewisboro, 232 F.3d 92, 103 (2d Cir.2000).*

## B. THE STANDING ISSUE

This case, in large measure, turns on the issue of standing — a threshold question in every federal case.

> The Constitution confines the judicial power of the federal courts to deciding cases or controversies. U.S. Const. art. III. § 2, cl.1. The doctrine of standing is derived directly from this constitutional provision. It focuses upon the party seeking to invoke federal jurisdiction, rather than upon the justiciability of the issue at stake in the litigation. We have held that the Article III "`case or controversy' requirement coincides with the scope of the powers the Bankruptcy Code gives a trustee."

*Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1091 (2d Cir.1995)* (citations omitted).

"[A] bankruptcy trustee has no standing generally to sue third parties on *100 behalf of the estate's creditors, but may only assert claims held by the bankrupt corporation itself." *Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114, 118 (2d Cir.1991).* Where "a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors." *Id.* This rule applies to professional malpractice claims. *Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1094 (2d Cir.1995).* Where a corporation's management and a third party collaborated in the fraudulent scheme, the trustee can sue only if it can establish that there has been damage to the corporation apart from the damage to the third-party creditors. *Wagoner, 944 F.2d at 118-19.* Even if there is damage to the corporation itself, the trustee cannot recover if the malfeasor was the corporation's sole shareholder and

decision maker. *Id.,* at 120; *see also Hirsch,* 72 F.3d at 1094 (holding that even though "there [was] at least a theoretical possibility that some independent financial injury to the Debtors might be established," the *Wagoner* rule precluded standing "because of the Debtors' collaboration with the defendants-appellees in promulgating and promoting the Colonial Ponzi schemes").

The rationale for the *Wagoner* rule is "the fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation." *Wight v. Bankamerica Corp.,* 219 F.3d 79, 86 (2d Cir.2000). Therefore, the acts of the agent will not be charged to the corporation if although the agent purportedly acts for the corporation, he "is really committing a fraud for his own benefit." *Id.,* at 87. This "adverse interest" exception is applied "only when the agent has 'totally abandoned' the principal's interests." *Id.,* (quoting *In re Mediators, Inc.,* 105 F.3d 822, 827 (2d Cir.1997)). Nevertheless, if the malfeasor has engaged in more than one scheme, it is possible to find that certain schemes inured to the benefit of the corporation but that others did not. *See Wight,* 219 F.3d at 89. Finally, "where the principal and agent are one and the same, the adverse interest exception is itself subject to an exception styled the 'sole actor rule.'" "This rule imputes the agent's knowledge to the principal notwithstanding the agent's self-dealing because the party that should have been informed was the agent itself albeit in its capacity as principal." *Mediators,* 105 F.3d at 827.

The "sole actor" rule does not readily apply here because the agent perpetrating the fraud, Patrick, was not one of the principal owners of the enterprise. Nevertheless, other well-established principles of agency law require that we dismiss the trustee's suit for lack of standing.

State law determines whether a right to sue belongs to the debtor in a bankruptcy proceeding. *Mediators,* 105 F.3d at 826. New York law recognizes the well-established principle of ratification, which imputes an agent's conduct to a principal who "condones those acts and accepts the benefits of them." *In Matter of New York State Medical Transporters Assoc.,* 160 A.D.2d 710, 553 N.Y.S.2d 790, 792 (2d Dep't 1990), *aff'd* 77 N.Y.2d 126, 564 N.Y.S.2d 1007, 566 N.E.2d 134 (1990); *see also Munroe v. Harriman,* 85 F.2d 493, 495 (2d Cir.1936) (acts of agent imputed to principal "if the principal adopts the unauthorized act of his agent in order to retain a benefit for himself.")

It is undisputed that Patrick exercised unfettered control over the financial operations of BFG with Bud and Kathleen's full approval. There does appear to be a dispute as to whether Patrick individually benefited from the fraud to the detriment *101 of the company and its shareholders. However, uncontroverted evidence before the district court demonstrated that Bud and Kathleen were aware of Patrick's actions, and that they diverted funds to themselves or entities they owned. When confronted with evidence of likely wrongdoing, they placed BFG stock in a trust expressly making Patrick Chairman and CEO of BFG. Their conduct amounted to acquiescence in the fraud perpetrated by Patrick. The trustee therefore lacks standing to sue the law firm defendants and AA for professional malpractice arising from that fraud.

The trustee's argument here rests in large measure on *Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld L.L.P.,* 212 B.R. 34 (S.D.N.Y.1997), which he cites for the proposition that to apply the rule which imputes fraud to the debtor and bars the trustee from bringing suit, "*all* relevant shareholders and/or decisionmakers [must be] involved in the fraud." *See Wechsler,* 212 B.R. at 36. Only then may the fraud be imputed to the corporation and the trustee denied standing to sue third parties on its behalf. *See In re CBI Holding Co.,* 247 B.R. 341, 364-65 (Bankr. S.D.N.Y.2000). The trustee contends that these cases require a reversal. We disagree.

