**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CHICKEN SOUP FOR THE SOUL ENTERTAINMENT, INC., *et al.*,<br><br>Debtor. | Chapter 7<br><br>Case No. 24-11442-MFW<br>Jointly Administered |
| George L. Miller, Chapter 7 Trustee for the Estate of CHICKEN SOUP FOR THE SOUL ENTERTAINMENT, INC., *et al.*,<br><br>Plaintiff,<br><br>v.<br><br>See Defendants listed on the **Exhibit "A"** attached hereto,<br><br>Defendants. | **Hearing Date: December 9, 2026, at 2:00 p.m. ET**<br>**Objection Deadline: November 27, 2026, at 4:30 p.m. ET** |

**THIRD OMNIBUS MOTION OF GEORGE L. MILLER, CHAPTER 7 TRUSTEE FOR THE ESTATE OF CHICKEN SOUP FOR THE SOUL ENTERTAINMENT, INC., *et al.*, TO APPROVE SETTLEMENT AGREEMENTS**

George L. Miller, the chapter 7 trustee (the "Trustee") to the estates of the above-captioned Debtors (collectively, the "Debtor"), hereby files this Third Omnibus Motion (the "Motion") for an order, pursuant to sections 105(a) and 704 of title 11 of the United States Code, as amended (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rule(s)") approving the Settlement Agreements[1] with Wrigley

[1] True and correct copies of the Settlement Agreements are attached hereto and incorporated herein as **Exhibit "B."**

Media Group ("Wrigley"), The Asylum ("Asylum"), Reed Smith LLP ("Reed"), Prologis Targeted U.S. Logistics Fund, L.P. ("Prologis"), Gallagher Benefit Services, Inc. f/k/a Operations, Inc. ("Operations"), Magnolia Pictures, LLC ("Magnolia"), FTI Consulting, Inc. ("FTI"), FiveTran, Inc. ("FiveTran"), Deloitte Tax, LLP ("Deloitte"), Bond-It, LLC ("Bond It"), Akamai Technologies, Inc. ("Akamai"), Doniger Burroughs, PC ("DB"), All Channel Films, Inc. ("ACF"), Okta, Inc. ("Okta"), Level 3 Communications, LLC dba LUMEN Technologies ("LUMEN") and Brendamour Moving & Stoage ("Brendamour") (collectively, the "Defendants"). Defendants along with the Trustee, shall collectively be referred to as the "Parties." In support of the Motion, the Trustee respectfully avers as follows:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F) and (O). Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are §§ 105(a) and 704 of the Bankruptcy Code and Bankruptcy Rule 9019.

## BACKGROUND

1. On June 28, 2024 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned cases (collectively, the "Chapter 11 Cases") [ECF No. 1].

2. On July 11, 2024, the Court entered an *Order Converting Cases from Chapter 11 to Chapter 7 of the Bankruptcy Code and Granting Related Relief* (the "Chapter 7 Cases") [ECF No. 120].

3. On July 11, 2024, George L. Miller was appointed as the Chapter 7 Trustee of the Debtors' estates. The Trustee is the Plaintiff in this action and brings this action on behalf of the Debtors' estates [ECF No. 130].

4. Prior to the Petition Date, the Debtors provided entertainment content to value-conscious consumers. The Debtors' flagship services were Redbox, Crackle, and Chicken Soup for the Soul.

5. The Debtors' business operations comprised the following four business segments: (i) streaming services, including advertising-supported video-on-demand (AVOD) services, transaction video-on demand (TVOD) services, and free-ad supported streaming television (FAST); (ii) physical media rentals via Redbox kiosks and related kiosk service; (iii) content acquisition and distribution; and (iv) content production.

6. Chicken Soup for the Soul Entertainment ("CSSE") was a Delaware corporation formed on May 4, 2016, and an indirect subsidiary of Chicken Soup for the Soul, LLC, which published the famous Chicken Soup for the Soul book series and super-premium pet food under the Chicken Soup for the Soul brand name.

7. In August 2022, CSSE acquired the Redbox business and its subsidiaries assumed and became co-obligors on approximately $359.9 million of indebtedness under the Pre-Petition Secured Facility (the "Redbox Acquisition").

8. The massive debt load from the Redbox Acquisition combined with declining DVD rentals, severe operational losses, and unpaid vendor bills triggered an acute liquidity crisis that destroyed the Debtors' financial runway. When their primary lender refused emergency financing, the Debtors were left with no operational capital. Starved of cash, the company missed

payroll and defaulted on employee healthcare benefits, forcing them to seek immediate bankruptcy relief.