Here, however, we need not resolve the question of whether the presence of innocent directors would provide the trustee with standing where fewer than all shareholders are implicated in the fraud, because that case is not before us. In *CBI* the bankruptcy judge makes clear that imputation applies unless at least one decisionmaker in a management role or amongst the shareholders is innocent *and* could have stopped the fraud. *See CBI,* 247 B.R. at 365. Here whether one or more so-called independent directors, the people relied upon by the trustee to avoid *Wagoner,* might have in some metaphysical sense stopped the fraud, it is beyond peradventure that under all the circumstances, it was only their heart that might have been in the right place. Indeed, each so-called independent director was impotent to actually do anything. The trustee seems to believe that the *Wagoner* rule is defeated by a would-a, could-a, should-a test but that is simply not the law. Further in *CBI,* unlike the case at bar, its 48% shareholder, TCW, was innocent and ignorant of the scheme, and the court found that one of TCW's representatives on the board was ready to expose the fraud had he only had exposure to it. *See id.* at 360 (findings of fact ¶ 130), 365 (conclusions of law ¶ 15). Hardly the fact pattern here. In this lawsuit, the Bennett family was in control of every aspect of every activity within the BFG empire, including the fraud, from the get-go.

Further, the trustee overlooks the rule whereby without a personal stake in the outcome of the controversy, the suit fails the case or controversy constitutional requirement. *See Warth v. Seldin,* 422 U.S. 490, 498-99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). As the *Wagoner* court explained:

> [U]nless the party whose standing is at issue has a personal stake in the outcome of the controversy, the suit does not meet the case or controversy requirement of the Constitution. A party must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.... [T]he "case or controversy" requirement coincides with the scope of the powers the Bankruptcy Code gives a trustee, that is, if a trustee has no power to assert a claim because it is not one belonging to the bankrupt estate, then he also fails to meet the *102 prudential limitation that the legal rights asserted must be his own.

*Wagoner,* 944 F.2d at 118 (citations and internal quotations omitted). Put another way, "[a] claim against a third party for defrauding a corporation with the cooperation of management, accrues to creditors, not to the guilty corporation." *Wagoner,* 944 F.2d at 120. As the Court noted, "even when defrauded creditors assigned to the trustee their claims against another for aiding and abetting the fraud the trustee lacked capacity to sue." *Id.* at 118 (citing *Barnes v. Schatzkin,* 215 A.D. 10, 13, 212 N.Y.S. 536 (N.Y.App.Div.1925)).

In short, we hold that the defrauded investors and not the bankruptcy trustee are entitled to pursue the claims arising from the fraud.

## C. HEARING AND RIGHT TO A JURY TRIAL

The trustee contends that (1) the district court could not dismiss on standing grounds after denying a Rule 12(b) motion on the same ground; (2) the district court erred by holding an evidentiary hearing; and (3) the district court erred by resolving issues of credibility. The trustee contends that he was deprived of a jury trial in contravention of the Constitution and that this occurred by virtue of the district judge holding an evidentiary hearing as well as misapplication of the standard for summary judgment. We find no error. Denial of the motion to dismiss on standing grounds does not preclude later consideration on summary judgment or indeed at trial as standing is an aspect of subject matter jurisdiction. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In order to defeat a motion for summary judgment, the non-movant must show enough that a jury could reasonably find for the plaintiff.

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1983). The *Matsushita* test for summary judgment in a standing case such as this is no different. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Clearly, a court may conduct an evidentiary hearing prior to trial where a jurisdictional issue such as standing is at stake. *Filetech S.A. v. France Telecom, S.A.,* 157 F.3d 922, 932 (2d Cir.1998). Here, however, the trustee argues that a hearing was inappropriate because the facts necessary to determine whether standing existed are the same facts that would be decided by the jury with respect to defendants' in pari delicto defense. It is precisely these standards that the court below sought to meet with an evidentiary hearing. The hearing did not decide questions of fact but was rather an effort to flesh them out.

"The Advisory Committee for the Federal Rules has stated that `The mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for a trial.'" *Argus, Inc. v. Eastman Kodak, Co.,* 612 F.Supp. 904, 908 (S.D.N.Y.1985). The Court in *Argus,* a standing case where an evidentiary hearing was held, went on to say in that regard, "the court may use summary procedures to assay the alleged probative evidence of the plaintiffs in order to narrow the controverted issues to triable matters and to dispose of matters unsupported by admissible evidence." *Id.* at 908. The procedure outlined in the district court's decision was cited approvingly on appeal. *See Argus, Inc. v. Eastman Kodak, Co.,* 801 F.2d 38, 42 n. 2 (2d Cir.1986) ("[T]he district court was well within its discretion to conclude that a hearing would allow the court to assess the record expeditiously and accurately.").

*103 We find nothing wrong with the court's having followed that procedure here.

## CONCLUSION

The judgment of the District Court is affirmed.

[*] Honorable Harold Baer, Jr., United States District Judge for the Southern District of New York, sitting by designation.

Save trees - read court opinions online on Google Scholar.