9. Additional information regarding the Debtors' business, their capital structure, and the circumstances leading to the filing of the Chapter 11 Cases is set forth in the *Declaration of William J. Rouhana, Jr., Chairman of the Board, in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration").

10. During the ninety (90) days before the Petition Date, the period between March 30, 2024, and June 28, 2024 (the "Preference Period"), the Debtors continued to operate their business affairs, including the transfer of property, either by checks, cashier checks, wire transfers, ACH transfers, direct deposits, credit card payment, or otherwise to various entities.

11. Upon information and belief, the Defendants provided various services to or for the Debtor prior to the Petition Date, as more fully disclosed herein.

2. Upon information and belief, prior to the Petition Date, Defendants and the Debtor were engaged in one or more business transactions, which are evidenced by one or more contracts, purchase orders, invoices, communications, and other documents (collectively, the "Agreements"). The Agreements concerned and related to the services provided by Defendants to the Debtor as described therein.

3. According to the Schedules of Assets and Liabilities and Statement of Financial Affairs (collectively, the "Schedules"), the Debtor's books and records, the Debtor's financial information in a Cloud, the Debtor's Bank Statements, and financial information received pursuant to Rule 2004 requests, the Debtor made one or more transfers of an interest of the Debtor's property through payments in amounts not less than those set forth below to the respective Defendants during the Preference Period:

a. Not less than $15,000 to Wrigley (the "Wrigley Transfers");

b. Not less than $25,000 to Asylum (the "Asylum Transfers");

c. Not less than $935,027.20 to Reed (the "Reed Transfers");

d. Not less than $211,714.94 to Prologis (the "Prologis Transfers);

e. Not less than $35,000.00 to Operations (the "Operations Transfers");

f. Not less than $65,000.00 to Magnolia (the "Magnolia Transfers");

g. Not less than $50,000.00 to FTI (the "FTI Transfers");

h. Not less than $30,955.16 to FiveTran (the "FiveTran Transfers");

i. Not less than $138,079.00 to Deloitte (the "Deloitte Transfers");

j. Not less than $80,000.00 to Bond It (the "Bond It Transfers");

k. Not less than $250,000.00 to Akamai (the "Akamai Transfers");

l. Not less than $11,524.61 to Doniger Burroughs PC (the "DB Transfers");

m. Not less than $10,000.00 to All Channel Films, Inc. (the "ACF Transfers");

n. Not less than $105,983.49 to Okta, Inc. (the "Okta Transfers");

o. Not less than $35,380.84 to Level 3 Communications, LLC dba LUMEN Technologies (the "LUMEN Transfers");

p. Not less than $550,000.00 to Brendamour (the "Brendamour Transfers").

q. The Wrigley Transfers, Asylum Transfers, Reed Transfers, Prologis Transfers, Operations Transfers, Magnolia Transfers, FTI Transfers, FiveTran Transfers, Deliotte Transfers, Bond It Transfers, Akamai Transfers, DB Transfers, ACF Transfers, Okta Transfers, LUMEN Transfers and Brendamour Transfers shall collectively be referred to as the "Transfers."

4. On June 24, 2026, a complaint was filed against Wrigley Media Group in the Bankruptcy Court, styled *Miller v. Wrigley Media Group* (the "Wrigley Complaint").

5. On June 24, 2026, a complaint was filed against Asylum in the Bankruptcy Court, styled *Miller v. The Asylum* (the "Asylum Complaint").

6. On June 24, 2026, a complaint was filed against Prologis in the Bankruptcy Court, styled *Miller v. Prologis* (the "Prologis Complaint").

7. On June 23, 2026, a complaint was filed against Operations in the Bankruptcy Court, styled *Miller v. Operations, Inc.* (the "Operation Complaint").

8. On June 25, 2026, a complaint was filed against Magnolia in the Bankruptcy Court, styled *Miller v. Magnolia Pictures, LLC (*the "Magnolia Complaint").

9. On June 23, 2026, a complaint was filed against FTI in the Bankruptcy Court, styled *Miller v. FTI Consulting, Inc.* (the "FTI Complaint").

10. On June 23, 2026, a complaint was filed against FiveTran in the Bankruptcy Court, styled *Miller v. FiveTran, Inc.*(the "FiveTran Complaint").

11. On June 23, 2026, a complaint was filed against Bond It in the Bankruptcy Court, styled *Miller v. Bond-It, LLC* (the "Bond It Complaint").

12. On June 23, 2026, a complaint was filed against Akamai in the Bankruptcy Court, styled *Miller v. Akamai Technologies, Inc.* (the "Akamai Complaint").

13. On June 23, 2026, a complaint was filed against DB in the Bankruptcy Court, styled *Miller v. Doniger Burroughs, PC* (the "DB Complaint").

14. On June 23, 2026, a complaint was filed against ACF in the Bankruptcy Court, styled *Miller v. All Channel Films, Inc.* (the "ACF Complaint").

15. On June 23, 2026, a complaint was filed against Okta in the Bankruptcy Court, styled *Miller v. Okta, Inc.* (the "Okta Complaint").

16. On June 23, 2026, a complaint was filed against Level 3 Communications, LLC dba LUMEN Technologies in the Bankruptcy Court, styled *Miller v. Level 3 Communications, LLC* (the "LUMEN Complaint").

17. On June 24, 2026, a complaint was filed against Brendamour in the Bankruptcy Court, styled *Miller v. Brendamour Moving & Storage* (the "Brendamour Complaint").

18. After much negotiation, the Parties have been able to reach a full and final settlement relating to each of the Transfers.

19. As set forth in each of the respective Settlement Agreements[2], the Parties have agreed to the following:

a. With respect to Wrigley, Wrigley has agreed to pay $10,000.00 in full and final settlement of the Wrigley Transfers;

b. With respect to Asylum, Asylum has agreed to pay $10,000.00 in five (5) installments in full and final settlement of the Asylum Transfers;

c. With respect to Reed, Reed has agreed to pay $25,000.00 in full and final settlement of the Reed Transfers;

d. With respect to Prologis, Prologis has agreed to pay $22,000.00 in full and final settlement of the Prologis Transfers;

e. With respect to Operations, Operations has agreed to pay $2,073.75 in full and final settlement of the Operations Transfers;

---

[2] The description contained herein is qualified in its entirety by reference to the individual Settlement Agreements attached hereto as collective **Exhibit "B."**

f. With respect to Magnolia, Magnolia has agreed to pay $10,000.00 in full and final settlement of the Magnolia Transfers.

g. With respect to FTI, FTI has agreed to pay $10,000.00 in full and final settlement of the FTI Transfers.

h. With respect to FiveTran, FiveTran has agreed to pay $12,500.00 in full and final settlement of the FiveTran Transfers.

i. With respect to Deloitte, Deloitte has agreed to pay $12,500.00 in full and final settlement of the Deloitte Transfers.

j. With respect to Bond It, Bond It has agreed to pay $30,000.00 in full and final settlement of the Bond It Transfers.

k. With respect to Akamai, Akamai has agreed to pay $30,000.00 in full and final settlement of the Akamai Transfers.

l. With respect to DB, DB has agreed to pay $5,000.00 in full and final settlement of the DB Transfers.

m. With respect to ACF, ACF has agreed to pay $2,500.00 in full and final settlement of the ACF Transfers.

n. With respect to Okta, Okta has agreed to pay $27,500.00 in full and final settlement on the Okta Transfers.

o. With respect to LUMEN, LUMEN has agreed to pay $10,000.00 in full and final settlement of the LUMEN Transfers.

p. With respect to Brendamour, Brendamour has agreed to pay $30,000.00 in full and final settlement of the Brendamour Transfers.

## RELIEF REQUESTED

20. By this Motion, the Trustee seeks this Court's approval of the Settlement Agreements pursuant to sections 105 and 704 of the Bankruptcy Code and Bankruptcy Rule 9019.

## BASIS FOR RELIEF

21. This court has the authority to grant the relief requested in this Motion pursuant to section 105 of the Bankruptcy Code and Bankruptcy Rule 9019. Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." Bankruptcy Rule 9019 grants the Court authority to approve settlements of claims and controversies after notice and a hearing.[3] Under this authority, the Third Circuit has emphasized that to "to minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'" *Myers v. Martin (In re Martin)*, 91 F. 3d. 389, 393 (3d Cir, 1996) (quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993). In addition, this District has recognized that the approval of a proposed compromise and settlement is committed to the sound discretion of the bankruptcy court. *See In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997).

22. Settlements in bankruptcy are favored as a means of minimizing litigation, expediting the administration of the bankruptcy estates, and providing for the efficient resolution of bankruptcy cases. *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996); *In re Mavrode*, 205 B.R. 716, 719 (Bankr. D.N.J. 1997). To achieve these results, Bankruptcy Rule 9019(a) empowers a bankruptcy court to approve a settlement or compromise by a debtor after notice and a hearing. FED R. BANKR. P. 9019(a).

---

[3] Bankruptcy Rule 9019 provides in pertinent part that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."

23. Before approving a settlement under Bankruptcy Rule 9019, a court must determine whether "the compromise is fair, reasonable, and in the interests of the estate." *In re Marvel Entertainment Group, Inc.*, 222 B.R. 243, 249 (D. Del. 1998) (*quoting Louise's*, 211 B.R. at 801). To reach such a determination, the court must assess the value of the claim that is being settled and balance it against the value to the estate of the approval of the settlement. *Martin*, 91 F.3d at 393. In striking this balance, the court should consider the following factors:

a. The probability of success in the litigation;

b. The complexity, expense, and likely duration of the litigation;

c. The possibilities of collecting any judgment which might be obtained;

d. All other factors relevant to making a full and fair assessment of the wisdom of the proposed compromise; and

e. Whether the proposed compromise is fair and equitable to the debtors, their creditors, and other parties in interest. *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424-425 (1968). *See also Martin*, 91 F.3d at 393. Basic to the process of evaluating proposed settlements is "the need to compare the terms of the compromise with the likely rewards of litigation." *TMT Trailer Ferry*, 390 U.S. at 425. The *TMT* rule does not require the Court to hold a full evidentiary hearing before compromise can be approved, rather, the Court's obligation is "to canvas the issues and see whether the settlement 'falls below the lowest point in a range of reasonableness.'" Collier on Bankruptcy, ¶ 9019.2, 9019-4 (15th ed.) (*quoting In re Drexel Lambert Group, Inc.*, 134 B.R. 493 (Bankr. S.D.N.Y. 1991)). *See also, Cosoff v. Rodman (In re W.T. Grant Co.),* 699 F.2d 599, 608 (2d Cir. 1983).

24. When applying the above criteria to the facts of a particular case, a bankruptcy court does not have to conduct a mini-trial to determine the probable outcome of any claims waived in the settlement. *Cajun Electric Power Cooperative Inc.*, 119 F.3d at 356. Nor does a bankruptcy court have to conduct an evidentiary hearing as a prerequisite to approving a settlement. *In re Depositer*, 36 F.3d 582, 586 (7th Cir. 1994).

25. The bankruptcy court must, however, gather all of the relevant facts and law so that it can make an informed, intelligent, and objective decision with respect to approving the settlement. *Depositer*, 36 F.3d at 586. *See also Cajun Electric Power Cooperative*, 119 F.3d at 356. In the present matter, as set forth in detail in the attached **Exhibit "B",** the Settlement Agreements fall well within the range of reasonableness, and accordingly, should be approved. The Trustee has reviewed all relevant defenses and has agreed to settle with the Defendants as set forth in the attached **Exhibit "A."**

26. Therefore, the Trustee has determined that the terms set forth in the Settlement Agreements are in the best interests of the estates and all of the creditors and are reasonable and within the Trustee's sound business judgement.

## NOTICE

27. Notice of the Motion has been served on the Office of the United States Trustee, the Defendants or their counsel, and the parties requesting notice pursuant to Bankruptcy Rule 2002. The Trustee submits that each notice is sufficient.

**WHEREFORE**, the Trustee respectfully requests that this Court enter an order approving the Settlement Agreements and granting such other relief as may be just and

appropriate under the circumstances.

Dated: November 13, 2026
Wilmington, Delaware

**CIARDI CIARDI & ASTIN**

By: ***/s/ John D. McLaughlin, Jr.***
John D. McLaughlin, Jr.
DE Bar ID No. 4123
1204 N. King Street
Wilmington, DE 19801
Telephone: 484-437-2676
jmclaughlin@ciardilaw.com

-and-

Albert A. Ciardi III
1905 Spruce Street
Philadelphia, PA 19103
Telephone: 215-557-3550
Facsimile: 215-557-3551
aciardi@ciardilaw.com

*Counsel to the Chapter 7 Trustee*